# 12-338-cv

## United States Court of Appeals
### for the
## Second Circuit

◦❙❘❙◦

PREDRAG CICVARA,

*Plaintiff-Appellant,*

– v. –

PROCTOR & GAMBLE CO., DURACELL,
LYNNE BURNETT,

*Defendants,*

– and –

GILLETTE CO., PROCTOR & GAMBLE CO., INC.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## JOINT APPENDIX
### Volume I of III (Pages A-1 to A-282)

SEYFARTH SHAW LLP
One Century Plaza, Suite 3500
2092 Century Park East
Los Angeles, California 90067
(312) 460-5831

    – and –

131 South Dearborn Street, Suite 2400
Chicago, Illinois 6063
(312) 460-5914

*Attorneys for Defendants-Appellees*

LAW OFFICE OF IGOR I. SIKORSKY, JR.
*Attorneys for Plaintiff-Appellant*
P.O. Box 38, 121 Perry Street
Unionville, Connecticut 06085
(860) 675-5313

Case 12-338, Document 57, 07/23/2012, 671466, Page2 of 291

i

# Table of Contents

**Page**

i

# Table of Contents

**Page**

District Court Docket Sheet for Case No.
3:09-cv-02054-JCH .................................................................. A-1

Notice of Removal, Dated December 15, 2009 ......................... A-14

First Amended Complaint, Dated January 6, 2010 .................... A-26

Plaintiff's Motion for Joinder and Remand to State Court,
Dated January 6, 2010 ............................................................ A-34

Answer and Affirmation Defenses, by Defendants The Gillette
Company and Proctor & Gamble Company, Inc. ("Proctor
& Gamble"), Dated January 22, 2010 .................................... A-37

Notice of Motion to Dismiss Count Eight and Lynne Burnett
from the Amended Complaint, Dated January 22, 2010 ......... A-48

Affidavit of Defendant Lynne Burnett, in Support of Motion
and in Opposition to Plaintiff's Motion, Dated
January 22, 2010 .................................................................... A-50

Defendant Burnett's Memorandum of Law in Support of her
Motion to Dismiss Count Eight to the Amended Complaint
and Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion to Remand to State Court and for Joinder,
Dated January 22, 2010 .......................................................... A-53

Plaintiff Cicvara's Objection to Defendant's Motion to Dismiss
Count Eight to the Amended Complaint with Annexed
Memorandum of Law in Opposition to Defendant's Motion
to Dismiss Count Eight to the Amended Complaint,
Dated February 12, 2010 ........................................................ A-69

Plaintiff's Cicvara's Memorandum of Law in Opposition
to Defendant's Motion to Dismiss Count Eight to the
Amended Complaint, Dated February 12, 2010 ..................... A-82

Defendant Lynne Burnett's Reply Memorandum of Law in
Further Support of her Motion to Dismiss Count Eight,
Dated February 25, 2010 ........................................................ A-93

Notice of Motion, by Plaintiff, for Leave to First Withdraw
Motion to Permit Joinder of an Additional Party and
Remand the Case to the Superior Court of Connecticut,
Dated March 22, 2010 ............................................................ A-104

ii

**Page**

Plaintiff's Motion to Compel Discovery and Supporting
　　Memorandum, Dated July 16, 2010 ........................................ A-106

Defendants' Memorandum of Law in Opposition to Plaintiff's
　　Motion to Compel Discovery, Dated July 7, 2010 .................. A-122

　　Exhibit A to Memorandum of Law -
　　Email from Predrag Cicvara to Bel Liu,
　　Sent June 10, 2009 ................................................................. A-142

Minute Entry before the Hon. Janet C. Hall,
　　Held July 20, 2010 ................................................................. A-144

Notice of Motion, by Defendants Proctor & Gamble,
　　for Summary Judgment, Dated April 15, 2011 ....................... A-145

Defendants' Memorandum of Law in Support of their Motion
　　for Summary Judgment, Dated April 15, 2011 ....................... A-147

Defendants' Statement of Undisputed Material Facts Pursuant
　　to Local Rule 56.1(a)(1), Dated April 15, 2011 ..................... A-177

Declaration of Edward Cerasia, for Defendants Proctor &
　　Gamble, in Support of Motion, Dated April 15, 2011 ............ A-194

　　Exhibit A to Cerasia Declaration -
　　Examination Before Trial ("EBT") of Plaintiff Predrag
　　Cicvara, Taken December 21, 2010 (excerpt pages) .............. A-196

　　Exhibit B to Cerasia Declaration -

　　　　(i) Proctor & Gamble Worldwide Business Conduct
　　　　Manual, Dated December 12, 2005
　　　　(Cicvara Deposition Exhibits 1–3) ..................................... A-215

　　　　(ii) Job Description (Cicvara Deposition Exhibit 4) ........... A-282

　　　　(iii) Email between Bel Liu and Predrag Cicvara, Sent
　　　　June 12, 2009 (Cicvara Deposition Exhibit 5) .................... A-284

　　　　(iv) Email between Bel Liu and Predrag Cicvara, Sent
　　　　June 12, 2009 (Cicvara Deposition Exhibit 6) .................... A-285

　　　　(v) Email between Bel Liu and Predrag Cicvara, Sent
　　　　June 12, 2009 (Cicvara Deposition Exhibit 7) .................... A-286

　　　　(vi) Email between Bel Liu and Predrag Cicvara, Sent
　　　　June 12, 2009 (Cicvara Deposition Exhibit 9) .................... A-287

iii

**Page**

(vii) Email between Bel Liu and Predrag Cicvara, Sent
June 10, 2009 (Cicvara Deposition Exhibit 10) .................. A-288

(viii) Transcription of Conversation with Predrag Cicvara,
Dated June 15, 2009 (Cicvara Deposition Exhibit 11)........ A-290

(ix) Email from Andrew Yau to Nitesh Singh, Sent
June 14, 2009 (Cicvara Deposition Exhibit 12) .................. A-294

(x) Letter from Peggy Wilczewski to Predrag Cicvara,
Dated June 16, 2009 (Cicvara Deposition Exhibit 13)........ A-295

(xi) Email from Peggy Wilczewski to Predrag Cicvara,
Sent September 16, 2009, with Annexed Short Term
Achievement Reward (Cicvara Deposition Exhibit 14)...... A-298

(xii) The Gillette Company, 1971 Stock Option Plan,
Dated December 13, 2005 (Cicvara Deposition
Exhibit 15)......................................................................... A-305

(xiii) Letter from Predrag Cicvara to Stock Option
Administration, Dated July 3, 2009, with Annexed Notice
of Exercise (Cicvara Deposition Exhibit 16) ...................... A-323

(xiv) Letter from Peggy Wilczewski to Predrag Cicvara,
Dated July 6, 2009 (Cicvara Deposition Exhibit 17) .......... A-328

Exhibit C to Cerasia Declaration -
Emails between Andrew Yau and Erik Lawson,
Sent June 16, 2009 to June 25, 2009 ...................................... A-330

Exhibit D to Cerasia Declaration -
Cicvara Stock Options/Future Shares Account Summary,
Dated December 14, 2009 ....................................................... A-334

Declaration of Peggy Wilczewski, for Proctor & Gamble,
in Support of Motion for Summary Judgment,
Dated April 14, 2011 ............................................................. A-336

Exhibit A to Wilczewski Declaration -
Email from Dina Schmude to Peggy Wilczewski,
Sent June 11, 2009 ................................................................. A-343

Exhibit B to Wilczewski Declaration -
Email from Peggy Wilczewski to Bel Liu, Sent June 11,
2009, with Annexed Phone Conversation Transcription ........ A-344

iv

**Page**

Exhibit C to Wilczewski Declaration -
Email from Peggy Wilczewski to Lynne Burnett, Sent
June 11, 2009, with Annexed Transcription of Telephone
Conversation between Bel Liu, Dina Schmude and
Peggy Wilczewski .................................................................. A-349

Exhibit D to Wilczewski Declaration -
Email from Bell Liu to Peggy Wilczewski,
with Attachments, Sent June 12, 2009 ................................... A-354

Exhibit E to Wilczewski Declaration -
Email from Peggy Wilczewski to Lynne Burnett,
with Attachments, Sent June 12, 2009 ................................... A-367

Exhibit F to Wilczewski Declaration -
Transcription of Conversation with Predrag Cicvara, Dated
June 15, 2009 (Cicvara Deposition Exhibit 11)
(Reproduced herein at pp. A-290–A-293).............................. A-382

Exhibit G to Wilczewski Declaration -
Transcription of Telephone Conversation between
Predrag Cicvara and Peggy Wilczewski, Dated
June 15, 2009, and June 16, 2009 .......................................... A-383

Exhibit H to Wilczewski Declaration -
Letter from Peggy Wilczewski to Predrag Cicvara, Dated
June 16, 2009 (Cicvara Deposition Exhibit 13)
(Reproduced herein at pp. A-295–A-297).............................. A-385

Exhibit I to Wilczewski Declaration -
Letter from Peggy Wilczewski to Predrag Cicvara, Dated
July 6, 2009 (Cicvara Deposition Exhibit 17)
(Reproduced herein at pp. A-328–A-329).............................. A-385

Exhibit J to Wilczewski Declaration -
Email from Peggy Wilczewski to Predrag Cicvara,
Sent September 16, 2009, with Annexed Short Term
Achievement Reward (Cicvara Deposition Exhibit 14)
(Reproduced herein at pp. A-298–A-304).............................. A-385

Declaration of Kevin Babis, for Defendants Proctor & Gamble,
in Support of Motion for Summary Judgment, Dated
April 15, 2011 ....................................................................... A-386

v

**Page**

Exhibit A to Babis Declaration -
Email from Kevin Babis to Dina Schmude,
Sent June 9, 2009 .................................................................. A-389

Exhibit B to Babis Declaration -
Transcription of Conversation with Predrag Cicvara, Dated
June 15, 2009 (Cicvara Deposition Exhibit 11)
(Reproduced herein at pp. A-290–A-293).............................. A-392

Plaintiff's Statement of Material Issues in Dispute,
Dated May 26, 2011 ................................................................ A-393

Exhibit A to Statement -
Email from Predrag Cicvara to Peggy Wilczewski,
Sent June 29, 2009 ................................................................ A-425

Exhibit B to Statement -

(a) Proctor & Gamble — World Wide Business
Conduct Manual ................................................................ A-426

(b) The Gillette Company, 1971 Stock Option Plan,
Dated December 13, 2005
(Reproduced herein at pp. A-323–A-327).......................... A-490

(c) Letter from Predrag Cicvara to Bel Liu ........................ A-491

(f) EBT of Plaintiff Predrag Cicvara,
Taken December 21, 2010.................................................. A-493

Exhibit C to Statement -
EBT of Plaintiff Predrag Cicvara, Taken December 21, 2010
(Reproduced herein at pp. A-493–A-691).............................. A-692

Exhibit D to Statement -
Motion by Plaintiff for Production of Documents,
Dated May 26, 2011 ................................................................ A-693

Exhibit E to Statement -
Defendants' Response and Objections to Plaintiff's Second
Request for Production of Documents with Annexed
Defendants' Response and Objection to Plaintiff's Second
Request for Interrogatories, Dated February 7, 2011.............. A-695

Exhibit F to Statement -

(i) T-Mobile Bill, Dated July 9, 2009.................................. A-716

vi

**Page**

(ii) Charted Timeline of T-Mobile Bill,
Dated June 8, 2009 ............................................................ A-718

Exhibit G to Statement -
Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion to Compel Discovery, Dated July 7, 2010
(Reproduced herein at pp. A-122–A-141).............................. A-720

Exhibit H to Statement -
Email between Andrew Yau and Erik Lawson,
Sent June 25, 2009 ............................................................ A-721

Exhibit I to Statement -
Letter from Peggy Wilczewski to Predrag Cicvara,
Dated June 16, 2009 ........................................................... A-723

Exhibit J to Statement -
Proctor & Gamble Severance Plan for Exempt Employees
— Summary Plan Description ............................................... A-725

Memorandum in Opposition to Gillette's Motion for Summary
Judgment and in Support of Cicvara's Cross-Motion
Argument Standard for Review, Dated May 26, 2011 ........... A-727

Notice of Cross-Motion, by Plaintiff, for Summary Judgment,
Dated May 26, 2011 ........................................................... A-734

Memorandum of Law, by Plaintiff, in Support of Cross-Motion
for Summary Judgment, Dated May 26, 2011 ....................... A-736

Plaintiff's Statement of Undisputed Material Facts Pursuant to
Local Rule 56.1(A)(1), and in Support of Cross-Motion for
Summary Judgment, Dated May 26, 2011 ............................. A-739

Affidavit of Plaintiff Predrag Cicvara,
Sworn to May 31, 2011 ....................................................... A-742

Exhibit A to Cicvara Affidavit -
Letter from Peggy Wilczewski to Predrag Cicvara,
Dated June 16, 2009
(Reproduced herein at pp. A-295–A-297).............................. A-762

Exhibit B to Cicvara Affidavit -
Salary Increase Notification ................................................. A-763

vii

**Page**

Exhibit C to Cicvara Affidavit -
Emails between Andrew Yau and Erik Lawson,
Sent June 16, 2009 to June 25, 2009
(Reproduced herein at A-330–A-333).................................... A-764

Exhibit D to Cicvara Affidavit -
Part 1 of Diversion (in Cicvara Deposition Exhibit B) ........... A-765

Exhibit E to Cicvara Affidavit -
Part 2 of Diversion (in Cicvara Deposition Exhibit C) ........... A-769

Exhibit F to Cicvara Affidavit -
Email from Rob DaPara to Predrag Cicvara,
Sent January 4, 2008 ............................................................... A-772

Exhibit G to Cicvara Affidavit -
T-Mobile Bill, Dated July 9, 2009
(Reproduced herein at A-716–A-717).................................... A-774

Exhibit H to Cicvara Affidavit -
Email from Dina Schmude to Bell Liu,
Sent June 10, 2009 ................................................................. A-775

Exhibit I to Cicvara Affidavit -
Letter from Michael Skiber to Proctor & Gamble,
Dated July 9, 2009.................................................................. A-779

Exhibit J to Cicvara Affidavit -

   (a) Proctor & Gamble — World Wide Business
   Conduct Manual
   (Reproduced herein at pp. A-426–A-489).......................... A-779

   (b) The Gillette Company, 1971 Stock Option Plan,
   Dated December 13, 2005
   (Reproduced herein at pp. A-323–A-327).......................... A-779

   (c) Letter from Predrag Cicvara to Bel Liu
   (Reproduced herein at p. A-491)........................................ A-779

   (f) EBT of Plaintiff Predrag Cicvara,
   Taken December 21, 2010
   (Reproduced herein at pp. A-493–A-691).......................... A-779

viii

**Page**

Exhibit K to Cicvara Affidavit -
Email from Predrag Cicvara to Peggy Wilczewski,
Sent June 29, 2009
(Reproduced herein at p. A-425)............................................. A-779

Exhibit L to Cicvara Affidavit -
Handwritten Notes, Dated June 15, 2009............................... A-780

Defendants' Reply Memorandum of Law in Further Support
of their Motion for Summary Judgment, Dated
July 16, 2011 ......................................................................... A-790

Defendants' Memorandum of Law in Opposition to Plaintiff's
Cross-Motion for Summary Judgment, Dated
July 16, 2011 ......................................................................... A-804

Defendants' Local Rule 569(a)(2) Statement in Response
to Plaintiff's Statement of Undisputed Material Facts,
Dated July 16, 2011................................................................ A-814

Ruling re: Defendant's Motion for Summary Judgment
(Doc. No. 74) and Plaintiff's Cross-Motion for Summary
Judgment (Doc. No. 85), Entered November 11, 2011........... A-820

Judgment of the Hon. Janet C. Hall, Entered
November 30, 2011, Appealed From...................................... A-833

Notice of Appeal, Dated January 19, 2012 ................................. A-834

APPEAL, CLOSED, EFILE

### U.S. District Court
### United States District Court for the District of Connecticut (New Haven)
### CIVIL DOCKET FOR CASE #: 3:09-cv-02054-JCH

| | |
|---|---|
| Cicvara v. Gillette Co et al | Date Filed: 12/17/2009 |
| Assigned to: Judge Janet C. Hall | Date Terminated: 11/30/2011 |
| Cause: 28:1332 Diversity-Notice of Removal | Jury Demand: Both |
| | Nature of Suit: 442 Civil Rights: Jobs |
| | Jurisdiction: Diversity |

**Plaintiff**

**Predrag Cicvara**                    represented by    **Igor I. Sikorsky , Jr.**
                                                         PO Box 38
                                                         Unionville, CT 06085
                                                         860-675-5313
                                                         Fax: 860-675-7104
                                                         Email: igorbox38@hotmail.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Michael E. Skiber**
                                                         Law Office of Michael E. Skiber, LLC
                                                         135 Elm Street
                                                         Bridgeport, CT 06604
                                                         203-615-0090
                                                         Email: skiberlaw@gmail.com
                                                         *TERMINATED: 11/05/2010*
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Gillette Co**                        represented by    **Edward Cerasia , II**
                                                         Ogletree, Deakins, Nash, Smoak &
                                                         Stewart, P.C.- NY
                                                         1745 Broadway 22nd Floor
                                                         New York, NY 10019
                                                         212-391-3890
                                                         Fax: 212-391-3891
                                                         Email:
                                                         edward.cerasia@ogletreedeakins.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Hema Chatlani**

**A-2**

Seyfarth Shaw - 8th Ave NY
620 Eighth Ave
New York, NY 10018-1405
212-218-5514
Fax: 917-344-1232
Email: hchatlani@seyfarth.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard I. Scharlat**
Greenberg, Traurig
Met Life Bldg.
200 Park Ave.
New York, NY 10166
Email: rscharlat@seyfarth.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Proctor & Gamble Co**          represented by **Edward Cerasia , II**
*TERMINATED: 01/06/2010*                      (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Richard I. Scharlat**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Duracell**

**Defendant**

**LYNNE BURNETT**          represented by **Edward Cerasia , II**
*TERMINATED: 07/22/2010*                      (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Hema Chatlani**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *PRO HAC VICE*
                                              *ATTORNEY TO BE NOTICED*

                                              **Richard I. Scharlat**
                                              Greenberg, Traurig
                                              200 Park Ave.
                                              New York, NY 10166
                                              Email: rscharlat@seyfarth.com

**A-3**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Proctor & Gamble Co., Inc**                 represented by   **Edward Cerasia , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hema Chatlani**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard I. Scharlat**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/17/2009 | 1 | NOTICE OF REMOVAL from JD of Fairfield, case number FBT-CV09-5028901-S., filed by Gillette Co, Proctor & Gamble Co. (Attachments: # 1 Exhibit)(Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 2 | NOTICE of Appearance by Richard I. Scharlat on behalf of Gillette Co, Proctor & Gamble Co (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 3 | NOTICE of Appearance by Edward Cerasia, II on behalf of Gillette Co, Proctor & Gamble Co (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 4 | Compliance with Standing Order by Gillette Co, Proctor & Gamble Co (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 5 | NOTICE of No Pending Motions by Gillette Co, Proctor & Gamble Co (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 6 | Corporate Disclosure Statement by Gillette Co, Proctor & Gamble Co. (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 7 | ELECTRONIC FILING ORDER - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Janet C. Hall on 12/17/09. (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 8 | PROTECTIVE ORDER. Signed by Judge Janet C. Hall on 12/17/09. (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 9 | Order on Pretrial Deadlines: Motions to Dismiss due on 3/17/2010. Amended Pleadings due by 2/15/2010 Discovery due by 6/18/2010 Dispositive Motions due by 7/18/2010. Signed by Clerk on 12/17/09. (Bauer, J.) (Entered: 12/22/2009) |

Case 12-338, Document 57, 07/23/2012, 671466, Page13 of 291

**A-4**

| | | |
|---|---|---|
| 12/17/2009 | | Filing fee: $ 350.00, receipt number B018994 (Jaiman, R.) (Entered: 12/22/2009) |
| 12/22/2009 | 10 | Consent MOTION for Extension of Time until January 22, 2010 (pursuant to Local Rule 7(b)) to file a responsive pleading to Plaintiffs Complaint re: 1 Notice of Removal by Gillette Co, Proctor & Gamble Co. (Attachments: # 1 Certificate of Service)(Cerasia, Edward) (Entered: 12/22/2009) |
| 12/23/2009 | 11 | ORDER granting 10 Motion for Extension of Time. The court expects this will be the only extension. SO ORDERED by Judge Janet C. Hall on 12/23/09. (Volek, J.) (Entered: 12/23/2009) |
| 12/29/2009 | | Answer deadline updated for Gillette Co to 1/22/2010; Proctor & Gamble Co to 1/22/2010. (DeRubeis, B.) (Entered: 12/29/2009) |
| 01/06/2010 | 12 | NOTICE of Appearance by Michael E. Skiber on behalf of Predrag Cicvara (Skiber, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 13 | First MOTION to Amend/Correct *COMPLAINT ONCE AS A MATTER OR COURSE* by Predrag Cicvara.Responses due by 1/27/2010 (Skiber, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 14 | AMENDED COMPLAINT *ONCE AS A MATTER OF COURSE* against all defendants, filed by Predrag Cicvara.(Skiber, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 15 | First MOTION to Remand to State Court *AND JOINDER OF PARTY* by Predrag Cicvara.Responses due by 1/27/2010 (Skiber, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 16 | First Memorandum in Support re 15 First MOTION to Remand to State Court *AND JOINDER OF PARTY* filed by Predrag Cicvara. (Skiber, Michael) Modified on 1/22/2010 TO CREATE DOCKET ENTRY RELATIONSHIP TO DOC #17 (Simpson, T.). (Entered: 01/06/2010) |
| 01/06/2010 | 17 | MOTION for Joinder by Predrag Cicvara -ORIGINALLY E-FILED IN ERROR AS PART OF DOCUMENT # 15; REDOCKETED TO PROPERLY IDENTIFY AS A TWO PART MOTION (Simpson, T.) (Entered: 01/22/2010) |
| 01/11/2010 | | Summons Issued as to LYNNE BURNETT. (Simpson, T.) (Entered: 01/11/2010) |
| 01/22/2010 | 18 | ANSWER to 14 Amended Complaint with Affirmative Defenses. *dated 1/22/2010* by Gillette Co, LYNNE BURNETT, Proctor & Gamble Co. (Scharlat, Richard) (Entered: 01/22/2010) |
| 01/22/2010 | 19 | CERTIFICATE OF SERVICE by Gillette Co, Proctor & Gamble Co., Inc re 18 Answer to Amended Complaint (Scharlat, Richard) (Entered: 01/22/2010) |
| 01/22/2010 | 20 | MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint* by Gillette Co, LYNNE BURNETT, Proctor & Gamble Co., Inc.Responses due by 2/12/2010 (Attachments: # 1 Affidavit of Lynne Burnett dated 1/16/2010 in support of motion, # 2 Certificate of Service dated 1/22/2010)(Scharlat, Richard) (Entered: 01/22/2010) |
| | | |

| 01/22/2010 | 21 | Memorandum in Support re 20 MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint dated 1/22/2010 and in opposition to plaintiff's motion to remand to state court and for joinder* filed by Gillette Co, LYNNE BURNETT, Proctor & Gamble Co., Inc, Proctor & Gamble Co. (Scharlat, Richard) (Entered: 01/22/2010) |
|---|---|---|
| 02/12/2010 | 22 | OBJECTION re 20 MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint* filed by Predrag Cicvara. (Attachments: # 1 Memorandum in Support OBJECTION TO MOTION TO DISMISS)(Skiber, Michael) (Entered: 02/12/2010) |
| 02/12/2010 | 23 | RESPONSE re 18 Answer to Amended Complaint *REPLY TO SPECIAL DEFENSES* by Predrag Cicvara. (Attachments: # 1 Affidavit CERTIFICATION OF SERVICE)(Skiber, Michael) (Entered: 02/12/2010) |
| 02/12/2010 | 24 | CERTIFICATE OF SERVICE by Predrag Cicvara *OBJECTION TO MOTION TO DISMISS* (Skiber, Michael) (Entered: 02/12/2010) |
| 02/12/2010 | 25 | Memorandum in Opposition re 20 MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint* filed by Predrag Cicvara. (Skiber, Michael) (Entered: 02/12/2010) |
| 02/25/2010 | 26 | REPLY to Response to 20 MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint* filed by LYNNE BURNETT. (Attachments: # 1 Certificate of Service)(Cerasia, Edward) (Entered: 02/25/2010) |
| 03/08/2010 | 27 | NOTICE TO COUNSEL/PRO SE PARTIES, ( Rule 26 Meeting Report due by 3/29/2010). Signed by Clerk on 3/8/10. (Gutierrez, Y.) (Entered: 03/10/2010) |
| 03/19/2010 | 28 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Conference set for 3/24/2010 02:00 PM in Chambers Room 417, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. Counsel are requested to participate in this conference via telephone. This conference call is to be arranged between counsel. Once all parties are on the line, please telephone chambers at (203) 579-5554 (Volek, J.) (Entered: 03/19/2010) |
| 03/22/2010 | 29 | First MOTION to Withdraw 15 First MOTION to Remand to State Court *AND 17 Motion for Joinder of Party Lynne Burnett* by Predrag Cicvara. (Attachments: # 1 Affidavit Certificate of Service)(Skiber, Michael) Modified on 3/23/2010 TO CREATE DOCKET ENTRY RELATIONSHIP TO DOC #17 (Simpson, T.). (Entered: 03/22/2010) |
| 03/24/2010 | 30 | Joint REPORT of Rule 26(f) Planning Meeting. (Attachments: # 1 Joint Statement Pursuant to Clerks Order Dated March 8, 2010)(Cerasia, Edward) (Entered: 03/24/2010) |
| 03/24/2010 | 31 | Minute Entry. Telephone Conference held before Judge Janet C. Hall on 3/24/2010: granting as of right 13 Motion to Amend/Correct; granting 29 Motion to Withdraw; withdrawing 15 Motion to Remand to State Court; |

| | | |
|---|---|---|
| | | withdrawing 17 Motion for Joinder, for the reasons stated on the record. 15 minutes (Court Reporter T. Fidanza.) (Volek, J.) (Entered: 03/24/2010) |
| 03/31/2010 | 32 | SCHEDULING ORDER re: 30 Joint REPORT of Rule 26(f) Planning Meeting. Discovery due by 8/1/2010 Dispositive Motions due by 9/1/2010 Status Report due by 6/30/2010 Trial Brief due by 9/1/2010. Signed by Judge Janet C. Hall on 3/31/2010. (Simpson, T.) (Entered: 03/31/2010) |
| 05/20/2010 | 33 | MOTION for Leave to Appear Pro Hac Vice Attorney Hema Chatlani. Filing Fee $25.00. Receipt Number B019726. by LYNNE BURNETT, Gillette Co, Proctor & Gamble Co., Inc. (Simpson, T.) Modified on 5/21/2010 (Villano, P.). (Entered: 05/20/2010) |
| 05/20/2010 | 34 | ORDER granting 33 Motion for Attorney Hema Chatlani to Appear Pro Hac Vice. Signed by Clerk on 5/20/2010. (Simpson, T.) Modified on 5/21/2010 (Villano, P.). Modified on 5/21/2010 (Villano, P.). (Entered: 05/20/2010) |
| 05/21/2010 | 35 | Docket Entry Correction re 33 MOTION for Leave to Appear Pro Hac Vice Attorney Hema Chatlani. Filing Fee $25.00. Receipt Number B019726., 34 Order on Motion to Appear. Corrected attorney's name that is appearing pro hac vice (Villano, P.) (Entered: 05/21/2010) |
| 06/01/2010 | 36 | PROPOSED ORDER *GOVERNING THE TREATMENT OF CONFIDENTIAL MATERIAL, filed* by LYNNE BURNETT, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Text of Proposed Order) (Cerasia, Edward) (Entered: 06/01/2010) |
| 06/09/2010 | 37 | NOTICE of Appearance by Hema Chatlani on behalf of LYNNE BURNETT, Gillette Co, Proctor & Gamble Co., Inc (Chatlani, Hema) (Entered: 06/09/2010) |
| 06/14/2010 | 38 | MOTION for Extension of Time until July 15, 2010 Rule 26(a)(2)(B) Disclosures 32 Scheduling Order, by Predrag Cicvara. (Skiber, Michael) (Entered: 06/14/2010) |
| 06/16/2010 | 39 | MOTION to Compel *Production of Documents* by Predrag Cicvara.Responses due by 7/7/2010 (Attachments: # 1 Affidavit Certification of Service, # 2 Exhibit Notice of Manual Filing)(Skiber, Michael) (Entered: 06/16/2010) |
| 06/17/2010 | 40 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing as to 39 MOTION to Compel Production of Documents set for 6/29/2010 10:30 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. (Volek, J.) (Entered: 06/17/2010) |
| 06/22/2010 | 41 | Consent MOTION to Continue . *filed* by LYNNE BURNETT, Gillette Co, Proctor & Gamble Co., Inc. (Cerasia, Edward) (Entered: 06/22/2010) |
| 06/23/2010 | 42 | ORDER granting 41 Motion to Continue. A rescheduled calendar will issue. SO ORDERED by Judge Janet C. Hall on 6/23/10. (Volek, J.) (Entered: 06/23/2010) |
| | | |

**A-7**

| 06/25/2010 | 43 | NOTICE OF rescheduled E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing as to 39 MOTION to Compel Production of Documents previously set for 6/29/2010 10:30 AM has been RESCHEDULED for 7/20/2010 03:30 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. (Volek, J.) (Entered: 06/25/2010) |
|---|---|---|
| 06/30/2010 | 44 | Joint STATUS REPORT *of COUNSEL, submitted in accordance with Judge Janet C. Hall's 3/31/10 SCHEDULING ORDER REGARDING CASE MANAGEMENT PLAN [Docket Entry No. 32], filed* by LYNNE BURNETT, Predrag Cicvara, Gillette Co, Proctor & Gamble Co., Inc. (Cerasia, Edward) (Entered: 06/30/2010) |
| 07/07/2010 | 45 | Memorandum in Opposition re 39 MOTION to Compel *Production of Documents* filed by LYNNE BURNETT, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Exhibit A, # 2 Certificate of Service)(Cerasia, Edward) (Entered: 07/07/2010) |
| 07/13/2010 | 46 | Sealed Document: Exhibits A-E to the Motion to Compel Discovery and Supporting Memorandum by Predrag Cicvara re 39 MOTION to Compel *Production of Documents*. (Simpson, T.) (Entered: 07/13/2010) |
| 07/22/2010 | 47 | Minute Entry. Proceedings held before Judge Janet C. Hall: Hearing held on 7/20/10, granting 38 Motion for Extension of Time nunc pro tunc; denying without prejudice to renew 39 Motion to Compel, and taking under advisement remaining request; granting 20 Motion to Dismiss, all as stated on the record. The plaintiff is granted leave to file a Second Amended Complaint. Total Time: 1 hours and 20 minutes. (Court Reporter T. Fidanza.) (Volek, J.) Modified on 7/29/2010 to correct motion relief(DeRubeis, B.). (Main Document 47 replaced on 7/29/2010) (DeRubeis, B.). (Entered: 07/22/2010) |
| 07/27/2010 | 48 | Joint MOTION for Extension of Time *re: Docket Entry # 32* Scheduling Order, by LYNNE BURNETT, Predrag Cicvara, Gillette Co, Proctor & Gamble Co., Inc, Duracell. (Cerasia, Edward) Modified on 7/28/2010 (Simpson, T.). (Entered: 07/27/2010) |
| 07/28/2010 | | Docket Entry Correction re 48 Joint MOTION for Extension of Time MODIFIED TO ADD DEFENDANT DURACELL AS A FILER TO THE DOCKET ENTRY (Simpson, T.) (Entered: 07/28/2010) |
| 07/29/2010 | 49 | Docket Entry Correction: Minute Entry corrected to reflect motion relief. Proceedings held before Judge Janet C. Hall: Hearing held on 7/20/10, granting 38 Motion for Extension of Time nunc pro tunc; denying without prejudice to renew 39 Motion to Compel, and taking under advisement remaining request; granting 20 Motion to Dismiss, all as stated on the record. The plaintiff is granted leave to file a Second Amended Complaint. Total Time: 1 hours and 20 minutes. (Court Reporter T. Fidanza.) (Volek, J.) Modified on 7/29/2010 to correct motion relief (DeRubeis, B.). (Main Document 47 replaced on 7/29/2010) (DeRubeis, B.) (Entered: 07/29/2010) |

A-8

| | | |
|---|---|---|
| 07/29/2010 | 50 | ORDER granting <u>48</u> Joint MOTION for Extension of Time re: Docket Entry # 32 Scheduling Order, by LYNNE BURNETT, Predrag Cicvara, Gillette Co, Proctor & Gamble Co., Inc, Duracell. The court notes that it does not recall suggesting plaintiff "file additional document requests." He is not barred from doing so, but he and the defendant should be mindful that the court does not expect to extend these deadlines. SO ORDERED by Judge Janet C. Hall on 7/29/2010. (DeRubeis, B.) (Entered: 07/29/2010) |
| 07/29/2010 | | Set Deadlines/Hearings: Discovery due by 12/15/2010 Dispositive Motions due by 1/17/2011 Trial Brief due by 1/17/2011 (DeRubeis, B.) (Entered: 07/29/2010) |
| 08/19/2010 | 51 | NOTICE by LYNNE BURNETT, Gillette Co, Proctor & Gamble Co., Inc (Attachments: # <u>1</u> Exhibit A to Defendants' Letter Notice, # <u>2</u> Exhibit B to Defendants' Letter Notice, # <u>3</u> Exhibit C to Defendants' Letter Notice, # <u>4</u> Exhibit D to Defendants' Letter Notice)(Cerasia, Edward) (Entered: 08/19/2010) |
| 09/02/2010 | 52 | NOTICE: If any discovery issues from the motions addressed on the record on 07/20/10 (Doc. nos. 47 & 49) remain pending after the filing of Defendants' Notice (Doc. no. 51), Plaintiff is directed to file a pleading raising those issues. Otherwise the court will assume those issues have been resolved. SO ORDERED by Judge Janet C. Hall on 09/02/10. (Hobbs, J.) (Entered: 09/02/2010) |
| 09/28/2010 | 53 | MOTION for Michael E. Skiber to Withdraw as Attorney by Predrag Cicvara. (Attachments: # <u>1</u> Affidavit Certification of Service)(Skiber, Michael) (Entered: 09/28/2010) |
| 09/28/2010 | 54 | Second STATUS REPORT *of COUNSEL, submitted (jointly) in accordance with Judge Janet C. Hall's 3/31/10 SCHEDULING ORDER REGARDING CASE MANAGEMENT PLAN [Docket Entry No. 32], filed* by LYNNE BURNETT, Gillette Co, Proctor & Gamble Co., Inc, Predrag Cicvara . (Cerasia, Edward) Modified on 9/29/2010 (Simpson, T.). (Entered: 09/28/2010) |
| 09/29/2010 | | Docket Entry Correction re <u>54</u> Status Report MODIFIED TO ADD PLAINTIFF AS A FILER TO THE DOCKET ENTRY (Simpson, T.) (Entered: 09/29/2010) |
| 09/30/2010 | 56 | NOTICE to PLAINTIFF re <u>53</u> MOTION for Michael E. Skiber to Withdraw as Attorney. Reset Deadlines as to <u>53</u> MOTION for Michael E. Skiber to Withdraw as Attorney.(Responses due by 10/21/2010, ). Signed by Judge Janet C. Hall on 9/30/2010. (Simpson, T.) (Entered: 10/05/2010) |
| 10/04/2010 | 55 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing on <u>53</u> Motion to Withdraw set for 10/27/2010 10:30 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall (Hobbs, J.) (Entered: 10/04/2010) |
| 10/26/2010 | 57 | NOTICE of Appearance by Igor I. Sikorsky, Jr on behalf of Predrag Cicvara |

|  |  | *Lead Counsel* (Sikorsky, Igor) (Entered: 10/26/2010) |
|---|---|---|
| 10/27/2010 | 58 | NOTICE re 55 Calendar Entry. The hearing on Attorney Skiber's Motion to Withdraw is canceled in light of the Notice of Appearance filed by Attorney Sikorsky. So ordered by Judge Janet C. Hall on 10/27/10. (Hobbs, J.) (Entered: 10/27/2010) |
| 11/05/2010 | 59 | ORDER granting 53 Motion to Withdraw as Attorney. Attorney Michael E. Skiber terminated. SO ORDERED by Judge Janet C. Hall on 11/5/2010. (DeRubeis, B.) (Entered: 11/05/2010) |
| 12/10/2010 | 60 | MOTION for Extension of Time , *filed* by LYNNE BURNETT, Gillette Co, Proctor & Gamble Co., Inc. (Cerasia, Edward) (Entered: 12/10/2010) |
| 12/10/2010 | 61 | First MOTION for Extension of Time until March 10, 2010 *For Present Counsel of Plaintiff* Plaintiff to Conclude Discovery by Predrag Cicvara. (Sikorsky, Igor) (Entered: 12/10/2010) |
| 12/13/2010 | 62 | ORDER granting 60 Motion for Extension of Time; granting in part 61 First MOTION for Extension of Time for Present Counsel of Plaintiff to Conclude Discovery by Predrag Cicvara. Discovery is to be completed by February 15, 2011 and dispositive motions by March 15, 2011. SO ORDERED by Judge Janet C. Hall on 12/13/2010. (DeRubeis, B.) (Entered: 12/13/2010) |
| 12/13/2010 |  | Set Deadlines/Hearings: Discovery due by 2/15/2011 Dispositive Motions due by 3/15/2011 (DeRubeis, B.) (Entered: 12/13/2010) |
| 12/27/2010 | 63 | Third STATUS REPORT *filed* by LYNNE BURNETT, Predrag Cicvara, Gillette Co, Proctor & Gamble Co, Proctor & Gamble Co., Inc. (Chatlani, Hema) (Entered: 12/27/2010) |
| 02/14/2011 | 64 | Second MOTION for Extension of Time until 03/20/2011 *of Discovery Time* Discovery by Predrag Cicvara. (Sikorsky, Igor) (Entered: 02/14/2011) |
| 02/15/2011 | 65 | ORDER granting in part to 3/1/2011 64 Second MOTION for Extension of Time for Discovery Time by Predrag Cicvara. SO ORDERED by Judge Janet C. Hall on 2/15/2011. (DeRubeis, B.) (Entered: 02/15/2011) |
| 02/15/2011 |  | Set Deadlines/Hearings: Discovery due by 3/1/2011 (DeRubeis, B.) (Entered: 02/15/2011) |
| 02/23/2011 | 66 | LETTER MOTION for Extension of Time by Gillette Co, Proctor & Gamble Co., Inc. (DeRubeis, B.) (Entered: 02/23/2011) |
| 02/23/2011 | 67 | ORDER granting 66 Letter Motion for Extension of Time. The court, treating this as a Motion to Extend the dispositive motion deadline, grants the motion to 4/1/2011. SO ORDERED by Judge Janet C. Hall on 2/23/2011. (DeRubeis, B.) (Entered: 02/23/2011) |
| 02/23/2011 |  | Set Deadlines/Hearings: Dispositive Motions due by 4/1/2011 (DeRubeis, B.) (Entered: 02/23/2011) |
| 02/25/2011 | 68 | First MOTION to Compel *Prodution of Documents* by Predrag Cicvara.Responses due by 3/18/2011 (Sikorsky, Igor) (Entered: 02/25/2011) |

Case 12-338, Document 57, 07/23/2012, 671466, Page19 of 291

**A-10**

| 03/10/2011 | 69 | Memorandum in Opposition re 68 First MOTION to Compel *Prodution of Documents* filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co, Proctor & Gamble Co., Inc. (Cerasia, Edward) (Entered: 03/10/2011) |
|---|---|---|
| 03/17/2011 | 70 | MOTION for Extension of Time until April 15, 2011 To File A Dispositive Motion by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co, Proctor & Gamble Co., Inc. (Cerasia, Edward) (Entered: 03/17/2011) |
| 03/21/2011 | 71 | ORDER granting 70 MOTION for Extension of Time until April 15, 2011 To File A Dispositive Motion by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. SO ORDERED by Judge Janet C. Hall on 3/21/2011. (DeRubeis, B.) (Entered: 03/21/2011) |
| 03/21/2011 | | Set Deadlines/Hearings: Dispositive Motions due by 4/15/2011 (DeRubeis, B.) (Entered: 03/21/2011) |
| 03/28/2011 | 72 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Conference re 68 Motion to Compel set for 4/6/2011 12:00 PM in Chambers Room 417, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. Counsel are requested to participate in this conference via telephone. This conference call is to be arranged between counsel. Once all parties are on the line, please telephone chambers at (203) 579-5554. (Hobbs, J.) (Entered: 03/28/2011) |
| 04/06/2011 | 73 | Minute Entry. Proceedings held before Judge Janet C. Hall: Motion Hearing re 68 First MOTION to Compel held on 4/6/2011. Ruling on the record denying 68 Motion to Compel. Defendant will provide additional disclosure as directed on the record. Total Time: 15 minutes(Court Reporter T. Fidanza) (Hobbs, J.) (Entered: 04/06/2011) |
| 04/15/2011 | 74 | MOTION for Summary Judgment by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc.Responses due by 5/6/2011 (Attachments: # 1 Memorandum in Support, # 2 Statement of Material Facts, # 3 Proof of Service)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 75 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Edward Cerasia II filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, Part 1 of 2, # 3 Exhibit B, Part 2 of 2, # 4 Exhibit C-D)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 76 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Dina Schmude filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Exhibit A-C)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 77 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Peggy Wilczewski filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Exhibit A-J)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 78 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Lynne |

| | | Burnett filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Exhibit A-B)(Cerasia, Edward) (Entered: 04/15/2011) |
|---|---|---|
| 04/15/2011 | 79 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Kevin Babis filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Exhibit A-B)(Cerasia, Edward) (Entered: 04/15/2011) |
| 05/03/2011 | 80 | First MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Summary Judgment until 05/27/2011 by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/03/2011) |
| 05/04/2011 | 81 | ORDER granting 80 Motion for Extension of Time to File Response/Reply re 74 MOTION for Summary Judgment. Responses due by 5/27/2011. SO ORDERED by Judge Janet C. Hall on 5/4/2011. (DeRubeis, B.) (Entered: 05/04/2011) |
| 05/26/2011 | 82 | First MOTION for Leave to File Excess Pages by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/26/2011 | 83 | First Statement of Material Facts re 74 MOTION for Summary Judgment *Material Facts In Dispute* filed by Predrag Cicvara. (Attachments: # 1 Exhibit Email June 29, 2009, # 2 Exhibit P&G Conduct Manual, # 3 Exhibit 1971 SOP plan 10 2004, # 4 Exhibit Letter to HK jULY 20, 2009, # 5 Exhibit Complete Depo Dec. 21, 2010, # 6 Exhibit Complete Deposition Dec. 21, 2010, # 7 Exhibit Motion for Production Jan. 3, 2011, # 8 Exhibit Defendant's Responses and Objections Feb. 7, 2011, # 9 Exhibit Blackberry Bill June 2009, # 10 Exhibit Explanation Table, # 11 Exhibit Sixth Text Message Bel Liu, # 12 Exhibit Def. Mem. of Law Opp. Plantiff July 7, 2010, # 13 Exhibit Email June 25, 2009, # 14 Exhibit Stock Options Letter June 16, 2009) (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/26/2011 | 84 | First Memorandum in Opposition *To Gillette's* re 74 MOTION for Summary Judgment filed by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/26/2011 | 85 | First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment* by Predrag Cicvara.Responses due by 6/16/2011 (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/26/2011 | 86 | First Memorandum in Support re 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment Memorandum In Support of Cicvara's Cross Motion For Summary Judgment* filed by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/26/2011 | 87 | First Statement of Material Facts re 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment,* 74 MOTION for Summary Judgment *Plaintiff's Statement Of Undisputed Material Facts Pursuant To Local Rule 56.1(A)(1)* filed by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/27/2011 | 88 | ENTERED IN ERROR - First EXHIBIT *Affidavit Of Predrag Cicvara May 25, 2011* by Predrag Cicvara re 84 Memorandum in Opposition to Motion, 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary* |

| | | |
|---|---|---|
| | | *Judgment,* 74 MOTION for Summary Judgment. (Attachments: # 1 Exhibit Stock Options Letter June 16, 2009, # 2 Exhibit Notice Salary Increase June 1, 2009, # 3 Exhibit Email Andrew Yau June 25, 2009, # 4 Exhibit Facts In Chronological Order 12-21-2007, # 5 Exhibit First Part More... 2-11-2008, # 6 Exhibit Email Rob DaPra Jan. 4, 2008, # 7 Exhibit Blackberry Bill June 2009, # 8 Exhibit Exact Explanation Table, # 9 Exhibit Sixth Text Message Bel Liu, # 10 Exhibit Email Austin Lin June 9, 2009, # 11 Exhibit Letter To Duracell Lawyer July 9, 2009, # 12 Exhibit P&G Business Conduct Manual, # 13 Exhibit 1971 SOP Plan 10 2004 Gillette Stock Plan, # 14 Exhibit Letter To HK July 20, 2009, # 15 Exhibit Complete Deposition Cicvara Dec. 21, 2010, # 16 Exhibit Email Cicvara Wilczewski June 29 2009, # 17 Exhibit Hand Written Notes Wilcz After June 30 2009)(Sikorsky, Igor) Modified on 5/31/2011 (Simpson, T.). (Entered: 05/27/2011) |
| 05/31/2011 | 89 | First AFFIDAVIT re 84 Memorandum in Opposition to Motion, 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment,* 74 MOTION for Summary Judgment *dated May 25, 2011* Signed By Predrag Cicvara filed by Predrag Cicvara. (Attachments: # 1 Exhibit Stocks Options Letter Peggy Wilcz June 16, 2009, # 2 Exhibit Notice Salary Increase June 1, 2009, # 3 Exhibit Email Andrew Yau To Lawson June 25, 2009, # 4 Exhibit FACTS PUT IN A CHRONOLOGICAL ORDER Orig. Date 12-21-2007, # 5 Exhibit FIRST PART more and the part of second Orig. Date 2 11 2008, # 6 Exhibit Email Rob DaPra Jan. 4, 2008, # 7 Exhibit Blackberry Bill June 2009, # 8 Exhibit EXACT EXPLANATION TABLE, # 9 Exhibit Page 00612 Sixth Text Message Bel Liu, # 10 Exhibit Email Austin Lin Reporting June 9, 2009, # 11 Exhibit Letter To Duracell Lawyer Skiber July, 9 2009, # 12 Exhibit P&G Business Conduct Manual Manual WBCM REDUCED Single Page, # 13 Exhibit 1971 SOP plan 10 2004 Gillette Stock Plan, # 14 Exhibit Letter to HK 10 minutes on Monday Orig. File July, 20 2009, # 15 Exhibit Complete Deposition Cicvara Dec. 21, 2010, # 16 Exhibit Email Cicvara Wilczewski June 29, 2009, # 17 Exhibit Hand Written Notes Wilcz After June 30, 2009)(Sikorsky, Igor) (Entered: 05/31/2011) |
| 06/01/2011 | 90 | First MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Summary Judgment until June 17, 2011 by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co, Proctor & Gamble Co., Inc. (Cerasia, Edward) (Entered: 06/01/2011) |
| 06/02/2011 | 91 | ORDER granting 90 Motion for Extension of Time to File Response/Reply re 74 MOTION for Summary Judgment. Reply due by 6/17/2011. SO ORDERED by Judge Janet C. Hall on 6/2/2011. (DeRubeis, B.) (Entered: 06/02/2011) |
| 06/04/2011 | 92 | First CERTIFICATE OF SERVICE by Predrag Cicvara re 89 Affidavit,,,,, *to provide a certificate of service for document 89* (Sikorsky, Igor) (Entered: 06/04/2011) |
| 06/06/2011 | 93 | ORDER denying 82 Motion for Leave to File Excess Pages. There is no limit on exhibit pages. As best as the court can determine, plaintiff's memorandum does not exceed the page limit. SO ORDERED by Judge Janet C. Hall on 6/6/2011. (DeRubeis, B.) (Entered: 06/06/2011) |

| 06/16/2011 | 94 | REPLY to Response to 74 MOTION for Summary Judgment filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Proof of Service)(Cerasia, Edward) (Entered: 06/16/2011) |
| 06/16/2011 | 95 | Memorandum in Opposition re 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment* filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. (Attachments: # 1 Proof of Service)(Cerasia, Edward) (Entered: 06/16/2011) |
| 06/16/2011 | 96 | Statement of Material Facts re 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment Defendants' Local Rule 56(a) 2 Statement* filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor & Gamble Co., Inc. (Cerasia, Edward) (Entered: 06/16/2011) |
| 11/22/2011 | 97 | RULING granting 74 Motion for Summary Judgment; denying 85 Motion for Summary Judgment. Signed by Judge Janet C. Hall on 11/22/2011. (Oliver, T.) (Entered: 11/22/2011) |
| 11/30/2011 | 98 | JUDGMENT entered in favor of Duracell, Gillette Co, Proctor & Gamble Co., Inc against Predrag Cicvara.<br><br>For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms.html. Signed by Clerk on 11/29/2011. (Oliver, T.) (Entered: 11/30/2011) |
| 11/30/2011 |  | JUDICIAL PROCEEDINGS SURVEY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey (Oliver, T.) (Entered: 11/30/2011) |
| 12/21/2011 | 99 | First MOTION for Extension of Time until 01/25/2012 *For Plaintiff, Predrag Cicvara* To Perfect An Appeal 98 Judgment, 97 Order on Motion for Summary Judgment, by Predrag Cicvara. (Sikorsky, Igor) (Entered: 12/21/2011) |
| 12/22/2011 | 100 | ORDER granting 99 Motion for Extension of Time for good cause shown. SO ORDERED by Judge Janet C. Hall on 12/22/2011. (Lienke, J) (Entered: 12/22/2011) |
| 01/19/2012 | 101 | NOTICE OF APPEAL as to 98 Judgment by Predrag Cicvara. Filing fee $ 455, receipt number CTXB00001587. (Oliver, T.) (Entered: 01/19/2012) |

**A-14**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PREDRAG CICVARA,

                Plaintiff,                :   Civil Action No. _____

              v.

                                  :   December 15, 2009

THE GILLETTE COMPANY and PROCTER &
GAMBLE COMPANY and DURACELL.

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441, 1446, defendants The Gillette Company and The Procter

& Gamble Company (collectively "Procter & Gamble" or "Defendants") (incorrectly pled as

"The Gillette Company and Procter & Gamble Company & Duracell") hereby remove the above-

entitled action to this Court based on the following grounds:

      1.     On or about November 16, 2009, Predrag Cicvara ("Cicvara" or "Plaintiff")

commenced a civil action against defendants in the Fairfield Judicial District of the State of

Connecticut Superior Court, *Predrag Cicvara v. The Gillette Company and Procter & Gamble*

*Company and Duracell*, Civil Action No. FBT-CV09-5028901-S (the "State Court Action"),

alleging that he was prevented from exercising stock options awarded to him, and he did not

receive his severance package or an annual bonus, and he asserts common law claims of unjust

enrichment and failure to pay wages in violation of C.G.S. § 31-71a, *et seq.*

      2.     Defendants received service of process of the State Court Action through their

registered agent on or about November 19, 2009.  This Notice of Removal is filed within thirty

(30) days of receipt of service, and is therefore timely pursuant to 28 U.S.C. 1446(b). *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-55 (1999).

3.      This Court has original jurisdiction over this action by reason of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

4.      Plaintiff is a citizen of the State of Connecticut. *See* Complaint ¶ 2. The Procter & Gamble Company is a citizen of the State of Ohio for purposes of the diversity jurisdiction statute because it is a corporation organized under the laws of the State of Ohio and has its principal place of business in Cincinnati, Ohio. 28 U.S.C. § 1332(c)(1). The Gillette Company is a citizen of the Commonwealth of Massachusetts and State of Delaware for purposes of the diversity jurisdiction statute because it is a corporation organized under the laws of the State of Delaware and has its principal place of business in Boston, Massachusetts. *Id.* The Complaint names "Duracell" as a defendant and incorrectly alleges it is "a corporation existing under the laws of Delaware with offices located at Bethel, Connecticut." *See* Complaint ¶ 4. Duracell is not an existing corporate entity; it is a product brand of Procter & Gamble.

5.      The amount in controversy exceeds $75,000.00 by the collective value of the allegedly owed stock options, bonus, and severance package.

6.      Pursuant to 28 U.S.C. § 1446(a) copies of the Complaint, Summons and other submissions in the Superior Court action are attached hereto as Exhibit A, and constitute all processes, pleadings and others served upon or by Procter & Gamble in this action to the present date.

-2-

**A-16**

7.     Pursuant to 28 U.S.C. § 1446, defendants will file written notice of the filing of this Notice of Removal, together with a copy of the Notice of Removal, with the Clerk of the Connecticut Superior Court for the Fairfield Judicial District.  Defendants will also serve a copy of the notice filed with the Connecticut Superior Court on counsel for all adverse parties.

8.     Pursuant to the Standing Order of this Court, defendants will file the required certification and the Notice of Pending Motions.

WHEREFORE, Defendants Procter & Gamble and The Gillette Company, remove the above-captioned action pending in the Fairfield Judicial District of the State of Connecticut Superior Court to this Court.

Dated this 15th day of December, 2009, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP

By: _____
Richard I. Scharlat (ct 23641)
Edward Cerasia II (ct 13096)
620 Eighth Avenue, 32nd floor
New York, New York 10018
(212) 218-5500
rscharlat@seyfarth.com

Attorneys for Defendants The Procter & Gamble
Company and The Gillette Company

-3-

A-17

## CERTIFICATE OF SERVICE

I, Richard I. Scharlat, hereby certify that on December 15, 2009, a true copy of the

foregoing document was delivered by first class U.S. mail, postage prepaid, upon Michael E.

Skiber, Law Offices of Michael E. Skiber, 135 Elm Street, Bridgeport, CT 06615.

Richard I. Scharlat

-4-

 **CT Corporation**

**Service of Process Transmittal**
11/19/2009
CT Log Number 515752030

TO:      Bonnie Zink
         The Procter & Gamble Company
         299 East Sixth Street, Legal Dept., S9-118
         Cincinnati, OH 45202

RE:      **Process Served in Connecticut**

FOR:     The Gillette Company (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Predrag Cicvara, Pltf. vs. The Gillette Company, et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Statement |
| **COURT/AGENCY:** | Fairfield at Bridgeport Superior Court Judicial District, CT<br>Case # None Specified |
| **NATURE OF ACTION:** | Employee Litigation - Wrongful Termination - Terminated from position for violating the Worldwide Business Conduct Manual |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Hartford, CT |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/19/2009 at 14:00 |
| **APPEARANCE OR ANSWER DUE:** | 12/15/2009 - summons // on or before the second day after the Return Date - file an appearance form |
| **ATTORNEY(S) / SENDER(S):** | Michael E. Skiber<br>Law Offices of Michael E. Skiber<br>135 Elm Street<br>Bridgeport, CT 06615<br>203-615-0090 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/19/2009, Expected Purge Date: 11/24/2009<br>Image SOP<br>Email Notification, Bonnie Zink zink.mb@pg.com<br>Email Notification, Angie Hall hall.ag@pg.com<br>Email Notification, Rebecca Burgett burgett.rs@pg.com<br>Email Notification, Amanda Bili bili.al@pg.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Gary Scappini |
| **ADDRESS:** | One Corporate Center<br>Floor 11<br>Hartford, CT 06103-3220 |
| **TELEPHONE:** | 860-724-9044 |

Page 1 of 1 / AF

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**SUMMONS - CIVIL**
JD-CV-1 Rev. 10-99
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a;
52-48, 52-259, P.B. Secs. 3-1 through 3-21, 8-1

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.ct.gov

See page 2 for instructions

TO: Any proper officer: BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

☐ "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.
☒ "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.
☐ "X" if claiming other relief in addition to or in lieu of money or damages.

| Address of court clerk where writ and other papers shall be filed (Number, street, town and zip code) (C.G.S. §§ 51-346, 51-350) | Telephone number of clerk (with area code) | Return Date (Must be a Tuesday) |
|---|---|---|
| 1061 MAIN STREET, BRIDGEPORT, CT 06604 | ( 203 ) 579 6527 | DECEMBER 15, 2009 |

☒ Judicial District  ☐ G.A.  ☐ Housing Session  ☐ Number | At (Town in which writ is returnable) (C.G.S. §§ 51-346, 51-349) BRIDGEPORT | Case type code (See list on page 2) Major: C  Minor: 90

**For the Plaintiff(s) please enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented (Number, street, town and zip code) LAW OFFICES OF MICHAEL E. SKIBER, 135 ELM STREET, BRIDGEPORT, CT 06604 | Juris number (to be entered by attorney only) 429588 |
|---|---|
| Telephone number (with area code) ( 203 ) 615 0090 | Signature of Plaintiff (if self-represented) |

Number of Plaintiffs: 1    Number of Defendants: 3    ☐ Form JD-CV-2 attached for additional parties

| Parties | Name (Last, First, Middle Initial) and Address of Each party (Number; Street; P.O. Box; Town; State; Zip; Country, if not USA) | |
|---|---|---|
| First Plaintiff | Name: CICVARA, PREDRAG  Address: 2122 NORTH BENSON ROAD, FAIRFIELD, CT 06824 | P-01 |
| Additional Plaintiff | Name:  Address: | P-02 |
| First Defendant | Name: ~~GILLETTE COMPANY~~ serve C T CORPORATION SYSTEM  Address: ONE CORPORATE CENTER, FLOOR 11, HARTFORD, CT 06103 | D-50 |
| Additional Defendant | Name: PROCTER & GAMBLE COMPANY serve C T CORPORATION SYSTEM, ONE CORPORATE CENTER, FLOOR 11, HARTFORD, CT 06103; serve also, CONNECTICUT SECRETARY OF THE STATE  Address: 30 TRINITY STREET, HARTFORD, CT 06106 | D-51 |
| Additional Defendant | Name: DURACELL serve CONNECTICUT SECRETARY OF THE STATE  Address: 30 TRINITY STREET, HARTFORD, CT 06106 | D-52 |
| Additional Defendant | Name:  Address: | D-53 |

**Notice to Each Defendant**

1. YOU ARE BEING SUED. This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at www.jud.ct.gov under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at www.jud.ct.gov under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. The Clerk of Court is not allowed to give advice on legal questions.

| Signed (Sign and "X" proper box) | ☒ Commissioner of the Superior Court ☐ Assistant Clerk | Name of Person Signing at Left Michael E. Skiber, Esq | Date signed 11/16/2009 |
|---|---|---|---|

If this Summons is signed by a Clerk:
a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.
c. The Clerk is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint.

For Court Use Only  File Date

A TRUE COPY ATTEST:

| I certify I have read and understand the above: | Signed (Self-Represented Plaintiff) | Date |
|---|---|---|

Name and address of person recognized to prosecute in the amount of $250
Wayne R. Keeney, 135 Elm Street, Bridgeport, CT 06604

| Signed (Official taking recognizance, "X" proper box) | ☒ Commissioner of the Superior Court ☐ Assistant Clerk | Date 11/16/2009 | Docket Number |
|---|---|---|---|

(Page 1 of 2)

A-20

DOCKET NO. CV
RETURN DATE: DECEMBER 15, 2009          :  SUPERIOR COURT
                                                           :
PREDRAG CICVARA                             :  J.D. OF FAIRFIELD
                                                           :
        v.                                               :
                                                           :  AT BRIDGEPORT
THE GILLETTE COMPANY and              :
PROCTER & GAMBLE COMPANY and      : NOVEMBER 16, 2009
DURACELL                                     :

## COMPLAINT

__COUNT ONE (Stock Options):__

   1.  At all relevant ties hereinafter mentioned, the plaintiff, PREDRAG CICVARA was and is an individual residing in Fairfield, Connecticut.

   2.  At all relevant times hereinafter mentioned, the defendant, THE GILLETTE COMPANY, was and is a corporation existing under the laws of Delaware with offices located in Cincinnati, Ohio.

   3.  At all relevant times hereinafter mentioned, the defendant, PROCTER & GAMBLE COMPANY, was and is a corporation existing under the laws of Ohio with offices located in Cincinnati, Ohio.

   4.  At all relevant times hereinafter mentioned, the defendant, DURACELL, was and is a corporation existing under the laws of Delaware with offices located at Bethel, Connecticut.

   5.  The defendant DURACELL is an entity wholly owned or controlled by the defendant THE GILLETTE COMPANY.

   6.  The defendant THE GILLETTE COMPANY is an entity wholly or controlled owned by the defendant PROCTER & GAMBLE COMPANY.

   7.  The plaintiff was hired by the defendant DURACELL in or about November, 2000.

   8.  At the time the plaintiff was hired, the defendant DURACELL was wholly owned or controlled by the defendant THE GILLETTE COMPANY.

9. As part of his compensation plan with the defendant DURACELL the plaintiff was eligible to receive options to purchase stock of the defendant THE GILLETTE COMPANY (Gillette Options).

10. On or about June 21, 2001 the defendant DURACELL awarded the plaintiff 2,000 Gillette Options at the Award Price of $28.26 per share.

11. On or about June 20, 2002 the defendant DURACELL awarded the plaintiff 2,000 Gillette Options at the Award Price of $35.58 per share.

12. On or about June 19, 2003 the defendant DURACELL awarded the plaintiff 3,000 Gillette Options at the Award Price of $32.38 per share.

13. On or about June 17, 2004 the defendant DURACELL awarded the plaintiff 2,500 Gillette Options at the Award Price of $43.10 per share.

14. On or about June 16, 2005 the defendant DURACELL awarded the plaintiff 2,000 Gillette Options at the Award Price of $51.96 per share.

15. In or about October, 2005 the defendants PROCTER & GAMBLE COMPANY and THE GILLETTE COMPANY merged and the plaintiff was offered and accepted continued employment in the new entity.

16. On or about November 1, 2005 the defendant PROCTER & GAMBLE COMPANY notified the plaintiff that his outstanding Gillette Options had been converted to options to purchase Procter & Gamble stock (P&G Options).

17. On or about June 15, 2009 the plaintiff was terminated from his position with the defendant DURACELL.

18. The plaintiff was told that he was terminated from his position with the defendant DURACELL for violating the Worldwide Business Conduct Manual.

19. On or about June 16, 2009 the plaintiff attempted to exercise his P&G Options and was informed that they were cancelled because the plaintiff was "discharged for cause" as defined in the Gillette Company 1971 Stock Option Plan.

20. The circumstances surrounding the plaintiff's termination were not "discharge for cause" as defined in the Gillette Company 1971 Stock Option Plan.

21. The plaintiff is entitled to the value of P&G Options.

**COUNT TWO (Unjust Enrichment Stock Options)**

22. Paragraphs 1 through 21 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

23. The defendants DURACELL, THE GILLETTE COMPANY, and PROCTER & GAMBLE COMPANY were unjustly enriched as a result of canceling the plaintiff's stock options.

**COUNT THREE (Severance Package)**

24. Paragraphs 1 through 23 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

25. As part of the plaintiff's compensation package with the defendants DURACELL, THE GILLETTE COMPANY and PROCTER & GAMBLE COMPANY, the plaintiff was entitled to a severance package upon termination of his employment.

26. The plaintiff did not receive his severance package upon termination.

**COUNT FOUR (Unjust Enrichment Severance Package)**

27. Paragraphs 1 through 26 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

28. The defendants DURACELL, THE GILLETTE COMPANY, and PROCTER & GAMBLE COMPANY were unjustly enriched as a result of canceling the plaintiff's severance package.

**COUNT FIVE (Annual Bonus)**

29. Paragraphs 1 through 28 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

30. As part of the plaintiff's compensation package with the defendants DURACEL, THE GILLETTE COMPANY and PROCTER & GAMBLE, the plaintiff was entitled to an annual bonus.

31. The plaintiff did not receive his annual bonus for fiscal 2008 - 2009.

**COUNT SIX (Statutory Payment of Wage)**

32. Paragraphs 1 through 31 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

33. The defendants, DURACELL, THE GILLETTE COMPANY and PROCTER & GAMBLE are each, employers as defined under Connecticut General Statutes (C.G.S.) § 31-71a, et. seq.

34. The plaintiff is an employee as defined under C.C.S. § 31-71a, et. seq.

35. The plaintiff asserts his claim for damages under C.G.S. § 31-72.

WHEREFORE, the Plaintiff PREDRAG CICVARA claims,

As to Count One:

    1. Money damages;

    2. Interest and costs;

    3. Such other and further relief as the Court deems equitable.

As to Count Two:

    1. Money damages;

    2. Interest and costs;

    3. Such other and further relief as the Court deems equitable.

As to Count Three:

    1. Money damages;

    2. Interest and costs;

    3. Such other and further relief as the Court deems equitable.

As to Count Four:

    1. Money damages;

    2. Interest and costs;

    3. Such other and further relief as the Court deems equitable.

As to Count Five:

    1. Money damages;

    2. Interest and costs;

    3. Such other and further relief as the Court deems equitable.

As to Count Six:

    1. Money damages;

    2. Twice the full amount of wages owed as allowed under C.G.S. § 71-32;

    3. Interest and costs;

    4. Such other and further relief as the Court deems equitable.

THE PLAINTIFF,
PREDRAG CICVARA, BY

Michael E. Skiber
Law Offices of Michael E. Skiber
Juris# 429588
135 Elm Street, Bridgeport, CT 06615
(203) 615-0090
His Attorney .

A TRUE COPY ATTEST:

STATE MARSHAL / INDIFFERENT PERSON

DOCKET NO. CV
RETURN DATE:  DECEMBER 15, 2009     :  SUPERIOR COURT
                                     :
PREDRAG CICVARA               :  J.D. OF FAIRFIELD
                                       :
       v.                          :
                                       :  AT BRIDGEPORT
THE GILLETTE COMPANY and    :
THE PROCTOR & GAMBLE COMPANY and   : NOVEMBER 16, 2009
DURACELL                                :

## STATEMENT OF AMOUNT IN DEMAND

The amount, legal interest or property in demand is more than $15,000.00, exclusive of interest and costs.

THE PLAINTIFF,
PREDRAG CICVARA, BY

_____

Michael E. Skiber
Law Offices of Michael E. Skiber
Juris# 429588-
135 Elm Street, Bridgeport, CT  06615
(203) 615-0090
His Attorney

A TRUE COPY ATTEST:

ARE GILES STATE MARSHAL OC / INDIFFERENT PERSON

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------------x
                                    :
PREDRAG CICVARA                     :
                                    :
         v.                         :CIVIL ACTION NO. 3:09-cv-2054(JCH)
                                    :
THE GILLETTE COMPANY and            :
PROCTER & GAMBLE COMPANY, INC       : JANUARY 6, 2009
DURACELL, AN ENTITY OF UNKNOWN      :
FORM and                            :
LYNNE BURNETT                       :
------------------------------------------------------------x
```

### FIRST AMENDED COMPLAINT

1.  At all relevant times hereinafter mentioned, the plaintiff, PREDRAG CICVARA was and is an individual residing in Fairfield, Connecticut.

2.  At all relevant times hereinafter mentioned, the defendant, THE GILLETTE COMPANY, was and is a corporation existing under the laws of Delaware with offices located in Cincinnati, Ohio.

3.  At all relevant times hereinafter mentioned, the defendant, PROCTER & GAMBLE COMPANY, was and is a corporation existing under the laws of Ohio with offices located in Cincinnati, Ohio.

4.  At all relevant times hereinafter mentioned, the defendant, DURACELL, is an unknown entity with offices located at Bethel, Connecticut.

5.  At all relevant times hereinafter mentioned, the defendant, LYNNE BURNETT, was and is an individual residing in Ridgefield, Connecticut.

Case 12-338, Document 57, 07/23/2012, 671466, Page36 of 291

**COUNT ONE (Breach of Contract - Stock Options):**

6. Paragraphs 1 through 5 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately

7. The defendant DURACELL is an unknown entity affiliated with the defendant THE GILLETTE COMPANY and PROCTER & GAMBLE.

8. The defendant THE GILLETTE COMPANY is an entity wholly or controlled owned by the defendant PROCTER & GAMBLE COMPANY.

9. The plaintiff was hired by the defendant DURACELL in or about November, 2000.

10. At the time the plaintiff was hired, the defendant DURACELL was wholly owned or controlled by the defendant THE GILLETTE COMPANY.

11. As part of his compensation plan with the defendant DURACELL the plaintiff was eligible to receive options to purchase stock of the defendant THE GILLETTE COMPANY (Gillette Options).

12. On or about June 21, 2001 the defendant DURACELL and THE GILLETTE COMPANY awarded the plaintiff 2,000 Gillette Options at the Award Price of $28.26 per share.

13. On or about June 20, 2002 the defendant DURACELL and THE GILLETTE COMPANY awarded the plaintiff 2,000 Gillette Options at the Award Price of $35.58 per share.

14. On or about June 19, 2003 the defendant DURACELL and THE GILLETTE COMPANY awarded the plaintiff 3,000 Gillette Options at the Award Price of $32.38 per share.

15. On or about June 17, 2004 the defendant DURACELL and THE GILLETTE COMPANY awarded the plaintiff 2,500 Gillette Options at the Award Price of $43.10 per share.

2

16. On or about June 16, 2005 the defendant DURACELL and THE GILLETTE COMPANY awarded the plaintiff 2,000 Gillette Options at the Award Price of $51.96 per share.

17. In or about October, 2005 the defendants PROCTER & GAMBLE COMPANY and THE GILLETTE COMPANY merged and the plaintiff was offered and accepted continued employment in the new entity.

18. On or about November 1, 2005 the defendant PROCTER & GAMBLE COMPANY notified the plaintiff that his outstanding Gillette Options had been converted to options to purchase Procter & Gamble stock (P&G Options).

19. On or about June 15, 2009 the plaintiff's employment was terminated with defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL, allegedly for cause.

20. The plaintiff was told that he was terminated from his position with the defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL for violating the Worldwide Business Conduct Manual.

21. On or about June 16, 2009 the plaintiff attempted to exercise his P&G Options and was informed that they were cancelled because the plaintiff was "discharged for cause" as defined in the Gillette Company 1971 Stock Option Plan.

22. Importantly, all the P&G Options had vested prior to the plaintiff's end of employment with PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL.

23. The circumstances surrounding the plaintiff's end of employment was not "discharge for cause" as defined in the Gillette Company 1971 Stock Option Plan.

24. The plaintiff is entitled to the value of P&G Options from PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL.

3

**COUNT TWO (Unjust Enrichment - Stock Options)**

25. Paragraphs 1 through 24 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

26. The defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL were unjustly enriched as a result of canceling the plaintiff's stock options.

**COUNT THREE (Breach of Contract - Severance Package)**

27. Paragraphs 1 through 26 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

28. As part of the plaintiff's compensation package with the defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL, the plaintiff was entitled to a severance package upon the end of his employment.

29. The plaintiff did not receive his severance package upon the end of his employment with PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL.

30. The plaintiff is entitled to the value of the severance package from PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL.

**COUNT FOUR (Unjust Enrichment - Severance Package)**

31. Paragraphs 1 through 30 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

32. The defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL were unjustly enriched as a result of canceling the plaintiff's severance package.

4

## COUNT FIVE (Breach of Contract - Annual Bonus)

33. Paragraphs 1 through 32 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

34. As part of the plaintiff's compensation package with the defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL, the plaintiff was entitled to an annual bonus.

35. The plaintiff did not receive his annual bonus for fiscal 2008 - 2009.

36. The plaintiff is entitled to his annual bonus for fiscal 2008-2009.

## COUNT SIX (Unjust Enrichment – Annual Bonus)

37. Paragraphs 1 through 36 of the plaintiff's complaint are incorporated herein and made part hereof as if each had been fully set forth and enumerated separately.

38. The defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL were unjustly enriched as a result of canceling the plaintiff's annual bonus.

## COUNT SEVEN (Statutory Payment of Wage)

39. Paragraphs 1 through 38 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

40. The defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and DURACELL are each, employers as defined under Connecticut General Statutes (C.G.S.) § 31-71a, *et.seq.*

41. The plaintiff is an employee as defined under C.C.S. § 31-71a, *et. seq.*

42. The plaintiff asserts his claim for damages under C.G.S. § 31-72 *et seq.*.

5

**COUNT EIGHT (Tortious Interference with Business Relationship)**

43. Paragraphs 1 through 42 of the plaintiff's complaint are incorporated herein and made a part hereof as if each had been fully set forth and enumerated separately.

44. Under Connecticut Law the elements for Tortious Interference with a Business Relationship is the following

  a. The existence of a business relationship;

  b. An intentional and improper interference with that relationship; and,

  c. A resulting loss of benefit of the relationship.

45. Both the plaintiff and defendant LYNNE BURNETT were employees at all relevant times of defendants PROCTER & GAMBLE, DURACELL and THE GILLETTE COMPANY.

46. Upon information and belief, LYNNE BURNETT conducted an internal investigation concerning plaintiff.

47. In or about June 2009, Defendant LYNNE BURNETT, conducted a meeting with the plaintiff where she made unprofessional, inappropriate and disparaging personal comments about plaintiff, which clearly evince she harbored negative personal feelings towards plaintiff.

48. Defendant LYNNE BURNETT intentionally and improperly failed to consider claims made by plaintiff based on her negative personal feelings towards plaintiff.

49. Instead, LYNNE BURNETT intentionally and improperly caused the end of plaintiff's employment due to her negative personal feeling towards plaintiff.

50. As a direct and proximate result of defendant LYNNE BURNETT's improper and intentional interference with plaintiff's business relationship with defendants PROCTER &

6

Case 12-338, Document 57, 07/23/2012, 671466, Page41 of 291

GAMBLE, THE GILLETTE COMPANY and DURACELL, plaintiff was allegedly "discharged for cause" and suffered significant damages.

**WHEREFORE,** the plaintiff PREDRAG CICVARA claims,

**As to Count One Against Procter & Gamble, Duracell and The Gillette Company:**

> 1. Money damages;
>
> 2. Interest and costs;
>
> 3. Such other and further relief as the Court deems equitable.

**As to Count Two Against Procter & Gamble, Duracell and The Gillette Company:**

> 1. Money damages;
>
> 2. Interest and costs;
>
> 3. Such other and further relief as the Court deems equitable.

**As to Count Three Against Procter & Gamble, Duracell and The Gillette Company:**

> 1. Money damages;
>
> 2. Interest and costs;
>
> 3. Such other and further relief as the Court deems equitable.

**As to Count Four Against Procter & Gamble, Duracell and The Gillette Company:**

> 1. Money damages;
>
> 2. Interest and costs;
>
> 3. Such other and further relief as the Court deems equitable.

**As to Count Five Against Procter & Gamble, Duracell and The Gillette Company:**

> 1. Money damages;
>
> 2. Interest and costs;

7

3. Such other and further relief as the Court deems equitable.

**As to Count Six Against Procter & Gamble, Duracell and The Gillette Company:**

1. Money damages;

2. Interest and costs;

3. Such other and further relief as the Court deems equitable.

**As to Count Seven Against Procter & Gamble, Duracell and The Gillette Company:**

1. Money damages;

2. Twice the full amount of wages owed as allowed under C.G.S. § 71-32 *et seq.*;

3. Interest and costs;

4. Attorney's Fees;

5. Such other and further relief as the Court deems equitable

**As to Count Eight Against Lynne Burnett**

1. Money damages;

2. Interest and costs;

3. Such other and further relief as the Court deems equitable.

Respectfully Submitted,

PREDRAG CICVARA, BY

/s/ Michael E. Skiber, Esq.
Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT  06604
(203) 615-0090

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

-----------------------------------------------------------------x

PREDRAG CICVARA         :
                :
   v.           :CIVIL ACTION NO. 3:09v2054(JCH)
                :
THE GILLETTE COMPANY and    :
PROCTER & GAMBLE COMPANY, INC and  :JANUARY 6, 2009
DURACELL, AN ENTITY OF UNKNOWN   :
FORM  and            :
LYNNE BURNETT        :

-----------------------------------------------------------------x

### PLAINTIFF'S MOTION FOR JOINDER
### AND REMAND TO STATE COURT

   Pursuant to 28 U.S.C. §1447(e), the Plaintiff Predrag Cicvara ("Plaintiff") hereby

requests leave from this honorable Court to permit joinder of an additional party and remand the

above captioned case to the Superior Court of Connecticut on the ground of lack of complete

diversity of citizenship required under 28 U.S.C. § 1332(a)(1).  In support of his motion, the

plaintiff represents the following:

   1.  On or about November 19, 2009, the Plaintiff, pursuant to the laws of the State of

Connecticut and Rules of the Connecticut Superior Court, caused proper service of a writ,

summons and complaint (collectively referred to as the "State Court Action") upon the

respective agents of service of Defendants, which alleges among other things breach of contract

and unjust enrichment related to the failure of the Defendants to exercise Plaintiff's vested stock

options, to pay a yearly bonus and severance package, and to failure to pay wages in violation of

C.G.S. § 31-71a, *et seq.*

2. On or about December 18, 2009, Defendants filed a petition for removal to Federal District Court for the District of Connecticut and the case was assigned CIVIL ACTION NO. 3:09v2054(JCH).

3. On or about January 6, 2009, plaintiff, pursuant to additional research and investigation, filed a First Amended Petition, which included the addition of an defendant, Lynne Burnett, a resident of Connecticut and employee of defendants PROCTER & GAMBLE, THE GILLETTE COMPANY and/or DURACELL and an additional count of Tortious Interference with Business Relationship against defendant Burnett.  A copy of the plaintiff's Motion to file first amended complaint and First Amended Complaint are attached heretofore as Exhibit A and Exhibit B, respectively.

4. Pursuant to 28 U.S.C. § 1447(e)" "If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court."

5. Fed.R.Civ.P. 20 holds in pertinent part that joinder of parties is appropriate:  "if there is asserted against [the defendants] any right to relief in respect of or arising out of the same transaction or occurrences and if any question of law or fact common to all defendants will arise in the action."

6. Under § 1332(a)(1), a district court has original subject-matter jurisdiction pursuant to diversity of citizenship jurisdiction "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States."  Diversity jurisdiction is found only when all adverse parties to litigation are completely diverse in citizenships.

2

7.     The Joinder of defendant Lynne Burnett, a Connecticut resident is necessary to adjudicate plaintiff's claims for relief and will destroy complete diversity of parties required for subject matter jurisdiction based on diversity of citizenship.

8.     The claims for relief by plaintiff are based solely on the laws of the State of Connecticut and defendants have not stated any additional basis for this Court's to retain subject matter jurisdiction.

**WHEREFORE,** the plaintiff prays this honorable court grant this Motion for Joinder of a Party and Remand the above captioned case to State Court.

Respectfully Submitted,

PREDRAG CICVARA, BY

/s/ Michael E. Skiber, Esq.
Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT  06604
(203) 615-0090

3

**A-37**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PREDRAG CICVARA,

      Plaintiff,

      v.

THE GILLETTE COMPANY and PROCTER &
GAMBLE COMPANY, INC, DURACELL, AN ENTITY
OF UNKNOWN FORM, and LYNNE BURNETT,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.3:09-cv-2054
(JCH) (HF)

January 22, 2010

### ANSWER AND AFFIRMATIVE DEFENSES

Defendants The Gillette Company and The Procter & Gamble Company (collectively

"Procter & Gamble") (incorrectly pled as "Procter & Gamble Company, Inc., Duracell, an entity

of unknown form"),[1] pursuant to Fed. R. Civ. P. 8 & 12, by their attorneys, Seyfarth Shaw LLP,

answer the First Amended Complaint ("Amended Complaint") of Plaintiff Predrag Cicvara

("Plaintiff") as follows:

### FIRST AMENDED COMPLAINT

1.     Procter & Gamble lacks knowledge sufficient to admit or deny the allegations

contained in paragraph 1 of the Amended Complaint, except admits, on information and belief,

that Plaintiff is a resident of the State of Connecticut.

---

[1] Defendant Lynne Burnett has filed a Motion to Dismiss the sole count against her, Count Eight, and to be dismissed as a party to this action pursuant to Fed. R. Civ. P. 12(b)(6). Following the adjudication of that motion, Defendant Burnett will submit her Answer to the Amended Complaint, if necessary.

Case 12-338, Document 57, 07/23/2012, 671466, Page47 of 291

A-38

2.      Procter & Gamble denies the allegations in paragraph 2 of the Amended Complaint, except admits that The Gillette Company is organized under the laws of the State of Delaware and has offices located in Boston, Massachusetts.

3.      Procter & Gamble admits the allegations contained in paragraph 3 of the Amended Complaint.

4.      Procter & Gamble denies the allegations in paragraph 4 of the Amended Complaint, except as to the allegation that Duracell is an "unknown entity," as to which Procter & Gamble avers that Duracell is not an entity but a product brand of Procter & Gamble.

5.      Procter & Gamble denies the allegations in paragraph 5 of the Amended Complaint.

<u>COUNT ONE (Breach of Contract – Stock Options)</u>

6.      Procter & Gamble relies on, and incorporates herein in full, all prior responses to allegations in the Amended Complaint.

7.      Procter & Gamble denies the allegations in paragraph 7 of the Amended Complaint, except as to the allegation that Duracell is an "unknown entity," as to which Procter & Gamble avers that Duracell is not an entity but a product brand of Procter & Gamble.

8.      Procter & Gamble admits the allegations in paragraph 8 of the Amended Complaint.

9.      Procter & Gamble denies the allegations in paragraph 9 of the Amended Complaint, and avers that Duracell ceased being a legal entity as of January 1, 1999.

10.     Procter & Gamble denies the allegations in paragraph 10 of the Amended

Complaint, and avers that Duracell ceased being a legal entity as of January 1, 1999.

11.     As to the allegations in paragraph 11 of the Amended Complaint, Procter &

Gamble denies that Plaintiff had any compensation plan with Duracell, admits that Plaintiff was

eligible to receive options to purchase the common stock of The Gillette Company ("Gillette

Options"), and avers that Duracell ceased being a legal entity as of January 1, 1999.

12.     Procter & Gamble denies the allegations in paragraph 12 of the Amended

Complaint as to the number of options and exercise price and that Duracell awarded any such

options, and admits only that Plaintiff was granted Gillette Options, subject to the terms and

conditions of the 1971 Stock Option Plan (as amended).  Procter & Gamble further denies that

Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

13.     Procter & Gamble denies the allegations in paragraph 13 of the Amended

Complaint as to the number of options and exercise price and that Duracell awarded any such

options, and admits only that Plaintiff was granted Gillette Options, subject to the terms and

conditions of the 1971 Stock Option Plan (as amended).  Procter & Gamble further denies that

Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

14.     Procter & Gamble denies the allegations in paragraph 14 of the Amended

Complaint as to the number of options and exercise price and that Duracell awarded any such

options, and admits only that Plaintiff was granted Gillette Options, subject to the terms and

conditions of the 1971 Stock Option Plan (as amended).  Procter & Gamble further denies that

Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

15.    Procter & Gamble denies the allegations in paragraph 15 of the Amended Complaint as to the number of options and exercise price and that Duracell awarded any such options, and admits only that Plaintiff was granted Gillette Options, subject to the terms and conditions of the 1971 Stock Option Plan (as amended).  Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

16.    Procter & Gamble denies the allegations in paragraph 16 of the Amended Complaint as to the number of options and exercise price and that Duracell awarded any such options, and admits only that Plaintiff was granted Gillette Options subject to the terms and conditions of the 1971 Stock Option Plan (as amended).  Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

17.    To the extent that the allegations in paragraph 17 of the Amended Complaint call for legal conclusions, no response is required.  To the extent that paragraph 17 of the Amended Complaint alleges facts against Procter & Gamble, Procter & Gamble admits those allegations.

18.    To the extent that the allegations in paragraph 18 of the Amended Complaint call for legal conclusions, no response is required.  To the extent that paragraph 18 of the Amended Complaint alleges facts against Procter & Gamble, Procter & Gamble admits those allegations.

19.    Procter & Gamble denies the allegations in paragraph 19 of the Amended Complaint that Duracell terminated Plaintiff's employment and that Duracell employed Plaintiff at the time of his termination, and admits that Procter & Gamble terminated his employment for cause on June 15, 2009.  Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

-4-

20.     Procter & Gamble denies the allegations in paragraph 20 of the Amended Complaint that Duracell terminated Plaintiff's employment and that Duracell employed Plaintiff at the time of his termination, and admits that his employment with Procter & Gamble was terminated for violating the Worldwide Business Conduct Manual.  Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

21.     Procter & Gamble denies the allegations in paragraph 21 of the Amended Complaint that Plaintiff attempted to exercise his "P&G Options" on June 16, 2009, and admits that his "P&G Options" were cancelled because he was discharged for cause in accordance with the 1971 Stock Option Plan (as amended).

22.     Procter & Gamble denies the allegations in paragraph 22 of the Amended Complaint that Duracell employed Plaintiff and that his employment with Duracell ended.  To the extent that the remaining allegations in paragraph 22 of the Amended Complaint call for legal conclusions, no response is required.  To the extent that the remaining allegations in paragraph 22 of the Amended Complaint allege facts against Procter & Gamble, Procter & Gamble admits those allegations, and further avers the options were cancelled in accordance with the 1971 Stock Option Plan (as amended).  Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

23.     Procter & Gamble denies the allegations in paragraph 23 of the Amended Complaint.  Procter & Gamble avers that Plaintiff was discharged for cause because, among other reasons, he made repeated, unwanted, physical, sexual advances on a client representative of Procter & Gamble, and that he stated to this representative "I want to rape you."

24.     To the extent that the allegations in paragraph 24 of the Amended Complaint call for legal conclusions, no response is required.  To the extent that paragraph 24 of the Amended Complaint alleges facts against Procter & Gamble, Procter & Gamble denies those allegations. Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

### COUNT TWO (Unjust Enrichment - Stock Options)

25.     Procter & Gamble relies on, and incorporates herein in full, all prior responses to allegations in the Amended Complaint.

26.     To the extent that the allegations in paragraph 26 of the Amended Complaint call for legal conclusions, no response is required.  To the extent that paragraph 26 of the Amended Complaint alleges facts against Procter & Gamble, Procter & Gamble denies those allegations. Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

### COUNT THREE (Breach of Contract - Severance Package)

27.     Procter & Gamble relies on, and incorporates herein in full, all prior responses to allegations in the Amended Complaint.

28.     To the extent that the allegations in paragraph 28 of the Amended Complaint call for a legal conclusion, no response is required.  To the extent that paragraph 28 of the Amended Complaint alleges facts against Procter & Gamble, Procter & Gamble denies those allegations. Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a legal entity as of January 1, 1999.

29.     Procter & Gamble denies the allegations in paragraph 29 of the Amended

Complaint that any severance package existed and that Plaintiff had any legal right to any such

severance package, and admits he did not receive a severance package upon his termination.

Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a

legal entity as of January 1, 1999.

30.     To the extent that the allegations in paragraph 30 of the Amended Complaint call

for a legal conclusion, no response is required.  To the extent that paragraph 30 of the Amended

Complaint alleges facts against Procter & Gamble, Procter & Gamble denies those allegations.

Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a

legal entity as of January 1, 1999.

### COUNT FOUR (Unjust Enrichment - Severance Package)

31.     Procter & Gamble relies on, and incorporates herein in full, all prior responses to

allegations in the Amended Complaint.

32.     To the extent that the allegations in paragraph 32 of the Amended Complaint call

for a legal conclusion, no response is required.  To the extent that paragraph 32 of the Amended

Complaint alleges facts against Procter & Gamble, Procter & Gamble denies those allegations.

Procter & Gamble further denies that Duracell is a proper defendant, and avers it ceased being a

legal entity as of January 1, 1999.

### COUNT FIVE (Breach of Contract - Annual Bonus)

33.     Procter & Gamble relies on, and incorporates herein in full, all prior responses to

allegations in the Amended Complaint.

34.     Procter & Gamble denies the allegations in paragraph 34 of the Amended Complaint.

35.     Procter & Gamble denies the allegations in paragraph 35 of the Amended Complaint to the extent it assumes Plaintiff had any legal right to any annual bonus, and admits he did not receive an annual bonus for fiscal year 2008 to 2009.

36.     Procter & Gamble denies the allegations in paragraph 36 of the Amended Complaint.

<u>COUNT SIX (Unjust Enrichment – Annual Bonus)</u>

37.     Procter & Gamble relies on, and incorporates herein in full, all prior responses to allegations in the Amended Complaint.

38.     Procter & Gamble denies the allegations in paragraph 38 of the Amended Complaint.

<u>COUNT SEVEN (Statutory Payment of Wage)</u>

39.     Procter & Gamble relies on, and incorporates herein in full, all prior responses to allegations in the Amended Complaint.

40.     To the extent that the allegations in paragraph 40 of the Amended Complaint call for a legal conclusion, no response is required.  Procter & Gamble denies that Duracell is a proper defendant and avers that Duracell ceased being a legal as of January 1, 1999, and admits that Procter & Gamble employs individuals to work for it.

41.     To the extent that the allegations in paragraph 41 of the Amended Complaint call for a legal conclusion, no response is required.  To the extent that paragraph 41 of the Amended

Complaint alleges facts against Procter & Gamble, Procter & Gamble lacks knowledge sufficient to admit or deny the remaining allegations.

42.     To the extent that the allegations in paragraph 42 of the Amended Complaint call for a legal conclusion, no response is required.  To the extent that paragraph 42 of the Amended Complaint alleges facts against Procter & Gamble, Procter & Gamble lacks knowledge sufficient to admit or deny the remaining allegations.

### COUNT EIGHT (Tortious Interference with Business Relationship)

Defendant Burnett has filed a Motion to Dismiss this count and to be dismissed as a party to this action pursuant to Fed. R. Civ. P. 12(b)(6), as this count fails to state a claim as a matter of law.  Following the adjudication of that motion, Defendant Burnett will respond to this count, if necessary.

Procter & Gamble denies that Plaintiff is entitled to any of the relief sought in the "WHEREFORE" clause on pages 7 and 8 of the Amended Complaint, or to any other relief.

### GENERAL DENIAL

Procter & Gamble denies each and every allegation in the Amended Complaint, not specifically admitted therein.

### AFFIRMATIVE AND OTHER DEFENSES

Procter & Gamble asserts the following affirmative and other defenses without assuming any burden of production or proof that it would not have otherwise.  Procter & Gamble further avers that, to the extent Plaintiff's allegations and/or claims are so vague as to render them impossible to identify every affirmative or other defense, Procter & Gambles expressly reserves its right to assert additional defenses should the precise nature of Plaintiff's allegations and/or claims later become clear.

### FIRST DEFENSE

The Amended Complaint fails, in whole or in part, to state a claim upon which relief may be granted.

## SECOND DEFENSE

Plaintiff's alleged damages must be reduced to the extent that he has failed to reasonably mitigate them.

## THIRD DEFENSE

The Amended Complaint is barred, in whole or in part, by the doctrine of after-acquired evidence and/or unclean hands.

## FOURTH DEFENSE

The Amended Complaint is barred, in whole or in part, by the doctrine of waiver, estoppel, and/or laches.

## FIFTH DEFENSE

The Amended Complaint is barred, in whole or in party, by the applicable statute(s) of limitations.

## SIXTH DEFENSE

Plaintiff's own conduct caused, in whole or in part, whatever damages he may have suffered.

## SEVENTH DEFENSE

At all times, Procter & Gamble acted reasonably and in good faith.

## EIGHTH DEFENSE

All actions taken or omitted by Procter & Gamble with respect to Plaintiff were taken or omitted in good faith, without any malice, evil motives, callous indifference, reckless indifference, or willfulness.

## NINTH DEFENSE

Procter & Gamble did not intentionally, willfully, recklessly, negligently or otherwise violate Connecticut General Statutes §§ 31-81a, et seq.

## RESERVATION OF RIGHTS

Procter & Gamble reserves its rights to amend its Answer and to assert any additional affirmative or other defenses as may become available or apparent at a future date.

WHEREFORE, Procter & Gamble prays that the Court enter a judgment:

1.    dismissing the Amended Complaint;

2.    granting to Procter & Gamble its costs, including attorneys' fees, incurred in this action; and

3.    granting to Procter & Gamble such other and further relief as the Court may deem just and proper.

Dated this 22nd day of January, 2010, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP

By: /s/ Richard I. Scharlat
        Richard I. Scharlat (ct 23641)
        Edward Cerasia II (ct 13096)
620 Eighth Avenue, 32nd floor
New York, New York 10018
(212) 218-5500

Attorneys for Defendants The Procter & Gamble Company, The Gillette Company and Lynne Burnett

-11-

**A-48**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| PREDRAG CICVARA, | Civil Action No.3:09-cv-2054 |
| Plaintiff, | (JCH) (HF) |
| v. | January 22, 2010 |
| THE GILLETTE COMPANY and PROCTER & GAMBLE COMPANY, INC., DURACELL, AN ENTITY OF UNKNOWN FORM and LYNNE BURNETT, | NOTICE OF MOTION TO DISMISS COUNT EIGHT AND LYNNE BURNETT FROM THE AMENDED COMPLAINT |
| Defendants. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLEASE TAKE NOTICE, that, upon the accompanying Motion to Dismiss, and

Memorandum of Law of Defendant Lynne Burnett in Support of Her Motion to Dismiss,

Defendant Burnett, by her attorneys Seyfarth Shaw LLP, will move this Court, before the

Honorable Janet C. Hall, at the Brien McMahon Federal Building, 915 Lafayette Boulevard,

Bridgeport, Connecticut 06604, for an Order pursuant to Fed. R. Civ. P. 12(b)(6) granting

Defendant Burnett's Motion to Dismiss and dismissing Count Eight and Defendant Burnett as a

party from the Amended Complaint, and for such other and further relief as this Court may deem

just and proper.

Dated this 22nd day of January, 2010, at New York, New York.

SEYFARTH SHAW LLP

By: /s/ Richard I. Scharlat
     Richard I. Scharlat (ct 23641)
     Edward Cerasia II (ct 13096)
620 Eighth Avenue, 32nd floor
New York, New York 10018
(212) 218-5500
rscharlat@seyfarth.com

Attorneys for Defendants The Procter & Gamble
Company, The Gillette Company and
Lynne Burnett

.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| PREDRAG CICVARA, | Civil Action No.3:09-cv-2054 (JCH) (HF) |
| Plaintiff, |  |
| v. | January 16, 2010 |
| THE GILLETTE COMPANY and PROCTER & GAMBLE COMPANY, INC., DURACELL, AN ENTITY OF UNKNOWN FORM and LYNNE BURNETT | AFFIDAVIT OF LYNNE BURNETT |
| Defendants. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW MEXICO  :
                     : ss.
COUNTY OF LINCOLN    :

LYNNE BURNETT, being duly sworn, deposes and says:

1.      I am named as an individual defendant in the above-captioned matter, and am a former employee of Defendant The Procter & Gamble Company (incorrectly pled as "Procter & Gamble Company, Inc."). I submit this Affidavit upon my own personal knowledge. I offer this Affidavit in support of The Gillette Company, The Procter & Gamble Company (collectively "Procter & Gamble") and Lynne Burnett's (collectively "Defendants'") opposition to Plaintiff's Motion To Remand to State Court and For Joinder of an Additional Party.

2.      I have maintained my permanent residence in the State of Florida since January 2009.

3.      From January 2009 and until I retired from Procter & Gamble in January 2010, I worked remotely from my permanent residence in the State of Florida and would commute to Bethel, Connecticut or Cincinnati, Ohio, or other locations as necessary.

4.      When I commuted to Bethel, Connecticut from my permanent residence in the State of Florida, I would stay at a house I rented at 6 West Mountain Road, Ridgefield, Connecticut 06877.  The lease for this rented house expired in September 2008, after which I rented the house on a month-to-month basis until September 2009.  This is the address listed for me in the Certificate of Service of Plaintiff's Amended Complaint.  After conducting the necessary business in Connecticut, I would return to my permanent residence in the State of Florida.

5.      After the lease expired and I stopped renting the house on a month-to-month basis, I would stay with a friend in New York or a hotel if I had to commute to Connecticut, after which I would return to my home in Florida.

6.      I am registered to vote in the State of Florida, and I have a Florida-issued drivers' license.

7.      I am currently in the State of New Mexico on vacation.

-2-

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct.

*Lynne Burnett*

Lynne Burnett

Sworn to before me
this 1⅛ day of January, 2010

*Robert Odom*

Notary Public

OFFICIAL SEAL
ROBERT ODOM
Notary Public
State of New Mexico
My Comm. Expires 2/4/2013

-3-

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

---------------------------------------- x

| | |
|---|---|
| PREDRAG CICVARA, | Civil Action No.3:09-cv-2054 |
| | (JCH) (HF) |
| Plaintiff, | |
| | |
| v. | |
| | |
| THE GILLETTE COMPANY and PROCTER & | January 22, 2010 |
| GAMBLE COMPANY and DURACELL, AN ENTITY | |
| OF UNKNOWN FORM and LYNNE BURNETT, | |
| | |
| Defendants. | |

---------------------------------------- x

### DEFENDANT BURNETT'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO DISMISS COUNT EIGHT TO THE AMENDED COMPLAINT AND DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND TO STATE COURT AND FOR JOINDER

*Of Counsel:*

Edward Cerasia II (ct 13096)
Richard I. Scharlat (ct 23641)

Oral argument is requested

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendants The Gillette Company,
The Procter & Gamble Company and Lynne Burnett

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.........................................................2

ARGUMENT...........................................................................................................5

     I.    PLAINTIFF'S CLAIM OF TORTIOUS INTERFERENCE WITH
          BUSINESS RELATIONSHIP AGAINST LYNNE BURNETT FAILS TO
          ALLEGE FACTS SUFFICIENT TO ESTABLISH A VALID CLAIM IN
          THE AMENDED COMPLAINT .............................................................5

     II.   PLAINTIFF'S MOTION TO REMAND SHOULD BE DENIED
          BECAUSE DIVERSITY JURISDICTION REMAINS EVEN IF MS.
          BURNETT IS AN ADDED PARTY .........................................................8

     III.  PLAINTIFF FRAUDULENTLY JOINED MS. BURNETT TO DEFEAT
          DIVERSITY JURISDICTION AND ASSERTED A CAUSE OF
          ACTION AGAINST HER WITH NO POSSIBILITY OF SUCCESS
          AND HIS MOTION FOR JOINDER SHOULD THEREFORE BE
          DENIED...........................................................................................10

CONCLUSION.......................................................................................................12

i

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Adrian Family Partners I, LP v. ExxonMobil Corp.,*
   79 Fed. Appx. 489 (2d Cir. 2003) ...................................................................9

*Ashcroft v. Iqbal,*
   129 S.Ct. 1937 (2009) ...................................................................1, 5

*Bell Atlantic Corp. v. Twombly,*
   127 S.Ct. 1955 (2007) ...................................................................1, 5

*Boulevard Assocs. v. Sovereign Hotels, Inc.,*
   72 F.3d 1029 (2d Cir. 1995) ...................................................................7

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,*
   373 F.3d 296 (2d Cir. 2004) ...................................................................10

*Deming v. Nationwide Mutual Ins. Co.,*
   2004 U.S. Dist. LEXIS 2396 (D. Conn. Feb. 14, 2004) .........................................10

*Gooden v. State Dep't of Corr.,*
   2009 U.S. Dist. LEXIS 68123 (D. Conn. Aug. 3, 2009) .........................................5

*Johnson v. Smithsonian Inst.,*
   4 Fed. Appx. 69 (2d Cir. 2001) ...................................................................8, 9

*Newman-Green, Inc. v. Alfonzo-Larrain,*
   490 U.S. 826 (1989) ...................................................................8

*Oski v. Fed. Express Corp.,*
   2009 U.S. Dist. LEXIS 93998 (D. Conn. Oct. 6, 2009) .........................................6, 7

*Pampillonia v. RJR Nabisco, Inc.,*
   138 F.3d 459 (2d Cir. 1998) ...................................................................8, 10, 11

*Pinkston v. Conn.,*
   2009 U.S. Dist. LEXIS 79601 (D. Conn. Sept. 2, 2009) .........................................5

*Raynor v. Shock Doctor, Inc.,*
   2009 U.S. Dist. LEXIS 10624 (D. Conn. Feb. 11, 2009) .........................................8, 9

*Rosado v. Potter,*
   2007 U.S. Dist. LEXIS 277 (D. Conn. Jan. 3, 2007) .........................................6

*Strawbridge v. Curtiss*,
7 U.S. 267, 2 L. Ed. 435 (1806)................................................................8

*Wachovia Bank, N.A. v. Schmidt*,
546 U.S. 303 (U.S. 2006)........................................................................8

*Whitaker v. Am. Telecasting, Inc.*,
261 F.3d 196 (2d Cir. 2001)...................................................................10

**STATE CASES**

*Appleton v. Bd. of Educ.*,
53 Conn. App. 252, 730 A.2d 88 (1999) ............................................7, 10

*Daley v. Aetna Life and Casualty Co.*,
249 Conn. 766, 734 A.2d 112 (1999) .............................................6, 7, 11

*Harp v. King*,
266 Conn. 747, 835 A.2d 953 (2003) .....................................................7

*Lawrence v. Harrington*,
2005 Conn. Super. LEXIS 1639 (Conn. Super. Ct. June 14, 2005) ............7

*Solomon v. Aberman*,
196 Conn. 359, 493 A.2d 193 (1985) .................................................6, 11

**FEDERAL STATUTES**

28 U.S.C. § 1332(a) ................................................................................9

28 U.S.C. § 1332(a)(1)..........................................................................2, 3

**RULES**

Fed. R. Civ. P. 12(b)(6)........................................................................1, 5

PRELIMINARY STATEMENT

Defendant Lynne Burnett ("Burnett") respectfully submits this memorandum of law in support of her motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Count Eight to the Amended Complaint of Plaintiff Predrag Cicvara for failure to state a claim upon which relief can be granted, and The Gillette Company, The Procter & Gamble Company (collectively "Procter & Gamble") and Ms. Burnett (collectively "Defendants") submit this memorandum of law in opposition to Plaintiff's Motion to Remand to State Court and for Joinder of an Additional Party.

A review of Plaintiff's Amended Complaint and motions for remand and joinder leads to the inescapable conclusion that Lynne Burnett was added as an individual Defendant solely in an effort to defeat diversity jurisdiction. Plaintiff's efforts fail for three critical, independent reasons.

First, the Eighth Count should be dismissed as a matter of law. By asserting the claim of tortious interference with business relationship against Ms. Burnett, Plaintiff fails to meet the necessary pleading standard the United States Supreme Court established in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) that a claim must be supported by factual allegations. This cause of action is pled without the necessary supporting factual allegations. It is, at most, the kind of threadbare claim that the Supreme Court rejected in *Iqbql* and *Twombly*, and is properly dismissed pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff fails to plead two essential elements for establishing a tortious interference claim in the employment context, namely: (1) that Ms. Burnett intentionally and without justification interfered with Plaintiff's relationship with Procter & Gamble; and (2) that Ms. Burnett acted outside the scope of her employment with Procter & Gamble in engaging in the alleged conduct.

1

Count Eight of the Amended Complaint, and correspondingly Ms. Burnett, should be dismissed, thus defeating Plaintiff's motion to remand and for joinder.

Second, Plaintiff's motion to remand should be denied as diversity jurisdiction remains undisturbed even if Ms. Burnett remains as a party. She was, and remains, a citizen of the State of Florida during all critical filings: the original Complaint, Defendants' removal of the case to this Court, and the Amended Complaint. Thus, even with Ms. Burnett as a Defendant, this Court maintains original jurisdiction over this action by reason of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1).

Third, Plaintiff's motion for joinder of Ms. Burnett as an additional party fails for the axiomatic reason that Plaintiff fraudulently joined Ms. Burnett with the sole purpose to defeat diversity jurisdiction. Plaintiff's only claim against her of tortious interference with business relationship is not cognizable under Connecticut State law in that it lacks two necessary requirements for any potential recovery against Ms. Burnett.

Plaintiff's Amended Complaint and motions for remand and joinder should be recognized for what they are – a naked attempt to defeat diversity jurisdiction. For the reasons detailed herein, this action should be restored to the procedural posture before Plaintiff's filings.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Predrag Cicvara was an employee of Procter & Gamble in its Bethel, Connecticut office until his employment was terminated on June 15, 2009, for cause, for violating the Worldwide Business Conduct Manual. After his termination, Plaintiff attempted to exercise options to purchase common stock of Procter & Gamble. However, he was unable to do so because the options were cancelled as a result of his termination for cause.

Plaintiff filed the original Complaint in the Connecticut State Superior Court on November 17, 2009 (the "State Court Action"). (Docket Entry 1, Ex. 1). In the Complaint, he

2

asserted six counts against Procter & Gamble and the other corporate Defendants: "stock options," "unjust enrichment stock options," "severance package," "unjust enrichment severance package," "annual bonus," and "statutory payment of wage."

Procter & Gamble removed the State Court Action to this Court on December 19, 2009, on the grounds that this Court has original jurisdiction over this action by reason of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1). (Docket Entry 1). In the Notice of Removal, Procter & Gamble sets forth the diversity of citizenship of all parties: Plaintiff is a citizen of the State of Connecticut; The Procter and Gamble Company is a citizen of the State of Ohio; and The Gillette Company is a citizen of the Commonwealth of Massachusetts. (*Id.* at ¶ 4). Defendants also clarified that "Duracell" is not an existing corporate entity, but rather a product brand.

Plaintiff filed his Amended Complaint as a matter of course on January 6, 2010. (Docket Entry 14). The Amended Complaint differs from the original Complaint in a few key respects. First, Lynne Burnett has now been added as an individual Defendant. Plaintiff erroneously claims she is a citizen of Connecticut, and asserts the separate cause of action of tortious interference with business relationship against Ms. Burnett. (*Id.* at ¶¶ 43-50). Plaintiff also re-styled the counts against the corporate Defendants: breach of contract – stock options, unjust enrichment – stock options, breach of contract – severance package, unjust enrichment – severance package, breach of contract – annual bonus, unjust enrichment – annual bonus, and statutory payment of wages. Claiming Ms. Burnett is a non-diverse party, Plaintiff also filed a motion to remand this action to the Connecticut State Superior Court and for joinder of Ms. Burnett as an additional party on January 6, 2010. (Docket Entries 15, 16).

3

Defendant Burnett now moves to dismiss the sole count against her, as it fails to state a claim under Connecticut State law and correspondingly to be dismissed as a party in this case. All Defendants oppose the motion to remand and for joinder of Ms. Burnett as an additional party on the grounds that diversity of citizenship remains even if Ms. Burnett is added as an additional party, and that Plaintiff fraudulently joined her for the sole purpose of defeating diversity jurisdiction.

<u>ARGUMENT</u>

I.   PLAINTIFF'S CLAIM OF TORTIOUS INTERFERENCE WITH BUSINESS
     RELATIONSHIP AGAINST LYNNE BURNETT FAILS TO ALLEGE FACTS
     <u>SUFFICIENT TO ESTABLISH A VALID CLAIM IN THE AMENDED COMPLAINT</u>

A plaintiff must allege factual allegations, rather than conclusory allegations, sufficient to

state a claim to survive a motion to dismiss. Fed. R. Civ. P. 12(b)(6).  The United States

Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), that "a plaintiff's

obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at

1964-65.  This rule was recently expanded upon in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009),

where the Supreme Court held that a court should upon a motion to dismiss first "begin by

identifying pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth.  While legal conclusions can provide the framework of a complaint, *they*

*must be supported by factual allegations*." *Id.* at 1940. (emphasis added).  As such, this Court

has held that a plaintiff must "amplify [his] claim with some factual allegations in those contexts

were such amplification is needed to render the claim plausible," otherwise the claim should be

dismissed. *Gooden v. State Dep't of Corr.*, 2009 U.S. Dist. LEXIS 68123, at *11 (D. Conn. Aug.

3, 2009) (quoting *Iqbal*); *Pinkston v. Conn.*, 2009 U.S. Dist. LEXIS 79601, at **2-4 (D. Conn.

Sept. 2, 2009) (granting motion to dismiss).

Plaintiff's claim of tortious interference with business relationship in the Amended

Complaint against Ms. Burnett fails for the reasons the Supreme Court articulated in *Iqbal* and

*Twombly*.  The claim is based upon conclusory allegations only, lacking the necessary,

supporting allegations.  It at most alleges Ms. Burnett conducted an internal investigation of

Plaintiff; she met with Plaintiff and made unprofessional remarks, which evince negative

5

feelings towards him; and she intentionally and improperly terminated Plaintiff's employment because of her negative feelings towards him. (Am. Comp. ¶¶ 43-50).

To prevail on a tortious interference claim in the employment context, a plaintiff must allege facts as to five elements. The Connecticut State Supreme Court sets forth the first four elements that apply to all claims of tortious interference, regardless of whether it is in the employment context: (1) a contract or beneficial relationship exists; (2) defendant has knowledge of that relationship; (3) defendant intended to interfere with that relationship; and (4) plaintiff suffered an actual loss as a result of that interference. *Solomon v. Aberman*, 196 Conn. 359, 364-65, 493 A.2d 193 (1985); *Oski v. Fed. Express Corp.*, 2009 U.S. Dist. LEXIS 93998, at \*\*16-18 (D. Conn. Oct. 6, 2009). To adequately plead and establish the third element, "plaintiff must prove that defendants committed tortious conduct such as fraud, misrepresentation, intimidation or acted maliciously." *Oski*, 2009 U.S. Dist. LEXIS at \* 17 (citing *Solomon*, 196 Conn. at 365); *Rosado v. Potter*, 2007 U.S. Dist. LEXIS 277, at \*18-19 (D. Conn. Jan. 3, 2007). The Connecticut State Supreme Court makes an important distinction as to this element: "This malice is not necessarily ill will but rather an intentional interference without justification." *Daley v. Aetna Life and Casualty Co.*, 249 Conn. 766, 806, 734 A.2d 112 (1999) (internal quotations omitted).

The fifth, required element is specific to a claim that is directed against an agent-employee of the plaintiff's former employer: whether a defendant acted within the scope of their employment. The Connecticut Appellate Court explains the reasoning for the additional element:

> An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the

6

> corporation liable in tort for breaching its own contract ... [the
> agent, however,] could be held liable for such interference or
> inducement if he did not act legitimately within his scope of duty
> but used the corporate power improperly for personal gain.

*Appleton v. Bd. of Educ.*, 53 Conn. App. 252, 267, 730 A.2d 88 (1999); *Oski*, 2009 U.S. Dist.

LEXIS, at *17 (quoting *Appleton* and *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029,

1036 (2d Cir. 1995)); *Lawrence v. Harrington*, 2005 Conn. Super. LEXIS 1639, at **5-6 (Conn.

Super. Ct. June 14, 2005).  It is therefore necessary to determine whether the individual

defendant-employee acted within the scope of his employment.  To do so, courts consider

whether the conduct "(1) occurs primarily within the employer's authorized time and space

limits; (2) is the type that the employee is employed to perform; and (3) is motivated, at least in

part, by a purpose to serve the employer." *Harp v. King*, 266 Conn. 747, 783, 835 A.2d 953

(2003).

   Plaintiff's claim against Ms. Burnett lacks two critical elements.  First, he fails to allege

that Ms. Burnett's alleged conduct was motivated by anything beyond mere ill will towards him.

Plaintiff only claims that Ms. Burnett "conducted a meeting with the plaintiff where she made

unprofessional, inappropriate and disparaging personal comments about plaintiff, which clearly

evince she harbored negative personal feelings towards plaintiff." (Am. Comp. ¶ 47).  This is

insufficient to survive a motion to dismiss as a matter of law. *Daley*, 249 Conn. at 806.

   The second fatal defect is that Plaintiff fails to allege – in any way – that Ms. Burnett

acted outside the scope of her employment in engaging in any of the alleged conduct.  Plaintiff

makes no, and can make no, allegation that the alleged conduct occurred: (1) outside Procter &

Gamble's "time and space limits," (2) that it is the type of conduct Ms. Burnett was not hired to

perform, or (3) that her conduct was motivated by a purpose other than "to serve [Procter &

Gamble]." *See Harp*, 266 Conn. at 786.  Rather, while assuming the allegations to be true, the

7

Amended Complaint actually confirms Ms. Burnett acted *within* the scope of her employment during the alleged conduct: it specifically states that she conducted an internal investigation of Plaintiff and met with Plaintiff in her capacity as a Procter and Gamble employee – nothing more. (Am. Comp. ¶¶ 45, 46). As such, Count Eight should be dismissed as a matter of law, and Ms. Burnett should be dismissed from the Amended Complaint as a party in this case.

II.   PLAINTIFF'S MOTION TO REMAND SHOULD BE DENIED BECAUSE DIVERSITY JURISDICTION REMAINS EVEN IF MS. BURNETT IS AN ADDED PARTY

Plaintiff fails in his attempt to defeat diversity jurisdiction by amending the Complaint to name Ms. Burnett as an individual defendant. Ms. Burnett has been, and remains, a citizen of the State of Florida since the original Complaint was filed in state court. Defendants have thus fulfilled the requirements for removal under diversity jurisdiction.

Federal courts have diversity jurisdiction over an action "where all plaintiffs are citizens of different states from all defendants." *Strawbridge v. Curtiss*, 7 U.S. 267, 2 L. Ed. 435 (1806); *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998). An individual is considered a citizen of but one state for purposes of diversity jurisdiction, and the individual is deemed a citizen of the state of her "domicile." *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 318 (U.S. 2006) (citing *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989)). "Domicile is the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." *Johnson v. Smithsonian Inst.*, 4 Fed. Appx. 69, 70 (2d Cir. 2001) (internal citations omitted). Indicia of an individual's domicile include the state the individual acquired his drivers' license, opened a bank account, registered to vote or paid taxes. *Raynor v. Shock Doctor, Inc.*, 2009 U.S. Dist. LEXIS 10624, *5 (D. Conn. Feb. 11, 2009).

8

Ms. Burnett's domiciliary has been the State of Florida since January 2009. (Burnett Aff. ¶¶ 2-6). It is in Florida where Ms. Burnett owns her "fixed home and principal establishment." (*Id.* at ¶ 2). From this Florida home, she worked remotely and would commute to Connecticut when necessary. (*Id.* at ¶ 3). When she did commute to Connecticut, she would stay at a temporary residence, which is the address Plaintiff lists for her in the Certificate of Service of the Amended Complaint. (*Id.* at ¶ 4). The lease for this rented house expired in September 2008, after which Ms. Burnett rented the house on a month-to-month basis until September 2009. (*Id.*). After September 2009, Ms. Burnett would either stay with a friend in New York or in a hotel if she had to commute to Connecticut, and would then ultimately return to her "fixed home and principal establishment" in Florida. (*Id.* at ¶ 5). She is also registered to vote in Florida, and has a Florida-issued drivers' license. (*Id.* at ¶ 6). Ms. Burnett is thus indisputably a citizen of the State of Florida. *See Johnson*, 4 Fed. Appx. at 70*; Raynor*, 2009 U.S. Dist. LEXIS at *5.

Accordingly, this Court had, and maintains, original jurisdiction over this action by reason of diversity of citizenship pursuant to 28 U.S. C. § 1332(a) at all the critical times: (1) when the original action was filed in state court on November 19, 2009; (2) when it was removed to federal court on December 19, 2009; and (3) even when the Amended Complaint was filed on January 6, 2010. *Adrian Family Partners I, LP v. ExxonMobil Corp.*, 79 Fed. Appx. 489, 491 (2d Cir. 2003). Thus, Defendants have met their burden showing that the requirements for removal have been met, and Plaintiff raises no other argument as to why this action should be remanded other than his erroneous assumption that Ms. Burnett is a citizen of Connecticut.

9

III.     PLAINTIFF FRAUDULENTLY JOINED MS. BURNETT TO DEFEAT DIVERSITY
         JURISDICTION AND ASSERTED A CAUSE OF ACTION AGAINST HER WITH NO
         POSSIBILITY OF SUCCESS AND HIS MOTION FOR JOINDER SHOULD
         THEREFORE BE DENIED

         The sole cause of action Plaintiff asserts against Ms. Burnett is Count Eight, tortious

interference with a business relationship.  No possibility exists that Plaintiff could successfully

state this claim in any Connecticut State court.  Accordingly, because Plaintiff fraudulently

joined Ms. Burnett to defeat diversity jurisdiction, his motion should be denied.

         The doctrine of fraudulent joinder is designed to prevent the tactic of plaintiffs "in an

effort to defeat federal jurisdiction, join non-diverse defendants against whom they have no real

claims." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 302 (2d Cir. 2004).

Fraudulent joinder exists where there is clear and convincing evidence that "there has been

outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the

pleadings, that a plaintiff can state a cause of action against the [fraudulently joined] defendant in

state court." *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998).  In applying the

latter ground for fraudulent joinder, "federal courts are not to weigh the merits of a plaintiff's

claim beyond determining whether it is an arguable one under state law." *Deming v. Nationwide*

*Mutual Ins. Co.*, 2004 U.S. Dist. LEXIS 2396, at *4 (D. Conn. Feb. 14, 2004).  Stated another

way, "joinder will be considered fraudulent when it is established that there can be no recovery

against the defendants under the law of the state on the cause alleged." *Whitaker v. Am.*

*Telecasting, Inc.*, 261 F.3d 196, 207 (2d Cir. 2001).

         Plaintiff's claim of tortious interference with a business relationship against Ms. Burnett

is not "an arguable one under [Connecticut] [S]tate law." *See Deming*, 2004 U.S. Dist. LEXIS at

*4.  As discussed above, the Connecticut State Supreme Court does not recognize such a claim

when it is directed against an agent acting within the scope of her employment. *See Appleton*, 53

10

Conn. App. at 267; *supra* at Point I, pp. 6-7. The Amended Complaint is devoid of any allegation – even when construing it as broadly as possible – that Ms. Burnett acted outside the scope of her employment in engaging in the alleged conduct. The absence of such allegations is fatal to Plaintiff's claim.

Additionally, the Amended Complaint fails to allege the critical element that Ms. Burnett's alleged conduct constitutes "fraud, misrepresentation, intimidation or [that she] acted maliciously." *See Solomon*, 196 Conn. at 365; *supra* at Point I, p. 6. Even giving the Amended Complaint the most generous reading, Plaintiff has only alleged that Ms. Burnett acted out of ill will. This is insufficient as a matter of law to state a viable claim. *See Daley*, 249 Conn. at 806; *supra* at Point I, p. 6. As such, no possibility exists that "based on the pleadings" Plaintiff can state this cause of action against Ms. Burnett in Connecticut State court. *See Pampillonia*, 138 F.3d at 461.

As Count Eight is the only cause of action directed against Ms. Burnett, Plaintiff's motion for joinder of an additional party should be denied.

**A-68**

<u>CONCLUSION</u>

For the foregoing reasons, Defendant Burnett respectfully requests that the Court dismiss the Eighth Count and Ms. Burnett as a party from the Amended Complaint in its entirety, all Defendants request that the Court deny Plaintiff's motion for joinder and to remand this matter to state court, and award such other and further relief as the Court deems appropriate.

Dated this 22nd day of January, 2010, at New York, New York.

Respectfully submitted,
SEYFARTH SHAW LLP


By: /s/ Richard I. Scharlat
      Edward Cerasia II (ct 13096)
      Richard I. Scharlat (ct 23641)
620 Eighth Avenue, 32nd floor
New York, New York 10018
(212) 218-5500
rscharlat@seyfarth.com
Attorneys for Defendants The Procter & Gamble
Company, The Gillette Company and
Lynne Burnett

**A-69**

.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------------------------x
:
PREDRAG CICVARA,                                        :  Civil Action No.3:09-cv-2054
                                                        :  (JCH) (HF)
          Plaintiff,                                 :
                                                        :
      v.                                                :  February 12, 2010
                                                        :
THE GILLETTE COMPANY and PROCTER &                      :
GAMBLE COMPANY, INC, DURACELL, AN ENTITY                :
OF UNKNOWN FORM, and LYNNE BURNETT,                     :
                                                        :
          Defendants.                                :
                                                        :
                                                        :
---------------------------------------------------------------------------x

### PLAINTIFF CICVARA'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS
### COUNT EIGHT TO THE AMENDMENDED COMPLAINT

      The Plaintiff in the above captioned action, respectfully objects to Defendant Lynne

Burnett's Motion to Dismiss.  In support of his motion the plaintiff has attached a memorandum

of law in support of his objection.

      WHEREFORE, the Plaintiff prays this honorable court:

      1.  Grant this Objection;

      2.  Award the Plaintiff its costs, including attorney's fees, incurred in objecting to this

motion;

      3.  Granting to Plaintiff such other and further relief as the Court may deem just and

proper

**A-70**

Respectfully submitted,

/s/ Michael E. Skiber. Esq.
Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT 06604
(203) 615-0090

Attorney for the Plaintiff Predrag Cicvara

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------------------------x
:
PREDRAG CICVARA,                               :   Civil Action No.3:09-cv-2054
                                               :   (JCH) (HF)
            Plaintiff,                         :
                                               :
      v.                                       :   February 8, 2010
                                               :
THE GILLETTE COMPANY and PROCTER &             :
GAMBLE COMPANY, INC, DURACELL, AN ENTITY       :
OF UNKNOWN FORM, and LYNNE BURNETT,            :
                                               :
            Defendants.                        :
                                               :
                                               :
---------------------------------------------------------------------------x

### PLAINTIFF'S CICVARA'S MEMORANDUM OF LAW IN OPPOSITION TO
### DEFENDANT'S MOTION TO DISMISS COUNT EIGHT TO THE AMENDED COMPLAINT

Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT 06604
(203) 615-0090

Attorney for the Plaintiff Predrag Cicvara

A-72

TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................3

BRIEF STATEMENT OF THE FACTS...................................................................4

ARGUMENT.......................................................................................6

    I.     MR. CICVARA'S CLAIM OF TORTIOUS INTERFERENCE
          WITH A BUSINESS RELATIONSHIP AGAINST LYNNE
          BURNETT IS SUFFICIENT TO ESTABLISH A VALID CLAIM
          UNDER THE PLAUSIBILITY STANDARD UNDER
          BELL ATLANTIC V. TWOMBLY..................................................6

    II.    MR. CICVARA PROPERLY JOINED DEFENDANT LYNNE
          BURNETT FOR TORTIOUS INTERFERENCE WITH A
          BUSINESS RELATIONSHIP AND IS ENTITLED TO BRING
          THAT CLAIM IN THIS COURT..................................................11

CONCLUSION....................................................................................12

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)……………………………………………………6, 7

*Bennett v. Beiersdorf, Inc.*, 889 F.Supp. 46 (D. Conn. 1995)…………………………………………9

*Bolt Elec., Inc. v.City of New York*, 53 F.3d 465, 469 (2d Cir. 1995)………………………………6

*Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir.2004)…………………………6

### STATE CASES

*Appleton v. Board of Education*, 254 Conn. 205, 212-13, 757 A.2d 1059 (2000)……………..7

*Bradkin v. Leverton*, 32 A.D.2d 1057, 1058 (N.Y. 1969)…………………………………………9

*Harp v. King*, 266 Conn. 747, 782-83 (2003)……………………………………………………8

*Metcoff v. Lebovics*, 2008 WL 707311 (Conn.Super.), 45 Conn. L. Rptr. 81 (2008)…………9

*Murray v. Bridgeport Hospital*, 40 Conn.Supp. 56, 60-61 (1984)……………………………......9

*Savage v. Andoh*, 2008 WL 1914630 (Conn.Super.), 45 Conn. L. Rptr. 493 (2008)…………..8

### FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 8………………………………………………………………………………6

Fed. R. Civ. P. 12……………………………………………………………………………6

Fed. R. Civ. P. 84……………………………………………………………………………6

Fed. R. Civ. P. form 11………………………………………………………………………7

### BRIEF STATEMENT OF THE FACTS

Predrag Cicvara was an employee of Procter & Gamble, the Gillette Company and Duracell working out of the Bethel, Connecticut office for approximately a decade and earned a substantial amount of stock options, which had been completely vested for more than four years at the time of his termination. On June 15, 2009 Mr. Cicvara was terminated for cause after a fifteen minute meeting at Duracell Headquarters in Bethel, CT with defendant Lynne Burnett for allegedly violating the so-called Worldwide Business Conduct manual.

Importantly, Ms. Burnett failed to ask Mr. Cicvara for his version of the events that took place concerning his termination, and upon information and belief never considered Mr. Cicvara's claims.  Instead, during this meeting with Mr. Cicvara, Ms. Burnett visibly and verbally expressed distaste for Mr. Cicvara.  As a result, Mr. Cicvara was terminated for cause, resulting in substantial damages including, but not limited to, loss of job, loss of benefits including stock options and bonus, tarnished business reputation in the industry, and a complete collapse of his family life. To date Mr. Cicvara remains unemployed.

Mr. Cicvara filed the original Complaint in the Connecticut Superior Court on November 17, 2009. Procter & Gamble, the Gillette Company and Duracell removed the State Court Action to this Court on December 19, 2009 pursuant to 28 U.S.C. § 1332(a)(1) for diversity of citizenship. Upon further investigation, Mr. Cicvara filed an Amended Complaint on January 6, 2010, adding defendant Lynne Burnett for tortious interference with a business relationship in addition to the original counts filed against Procter & Gamble, the Gillette Company and Duracell related to his termination.

4

Case 12-338, Document 57, 07/23/2012, 671466, Page84 of 291

Defendant presently moves to dismiss pursuant to Rule 12(b)(6) of the Federal Civil Rules of Procedure.

## ARGUMENT

I.   MR. CICVARA'S CLAIM OF TORTIOUS INTERFERENCE WITH A BUSINESS
     RELATIONSHIP AGAINST LYNNE BURNETT IS SUFFICIENT TO
     ESTABLISH A VALID CLAIM UNDER THE PLAUSIBILITY STANDARD SET
     FORTH IN BELL ATLANTIC V. TWOMBLY.

Defendant Lynne Burnett moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to

dismiss Count EIGHT of the Amended Complaint for failure to state a claim upon which relief

may be granted. Fed. R. Civ. P. 12(b)(6). "When deciding a 12(b)(6) motion, the Court must take

as true the facts as alleged in plaintiff's complaint." *Bolt Elec., Inc. v.City of New York*, 53 F.3d

465, 469 (2d Cir. 1995). Moreover, reasonable inferences must be drawn in the plaintiff's favor.

*Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir.2004). A 12(b)(6) motion will fail

where the plaintiff pleads "enough facts to state a claim to relief that is plausible on its face."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The defendant's 12(b)(6) motion

should be denied because Ms. Burnett's claim asserts factual support to satisfy the essential

elements of toritous interference with a business relationship.

The Federal Rules of Civil Procedure require only "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. R. 8(1)(2). In *Bell Atlantic v.

Twombly*, the Supreme Court affirmed that "a complaint attacked by a Rule 12(b)(6) motion to

dismiss does not need detailed factual allegations." *Twombly*, 550 U.S. at 555. The Defendant

contends that the decision in *Twombly* heightened the pleading standard, however the Court

explicitly rejected this argument in stating, "we do not require heightened fact pleading of

specifics." *Id.* at 564 n.8. The Court in *Twombly* merely articulated that "[f]actual allegations

must be enough to raise a right to relief above the speculative level." *Id.* at 555. Moreover, the

Federal Rules offer guidance as to what type of factual allegations would be sufficient to state a

claim in the Appendix of Forms. Fed. R. Civ. P. 84 ("The forms in the Appendix suffice under

these rules and illustrate the simplicity and brevity that these rules contemplate."). Form 11, for

example, reads "On date, at place, the defendant negligently drove a motor vehicle against the

plaintiff." Fed. R. Civ. P. form 11. The defendant's argument that a complaint cannot rely on

legal conclusions is inconsistent with the Federal Rules of Civil Procedure.

The complaint alleges that Ms. Burnett conducted an internal investigation of Mr. Cicvara

where she made unprofessional remarks that evinced negative feelings toward him and failed to

consider claims made by Mr. Cicvara. These actions led to Mr. Cicvara's termination for cause

resulting in severe damages. For the following reasons, Mr. Cicvara's complaint alleges facts

which create sufficient plausibility that he is entitled to relief pursuant to tortious interference

with a business relationship as required by the pleading standard set forth in *Twombly*. 550 U.S.

544.

To prevail on a claim for tortious interference with a business relationship the plaintiff

must show the following elements: "1) the existence of a contractual or beneficial relationship,

2) the defendants' knowledge of that relationship, 3) the defendants' intent to interfere with the

relationship, 4) the interference was tortious, and 5) a loss suffered by the plaintiff that was

caused by the defendants' tortious conduct." *Appleton v. Board of Education*, 254 Conn. 205,

212-13, 757 A.2d 1059 (2000). An additional element applies in this case.

> The general rule is that the agent may not be charged with having
> interfered with a contract of the agent's principal. An agent acting
> legitimately within the scope if his authority cannot be held liable
> for interfering with or inducing his principal to breach a contract
> between his principal and a third party . . . [the agent, however]
> could be held liable for such interference or inducement if he did
> not act legitimately within his scope of duty but used the corporate
> power improperly for personal gain." (Citations omitted; internal
> quotations omitted) *Appleton v. Board of Education*, 53 Conn.App.
> 252, 267 (1999), rev'd in part on other grounds, 254 Conn. 505,
> 757 A.2d 1059 (2000).

First, there was a contractual relationship between Mr. Cicvara and Procter & Gamble, the Gillette Company and Duracell, Ms. Burnett knew about the contract, and she tortiously and intentionally interfered with that contract when she made the decision to terminate Mr. Cicvara for cause without proper investigation of the allegations against him. Mr. Cicvara suffered considerable damages as a result.

Moreover, Ms. Burnett was acting outside of the scope of her employment when she terminated Mr. Cicvara for cause. Determining whether the defendant's conduct is within the scope of their employment is not controlled by whether Ms. Burnett received personal benefit from her conduct, but "whether the agent's conduct is beyond any fair description of the agent's legitimate responsibilities and whether the agent's conduct is inimical to the principal's interests or both." *Metcoff v. Lebovics*, 2008 WL 707311 (Conn.Super.), 45 Conn. L. Rptr. 81 (2008). Courts generally consider whether the agent's conduct "(1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Harp v. King*, 266 Conn. 747, 782-83 (2003). "Ordinarily, it is a question of fact as to whether a willful tort of the servant has occurred within the scope of the servant's employment." *Id.* In *Savage v. Andoh*, 2008 WL 1914630 (Conn.Super.), 45 Conn. L. Rptr. 493 (2008), the court held that the chair of the plaintiffs department who allegedly made improper and false statements and reports about her performance was not acting within the scope of his employment. *Id.* at *6.

In this case, there is an asymmetry of information. Currently, it cannot be known whether Ms. Burnett's improper statements were false, however, one could reasonably presume that the failure of Ms. Burnett to conduct a proper investigation in failing to inquire about Mr. Cicvara's version of the events that took place leading up to the interview, in addition to her making of

unprofessional comments during the investigation, is suggestive that Ms. Burnett's conduct fell outside of the authorized scope of her employment, as well as contrary to the interests of her principal Procter and Gamble, the Gillette Company and Duracell.

Moreover, the test is whether the agent "did not act legitimately within his scope of duty *but* [instead] used the corporate power improperly for personal gain." *Murray v. Bridgeport Hospital*, 40 Conn.Supp. 56, 60-61 (1984)(emphasis added). This Court has stated that "[a]n agent may be said to be acting for 'personal gain' if she seeks personal financial gain, or if she is motivated by personal animus." *Bennett v. Beiersdorf, Inc.*, 889 F.Supp. 46, 52 (D. Conn. 1995). In *Bennett*, this Court further noted that "tort liability should be swiftly imposed whenever an officer, director, employee or stockholder induces a breach of contract for private benefit or to satisfy personal feelings against a third party." (*citing Murray*, 40 Conn.Supp. at 61)(*citing Bradkin v. Leverton*, 32 A.D.2d 1057, 1058 (N.Y. 1969). This Court held that because the ill-feelings toward the plaintiff were not alleged in the complaint, the defendant's motion to dismiss was granted. *Bennett*, 889 F.Supp. at 52. Ms. Burnett is both an employee and stockholder who interfered with Mr. Cicvara's contract with Proctor and Gamble to satisfy her personal feelings against him. Lastly, it cannot be said at this point whether Ms. Burnett was in compliance with company policies related to the situation in which she put Mr. Cicvara. There has not been any discovery performed, which will undoubtedly include work product produced by Ms. Burnett and others responsible for the wrongful termination for cause of Mr. Cicvara.  As this was alleged in the complaint, this Court should deny the defendant's motion to dismiss for failure to state a claim.

**A-80**

II.    MR. CICVARA PROPERLY JOINED DEFENDANT LYNNE BURNETT FOR
        TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP AND IS
        ENTITLED TO ASSERT THAT CLAIM IN THIS COURT.

As contended in Argument § I, Mr. Cicvara has a valid claim against defendant Lynne

Burnett. It is the Plaintiff's position that upon further discovery and due diligence, facts that can

currently only be known to the Defendant will further establish that Mr. Cicvara was wrongfully

terminated "for cause" by Ms. Burnett because of her personal animus toward him and so that

the company could relinquish the benefits he would receive if he had been fired without cause.

CONCLUSION

For the foregoing reasons, Predrag Cicvara respectfully requests that this Court deny

Defendant Lynne Burnett's motion to dismiss the Eighth Count of the Amended Complaint.

Respectfully submitted,

/s/ Michael E. Skiber. Esq.
Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT 06604
(203) 615-0090

Attorney for the Plaintiff Predrag Cicvara

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

-----------------------------------------------------------------------------x
:
PREDRAG CICVARA,                                          :   Civil Action No.3:09-cv-2054
                                                         :   (JCH) (HF)
                        Plaintiff,                        :
                                                         :
            v.                                            :   February 8, 2010
                                                         :
THE GILLETTE COMPANY and PROCTER &                       :
GAMBLE COMPANY, INC, DURACELL, AN ENTITY                 :
OF UNKNOWN FORM, and LYNNE BURNETT,                      :
                                                         :
                        Defendants.                      :
                                                         :
                                                         :
-----------------------------------------------------------------------------x


## PLAINTIFF'S CICVARA'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS COUNT EIGHT TO THE AMENDED COMPLAINT


Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT 06604
(203) 615-0090

Attorney for the Plaintiff Predrag Cicvara

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………3

BRIEF STATEMENT OF THE FACTS………………………………………………...4

ARGUMENT……………………………………………………………………….…6

      I.     MR. CICVARA'S CLAIM OF TORTIOUS INTERFERENCE
           WITH A BUSINESS RELATIONSHIP AGAINST LYNNE
           BURNETT IS SUFFICIENT TO ESTABLISH A VALID CLAIM
           UNDER THE PLAUSIBILITY STANDARD UNDER
           BELL ATLANTIC V. TWOMBLY……………………………………………6

      II.    MR. CICVARA PROPERLY JOINED DEFENDANT LYNNE
           BURNETT FOR TORTIOUS INTERFERENCE WITH A
           BUSINESS RELATIONSHIP AND IS ENTITLED TO BRING
           THAT CLAIM IN THIS COURT……………………………………………...11

CONCLUSION…………………………………………………………………………12

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)........................................................6, 7

*Bennett v. Beiersdorf, Inc.*, 889 F.Supp. 46 (D. Conn. 1995)........................................9

*Bolt Elec., Inc. v.City of New York*, 53 F.3d 465, 469 (2d Cir. 1995)...........................6

*Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004)..............................6

### STATE CASES

*Appleton v. Board of Education*, 254 Conn. 205, 212-13, 757 A.2d 1059 (2000).................7

*Bradkin v. Leverton*, 32 A.D.2d 1057, 1058 (N.Y. 1969)...............................................9

*Harp v. King*, 266 Conn. 747, 782-83 (2003)...........................................................8

*Metcoff v. Lebovics*, 2008 WL 707311 (Conn.Super.), 45 Conn. L. Rptr. 81 (2008).............9

*Murray v. Bridgeport Hospital*, 40 Conn.Supp. 56, 60-61 (1984)...................................9

*Savage v. Andoh*, 2008 WL 1914630 (Conn.Super.), 45 Conn. L. Rptr. 493 (2008)..............8

### FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 8...........................................................................................6

Fed. R. Civ. P. 12........................................................................................6

Fed. R. Civ. P. 84........................................................................................6

Fed. R. Civ. P. form 11...................................................................................7

### BRIEF STATEMENT OF THE FACTS

Predrag Cicvara was an employee of Procter & Gamble, the Gillette Company and Duracell working out of the Bethel, Connecticut office for approximately a decade and earned a substantial amount of stock options, which had been completely vested for more than four years at the time of his termination. On June 15, 2009 Mr. Cicvara was terminated for cause after a fifteen minute meeting at Duracell Headquarters in Bethel, CT with defendant Lynne Burnett for allegedly violating the so-called Worldwide Business Conduct manual.

Importantly, Ms. Burnett failed to ask Mr. Cicvara for his version of the events that took place concerning his termination, and upon information and belief never considered Mr. Cicvara's claims.  Instead, during this meeting with Mr. Cicvara, Ms. Burnett visibly and verbally expressed distaste for Mr. Cicvara.  As a result, Mr. Cicvara was terminated for cause, resulting in substantial damages including, but not limited to, loss of job, loss of benefits including stock options and bonus, tarnished business reputation in the industry, and a complete collapse of his family life. To date Mr. Cicvara remains unemployed.

Mr. Cicvara filed the original Complaint in the Connecticut Superior Court on November 17, 2009. Procter & Gamble, the Gillette Company and Duracell removed the State Court Action to this Court on December 19, 2009 pursuant to 28 U.S.C. § 1332(a)(1) for diversity of citizenship. Upon further investigation, Mr. Cicvara filed an Amended Complaint on January 6, 2010, adding defendant Lynne Burnett for tortious interference with a business relationship in addition to the original counts filed against Procter & Gamble, the Gillette Company and Duracell related to his termination.

4

A-86

Defendant presently moves to dismiss pursuant to Rule 12(b)(6) of the Federal Civil Rules of Procedure.

.

## ARGUMENT

I.     MR. CICVARA'S CLAIM OF TORTIOUS INTERFERENCE WITH A BUSINESS
       RELATIONSHIP AGAINST LYNNE BURNETT IS SUFFICIENT TO
       ESTABLISH A VALID CLAIM UNDER THE PLAUSIBILITY STANDARD SET
       FORTH IN BELL ATLANTIC V. TWOMBLY.

Defendant Lynne Burnett moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to

dismiss Count EIGHT of the Amended Complaint for failure to state a claim upon which relief

may be granted. Fed. R. Civ. P. 12(b)(6). "When deciding a 12(b)(6) motion, the Court must take

as true the facts as alleged in plaintiff's complaint." *Bolt Elec., Inc. v.City of New York*, 53 F.3d

465, 469 (2d Cir. 1995). Moreover, reasonable inferences must be drawn in the plaintiff's favor.

*Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir.2004). A 12(b)(6) motion will fail

where the plaintiff pleads "enough facts to state a claim to relief that is plausible on its face."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The defendant's 12(b)(6) motion

should be denied because Ms. Burnett's claim asserts factual support to satisfy the essential

elements of toritous interference with a business relationship.

The Federal Rules of Civil Procedure require only "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. R. 8(1)(2). In *Bell Atlantic v.*

*Twombly*, the Supreme Court affirmed that "a complaint attacked by a Rule 12(b)(6) motion to

dismiss does not need detailed factual allegations." *Twombly*, 550 U.S. at 555. The Defendant

contends that the decision in *Twombly* heightened the pleading standard, however the Court

explicitly rejected this argument in stating, "we do not require heightened fact pleading of

specifics." *Id.* at 564 n.8. The Court in *Twombly* merely articulated that "[f]actual allegations

must be enough to raise a right to relief above the speculative level." *Id.* at 555. Moreover, the

Federal Rules offer guidance as to what type of factual allegations would be sufficient to state a

claim in the Appendix of Forms. Fed. R. Civ. P. 84 ("The forms in the Appendix suffice under

these rules and illustrate the simplicity and brevity that these rules contemplate."). Form 11, for

example, reads "On date, at place, the defendant negligently drove a motor vehicle against the

plaintiff." Fed. R. Civ. P. form 11. The defendant's argument that a complaint cannot rely on

legal conclusions is inconsistent with the Federal Rules of Civil Procedure.

The complaint alleges that Ms. Burnett conducted an internal investigation of Mr. Cicvara

where she made unprofessional remarks that evinced negative feelings toward him and failed to

consider claims made by Mr. Cicvara. These actions led to Mr. Cicvara's termination for cause

resulting in severe damages. For the following reasons, Mr. Cicvara's complaint alleges facts

which create sufficient plausibility that he is entitled to relief pursuant to tortious interference

with a business relationship as required by the pleading standard set forth in *Twombly*. 550 U.S.

544.

To prevail on a claim for tortious interference with a business relationship the plaintiff

must show the following elements: "1) the existence of a contractual or beneficial relationship,

2) the defendants' knowledge of that relationship, 3) the defendants' intent to interfere with the

relationship, 4) the interference was tortious, and 5) a loss suffered by the plaintiff that was

caused by the defendants' tortious conduct." *Appleton v. Board of Education*, 254 Conn. 205,

212-13, 757 A.2d 1059 (2000). An additional element applies in this case.

> The general rule is that the agent may not be charged with having
> interfered with a contract of the agent's principal. An agent acting
> legitimately within the scope if his authority cannot be held liable
> for interfering with or inducing his principal to breach a contract
> between his principal and a third party . . . [the agent, however]
> could be held liable for such interference or inducement if he did
> not act legitimately within his scope of duty but used the corporate
> power improperly for personal gain." (Citations omitted; internal
> quotations omitted) *Appleton v. Board of Education*, 53 Conn.App.
> 252, 267 (1999), rev'd in part on other grounds, 254 Conn. 505,
> 757 A.2d 1059 (2000).

First, there was a contractual relationship between Mr. Cicvara and Procter & Gamble, the Gillette Company and Duracell, Ms. Burnett knew about the contract, and she tortiously and intentionally interfered with that contract when she made the decision to terminate Mr. Cicvara for cause without proper investigation of the allegations against him. Mr. Cicvara suffered considerable damages as a result.

Moreover, Ms. Burnett was acting outside of the scope of her employment when she terminated Mr. Cicvara for cause. Determining whether the defendant's conduct is within the scope of their employment is not controlled by whether Ms. Burnett received personal benefit from her conduct, but "whether the agent's conduct is beyond any fair description of the agent's legitimate responsibilities and whether the agent's conduct is inimical to the principal's interests or both." *Metcoff v. Lebovics*, 2008 WL 707311 (Conn.Super.), 45 Conn. L. Rptr. 81 (2008). Courts generally consider whether the agent's conduct "(1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Harp v. King*, 266 Conn. 747, 782-83 (2003). "Ordinarily, it is a question of fact as to whether a willful tort of the servant has occurred within the scope of the servant's employment." *Id.* In *Savage v. Andoh*, 2008 WL 1914630 (Conn.Super.), 45 Conn. L. Rptr. 493 (2008), the court held that the chair of the plaintiffs department who allegedly made improper and false statements and reports about her performance was not acting within the scope of his employment. *Id.* at *6.

In this case, there is an asymmetry of information. Currently, it cannot be known whether Ms. Burnett's improper statements were false, however, one could reasonably presume that the failure of Ms. Burnett to conduct a proper investigation in failing to inquire about Mr. Cicvara's version of the events that took place leading up to the interview, in addition to her making of

8

unprofessional comments during the investigation, is suggestive that Ms. Burnett's conduct fell

outside of the authorized scope of her employment, as well as contrary to the interests of her

principal Procter and Gamble, the Gillette Company and Duracell.

Moreover, the test is whether the agent "did not act legitimately within his scope of duty

*but* [instead] used the corporate power improperly for personal gain." *Murray v. Bridgeport*

*Hospital*, 40 Conn.Supp. 56, 60-61 (1984)(emphasis added). This Court has stated that "[a]n

agent may be said to be acting for 'personal gain' if she seeks personal financial gain, or if she is

motivated by personal animus." *Bennett v. Beiersdorf, Inc.*, 889 F.Supp. 46, 52 (D. Conn. 1995).

In *Bennett*, this Court further noted that "tort liability should be swiftly imposed whenever an

officer, director, employee or stockholder induces a breach of contract for private benefit or to

satisfy personal feelings against a third party." (*citing Murray*, 40 Conn.Supp. at 61)(*citing*

*Bradkin v. Leverton*, 32 A.D.2d 1057, 1058 (N.Y. 1969). This Court held that because the ill-

feelings toward the plaintiff were not alleged in the complaint, the defendant's motion to dismiss

was granted. *Bennett*, 889 F.Supp. at 52. Ms. Burnett is both an employee and stockholder who

interfered with Mr. Cicvara's contract with Proctor and Gamble to satisfy her personal feelings

against him. Lastly, it cannot be said at this point whether Ms. Burnett was in compliance with

company policies related to the situation in which she put Mr. Cicvara. There has not been any

discovery performed, which will undoubtedly include work product produced by Ms. Burnett

and others responsible for the wrongful termination for cause of Mr. Cicvara.  As this was

alleged in the complaint, this Court should deny the defendant's motion to dismiss for failure to

state a claim.

II.   MR. CICVARA PROPERLY JOINED DEFENDANT LYNNE BURNETT FOR
      TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP AND IS
      ENTITLED TO ASSERT THAT CLAIM IN THIS COURT.

As contended in Argument § I, Mr. Cicvara has a valid claim against defendant Lynne

Burnett. It is the Plaintiff's position that upon further discovery and due diligence, facts that can

currently only be known to the Defendant will further establish that Mr. Cicvara was wrongfully

terminated "for cause" by Ms. Burnett because of her personal animus toward him and so that

the company could relinquish the benefits he would receive if he had been fired without cause.

### CONCLUSION

For the foregoing reasons, Predrag Cicvara respectfully requests that this Court deny

Defendant Lynne Burnett's motion to dismiss the Eighth Count of the Amended Complaint.

Respectfully submitted,

/s/ Michael E. Skiber. Esq.
Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT 06604
(203) 615-0090

Attorney for the Plaintiff Predrag Cicvara

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

| | |
|---|---|
| PREDRAG CICVARA, | Civil Action No.3:09-cv-2054 (JCH) (HF) |
| Plaintiff, | |
| v. | |
| THE GILLETTE COMPANY and PROCTER & GAMBLE COMPANY and DURACELL, AN ENTITY OF UNKNOWN FORM and LYNNE BURNETT, | February 25, 2010 |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANT LYNNE BURNETT'S REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF HER MOTION TO DISMISS COUNT EIGHT**

Edward Cerasia II (ct 13096)
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
(212) 218-5500
Attorneys for Defendant Lynne Burnett

Case 12-338, Document 57, 07/23/2012, 671466, Page103 of 291

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I.      CICVARA HAS FAILED TO ALLEGE THAT BURNETT ACTED OUTSIDE THE SCOPE OF HER EMPLOYMENT AND CANNOT DO SO AS A MATTER OF LAW ........................................................................................... 2

    II.     CICVARA FAILS TO ALLEGE MALICE BY BURNETT ................................. 6

    III.    CICVARA'S CASES ARE DISTINGUISHABLE ............................................... 7

CONCLUSION ..................................................................................................................... 8

i

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009)..................................................................................................1

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007)..................................................................................................1

*Bennett v. Beiersdorf, Inc.,*
   889 F. Supp. 46 (D. Conn. 1995).............................................................................7, 8

*Malik v. Carrier Corp.*
   202 F.3d 97 (2d Cir. 2000)........................................................................................3, 5

*Purgess v. Sharrock,*
   33 F.3d 134 (2d Cir. 1994)..........................................................................................4

*Taylor v. Maxxim Med., Inc.,*
   2001 U.S. Dist. LEXIS 3381 (D. Conn. Feb. 28, 2001) ........................................3, 4

*Wylie v. City of New Haven*
   2003 U.S. Dist. LEXIS 25273 (D. Conn. Feb. 27 2003) ...........................................2

**STATE CASES**

*Cassidy v. Hartford Fin. Servs. Group,*
   2008 Conn. Super. LEXIS 107 (Conn. Super. Ct. Jan. 8, 2008) ...............................5

*Daley v. Aetna Life & Cas. Co.,*
   249 Conn. 766, 734 A.2d 112 (1999) ........................................................................6

*Harp v. King,*
   266 Conn. 747, 835 A.2d 953 (2003) ......................................................................4, 7

*Savage v. Andoh,*
   2008 Conn. Super. LEXIS 882 (Conn. Super. Ct. Apr. 11, 2008)............................7

**RULES**

Fed. R. Civ. P. 12(b)(6)..................................................................................................1, 3

ii

**PRELIMINARY STATEMENT**

Defendant Lynne Burnett ("Burnett") respectfully submits this reply memorandum of law in further support of her Fed. R. Civ. P. 12(b)(6) motion to dismiss Count Eight of Plaintiff Predrag Cicvara's ("Cicvara's") Amended Complaint for failure to state a claim upon which relief can be granted.

Cicvara's opposition memorandum makes clear that his tortious interference with business relationship claim in Count Eight should be dismissed because he failed to plead that Burnett acted outside the scope of her employment as a human resources professional at The Gillette Company and The Procter & Gamble Company (collectively, "Procter & Gamble") when she engaged in the alleged conduct. Obviously recognizing that he failed to plead such facts, Cicvara makes this "allegation" in his opposition memorandum. The Court, however, should reject his attempt to do so, because a party cannot use an opposition memorandum to supplement or account for allegations that do not appear in a complaint, which leaves Cicvara with no allegations. Thus, the Court should dismiss the claim.

Nonetheless, even if the Court looks at the allegations in Cicvara's opposition memorandum, those allegations are nothing short of conclusory statements, and thus not the type of factual allegations that are required under *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). Moreover, Cicvara's assertion on page 10 of his opposition memorandum that Burnett made her decision – at least in part – "so that the company could relinquish the benefits he would receive if he had been fired without cause," (Pl.'s Opp. Mem. at 10), is a fatal judicial admission that dooms his tortious interference claim, because he now cannot allege that the benefit to Procter & Gamble played "no role" in Burnett's alleged actions. For these reasons, and those set forth in Burnett's moving papers, the Court should dismiss Count Eight.

In addition, Cicvara has failed to show that Burnett intentionally and without justification interfered with his employment relationship with Procter & Gamble. That is yet another reason to grant Burnett's motion.

In the end, Cicvara's lack of factual allegations and a legal basis for maintaining a viable claim against Burnett make clear that he added a claim against her in the Amended Complaint in the hopes of defeating diversity jurisdiction and going back to state court, but that did not play out for him. The Court should now grant Burnett's motion to dismiss Count Eight and dismiss her as a party from this case.

## ARGUMENT

### I.   CICVARA HAS FAILED TO ALLEGE THAT BURNETT ACTED OUTSIDE THE SCOPE OF HER EMPLOYMENT AND CANNOT DO SO AS A MATTER OF LAW

Obviously recognizing that the Amended Complaint does not include a single allegation that Burnett acted outside the scope of her employment as a senior human resources professional at Procter & Gamble, which is fatal to his claim, (*see* Def.'s Mem. at 5-8; Am. Compl., ¶¶ 44-50), Cicvara states in his opposition memorandum that "Ms. Burnett was acting outside the scope of her employment when she terminated Mr. Cicvara for cause," (Pl.'s Opp. Mem. at 8). First, the Court should disregard the "allegations" in Cicvara's opposition papers, since he cannot use those papers to substitute for allegations that are not in his Amended Complaint, and thus grant Burnett's motion. *Wylie v. City of New Haven*, 2003 U.S. Dist. LEXIS 25273, at *6 (D. Conn. Feb. 27, 2003) ("Memoranda filed in opposition to motions to dismiss are not opportunities to supplement the allegations in the complaint. Allegations may be supplemented only by the filing of an amended complaint."). In any event, Cicvara's conclusory and contradictory allegations in his opposition memorandum and Amended Complaint show that he cannot maintain a viable tortious interference claim against Burnett.

2

A-98

"Where, as here, a claim for tortious interference with business expectancy or contractual relations is brought against an agent of one of the contracting parties, the plaintiff must allege that the agents acted for their personal benefit or gain and that the benefit to the corporation played no role in their actions." *Taylor v. Maxxim Med., Inc.*, 2001 U.S. Dist. LEXIS 3381, at *1-2 (D. Conn. Feb. 28, 2001). In *Taylor*, the plaintiff initially alleged that two high-ranking managerial employees engaged in an intentional course of conduct to force the plaintiff to quit. *Id.* at *2. Judge Nevas ruled that those allegations were insufficient to prove a tortious interference claim, and gave plaintiff the chance to re-plead. *Id.* Thereafter, the plaintiff filed a second amended complaint "in which he asserted that each defendant acted 'for his own personal benefit outside the legitimate scope of his employment . . . to deprive and to deny plaintiff his right to severance and/or retention bonus.'" *Id.* He further alleged that their conduct "'served no legitimate or lawful benefit to the corporate defendants.'" *Id.* Judge Nevas, however, granted the individual defendants' Rule 12(b)(6) motion to dismiss the tortious interference claim, aptly stating in words applicable to Burnett's motion:

> Here, the plaintiff has not alleged any factual basis whatsoever to support the conclusory assertions that [the individual defendants] acted for their own personal gain and outside the scope of their employment or authority, nor do any of the alleged facts reasonably permit such inferences. To the contrary, the alleged facts support an inference that these defendants acted on behalf of their corporate employer when they engaged in the alleged campaign to harass, embarrass and ridicule the plaintiff to drive him from his employment.

*Id.* at *3; *see also Malik v. Carrier Corp.*, 202 F.3d 97, 109 (2d Cir. 2000) (affirming dismissal of tortious interference claim against the recruitment manager of plaintiff's employer for failing to prove manager was acting outside the scope of her employment, concluding that manager's actions "were in furtherance of her professional duties") (quotations and citations omitted). This Court should reach the same conclusion.

Here, Cicvara merely asserts in a conclusory fashion that Burnett was "acting outside the scope of her employment." (Pl.'s Opp. Mem. at 8.) He does not include any factual basis whatsoever to support that conclusory assertion. Nor do any of his alleged facts in the Amended Complaint or his opposition memorandum reasonably permit the inference that Burnett acted for personal gain and outside the scope of her employment. In fact, just the opposite is true: Cicvara maintains that Burnett made her decision – at least in part – "so that the company could relinquish the benefits he would receive if he had been fired without cause." (*Id.* at 10.) That is a judicial admission, *see Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("A court can appropriately treat statements in briefs as binding judicial admissions of fact."), and dooms Cicvara's claim because he does not – and now cannot – allege that "the benefit to the corporation played no role in [Burnett's] actions," *Taylor*, 2001 U.S. Dist. LEXIS 3381, at \*1-2. That admission also shows that Burnett's investigation and allegedly "unprofessional remarks" occurred: (1) primarily within Procter & Gamble's "authorized time and space limits;" (2) was the type of work that Burnett, as a human resources professional, was employed to perform; and (3) was motivated by a purpose to serve Procter and Gamble. *Harp v. King*, 266 Conn. 747, 783, 835 A.2d 953 (2003) (stating the factors to consider in determining whether an employee-defendant acted outside the scope of her employment). Therefore, Cicvara has given the Court no choice but to dismiss his tortious interference claim.

Cicvara's untenable argument that Burnett acted outside the scope of her employment because she purportedly failed to investigate his version of the facts and she made "unprofessional" comments, (Pl.'s Opp. Mem. at 7), also ignores one key fact: "[e]ven assuming that [his] evidence is accurate and that [Burnett] conducted a sloppy investigation[,]" she was still engaged at all times in an internal investigation, "an activity which . . . was within [her] job

4

description." *Cassidy v. Hartford Fin. Servs. Group*, 2008 Conn. Super. LEXIS 107, at *13 (Conn. Super. Ct. Jan. 8, 2008). *Cassidy* also disposes of Cicvara's argument that discovery might reveal that Burnett "was not in compliance with company policies," (Pl.'s Opp. Mem. at 9), because "[a] failure to adhere to company protocol may be a matter for [the company] to address internally, but such variances from procedure are not enough to remove [Burnett's] actions from the scope of [her] employment," *Cassidy*, 2008 Conn. Super. LEXIS 107, at *13. Thus, even assuming, *arguendo*, that Burnett violated company policies (which she denies), that would not show that she was acting outside of the scope of her employment in conducting the internal investigation on behalf of Procter and Gamble.

Finally, Cicvara's argument that Burnett acted "to satisfy her personal feelings against him," (Pl.'s Opp. Mem. at 9), even taken as true, does not show that she acted outside of the scope of her employment. In *Malik*, 202 F.3d at 110, the Second Circuit rejected a plaintiff's similar argument that an employee-defendant acted tortiously because his actions were "undertaken out of animosity towards [the plaintiff]," stating: "[e]ven assuming *arguendo* that motivations of the sort alleged here are sufficient to support a claim for tortious interference with contract, it is manifest that [defendant's] actions towards [plaintiff] were in furtherance of her professional duties." *Malik*, 202 F.3d at 110 (emphasis in original). In that same vein, Burnett's alleged personal feelings are irrelevant. The internal investigation and Burnett's purported comments were motivated by Procter & Gamble's expectations of someone in her role as an human resources professional investigating allegations of unprofessional conduct, and not by her own personal gain. Cicvara's assertion that she terminated his employment "so that the company could relinquish the benefits he would receive if he had been fired without cause," (Pl.'s Opp. Mem. at 10), makes this clear.

In the end, Cicvara's argument for maintaining a tortious interference claim is simply absurd. To permit a claim in this context would effectively result in a tortious interference claim by any and all disgruntled employees against human resources professionals investigating violations of company policy and taking appropriate corrective action in response to such violations. This would expose every human resources professional in Connecticut to extensive and costly discovery simply because she acted within the scope of her duties in investigating a wayward employee's violation of company policy. The intended reach of a tortious interference claim is simply not that broad.

## II.   CICVARA FAILS TO ALLEGE MALICE BY BURNETT

As Burnett demonstrated in her moving papers, to prevail on a tortious interference claim, Cicvara must allege, *inter alia*, that she intentionally interfered with his employment. (Def.'s Mem. at 6-7.) To do so, he had to allege that Burnett "was guilty of fraud, misrepresentation, intimidation or molestation . . . or that [she] acted maliciously." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 805, 734 A.2d 112, 135 (1999) (internal quotations omitted). "[T]he employee bears the burden of alleging and proving lack of justification on the part of the actor." *Id.* This Cicvara has not done.

Cicvara has not set forth any factual allegations that Burnett acted with malice. Rather, he makes the conclusory statement that Burnett made allegedly "inappropriate and disparaging" comments and purportedly failed to consider his claims because "she harbored negative personal feelings toward plaintiff." (Am. Compl., ¶¶ 47-49.) Even if Burnett had "negative personal feelings" toward Cicvara, however, this shows ill will, at most, and does not indicate that Burnett acted maliciously and without justification. *See Daley*, 249 Conn. at 806 (explaining that allegations of ill will are insufficient to show malice). Therefore, the Court should grant Burnett's motion for this reason, too.

6

### III.   CICVARA'S CASES ARE DISTINGUISHABLE

In his opposition memorandum, Cicvara cites to *Savage v. Andoh*, *Harp v. King* and *Bennett v. Beiersdorf, Inc.* to support his argument that he has pled a viable tortious interference claim. (Pl.'s Opp. Mem. at 8-9.)  As demonstrated below, those cases are distinguishable and do not save Cicvara's claim from dismissal.

In *Savage v. Andoh*, 2008 Conn. Super. LEXIS 882, at *20 (Conn. Super. Ct. Apr. 11, 2008), a professor alleged that her department chair submitted false written reports to her superiors stating that she had acted inappropriately and was not meeting the department's expectations.  The court ruled that the plaintiff met the requirement of pleading that the department chair acted outside the scope of his employment because she "specifically alleged that the defendant provided *false* information regarding her to her supervisor." *Id.* at *22 (emphasis added).  Unlike the complaint in *Savage*, the Amended Complaint does not allege that Burnett deliberately provided *false* information during her internal investigation.[1]

Cicvara's citation to *Harp v. King*, 266 Conn. 747, 783 (2003), for the proposition that, "[o]rdinarily, it is a question of fact as to whether a willful tort of the servant has occurred within the scope of the servant's employment," is equally mistaken.  Cicvara conveniently fails to include the remainder of the court's sentence: "but there are occasional cases [in which a] servant's digression from [or adherence to] duty is so clear-cut that the disposition of the case becomes a matter of law." *Id.*  The court then concluded that *Harp* was such a case because "there [was] nothing in the record from which a fact finder could conclude that the defendants' allegedly tortious conduct had occurred outside the scope of their employment." *Id.*  The same

---

[1]   Notably, the court in *Savage* nonetheless granted the defendant's motion to strike because "the plaintiff ha[d] not presented even conclusory allegations that the defendant used his power improperly for personal gain." *Id.* at *23.  Similarly, Cicvara's Amended Complaint is devoid of any allegations indicating that Burnett acted for personal benefit.

rationale applies here, as Cicvara has failed to allege that Burnett acted outside the scope of her employment in conducting the internal investigation and, in fact, admitted that she was acting for Procter & Gamble in order to deprive him of his stock options. (Pl.'s Opp. Mem. at 10.)

*Bennett v. Beiersdorf, Inc.*, 889 F. Supp. 46 (D. Conn. 1995), also is distinguishable. There, the plaintiff argued that the defendant's racial animus prompted him to interfere with the plaintiff's promotional opportunities. *Id*. at 52. In the present case, there are no allegations in the Amended Complaint (or opposition memorandum) that Burnett harbored racial animus of any kind.

## CONCLUSION

For each of the foregoing reasons, and those stated in Burnett's moving papers, Burnett respectfully requests that the Court dismiss Count Eight of the Amended Complaint and dismiss her as a party in this action, and grant to her such other and further relief as the Court deems appropriate.

Dated this 25th day of February, 2010, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP

By /s/ Edward Cerasia II
   Edward Cerasia II (ct 13096)
   620 Eighth Avenue, 32nd Floor
   New York, New York 10018
   (212) 218-5500
   ecerasia@seyfarth.com

Attorneys for Defendant Lynne Burnett

8

A-104

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------------------------------x
                  :

PREDRAG CICVARA,                :  Civil Action No.3:09-cv-2054
                            :  (JCH) (HF)

        Plaintiff,           :

                            :

        v.                   :  March 22, 2010
                            :

THE GILLETTE COMPANY and PROCTER &  :
GAMBLE COMPANY, INC, DURACELL, AN ENTITY  :
OF UNKNOWN FORM, and LYNNE BURNETT,  :

                            :

        Defendants.         :

                            :
-------------------------------------------------------------------------------x

### PLAINTIFF CICVARA'S MOTION TO WITHDRAW HIS MOTION TO REMAND TO STATE COURT AND JOINDER OF PARTY

     The Plaintiff in the above captioned action, respectfully requests this honorable Court grant him leave to withdraw his <u>FIRST MOTION TO REMAND TO STATE COURT AND JOINDER OF PARTY</u>, which was filed January 6, 2010.   In support of this Motion For Leave, the Plaintiff, represents the following.

     1.  Upon information and belief, in good faith, the plaintiff had reason to believe that Defendant Lynne Burnett was a resident of Ridgefield, CT, which information was provided to him by a private investigator.

     2.  However, on January 21, 2010, it was determined pursuant to an affidavit filed by defense counsel on behalf of Ms. Burnett that she actually was a Florida resident, and merely rented a home in Ridgefield, Connecticut.

Case 12-338, Document 57, 07/23/2012, 671466, Page114 of 291

3. Therefore, for purposes of diversity jurisdiction, plaintiff is satisfied that Ms. Burnett is in fact completely diverse from all the plaintiffs to this action.

WHEREFORE, the Plaintiff prays this honorable court:

1. Grant him leave of the Court to withdraw his <u>FIRST MOTION TO REMAND TO STATE COURT AND JOINDER OF PARTY</u>;

Respectfully submitted,

/s/ Michael E. Skiber. Esq. _____
Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT 06604
(203) 615-0090

Attorney for the Plaintiff Predrag Cicvara

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------------------------x
                                                          :
PREDRAG CICVARA,                                          :Civil Action No.3:09-cv-2054
                                                          :(JCH)
        Plaintiff,                                    :
                                                          :
        v.                                            :JUNE  15, 2010
                                                          :
THE GILLETTE COMPANY and PROCTER &                        :**PLAINTIFF'S MOTION TO**
                                                          :**COMPEL DISCOVERY AND**
GAMBLE COMPANY, INC, DURACELL, AN ENTITY                  :**SUPPORTING MEMORANDUM**
OF UNKNOWN FORM, and LYNNE BURNETT,                       :
                                                          :
        Defendants.                                   :
                                                          :
---------------------------------------------------------------------------x

        Pursuant to Fed. R. Civ. P. 37 and D. Conn. L. Civ. R. 37, the plaintiff moves to

compel Defendants The Gillette Company ("Gillette"), Procter & Gamble Company, Inc. (P&G),

Duracell, an entity of unknown form ("Duracell") and Lynne Burnett ("Burnett"), collectively

("Defendants") to produce responsive documents to Requests For Production 2,7 14-21, 23, 27-

31, 33-34, 36-39.  The Plaintiff sent Requests For Production and Interrogatories on April 19,

2010 and the Defendants objected to the aforementioned Requests and Interrogatories.

        Moreover, pursuant to a Rule 37 conference on June 7, 2010, Defendants were

unwavering in its objections. Accordingly, the instant motion to compel is necessary for Plaintiff

to obtain discovery he is entitled to under the FRCP.

## I.    CONCISE STATEMENT OF THE CASE

        Predrag Cicvara was an employee of Procter & Gamble, the Gillette Company and

**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT REQUIRED**

Duracell working out of the Bethel, Connecticut office for approximately a decade where he earned a substantial amount of stock options, which had been completely vested for more than four years at the time of his termination. On June 15, 2009 Mr. Cicvara was terminated allegedly for cause after a fifteen minute meeting with defendant Lynne Burnett for allegedly violating the so-called Worldwide Business Conduct manual.

Importantly, Ms. Burnett failed to ask Mr. Cicvara for his version of the events that took place concerning his termination, upon information and belief never investigated Mr. Cicvara's claims. Instead, during this meeting with Mr. Cicvara, Ms. Burnett visibly and verbally expressed distaste for Mr. Cicvara. As a result, Mr. Cicvara was terminated allegedly for cause, resulting in substantial damages including, but not limited to, loss of job, loss of benefits including stock options and bonus, tarnished business reputation in the industry, and a complete collapse of his family life. To date Mr. Cicvara remains unemployed.

Mr. Cicvara filed the original Complaint in the Connecticut Superior Court on November 17, 2009. Procter & Gamble, the Gillette Company and Duracell removed the State Court Action to this Court on December 19, 2009 pursuant to 28 U.S.C. § 1332(a)(1) for diversity of citizenship. Upon further investigation, Mr. Cicvara filed an Amended Complaint on January 6, 2010 adding defendant Lynne Burnett for tortious interference with a business relationship in addition to the original counts filed against Procter & Gamble, the Gillette Company and Duracell.

The parties commenced Discovery on April 1, 2010 and Plaintiff filed both a Request for Production of Documents and Interrogatories (See Exhibit A) in or about April 19, 2010.  In or

about May 29, 2010, about a week after the prescribed date of production, Plaintiff obtained Defendants' materials.

Upon review of Defendants' production of documents and review of its responses, Plaintiff took note that Defendants objected to each and every request, for various reasons, but did provide some materials, albeit limited, which for the most part support Defendants' position.

In or about June 7, 2010, Plaintiff and Defendant conducted a Rule 37 conference. Unfortunately, the parties were unable to make progress concerning Plaintiff's Request for Production and Interrogatories.  Plaintiff pointed out to Defendant certain documents that were known to be in existence and relevant to the instant action that were not disclosed.  However, Defendants disagreed with Plaintiff's assessment.  Accordingly, Plaintiff files this Motion to Compel for documents as an absolute right to discover under the FRCP.

## II.   GOVERNING LEGAL PRINCIPLES

In General.  Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(a); *See* In Re Madden, 151 F.3d 125, 138 (3rd Cir.) (Pretrial discovery is.... 'accorded a broad and liberal treatment.'") (*citing* Hickman v. Taylor, 329 U.S. 495, 507 (1947)); *see also* Wright, Miller & Marcus, Federal Practice & Procedure, Civil 2d. § 2007 ("The rule does allow broad scope to discovery and this has been well recognized by the courts.")

The documents sought herein are directly relevant to the core issues of this case, and fall

well within the liberally defined broad boundaries applicable to discovery.

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

**REQUEST 2:**  The employer's personnel manuals, memoranda and written policies electronic
or otherwise concerning employment, performance and discharges.
**RESPONSE** Defendants' objection relies on the grounds that the Plaintiff's request is over

broad, unduly burdensome, vague and ambiguous.  Plaintiff's request is clear on its face.

Plaintiff is seeking company manuals concerning Defendants' policies, procedures and practices

in making personnel decisions, which goes to the heart of plaintiff's allegations against

Defendants.

**REQUEST 7:**  Any and all Documents and Communication, including, but not limited to, any
audio tape recordings, email messages, SMS and MMS text messages, phone records, concerning
any Communication between Plaintiff, Bel Liu and/or Practical.

**RESPONSE:** Defendants objection relies on the grounds that Plaintiff's request is over broad,

vague and ambiguous.

Defendants has clearly picked and chosen what to produce to Plaintiff.  Plaintiff and

Defendants are well aware that there was a significant business and personal relationships

between Bel Liu, Plaintiff, Defendants and its employees.  Peculiarly, Defendants have chosen

only materials it deems supportive of its position for disclosure.  (See Exhibit B PG000477 –

PG000483), which includes emails from Practical to Defendants more than ten days after

Plaintiff was terminated) Plaintiff further represents that there are multiple exculpatory emails

that have not been disclosed to Plaintiff by Defendants, which time frame and custodian Plaintiff

has identified.

**REQUEST 14:**  Any and all Documents and Communication generated during the investigation
involving the alleged affair between Mani Parma and Ana Cardinale.

**RESPONSE:**  Defendants objection relies on the grounds that Plaintiff's request is overly broad, vague and ambiguous.

Plaintiff contends the production of information is relevant to the instant action since the investigation made allegations of discrimination against Plaintiff and was conducted by the same personnel who ultimately decided to terminate plaintiff and cancel his stock options.  Plaintiff further alleges that there was significant documentation provided by him to Defendants during the so-calleed investigation in 2007 that was not disclosed to Plaintiff in its First Request for Documents, including but not limited to sametime messages and emails.

Plaintiff also points out that Defendants produced a memo and notes on point with the instant action, which downplays and reprimands Plaintiff for coming forward with accusations of sexual discrimination.  Moreover, Plaintiff was told by P&G counsel that Plaintiff was accused of inappropriate sexual harassment related to this Request, which fact Plaintiff must be able to fully investigate.

Plaintiff also represents that the investigation related to the instant request was performed by Peggy Wilczewski and Defendant Lynne Burnett who is the subject of a claim for tortious interference with a contractual relationship and has showed a clear penchant for harboring ill will towards the Plaintiff .  (See Exhibit C, PG000498 through PG000501).  Also, Lynn Burnett conducted a so-called meeting with the Plaintiff and both she and Wilsczewski were involved in the decision to terminate Plaintiff and divest him of his vested stock options.

Finally, Plaintiff must be able to discover materials relevant to the instant request because it promotes an important public policy issue that Plaintiff requires to file amended complaint in good faith.  Plaintiff represents that he was prevented from obtaining a promotion and ultimately terminated at least in part as a result of the sexual discrimination by Defendants, which facts can

reasonably be inferred from materials provided by Defendants (See Exhibit D, PG000390 –

PG000470 and PG000001 – PG000009).

**REQUEST** 15:  Any and all Documents and Communication between Mani Parmar and Ana
Cardinale from January 1, 2000 to present related to a personal relationship.
**RESPONSE:**  Defendants objection relies on the grounds that Plaintiff's request is overly broad,

vague and ambiguous.

Plaintiff contends the production of information is relevant to the instant action since the

investigation made allegations of discrimination against Plaintiff and was conducted by the same

personnel who ultimately decided to terminate plaintiff and cancel his stock options.  Plaintiff

further alleges that there was significant documentation provided by him to Defendants during

the so-calleed investigation in 2007 that was not disclosed to Plaintiff in its First Request for

Documents, including but not limited to sametime messages and emails.

Plaintiff also points out that Defendants produced a memo and notes on point with the

instant action, which downplays and reprimands Plaintiff for coming forward with accusations of

sexual discrimination.  Moreover, Plaintiff was told by P&G counsel, Sue Brock that Plaintiff

himself was accused of inappropriate sexual harassment related to this Request, which fact

Plaintiff must be able to fully investigate.

Plaintiff also represents that the investigation related to the instant request was performed

by Peggy Wilczewski and Defendant Lynne Burnett who is the subject of a claim for tortious

interference with a contractual relationship and has showed a clear penchant for harboring ill will

towards the Plaintiff .  (See Exhibit C, PG000498 through PG000501)..  Also, Lynn Burnett

conducted a so-called meeting with the Plaintiff and both she and Wilsczewski were involved in

the decision to terminate Plaintiff and divest him of his vested stock options.

Finally, Plaintiff must be able to discover materials relevant to the instant request because it

promotes an important public policy issue that Plaintiff requires to file amended complaint in

good faith.  Plaintiff represents that he was prevented from obtaining a promotion and ultimately

terminated at least in part as a result of the sexual discrimination by Defendants, which facts can

reasonably be inferred from materials provided by Defendants (See Exhibit D, PG000390 –

PG000470 and PG000001 – PG000009).

**REQUEST** 16:  Any and all Documents and Communication between Mani Parmar and Ana
Cardinale from January 1, 2000 to present related to the Plaintiff.
**RESPONSE:** Defendants objection relies on the grounds that Plaintiff's request is overly broad,

vague and ambiguous.

Plaintiff contends the production of information is relevant to the instant action since the

investigation made allegations of discrimination against Plaintiff and was conducted by the same

personnel who ultimately decided to terminate plaintiff and cancel his stock options.  Plaintiff

further alleges that there was significant documentation provided by him to Defendants during

the so-calleed investigation in 2007 that was not disclosed to Plaintiff in its First Request for

Documents, including but not limited to sametime messages and emails.

Plaintiff also points out that Defendants produced a memo and notes on point with the

instant action, which downplays and reprimands Plaintiff for coming forward with accusations of

sexual discrimination.  Moreover, Plaintiff was told by P&G counsel that Plaintiff was accused

of inappropriate sexual harassment related to this Request, which fact Plaintiff must be able to

fully investigate.

Plaintiff also represents that the investigation related to the instant request was performed

by Peggy Wilczewski and Defendant Lynne Burnett who is the subject of a claim for tortious

interference with a contractual relationship and has showed a clear penchant for harboring ill will

towards the Plaintiff.  Also, Lynn Burnett conducted a so-called meeting with the Plaintiff and

both she and Wilsczewski were involved in the decision to terminate Plaintiff and divest him of

his vested stock options.

Finally, Plaintiff must be able to discover materials relevant to the instant request because it

promotes an important public policy issue that Plaintiff requires to file amended complaint in

good faith.  Plaintiff represents that he was prevented from obtaining a promotion and ultimately

terminated at least in part as a result of the sexual discrimination by Defendants, which facts can

reasonably be inferred from materials provided by Defendants (See Exhibit D, PG000390 –

PG000470 and PG000001 – PG000009).

**REQUEST 17:**  Any and all Documents and Communication generated by Defendants,
including but not limited to Rob Dapra and Mark Bertolami concerning an Original Equipment
Manufacturer aka "OEM" irregularity and the illegal sales of Duracell's batteries from Hong
Kong to Latin America.

**RESPONSE:**  Defendants objection is based on the grounds that Plaintiff's request is overly

broad unduly burdensome, and purports to request documents that are neither relevant to the

subject matter of this litigation nor reasonably calculated to lead to discovery of admissible

documents.

The Defendants' conduct here purports to demonstrate its continued disdain for Plaintiff and

sought to squash Plaintiff from performing a vital function per his job description and the

Defendants' Conduct Manual and promoting an important public policy function in preventing

fraud.  Plaintiff represents he was immediately precluded from further investigating obvious

illegal activity upon disclosing said information.

Lastly, Plaintiff must be able to discover materials relevant to the instant request because it relates to the termination of Plaintiff as well as promoting an important public policy issue , which Plaintiff requires to file amended complaint in good faith.

**REQUEST 18:**  Any and all Documents and Communication generated by Rob Dapra related to the Plaintiff.

**RESPONSE:**  Defendants objection is based on the grounds that Plaintiff's request is overly broad unduly burdensome, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible documents.

The Defendants' conduct here purports to demonstrate its continued disdain for Plaintiff and sought to squash Plaintiff from performing a vital function per his job description and the Defendants' Conduct Manual and promoting an important public policy function in preventing fraud.  Plaintiff represents he was immediately precluded from further investigating obvious illegal activity upon disclosing said information.

Plaintiff must also be able to discover materials relevant to the instant request because it relates to the termination of Plaintiff as well as promoting an important public policy issue, which Plaintiff requires to file amended complaint in good faith.

**REQUEST** 19:  Any and all Documents and Communication generated by Mark Bertolami related to the Plaintiff.

**RESPONSE:**  Defendants objection is based on the grounds that Plaintiff's request is overly broad unduly burdensome, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible documents.

Mark Bertolami, the CEO of Duracell had direct decision making authority in a number of circumstances related to Plaintiff and in each one, Plaintiff was ruled against, including the affair

between Mani Parma and Ana Cardinale and OEM irregularity uncovered by Plaintiff.  Plaintiff

represents that Mr. Bertolami had a significant impact in each of these incidents, which clearly is

relevant to the instant case and/or will lead to relevant evidence applicable to the instant case.

**REQUEST 20**:  Any and all Documents and Communication generated by Lynne Burnett
related to the termination of Plaintiff.
**RESPONSE:**  Defendants objection is based on the grounds that Plaintiff's request is overly

broad, vague, ambiguous and violates the attorney-client privilege.

**RESPONSE:**  Defendants admit Ms. Burnett, a party to the instant action, was responsible for

investigating the allegations related to Mani Parma and Ana Cardinale as well as conducting the

termination meeting some two years later where she made several remarks that clearly

demonstrated she harbored ill will towards the Plaintiff that is documented in Documents

provided by Defendants.  Plaintiff contends said Documents and Communication will further

bolster its allegations that Ms. Burnett harbored said ill will towards the Plaintiff.  Accordingly,

Documents and Communication generated by Burnett are relevant to the instant action or likely

to lead to relevant evidence.

**REQUEST 21**:  Any and all Documents and Communication generated by Defendants related to
the termination of Plaintiff.
**RESPONSE:**  Plaintiff agrees that the above request was overly broad unduly burdensome, and

purports to request documents that are neither relevant to the subject matter of this litigation nor

reasonably calculated to lead to discovery of admissible documents notwithstanding the fact,

Plaintiff asked more direct and focused Requests that were deemed overly broad unduly

burdensome, and purports to request documents that are neither relevant to the subject matter of

this litigation nor reasonably calculated to lead to discovery of admissible documents by

Defendants.

**REQUEST 22**:  Any and all Documents and Communication generated by Defendants related to
the cancellation of Plaintiff's stock options.

Case 12-338, Document 57, 07/23/2012, 671466, Page125 of 291

**RESPONSE:** Plaintiff agrees that the above request was overly broad unduly burdensome, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible documents notwithstanding the fact, Plaintiff asked more direct and focused Requests that were deemed overly broad unduly burdensome, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible documents by Defendants.

**REQUEST 23:** Any and all Documents and Communication received or generated by Lynne Burnett related to the Plaintiff.

**RESPONSE:** Defendants objection is based on the grounds that Plaintiff's request is overly broad unduly burdensome, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible documents.

Plaintiff alleges that Ms. Burnett in her short tenure as an employee of Defendants (2 years) was responsible for several important decisions regarding Plaintiff, including but not limited to his allegations of discrimination and his termination, allegedly for cause. Moreover, she made several comments that clearly indicates she harbored ill will towards Plaintiff while conducting a so-called investigation into allegations against Plaintiff. (See Exhibit C, PG000498 through PG000501). Accordingly, without question, Documents and Communication generated by Defendant Burnett concerning Plaintiff is extremely relevant to the instant action and/or likely to produce relevant evidence.

**REQUEST 27:** Any contracts, agreements and understandings related to the business relationship of Practical Flashlight Company ("Practical") and Defendants.

Case 12-338, Document 57, 07/23/2012, 671466, Page126 of 291

**RESPONSE:**  Defendants objection is based on the grounds that Plaintiff's request is overly broad, unduly burdensome, vague, ambiguous, purports to seek Defendants' proprietary business information, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff contends the Request goes to the heart of the matter.  Pursuant to its Stock Options Agreement, Defendants' claim among other things that Plaintiff's conduct was materially injurious to the Defendants' business with Practical.  Accordingly, information regarding Defendants' business agreements is extremely relevant to the instant action and/or likely to lead to relevant evidence.

**REQUEST 28:**  Any Documents related to the production of flashlights provided by Practical from January 2005 to present.

**RESPONSE:**  Defendants objection is based on the grounds that Plaintiff's request is overly broad, unduly burdensome, vague, ambiguous, purports to seek Defendants' proprietary business information, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff contends the Request goes to the heart of the matter.  Pursuant to its Stock Options Agreement, Defendants' claim among other things that Plaintiff's conduct was materially injurious to the Defendants' business with Practical Flashlights, the employer of Bel Liu.  Accordingly, information regarding Defendants' business agreements is extremely relevant to the instant action and/or likely to lead to relevant evidence.

**REQUEST 29:**  Any and all Communication and Documents from Practical to Defendants from January 1, 2009 to present.

**RESPONSE:**  Defendants objection is based on the grounds that Plaintiff's request is overly broad, unduly burdensome, vague, ambiguous, purports to seek Defendants' proprietary business

information, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff contends the Request goes to the heart of the matter. Pursuant to its Stock Options Agreement, Defendants' claim among other things that Plaintiff's conduct was materially injurious to the Defendants' business with Practical Flashlights, the employer of Bel Liu. Accordingly, information regarding Defendants' business agreements is extremely relevant to the instant action and/or likely to lead to relevant evidence.

**REQUEST 30:** Any and all Documents and/or Communication sent to or from Practical and Defendants regarding the instant action.

Plaintiff agrees that the above request was overly broad unduly burdensome, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible documents notwithstanding the fact, Plaintiff asked more direct and focused Requests that were deemed overly broad unduly burdensome, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible documents by Defendants.

**REQUEST 31:** Any and all Documents or Communication regarding the rejection of flashlight shipment(s) from Practical manufacturing locations to Defendants warehouse in May/June/July 2009.

**RESPONSE:** Defendants objection is based on the grounds that Plaintiff's request is overly broad, vague, ambiguous, and purports to request documents that are neither relevant to the subject matter of the litigation nor reasonably calculated to lead to discovery of admissible evidence.

Plaintiff contends the Request goes to the heart of the instant action. Plaintiff contends that on the day prior to the alleged conduct, which lead to his termination for cause and cancellation of his vested stock options, Plaintiff personally rejected an ENTIRE shipment of flashlights

produced by Practical Flashlights, the employer of Bel Liu, the woman who has made allegations

against Plaintiff, which allegations Plaintiff believes in part lead to Plaintiff's termination and

divesture of vested stock options.  Accordingly, Plaintiff's Request is extremely relevant to the

instant action and/or likely to lead to relevant evidence.

**REQUEST** 33:  Any and all Documents and Communications regarding the investigation of
Austin Lin's expense reports in or about March 2009 to the present, which was investigated by
Plaintiff and Kevin Babis.
**RESPONSE:**  Defendants objection is based on the grounds that Plaintiff's request is overly

broad, vague, ambiguous, and purports to request documents that are neither relevant to the

subject matter of the litigation nor reasonably calculated to lead to discovery of admissible

evidence as well as "Violates any [sic] third party's right to privacy.

Plaintiff asserts there is ample evidence that Austin Lin, Defendants' employee who

alerted Defendants to the allegations by Bel Liu was caught in a significant expense account

fraud by Plaintiff, which occurred days before the allegations were launched and is known my

Plaintiff and many other employees to have had a personal sexual relationship with Bel Liu.

Moreover, upon information and belief, Austin Lin was in contact with Bel Liu immediately

before, during and after the allegations were launched against Plaintiff.

**REQUEST** 34:  Any and all Documents and Communications between Austin Lin and Bel Liu
from January 2006 to the present.
**RESPONSE:**   Defendants objection is based on the grounds that Plaintiff's request is overly

broad, vague, ambiguous, and purports to request documents that are neither relevant to the

subject matter of the litigation nor reasonably calculated to lead to discovery of admissible

evidence as well as "Violates any [sic] third party's right to privacy.

Plaintiff asserts there is ample evidence that Austin Lin, Defendants' employee who alerted

Defendants to the allegations by Bel Liu was caught in a significant expense account fraud by

Plaintiff, which occurred days before the allegations were launched and is known by Plaintiff

and many other employees to have had a personal sexual relationship with Bel Liu. In fact,

Austin Lin personally contacted Defendants' management regarding allegations against Plaintiff

after Bel Liu reported the alleged misconduct to him.  Moreover, upon information and belief,

Austin Lin was in contact with Bel Liu immediately before, during and after the allegations were

launched against Plaintiff.

**REQUEST** 36:  Records of any and all Documents regarding any incoming and outgoing
Communication Defendant is aware of for phone number + 0118676086691198 and
+01185223321887 or any variations thereof.
**RESPONSE:**  Defendants object to the Request to the Request on the grounds that it is vague,

ambiguous, overly broad and unduly burdensome.

**REQUEST 37:**  Any and all Documents and Communication received or sent by Defendants or
its/her employees for email address bell@practical.com.hk.

**RESPONSE:**  Defendants have informed Plaintiff that they would again review the request by

Plaintiff.  However, they were put on notice on April 19, 2010 regarding this request and should

have complied with the Request long ago.  Plaintiff emphasizes that this Request is the most

important and most relevant to its claims.  Peculiar enough, Defendant produced emails provided

by Bel Liu where it supported its position (See Exhibit E PG000475 – PG000476).  To date,

Plaintiff has not received any emails from Bel Liu that it knows exists and will provide

significant supportive evidence in the instant action.  Accordingly, Defendants MUST produce

any and all Documents and Communication sent or received related to email

bell@practical.com.hk.

**REQUEST** 38:  Any and all Documents and Communication related to disparaging nature
towards the Plaintiff.

**RESPONSE:** Plaintiff agrees that the above request was overly broad unduly burdensome, and

purports to request documents that are neither relevant to the subject matter of this litigation nor

reasonably calculated to lead to discovery of admissible documents notwithstanding the fact,

Plaintiff asked more direct and focused Requests that were deemed overly broad unduly

burdensome, and purports to request documents that are neither relevant to the subject matter of

this litigation nor reasonably calculated to lead to discovery of admissible documents by

Defendants.

**REQUEST 39**:  Any and all Documents and Communications that would be exculpatory
towards the Plaintiff concerning his discharge for cause and cancellation of Plaintiff's stock
options.

**RESPONSE:**  Defendant objection is based in part that they are not aware of any documents

responsive to this request.

Plaintiff contends that the very nature of Defendant's answer demonstrates its reluctance

or inability to assist Plaintiff in obtaining its discovery.  Moreover, it shows that Defendant failed

to consider the validity of the allegations against the Plaintiff when he was accused of

misconduct, which ultimately led to his termination and divesture of his stock options.

Respectfully Submitted,

/s/ Michael E. Skiber, Esq.
Michael E. Skiber, Esq.
The Law Office of Michael E. Skiber, LLC
Federal Bar No. ct27935
135 Elm Street, Bridgeport, CT  06604
(203) 615-0090

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| PREDRAG CICVARA, | Civil Action No.3:09-cv-2054 (JCH) (HF) |
| Plaintiff, |  |
| v. |  |
| THE GILLETTE COMPANY and PROCTER & GAMBLE COMPANY and DURACELL, AN ENTITY OF UNKNOWN FORM and LYNNE BURNETT, | July 7, 2010 |
| Defendants. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN
## OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Edward Cerasia II (ct 13096)
Hema Chatlani (phv 04023)
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
(212) 218-5500
Attorneys for Defendants

## TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  BACKGROUND FACTS.........................................................................................3

III. ARGUMENT..........................................................................................................6

     A.   The Applicable Standard Under Rule 26.................................................6

     B.   Cicvara Is Not Entitled To Discovery Concerning His New Allegations Of
          Discrimination That Do Not Appear In The Amended Complaint ...........7

     C.   Defendants' Responses and Objections Are Appropriate ......................9

IV.  CONCLUSION ....................................................................................................17

## TABLE OF AUTHORITIES

Page(s)

CASES

*Croom v. W. Conn. State Univ.,*
   218 F.R.D. 15 (D. Conn. 2002) ................................................................................................7

*Dembinski v. Pfizer, Inc.,*
   628 F. Supp. 2d 267 (D. Conn. 2009)......................................................................................8

*Edwards v. William Raveis Real Estate,*
   No. 08-CV-1907, 2009 U.S. Dist. LEXIS 42400 (D. Conn. May 18, 2009) ...........................8

*Favale v. Roman Catholic Diocese of Bridgeport,*
   233 F.R.D. 243 (D. Conn. 2005) ..............................................................................................7

*Hickman v. Taylor,*
   329 U.S. 495 (1947) .................................................................................................................7

*Karath v. Bd. of Trs. of Tunxis Cmty. College,*
   No. 3:07-CV-1073, 2009 U.S. Dist. LEXIS 115026 (D. Conn. Dec. 10, 2009) ....................10

*Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,*
   274 F.3d 683 (2d Cir. 2001) ....................................................................................................8

*Oppenheimer Fund Inc. v. Sanders,*
   437 U.S. 340 (1978) .................................................................................................................7

*Petrosino v. Bell Atl.,*
   385 F.3d 210 (2d Cir. 2004) ....................................................................................................8

*Tyszka v. Edward McMahon Agency,*
   188 F. Supp. 2d 186 (D. Conn. 2001)......................................................................................8

*Wells Fargo Bank, N.A. v. Konover,*
   No. 3:05-CV-1924, 2009 U.S. Dist. LEXIS 18988 (D. Conn. Mar. 4, 2009)..........................7

OTHER AUTHORITIES

Fed. R. Civ. P. 26..........................................................................................................................6

Fed. R. Civ. P. 34..........................................................................................................................6

Fed. R. Civ. P. 37(a)(4) ...............................................................................................................17

## I. PRELIMINARY STATEMENT

Defendants The Gillette Company, The Procter & Gamble Company ("P&G"), and Lynne Burnett (collectively, the "Defendants") respectfully submit this memorandum of law in opposition to plaintiff Predrag Cicvara's ("Cicvara's") motion to compel discovery.

Cicvara worked for P&G in Bethel, Connecticut, until June 15, 2009, when P&G terminated his employment for cause for violating P&G's Worldwide Business Conduct Manual. Specifically, P&G learned through an investigation that, while Cicvara was on a business trip to Hong Kong, he made unwanted, sexual advances on Bel Liu ("Liu"), a representative of a P&G client known as Practical Flashlight Company ("Practical"), including admittedly telling Liu, "I could rape you." After his termination, Cicvara attempted to exercise options to purchase P&G's common stock, but was precluded from doing so because the options were cancelled by operation of the terms of the Stock Option Plan when he was terminated for cause.

On November 16, 2009, Cicvara filed his lawsuit, in which he seeks the value of his stock options, claiming that he was not terminated for cause within the meaning of the Stock Option Plan. All of his claims in the Amended Complaint relate to his termination and effort to obtain the value of his stock options. Thus, discovery should be limited to those claims and the basis for his termination.

In response to Cicvara's document requests, Defendants have produced over five hundred pages of documents consisting, for example, of the following: Cicvara's personnel file and pay records; job descriptions for the two positions he held; P&G's Worldwide Business Conduct Manual; the applicable Stock Option Plans and Amendments; P&G Rewards of Leadership Compensation Program and its Long-Term Incentive Plan; Cicvara's phone log; various e-mails and text messages sent between Cicvara and Liu; various e-mails from Andrew Yau, an employee of Practical, regarding the incident with Liu; and documents and notes regarding

P&G's investigation of the incident and the termination of Cicvara's employment. Simply put, Defendants produced all documents in their position concerning the basis for Cicvara's termination, the investigation leading up to that decision, and the cancellation of his stock options.

Despite the fact that P&G has produced all of these documents, Cicvara contends that Defendants' discovery responses are insufficient.[1] Specifically, in his motion to compel discovery, Cicvara maintains that he is entitled to discovery related to P&G employees who had no involvement in the decision to terminate his employment and to events that occurred, if at all, years before his termination in June 2009. For instance, he seeks documents concerning an alleged affair between two unrelated P&G employees, Mani Parmar ("Parmar") and Ann Cardinale ("Cardinale"), in 2007, documents related to his unfounded complaint in 2008 regarding P&G's purported "illegal" sale of Duracell batteries, and his "rejection" of a flashlight shipment. Yet these documents are not reasonably likely to lead to the discovery of admissible evidence as to whether he is entitled to the value of his stock options.

Obviously recognizing that these documents are unrelated to his claims in the Amended Complaint for stock options, Cicvara now asserts that these documents are relevant to his claim of "discrimination." But, Cicvara has not alleged a discrimination claim in the Amended Complaint, nor has he moved for leave to amend his Amended Complaint to add a discrimination claim. Because the documents he seeks are not related to the claims in the Amended Complaint, the Court should deny his motion to compel.

---

[1]     While Cicvara states in his motion that Defendants' document production was late, that statement is disingenuous. Defendants received consent from Cicvara's counsel to extend the deadline for production and complied with that deadline.

2

In any event, any discrimination claim would fail as a matter of law because Cicvara has

not exhausted his administrative remedies before the U.S. Equal Employment Opportunity

Commission ("EEOC") or the Connecticut Commission on Human Rights and Opportunities

("CHRO"), and is time-barred at this point.  For these reasons, the Court should not permit

Cicvara to engage in a fishing expedition to support claims that do not appear in the case and

which he cannot assert in the end.

Finally, Cicvara's motion seeks many documents that Defendants have already produced

to him or that they do not have in their possession.  Despite Defendants' representations to

Cicvara's counsel that they are unaware of and cannot locate any additional documents

responsive to the document requests, Cicvara stubbornly, and without any legitimate basis,

insists that P&G is withholding certain documents.  That assertion, however, has no basis in

reality and seeks to create a discovery dispute where none exists.

For each of these reasons, the Court should deny Cicvara's motion to compel in its

entirety.

## II. <u>BACKGROUND FACTS</u>

P&G is a large, international company that manufactures and sells a variety of brand

name consumer products worldwide.  In 2005, P&G acquired Gillette, an entity that produces

various products, including the Gillete brand razors and shaving products, and the Duracell brand

of batteries and flashlights.[2]

In approximately October 2000, Gillette hired Cicvara as the Manager Worldwide

Technical and Consulting Services, in Bethel, Connecticut.  In April 2002, Cicvara transferred to

---

[2]      Duracell ceased being its own legal entity on January 1, 1999, when it was merged into
Gillette.

the OEM Business Services Group, where he continued to work as a manager. Cicvara remained in that position until June 15, 2009, when his employment was terminated for cause for making unwanted sexual advances and telling Liu, a female employee of Practical, that he wanted to rape her.

In early June 2009, Cicvara travelled to several cities in Asia to conduct factory audits. While in Asia, Cicvara met and travelled with Liu and various other employees of Practical. On or about June 9, 2009, Liu called Andrew Yau ("Yau"), Chairman of Practical Group of Companies, and informed him that Cicvara made unwanted sexual advances toward Liu during the course of their travel together. Yau subsequently alerted P&G's Human Resources Department to Liu's allegations. Upon hearing of the incident, Peggy Wilczewski ("Wilczewski"), P&G's Senior Human Resources Manager, and Dina Schmude ("Schmude"), P&G's Human Resources Manager, conducted a full investigation to evaluate the merits of Liu's complaint.

During the course of the investigation, P&G learned that Liu had recorded a portion of her conversation with Cicvara, during which Cicvara made unwanted advances toward Liu. On June 15, 2009, Burnett, P&G's then-Global Human Resources Director, Kevin Babis, P&G's Global Quality Assurance Leader, and Wilczewski spoke with Cicvara to obtain his version of the events. Although Cicvara first denied engaging in any inappropriate conduct, he later voluntarily admitted that he visited Liu's hotel room while in Asia and felt attracted to Liu because she was wearing short sleeping shorts. Thereafter, Cicvara confessed that he told Liu that he could "rape" her.

P&G terminated Cicvara's employment on that same day for engaging in inappropriate and harassing behavior towards Liu. Cicvara called Wilczewski to inquire about his stock option

4

plan. By letter, dated June 16, 2009, Wilczewski informed Cicvara that, pursuant to Section 6(f)(A) of The Gillette Company 1971 Stock Option Plan, Cicvara's stock options were cancelled as a result of his termination for cause.

On November 17, 2009, Cicvara filed this lawsuit in the Connecticut State Superior Court. In his original Complaint, Cicvara alleged the following six causes of action against P&G and the other corporate defendants: "stock options," "unjust enrichment stock options," "severance package," "unjust enrichment severance package," "annual bonus," and "statutory payment of wage." After the corporate defendants removed the State Court Complaint to this Court on the basis of diversity jurisdiction, Cicvara filed an Amended Complaint adding Burnett as an individual defendant and asserting a separate cause of action for tortious interference with business relationship against her. (Am. Compl., ¶¶ 43-50.) In the Amended Complaint, Cicvara rephrased his former causes of action as follows: breach of contract – stock options; unjust enrichment – stock options; breach of contract – severance package; unjust enrichment – severance package; breach of contract – annual bonus; unjust enrichment – annual bonus; and statutory payment of wages. He also asserts a tortious interference claim against Burnett, which she has moved to dismiss under Rule 12(b)(6).

On April 19, 2010, Cicvara served Defendants with his document request. After obtaining Cicvara's counsel's consent for a short extension of time to respond to that document request, Defendants produced its responses and documents on May 27, 2010.

On June 7, 2010, Hema Chatlani, counsel for Defendants, conferred with Attorney Skiber about the alleged deficiencies in Defendants' discovery responses. During their telephone conference, Attorney Skiber insisted that Defendants were withholding documents. Attorney Chatlani informed Attorney Skiber that Defendants objected to some of Cicvara's requests and,

as to the remaining requests, Defendants had produced every document they currently possessed.

Attorney Chatlani further informed Attorney Skiber that Defendants believed that their

objections were justified and that their responses were sufficient, but that if Attorney Skiber

wanted to narrow some of his requests, or if he had additional requests, he should put those

requests in writing and defense counsel would work with P&G to obtain additional documents, if

they exist.  Thereafter, Defendants did not receive any additional requests from Attorney Skiber.

On June 14, 2010, Attorney Skiber and Attorney Edward Cerasia II conferred by telephone in an

attempt to resolve the parties' discovery disputes.  In particular, Attorney Skiber indicated that

the documents he sought were responsive to a number of allegations that had not been brought to

Defendants' attention earlier, such as an alleged claim for discrimination.  Although Attorney

Cerasia informed Attorney Skiber that neither the Complaint nor his Amended Complaint

included a cause of action for discrimination -- and that any such claim would be meritless,

administratively deficient, and time-barred – Attorney Skiber has continued to pursue discovery

on behalf of Cicvara with respect to this new claim.

On June 16, 2010, before providing Defendants with amended requests and an

opportunity to resolve the discovery disputes without motion practice, Attorney Skiber filed the

instant motion to compel.

### III.  ARGUMENT

**A.    The Applicable Standard Under Rule 26**

Defendants' objections to Cicvara's discovery requests were properly asserted and

Defendants have fulfilled their obligations under Fed. R. Civ. P. 34.  Contrary to well-established

law and without any relationship to his claims for stock options in the Amended Complaint,

Cicvara now asserts that he is entitled to discovery concerning unrelated employees who were

not involved in the decision to terminate his employment, documents related to his  numerous

unfounded allegations against other P&G employees in years past, as well as overbroad discovery related to *every* communication between Practical and P&G. But, Cicvara cannot use discovery tools to engage in an overbroad and unduly burdensome fishing expedition. Discovery has limitations; "[l]ike all matters of procedure, [discovery] has ultimate and necessary boundaries." *Oppenheimer Fund Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). Although discovery requests are construed liberally, "the party seeking discovery must make at least a prima facie showing that the discovery sought is more than merely a fishing expedition." *Wells Fargo Bank, N.A. v. Konover*, No. 3:05-CV-1924, 2009 U.S. Dist. LEXIS 18988, at *14 (D. Conn. Mar. 4, 2009). The Court should not compel discovery "absent a showing by the movant that the material sought is either directly relevant or likely to produce relevant material." *Croom v. W. Conn. State Univ.*, 218 F.R.D. 15, 16 (D. Conn. 2002). Additionally, the Court should not issue such an order "if the burden or expense of the proposed discovery outweighs its likely benefit." *Favale v. Roman Catholic Diocese of Bridgeport*, 233 F.R.D. 243, 245 (D. Conn. 2005). As demonstrated below, an application of these standards dictate that the Court should deny Cicvara's motion to compel.

**B.     Cicvara Is Not Entitled To Discovery Concerning His New Allegations Of Discrimination That Do Not Appear In The Amended Complaint**

In his motion to compel, Cicvara repeatedly refers to alleged "sexual discrimination by Defendants." (*E.g.*, Pl.'s Br. at 5.) While Defendants deny those allegations, it is notable that there is no discrimination claim in the Amended Complaint in this case. Consequently, Cicvara cannot seek discovery relating to a claim that is not asserted in this case, and which cannot be asserted in any proposed Second Amended Complaint because he failed to exhaust his administrative remedies and, in any event, those claims are time-barred.

7

Before filing a complaint in federal court alleging a violation of Title VII, a plaintiff must first file a charge with the EEOC and obtain a right to sue letter. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001). Likewise, the Connecticut Fair Employment Practices Act ("CFEPA") "require[s] exhaustion of administrative remedies against the parties named in the complaint. To fail to do so is fatal." *Tyszka v. Edward McMahon Agency,* 188 F. Supp. 2d 186, 195 (D. Conn. 2001). Here, Cicvara has not given the Court or Defendants any notice that he filed a charge of discrimination with either the EEOC or CHRO, and cannot now circumvent this mandatory administrative process by alleging a claim of discrimination in federal court. *Edwards v. William Ravets Real Estate*, No. 08-CV-1907, 2009 U.S. Dist. LEXIS 42400, at \*10 (D. Conn. May 18, 2009) (dismissing plaintiff's CFEPA claims for failure to file a complaint with the CHRO).

Even if Cicvara were to file a charge of discrimination at this late juncture, his claim would nonetheless fail because it is time-barred. "An aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." *Petrosino v. Bell Atl.*, 385 F.3d 210, 219 (2d Cir. 2004). Under the CFEPA, a plaintiff must file a charge within 180 days from the date of the alleged discriminatory act. *Dembinski v. Pfizer, Inc.*, 628 F. Supp. 2d 267, 271 (D. Conn. 2009). Because it has been well over 300 days since P&G terminated Cicvara's employment for cause on June 15, 2009 – the last possible discriminatory act in this case – a discrimination claim under either statute is time-barred.

Because Cicvara has not alleged, and *cannot* allege, a claim of discrimination under Title VII or the CFEPA, he cannot seek discovery unrelated to his claims in the Amended Complaint

8

under the pretext that such documents *may* be related to a meritless, procedurally defective and time-barred discrimination claim.

### C.   Defendants' Responses and Objections Are Appropriate

Defendants have provided Cicvara with substantial information and documents concerning his employment and the circumstances surrounding his termination. They simply have no obligation to produce anything more. Moreover, notwithstanding Cicvara's unfounded claim that Defendants are withholding relevant documents, Defendants have produced all documents in their possession relevant to his claims in the Amended Complaint and have not located any other documents responsive to his requests.

With respect to Cicvara's specific requests in his motion to compel, Defendants respond as follows:

Document Request No. 2: This request seeks Defendants' personnel manuals, memoranda, and written policies concerning employment, performance, and discharges. Plaintiff argues that Defendants objected to this request on the grounds that Plaintiff's request is over broad, unduly burdensome, vague, and ambiguous.

Defendants produced all documents in its possession relevant to this request. For example, Defendants produced P&G's Worldwide Business Conduct Manual, Stock Option Plans and Amendments, P&G Rewards of Leadership Compensation Program, and its Long-Term Incentive Plan, which are the only "personnel manual[], memoranda [or] written [policy]" concerning Cicvara's employment, performance or discharge. Defendants have already stated that they have not located any additional materials responsive to this request, which ends any dispute.

Document Request No. 7: This request seeks any documents concerning communications between Plaintiff, Bel Liu, and/or Practical. Plaintiff maintains that Defendants have "chosen only materials it deems supportive of its position for disclosure." (Pl.'s Br. at 4.)

In response to this discovery request, Defendants produced several e-mails and text messages between Cicvara and Liu, e-mails to P&G employees from Andrew Yau, and documents related to P&G's conversations with Liu regarding the incident. Notwithstanding this production, Cicvara now maintains that "there are multiple exculpatory emails that have not been disclosed to Plaintiff by Defendants." (Pl.'s Br. at 4.) Defendants already informed Attorney Skiber on June 7, 2010, that Defendants were unaware of any other e-mails responsive to this Request.

Document Requests No. 14, 15, and 16: These requests relate to Plaintiff's 2007 complaints regarding an alleged affair between two P&G employees, Mani Parmar and Ann Cardinale. Plaintiff maintains that he is entitled to these documents because P&G allegedly reprimanded him for "coming forward with accusations of sexual discrimination" (Pl.'s Br. at 5); the investigation related to the complaint was conducted by Lynne Burnett, whom Plaintiff claims tortiously interfered with his contractual relationship; and because the documents promote an important "public policy issue that Plaintiff requires to file amended complaint in good faith." (Id.)

Defendants objected to this Request on the grounds that it purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence. First, Cicvara complained about the alleged affair between Mani Parmar and Ann Cardinale in 2007 – *two years* before his termination. To the extent that Cicvara now maintains that P&G retaliated against him for his allegations regarding Parmar and Cardinale, the time between his complaint and his termination two years later is simply too remote to support an inference of causation, and thus should not form the basis for discovery. "Generally, courts have found that a time period of one year between the protected activity and the alleged retaliatory act is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Karath v. Bd. of Trs. of Tunxis Cmty. College*, No. 3:07-CV-1073, 2009 U.S. Dist. LEXIS 115026, at *13 (D. Conn.

10

Dec. 10, 2009). Here, Cicvara seeks discovery related to a complaint he made over *two* years

prior to his termination.

Second, to the extent that Cicvara now argues that these documents promote "public

policy" and relate to his newly-minted claim of discrimination, as Defendants set forth above,

any amendment to the Amended Complaint would be futile because Cicvara's purported

discrimination claim is procedurally defective and time-barred. Accordingly, information

regarding the investigation into Cicvara's 2007 complaint of the affair between Cardinale and

Parmar is not likely to lead to the discovery of admissible evidence.

Document Requests No. 17, 18, and 19: These requests relate to Plaintiff's complaints regarding
the alleged illegal sale of Duracell batteries from Hong Kong to Latin America, and an alleged
Original Equipment Manufacturer irregularity. The requests also seek all documents generated
by Rob Dapra and Mark Bertolami on the grounds that these two P&G executives were involved
in reviewing Cicvara's complaints of alleged illegal activities. Plaintiff argues that this
information is related to his claims because it "demonstrates [Defendants'] continued disdain for
Plaintiff." (Pl.'s Br. at 8.) Additionally, Plaintiff maintains that Defendants "sought to squash
Plaintiff from performing a vital function per his job description" and that the documents again
relate to his purported amended claim of discrimination.[3]

These Requests are overly broad, unduly burdensome, and neither relevant to the subject

matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Similar to Cicvara's requests for documents related to the affair between Parmar and Cardinale,

Document Request Nos. 17, 18, and 19 seek documents that are completely tangential to the

claims in the Amended Complaint. First, Cicvara's complaints about the alleged "illegal sale" of

batteries and the purported OEM irregularity in 2008 occurred well over a year prior to his

termination, and thus are unrelated to his termination. The catalyst for his termination was his

admitted inappropriate sexual advances toward Liu. Finally, as demonstrated above, any

---

[3]     Contrary to Cicvara's contention, the record shows that Defendants did not "squash" him
from doing his job and, as he knows, fully investigated any and all of his complaints.

discrimination claim is procedurally defective and time-barred, and thus cannot be the basis for

discovery.

Document Request No. 20: This request relates to all documents and communication generated by Lynne Burnett related to the termination of Plaintiff's employment. Plaintiff argues that the documents generated by Burnett related to Plaintiff's termination are relevant to the instant action.

Defendants agree that the documents sought in Document Request No. 20 are relevant.

But, Defendants already informed Attorney Skiber that they have produced all documents in

their possession generated by Burnett and related to the termination of Cicvara's employment.

Defendants further stated that they have been unable to locate additional responsive documents.

Thus, Defendants have fully responded to this Document Request.

Document Request No. 21: This request seeks all documents generated by Defendants related to Plaintiff's termination.

Cicvara argues, and Defendants agree, that these documents are related to the subject

matter of his lawsuit. Yet, the remainder of his argument is unclear. Although Cicvara purports

to agree that the Request is "unduly burdensome, and [requests] documents that are neither

relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery

of admissible documents," Defendants did not object to Document Request No. 21 on these

grounds. Rather, while Defendants generally objected that the Request is overly broad, vague

and ambiguous, they did not withhold any documents from production on these grounds. Indeed,

Defendants informed Attorney Skiber that they produced all documents in their possession

related to P&G's decision to terminate Cicvara's employment. Because Defendants fully

responded to this Request, Cicvara's objections lack merit.

Document Request No. 22: This request seeks all documents and communication generated by Defendants regarding the cancellation of Plaintiff's stock options.

12

Inexplicably, Cicvara again maintains that he "agrees that the above request was overly broad unduly burdensome and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible documents." While Defendants objected on the grounds that the Request is overly broad, vague, and ambiguous, they did not maintain that the Request is not relevant. In any event, Defendants produced all documents in their possession that are responsive to this Request, including Gillette's Stock Option Plan and amendments; Long Term Incentive Plan and amendments; a memorandum prepared by Wilczewski summarizing her phone calls with Cicvara discussing the stock option plans; June 16, 2009 and July 6, 2009 letters from Wilczewski to Cicvara regarding his stock options, and Cicvara's July 3, 2009 letter to the stock option administrator. As Defendants already informed Attorney Skiber, P&G does not possess, and has not located, any additional documents responsive to this Document Request.

Document Request No. 23: This request seeks all documents and communication received or generated by Lynne Burnett related to the Plaintiff. Plaintiff maintains that this request is relevant because Burnett "made several comments that clearly indicates she harbored ill will towards Plaintiff while conducting a so-called investigation into allegations against Plaintiff."

Defendants generally objected to this Request on the grounds that it overly broad, unduly burdensome, vague, ambiguous, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to discovery of admissible evidence. Defendants properly limited their response to documents related to Burnett's participation in the investigation of the Bel Liu incident and her involvement in the decision to terminate Cicvara's employment. Cicvara is not entitled to *every* document received or generated by Burnett, a senior Human Resources official, related to *every single* matter that human resources dealt with on a regular basis.

13

Document Requests No. 27:  This request seeks all contracts, agreements, and understandings related to the business relationship between Practical and Defendants.  Plaintiff maintains that this Request "goes to the heart of the matter."

This request is overly broad and unduly burdensome, as it will require P&G to produce

every piece of paper and electronic documents relating to its relationship with Practical.

Defendants informed Attorney Skiber that they would provide any relevant responsive

documents that P&G has in its possession if Cicvara submits a narrowed, focused request.  To

date, Cicvara has not done so.

Document Requests No. 28 and 29:  This request seeks *all* documents related to the production of flashlights by Practical from January 2005 to the present and any and all communication and documents from Practical to Defendants from January 1, 2009.  Plaintiff again maintains that these documents go "to the heart of the matter."

This Request is overly broad and unduly burdensome.  Cicvara is *not* entitled to every

document related to the production of flashlights over a five-year period, nor is he entitled to

every communication from anyone at Practical to each and every employee at P&G.  The

Request seeks overly broad information concerning employees and departments that have

nothing to do with Cicvara, his termination, or the cancellation of his stock options.

Document Request No. 30:  This Request seeks all documents and communication exchanged between Practical and Defendants regarding the instant action.

While Defendants objected to this request as overly broad, unduly burdensome, vague,

and ambiguous, they produced all responsive documents in their possession.  Despite that

representation, Cicvara boldly maintains that additional documents existed between Practical and

P&G regarding the litigation.  Again, Defendants have complied with this Request, and are not

aware of any additional responsive documents.

Document Request No. 31:  This Request relates to Plaintiff's rejection of a Practical flashlight shipment in mid-2009.  Plaintiff argues that this Request is relevant because Plaintiff rejected this shipment one day prior to his offensive behavior with Liu.

14

Whether Cicvara rejected a shipment of flashlights is irrelevant to this case, and not reasonably likely to lead to the discovery of admissible evidence.  This is particularly true given that Cicvara admitted to engaging in inappropriate conduct towards Liu, (*see* Exhibit A, attached hereto ("I can promise that never again I will be a 'dirty man' with you.'")), so whether or not he rejected a shipment of flashlights does not change the fact that he admitted to such conduct and was terminated for that admitted conduct.  Consequently, Cicvara is not entitled to any such documents relating to the rejected flashlight shipment.

Document Request No. 33:  This request seeks information concerning the investigation of Austin Lin's expense reports.  Plaintiff's motion appears to argue that Austin Lin retaliated against Plaintiff for uncovering Lin's "significant expense account fraud" and asked Liu, with whom he allegedly was having an affair, to launch the allegations against Plaintiff.

There is no evidence of Lin's "significant expense account fraud," let alone that it had any impact on Cicvara's termination.  It also is irrelevant, given that Cicvara *admitted to inappropriate sexual behavior towards Liu.*  Whether Lin brought this to P&G's attention or not, the fact remains that Cicvara admitted to engaging in inappropriate conduct, (*see* Exhibit A); thus, it is irrelevant how P&G learned about the incident in the first place or whether Lin has issues with his credibility because of purported false expense reports.  Consequently, the Request seeks documents that are neither relevant to the claims in this case nor reasonably calculated to lead to the discovery of admissible evidence.

Document Requests Nos. 34, 36, and 37:  These requests seek communication between Austin Lin and Bel Liu, incoming and outgoing phone calls from Bel Liu's cell phone, and all documents sent or received from Liu's e-mail address.

Cicvara disingenuously maintains that Defendants have only produced documents that support their position in this case.  Simply put, he is wrong.  Defendants have produced *all* responsive documents in their possession.  Defendants have been unable to locate any additional responsive e-mails or documents.  To the extent that Cicvara is referring to e-mails exchanged

15

Case 12-338, Document 57, 07/23/2012, 671466, Page149 of 291

prior to the Liu incident (and Defendants are not aware of any such e-mails), such emails would have been subject to P&G's normal document retention policy. Prior to the institution of a litigation hold, email would not have been retained.

Document Request No. 38: This request seeks all documents "related to disparaging nature towards the Plaintiff."

Cicvara agrees with Defendants that this Request is overly broad, unduly burdensome, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence. While Cicvara maintains that he asked for "more direct and focused Requests," (Pl.'s Br. at 16), he fails to identify these "more direct and focused Requests" in his moving papers and Defendants are not aware of any such tailored requests.

Document Request No. 39: This request seeks any documents that "would be exculpatory towards the Plaintiff." (Pl.'s Br. at 16.)

Defendants objected to this Request on the grounds that it calls for a legal conclusion and is premature at this stage of the discovery process, but further stated that they are not aware of any documents responsive to this Request. Cicvara ignores Defendants' representation, and argues that Defendants' response "shows that Defendant[s] failed to consider the validity of the allegations against the Plaintiff when he was accused of misconduct." (Pl.'s Br. at 16.) But, Defendants cannot produce documents that they do not have.

## IV. <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny Cicvara's motion to compel

discovery, grant Defendants' costs, including attorneys' fees, in connection with this motion

pursuant to Fed. R. Civ. P. 37(a)(4), and grant Defendants such other and further relief as the

Court may deem just and proper.

Dated this 7th day of July, 2010, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP

By  /s/ Edward Cerasia II
    Edward Cerasia II (ct 13096)
620 Eighth Avenue, 32nd Floor
New York, New York 10018
(212) 218-5500
ecerasia@seyfarth.com

Attorneys for Defendants

17

Re: Please Read This E-mail                                                              Page 1 of 2

From:      Cicvara, Predrag /IMCEAEX-
           _O=PB_OU=FIRST+20ADMINISTRATIVE+20GROUP_CN=RECIPIENTS_CN=CICVARA+2EP@xxd

Sent:      Wednesday, June 10, 2009 8:49 AM

To:        bell@practical.com.hk

Subject: Re: Please Read This E-mail

Life seems better now Bel. It would be very difficult without you. Listening (still in the car with Lori, River and Tanya) to
Ali Farka song Ai Du (blues you listened to in Singapore). Sweet memories!

I can promise that never again I will be a "dirty man" with you.

Thank you.

Predrag Cicvara

---- Original Message ----
From: Bel <bell@practical.com.hk>
To: Cicvara, Predrag
Cc: Bel <bell@practical.com.hk>
Sent: Wed Jun 10 03:42:01 2009
Subject: Re: Please Read This E-mail

I'm sorry because I don't love you but I know you love me so. I appreciated you in the past because we were just friend. What
I cannot accept is what you did in the last few days. Without those dirty things, we can be friend.
I'm on the way to airport now. Will call you in about 30 mins.

Bel

Sent via BlackBerry® from 3

From: "Cicvara, Predrag"
Date: Wed, 10 Jun 2009 02:51:19 -0400
To: <bell@practical.com.hk>
Subject: Please Read This E-mail

Hi ma Belle,

Having nothing more urgent to occupy my mind in the plane I am thinking about all the wonderfull moments that I had a
privilege to experience in the last year or so, all connected to you. From your Bethel's visit last year, to our December's
moments together, through the European winter, our exchange of short e-mails while traveling, receiving a postcard from
you, my warm feelings about you, my desire to protect you and inexplicable closeness that I felt towards you all this time.

It was you whom I chose to confine my thoughts when I had troubles, and it appeared you chose the same by starting to
confine your personal dilemmas and doubts to me. I have cherished our secret friendship deeply all the way feeling extremely
strong respect for you as a person, successful business woman, as a woman and as a friend.

This is NOT changed today I guess I have desire to say and would like you to understand. I would love nothing more than to
take back few emotional outbreaks that I experinced last few days. Had I known that I have risked losing such a precious
thing as our friendship, I wouldn't ever have attempted what I so foolishly did misjudging the nature of our closeness in the
last few days.

Maybe the cultural differences that you so graceously tried to point out in one of our conversations did ironically played the

Confidential                                                                                       PG000475

Re: Please Read This E-mail                                                    Page 2 of 2

part in what transpired lately. I believe if you had taken a strong stance against my foolish attempts to get more out of our relation stopping it from the very beginning, I would have stopped then and would have still be in that special relation with you that meant so much to me. By being so polite and trying not to hurt my feelings you have unobliciously encouraged my (macho? possessive? animolous? stupid?) efforts to get more than you were ready to give.

Foolish dirty old man! How quickly such a wonderful friendship (at least on my part) could be destroyed?

So I guess I am trying to tell you that regardless of what your decision about us and our friendship will be, I still will have all these little precious pieces of happiness deeply carved in my memory and nothing will take these from me ever.

I can only hope that you will understand me and remain beeing my true friend in the future. Again I can only say I am sorry for what I did to you and I know there is no real excuse for it. Not sure that I described correctly what I really feel but probably can't do it better anyway. Maybe, just maybe you could understand what went wrong a bit better.

I hope I will have a strength to send this e-mail after landing.

Sorry if reading this stream of thoughts took too much of your time, which I know you don't have much of. I simply had to write it.

Your friend Predrag

Predrag Cicvara

A-144

Civil- (Dec-2008)

HONORABLE: Judge Janet C. Hall

DEPUTY CLERK _____  RPTR/ECRO/TAPE Terri Fidanza

TOTAL TIME: 1  hours 20  minutes

DATE: 7/20/10  START TIME: 3:30 PM  END TIME: 4:50 PM

LUNCH RECESS  FROM: _____ TO: _____

RECESS (if more than ½ hr)  FROM: _____ TO: _____

CIVIL NO. 09-cv-2054(JCH)

Predrag Cicvara

vs
Gillete Company, et al.

Michael E. Skiber

Plaintiff's Counsel

Edward Cerasia, II

Defendant's Counsel

## COURTROOM MINUTES- CIVIL

☑ Motion hearing  ☐ Show Cause Hearing
☐ Evidentiary Hearing  ☐ Judgment Debtor Exam
☐ Miscellaneous Hearing

☑ ....#20____ Motion to Dismiss Count Eight  ☑ granted ☐ denied ☐ advisement
☑ ....#38____ Motion for Extension of Time  ☑ granted ☐ denied ☐ advisement
☑ ....#39____ Motion to Compel: denied without prejudice to renew  ☐ granted ☑ denied ☐ advisement
☐ ....#____ Motion _____  ☐ granted ☐ denied ☐ advisement
☐ ....#____ Motion _____  ☐ granted ☐ denied ☐ advisement
☐ ....#____ Motion _____  ☐ granted ☐ denied ☐ advisement
☐ ....#____ Motion _____  ☐ granted ☐ denied ☐ advisement
☐ .....  Oral Motion _____  ☐ granted ☐ denied ☐ advisement
☐ .....  Oral Motion _____  ☐ granted ☐ denied ☐ advisement
☐ .....  Oral Motion _____  ☐ granted ☐ denied ☐ advisement
☐ ....  Oral Motion _____  ☐ granted ☐ denied ☐ advisement
☐ .....  ☐ Briefs(s) due _____ ☐ Proposed Findings due_____ Response due____
☐ ............  _____  ☐ filed ☐ docketed
☐ ............  _____  ☐ filed ☐ docketed
☐ ............  _____  ☐ filed ☐ docketed
☐ ............  _____  ☐ filed ☐ docketed
☐ ............  _____  ☐ filed ☐ docketed
☐ ............  _____  ☐ filed ☐ docketed
☐ ............  _____Hearing continued until _____ at _____

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
PREDRAG CICVARA,                          :    Civil Action No. 3:09-cv-2054
                                          :    (JCH) (HF)
                 Plaintiff,               :
                                          :
       v.                                 :    April 15, 2011
                                          :
THE GILLETTE COMPANY and PROCTER &        :
GAMBLE COMPANY and DURACELL, AN ENTITY    :
OF UNKNOWN FORM and LYNNE BURNETT,        :
                                          :
                 Defendants.              :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## NOTICE OF MOTION FOR SUMMARY JUDGMENT

Defendants The Gillette Company and The Procter & Gamble Company (collectively, the "Defendants") respectfully move for an order from the Court granting the Company summary judgment and dismissing the Amended Complaint in its entirety, pursuant to Fed. R. Civ. P. 56.

As set forth in Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment; Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1(a)(1); the Declaration of Edward Cerasia II, Esq., together with Exhibits A through D annexed thereto; the Declaration of Lynne Burnett, together with Exhibits A and B annexed thereto; the Declaration of Kevin Babis, together with Exhibits A and B annexed thereto; the Declaration of Peggy Wilczewski, together with Exhibits A through J annexed thereto; the Declaration of Dina Schmude, together with Exhibits A through C annexed thereto, and upon all of the papers and proceedings herein, Defendants respectfully submit that they are entitled to an Order granting summary judgment in their favor and dismissing the Amended Complaint in its entirety on each of the following grounds, pursuant to Fed. R. Civ. P. 56: (1) plaintiff cannot

Case 12-338, Document 57, 07/23/2012, 671466, Page155 of 291

prevail on his breach of contract claims (Counts One, Three, and Five of the Amended Complaint) because the undisputed facts demonstrate that Defendants did not breach any promise to plaintiff; (2) plaintiff cannot recover on his unjust enrichment claims (Counts Two, Four, and Six of the Amended Complaint) seeking the value of his stock options, bonus, and severance pay because there is an express contract governing his stock options and bonus and, in any event, unjust enrichment is an equitable remedy and his own gross misconduct precludes any such award; (3) plaintiff's cause of action for "Statutory Payment of Wage" (Count Seven of the Amended Complaint) fails because he was not owed any further payment from the Company, and, under Connecticut law, severance pay and the type of bonus involved in this case do not constitute "wages."

Dated this 15th day of April, 2011, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP

By _s/ Edward Cerasia II_____
   Edward Cerasia II (ct 13096)
   Hema Chatlani (phv 04023)
   620 Eighth Avenue, 32nd Floor
   New York, New York 10018
   (212) 218-5500
   ecerasia@seyfarth.com

Attorneys for Defendants
   The Gillette Company
   and The Procter & Gamble Company

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

------------------------------------------- x
                                            :
PREDRAG CICVARA,                            :     Civil Action No. 3:09-cv-2054
                                            :     (JCH) (HF)
           Plaintiff,                       :
                                            :
     v.                                     :     April 15, 2011
                                            :
THE GILLETTE COMPANY and PROCTER &          :
GAMBLE COMPANY and DURACELL, AN ENTITY      :
OF UNKNOWN FORM and LYNNE BURNETT,          :
                                            :
           Defendants.                      :
                                            :
------------------------------------------- x


# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Edward Cerasia II (ct 13096)
Hema Chatlani (phv 04023)
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendants
The Gillette Company
and The Procter & Gamble Company

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

I. PRELIMINARY STATEMENT .................................................................. 1

II. SUMMARY OF UNDISPUTED FACTS ................................................. 3

III. ARGUMENT .............................................................................................. 8

    A.    THE SUMMARY JUDGMENT STANDARD ....................................... 8

    B.    CICVARA IS NOT ENTITLED TO THE VALUE OF HIS STOCK
        OPTIONS BECAUSE HIS OPTIONS WERE AUTOMATICALLY
        FORFEITED AS A RESULT OF HIS TERMINATION FOR CAUSE ............... 9

        1.    Cicvara Cannot Prevail On His Breach of Contract Claim Because
            The Company Did Not Breach Any Agreement Owed To Him ............... 10

        2.    The Company's Determination That Cicvara's Termination
            Constituted A Termination For "Cause" Under The Plan Was Not
            Arbitrary Or Capricious ........................................................................ 13

        3.    Cicvara's Unjust Enrichment Claim Is Barred By His Remedies At
            Law ........................................................................................................ 14

        4.    Even If Cicvara's Unjust Enrichment Claim Was Not Barred By
            The Express Terms Of The Contract, His Egregious Behavior
            Precludes Any Equitable Remedy ........................................................ 15

    C.    CICVARA CANNOT PREVAIL ON HIS BREACH OF CONTRACT
        OR UNJUST ENRICHMENT CLAIMS SEEKING THE VALUE OF HIS
        2009 BONUS ........................................................................................... 16

        1.    Cicvara's Breach Of Contract Claim Fails Because He Was Not
            Employed On The Date The Bonuses Were Paid .................................. 17

        2.    Cicvara's Unjust Enrichment Claim Fails Because There Is An
            Express Contract Governing His Right To A Bonus .............................. 18

        3.    The Company Was Not Unjustly Enriched By Cicvara's
            Termination For Cause .......................................................................... 18

    D.    CICVARA ADMITS THAT THERE IS NO FACTUAL BASIS
        ENTITLING HIM TO SEVERANCE PAY ........................................... 19

E.    CICVARA'S STATUTORY PAYMENT OF WAGES CLAIM SHOULD
BE DISMISSED BECAUSE THE COMPANY DOES NOT OWE HIM
ANY WAGES.........................................................................................20

IV. CONCLUSION............................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABC Office Equip., Inc. v. Royal Cons. Bus. Prods., Div. of Triumph-Adler-Royal, Inc.,*
   721 F. Supp. 1557 (D. Conn. 1989) ............................................................................23

*Agugliaro v. Brooks Bros.,*
   927 F. Supp. 741 (S.D.N.Y. 1996) ............................................................................12

*Anderson v. Baker,*
   2008 Ohio 6919 (Ohio Ct. App. 2008) ...............................................................16, 17

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ....................................................................................................9

*Capuano v. Island Computer Prods., Inc.,*
   382 F. Supp. 2d 326 (D. Conn. 2005) ........................................................................10

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ....................................................................................................9

*Chardavoyne v. Thames Water Holdings Inc.,*
   No. 03-CV-0056, 2008 U.S. Dist. LEXIS 33615 (D. Conn. Apr. 23, 2008) ..............21, 22

*Christensen v. Bic Corp.,*
   18 Conn. App. 451 (1989) ....................................................................................17, 21

*City of Bridgeport v. Kasper Group, Inc.,*
   278 Conn. 466 (2006) .................................................................................................18

*Collins v. S. New Eng. Tel. Co.,*
   617 F. Supp. 2d 67 (D. Conn. 2009) ..........................................................................19

*Davidson v. Davidson,*
   2005 Ohio 6414 (Ohio Ct. App. 2005) .......................................................................15

*DeSantis v. Deutsche Bank Trust Co. Ams., Inc.,*
   501 F. Supp. 2d 593 (S.D.N.Y. 2007) ........................................................................17

*Doner v. Snapp,*
   98 Ohio App. 3d 597 (1994) .................................................................................10, 11

*Drybrough v. Acxiom Corp.,*
   172 F. Supp. 2d 366 (D. Conn. 2001) ........................................................................23

*Duviella v. JetBlue Airways Corp.,*
   No. 04-CV-5063, 2008 U.S. Dist. LEXIS 36979 (E.D.N.Y. May 6, 2008) ..................11

iii

*Gagne v. Vaccaro,*
    255 Conn. 390 (2001) ............................................................................................................18

*Garry v. Bertucci's Rest. Corp.,*
    No. 00-CV-0395, 2001 U.S. Dist. LEXIS 22947 (D. Conn. Sept. 26, 2001) ...................17, 22

*Gehrhardt v. Gen. Motors Corp.,*
    581 F.2d 7 (2d Cir. 1978) ......................................................................................................13

*Henwood v. Unisource Worldwide, Inc.,*
    No. 01-CV-0996, 2006 U.S. Dist. LEXIS 71449 (D. Conn. Sept. 29, 2006) ...................20, 21

*Humayun v. Hudson News Co.,*
    No. 95 Civ. 7926, 1996 U.S. Dist. LEXIS 19963 (S.D.N.Y. Dec. 31, 1996) ........................12

*Kitson v. Berryman,*
    2003 Ohio 2662 (Ohio Ct. App. 2003) ..................................................................................15

*Leland Eaves v. Designs for Fin., Inc.,*
    No. 09-CV-3952, 2011 U.S. Dist. LEXIS 33654 (S.D.N.Y. Mar. 30, 2011) .........................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................................................................9

*McGowan v. Administrator, Unemployment Compensation Act,*
    220 A.2d 284 (Conn. 1966) ...................................................................................................23

*Messler v. Barnes Group, Inc.,*
    No. CV 960560004, 1999 WL 61034 (Sup. Ct. Conn. 1999) ...........................................10, 14

*Mohr v. Best Buy Stores, L.P.,*
    547 F. Supp. 2d 783 (N.D. Ohio 2008) ..................................................................................12

*Noonan v. Staples, Inc.,*
    556 F.3d 20 (1st Cir. 2009) ...................................................................................................13

*Padula v. Weston Bd. of Educ.,*
    2009 Conn. Super. LEXIS 1557 (Conn. Super. Ct. June 9, 2009) .........................................20

*Parma Cmty. Gen. Hosp. v. Premier Anesthesia of Parma,*
    No. 09-CV-0325, 2011 U.S. Dist. LEXIS 11035 (N.D. Ohio Feb. 4, 2011) ..........................14

*Prey v. Kruse,*
    No. 08-CV-0207, 2010 U.S. Dist. LEXIS 85096 (S.D. Ohio Aug. 19, 2010) ........................16

*Russell v. Russell,*
    91 Conn. App. 619 (2005) .....................................................................................................18

*Salling v. Budget Rent-A-Car Sys.,*
    No. 09-CV-2160, 2010 U.S. Dist. LEXIS 70603 (N.D. Ohio July 14, 2010) .........................16

*TFS Energy, LLC v. Campisi,*
    No. 06-CV-0191, 2009 U.S. Dist. LEXIS 11431 (D. Conn. Feb. 17, 2009) ...........................18

*Turner v. Langenbrunner,*
    2004 Ohio 2814 (Ohio Ct. App. 2004) ...................................................................................15

*W. World Ins. Co. v. Stack Oil, Inc.,*
    922 F.2d 118 (2d Cir. 1990)......................................................................................................9

*Weir v. Anaconda Co.,*
    773 F.2d 1073 (10th Cir. 1985) ..............................................................................................13

*Weiskopf v. Am. Kennel Club, Inc.,*
    No. 00-CV-0471, 2002 U.S. Dist. LEXIS 10694 (E.D.N.Y. June 10, 2002) ..........................19

*Welland v. Citicorp, Inc.,*
    No. 00-CV-0738, 2003 U.S. Dist. LEXIS 22721 (S.D.N.Y. Dec. 17, 2003) ..........................13

*Wood v. Sempra Energy Trading Corp.,*
    No. 03-CV-0986, 2005 U.S. Dist. LEXIS 2848 (D. Conn. Feb. 22, 2005) .............................22

*Ziotas v. Reardon Lawfirm, P.C.,*
    296 Conn. 579 ..........................................................................................................................21

**OTHER AUTHORITIES**

Conn. Gen. Stat. § 31-71a(3) ..............................................................................................20, 21, 23

Conn. Gen. Stat. § 31-72..................................................................................................................20

**RULES**

Fed. R. Civ. P. 1 ................................................................................................................................9

Fed. R. Civ. P. 56(c) .........................................................................................................................8

Case 12-338, Document 57, 07/23/2012, 671466, Page162 of 291

## I. PRELIMINARY STATEMENT

Defendants The Gillette Company and The Procter & Gamble Company (collectively, the "Company") respectfully submit this memorandum of law in support of their Fed. R. Civ. P. 56 motion for summary judgment seeking the dismissal of plaintiff Predrag Cicvara's ("Cicvara's") remaining claims in the Amended Complaint for breach of contract, unjust enrichment, and statutory payment of wages.[1]  As demonstrated below, the Court should grant summary judgment in favor of the Company because Cicvara has no competent evidence whatsoever from which a reasonable jury could find that the Company breached any alleged contract, was unjustly enriched, or owes Cicvara any unpaid wages.

Cicvara brought this action in a desperate attempt to undo the consequences of his own gross misconduct, which included visiting the hotel room of Bel Liu ("Liu"), a female employee of a Company supplier known as Practical Lighting Company ("Practical Lighting"), stripping down to his underwear and sitting on her bed, massaging her feet and back despite the fact that she had not asked him to do so, and admittedly telling her that "one could rape [her]." Thereafter, Cicvara sent Liu a barrage of text messages and e-mails apologizing for his actions and promising that he will never again act as a "dirty old man" with her.  When Cicvara's gross misconduct was communicated to the Company, it promptly investigated.  As a result of that investigation, the Company reasonably concluded that Cicvara's outrageous behavior violated its policy against harassment and its Purpose, Values and Principles ("PVPs"), and accordingly terminated his employment for cause.  As a result of that termination for cause, Cicvara's stock

---

[1]     On July 20, 2010, this Court granted defendant Lynne Burnett's ("Burnett's") Rule 12(b)(6) motion to dismiss the tortious interference claim against her.  Thus, Burnett is no longer a defendant in this case.  In addition, Duracell ceased being a legal entity as of January 1, 1998, (Defendants' Local Civil Rule 56.1 Statement of Material Facts ("Defs.' 56.1"), ¶ 2), and therefore is not a proper defendant in this case.

options were cancelled by operation of the terms of the Gillette Company 1971 Stock Option Plan (the "Plan"), which states that an employee forfeits his stock options if he is terminated for "gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary."

Faced with the fact that his *own* inappropriate behavior led to his termination and ultimately caused him to forfeit his stock options, Cicvara filed a hodgepodge of claims attempting to recoup monies and benefits to which he is not entitled. The undisputed evidence, however, shows that the Company did not breach any promise to Cicvara and does not owe him *any* benefits or monies. With respect to his stock options claim, Cicvara's admitted inappropriate sexual advances and comments toward Liu violated the Company's policies and resulted in his termination for cause. As a result of that termination for cause, Cicvara's stock options were automatically forfeited, rendering his breach of contract and unjust enrichment claims as to those options baseless.

Cicvara's cause of action for breach of contract seeking to recover the value of his bonus and severance pay are equally untenable. Cicvara admits that he was not entitled to a bonus because he was not an "active employee" on the date that bonuses were paid out in 2009, as required by the Company's bonus plan. With respect to severance pay, Cicvara admits he was *never* promised such pay, and in fact cannot point to *any* writing indicating any entitlement to a severance package. Rather, Cicvara testified that he should have received severance pay because he *believes* that the Company provided such payments to employees who are involuntarily terminated as part of a reduction-in-force ("RIF"). First, summary judgment is not about what Cicvara "believes"; it is about admissible evidence that creates a genuine issue of material fact, which does not exist here. Second, whether the Company paid severance pay to employees who

2

were involuntarily terminated as part of a RIF is utterly irrelevant to this case because Cicvara

was terminated *for cause* and not as a result of a RIF.

Cicvara also cannot circumvent the express terms of the Company's bonus plan and stock

option agreement by seeking to recover the value of these benefits in unjust enrichment.  It is

well established that restitution for unjust enrichment is simply unavailable when a contract

exists governing the exact same subject matter.  In any event, even if Cicvara could circumvent

the express terms of the contracts governing his bonus and stock options, and the fact that he was

*never* promised severance pay, he still cannot recover based on unjust enrichment because this is

an equitable remedy and his own gross misconduct precludes any such award.

Finally, Cicvara has no viable claim for unpaid "wages" under the Connecticut General

Statutes.  Cicvara was fully compensated for all days worked and, as already explained, is not

owed any further payment from the Company.  Moreover, under Connecticut law, severance pay

and the type of bonus involved in this case do not constitute "wages."

For these reasons, and those demonstrated below, the Court should grant summary

judgment in favor of the Company and dismiss Cicvara's Amended Complaint in its entirety.

## II.  SUMMARY OF UNDISPUTED FACTS

The undisputed material facts in this case are set forth in the Company's Local Civil Rule

56.1(a)(1) Statement of Undisputed Material Facts.  For the Court's convenience, the Company

incorporates herein those undisputed facts and provides the following summary of the facts.

Cicvara was last employed by the Company as Quality Assurance ("QA") Manager for

Duracell Lighting in its Bethel, Connecticut office.  (Defs.' 56.1, ¶ 1.)  As QA Manager, Cicvara

was responsible for interacting with the Company's suppliers on all quality-related issues, which

included auditing the suppliers' factories and ensuring that they met the Company's quality

standards.  (*Id.*, ¶ 15.)  Because Cicvara's managerial position required significant travel abroad

3

and substantial interactions with the Company's suppliers, the Company regarded him as its "face" when traveling abroad.  (*Id.*, ¶ 14.)  Indeed, the job duties for Cicvara's management position specifically required him to "[p]rovide professional representation of Duracell/P&G per the P&G Worldwide Business Conduct Manual" and stated that this professional representation was "vitally important in dealing with Contractors and Suppliers in that plans, decisions, and commitments could have significant impact from a financial and/or confidential perspective." (*Id.*)

In June 2009, Cicvara traveled to Indonesia, Thailand, and China for a multi-day audit of Practical Lighting's facilities.  (*Id.*, ¶ 22.)  The trip included overnight stays in Jakarta and Medan, Indonesia; Singapore; Bangkok, Thailand; and Guangzhou, China.  (*Id.*)  Liu and Andrew Yau ("Yau"), Practical's Chairman, traveled from Practical's headquarters in Hong Kong to meet with Cicvara and the Company's auditors at the various factories.  (*Id.*)

On June 8, 2009, while in Thailand, Liu, Yau and Yuen Yau, another Practical employee, had dinner with Cicvara.  (*Id.*, ¶ 26.)  Liu left dinner early and returned to her hotel room because she was not feeling well.  (*Id.*)  After dinner, Cicvara sent Liu a text message asking if he could visit her hotel room to bring her a "special dessert."  (*Id.*, ¶ 27.)  Although Liu initially said no, Cicvara continued to press her until Liu finally relented because she did not want to offend a customer.  (*Id.*)  Cicvara took that opportunity and visited Liu's room with his "special dessert." (*Id.*)

When he entered Liu's hotel room, Cicvara inexplicably stripped off his pants and sat on Liu's bed wearing nothing but his underwear and shirt.  (*Id.*, ¶ 28.)  He then started to massage her feet and touch her back, even though Liu had never asked him to do so.  (*Id.*, ¶ 29.)  Liu, who was lying in bed sick, told Cicvara to stop because she did not "like this."  (*Id.*)  Rather than

4

ceasing his inappropriate behavior, Cicvara told Liu that he could "rape her." (*Id.*, ¶ 30.)
Cicvara finally left the room after Liu repeatedly asked him to do so. (*Id.*)

The next morning, on June 9, 2009, Liu left a Hard Rock Café shirt that Cicvara had
bought for her earlier during the trip outside of his hotel room door. (*Id.*, ¶ 31.) When he found
the shirt at the foot of his door, Cicvara went to Liu's hotel room and asked her why she had
returned the shirt. (*Id.*) Liu told Cicvara that she was scared of him. (*Id.*) At that point, Liu
called Austin Lin ("Lin"), a Company employee with whom she had worked in the past, but
received his voicemail. (*Id.*) Lin's voicemail recorded portions of the conversation between
Cicvara and Liu. (*Id.*) After asking Liu a few more times why she had returned the shirt,
Cicvara finally left Liu's room. (*Id.*)

Shortly thereafter, Cicvara sent Liu a text message stating, "Feel terrible that can't [*sic*]
be with you and pamper you." (*Id.*, ¶ 32.) Less than fifteen minutes later, Liu once again
rebuffed Cicvara's unwanted advances by stating: "Thx P. I'm fine but I have to re-emphasize
that we are not either couples or lovers." (*Id.*) Cicvara did not take that polite rebuff, and
continued to barrage Liu with text messages and e-mails stating, among other things, that he was
"in a shock and disgusted by [himself] and [his] poor judgment of things" and acknowledging
that there was "no real excuse" for what he had done. (*Id.*, ¶¶ 32-35.) Tellingly, Cicvara
admitted to her in writing that he had been a "[f]oolish dirty old man." (*Id.*, ¶ 34.)

Later on June 9, 2009, Liu spoke with Lin and told him about Cicvara's conduct from the
night before. (*Id.*, ¶ 36.) Lin reported Cicvara's conduct to Dina Schmude ("Schmude"), the
Company's Human Resources Manager, and encouraged Liu to speak with her boss, Andrew
Yau. (*Id.*) Schmude relayed Lin's report to Lynne Burnett ("Burnett"), the Company's Global

5

Human Resources Director in Bethel, who advised Schmude to investigate the incident by speaking with both Liu and Cicvara. (*Id.*, ¶ 37.)

On June 11, 2009, Schmude and Peggy Wilczewski ("Wilczewski"), the Company's Senior Human Resources Manager in Bethel, called Liu in Hong Kong and inquired about Cicvara's behavior in Asia. (*Id.*, ¶ 38.) Over the next hour and half, Liu provided Schmude and Wilczewski with details of Cicvara's inappropriate conduct during the audit and, in particular, his shocking actions in her hotel room on June 8, 2009. (*Id.*) The next day, Liu sent Schmude and Wilczewski the emails and text messages she exchanged with Cicvara. (*Id.*, ¶ 40.) In her cover e-mail to Schmude and Wilczewski, Liu explained that she tried to be polite with Cicvara, whom she did not want to offend because he was a customer of Practical. (*Id.*)

While the Company was investigating the report, Andrew Yau, who had by now learned of Cicvara's conduct, sent an e-mail to Nitesh Singh, the Company's Senior Purchasing Manager, informing Singh that Cicvara had made "inappropriate sexual advances" toward Liu during his trip to Asia. (*Id.*, ¶ 42.) Yau added that Cicvara was no longer welcome at Practical in the future, and that the Company should send someone else for future audits. (*Id.*) Yau's e-mail about Cicvara's egregious conduct came at a time when the relationship between the Company and Practical was strained; indeed, Yau noted a few days later to Eric Lawson, the Company's Associate Director for the Duracell Division, that Practical was "very disappointed" with its business with the Company. (*Id.*, ¶ 43.)

On June 15, 2009, Burnett, Wilczewski and Kevin Babis ("Babis"), Cicvara's manager, met with Cicvara in a conference room and interviewed him regarding Liu's allegations. (*Id.*, ¶ 44.) During that meeting, Cicvara admitted to visiting Liu's hotel room and touching her. (*Id.*, ¶ 45.) When Burnett asked Cicvara whether he stated that he wanted to "rape" Liu, Cicvara

6

responded, "Look, it was in a hotel and she was dressed in a way.  I told her that I had a feeling I

would rape her but I never had that in my mind and I didn't thin[k] she'd think about it

seriously."  (*Id.*)  Amazingly, Mr. Cicvara then attempted to excuse his comment by suggesting

that Liu's attire somehow provoked him; specifically, he stated that Liu was "dressed in very

short shorts," which prompted him to tell her, "I'm a man and it looks like I could rape you like

that.  You are showing off."  (*Id.*)  When asked if he had anything else to say, Cicvara stated, "If

I was thinking of things the way it turned out, I should not have been touching her that way."

(*Id.*, ¶ 47.)

At the end of their meeting, Burnett, Babis and Wilczewski asked Cicvara to remain in

the conference room while they left to discuss the matter.  (*Id.*, ¶ 48.)  During that time, the three

unanimously determined that Cicvara's employment should be terminated for engaging in

egregious misconduct, which not only violated the Company's policy and PVPs, but also

reflected poorly on the Company and negatively affected the Company's relationship with

Practical.  (*Id.*)  They then returned to the conference room, when Burnett informed Cicvara that

he was being terminated for violating the Company's PVPs and policy by engaging in harassing

behavior toward Liu, an employee of a Company supplier.  (*Id.*)

On the same day of his termination, Cicvara contacted Wilczewski and asked whether he

would receive a bonus for the year and whether he could still exercise certain stock options that

he had with the Company.  (*Id.*, ¶ 56.)  Wilczewski informed him that she would research his

questions.  (*Id.*)  Wilczewski then participated in a telephone conference with Burnett and Jason

Muncy ("Muncy"), one of the Company's in-house attorneys who advises the business on

securities and corporate law.  (*Id.*, ¶ 57.)  During that conference call, Burnett explained the

reasons for Cicvara's termination, at which point Muncy stated that Cicvara's stock options were

automatically cancelled as a result of his termination for cause. (*Id.*)  Muncy pointed
Wilczewski and Burnett to Section 6(f) of the Plan, which states that an employee's stock
options are automatically forfeited if the employee is terminated for "Cause."  (*Id.*)  That section
defines "Cause" as, among other things, engaging in "gross misconduct."  (*Id.*, ¶¶ 50, 57.)  The
next day, Wilczewski erroneously told Cicvara that he would receive a bonus when they were
paid out in September 2009, and informed Cicvara by letter and telephone that his stock options
had been automatically forfeited as a result of his termination for cause.  (*Id.*, ¶¶ 58-60.)

On September 15, 2009, Cicvara sent Wilczewski an e-mail inquiring about the status of
his bonus.  (*Id.*, ¶ 64.)  At that point, Wilczewski informed Cicvara that he was not entitled to a
bonus because the Company's Short Term Achievement Award ("STAR") plan provided that he
had to be actively employed on June 30th, the date that bonuses were paid, to be entitled to a
bonus.  (*Id.*)  Because Cicvara's employment ended on June 15, he was not eligible for a bonus
under the STAR plan.  (*Id.*, ¶ 65.)

Shortly thereafter, faced with the fact that his own misconduct resulted in the loss of his
benefits, Cicvara filed his lawsuit alleging breach of contract (Counts One, Three, and Five)
unjust enrichment (Counts Two, Four, and Six), and statutory payment of wages (Count Seven),
seeking to recover the value of his forfeited stock options, a bonus and a severance package.

## III.  ARGUMENT

### A.    THE SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where "the pleadings, the discovery . . . [and]
affidavits show that there is no genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment provides a
procedure whereby determinations can be made without recourse to a costly, lengthy, and
unnecessary trial:

[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

To carry its initial burden, the moving party must show that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. A moving party need only show the absence of proof of any of the essential elements of the non-movant's case. *Id.* at 323. Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party to proffer admissible evidence demonstrating that a trial is required because disputed issues of material facts exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, to withstand the motion, the non-movant must do more than present evidence that is merely colorable, conclusory or speculative; it must present "concrete evidence from which a reasonable [fact-finder] could return a verdict in [its] favor." *Id.* at 256; *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (non-moving party "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture") (citations & quotations omitted). In the end, the non-movant must do more than show "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Applying this standard to the undisputed material facts in this case, summary judgment should be granted in favor of the Company.

**B.    CICVARA IS NOT ENTITLED TO THE VALUE OF HIS STOCK OPTIONS BECAUSE HIS OPTIONS WERE AUTOMATICALLY FORFEITED AS A RESULT OF HIS TERMINATION FOR CAUSE**

In his Amended Complaint, Cicvara asserts a breach of contract and an unjust enrichment claim seeking to recover the value of his forfeited stock options. (Am. Comp., ¶¶ 6-26.) As the

9

undisputed facts demonstrate, however, Cicvara cannot prevail on his breach of contract claim

because the Company did not breach any agreement with him.  As for his unjust enrichment

claim, the law is clear that this equitable remedy cannot be asserted where there is an express

contract governing the same subject matter.  In any event, even if Cicvara were permitted to

assert an unjust enrichment claim, he cannot point to any facts entitling him to recover under this

equitable remedy because it was not unjust for Cicvara to lose his stock options as a result of his

own egregious misconduct.

### 1. Cicvara Cannot Prevail On His Breach of Contract Claim Because The Company Did Not Breach Any Agreement Owed To Him

To prevail on his breach of contract claim, Cicvara must establish the existence of a

contract, performance by him, a breach by the Company, and damage or loss to him.  *See, e.g.,*

*Doner v. Snapp*, 98 Ohio App. 3d 597, 600 (1994).[2]  Although the Company does not dispute

that a valid contract existed (*i.e.*, the Plan), Cicvara's breach of contract claim nonetheless fails

because he cannot establish that he performed under the terms and conditions of the Plan, or that

the Company breached the terms of the Plan.

The clear and unambiguous terms of the Plan state that "[i]f an employee Participant is

discharged for Cause . . . all his options shall *immediately* be cancelled effective as of the date of

---

[2]      Under the choice of law provision in Section 13 of the Plan, the Plan and each option
issued under it shall be governed and issued in accordance with the laws of the State of Ohio.
(Defs.' 56.1, ¶ 49.)  Therefore, Cicvara's breach of contract and unjust enrichment claims as to
the stock options are governed by the laws of the State of Ohio.  *See Capuano v. Island
Computer Prods., Inc.*, 382 F. Supp. 2d 326, 337 (D. Conn. 2005) (applying New York law to
breach of covenant of good faith and fair dealing claim in light of choice of law provision); *see
also Messler v. Barnes Group, Inc.*, No. CV 960560004, 1999 WL 61034, at *11-12 (Sup. Ct.
Conn. 1999) (applying Ohio substantive law to unjust enrichment claim in light of choice of law
provision).  Because neither party has challenged the enforceability of the Plan and the choice of
law provision selects Ohio law as governing, the Company's arguments are premised on the
applicability of Ohio law.

termination of his employment." (Defs.' 56.1, ¶ 50.) (emphasis added).  Section 6(f)(B) of the

Plan specifically defines "Cause" as "the Participant's engaging in illegal conduct or gross

misconduct which is materially and demonstrably injurious to the Company or the subsidiary."

(*Id.*)  The undisputed evidence before this Court shows that the Company legitimately concluded

that Cicvara engaged in this very type of gross misconduct when he engaged in sexually

harassing conduct and made sexually suggestive comments toward Liu in violation of the

Company's policies and PVPs.  (*Id.*, ¶¶ 48, 57.)  Indeed, the Company substantiated Liu's highly

disturbing allegations that Cicvara inappropriately touched Liu in her hotel room and commented

that he could "rape her."  (*Id.*, ¶¶ 44-47.)  Cicvara's shocking behavior also was corroborated by

his e-mails and text messages to Liu apologizing for his actions and promising not to behave like

a "dirty old man" with her again, as well as his admission to Burnett, Wilczewski, and Babis that

he had a "feeling [he] would rape her."  (*Id.*, ¶¶ 33-35, 45-47.)

Although the Company would consider this type of behavior gross misconduct if engaged

in by *any* employee, it was particularly egregious for Cicvara because he was entrusted with

traveling abroad, meeting with suppliers, and acting as the face of the Company when interacting

with these suppliers; indeed, his job duties specifically included "[p]rovid[ing] professional

representation of Duracell/P&G per the P&G Worldwide Business Conduct Manual."  (*Id.*, ¶ 14.)

Cicvara failed to professionally represent the Company as per the Worldwide Business Conduct

Manual, and also *completely* violated the Manual and the Company's PVPs by engaging in

sexually harassing conduct toward Liu.

The Second Circuit routinely has held that the lodging of a sexual harassment complaint

against an employee is a compelling reason for the employer's decision to terminate that

employee.  *See, e.g., Duviella v. JetBlue Airways Corp.*, No. 04-CV-5063, 2008 U.S. Dist.

11

LEXIS 36979, at *10 (E.D.N.Y. May 6, 2008) (granting summary judgment and concluding that employer's belief that plaintiff sexually harassed another employee provided a legitimate reason for his discharge), *aff'd*, 353 Fed. Appx. 476 (2d Cir. 2009) (summary order); *Agugliaro v. Brooks Bros.*, 927 F. Supp. 741, 746 (S.D.N.Y. 1996) (employer's "belief that [plaintiff] had sexually harassed a subordinate employee" is a "completely appropriate and justifiable reason for dismissing plaintiff"); *Humayun v. Hudson News Co.*, No. 95 Civ. 7926, 1996 U.S. Dist. LEXIS 19963, at *14 (S.D.N.Y. Dec. 31, 1996) ("An employer is justified in taking appropriate action against a sexual harasser.  Acts of sexual harassment 'must be treated as an adequate basis for adverse personnel action.'") (citation omitted).

Here, the Company was more than justified in concluding that Cicvara engaged in gross misconduct when he visited Liu's hotel room, sat on her bed with only his underwear on, massaged her feet, and told her that he could "rape her."   By engaging in that gross misconduct, Cicvara failed to act in accordance with the terms of the Plan, thus resulting in the automatic forfeiture of his stock options under the Plan.  *Mohr v. Best Buy Stores, L.P.*, 547 F. Supp. 2d 783, 791 (N.D. Ohio 2008) (granting summary judgment for employer and holding that plaintiff did not act in accordance with the terms of the stock option agreement because the agreement stated that termination for a breach of company policy would result in the forfeiture of stock options, and plaintiff was terminated after using a gift card he found in the company's parking lot in violation of an unwritten policy prohibiting employees from using gift cards not belonging to them).  Therefore, the Court should dismiss Cicvara's breach of contract claim as to the stock options.

2.     **The Company's Determination That Cicvara's Termination Constituted A
       Termination For "Cause" Under The Plan Was Not Arbitrary Or Capricious**

Courts have held that an employer's decision to terminate an employee's non-ERISA

benefits, such as stock options, should be set aside *only if* the employer's decision was "arbitrary

and capricious." *Welland v. Citicorp, Inc.*, No. 00-CV-0738, 2003 U.S. Dist. LEXIS 22721, at

\*35-36 (S.D.N.Y. Dec. 17, 2003), *aff'd*, 116 Fed. Appx. 321, 322 (2d Cir. 2004) (summary

order).  As such, if the employer has a reasonable basis for its decision, "the court may not

substitute its judgment for that of [the employer] on the disputed factual issues." *Gehrhardt v.*

*Gen. Motors Corp.*, 581 F.2d 7, 11 (2d Cir. 1978) (quotations omitted); *Welland*, 2003 U.S. Dist.

LEXIS 22721, at \*35 (where an employee's stock option plan provided that any unvested stock

options would be forfeited if the plaintiff was terminated "for cause," the court rejected

plaintiff's argument that "whether cause existed is a fact intensive inquiry that cannot be

determined on a motion for summary judgment;" the court concluded that the company had a

reasonable basis to find that the plaintiff's termination was "for cause" because he was

terminated for violating company policy when he accepted gifts from a company vendor);

*Noonan v. Staples, Inc.*, 556 F.3d 20, 34 (1st Cir. 2009) ("Even if we might disagree with

Staples's action regarding [plaintiff's] firing, if Staples's decision was not arbitrary, capricious,

or made in bad faith, then we must accord it deference, and consequently affirm the denial of

[plaintiff's] stock options under the plain terms of the agreements," which provided that an

employee's stock options would be cancelled automatically if the employee was terminated "for

cause."); *Weir v. Anaconda Co.*, 773 F.2d 1073, 1080 (10th Cir. 1985) (employee's stock option

agreement provided that employees terminated for cause are ineligible for stock options;

although the plan did not define "for cause," Tenth Circuit held that the determination that

13

plaintiff's termination for poor performance was a "for cause" termination was not arbitrary, in bad faith, or fraudulent).

Here, the Company's decision to terminate Cicvara's employment for gross misconduct after he made inappropriate sexual advances and comments toward Liu was not arbitrary, capricious, or in bad faith. The Company terminated Cicvara's employment only after speaking with Lui, who provided the Company with details of Cicvara's wrongdoing, and after speaking with Cicvara, who *admitted* to Burnett, Wilcewski and Babis, that, among other things, he had touched Liu and told her he "had a feeling [he] would rape her." (Defs.' 56.1, ¶¶ 38-47.) Given these undisputed facts, it was more than reasonable for the Company to conclude that Cicvara had engaged in gross misconduct in violation of its policies and that, as a result, his stock options were automatically forfeited by the terms and conditions of the Plan.

For these reasons, Cicvara cannot prove that he complied with his obligations under the Plan or that the Company breached any duty it owed to him under the Plan, which are essential elements of his breach of contract claim. Consequently, the Court should grant summary judgment dismissing Cicvara's claims in Count One of the Amended Complaint.

### 3.   Cicvara's Unjust Enrichment Claim Is Barred By His Remedies At Law

Cicvara also asserts a claim for unjust enrichment as to the value of the stock options. (Am. Comp., ¶¶ 25-26.) Because the parties entered into a contract governing Cicvara's entitlement to his stock options (*i.e.*, the Plan), Cicvara's unjust enrichment claim fails as a matter of law. Under Ohio law, the equitable remedy of an unjust enrichment claim is simply "not allowed where an express contract governs the transactions at issue."[3] *Parma Cmty. Gen.*

---

[3]   As stated in footnote 2, Cicvara's unjust enrichment claim seeking the value of his stock options is governed by Ohio law. *Messler*, 1999 WL 61034, at *11-12. However, as discussed in Section III.C.2., *infra*, Cicvara cannot recover even if Connecticut law applied because both

*Hosp. v. Premier Anesthesia of Parma*, No. 09-CV-0325, 2011 U.S. Dist. LEXIS 11035, at *9

(N.D. Ohio Feb. 4, 2011); *see also Davidson v. Davidson*, 2005 Ohio 6414, P19 (Ohio Ct. App.

2005) ("Ohio law does not recognize an equitable claim for unjust enrichment, as a matter of

law, when an express contract covers the same subject matter."); *Turner v. Langenbrunner*, 2004

Ohio 2814, P38 (Ohio Ct. App. 2004) ("Unjust enrichment is an equitable doctrine to justify a

quasi-contractual remedy that operates in the absence of an express contract or a contract implied

in fact to prevent a party from retaining money or benefits that in justice and equity belong to

another.").

Here, there is absolutely no dispute that the Plan expressly governs Cicvara's purported

entitlement to the stock options.  Because there is an express contract on this very issue, Cicvara

is precluded, as a matter of law, from asserting an unjust enrichment claim seeking the value of

the stock options.  Thus, the Court should grant summary judgment for the Company dismissing

Cicvara's unjust enrichment claim in Count Two of the Amended Complaint.

4.      **Even If Cicvara's Unjust Enrichment Claim Was Not Barred
        By The Express Terms Of The Contract, His Egregious Behavior
        Precludes Any Equitable Remedy**

Even assuming, *arguendo*, that Cicvara could maintain an unjust enrichment claim, the

Court should still grant summary judgment dismissing that claim because his inappropriate

conduct precludes his recovery under this equitable remedy.  "[T]o prove unjust enrichment, a

plaintiff must establish a benefit conferred by the plaintiff upon a defendant, the defendant's

knowledge of the benefit, and the defendant's retention of the benefit under circumstances where

it would be unjust to do so without payment." *Kitson v. Berryman*, 2003 Ohio 2662, P18 (Ohio

---

Connecticut and Ohio law prohibit recovery under unjust enrichment when there is an express
contract governing the same issue.

Ct. App. 2003). "Recovery under unjust enrichment is designed to compensate the plaintiff for the benefit he has conferred upon another, not to compensate him for a loss suffered." *Prey v. Kruse*, No. 08-CV-0207, 2010 U.S. Dist. LEXIS 85096, at *7 (S.D. Ohio Aug. 19, 2010) (quotations omitted).

Here, Cicvara cannot establish that he conferred any benefit on the Company entitling him to the value of his forfeited stock options. Further, Cicvara simply cannot recover under this equitable claim because it was not unjust for the Company to determine that he engaged in gross misconduct under the Plan and to conclude that he forfeited his stock options as a result of that misconduct. Rather, the undisputed facts establish the *opposite*: it would be unjust for Cicvara to receive the value of his stock options in light of his sexually harassing behavior and the harm he caused to Practical and the Company. *Salling v. Budget Rent-A-Car Sys.*, No. 09-CV-2160, 2010 U.S. Dist. LEXIS 70603, at *23 (N.D. Ohio July 14, 2010) (granting summary judgment and holding that it would be inequitable for plaintiff to recover in unjust enrichment); *Anderson v. Baker*, 2008 Ohio 6919, P42 (Ohio Ct. App. 2008) (affirming grant of summary judgment and explaining that plaintiff's unjust enrichment claim failed because he did not "present evidence that [defendant's] retention of any benefit was unjust"). Therefore, the Court should grant summary judgment dismissing Cicvara's cause of action for unjust enrichment.

## C.   CICVARA CANNOT PREVAIL ON HIS BREACH OF CONTRACT OR UNJUST ENRICHMENT CLAIMS SEEKING THE VALUE OF HIS 2009 BONUS

In Counts Five and Six of his Amended Complaint, Cicvara asserts claims for breach of contract and unjust enrichment with respect to his bonus for 2009.[4]  Cicvara cannot prevail on

---

[4]      Unlike the relevant stock option plan, the STAR plan does not contain a choice of law provision. According, Connecticut law applies to Cicvara's claims under the STAR plan for breach of contract and unjust enrichment.

his bonus claims because the express terms of the Company's bonus plan required that he be employed on the date bonuses were paid. Because Cicvara was terminated for cause prior to the date on which bonuses were paid, he admittedly was not entitled to a bonus payment under the plan. Cicvara's unjust enrichment claim fails once again because there is an express "contract" or policy governing Cicvara's entitlement to a bonus and, in any event, he cannot establish that equity demands that the Company pay him a bonus.

## 1. Cicvara's Breach Of Contract Claim Fails Because He Was Not Employed On The Date The Bonuses Were Paid

Cicvara's entitlement to a bonus was subject to the terms and conditions of the Company's STAR plan. Cicvara admits that the STAR plan required that he be an "active employee as of June 30 (the close of the fiscal year for which the award is payable) to receive an award." (Defs.' 56.1, ¶ 65.) Because Cicvara was not an active employee as of June 30, (id., ¶¶ 63-65), he was *not* entitled to a bonus in 2009. *See, e.g., Garry v. Bertucci's Rest. Corp.*, No. 00-CV-0395, 2001 U.S. Dist. LEXIS 22947, at *6 (D. Conn. Sept. 26, 2001) (explaining that employer did not pay employee bonus because she was not "an active employee during the week in which bonuses are distributed to receive any earned bonus," as required by the plan); *Christensen v. Bic Corp.*, 18 Conn. App. 451, 456 (1989) (holding that jury verdict should be set aside on plaintiff's implied contract theory because although bonus plan stated that "[b]onuses will be paid some time during the first quarter, after the operating results for the previous year are announced," that provision did not entitle plaintiff to a bonus after he was discharged and before bonuses were authorized); *DeSantis v. Deutsche Bank Trust Co. Ams., Inc.*, 501 F. Supp. 2d 593, 601 (S.D.N.Y. 2007) (granting summary judgment and explaining that "[t]he HR Policies in the Handbook make clear that . . . to receive a bonus, an employee must be employed

by the Bank on the date bonuses are paid"). Therefore, the Court should grant summary judgment dismissing Cicvara's bonus claim.

### 2.     Cicvara's Unjust Enrichment Claim Fails Because There Is An Express Contract Governing His Right To A Bonus

Similar to Cicvara's unjust enrichment claim as to the value of his stock options, Count Six for unjust enrichment concerning his bonus should be dismissed because his purported entitlement to any bonus is governed by an express policy, the STAR plan, thus precluding a claim for unjust enrichment. It is a fundamental precept of Connecticut law that the existence of a written agreement precludes a claim for unjust enrichment. *City of Bridgeport v. Kasper Group, Inc.*, 278 Conn. 466, 472 n.4 (2006) ("It is well established . . . that an express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter") (quotations omitted); *Gagne v. Vaccaro*, 255 Conn. 390, 401 (2001) ("Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment."); *Russell v. Russell*, 91 Conn. App. 619, 638 (2005) ("Action for unjust enrichment cannot lie in the face of an express contract.") (quotations omitted).

Here, it is undisputed that there is a valid and enforceable "agreement" or policy governing the terms and conditions of Cicvara's bonus – the STAR plan. Because Cicvara's claim for a bonus is governed exclusively by the STAR plan, he cannot maintain an unjust enrichment claim and this Court should grant summary judgment dismissing that claim as a matter of law.

### 3.     The Company Was Not Unjustly Enriched By Cicvara's Termination For Cause

Even if Cicvara's unjust enrichment claim relating to his bonus was not covered by the express terms of the STAR plan, he is still not entitled to recover because unjust enrichment is an *equitable* remedy, and Cicvara's own gross misconduct bars any such remedy. *See TFS Energy,*

18

*LLC v. Campisi*, No. 06-CV-0191, 2009 U.S. Dist. LEXIS 11431, at *15 (D. Conn. Feb. 17,

2009) (holding that former employee could not recover value of bonus under a theory of unjust

enrichment because the facts revealed "unclean hands on the part of the [employee] and an

enforceable agreement that excludes payment of a bonus. The mere fact that there might be an

amount the [employee] would have received under the agreement had he not been properly

terminated for cause does not mean the company has been unjustly enriched"). Thus, the Court

should grant summary judgment dismissing the unjust enrichment claim on this ground alone.

**D.      CICVARA ADMITS THAT THERE IS NO FACTUAL BASIS
         ENTITLING HIM TO SEVERANCE PAY**

         In his Amended Complaint, Cicvara asserts a cause of action for breach of contract, and

once more throws in unjust enrichment, seeking to recover a severance package.  (Am. Comp.,

¶¶ 27-32.) Yet, Cicvara cannot point to any agreement or promise entitling him to a severance

package, and admitted during his deposition that he seeks a severance package because he

believes that the Company *may* have provided a severance package in the past to employees

terminated as part of a RIF.  (Defs.' 56.1, ¶¶ 66-67.) Cicvara's claim for a breach of contract is

meritless because he cannot even point to an *actual contract*.  *See, e.g., Collins v. S. New Eng.

Tel. Co.*, 617 F. Supp. 2d 67, 80 n.17 (D. Conn. 2009) ("It goes without saying that an action for

breach of contract requires the existence of a valid contract."); *see also Weiskopf v. Am. Kennel

Club, Inc.*, No. 00-CV-0471, 2002 U.S. Dist. LEXIS 10694, at *18 (E.D.N.Y. June 10, 2002)

(granting summary judgment on breach of contract claim where "plaintiff ha[d] not shown the

existence of an agreement"); *Leland Eaves v. Designs for Fin., Inc.*, No. 09-CV-3952, 2011 U.S.

Dist. LEXIS 33654, at *57 (S.D.N.Y. Mar. 30, 2011) (dismissing breach of contract claim

because "Plaintiffs fail[ed] to provide facts regarding any specific contract between the parties,

how or when such contract was formed, or any terms of the contract(s) at issue").

Cicvara's unjust enrichment claim is equally defective because the evidence establishes that his own highly inappropriate sexual advances and comments toward Liu resulted in his termination for cause. He cannot now claim that the Company was unjustly enriched by failing to offer him severance pay for his termination for cause. *Padula v. Weston Bd. of Educ.*, 2009 Conn. Super. LEXIS 1557, at *27 (Conn. Super. Ct. June 9, 2009) (rejecting plaintiff's argument that "defendant was unjustly enriched by the unpaid sick time and retirement benefits" which plaintiff did not receive because he was terminated for cause because plaintiff was an at-will employee, "the defendant was within its rights to terminate the plaintiff," and "plaintiff has failed to present evidence that the defendant has been unjustly enriched")

For these reasons, the Court should grant summary judgment dismissing Cicvara's claims with respect to severance pay.

## E.   CICVARA'S STATUTORY PAYMENT OF WAGES CLAIM SHOULD BE DISMISSED BECAUSE THE COMPANY DOES NOT OWE HIM ANY WAGES

Cicvara alleges that the Company owes him money and penalties under the Connecticut General Statutes for the value of his stock options, bonus, and severance pay. (Am. Comp., ¶¶ 39-42.) He has no viable claim.

"To make out a *prima facie* case under Conn. Gen. Stat. § 31-72, the plaintiff must demonstrate that (1) the defendant is an employer; (2) the amount sought to be recovered qualifies as a wage under § 31-71a(3); and (3) the employee is entitled to monies that were withheld wrongfully by the defendant employer." *Henwood v. Unisource Worldwide, Inc.*, No. 01-CV-0996, 2006 U.S. Dist. LEXIS 71449, at *55-56 (D. Conn. Sept. 29, 2006), *aff'd*, 282 Fed. Appx. 26 (2d Cir. 2008). Cicvara's claims under the wage payment statute are defective because, as demonstrated above, he was *not* entitled to a bonus, severance pay or stock options,

and none of these monies were wrongfully withheld by the Company. Moreover, Cicvara cannot establish that the bonus or severance pay he seeks qualify as "wages" under Section 31-71a(3).

As demonstrated above, Cicvara is not entitled to the value of his stock options because his termination for "Cause" resulted in the automatic forfeiture of those options, he is not entitled to the payment of a bonus under the express terms of the STAR plan, and he has absolutely no right to severance pay. Because Cicvara cannot establish that he is entitled to any of these benefits, his claim for unpaid "wages" fails as a matter of law. *See Henwood*, 2006 U.S. Dist. LEXIS 71449, at *56-57 (dismissing plaintiff's wage payment claim because he did not establish that former employer owed him any unpaid commissions); *Christensen*, 18 Conn. App. at 459 (concluding that plaintiff could not recover under wage payment statute because he could not show that the employer owed him any unpaid wages).

While Cicvara's failure to show entitlement to any unpaid wages alone warrants dismissal of his claims for statutory "wages," his claims also fail because severance pay and the type of bonus involved in this case do not constitute "wages" under Connecticut law. "[A] bonus constitutes wages where the bonus amount is determined according to the plaintiff employee's work effort rather than the employer's overall success." *Chardavoyne v. Thames Water Holdings Inc.*, No. 03-CV-0056, 2008 U.S. Dist. LEXIS 33615, at *9-10 (D. Conn. Apr. 23, 2008). If a bonus is not contingent on the efforts of the plaintiff alone, but rather is determined in accordance with the overall performance of the company, such a bonus does not constitute wages. *Id.* Indeed, courts have held that a bonus does not constitute "wages" even if "payment of a bonus was contractually required and only the amount of the bonus was discretionary." *Ziotas v. Reardon Lawfirm, P.C.*, 296 Conn. 579, 588-89 (explaining that such a bonus is not within definition of wages because "[a]lthough an employee may have a justified expectation of

21

additional compensation when the employer is contractually obligated to give a bonus to the

employee and any contractual conditions, such as the employer's annual profitability, are met,

the relationship between performance and compensation is still attenuated if the amount of the

bonus is discretionary and dependent on factors other than the employee's performance").

Here, the STAR plan guidelines provided a formula that factored in each business unit's

performance, as well as the Company's total results, for that fiscal year in determining an

employee's bonus.  Because the bonus was not contingent on Cicvara's performance alone, the

bonus does not constitute "wages" under Connecticut law.  *See Chardavoyne*, 2008 U.S. Dist.

LEXIS 33615, at *10 (granting summary judgment on plaintiff's wage act claim where

"plaintiff's bonus award was calculated pursuant to [a] formula rather than his individual work

performance" and "[n]o evidence indicate[d] that this award was promised in exchange for

additional services or was based on plaintiff's individual performance as defined by extant case

law"); *Garry*, 2001 U.S. Dist. LEXIS 22947, at *12 (granting summary judgment on wage

payment claim where the plaintiff's bonus plan was "not promised in exchange for additional

services or based on an employee's individual performance"; rather, plaintiff's bonus was

contingent on the performance of the restaurant as a whole); *Wood v. Sempra Energy Trading

Corp.*, No. 03-CV-0986,  2005 U.S. Dist. LEXIS 2848, at *33 (D. Conn. Feb. 22, 2005)

(granting summary judgment and dismissing wage payment claim because bonus plan indicated

that plaintiff's entitlement to a bonus was "based on [the employee's] performance *and that of

Sempra Trading and its subsidiaries*") (emphasis in original).

Likewise, severance pay is not considered to be "wages" under Connecticut law because

severance pay "is not compensation for labor or services rendered, and because wages, unlike

severance pay, cease when employment does." *Drybrough v. Acxiom Corp.*, 172 F. Supp. 2d

366, 371 (D. Conn. 2001) (quotations & citations omitted); *McGowan v. Administrator,*

*Unemployment Compensation Act,* 220 A.2d 284, 286 (Conn. 1966) ("Since, in the connotation

of the statute, wages cease when employment does, severance pay cannot be considered

wages."). Because severance pay is not considered "wages" under Connecticut law, Cicvara

simply cannot prevail on his claim for unpaid wages based on severance pay. *ABC Office*

*Equip., Inc. v. Royal Consumer Bus. Prods., Div. of Triumph-Adler-Royal, Inc.,* 721 F. Supp.

1557, 1559 (D. Conn. 1989) ("Neither this court's research nor the parties' have revealed any

Connecticut case law construing severance pay as "wages" under § 31-71a."). Accordingly, the

Court should grant summary judgment to the Company on Cicvara's wage payment claims in

Count Seven of the Amended Complaint.

## IV. <u>CONCLUSION</u>

Based on the foregoing undisputed facts, arguments and authorities, the Court should grant the Company's motion for summary judgment; grant to the Company its attorneys' fees and costs in this case; and grant to the Company such other and further relief as the Court may deem just and proper.

Dated this 15th day of April, 2011, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP


By  _s/ Edward Cerasia II_
   Edward Cerasia II (ct 13096)
   Hema Chatlani (phv 04023)
620 Eighth Avenue, 32nd Floor
New York, New York 10018
(212) 218-5500
ecerasia@seyfarth.com


Attorneys for Defendants
 The Gillette Company
 and The Procter & Gamble Company

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| PREDRAG CICVARA, | :    Civil Action No. 3:09-cv-2054 |
| | :    (JCH) (HF) |
|       Plaintiff, | : |
| | : |
|       v. | :    April 15, 2011 |
| | : |
| THE GILLETTE COMPANY and PROCTER & | : |
| GAMBLE COMPANY and DURACELL, AN ENTITY | : |
| OF UNKNOWN FORM and LYNNE BURNETT, | : |
| | : |
|       Defendants. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEFENDANTS' STATEMENT OF UNDISPUTED
### MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(a)(1)

Pursuant to Local Civil Rule 56.1(a)(1), defendants The Gillette Company and The

Procter & Gamble Company ("P&G") (collectively, the "Defendants" or the "Company")

respectfully submit this statement of undisputed material facts in support of their motion for

summary judgment.[1]

**The Parties**

1.      Predrag Cicvara ("Cicvara") was employed by the Company in its Bethel,

Connecticut, office as a Quality Assurance Manager prior to his termination on June 15, 2009.

(Am. Comp., ¶ 19; Answer, ¶ 19.)

---

[1]      The undisputed facts set forth herein are followed by citations to their support in the record. Copies of all deposition testimony, deposition exhibits, and other documents cited herein are annexed to the Declaration of Edward Cerasia II, Esq., dated April 15, 2011, the Declaration of Lynne Burnett, dated April 11, 2011, the Declaration of Peggy Wilczewski, dated April 14, 2011, the Declaration of Dina Schmude, dated April 14, 2011, and the Declaration of Kevin Babis, dated April 15, 2011, submitted herewith.

2.    On December 31, 1997, "Duracell, Inc." merged with and into "The Gillette

Company." (Declaration of Peggy Wilczewski ("Wilczewski Decl."), ¶ 2.) As a result of that

merger, Duracell ceased being a legal entity as of January 1, 1998. (*Id.*)

3.    The Gillette Company ("Gillette") is a global supplier of various personal care

products. (Wilczewski Decl., ¶ 2.) P&G purchased Gillette in 2005. (*Id.*)

4.    P&G is a global company providing branded products and services in over 80

countries worldwide. (Wilczewski Decl., ¶ 1.) The Company produces several of its own

products, as well as fully packaged products provided by suppliers. (Deposition of Predrag

Cicvara ("Cicvara Dep.") at 17-18.)

**The Worldwide Business Conduct Manual And**
**The Company's Purpose, Values and Principles**

5.    Each Company employee receives P&G's Worldwide Business Conduct Manual

(the "Conduct Manual"). (Cicvara Dep. at 36.) Cicvara read the Conduct Manual "a couple of

times." (*Id.,* at 36; Cicvara Dep. Ex. 1.) In its introductory page, the Conduct Manual provides:

> P&G has been built through the character of its people through
> generations. That character is reflected in our Purpose, Values and
> Principles, and in how well we live them as individuals and as a
> Company. It is consistent with our historic principle of doing the
> right thing. Integrity, trust and respect for others have been
> fundamental P&G values since the Company was founded in 1837.
> Our continued success depends on each of us doing our part to
> uphold these values in our day-to-day work and in all decisions we
> make.

(Cicvara Dep. Ex. 2 at 1.)

6.    The Conduct Manual prohibits employees from engaging in personal relationships

that might result in a conflict of interest. (Cicvara Dep. Ex. 2 at 30.) For example, the Conduct

Manual lists the following as a situation that raises concern: "When an employee has a romantic

relationship with a current or potential supplier, contractor or customer (or an employee of any

such entity) when the Company employee has direct or indirect decision-making authority or

influence with respect to the underlying business relationship." (*Id.*)

      7.    The Conduct Manual specifically includes a "General Business Ethics" policy,

which provides:

> The Core of the Company's business ethic is "doing the right thing." In
> addition to complying with any applicable legal requirements and the
> requirements described elsewhere in this Manual, you should ask the
> following questions in making decisions:
>
> •    Is my action the "right thing to do?"
>
> •    Would I feel comfortable if my action were reported broadly in the news,
>      or reported to a person whose principles I respect?
>
> •    Will my action protect the Company's reputation as an ethical company?
>
> •    Am I being truthful and honest?
>
> If the answer to any of these questions about the action you are
> considering is not an unqualified "Yes," then simply do not take the
> action.

(Cicvara Dep. Ex. 2 at 10.)

      8.    The Conduct Manual also contains a Harassment/Discrimination policy which

requires that all employees "treat their colleagues with respect" and refrain from behaving in an

"intimidating, hostile or offensive" manner. (Cicvara Dep. Ex. 2 at 18.) Cicvara read this policy

and understood that it prohibited him from making sexual advances toward customers,

contractors, or employees. (Cicvara Dep. at 40-41.) Cicvara also understood that it was a

violation of the Conduct Manual to make unwelcomed sexual advances toward a supplier and

that such harassment would be viewed as serious misconduct by the Company. (Cicvara Dep. at

43.)

      9.    Every employee, including Cicvara, also received a copy of the Purpose, Values

and Principles ("PVPs") booklet referenced in the Conduct Manual. (Wilczewski Decl., ¶ 11.)

The PVPs outline the Company's principles and values, which include integrity and trust. (Cicvara Dep. at 38; Cicvara Dep. Ex. 3 at PG000181.)

10.     Cicvara acknowledges that *every* Company employee must uphold the PVPs, and that this is particularly important for management-level employees, such as himself, who are entrusted with upholding the Company's reputation in the industry.  (Cicvara Dep. at 38, 46.)

**Cicvara's Employment With The Company**

11.     On or about November 1, 2000, Cicvara began his employment at the Company as Manager of Worldwide Technical Services, in the Original Equipment Manufacturer sales group.  (Cicvara Dep. at 11.)

12.     On April 1, 2008, the Company transferred Cicvara to the position of Duracell Lighting Quality Leader, which he held for approximately two months until becoming the Quality Assurance ("QA") Manager.  (Cicvara Dep. at 14-15.)  Cicvara held the position of QA Manager until his termination on June 15, 2009.  (*Id.* at 15.)

13.     As QA Manager, Cicvara reported to Kevin Babis ("Babis"), with whom he had an excellent working relationship.  (Cicvara Dep. at 15-16.)  Cicvara found Babis to be a fair and honest manager.  (*Id.* at 17.)

14.     The QA Manager position was an important role for the Company.  (Cicvara Dep. at 34.)  As QA Manager, Cicvara was the "face" of the Company, and had significant interaction with the Company's suppliers regarding quality issues.  (*Id.* at 34-35.)  As such, his QA Manager position specifically included the following job responsibility:  "[p]rovide professional representation of Duracell/P&G per the P&G Worldwide Business Conduct Manual.  This is vitally important in dealing with Contractors and Suppliers in that plans, decisions, and commitments could have significant impact from a financial and/or confidentiality perspective." (Cicvara Dep. at 49-52; Cicvara Dep. Ex. 4 at PG000172.)

4

Case 12-338, Document 57, 07/23/2012, 671466, Page190 of 291

15.     Cicvara's job duties as QA Manager included managing Duracell branded lighting products, interacting with the Company's suppliers on all quality-related issues, and auditing the suppliers' factories. (Cicvara Dep. at 24; Cicvara Dep. Ex. 4.)  The audits required Cicvara to travel to the suppliers' factories and ensure that the facilities met the Company's quality standards. (Cicvara Dep. at 24.)

**The Practical Lighting Company**

16.     Practical Lighting ("Practical") is a Company supplier that provides the Company with certain types of flashlights, including a flashlight known as "Daylite." (Cicvara Dep. at 20-21.)

17.     Practical is based out of Hong Kong, China, and has three manufacturing facilities, located in Zhongshan, China, Bangkok, Thailand, and Medan, Indonesia. (Cicvara Dep. at 18-19.)

18.     In 2008, the Company initially launched two models of the Daylite product, which utilized "AA" and "AAA" cell batteries, with one of Practical's competitors. (Cicvara Dep. at 21-22.)

19.     The Company's relationship with Practical became strained when Practical learned that the Company had given the Daylite business to one of its competitors. (Cicvara Dep. at 21-22; Declaration of Edward Cerasia II, Esq. ("Cerasia Decl."), Ex. C.)  As a result, the Company thereafter contracted with Practical to produce Daylite flashlights utilizing type "C" and "D" cell Duracell batteries. (Cicvara Dep. at 21-22.)

5

**During A Business Trip, Cicvara Visits The Hotel Room Of Practical's General Manager, Sits On Her Bed With Only His Underwear On, And Tells Her "One Could Rape You"**

20.     At the time of Cicvara's employment as QA Manager, Bel Liu ("Liu") was a general manager at Practical and one of the Company's primary contacts at Practical. (Cicvara Dep. at 53-54.)

21.     Cicvara first met Liu in or about September 2008, when Liu visited Duracell's facilities in Bethel, Connecticut, in connection with the Company's development of the Daylite flashlight. (Cicvara Dep. at 52.) He met Liu again during December 2008, when he visited Practical's facilities in China. (*Id.* at 53.)

22.     In June 2009, Cicvara traveled to Indonesia, Thailand, and China for a multi-day audit of four of Practical's factories. (Cicvara Dep. at 53; Declaration of Kevin Babis ("Babis Decl."), Ex. A.) The trip included overnight stays in Jakarta and Medan, Indonesia; Singapore; Bangkok, Thailand; and Guangzhou, China. (Babis Decl., Ex. A.) Liu and Andrew Yau ("Yau"), Practical's Chairman, traveled from Practical's headquarters in Hong Kong to meet with Cicvara and the Company's auditors at the various factories. (Cicvara Dep. at 53; Wilczewski Decl., Exs. B-D & E at PG000601-602.)

23.     While in Indonesia, Cicvara asked Liu if he could visit her hotel room to look at the view. (Wilczewski Decl., Exs. B-D & E at PG000602.) Although Liu was not comfortable with him visiting her room, she said yes because she did not want to offend Cicvara, whom she viewed as a valuable customer. (*Id.*) Shortly after entering Liu's room, Cicvara began hugging her. (*Id.*) Liu informed Cicvara that she was not comfortable with him hugging her, and asked him to leave her hotel room. (*Id.*)

24.     Thereafter, Liu sent Austin Lin, a Company employee with whom she had worked in the past, a text message informing him that she was afraid of Cicvara, and did not know how

6

to handle the situation because Cicvara was a customer.  (Wilczewski Decl., Exs. B-D & E at PG000602.)

26. After completing the audit in Indonesia, Cicvara, Liu, Yau, and Yuen Yau, another Practical employee, traveled to Thailand to visit Practical's facilities in that country. (Wilczewski Decl., Exs. B-D & E at PG000602.)

26. On June 8, 2009, while in Thailand, Cicvara had dinner with Liu, Yau, and Yuen Yau.  (Wilczewski Decl., Exs. B-D & E at PG000603.)  Liu left and returned to her hotel room shortly after dinner because she was not feeling well.  (*Id.*)

27. After dinner, Cicvara sent Liu a text message asking if he could visit Liu's hotel room to bring her a "special dessert."  (Cicvara Dep. at 69, 129; Wilczewski Decl., Exs. B-D & E at PG000603.)  Although Liu initially said no, Civara continued to press her until Liu finally relented because she did not want to offend her customer.  (Wilczewski Decl., Exs. B-D & E at PG000603 & PG000612.)  Cicvara took the opportunity and went to Liu's room with a "special dessert" for her.  (Cicvara Dep. at 69.)

28. When he entered Liu's hotel room, Cicvara inexplicably stripped off his pants and sat on Liu's bed wearing nothing but his underwear and shirt.  (Cicvara Dep. at 136-138; Wilczewski Decl., Exs. B-D & E at PG000603.)

29. After sitting on her bed in his underwear, Cicvara touched Liu's back, and "massaged her feet for a while."  (Cicvara Dep. at 68.)  Liu, who was lying in bed sick, told Cicvara "stop this, I don't like this."  (*Id.* at 126.)  At no point did Liu ask Cicvara to massage her back or feet.  (*Id.* at 71-72.)

30. Rather than ceasing his inappropriate behavior, Cicvara told Liu that he could "rape her."  (Cicvara Dep. at 86-87; Cicvara Dep. Ex. 11; Wilczewski Decl., Exs. B-D & E at

PG000603.)  Uncomfortable with the situation, Liu asked Cicvara to leave her room. (Wilczewski Decl., Exs. B-D & E at PG000603.)

31.     The next morning, on June 9, 2009, Liu left a Hard Rock Café shirt that Cicvara had bought for her earlier during the trip outside of his hotel room door.  (Cicvara Dep. at 109-10; Wilczewski Decl., Exs. B-D & E at PG000604.)  When he found the shirt, Cicvara went to Liu's hotel room and asked her why she had returned the shirt.  (Cicvara Dep. at 111; Wilczewski Decl., Exs. B-D & E at PG000604.)  Liu told Cicvara that she was scared of him. (Wilczewski Decl., Exs. B-D & E at PG000604.)  At that point, Liu called Austin Lin, but received his voicemail, which recorded portions of the conversation between Cicvara and Liu. (*Id.*)  After asking Liu a few more times why she had returned the shirt, Cicvara finally left Liu's room.  (*Id.*)

32.     After visiting Liu's room and asking her why she had returned his gift of a Hard Rock Café tee shirt, Cicvara sent Liu a text message from his BlackBerry stating: "I hope you will bew [*sic*] better soon. Feel terrible that can't [*sic*] be with you and pamper you." (Cicvara Dep. at 97-98; Cicvara Dep. Ex. 5.)  Less than fifteen minutes later, Liu responded, "Thx P. I'm fine but I have to re-emphasize that we are not either couples or lovers. Pls stop thinking about me." (Cicvara Dep. at 99-100; Cicvara Dep. Ex. 6.)  Cicvara then responded: "Right. No need to emphasize the obvious. Thx for the good time though. P." (Cicvara Dep. at 103-04; Cicvara Dep. Ex. 7.)

33.     On the morning of June 10, Cicvara sent Liu a text message stating that he was "in a shock and disgusted by [himself] and [his] poor judgment of things." (Cicvara Dep. at 105-06; Cicvara Dep. Ex. 9.)

34.     Later on June 10, during his plane ride from Thailand to China, Cicvara typed a

detailed e-mail to Liu, which he sent to Liu after landing in China. (Cicvara Dep. at 116-17.) In

that e-mail, Cicvara acknowledged his inappropriate behavior in writing by stating:

> I would love nothing more than to take back few emotional
> outbreaks that I experienced [*sic*] last few days.  Had I known that I
> have risked losing such a precious thing as our friendship, I
> wouldn't ever have attempted what I so foolishly did misjudging
> the nature of our closeness in the last few days.
>
> Maybe the cultural differences that you so graceously [*sic*] tried to
> point out in one of our conversations did ironically played the part
> in what transpired lately.  I believe if you had taken a strong stance
> against my foolish attempts to get more out of our relation
> stopping it from the very beginning, I would have stopped then and
> would have still be in that special relation with you that meant so
> much to me.  By being so polite and trying not to hurt my feelings
> you have unconciously [*sic*] encouraged my (macho? possessive?
> animouse? [*sic*] stupid?) efforts to get more than you were ready to
> give.
>
> Foolish dirty old man!  How quickly such a wonderfool [*sic*]
> friendship (at least on my part) could be destroyed!?
>
> . . . .
>
> I can only hope that you will understand me and remain beeing
> [*sic*] my true friend in the future.  Again[,] I can only say I am
> sorry for what I did to you and I know there is no real excuse for it.

(Cicvara Dep. Ex. 10; Cicvara Dep. at 116-29.)

35.     Liu once again politely rebuffed Cicvara by stating:  "I'm sorry because I don't

love you but I know you love me so.  I appreciated you in the past because we were just friend.

What I cannot accept is what you did in the last few days.  Without those dirty things, we can be

friend."  (Cicvara Dep. Ex. 10.)  Cicvara replied, "I can promise that never again I will be a

'dirty man' with you."  (*Id.*; Cicvara Dep. at 128.)

36.     On June 9, 2009, the day after Cicvara inappropriately touched Liu and told her

that he "could rape" her, Liu spoke with Lin and informed him of what had occurred the night

Case 12-338, Document 57, 07/23/2012, 671466, Page195 of 291

before. (Wilczewski Decl., Exs. B-D & E at PG000603.)  Lin reported Cicvara's conduct to Dina Schmude ("Schmude"), the Company's Human Resources Manager in Bethel, and encouraged Liu to speak with her boss, Andrew Yau. (Declaration of Dina Schmude ("Schmude Decl."), ¶ 2; Wilczewski Decl., Exs. B-D & E at PG000603.)

37.     Shocked by Liu's allegations, Schmude immediately relayed Lin's report to Lynne Burnett ("Burnett"), the Company's Global Human Resources Director in Bethel, who advised Schmude to investigate the incident by speaking with both Liu and Cicvara. (Schmude Decl., ¶ 3; Burnett Decl., ¶ 3.)  Thereafter, Schmude contacted Liu to schedule a time to speak with her. (Schmude Decl., ¶ 3, Ex. A.)

**The Company's Investigation Confirms Liu's Complaint,
Leading To Cicvara's Termination For Cause**

38.     On June 11, 2009, Schmude and Peggy Wilczewski, the Company's Senior Human Resources Manager in Bethel, called Liu in Hong Kong and inquired about Cicvara's behavior in Asia. (Schmude Decl., ¶ 4; Wilczewski Decl., ¶ 5 & Exs B-D & E at PG000601-PG000604.)  Over the next hour and half, Liu provided Schmude and Wilczewski with details of Cicvara's inappropriate conduct during the audit and, in particular, his egregious behavior in her hotel room on June 8, 2009. (Schmude Decl., ¶ 4; Wilczewski Decl., ¶ 5 & Exs. B-D & E at PG000601-PG000604.)

39.     After ending their telephone conversation, Wilczewski e-mailed Liu and asked Liu to review her notes from their conversation for accuracy and to forward the text messages between Liu and Cicvara. (Wilczewski Decl., ¶ 6 & Exs. A & B.)

40.     On June 12, 2009, Liu forwarded the text messages and e-mails between Cicvara and herself to Schmude and Wilczewski, and provided her edits to Schmude's notes. (Schmude Decl., ¶ 6 & Ex. C.; Wilczewski Decl., ¶ 8 & Ex. D.)  In her cover e-mail to Schmude and

Wilczewski, Liu explained that she tried to be polite with Cicvara, whom she did not want to offend because he was a customer of Practical.  (Schmude Decl., ¶ 6 & Ex. C; Wilczewski Decl., ¶ 8 & Ex. D at PG000613.)

41.     Wilczewski forwarded the text messages and e-mails received from Liu to Burnett and provided Burnett with the notes from her June 11, 2009 call with Liu.  (Burnett Decl., ¶¶ 4, 5; Wilczewski Decl., ¶ 9 & Ex. E.)

42.     While the Company was investigating Liu's complaint, Yau, who had by then learned of the incident from Liu, sent an e-mail to Nitesh Singh, the Company's Senior Purchasing Manager, informing Singh that Cicvara had made "inappropriate sexual advances" toward Liu during his trip to Asia.  (Cicvara Dep. Ex. 12; Wilczewski Decl., ¶ 13.)  Yau made clear that Cicvara was no longer welcome at Practical in the future, and the Company should send someone else for future audits.  (Cicvara Dep. at 148-49; Cicvara Dep. Ex. 12.)

43.     Yau's e-mail about Cicvara's egregious conduct came at a time when the relationship between the Company and Practical was strained; indeed, Yau noted a few days later to Eric Lawson, the Company's Associate Director for the Duracell Division, that Practical was "very disappointed" with its business with the Company.  (Cerasia Decl., Ex. C.)

44.     On June 15, 2009, Burnett, Wilczewski, and Babis met with Cicvara in a conference room and interviewed him regarding Liu's allegations.  (Cicvara Dep. at 132-33; Burnett Decl., ¶ 6; Wilczewski Decl. ¶ 10 & Ex. F; Babis Decl., ¶ 3.)  Burnett asked the majority of the questions during this conversation, while Wilczewski took notes of the meeting.  (Burnett Decl. ¶ 6; Wilczewski Decl. ¶ 10 & Ex. F.)

45.     At the meeting, Cicvara admitted that he had gone to Liu's hotel room while in Asia and that he had touched her.  (Burnett Decl., ¶ 7; Wilczewski Decl. ¶ 11 & Ex. F at

PG000498; Babis Decl., ¶ 4.)  When asked whether he told Liu that he wanted to rape her,

Cicvara stated: "Look, it was in a hotel and she was dressed in a way.  I told her I had a feeling I

would rape her but I never had that in my mind and I didn't thin[k] she'd think about it

seriously."  (Burnett Decl., ¶ 8; Wilczewski Decl. ¶ 11 & Ex. F at PG000499; *see also* Cicvara

Dep. at 87-88.)  Cicvara admitted that he told Liu: "one could rape you."  (Cicvara Dep. at 87.)

However, he claims that he did so because Liu crossed her legs in what he perceived to be a

provocative manner.  (*Id.* at 87-88.)  Cicvara then attempted to excuse his comment by

suggesting that Liu's attire somehow provoked him; specifically, he stated that Liu was "dressed

in very short shorts," which prompted him to tell her, "I'm a man and it looks like I could rape

you like that.  You are showing off."  (Burnett Decl., ¶ 8; Wilczewski Decl. ¶ 11 & Ex. F at

PG000499.)

46.     After Cicvara admitted that he told Liu "I could rape you," Burnett asked him:

"Do you realize you were a company representative and this is one of our suppliers?"  (Burnett

Decl., ¶ 9; Wilczewski Decl., Ex. F at PG000499-500.)  Cicvara responded that he did not

believe what he did was inappropriate, although he admitted that his wife would find his conduct

inappropriate.  (*Id.*)

47.     When asked if he had anything else to say, Cicvara stated, "If I was thinking of

things the way it turned out, I should not have been touching her that way."  (Wilczewski Decl.,

Ex. F at PG000500.)

48.     At the end of their meeting, Burnett, Babis and Wilczewski asked Cicvara to

remain in the conference room while they left to discuss the matter.  (Burnett Decl., ¶ 11;

Wilczewski Decl. ¶ 12 & Ex. F at PG000501; Babis Decl., ¶ 5.)  During that time, the three

unanimously determined that Cicvara's employment should be terminated for his egregious

Case 12-338, Document 57, 07/23/2012, 671466, Page198 of 291

misconduct, which not only violated the Company's policy and PVPs, but also reflected poorly on the Company and negatively affected the Company's relationship with Practical. (Burnett Decl., ¶¶ 11-12; Wilczewski Decl. ¶ 13 & Ex. F; Babis Decl., ¶ 5.) They then returned to the conference room, and Burnett informed Cicvara that he was being terminated for violating the Company's PVPs and company policy by engaging in harassing behavior toward a company supplier. (Burnett Decl., ¶ 11; Wilczewski Decl. ¶ 12 & Ex. F at PG000501; Babis Decl., ¶ 5.)

**Cicvara's Stock Options Were Forfeited By Virtue Of His Termination For Cause**

49.     During his employment, Cicvara was awarded stock options pursuant to The Gillette Company 1971 Stock Option Plan (the "Plan"). (Cicvara Dep. Ex. 15.) Under the choice of law provision in Section 13 of the Plan, the Plan and each option issued under it are governed and issued in accordance with the laws of the State of Ohio. (Cicvara Dep. Ex. 15 at PG000199.)

50.     Section 6(f) of the Plan defines "Cause" as, among other things, engaging in "gross misconduct":

> If an employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment. For the purposes of the Plan . . . a discharge for "Cause" shall have occurred where a Participant is terminated because of
>
> . . . .
>
> (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary.

(Cicvara Dep. Ex. 15 at PG000191-192; Wilczewski Decl., ¶ 15; Burnett Decl., ¶ 13.)

51.     On June 21, 2001, Cicvara was awarded 1,950 incentive stock options at a purchase price of $28.98 per share. (Cerasia Decl., Ex. D.)

13

52.     On June 20, 2002, Cicvara was awarded 1,950 incentive stock options at a purchase price of $36.49 per share.  (Cerasia Decl., Ex. D.)

53.     On June 19, 2003, Cicvara was awarded 1,950 incentive stock options and 975 non-qualified stock options at a purchase price of $33.21 per share.  (Cerasia Decl., Ex. D.)

54.     On June 17, 2004, Cicvara was awarded 812 incentive stock options and 1,626 non-qualified stock options at a purchase price of $44.20 per share.  (Cerasia Decl., Ex. D.)

55.     On June 16, 2005, Cicvara was awarded 1,950 incentive stock options at a purchase price of $53.29 per share.  (Cerasia Decl., Ex. D.)

56.     On June 15, 2009, the same day of his termination, Cicvara contacted Wilczewski and asked whether he would receive a bonus for the year and whether he could still exercise certain stock options that he had with the Company.  (Wilczewski Decl., ¶ 14 & Ex. G at PG000504.)  Wilczewski informed him that she would research his questions.  (Id.)

57.     Wilczewski then participated in a telephone conference with Burnett and Jason Muncy ("Muncy"), one of the Company's in-house attorneys who advises the business on securities and corporate law.  (Wilczewski Decl., ¶ 15; Burnett Decl., ¶ 13.)  During that conference call, Burnett explained the reasons for Cicvara's termination, at which point Muncy stated that Cicvara's stock options were automatically cancelled as a result of his termination for cause.  (Id.)  Muncy pointed Wilczewski and Burnett to Section 6(f) of the Plan, which states that an employee's stock options are automatically forfeited if the employee is terminated for "Cause."  (Wilczewski Decl., ¶ 15; Burnett Decl., ¶ 13; Cicvara Dep. Ex. 15.)

58.     The next day, Wilczewski erroneously told Cicvara that he would receive a bonus when they were paid out in September 2009, and informed Cicvara that he could not exercise the options because they were forfeited by virtue of his termination for cause.  (Cicvara Dep. at 153;

Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Cicvara informed Wilczewski that he received

conflicting information the previous day when he called the stock plan administration number.

(Cicvara Dep. at 153-155; Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Cicvara stated that

the administrator informed him that employees terminated for cause could exercise their options

within thirty days of their termination.  (Cicvara Dep. at 155; Wilczewski Decl., ¶ 17 & Ex. G at

PG000504.)  Cicvara, however, did not provide the administrator with details regarding the

grounds for his termination.  (Cicvara Dep. at 155.)

   59. Wilczewski informed Cicvara that she would call the stock plan administrator and

clarify the issue.  (Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Later that day, Wilczewski

called Cicvara and told him that the information she provided to him earlier was correct and he

could not exercise his stock options because they had been forfeited by virtue of Section 6(f) of

the Plan.  (Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Wilczewski apologized for the

incorrect information Cicvara received from the stock plan administrator.  (Wilczewski Decl., ¶

17 & Ex. G at PG000504.)  Wilczewski further explained that the erroneous information relayed

to him did not change the clear terms of the Plan, which determined how options are handled and

stated that options are forfeited if an employee is terminated for cause.  (Wilczewski Decl., ¶ 17

& Ex. G at PG000504-505.)

   60. After speaking with Cicvara, Wilczewski sent him a letter memorializing their

conversation.  (Wilczewski Decl., ¶ 18 & Ex. H.)  Her letter, dated June 16, 2009, explained that

the administrator provided incorrect information because she did not know all of the relevant

facts and reiterated that Cicvara could not exercise his stock options because of his misconduct,

which constituted grounds for forfeiture under the Plan.  (Cicvara Dep. at 155; Cicvara Dep. Ex.

13; Wilczewski Decl., ¶ 18 & Ex. H.)

61.     Notwithstanding Wilczewski's statements, Cicvara attempted to exercise his stock options on July 3, 2009. (Wilczewski Decl., ¶ 19 & Ex. I; Cicvara Dep., Ex. 16.)  The Company rejected his attempt to do so because his stock options already had been cancelled. (Wilczewski Decl., ¶ 19 & Ex. I; Cicvara Dep., Ex. 17.)  On July 6, 2009, Wilczewski sent Cicvara a second letter, once more explaining that his stock options had been forfeited because he had been terminated for cause. (Wilczewski Decl., ¶ 19 & Ex. I.)

**Cicvara Was Not Entitled To A Bonus Under The STAR Plan**

62.     Certain Company employees are eligible for a yearly bonus, known as a "Short Term Achievement Reward" or "STAR." (Cicvara Dep. Ex. 14.)  These bonuses are calculated based on a formula which takes into consideration each employee's performance, as well as the employee's business unit's performance, and the Company's total results for that fiscal year. (*Id.* at PG000519.)

63.     The STAR plan specifically provides that an employee "must be an active employee as of June 30 (the close of the fiscal year for which the award is payable) to receive an award." (Cicvara Dep. Ex. 14 at PG000517; Cicvara Dep. at 161-62.)

64.     On September 15, 2009, Cicvara sent Wilczewski an e-mail inquiring about the status of his bonus. (Cicvara Dep. at 160; Cicvara Dep. Ex. 14 at PG000516.)  Wilczewski responded that Cicvara was not entitled to a bonus because the STAR plan provided that Cicvara must be employed on June 30th, the date that bonuses are paid, to receive a bonus. (Cicvara Dep. at 161; Cicvara Dep. Ex. 14 at PG000516.)

65.     Cicvara was not entitled to a bonus pursuant to the terms of the STAR plan because he was not actively employed on June 30, 2009. (Cicvara Dep. at 161-62.)

16

**Cicvara Was Never Promised A Severance Package And Is Not Entitled To One**

66.     Cicvara has never seen any written document referring to a severance package

and he was never promised severance pay.  (Cicvara Dep. at 169.)

67.     Cicvara believes that there is a severance package for people "who are normally

fired. . . . without cause," such as during a reduction-in-force.  (Cicvara Dep. at 169.)

68.     Cicvara was not laid off or terminated without cause during a reduction-in-force.

(Burnett Decl., ¶ 11; Wilczewski Decl. ¶ 12 & Ex. F; Babis Decl., ¶ 5.)

Dated this 15th day of April, 2011, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP


By _s/ Edward Cerasia II_____
   Edward Cerasia II (ct 13096)
   Hema Chatlani (phv 04023)
620 Eighth Avenue, 32nd Floor
New York, New York 10018
(212) 218-5500
ecerasia@seyfarth.com

Attorneys for Defendants
 The Gillette Company
 and The Procter & Gamble Company

A-194

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| PREDRAG CICVARA, | Civil Action No. 3:09-cv-2054 (JCH) (HF) |
| Plaintiff, | |
| v. | April 15, 2011 |
| THE GILLETTE COMPANY and PROCTER & GAMBLE COMPANY and DURACELL, AN ENTITY OF UNKNOWN FORM and LYNNE BURNETT, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF EDWARD CERASIA II, ESQ.

I, EDWARD CERASIA II, declare under the penalty of perjury:

1.      I am a partner with the law firm Seyfarth Shaw LLP, attorneys for defendants The Gillette Company and The Procter & Gamble Company in the above-captioned action.  I submit this Declaration, which is based upon personal knowledge, in support of the defendants' motion for summary judgment.

2.      Appended to this Declaration as **Exhibit A** is a true and correct copy of each of the following pages from the deposition transcript of plaintiff Predrag Cicvara: 11, 14, 15, 16, 17, 18, 19, 20, 21, 22, 24, 34, 35, 36, 38, 40, 41, 43, 46, 49, 50, 51, 52, 53, 54, 68, 69, 71, 72, 86, 87, 88, 97, 98, 99, 100, 103, 104, 105, 106, 109, 110, 111, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 132, 133, 136, 137, 138, 148, 149, 153, 154, 155, 160, 161, 162, 169.

3.      Appended to this Declaration as **Exhibit B** is a true and correct copy of each of the following Exhibits from Mr. Cicvara's deposition:  Exhibit 1, Exhibit 2, Exhibit 3, Exhibit 4,

Exhibit 5, Exhibit 6, Exhibit 7, Exhibit 9, Exhibit 10, Exhibit 11, Exhibit 12, Exhibit 13, Exhibit 14, Exhibit 15, Exhibit 16, and Exhibit 17.

4.      Appended to this Declaration as **Exhibit C** is a true and correct copy of emails between Andrew Yau and Erik Lawson, from June 2009, bates-stamped PG000480-PG000483.

5.      Appended to this Declaration as **Exhibit D** is a true and correct copy of Mr. Cicvara's Stock Options/Future Shares Account Summary for period ending December 14, 2009, bates-stamped PG000523-PG000524.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct.

Date Executed:  April 15, 2011

_s/ Edward Cerasia II___
Edward Cerasia II

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:09-CV-2054 (JCH)

--------------------------------------------x
PREDRAG CICVARA,                              :

                         Plaintiff,           :

                                              :

          -versus-                            :

                                              :

THE GILLETTE COMPANY and PROCTER &            :
GAMBLE COMPANY, Inc., DURACELL, AN
ENTITY OF UNKNOWN FORM and LYNNE              :
BURNETT,
                   Defendants.
--------------------------------------------x

              Videotaped Deposition of PREDRAG CICVARA,

     taken pursuant to Notice and the Federal Rules of

     Civil Procedure, at the law offices of Levett

     Rockwood P.C., 33 Riverside Avenue, Westport,

     Connecticut, before June Keefer, RMR, RPR, Licensed

     Shorthand Court Reporter, License No. 108, a Notary

     Public in and for the State of Connecticut, on

     December 21, 2010, at 10:03 a.m.

Case 12-338, Document 57, 07/23/2012, 671466, Page206 of 291

A-197

Page 11

1  Q.  No, no.
2  A.  S-t-a-r-a, and then the second word is
3  M-o-r-i-v-i-c-a.
4  Q.  And that's Yugoslavia?
5  A.  Yeah.  That was Yugoslavia at that time.
6  Q.  Right.
7  A.  So I'm just being precise.
8  Q.  When did you first become employed with
9  Duracell or Gillette?
10  A.  November 1st, 2000.
11  Q.  And who was your employer at that time or what
12  entity was your employer as you understood it?
13  A.  It was Duracell Corporation or Duracell, part
14  of Gillette Company.
15  Q.  And that was in Bethel?
16  A.  Bethel, Connecticut.
17  Q.  What role were you hired into?
18  A.  Manager of Worldwide Technical Services in the
19  OEM sales group.
20  Q.  What does OEM stand for, for the record?
21  A.  Original equipment manufacturer.
22  Q.  And what were your job duties as the Manager of
23  Worldwide Technical?
24  A.  I was in charge of technical issues which
25  salespeople were experiencing in that group.  Also in

Page 14

1  time?
2  A.  When I was Manager of Business Services I
3  reported to Mani Parmar.  M-a-n-i, that's the first name.
4  The last name is P-a-r-m-a-r.
5  Q.  And you held the position of Manager of OEM
6  Business Services from, what, 2002 to 2008?
7  A.  From April of 2002 until March 31st, 2008.
8  Q.  And then in March -- or excuse me, April 1st of
9  2008 you had a new role as the Duracell Lighting Quality
10  Leader?
11  A.  I have to correct you.  I didn't have new role.
12  I was transferred to that role, to the role of, yes,
13  exactly what you said, Duracell Lighting Quality Leader,
14  which pretty soon became something else in a few months.
15  Q.  Okay.  But the Duracell Lighting Quality Leader
16  role was different than the manager of OEM; right?
17  A.  Yes.
18  Q.  Whether it was a transfer or whatever, you had
19  a new job and a new role?
20  A.  Yes, because partially I was asking for that
21  because I didn't want to report to the person that I told
22  or was sure was responsible for diversion.
23  Q.  Okay.  So in the role as the Duracell Lighting
24  Quality Leader you started to report to Harley Ballew?
25  A.  Yes.

Page 15

1  Q.  That's B-a-i-l-e-w?
2  A.  Yes.
3  Q.  Was there anybody else that you reported to at
4  that time?
5  A.  Yeah.  I reported to Kevin Babis a few months
6  after that because I was kind of promoted to the position
7  of QA manager.  B-a-b-i-s, Kevin.
8  Q.  How long did you remain in the role of Duracell
9  Lighting Quality Leader?
10  A.  Just two months or three months maybe.
11  Q.  So until the summer of --
12  A.  Yes.
13  Q.  -- 2008?
14  A.  Yes.
15  Q.  So your last year of employment at the company
16  what was your title?
17  A.  QA manager.
18  Q.  And you stopped reporting to Haley, right?
19  A.  Yes, and I started to --
20  Q.  Or Harley, I'm sorry.
21  A.  Harley, yes.  And I started to report to Kevin
22  Babis.
23  Q.  Okay.  And what was your -- what were your job
24  duties as a QA manager from about June of 2008 through
25  June of 2009?

Page 16

1  A.  I was in charge of contractors.  That's a broad
2  definition, but contractors.  And just to make things
3  clear, Duracell bought many things directly from many
4  other companies and when they came in the form that is
5  ready to be sold directly to the shelves in retail, so if
6  you can brought product directly from the manufacturer,
7  which usually was in China to the retail, then in P&G
8  terms it is contractor.  So I was in charge of
9  contractors, and Duracell had about let's say anywhere
10  from 45 to 55 contractors at any given time in the world.
11  That's throughout the world, so China, Indonesia, Taiwan,
12  Japan, Europe, everywhere.  And also I was on my way to
13  become a section head in QA, which was I supposed to
14  become on July 1st, 2009 and I never did because I was
15  fired.
16  Q.  Did you have a good working relationship with
17  Kevin Babis?
18  A.  Excellent.
19  Q.  Did you have any animosity or hostility towards
20  him?
21  A.  No.
22  Q.  Did he ever exhibit any kind of animosity or
23  hostility toward you?
24  A.  No.
25  Q.  Did you trust him?

Page 17

1    A. Oh, I don't know. I honestly cannot answer
2    that, because, you know, from the professional point of
3    view I didn't have any reason not to trust him, but, you
4    know -- and as I said we had an excellent relationship,
5    but to trust somebody you have to have a little bit
6    deeper thing.
7    Q. Right, but from your professional dealings with
8    him you had no reason not to trust him?
9    A. No.
10   Q. In your dealings with him as your manager did
11   you find him to be a fair person?
12   A. Yes.
13   Q. Did you find him to be an honest person?
14   A. I don't know.
15   Q. In your dealings with him as a manager.
16   A. In my dealings with him, yes, yeah, I would say
17   so.
18   Q. Yeah, I'm just asking about your dealings with
19   him.
20   A. Yeah, yeah.
21   Q. Now, going back to when you said you were in
22   charge of contractors, does contractors also include
23   companies that supplied parts to the company?
24   A. No. No. That was the distinction. Whenever
25   somebody supplies the part, that is part for a product

Page 18

1    that is later manufactured, in P&G world that's not
2    contractor, so that's either supplier, vendor or you call
3    it whatever your name, whatever name you want. The
4    definition of contractor is somebody who is supplying the
5    product that is already packaged in Duracell packaging
6    which is ready to be sent to the shelves in retail.
7    Q. So it is the final product?
8    A. The final product, yes. It means like Duracell
9    would put its name on the products. And that's usual,
10   you know, that's not just Duracell, everybody is doing
11   that. So it includes different types of batteries that
12   Duracell did not manufacture but it did sell under
13   Duracell name, and it did include flashlights, you know,
14   memory cards, all these other things that are not
15   directly connected to the batteries.
16   Q. Are you familiar with a company out of Hong
17   Kong called Practical Lighting?
18   A. Yes.
19   Q. And is Practical Lighting one of the
20   contractors?
21   A. Oh, I have to correct you. I'm sorry. When
22   you said out of Hong Kong, they don't have name Practical
23   Lighting in Hong Kong; they have some other name. They
24   cannot use that name in Hong Kong because it's already
25   sold to somebody. So I think, I believe their name in

Page 19

1    Hong Kong is World Hint, I'm not sure, World Hint,
2    H-i-n-t, but I'm not sure even in that, but it's
3    different. In Hong Kong per se it's a different name,
4    but it's Practical, yes.
5    Q. Okay. Where was -- where did you understand
6    Practical Lighting to be based out of?
7    A. I had very good understanding of it. Practical
8    Lighting had three manufacturing facilities. One
9    facility was in Zhongshan, China. It's
10   Z-h-o-n-g-s-h-a-n, Zhongshan, okay, that's in China. The
11   other facility is in Bangkok, Thailand. And the third
12   facility is in Medan, M-e-d-a-n, Indonesia. So they had
13   three manufacturing facilities, and the third facility
14   didn't have even name Practical. The name Practical was
15   only in Thailand and in Zhongshan in China. The third
16   facility, let me try to refresh my memory just a second.
17   Oh, okay. So here you can actually see exactly, if you
18   want, this P.T. Era Cipta, that's the name of the
19   company.
20   Q. Can I see the card you're looking at?
21   A. Yeah, sure. That's the director.
22   Q. What are the other cards that you have in your
23   hand?
24   A. Oh, the other card, this is the owner of the
25   Practical Company, Mr. Andrew Yau. I have Yuen Yau,

Page 20

1    which is Practical Flashlight Company in Thailand. And I
2    have Mr. Willies Kurniawan, P.T. Cipta Elektrik
3    Kreasindo; that is the second part of the P.T. Era Cipta
4    in Indonesia, which is son of the owner, who actually
5    drove us when we were doing audit in Indonesia.
6       MR. SIKORSKY: May we have those copied
7    and then put in?
8       MR. CERASIA: Sure, that's what I'll do.
9       MR. SIKORSKY: Just a photocopy, since
10   they've become part of the testimony.
11      THE WITNESS: These are originals, maybe
12   I would like to have them.
13   Q. Andrew Yau --
14   A. Yes.
15   Q. -- was the chairman of Practical?
16   A. Yes; correct. He was the boss of Bel Liu,
17   B-e-l, L-i-u.
18   Q. And he ran the Practical Company was your
19   understanding?
20   A. Plus he ran some -- many other businesses.
21   Q. Okay. I need to go back to a question I asked
22   before you told me what the different name of Practical
23   was, maybe in Hong Kong. Was Practical one of the
24   contractors that you've identified?
25   A. Yes. Yes, one of the contractors, with the

Page 21

1  three manufacturing facilities, yes.
2      Q.  Correct.  And it was a contractor with respect
3  to the flashlights?
4      A.  Yes.
5      Q.  Which ones, the Daylite?
6      A.  Well, no.  There were many other contractors
7  for flashlights.
8      Q.  No.  I'm just asking about Practical, what did
9  it contract --
10     A.  Yeah, and in order for me to answer I have to
11  explain.  So if you allow me I will try to explain.
12  Daylite is a new product that Duracell launched and there
13  are many different types of flashlights for Daylite, it's
14  double A, triple A, there is a C and D, so five models at
15  least.  Two first models that were launched were not
16  given to Practical, they were given to Smart Light which
17  was another Chinese company that manufactured for
18  Duracell, which actually Practical didn't like, and they
19  didn't know that at the point.  We were trying not to
20  interfere with the businesses between the companies, but
21  they come to know it, and I don't even know how, but they
22  come to know it, so they actually make a lot of pressure
23  to Duracell to give them C and D businesses for Daylite,
24  which we did.
25      So that answers your question, yes, they were

Page 22

1  involved in the Daylite product, but they were not
2  involved at the beginning, which they didn't like at all,
3  because they felt they're losing business that they are
4  entitled to have.  So I think it's very important to say
5  that.
6      Q.  So the relationship at some point was a little
7  bit strained --
8      A.  Yes.
9      Q.  -- is that fair to say?
10     A.  Yes.
11     Q.  Because Mr. Yau and the folks at Practical were
12  upset with Duracell that they weren't getting more of the
13  business?
14     A.  Exactly.
15     Q.  What year was that?
16     A.  We launched Daylite in 2008 at the end.  So
17  basically the Daylite started to be, you know, processed
18  and manufactured throughout -- to be designed and
19  manufactured, double A and triple A, first two models, in
20  2008 throughout the year, and that was all with Smart
21  Light.  So the first time that Practical got involved was
22  towards the end of 2008 where they get D cell flashlight,
23  Daylite, and they were supposed to get certain orders by
24  the end of 2008 which they didn't, which again made them
25  very, very unhappy because their manufacturing facility

Page 24

1  his e-mail you promised that the business is going to
2  grow with Practical, we expected lots of orders and it
3  never come, so maybe when we see each other next time we
4  should sit down and talk about how this is going to
5  change, which means that he actually used my firing and
6  my alleged harassing of Bel Liu, alleged harassing of Bel
7  Liu, in order to gain leverage over Duracell, which he
8  actually did straightforwardly in that e-mail.
9      MR. CERASIA:  By the way, Erik is with a
10  K.
11      THE WITNESS:  Oh, I'm sorry.
12      MR. CERASIA:  That's okay.  And Daylite
13  is D-a-y-l-i-t-e.
14      THE WITNESS:  D-a-y-l-i-t-e, yes.  It's a
15  very unusual spelling.  It's probably to avoid certain
16  things and to give it brand mark.
17      Q.  You've referred to the fact that you audited
18  one of Practical's facilities in China.  What do you mean
19  by auditing the facility?
20      A.  Well, auditing is about a two-day event where
21  you go over what they call QAKE 1 through 19, Q-A-K-E
22  capitalized, 1 through 19, which means Quality Assurance
23  Key Elements 1 through 19, which is P&G quality assurance
24  way of auditing facilities, and again this is important
25  for the whole story so I'll give a little bit of

Page 34

1      Q.  And she was a quality assurance person as well?
2      A.  Yes, and she was also inspector that we used
3  very heavily on inspecting flashlights, Daylite
4  flashlights especially, before the shipments are sent to
5  U.S.A., but she actually worked same as River, she worked
6  in Chinese Duracell factory.
7      Q.  Now, the position that you held over the last
8  year of your employment as the QA manager reporting to
9  Kevin Babis --
10     A.  Yes.
11     Q.  -- would you consider that to be a very
12  important role for the company?
13     A.  Yes, it was important.  I wouldn't say very
14  important.  It was important, yes.
15     Q.  Okay.  And in that role that you were the
16  Duracell face from a quality point of view to the
17  contractors?
18     A.  Yeah.
19     Q.  And you had interaction with the contractors;
20  right?
21     A.  Yes, I had interactions with the contractors,
22  yes.
23     Q.  On important quality issues?
24     A.  On every quality issues, on each and every
25  quality issue, not just important or not important, every

Page 35

1  quality issue, starting with any document, with
2  everything that you can imagine from the quality point of
3  view, so yes.
4      Q.  And your relationship with those contractors
5  was important for Duracell's business, right?
6      A.  Yes.  Yes, it was.
7          MR. CERASIA:  Why don't we take a break
8  because there are some documents here that Mr. Cicvara
9  gave us that we have not seen before.  They were never
10  produced to us.  So I'd like to make copies of these.  I
11  don't know if you want to look at them first.  I don't
12  know if you've seen them.
13         MR. SIKORSKY:  Yes, if you want to mark
14  them for identification.
15         THE VIDEOGRAPHER:  Off the record at
16  10:52 a.m.
17         (Recess:  10:52 to 11:09 a.m.)
18         (Cicvara Exhibits 1 through 3:  Described
19  in Index - marked for identification.)
20         THE VIDEOGRAPHER:  On the record at 11:09
21  a.m.
22  BY MR. CERASIA:
23     Q.  Mr. Cicvara, I'm going to show you what's been
24  marked as Cicvara Deposition Exhibits Numbers 1 and 2.
25  If you'd take a look at Exhibit 1, it's a document

Page 36

1  entitled P&G Worldwide Business Conduct Manual Receipt
2  Confirmation.
3      A.  Yes.
4      Q.  And my question is, is that your signature
5  there?
6      A.  Yes.
7      Q.  Okay.  And that's dated 12/12/2005; correct?
8      A.  Yes.
9      Q.  And the second document you have in front of
10  you is a copy of the Worldwide Business Conduct Manual.
11  Have you seen that document before?
12     A.  Sure, I did, yes.  I actually read it a couple
13  of times.
14     Q.  You read it a couple of times?
15     A.  Yes, trying to find certain things in it.
16     Q.  Did you read it when you were employed with
17  Procter & Gamble?
18     A.  Yeah.  Everybody had to read it, so.  This is
19  stating that I actually did read it.
20     Q.  Why don't you take a look at the -- put Exhibit
21  1 to the side for a minute.  Take a look at Exhibit 2.
22  If you go to at the bottom you'll see there's small
23  numbers in the bottom right-hand?
24     A.  Yeah, sure.
25     Q.  And I'll refer to those numbers so we know

Page 38

1  Exhibit 2.  Put Exhibit 3 just to the side for a minute.
2  So in that sentence it says, in our purpose, values and
3  principles and in how well we live them as individuals
4  and as a company, right, and then it says It is
5  consistent with our historic principle of doing the right
6  thing, period.
7      A.  Yes.
8      Q.  Integrity, trust and respect for others have
9  been fundamental P&G values since the company was founded
10  in 1837.
11     A.  Yep.
12     Q.  Did you understand that P&G lived by the PVPs?
13     A.  Sure, and I actually lived by PVPs as well.
14     Q.  And you believe that as a management level
15  employee of Procter & Gamble that it was important for
16  you to act with integrity?
17     A.  Yes.
18     Q.  So that the contractors and people with whom
19  you dealt trusted you; right?
20     A.  Yes.
21     Q.  And it was important for you as a manager of
22  the company to treat others with respect; right?
23     A.  Yes.
24     Q.  And you would have expected any employee to
25  report to you to also carry out those PVPs; right?

Page 40

1  employment?
2      A.  I would like you to be much more specific in
3  what you just said.  What does it mean violate?  I don't
4  understand that at all.
5      Q.  Okay.  That's fair enough.
6      A.  Violation of PVP doesn't tell me anything, I'm
7  sorry.
8      Q.  Okay.  Why don't you look at the document
9  numbered Exhibit 2 on page PG 346.
10     A.  346, okay.
11     Q.  It's section 6, called behavior in the
12  workplace.
13     A.  Okay.  Yep.
14     Q.  Do you remember being familiar with this
15  harassment discrimination policy?
16     A.  I don't really particularly remember that, but
17  I probably read it, yes.
18     Q.  Did you understand as a management level
19  employee of Procter & Gamble that it was against company
20  policy to make sexual advances towards women?
21     A.  I'm sorry, I don't understand that question.
22  Could you be more specific.
23     Q.  Sure.  Did you understand in your role as, for
24  example, QA manager --
25     A.  Yes.

**Page 41**

1    Q.  – did you understand during the time that last

2  year you were employed that company policy prohibited you

3  from making sexual advances towards either female

4  customers or contractors or employees?

5    A.  Yes, I understood that, yes.

6    Q.  And did you understand that you could be fired

7  from Procter & Gamble if you in fact had made sexual

8  advances towards female contractors or employees?

9    A.  It would depend on the circumstances I would

10  say.

11    Q.  What do you mean by that?

12    A.  I wouldn't say that straightforwardly if I made

13  any sexual advances to contractor that I would be fired.

14  I don't think that that's written anywhere in here.  If

15  you find it you can read it to me.  I would really

16  appreciate that.

17    Q.  If you look at the summary of company policy

18  statement.

19    A.  Where is the summary?

20    Q.  That's on this page that you're looking at.

21    A.  Okay.

22    Q.  It's on the left-hand side.

23    A.  Okay.

24    Q.  It says the company's fundamental position is

25  that all employees should treat their colleagues with

**Page 46**

  being very straightforward with the things that were

  performed in auditing, so that if the company A were

3  audited and company A had 60 then you would say company B

4  if it had 60 you would expect more or less the same

5  circumstances as the company A had.  So if B and A had

6  the same score you would expect that those two companies

7  are equitable.  It's very important.

8    Q.  As far as Duracell's reputation, it obviously

9  can only impact its reputation through its managers like

10  yourself; right?

11    A.  Yeah, through every employee, not just

12  managers.

13    Q.  Right, I understand.

14    A.  Yes.

15    Q.  But you as a manager, let's just focus on you

16  for a minute, your conduct impacted Duracell's

17  reputation, whether negative or positive; correct?

18    A.  Yes.

19    Q.  All right.  So that your – what you wanted to

20  do is you – your charge from the company, so to speak –

21    A.  Yes.

22    Q.  – was to act in accordance with its PVPs so

23  that you would enhance its reputation in the industry;

24  correct?

25    A.  Correct, yes, and I actually did act in

**Page 43**

    Q.  And then in parentheses it says what do I need

2  to do or refrain from doing?

3    A.  Yes.

4    Q.  It's kind of a guide to you, right, as an

5  employee?

6    A.  Oh, sure, and I would strongly agree that's a

7  guide, yes.

8    Q.  And it says one of the things don't engage in

9  discrimination or harassment?

10    A.  Agreed, yeah.

11    Q.  Did you understand under the company's policy

12  in its Worldwide Business Conduct Manual that if you made

13  an unwelcomed sexual advance towards a contractor that

14  that would be a violation of the policy?

15    A.  Yes, if I made unwelcomed sexual advances to

16  the contractor it would be violation of this policy, yes,

17  I do agree with that wholeheartedly.

18    Q.  And you would agree with me that that would be

19  serious misconduct; right?

20    A.  That would be a serious misconduct if I had

21  done that, yes.  If I harassed a contractor it would be a

22  serious misconduct, I would agree with that, yes.

23    Q.  And would you agree that that would be – that

24  kind of conduct would be something that could injure the

25  company's relationship with the employee of that

**Page 49**

1  you were always supposed to try to do the right thing;

  correct?

3    A.  Yes, which I always did.

4    Q.  And that you knew that you had to be honest and

5  straightforward in your dealings with contractors?

6    A.  Yes.

7    Q.  And that you had to respect the employees of

8  those contractors with whom you dealt; right?

9    A.  Sure, I understand that.

10    Q.  And that you were held personally accountable

11  for your conduct towards those employees of contractors;

12  correct?

13    A.  Yes.

14    Q.  Why don't you take a look at what's been

15  marked as Cicvara Exhibit 4 –

16    A.  Yeah, okay.

17    Q.  – which is a job description.

18    A.  This description was just for the few months.

19    Q.  This was the job description you had when you

20  reported to Harley Ballew?

21    A.  Yes.

22    Q.  And it was for the time period of roughly you

23  thought from March – or, excuse me, April 1 until –

24    A.  July probably.

25    Q.  July of 2008?

Case 12-338, Document 57, 07/23/2012, 671466, Page211 of 291

Page 50

A.  Yes. Just to be -- I don't even know, but just to be straight.

3    Q.  Roughly about that time period?

4    A.  Roughly, yes.

5    Q.  I understand that it's your best guess.  Did
6  your job duties when you became a quality assurance
7  manager change at all from this job?

8    A.  Yes.  Yes.  They changed considerably, because
9  I got two employees who are reporting to me.  Before this
10  Austin Lin was not a person who reported to me, he was a
11  person who reported to Harley.  Francisco Restrepo was
12  the other which I couldn't remember.  So Francisco,
13  F-r -- Francisco is Francisco.  Restrepo is
14  R-e-s-t-r-e-p-o.  Okay.

15    Q.  So Francisco and Austin started reporting to
16  you when you became a quality assurance manager?

17    A.  Yes.

18    Q.  So they reported to you roughly your last 11
19  months of employment at Procter & Gamble?

20    A.  Roughly, yes, you're right.

21    Q.  Okay.

22    A.  And they brought certain things with them which
23  they used to do before which I couldn't agree with, which
24  particularly affected Austin Lin very heavily.

25    Q.  Okay.  Why don't you look at qualification

Page 51

number 6 on Exhibit 4 right on the first page right at
2  the bottom.

3    A.  Okay.  It says -- could I read that?

4    Q.  You can read it to yourself right now.

5    A.  Okay, excellent.

6    Q.  Tell me when you're done.  You should read
7  anything I give you.

8    A.  Okay.  Thank you.  Yes.

9    Q.  So job qualification number 6, which refers to
10  the P&G Worldwide Business Conduct Manual?

11    A.  Correct.

12    Q.  Do you believe that that was one of your job
13  qualifications when you were --

14    A.  Sure.

15    Q.  You've got to let me finish.

16    A.  Yeah, I believe that was.

17    Q.  You've got to let me finish.  Do you believe it
18  was one of your job qualifications when you were a
19  quality manager from July of 2008 through June 15th,
20  2009?

21    A.  Yes.  It was my duty to do according to this
22  not only from July to June 2009, but I would say
23  throughout my employment.  So that is nothing new there.

24    Q.  So job qualification 6 applied to every
25  position you held at the company?

Page 52

1    A.  Yes, every position, and not only me but every
2  employee.

3    Q.  I understand.

4    A.  So if I find that employees who are not doing
5  their job according to this, it's my duty to report that
6  too, which I did.

7    Q.  Can you give me Exhibits 3 and 4.

8    A.  Yes.

9    Q.  I'm done with those for now.

10    A.  Sure (handing.)  Okay.

11    Q.  I just want to make sure that, you know, you
12  don't leave home with them, it's a holiday present or
13  something.

14    A.  Yeah, I have that at home.  Don't worry about
15  that.

16    Q.  When did you first meet Bel?

17    A.  You mean first -- I think in September 2008
18  when Practical visited Duracell with respect to Daylite
19  development.

20    Q.  Right.  And when I refer to Bel, you understand
21  I'm speaking about Bel you pronounce her name Liu?

22    A.  Yes.

23    Q.  L-I-u?

24    A.  L-i-u, yes.

25    Q.  I'll refer to her as Bel, though, okay?

Page 53

1    A.  Okay.

2    Q.  All right.  So you first met her in September
3  of '08 when she came to Bethel, Connecticut?

4    A.  Yes.

5    Q.  Between September of '08, counting that trip,
6  until your last day of employment on June 15th of 2009,
7  how many times did you -- how many different trips did
8  you see Bel on?

9    A.  Two.

10    Q.  Two?

11    A.  Yes.

12    Q.  When else, other than September of '08 when was
13  the next time?

14    A.  The next time was December 2008 in China and
15  then it was June 2009 first in Indonesia and then in
16  Thailand.

17    Q.  So you saw her a total of three times?

18    A.  Yes.

19    Q.  Three different times?

20    A.  Three times, yes.

21    Q.  Multiple-day trips some of them; right?

22    A.  Correct, yes.

23    Q.  And what was her role within Practical as you
24  understood it?

25    A.  That was, as I understood she was general

Page 54

1    manager of Practical, and if I'm not mistaken she became
2    vice president of Practical recently, but I'm not sure.
3        Q.  So while you knew her during that, you know,
4    eight, nine month period she was a general manager at
5    Practical?
6        A.  Yes, she was general manager at Practical.
7        Q.  Do you know what her job responsibilities
8    entailed?
9        A.  She was always in contact with design people in
10   Duracell, with marketing people in Duracell, with program
11   management in Duracell, with purchasing people in
12   Duracell, with QA people in Duracell.  So she was
13   basically in contact with everybody in Duracell,
14   everybody, very, very -- position which entailed many,
15   many different venues, and she was very strongly aligned
16   with Austin Lin.
17       Q.  What do you mean by strongly aligned?
18       A.  I mean that during the course of 18 months that
19   I was without work, since I was fired, I learned a lot of
20   things about Austin Lin and Bel Liu, but I actually
21   noticed things even before that.
22           So, for example, in September when she visited
23   Duracell she -- Austin Lin was not there, he had to go
24   somewhere, but she told me that Austin bought a bag for
25   her and that he told her that I will show her how to come

Page 69

1    felt -- she didn't feel good, and when I came to her
2    room --
3        Q.  Was that in her room?
4        A.  Yes.  When I came to her room, she opened up
5    dressed very inappropriately.  When I say that I mean she
6    was dressed nearly undressed and it was very, very
7    unusual because I was before in her room and she would
8    never be dressed like that, especially when she called me
9    to come.
10       Q.  Okay.  What do you mean by she was dressed
11   inappropriately?
12       A.  She was dressed in shorts which was very, very
13   short, very, very short, naked legs, dressed in a blouse
14   which was white, clear basically, nearly clear, so you
15   would -- you know, you would kind of see her through it,
16   and I was very surprised because the reason I actually
17   asked her can I come to your room to have dessert with
18   you, before that we had dinner and after dinner there was
19   a special dessert brought to each of us which was mango
20   with rice, which was very special, which was special
21   dessert for Thailand.  I sent text message to her asking
22   her I would like to come to your room to have dessert
23   with you.  The second text message was I don't want you
24   to come, I'm tired.  The third was, okay, I accept that,
25   from me.  The fourth was I changed my mind, you can come

Page 68

1        Q.  One time --
2        A.  Except that time at the airport.
3        Q.  So one time was at the airport?
4        A.  Yeah.
5        Q.  And where were the -- what were the other
6    times?
7        A.  Well, the other times were on June 8th in the
8    room, you know, in that room.
9        Q.  When you say in that room, you're referring to
10   her hotel room?
11       A.  Yes, to the hotel room where she invited me to
12   come.  This is very important.  I would like you to put
13   that in.  She invited me to come to the room.
14       Q.  Did you ever -- when you hugged her did you
15   ever put your hands on her body other than her back?
16       A.  No.  No, I never touched her body.  I never
17   touched her breasts, if you mean that.  I never touched
18   any part of her body which would be considered private,
19   never.  I touched her back, I touched her legs, I
20   massaged her feet for a while, which I'm actually ashamed
21   of doing because I usually do that to my wife, ashamed of
22   doing now, but I never touched her body in a sexual
23   sense, never.
24       Q.  Why did you massage her legs and her feet?
25       A.  Because she told me that she felt bad, that she

Page 71

1    and forth by text messages, was this June 8th, 2009 that
2    you're referring to?
3        A.  Yes, it was June 8th, 2009 between 8 -- I would
4    say 8:50 p.m. Thailand time and 9:05 p.m. Thailand time,
5    so in the span of five or ten minutes.  That time,
6    Pacific Time is between 7:00 something a.m.  I'm telling
7    that because everything that you have, all the trace of
8    records that you have, phone records, are Pacific Time
9    U.S.A. and there is a 14 hours difference.  It's not that
10   easy to decipher.  It's very important, though.
11       Q.  And when you said you massaged her feet and her
12   legs, that was on June 8th, 2009?
13       A.  Yes.
14       Q.  Is that the only time that you claim that you
15   touched her other than hugging her?
16       A.  Yes.
17       Q.  You never touched her any other time?
18       A.  No, not in that sense, no.
19       Q.  Did she ask you to massage her feet?
20       A.  She didn't object.
21       Q.  Did she ask you to massage her feet?
22       A.  No.
23       Q.  Did she ask you to massage her legs?
24       A.  I didn't massage her legs, just her back.  I'm
25   sorry.

**Page 72**

1 Q. I think you testified that you massaged her
2 feet and her legs. I didn't massage her legs. I massaged her feet
3 A. I didn't massage her legs. I massaged her feet
4 and back.
5 Q. And her back?
6 A. Yeah.
7 Q. Did she ask you to massage her back?
8 A. She didn't ask me to massage anything, but —
9 Q. You just — so you did it on your own?
10 A. Yes, I did it on my own, yes.
11 Q. Okay. And do you think it was appropriate for
12 you as a quality manager to massage the feet of a general
13 manager for a contractor?
14 A. In the circumstances that we were on, yes, in
15 the circumstances that we were on I would say that,
16 because she did — as I said she touched my leg when we
17 were driving in the SUV in Indonesia.
18 Q. You said she touched your tie.
19 A. (Indicating.)
20 Q. Oh, your thigh?
21 A. Thigh, not this tie (indicating). She put her
22 hand on my thigh. She was sitting in front. I was
23 sitting in back. She put it and she actually did grab my
24 thigh, and the man who was next to me who was auditor in
25 Indonesia, Dave Arnsperger — girl, I'm not sure how to

**Page 86**

1 mind, but I didn't come to that room to have sex, and I
2 would never, I would never have sex with a woman who said
3 no, never. So I'm just not that person.
4 Q. Okay. When you saw her at the door did you
5 then want to have sex with her?
6 A. No, at that point, no, I was very surprised
7 actually.
8 Q. How about when you were rubbing her feet, did
9 you want to have sex with her?
10 A. That is sensual, yes. I didn't want to have
11 sex with her, but I thought about that, yes. It wouldn't
12 be, you know.
13 Q. How about when you were rubbing her back, did
14 the thoughts come to your mind to have sex with her?
15 A. I don't — I'm not sure. For me it's much more
16 sensual to have feet than the back. I'm not sure I was
17 thinking about that. As I said I massage my wife and I'm
18 really sorry of what I did to my wife. That would be the
19 extent of what I did to her.
20 Q. Did you ever tell her that you had a feeling
21 that you would rape her?
22 A. No. That is very misinterpreted in that — in
23 those notes. I never said I would rape you. I said when
24 you do that with your legs one could rape you. That's
25 exactly what I said.

**Page 87**

1 Q. When you do what with your legs?
2 A. What she did with her legs is she actually
3 uncovered herself and she spread her legs just enough so
4 that you can take a look and then she closed her legs and
5 she was laughing at me, and then I said when you do such
6 things one could rape you, and then we had academic
7 discussion about rape. She probably expected me to act
8 upon that, and actually when she said what is rape, I
9 started to explain what is rape and I said rape is when
10 somebody is, you know, attempting to forcefully have sex
11 with you and blah, blah, blah. That was the extent of
12 it.
13 Q. What do you mean by —
14 A. And I'm very sorry.
15 Q. What do you mean by when you say she uncovered
16 herself?
17 A. Oh, she was like — you know, she was in — how
18 you call that, whatever is on the bed, you know, she was
19 covered by that, and then she actually did this and she
20 showed her leg to me (indicating).
21 Q. Do you claim that she was in the bed in
22 something other than this blouse and her shorts?
23 A. No. No. She was in her blouse and her shorts,
24 but when she did that she was turning — spreading her
25 legs and putting her legs like this (indicating). I

**Page 88**

1 don't know why she did that.
2 Q. But she had her shorts on?
3 A. Yes, yes, she had her shorts on.
4 Q. And you claim she spread her legs and then she
5 crossed her legs?
6 A. Yes, and she did that repeatedly.
7 Q. Why didn't you walk out?
8 A. Well, you know, I ask myself that question
9 because there was something strange about all of the
10 situation I must say. I didn't because it's just that, I
11 felt I would be with her, and I actually was invited to
12 the room, don't forget that.
13 Q. I understand, but she didn't tie you down, did
14 she?
15 A. No, she didn't. I mean why would I leave the
16 room? What did I do to leave the room? I mean why would
17 I leave the room?
18 Q. Were you uncomfortable when she spread her legs
19 and crossed them?
20 A. I was feeling very strange, yes.
21 Q. And you still didn't leave the room?
22 A. No, I didn't.
23 Q. Did you think that was poor judgment on your
24 part?
25 A. Yes, it was. I would agree it was poor

**Page 97**

1  because she apologized to me, she apologized to me twice,
2  once on Tuesday night and once on Wednesday morning, and
3  she apologized profusely, she said I'm so sorry that this
4  is happening to you but it was out of my control, that's
5  exactly what she said, she said out of my control. Now
6  you think --
7      Q.  Did you ask her what she meant?
8      A.  Yes.  And she said I can't tell you, you will
9  see, I can't tell you.  Apologized to me.  Why would
10  somebody that I harassed apologize to me?
11     Q.  There's no question.
12     A.  She had all the time in the world --
13     Q.  There's no question, Mr. Cicvara.
14     A.  Okay.  I understand.
15         MR. CERASIA:  Mark that as 5 please.
16         (Cicvara Exhibit 5: Email - marked for
17  identification.)
18     Q.  Showing you what's been marked as Exhibit 5, if
19  you look down at the bottom, first of all it's a document
20  bearing number PG 470?
21     A.  Uh-huh.
22     Q.  Under the section marked SMS, the text, you see
23  it down at the bottom?
24     A.  Yeah.
25     Q.  Was (203)243-0079 either your cell phone or

**Page 98**

1      BlackBerry number?
2      A.  BlackBerry number.
3      Q.  Okay.  And did you send this text message or
4  SMS to Bel?
5      A.  Yes.
6      Q.  Was this the day after you were in her hotel
7  room June 8th?
8      A.  Yes, it was.
9      Q.  When you say -- I think there's a typo there,
10  it says I hope you will, it says b-e-w, but I assume it's
11  to be be, be better soon, what was wrong with her?
12     A.  I don't know.  She was -- we were told that she
13  is not there the second day on audit.  I don't know what
14  was wrong.  She said she's -- the guy said she's sick.
15     Q.  Who told you that?
16     A.  After Yuen told Predrag I was -- let me just
17  take a look, because I don't want to guess.  I think this
18  gentleman, Yuen Yau.
19     Q.  Y-u-e-n?
20     A.  Y-u-e-n, and last name Y-a-u.  He told us that,
21  because he picked me and Lori at hotel that morning and
22  he said she's going to be out for today because she's
23  sick.
24     Q.  And then you say to her in this text feel
25  terrible that can't be with you and pamper you?

**Page 99**

1      A.  Yes, I did say that.
2      Q.  How were you going to pamper her?
3      A.  Just to make her feel good.  I don't think --
4      Q.  Rub her feet?
5      A.  -- there was anything special in the word
6  pamper.  Maybe I used the wrong word.  Just -- you know,
7  just to make her feel good.  I still didn't understand
8  what I understood after the next message, which was, hey,
9  we are not a couple so why are you saying this, and I
10  just couldn't understand that coldness coming out of her
11  at that moment.  I was really shocked with that.
12         MR. CERASIA:  Mark that as 6 please.
13     Q.  All right, Mr. Cicvara, why don't you give me
14  number 5, if you can give me that back, please.
15     A.  Sure.  I think you have to put --
16     Q.  Yeah, you've got to wait.  You took it from
17  her.  Give it back.
18     A.  Sorry.
19         (Cicvara Exhibit 6: PG000471 - marked for
20  identification.)
21     Q.  Showing you what's been marked as Cicvara
22  Exhibit 6, which is another text message, it's PG 471.
23  If you look at the bottom, is that the reply you received
24  from Bel?
25     A.  Yes.

**Page 100**

1      Q.  And that's the reply to Exhibit 5; right?
2      A.  Yes.
3      Q.  Okay.
4      A.  And that was really kind of shocking, the way
5  she wrote it, because first of all I never thought that
6  we are couples and I never thought we are lovers, and
7  when she said please stop thinking about me that was
8  really strange because she actually did everything in her
9  power for me to think about her within six months, you
10  know, from December to June.
11     Q.  Right.
12     A.  I just couldn't, you know, get rid of her --
13  messages, e-mail messages, which I asked for and they
14  were never produced because computer was -- disappeared.
15     Q.  So that's the reply.  But let me ask you this.
16  Do you have any female friends?
17     A.  Do I have any female friends?
18     Q.  Yeah.
19     A.  I probably do.
20     Q.  Any of them who get sick and you write to them
21  that you want to pamper them?
22     A.  No.  No.  No.  Sometimes maybe.  I don't know.
23  If I'm very close maybe I don't pamper but I would like
24  to help.
25     Q.  Right.  Pamper suggests that you wanted to be

**Page 103**

1  to hear me, you know, saying things sort of, or, you
2  know, whatever it was in the room, so I said, no, you
3  don't have to play it because I know what happened in
4  that room and I was in that room. She also mentioned,
5  you know, like cameras, but she mentioned specifically
6  there was a recording from her boss' answering machine of
7  what was going on in that room, which came out not to be
8  true as you know. The recording was from Wednesday, June
9  10th, in the morning. There was no ever any recording
10  from that room.
11      MR. CERASIA: Can you mark this as 7.
12      A. So I was lied to.
13      Q. Okay. There's no question.
14      A. Okay. I think it's important. And it's not in
15  the notes.
16      Q. There's no question.
17      A. It's not in the notes, which means the notes
18  are not valid. I never saw the notes too.
19      Q. Mr. Cicvara, there's no question, please.
20      A. Okay. Good. I got this --
21      Q. There's no question.
22      A. I'm saying I shouldn't be reading this.
23          (Cicvara Exhibit 7: PG000472 - marked for
24  identification.)
25      Q. I'm showing you what's been marked as Exhibit

**Page 104**

1  7, which is Bates number PG 472. Let me ask you if this
2  is the response to your text message which was Exhibit 6?
3      A. Right. It says Thanks for the good time
4  though, P. It might be. I'm not sure that I ever
5  used --
6      Q. Well, that's your --
7      A. -- P point after I sent a message. I usually
8  use either Predrag or I'm not using anything. So
9  obviously it is, but somehow it doesn't look like I did
10  it. It must have been a new computer --
11      Q. Well, you were doing different things that you
12  had never done before according to you during that time,
13  right, like rubbing the feet --
14      A. Oh, like rubbing another woman's feet, yes, I
15  would agree, yes, I was doing that.
16      Q. All right. I have no other question about
17  Exhibit 7.
18      A. Okay.
19      Q. Give it back.
20          MR. CERASIA: Mark this as 8 please.
21          (Cicvara Exhibit 8: PG000473 - marked for
22  identification.)
23          (Cicvara Exhibit 9: PG000474 - marked for
24  identification.)
25      Q. I'm going to show you what's marked as Exhibit

**Page 105**

1  9, which is Bates number PG 474, it's a text message from
2  you June 10th, 2009 at 11:15. And if you look at Exhibit
3  7, you had sent that at 11:14, right?
4      A. That was June 9 and this is June 10.
5      Q. Oh, it's a whole day difference. Okay. I
6  might have been looking at Exhibit 8. Thank you for
7  correcting me.
8      A. Okay.
9      Q. So on the 10th you write to her, just wanted to
10  tell you that I am, and dot, dot, dot, just wanted to
11  tell you that I am still in a shock and disgusted by
12  myself and my poor judgment of things that were going
13  between us, forgive me if you can, P.
14      A. Yeah.
15      Q. What did you mean by that?
16      A. I was trying to apologize for the thinking that
17  at some point it might be -- instead of friendship our
18  relationship might be a little bit more than that, and I
19  actually found out that it was very unusual that she sent
20  message as she did like we are not couple and we are not
21  this, so I apologized for me ever thinking about -- that
22  there could be something more going on between us than
23  that. That was the reason why I did this.
24      Q. Because you thought that there was more going
25  on between you, right?

**Page 106**

1      A. As I said, I can't deny that it's crossed my
2  mind, yes. I wouldn't deny that. And I also said that
3  one of the things I really did wrong is I did wrong to my
4  wife on whatever I did with this woman. So that -- I
5  feel strongly about that, but I didn't harm the company
6  at all, at all.
7      Q. Then why were you in shock?
8      A. I don't know. It might be a poor choice of
9  words again.
10      Q. You've got a lot of poor choice of words; do
11  you blame that again on your lack of command of the
12  English language?
13      A. No, I don't blame it on lack of command. I
14  blame it maybe on text messaging where you are expected
15  to send answer quickly.
16      Q. Well, did anybody tell you you had a certain
17  amount of time to send her this text message?
18      A. No, nobody told me that. I had all the time in
19  the world to do it, but usually what I did when I
20  answered text message is I answered immediately. You
21  will notice that from the text messages that were
22  exchanged. You have the record.
23      Q. Why were you disgusted with yourself?
24      A. I don't know. I thought that it's not a good
25  thing that you would go over friendship if the other

Page 109

1  never even told me that she felt bad. She told me don't
2  rub -- don't rub my feet anymore; I stopped.
3      Q. Why don't you look at Exhibit 8, which is a
4  June 10th, 2009 text message from you to Bel 6:27,
5  bearing Bates number PG 473.
6      A. Okay. Yes.
7      Q. Did she --
8      A. That was when she apologized to me.
9      Q. Did you buy her a T-shirt?
10     A. Yes.
11     Q. And she returned it to you?
12     A. She returned it to me after all this happened,
13  yes.
14     Q. Why did you buy her a T-shirt?
15     A. Because she was like, oh, I need to buy this
16  T-shirt, she bought two already, and then, well, I spent
17  already too much for this, oh, should I buy this T-shirt,
18  no, I spent too much already, and she's actually
19  collecting T-shirts from -- what's the name of the store
20  that the stars, the rock stars -- I forgot, it doesn't
21  matter -- Hard Rock Cafe, okay, so she's collecting those
22  shirts and she wanted to buy the shirt but she already
23  bought two, so I said I'll buy it as a present for you.
24  I paid with my personal card and my wife found that, so I
25  had something to explain to my wife about this. But,

Page 110

1  yes, I bought her a shirt and she returned -- she put it
2  on the door outside of my room on Wednesday morning. But
3  you wouldn't talk about the other text message that I
4  sent her, which was like why did you apologize to me.
5      Q. I didn't get to there, Mr. Cicvara.
6      A. Okay. Sorry.
7      Q. Remember I ask the questions.
8      A. Sorry, sorry, you ask the questions.
9      Q. And according to her you sent this text message
10  before you saw her returning the shirt. In the first
11  message you send to her, the first line says good
12  morning, still sleeping or don't want to answer after
13  all?
14     A. Because I sent a message before this that she
15  didn't answer it, where it was the same question, what is
16  it that you did that you told me you were so sorry about
17  and that you told me you didn't have a way to influence
18  it? She said that, she said I didn't have a way to
19  influence what happened.
20     Q. But you don't know what -- you don't have --
21     A. Let me see. I actually wrote down what she
22  said. I was left no choice; that's exactly what she
23  said.
24     Q. When did you write that down in front of you,
25  at lunch?

Page 111

1      A. In front of me. We talked in the car, and he,
2  my lawyer, asked me exactly please try to recall --
3          MR. SIKORSKY: All right. That's --
4      A. -- what did she say exactly. I was left no
5  choice, that was one sentence. It was out of my control
6  and I really apologize to you, I did terrible thing to
7  you.
8          In the middle of the night I couldn't sleep
9  about thinking what the heck is terrible thing what she
10  did, and I asked once, she didn't answer, then I sent
11  another, and I said are you sleeping, I have a question,
12  why did you say I will understand, why are you sorry,
13  sent to her BlackBerry, okay, and she didn't answer this
14  one either, and then in the morning I found that shirt
15  outside of my room and that is when I went to her room
16  asking her, you know, why did you return this to me, I
17  bought it, it's a present, I bought it for you, keep the
18  present, and she kept it, and that is when I asked again
19  please tell me what did you do, because honestly I felt
20  she maybe said something to my wife, you know, like I had
21  a relationship, because I realized that she is -- I don't
22  even know how to say that, might be a little bit unstable
23  in relationships, so she was quick to make decisions like
24  decision don't come to my room and then five minutes
25  later come to my room, I changed my mind, decisions like

Page 116

1  You will be a very busy man. And I have enough evidence,
2  so. Because you did say unfounded claims in your
3  response. I would like to see those unfounded claims.
4          MR. CERASIA: Could you mark that as 10,
5  please.
6      A. I apologize if I'm falling into flames
7  sometimes. I will try to get calm. It's just that I
8  want truth to come out, all of it.
9          (Cicvara Exhibit 10: PG000475-476 -
10  marked for identification.)
11     Q. Why don't you take a look at what's been marked
12  as Exhibit 10. It's two pages of e-mail identified as
13  PG 475 to 476. Tell me after you've had a chance to look
14  at this.
15     A. Yes. Okay.
16     Q. Am I correct that the bottom e-mail you wrote
17  an e-mail while you were in the plane or typed the e-mail
18  while you were in the plane?
19     A. I guess.
20     Q. On the way back to the United States?
21     A. No. This was not written on the way back to
22  United States.
23     Q. Where was it written?
24     A. This was written on my way to China.
25     Q. China?

Page 117

1   A.  Yes.
2   Q.  From Indonesia or from --
3   A.  I was doing a lot of work for company, so in
4   less than two weeks I went to Indonesia, I had two
5   quality assurance inspections there, then I went to
6   Thailand, I had one quality assurance inspection there,
7   then I went to China and I had another quality assurance
8   there, and I returned to United States on Saturday, June
9   13th, very late in the night.
10  Q.  So you were on the plane when you typed this?
11  A.  Yes, to China.
12  Q.  Right.  And you didn't see her after you sent
13  this message?
14  A.  No.
15  Q.  The last time you saw Bel was on June 8th or
16  June 9th?
17  A.  No.  It was June 10th when I went to her room
18  to return the returned T-shirt and that was when she
19  actually -- when you had those recordings that Lynne
20  Burnett says that there are recordings from the answering
21  machine of her boss, those recordings came out to be from
22  the answering machine of Austin Lin that he -- she called
23  in the morning, I don't know why, to probably record me
24  trying to threaten her, which I never wanted to, I was
25  just asking her what did you do.

Page 118

1   Q.  Okay.  So the simple answer to my question is
2   the last time you saw her was June 10th?
3   A.  June 10th in the morning, yes, before I went to
4   the airport to China.
5   Q.  In the first line to her it says Hi ma Belle,
6   B-e-l-l-e, Hi, m-a, ma Belle?
7   A.  Yes.
8   Q.  What did you mean by that?
9   A.  It was between me and Bel.  It came out to be
10  the way of writing e-mails back and forth.  She liked it
11  a lot.  Ma Belle means there is a song from Beatles which
12  is Michelle, ma belle, so I told her that and then I used
13  ma Belle as my how are you Bel.  So it was just a polite
14  way of addressing her, nothing, between us again.
15  Q.  In the last sentence -- line of that first
16  paragraph it talks about your warm feelings about her?
17  A.  Yes.
18  Q.  And that's what you've already testified to or
19  is there something different?
20  A.  No.  I had feelings about her, yes, which were
21  pretty normal feelings about a human being.
22  Q.  And then it says my desire to protect you and
23  inexplicable closeness that I felt towards you all this
24  time?
25  A.  Yes.

Page 119

1   Q.  What's the inexplicable closeness?
2   A.  That's -- I don't want to say because you are
3   going to attack me, but that's maybe a way of expressing
4   my thoughts in English, nothing -- it doesn't mean
5   anything special.  I felt close to that person, nothing
6   else, because of the --
7   Q.  You just said you don't want to say.  What is
8   it you don't want to say?
9   A.  No, no.  I don't want to say -- I don't want to
10  excuse myself because of my English language.  So, yes, I
11  felt close to that person and that's why I said that.
12  Q.  Okay.  What were you protecting her from?
13  A.  Oh, from the pain that she had; you know, she
14  was complaining about having broken heart because older
15  gentleman left her while she was married to her husband
16  three months in marriage, which I didn't know at the
17  time.  She told me that she's married only in June.  I
18  didn't know that she was married.  I didn't know she went
19  to Spain with her husband.  She never told me that.  She
20  said I'm going alone.
21  Q.  But you knew she was married when you rubbed
22  her feet?
23  A.  Yes, I did.  She told me that.
24  Q.  Second paragraph, it says, It was you whom I
25  chose to confine my thoughts when I had troubles.  Like

Page 120

1   what?
2   A.  That means nothing, I'm really sorry.
3   Q.  You just write words you don't mean?
4   A.  No, I don't write words that I don't mean.
5   This was -- this e-mail is the worst thing and the worst
6   piece of written material that I ever did.  I did it
7   partially because I was still afraid that she might go to
8   my wife and tell her what was going on between me and
9   her, and I actually got the brunt of my wife in spite of
10  her telling me, because I was forced to tell my wife the
11  truth obviously and I did tell my wife the truth.  So
12  partially this e-mail was written as trying to appease
13  somebody who is dangerous.  So I did actually learn that
14  she can do very bad things and I was trying to protect
15  myself actually.  So I was trying to come out as good as
16  possible towards her and I really don't enjoy myself
17  writing these things but I did write them.  So this is to
18  the point exactly what I wrote.
19  Q.  So you say that what you wrote here is a lie?
20  A.  No.  It was trying -- I didn't lie.  I was
21  trying to appease a woman who was dangerous.
22  Q.  Is there anything in here that's not truthful?
23  A.  Oh, let me go through it.  Maybe there is.  If
24  I have to do it under oath I'll try to.  So let's go
25  sentence by sentence.

Case 12-338, Document 57, 07/23/2012, 671466, Page218 of 291

Page 121

1    This paragraph is true. This is no change
2 today --
3    Q.  Okay. The question was whether there's
4 anything untruthful, it's either yes or no.
5    A.  No, there is nothing really untruthful here,
6 no.
7    Q.  In the last -- third paragraph, the second
8 sentence says I would love nothing more than to take back
9 few emotional outbreaks that I experienced last few days.
10 What emotional outbreaks did you have?
11    A.  I don't think I had any outbreaks.  I --
12 emotionally probably, I can say that, you know, doing
13 that rubbing of feet and getting close in that way it was
14 not really a good thing to do.  So it probably is the
15 only thing I could refer to that was experienced last few
16 days, and also the shock that I had when she sent me that
17 text message where she said we are really not lovers and
18 we are not couple, which meant actually I don't want to
19 go on with this relationship anymore, so it was kind of
20 surprising to me, it was a shock.
21    Q.  But what emotional outbreaks did you have?
22    A.  Well, maybe when I returned the e-mail, my
23 message I did say, you know, okay, thank you for whatever
24 and ever, yes, we are not, you don't have to state the
25 obvious.  It was not really the nice thing to say.  So I

Page 122

had a few things which I could have worded probably
better than what I did actually.
3    Q.  It then says Had I known that I have risked
4 losing such a precious thing as our friendship, I
5 wouldn't ever have attempted what I so foolishly did.
6    A.  Which is --
7    Q.  What did you attempt?
8    A.  I didn't attempt physically anything, but in my
9 mind there was that thing about possibility that we have
10 more than just friendship, emotional, and I would stop
11 right there.
12    Q.  So you didn't really -- when you wrote the word
13 I wouldn't ever have attempted, you're now saying that
14 you never attempted anything?
15    A.  No, beyond what I did, I never attempted
16 anything, no.
17    Q.  And then it says you were misjudging the nature
18 of our closeness in the last few days.
19    A.  Yeah, because I told her there is more than
20 just friendship and then she said very coldly and calmly,
21 no, it's not even friendship.  The other reason why this
22 e-mail was written the way it is is I realized that I
23 will have to stay in business relationship and we are
24 coming here to business, so basically in order to try to
25 bridge the misunderstandings between us I did try to say

Page 123

1    let's stay in friendship and let's forget what happened.
2 She did say pretty strongly that she didn't want what she
3 did, but she also apologized for what she did twice,
4 which is very important because you wouldn't do it if you
5 were harmed by somebody.  She also said in her statement,
6 if I'm not mistaken, we will come to that, but she said
7 that -- she said I never meant any harm, I never did any
8 harm to her, never, and was always very polite, that's
9 what she said.
10    Q.  Do you know if she was ever afraid of you?
11    A.  No, she never said that, so I wouldn't say that
12 she was -- ever had any reasons to be afraid of me. I
13 never did anything to jeopardize her safety in any way,
14 and as I said it's not in my nature to be forceful with
15 any human being, let alone with a woman. I wouldn't ever
16 do that.
17    Q.  The last sentence on the first page says, Maybe
18 the cultural differences that you so graciously tried to
19 point out in one of our conversations did ironically
20 played the part in what transpired lately.
21    A.  Yeah.
22    Q.  What do you mean by she so graciously tried to
23 point out; did she try to tell you at some other point
24 that you were just friends?
25    A.  No. No, no, no, she didn't try to point that

Page 124

1    out. I think in one of the conversations she did say
2 that she would do a lot of things for the customers,
3 things that her boss is asking her to do, she would just
4 do it. So I think that she once said that in China when
5 somebody -- somebody is trying to be polite to the point
6 where they wouldn't say no ever, and I think what I meant
7 here is if you said one time you don't want any
8 relationship with me over our friendship I would have
9 accepted that immediately, which I did actually.
10    Q.  So you blamed her for not coming out so
11 strongly?
12    A.  No, no, I didn't blame her. I didn't blame
13 her. If you read this carefully there is no blame in
14 this. It just said maybe ironically it played a little
15 bit of something. Let me just read it. I said maybe the
16 cultural differences that you so graciously tried to
17 point out in one of our conversations did ironically
18 played the part in what transpired lately. So what I was
19 trying to say is if you ever just said no, I would accept
20 no, and when she said no I accepted no as a word.
21    Q.  And at the top of page 2 it says I believe if
22 you had taken a strong stance against my foolish attempts
23 to get more out of our relation stopping it from the very
24 beginning, I would have stopped then and would have still
25 be in that special relation with you that meant so much

Page 125

```
1   to me.
2       A.  Yeah.
3       Q.  You again use the word attempts.  What attempts
4   did you make, what foolish attempts did you make to get
5   more out of the relationship other than rubbing her feet
6   and her back?
7       A.  Those were the attempts and it probably
8   switched in my mind at some point where I thought that
9   there is possibly more, and I'm not blaming anybody for
10  that, it's me.
11      Q.  And then you use some words that are harsh of
12  your conduct, where it says if she wasn't so polite and
13  she wasn't trying to hurt your feelings, you have
14  unconsciously encouraged my, and then you got in brackets
15  macho, possessive, blah, blah, blah, efforts to get
16  more —
17      A.  That might be massaging —
18      Q.  Excuse me.
19      A.  Okay.  Sorry.
20      Q.  — to get more than you were ready to give.  So
21  you think that, you know, you were being possessive with
22  her?
23      A.  No, I don't think I have been possessive with
24  her.  I think exactly what I write here.
25      Q.  It says she encouraged your macho, possessive,
```

Page 126

```
    animouse, stupid efforts.
    A.  Which is massaging her back and getting her to
3   the point where she actually said no, stop this, I don't
4   like this, and then I stopped it, and because of that I
5   think we lost the precious thing, which is friendship,
6   and if she said that before, I would stop.
7       Q.  And then you refer to yourself as a foolish
8   dirty old man.
9       A.  Oh, there you go.  Okay.  Foolish dirty old man
10  is something that is again between us, it was just
11  attempt to diffuse the situation to the point where we
12  could laugh it off, and I'll explain why.
13      Q.  How long did it take you to think of that
14  answer, since you got fired?
15      A.  No, no.  I didn't think of the answer.  I'm
16  telling the truth.  In the plane when we were flying to
17  Singapore she picked up the brochures of Singapore.  In
18  the brochure there was a sentence which was saying you
19  can take a tour in the topless bus.  I was laughing at
20  topless bus and telling her in the plane, wow, that must
21  be exciting to be in the topless bus.  I just said that,
22  didn't mean anything else.  I meant what I meant.  And
23  she read it and she said, well, you dirty old man.  So
24  what she meant by that is I meant topless as a meaning of
25  topless.  That became words between us.  I didn't think
```

Page 127

```
    about that or think that I was fired.  It was just a
2   thing that happened on the plane between us and she said
3   to me you dirty old man.  That's why I used it here,
4   nothing else.
5       Q.  And then in the next — you skip a paragraph,
6   it says, Again I can only say I am sorry for what I did
7   to you and I know there is no real excuse for it.  What
8   is it that you did to her that you have no excuse for?
9       A.  You know, when she acted like she acted, when
10  she sent that text message where she said that there is
11  nothing between us, I have to tell you that was really
12  shocking to me, because I just couldn't understand it.
13  You know, she was confining to me things like her husband
14  went to China and had inappropriate relationship with
15  somebody.  She hated her husband.  She was confining to
16  me things like her boss was forcing her to marry the guy
17  so that he stops rumors about them going together on
18  trips, like if you are married woman that will stop the
19  rumors.  That came from her.  So she was confining to me
20  these things and then all of a sudden she's telling me
21  stop being close to me.  I was not even close to you, you
22  were close to me.  It was shocking to me.  I just
23  couldn't understand where this is coming from, so.
24      Q.  So she's telling you this stuff, but in
25  exchange you're rubbing her feet and her back and you're
```

Page 128

```
    saying that she was the one who was inappropriate but you
2   weren't?
3       A.  No, I'm not saying it was inappropriate.  I
4   said it was very inappropriate with respect to my wife,
5   nothing else.  I didn't — I was never in the position to
6   make any decision about business relationships.
7       Q.  I know.  You said that about four times now.
8       A.  Well, I would like you to understand that.
9       Q.  That's what you keep saying.  All right.  And
10  her response to you was, I'm sorry because I don't love
11  you but I know you love me so.  I appreciated you in the
12  past because we were just friend.  What I cannot accept
13  is that — is what you did in the last few days.  Without
14  those dirty things, we can be friend.
15      A.  You will have to ask her.
16      Q.  Well, you then respond to her and you never say
17  I haven't done any dirty things to you?
18      A.  No.  I just said I can promise that never again
19  I will be a dirty man and I did put this in parentheses
20  because that was meant again to be between me and her and
21  to laugh it off.
22      Q.  Oh, it's just a joke then?
23      A.  No, it's not just a joke.  It's something that
24  happened between me and her and she will understand in
25  what context this was.  So it's not just a joke.  And if
```

**Page 129**

1  you want to ask her what she meant by what I did in last
2  few days ask her why did she apologize, ask her why did
3  she do the same thing that she did to me to Al Peterson,
4  tried to do it to Dave Mathieu, did it to Austin Lin,
5  wanted me replaced because she counted Austin who was in
6  charge of flashlights before I came will become in charge
7  of flashlights again.  We never talked about what
8  happened on the audit the first day, which actually was
9  the trigger I think for whatever happened from that day
10  on, and actually changed her relationship with me
11  immediately.
12      Q.  By the way --
13      A.  So we talk about that or not?
14      Q.  Just so I'm clear, when you went to her room on
15  June 8th you were the one who first reached out to her to
16  find out if you could bring the special dessert to her
17  room, right?
18      A.  Yes.  I was, yes, but I didn't come uninvited.
19      Q.  I only had one question and you answered it.
20      A.  Okay.
21          MR. CERASIA:  Why don't we take a break.
22          THE VIDEOGRAPHER:  Off the record at 2:27
23  p.m.
24          (Recess:  2:27 to 2:37 p.m.)
25          THE VIDEOGRAPHER:  On the record at 2:37

**Page 132**

1  I think we're on 11.
2          (Cicvara Exhibit 11: PG000498-501 -
3  marked for identification.)
4      Q.  Mr. Cicvara, I'm showing you what's been marked
5  as Exhibit 11, a series of notes identified with numbers
6  PG 498 through 501, and have you seen these before?
7      A.  I've seen this on May 28, 2010 --
8      Q.  Okay.
9      A.  -- when it was provided to us.
10      Q.  Okay.  The answer would be yes.
11      A.  Oh, yes.  I believe the answer was yes.
12      Q.  I just asked you whether you saw it.
13      A.  Yes, I did.
14      Q.  And isn't it true that on May 15th, 2009 you
15  met with --
16          MR. SIKORSKY:  June 15th.  You just said
17  May I think.
18          MR. CERASIA:  Oh, then I have the wrong
19  date.  Thank you, Igor.
20      A.  June.
21      Q.  Isn't it true on June 15th, which by the way is
22  my birthday, you'd think I'd remember the date, but June
23  15th, 2009 you met with Lynne Burnett, your boss Kevin
24  Babis, and Peggy Wilczewski?
25      A.  Yes, it's true.

**Page 133**

1      Q.  And it was at that meeting that you were
2  notified that you were going to be terminated; correct?
3      A.  Correct.
4      Q.  Okay.  Do you have any reason to believe that
5  meeting did not start at 9:15 a.m.?
6      A.  It's irrelevant.  It doesn't matter.  It might
7  have been 9:14 or 9:17, it doesn't matter.
8      Q.  Did Kevin speak at all during the conversation,
9  during the meeting I mean?
10      A.  I don't think he did.  I also don't think he
11  did know that it was Austin Lin who reported this.
12      Q.  That's not the question.
13      A.  It is because he told me --
14      Q.  No, no.  You've got to just answer my
15  questions, okay?
16      A.  Okay, yeah.  He didn't know that, by the way.
17      Q.  Do you know whether or not Kevin knew what was
18  going to be discussed at this meeting?
19      A.  No, I didn't know that.  I was not told that he
20  knew or he doesn't know.
21      Q.  Do you know who made the decision to terminate
22  your employment?
23      A.  I believe that was Lynne Burnett.
24      Q.  And on what basis do you have that belief?
25      A.  Because she is a HR director.

**Page 136**

1  a pre-intent to fire me immediately when I say I was in
2  the room, which I never denied.  It was like she expected
3  me to struggle with the fact that I was in the room
4  because I was told there are cameras in hotel which can
5  prove that you went to her room uninvited.  This is very
6  important.  I'm stressing this.  I was told that I came
7  into her room uninvited, almost forcefully came into her
8  room.  No, I was not, and I said that.
9      Q.  Okay.  Mr. Cicvara, do you have any idea or any
10  personal knowledge as to what was considered or discussed
11  in making the decision to terminate your employment?
12      A.  No, I don't.
13      Q.  Okay.
14      A.  I never said -- heard that.
15      Q.  It says here when they asked you the question
16  at the bottom of page 1, did you take off your clothes in
17  her hotel room, and you said no?
18      A.  No, I didn't.
19      Q.  You never took off a shirt, you never took off
20  your socks?
21      A.  I took off my shorts, yes, because --
22      Q.  Your shorts?
23      A.  Yes, because I wouldn't lay on somebody's bed,
24  you know, even, you know, sit on somebody's bed without
25  taking off the stuff that I was out in.  So I --

Case 12-338, Document 57, 07/23/2012, 671466, Page221 of 291

A-212

Page 137

```
1      Q.  So you took your pants off?
2      A.  I wouldn't say pants, because I had my shorts,
3  it was 110 degrees.
4      Q.  Okay.  When you say shorts, you mean like
5  Bermuda shorts kind of shorts or do you mean shorts as
6  in, you know, short term for underwear, what did you take
7  off?
8      A.  No, no, no.  I took Bermuda shorts, yes.  I had
9  underwear on myself, yes.
10     Q.  Okay.  So you took your shorts off and you only
11 had your underwear on?
12     A.  Yes, I did.
13     Q.  Did you take your shirt off?
14     A.  No, I didn't.
15     Q.  So you had a shirt on and your underwear?
16     A.  Yes, as far as I -- yes, I think so.
17     Q.  Okay.  And do you believe that that was
18 appropriate conduct?
19     A.  No, I don't believe it was appropriate conduct,
20 but in the circumstances where somebody went directly
21 into the bed and dimmed the lights and I was left
22 basically with no choice but to sit down on her bed, I
23 actually did it just so that I don't, you know, spoil
24 somebody's bed sheets.
25     Q.  All right.  Was there something that you sat on
```

Page 138

```
1  with your shorts, like you sat in mud or you sat on oil?
2      A.  No.  I just don't do that.
3      Q.  So you took your shorts off and sat on the bed
4  with your underwear to be polite?
5      A.  Yes, I did, yes.  Yes.  Before we go on can I
6  just say something?
7      Q.  No.  I don't have a question.
8      A.  Well, these notes here --
9      Q.  I don't have a question.
10     A.  There wasn't --
11     Q.  I don't have a question.
12     A.  Okay.
13     Q.  And then they asked you the question did you
14 tell her that you wanted to rape her?
15     A.  No, I never said that.  I never told her --
16     Q.  Did you ever say, look, it was in a hotel and
17 she was dressed in a way, I told her that I had a feeling
18 I would rape her --
19     A.  No.
20     Q.  -- but never had that in my mind and didn't
21 think she'd think about it seriously?
22     A.  No, I never said that.  I said I never said I
23 would rape her and that's what I said, and that's why I
24 said these notes don't reflect what was talking about at
25 that meeting, they don't reflect it.
```

Page 148

```
1  answer.  At this meeting I was told you are fired for
2  cause, nothing else.  That's how I was fired, in ten
3  minutes; nine years of work in ten minutes.
4      Q.  That's what happens when you strip to your
5  underwear.
6      A.  Sure, yes.  Good.  And that's why computer
7  disappeared with all the reports about the diversion.
8      Q.  I don't know what you're talking about,
9  Mr. Cicvara.
10     A.  I know you don't, because the judge says, and
11 you said it was unfounded claim in your answer.
12     Q.  Okay.  There's no question pending.
13     A.  Good.
14         (Cicvara Exhibit 12: PG000525 - marked
15 for identification.)
16     Q.  Okay, Mr. Cicvara, I'm showing you what's been
17 marked as Exhibit 12, which is identified as PG 525, it
18 is an e-mail of June 14th, 2009 from Andrew to Nitesh
19 Singh, and you understand that to be Andrew Yau?
20     A.  Yes.
21     Q.  And when did you first see this, during
22 discovery in the lawsuit?
23     A.  May 28th.
24     Q.  2010?
25     A.  Yes.
```

Page 149

```
1      Q.  Second paragraph says I want to let you know in
2  no uncertain terms that he is no longer welcome in
3  Practical in the future, kindly send someone else for the
4  job next time.
5      A.  So?  What do you want me to say?
6      Q.  I didn't ask a question yet.
7      A.  Okay.
8      Q.  I'm just pointing you to something, okay?
9      A.  Okay.
10     Q.  So you got the chairman of Practical Lighting
11 saying that you're not welcome there anymore, right?
12     A.  Yeah.  That's the same chairman who is sending
13 e-mail messages to Bei saying we need to sack that guy
14 who is reporting to him.
15     Q.  Okay.  What's that have to do with the price of
16 tea in China?
17     A.  Nothing.  It has nothing to do with anything.
18     Q.  All right.  So Procter & Gamble, would you
19 agree that if one of their contractors said that they
20 didn't want you on site because you had been sexually
21 harassing one of its employees, that they should no
22 longer send you there, would you agree with that?
23     A.  Sure, as long as the investigation that will
24 prove that there were inappropriate sexual advances is
25 conducted in a proper way and they prove that that is
```

Page 153

1  knew him because he was buyer, nothing else.
2      Q. On the day that you were fired do you recall
3  whether or not you called Peggy to ask her about your
4  stock options and your bonus?
5      A. On the date when I was fired. I'm not sure was
6  it on that date or day after. I did call, yes, but I'm
7  not sure was it on that date or day after.
8      Q. And you spoke to Peggy?
9      A. Yes.
10      Q. And she -- do you remember her telling you that
11  you could not exercise your stock options because they
12  were forfeited when you were terminated from the company?
13      A. I remember that she said that, yes.
14      Q. And in response to that did you call somebody
15  else in the stock option administration department?
16      A. No. I called them before. I called them the
17  day before and they told me that I have 30 days to
18  exercise.
19      Q. Do you remember who you spoke with in the stock
20  option administration?
21      A. No.
22      Q. When you called stock option administration to
23  ask questions about your ability to exercise your stock
24  options, did you tell them that you had been terminated
25  for cause?

Page 154

1      A. Yes.
2      Q. Did you tell them the reasons you had been
3  terminated, what the cause was?
4      A. No, because I didn't know that.
5      Q. Well, you knew the allegations against you were
6  that you had engaged in inappropriate conduct towards
7  Bel, right?
8      A. As I said, until today's date I really don't
9  know why I was fired. I don't know why I was fired. I
10  asked not once, I asked many times and I asked in
11  writing, I said please, because I was advised by my
12  lawyers to ask, and I was always told you were terminated
13  because of violating Worldwide Conduct Manual. Look --
14      Q. So you were told the reason?
15      A. No, I was not told the reason. Because in
16  Worldwide Conduct Manual there about 20,000 reasons
17  for why you can be fired, and I was asking for a reason,
18  specific reason, not violating conduct, tell me what did
19  I violate. I don't know to this date why I was fired.
20  You are saying alleged harassment. She did write that in
21  the notes, but I was never told that during the meeting.
22  I was only told you are fired for cause, as of this date,
23  that's it.
24      Q. So all you did was you told the person in the
25  stock option administration that you were fired for

Page 155

1  cause?
2      A. For cause, yes.
3      Q. You didn't give any specific facts, nothing?
4      A. No, I didn't get into specifics because I
5  couldn't even tell specifics, I would be lying.
6      Q. Right. And you didn't know if this was a
7  person who had made decisions under the stock option
8  plan?
9      A. She -- no, the person told me if you are fired
10  for cause, and she didn't tell me that there are
11  specifics, you have 30 days until when you left the
12  company to exercise those stock. That is when I called
13  Peggy -- I think next day I called about that, and then I
14  was told that I was -- it was not a correct answer and
15  they regret that they gave me incorrect answer. Then I
16  called Peggy about what is going on and asked her to
17  explain this to me.
18      Q. Okay.
19      A. And then she -- I was sent, you know, that
20  rules about how you exercise and I was told that because
21  of certain things materially injurious to the company, I
22  cannot exercise. I think that's what came out.
23      MR. CERASIA: Mark that as 13 please.
24      Do you have an exhibit there?
25      THE WITNESS: No. I don't have anything

Page 160

1      A. No. It could be affected by many things. It's
2  not discretionary, it's 8 percent of my salary, but it
3  does include, you know, how P&G performed in that year,
4  how the specific division of P&G performed. There are
5  many things going into the formula. So it could be 8
6  percent, it could be 5 percent, it could be 10 percent.
7  That's why I'm saying it's irrelevant, it's given.
8      Q. I understand. And you claim that there's no
9  discretion in it?
10      A. I claim there is no discretion in it except
11  maybe in the case you are fired, maybe. So I didn't
12  receive bonus, but I was told I will receive bonus, but,
13  hey, it doesn't matter, it really doesn't matter. I was
14  told that I would receive bonus.
15      Q. Look at Exhibit 14, please.
16      A. Yes.
17      Q. This is an e-mail that you sent to Peggy on
18  September 15th, 2009?
19      A. Yes.
20      Q. Where you ask her about the bonus, right?
21      A. Yes. And I said that last time we spoke you
22  have stated that while my options are not going to be
23  valid I will be eligible for bonus and will receive it in
24  September; that's what she said.
25      Q. Okay. And she wrote back to you, per the

Page 161

1 attached guidelines, which are attached to the e-mail,
2 you must be an active employee as of June 30th of the
3 fiscal year to get the bonus?
4     A.  Perfectly clear.
5     Q.  And you were terminated before June 30th of the
6 fiscal year, right?
7     A.  As I said perfectly clear.
8     Q.  So do you admit that if you were fired that you
9 were not entitled to the bonus because you had not been
10 there on June 30th?
11     A.  I don't have to admit anything, it's here, it's
12 written.  I just say I was told differently, nothing
13 else, and I was told differently.  I have to admit I
14 probably didn't read this document carefully.  If I read
15 it, I probably would find the same thing, but as I said I
16 was told by human resources person that I would receive
17 it.  I wouldn't otherwise ask.
18     Q.  Okay.  But let's go back to the question.
19 Wouldn't you agree that under the short term achievement
20 award policy that you do not receive a bonus if you are
21 not employed on June 30th of that year?
22     A.  Just a second.
23         Yes, because it says remember you must be an
24 active employee on date of payment — oh, these are stock
25 options, I'm sorry.  But it's probably the same thing,

Page 162

yes, I would agree.
2     Q.  Okay.  So you agree that you were not entitled
3 to a bonus for that year?
4     A.  Sure, if I am fired, no.  The question is why
5 I'm fired, but that's beyond the point.
6     Q.  But you were fired before June 30th of that
7 year?
8     A.  Sure.
9     Q.  So you were not an active employee; correct?
10     A.  True.  All I'm saying is I was told
11 differently, nothing else, and obviously anybody can tell
12 you anything, but what is written is true, so yes.
13     Q.  Did you ever rely on the statement that you
14 claim Peggy made to you that you would be eligible to
15 receive a bonus in September?
16     A.  In what sense?  I don't understand.
17     Q.  Did you make any decisions based on it, did you
18 spend the money?
19     A.  How would I spend the money that I don't have?
20     Q.  Okay.  According to this e-mail, in June of '09
21 you say she told you you're going to get your bonus and
22 you're going to get it in September?
23     A.  Yes.
24     Q.  Okay.  From June '09 to September '09 did you
25 make any decisions to spend money in reliance on your

Page 169

1     A.  Yeah.
2     Q.  Right?  You were seeking what you call a
3 severance package; correct?
4     A.  Yes.
5     Q.  And then you said that you were seeking an
6 annual bonus, right?
7     A.  Yes.
8     Q.  Okay.  My question was the annual bonus, were
9 you seeking the annual bonus under the STAR plan?
10     A.  Yes.
11     Q.  Okay.  That we already addressed, right?
12     A.  We already addressed the case if you are fired
13 you don't have a right to have bonus, yes.  The question
14 is why was I fired.
15     Q.  I understand.  Is there any other bonus that
16 you are seeking other than the STAR bonus in this
17 lawsuit?
18     A.  No.  It was about that, yes.
19     Q.  Okay.  What is the severance package you're
20 referring to; is there any written document relating to
21 this severance package?
22     A.  I didn't receive any written document that I
23 recall about severance package, no, but there is a
24 severance package for people who are normally fired.  It
25 means normally without cause.

  

DEFENDANT'S
EXHIBIT
FOR IDENTIFICATION
DATE

## P&G Worldwide Business Conduct Manual
### Receipt Confirmation

**Instructions**: Please complete this form and return it to your immediate manager, who will place it in your personnel file.

*I have received a copy of the P&G Worldwide Business Conduct Manual. I am also confirming my intent to read the Manual and to comply with the Standards therein.*

PREDRAG   CICVARA

Employee Name (please print)

Employee Signature

12/12/2005

Date

**Manager's Note:** To ensure that every P&G employee has received a copy of the Worldwide Business Conduct Manual, please place this signed Receipt Confirmation Form in the employee's personnel file.

© 2004 P&G

 PG000104



Confidential

---



## Worldwide Business Conduct Manual
## Table of Contents

| | |
|---|---|
| Letter from the CEO | 1 |
| 1. Hierarchy of Company Ethics Principles | 3 |
| 2. General Information | 5 |
| 3. General Business Ethics | 9 |
| 4. General Compliance With Legal Requirements | 11 |
| 5. Accuracy of Company Books and Records | 13 |
| Books & Records | 14 |
| Disclosure Controls | 15 |
| Internal Controls | 16 |
| 6. Behavior in the Workplace | 17 |
| Harassment/Discrimination | 18 |
| Workplace Violence | 19 |
| Substance Abuse | 19 |
| 7. Bribery and Improper Business Dealings | 21 |
| Commercial Bribery | 22 |
| Improper Payments to Government Officials | 23 |
| Money Laundering and Product Diversion Avoidance | 23 |
| 8. Confidentiality | 26 |
| 9. Conflicts of Interest | 29 |
| Business, Financial and Personal Relationships | 30 |
| Improper Use of Company Assets | 32 |
| 10. Fair Dealing and Fair Competition | 33 |
| Treating Customers Appropriately | 34 |
| Treating Suppliers Appropriately | 35 |
| Advertising and Promoting to Consumers Appropriately | 36 |
| Treating Competitors Appropriately | 37 |
| Fair Competition | 37 |
| 11. Lobbying | 39 |
| 12. Privacy | 41 |
| 13. Safety, Health and Environmental | 45 |
| Product Safety | 46 |
| Employee Safety | 47 |
| Environmental Quality | 47 |
| 14. Trading in Securities | 49 |
| 15. AlertLine | 51 |
| 16. Special Legal Issues | 53 |
| Boycotts | 54 |
| Customs | 54 |
| Export Restrictions | 55 |
| Government Contracts | 55 |
| Restricted Countries | 55 |
| Summary of References | 57 |



Dear Fellow Employees:

Over the last several months, we took a close look at our Worldwide Business Conduct Manual to ensure it was relevant and up-to-date for every part of our Company. Our previous Manual was issued in 1995, and a lot has happened since then. We transitioned to a new structure under Organization 2005, expanded to new geographies, redefined our portfolio of businesses and established a direction and business plan to make sure P&G becomes the best it can be, while ensuring we maintain and reinforce our core Purpose, Values and Principles. And, of course, the world around us has changed.

With these changes and evolution, it was clear that we needed to update our Manual. We wanted to make sure its language is clear and relevant, and that its contents are applicable to all of us, everywhere in the Company. In other words, to ensure it is truly an up-to-date, worldwide Manual.

This Manual flows from our PVPs. In the first page of the Manual you will see that our PVPs are the umbrella for critical policy areas, which in turn create specific standards and guidelines. We expect that, with this Manual, you will be able to make easier connections to relevant policies and the tools that support them.

P&G has been built through the character of its people through generations. That character is reflected in our Purpose, Values and Principles, and in how well we live them as individuals and as a Company. It is consistent with our historic principle of doing the right thing. Integrity, trust and respect for others have been fundamental P&G values since the Company was founded in 1837. Our continued success depends on each of us doing our part to uphold these values in our day-to-day work and in all decisions we make.

This Manual appears both in hard copy as well as on-line at wwbcm.pg.com. At this website, you now have access to a variety of on-line tools, links and references that provide additional perspective on many of the policies in this Manual. This includes quizzes, Q&A's, and on-line training you can take at your own pace. The on-line version will also be the primary vehicle for sharing minor updates.

P&G competes vigorously to achieve business success, but it is vital for employees to understand the Company is concerned not only with results, but with how those results are achieved. We will not tolerate activities to achieve results through illegal or unethical dealings anywhere in the world.

1

PG000330



In P&G, we live our values and have been able to create a climate of trust and cooperation across generations, cultures and geographies. That is the spirit that we must maintain. It is important to remind ourselves that this Manual deals with those potentially delicate situations and areas where we must ensure we have consistent understanding and application anywhere in the world. The Manual defines the boundaries of our conduct.

It is important to emphasize that every employee is responsible for his or her own conduct. It is not acceptable to try to justify our conduct because "others are doing it" or "my manager told me to do it." We are all responsible for our own actions and each of us is responsible for learning and understanding the policies and standards that apply to us and our actions.

If you have any questions about any P&G policy, or if you have any questions about the lawfulness or appropriateness of your activities, those of other employees, or those of any P&G operation, you should discuss them with your management, your P&G legal counsel, or the appropriate Human Resources Manager. If you wish, you may also report concerns anonymously through the AlertLine referenced in this Manual. We are committed to ensuring an environment that fosters open communication and encourages employees to report known or suspected violations. All Company managers are responsible for creating such an environment and role-modeling integrity and trust at all levels. Retaliation of any kind will not be tolerated.

Please review the Worldwide Business Conduct Manual carefully and keep it handy for consultation. Of course, it is particularly important that new generations of employees are acquainted with this Manual and receive guidance from their manager as they become familiar with our standards and practices. As we continue to grow in an ever more complex global world, this Manual, and the on-line tools we are making available, are an additional source of support in maintaining our Company's integrity and character.

Thanks to all of you for making P&G a Company of great results and, equally important, of great character.



A. G. Lafley

PG000331

## 1. Hierarchy of Company Ethics Principles

PVP, Corporate Policies, Worldwide Business Conduct Standards, Operating Policies/Procedures/Practices
Definitions & Relationships to Each Other



Implementing Systems & Internal Controls

Definition:
Tools and processes to carry-out and monitor the
consistent implementation of standards, policies
and procedures.

Examples:
- Global Expense Reporting Form and process
- Work and Development Plan process
- Control Self Assessment (CSAs)



Confidential





## 2. General Information

Confidential



## What is the "Worldwide Business Conduct Manual"?

The Worldwide Business Conduct Manual (the "Manual") describes the Company's Worldwide Business Conduct Standards. These standards flow from the following core values of the Company:

- treat the Company's assets as you would treat your own;
- behave with the Company's long-term success in mind;
- always do the right thing; and
- operate within the letter and spirit of the law.

The Manual also provides non-exclusive examples of specific issues that give rise to business conduct considerations.

The portions of this Manual identified as "Worldwide Business Conduct Standards (What do I need to do or refrain from doing?)" are the Company's "code of ethics" for all Company employees, and also for the non-employee members of the Board of Directors of the Company in the course of their activities on behalf of or in connection with the Company. Accordingly, any reference to "employee" in this Manual includes the non-employee members of the Board of Directors of the Company acting in this capacity.

This Manual and the Company's Worldwide Business Conduct Standards are maintained, overseen, governed and interpreted by the Company's Ethics Committee, which currently consists of the Company's Global Human Resources Officer, Chief Financial Officer and Chief Legal Officer.



## Where do these standards apply?

The Worldwide Business Conduct Standards contained in this Manual apply to all parent company and subsidiary company employees worldwide. No one at any level of the Company has the authority to require or permit you to violate any of the Business Conduct Standards contained in this Manual unless an exception is granted by the Ethics Committee as outlined in the section of this Manual entitled "Can I get an exception to the Worldwide Business Conduct Standards?"

As used in this Manual, "Company" means The Procter & Gamble Company and all of its controlled subsidiaries. A controlled subsidiary is a subsidiary or other entity in which P&G owns, directly or indirectly, more than 50 percent of the voting rights, or in which the power to control the entity is possessed by or on behalf of P&G. Employees serving as directors or in equivalent positions of non-controlled subsidiaries in which P&G holds an ownership interest should, to the extent possible, encourage such entities to adopt and follow corresponding Worldwide Business Conduct Standards.

## General Worldwide Business Conduct Standards (What do I need to do or refrain from doing?)

Compliance with Worldwide Business Conduct Standards

- Do understand the Company Worldwide Business Conduct Standards contained in this Manual as they apply to your work for the Company.
- Do comply with all Company Worldwide Business Conduct Standards contained in this Manual that apply to your work for the Company.

Notification/Cooperation

- Do notify the Company if you believe a violation of law or Company Worldwide Business Conduct Standards has occurred in the course of the Company's business, whether the violation was by a full-time employee, part-time employee, contractor, consultant, or member of the Company's Board of Directors. How to report a potential violation is outlined on page 7 of this Manual.
- Do fully and honestly cooperate in the investigation of any alleged violation of the Company's Worldwide Business Conduct Standards.
- Don't conceal a violation of the law or this Manual, or alter or destroy evidence for the purpose of preventing or hindering an investigation.

6

Confidential



**Specific Requirements for Managers**

If you are a manager, in addition to the compliance, notification and cooperation obligations described above, do:

- Inform and train those reporting to you about the laws and Company Worldwide Business Conduct Standards applicable to their work;

- take proactive steps to prevent violations of laws and Company Worldwide Business Conduct Standards;

- use diligent efforts to detect and investigate any reported violations of laws and Company Worldwide Business Conduct Standards;

- take appropriate corrective actions to address violations of applicable legal requirements and/or Company Worldwide Business Conduct Standards; and

- ensure that any employee who reports a suspected violation of law or Company Worldwide Business Conduct Standards by others is protected from any form of retaliation for doing so.

**Are there penalties if I fail to comply?**

**Company Penalties**

Doing any of the following will subject you to appropriate discipline, up to and including termination.

- Violating the law or Company Worldwide Business Conduct Standards, or acting against legal advice from appropriate Company Legal personnel, in connection with your Company business activities.

- Intentionally withholding information about another person's violation of law or Company Worldwide Business Conduct Standards in connection with Company business activities.

- Threatening or engaging in retaliation against an employee who reports a suspected violation of law or Company Worldwide Business Conduct Standards by others in connection with Company business activities.

**Other Penalties**

- Violating the law may expose you (and the Company) to substantial criminal fines, prison terms and/or civil damages. For example, if you knowingly make a written or oral false statement to an employee of the United States government, you personally can be imprisoned for up to five years and fined up to US $250,000.00. The Company may not be able or willing to represent you in any criminal investigation or to protect you from these penalties.

**How do I report violations?**

Report potential violations of applicable legal requirements or Company Worldwide Business Conduct Standards in connection with Company business activities to any of the following people:

- your manager or a higher-level manager in your management chain;

- appropriate Finance & Accounting personnel;

- appropriate Internal Controls personnel;

- appropriate Human Resources personnel;

- the appropriate lawyer in the Company's Legal Division;

- appropriate Corporate Security personnel;

- the Secretary of The Procter & Gamble Company; or

- the Ethics Committee.

If you prefer, you can report potential violations anonymously by contacting the AlertLine through one of the methods described on page 51. Although potential violations involving members of the Board of Directors or executive officers can be reported through any of the means listed above, potential violations involving these individuals should be reported directly to the Secretary of The Procter & Gamble Company. See the Summary of Resources section of this Manual for information on how to contact the Ethics Committee or the Secretary of The Procter & Gamble Company.

Respect for all individuals is a fundamental principle underlying all of our actions. This includes the responsibility every manager has to create an environment that allows employees to report known or suspected violations without fear of retaliation. Any form of retaliation or intimidation is contrary to our PVPs, to the principle of respect for all individuals, and to our core values of integrity and trust. Any such behavior could result in liability for the manager and the Company.

**Can I get an exception to the Worldwide Business Conduct Standards?**

In some circumstances, certain standards in this Worldwide Business Conduct Manual may be waived. For example, it might be possible to get permission to share confidential information with persons not normally permitted to have access to it. However, many of the standards in this Manual cannot be waived for any reason. Unless an alternate means of waiver is specified in this Manual, only the Company's Ethics Committee may grant you a waiver from acting in accordance with this Manual.

7

PG000336



**Are there any other rules I need to follow?**

Yes, there are other Company policies and procedures that provide specific, detailed requirements that may be mandatory. Violations of these policies/procedures will subject a person to appropriate discipline; however, violation of such policies and procedures is not necessarily a violation of the Company's Worldwide Business Conduct Standards. For more information about many of these other Company policies and procedures, see the references and links which can be found at wwbcm.pg.com, or contact any appropriate Human Resources personnel.

**What are my rights under this Manual?**

This Manual is a statement of your business conduct obligations as an employee or director of the Company. This Manual does not create any rights for you as an employee or director, contractual or otherwise, and it does not limit or alter in any way any other obligations you may have as an employee or director. Any employee who comes forward to report a suspected violation will not be retaliated against.

**Where can I find out more?**

You can review the detailed policies that are referred to and support this Manual at wwbcm.pg.com. If you still have questions, you can contact any appropriate Human Resources personnel. However, final interpretations of the standards contained in this Manual can only be made by the Ethics Committee.

**What if I think this Manual needs to be revised or updated?**

You can contact the Ethics Committee through appropriate Company Legal or Human Resources personnel, by direct contact with one of the Ethics Committee members, or through the methods described in the Summary of References portion of this Manual.







## 3. General Business Ethics

9

Confidential



**Summary of Company policy statement**

The core of the Company's business ethic is "doing the right thing." In addition to complying with any applicable legal requirements and the requirements described elsewhere in this Manual, you should ask the following questions in making decisions:

* Is my action the "right thing to do?"
* Would I feel comfortable if my action were reported broadly in the news, or were reported to a person whose principles I respect?
* Will my action protect the Company's reputation as an ethical company?
* Am I being truthful and honest?

If the answer to any of these questions about the action you are considering is not an unqualified "Yes," then simply do not take the action.

**Selected operating policies/procedures/practices**

* P&G Purpose, Values, and Principles (pvp.pg.com)



10





### 4. General Compliance with Legal Requirements

Confidential



**Summary of Company policy statement**

The Company, and you as an employee, are subject to a wide variety of legal requirements as you conduct your work for the Company. We operate within the letter and spirit of the law.

**What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)**

* Do obey all applicable legal requirements at all times.
* Do understand what legal requirements apply to your work by using appropriate resources, including appropriate Company Legal personnel. Although many key legal principles are reflected in this Worldwide Business Conduct Manual, not all legal requirements are described in this Manual.
* If there are conflicting legal requirements in different jurisdictions, do consult with, and follow the direction of appropriate Company Legal personnel.
* Do follow legal advice from appropriate Company Legal personnel.
* Do address and resolve, in a timely manner, any legal compliance issues that have been identified.

*No one at any level of the Company has the authority to require or permit you to violate the law.*

If someone attempts to do so, do report the situation as described in the "How Do I Report Violations?" topic in the "General Information" section of this Manual.

**Selected operating policies/procedures/practices**

See page 53 of this Manual for several areas that raise special legal issues apart from the other business conduct principles outlined in this Manual.



12





5. Accuracy of Company Books & Records

Confidential



## Books & Records

### Summary of Company policy statement

There is no place within the Company for an intentionally false document or record. The Company must have adequate assurance that the information in books and records, including its financial and other business records as well as personnel and benefit-related forms that employees may fill out, is accurate, timely and complete.

**What are some situations that raise concerns?**

- In order to meet sales targets, an employee arranges to advance ship goods, without an explicit request from the customer.

- An employee enters into transactions to manage budget delivery. For example, prepaying next year's costs and charging it to a current year budget—or accruing costs without appropriate documentation—to avoid under-spending. Or, alternatively, an employee defers recognizing a legitimate expense because of budget limitations. For example, at the end of June, in a fiscal year where budgets are very tight, an employee asks a supplier to bill the Company a few days late for a purchase in order to record the purchase in the next fiscal year.

- A plant employee is responsible for making a certain quality check and recording the results every hour. Because the quality check is usually okay, the employee enters the next four entries on the log ahead of time, just to save time.

- An employee completes a benefit form to attempt to obtain Company benefits for a dependent that does not meet the requirements for eligibility.

- An employee asks an agency or consultant to purchase an item for the Company that the Company would not normally authorize for purchase then disguises the purchase by including the cost in the overall bill/payment for agency or consulting services.

- A sales employee records customer visits that s/he usually makes, but failed to actually visit on a particular day.

- Because there are no funds available in the "capital" budget, an employee asks a vendor to spread the cost of an expensive piece of office equipment across two invoices in order to get below the "capital" threshold.



14

Confidential



**What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)**

- If you are responsible for recording any transactions or events into Company records, don't intentionally delay them, or intentionally record incorrect, incomplete or misleading information about any transaction or event.

- If you do not directly record transactions or events, do provide timely, accurate and complete information to those who record them.

**Selected operating policies/procedures/practices**

- Company SAFE
  (Standards for Accounting and Financial Excellence)

## Disclosure Controls

### Summary of Company policy statement

Disclosure controls are systems and processes that help ensure that important information is made available to the right people at the right time. The Company requires every area of the business to maintain disclosure controls to provide adequate assurance that significant information is reported to the appropriate levels of the Company—so that the appropriate business steps can be taken to address any issues, and so that the Company can consider whether the information should be disclosed externally.

### What are some situations that raise concerns?

- A key customer is facing financial difficulties and possible bankruptcy that could affect the Company's future sales or the collectability of amounts the customer owes the Company.

- Safety issues have been raised about one of the Company's products.

- A sole supplier of a critical raw material for one of the Company's key products is considering breaching, canceling or not renewing its contract with the Company.

- A non-frivolous lawsuit has been filed against the Company claiming significant damages.

- The Company has entered into an unusual, significant new arrangement (e.g., derivative, supply arrangement, off-balance-sheet financing).

- Anticipated profit, sales or volume numbers for an area of the business are expected to be significantly different than what is reflected in the Company forecast.

**What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)**

- Do ensure that important information has been reported to the F&A Comptroller/Finance Manager for the business unit that will be impacted.

- If there are questions about the accounting or financial reporting for an item, do contact the F&A Comptroller/ Finance Manager for the business unit or Regional Corporate Accounting for assistance.

**Selected operating policies/procedures/practices**

- Company SAFE
  (Standards for Accounting and Financial Excellence)



15

Confidential

## Internal Controls

### Summary of Company policy statement

Internal Controls are systems and processes that combine policies, authorizations and procedures with proper accounting and management tracking. This reporting is designed to ensure that business operations are properly managed. The Company will have in place a set of internal controls that provides reasonable assurance that:

- Transactions are properly authorized and accurately recorded based on Company polices and procedures;
- Company assets are adequately safeguarded;
- Financial and management reporting is reliable and accurate, and reflects actual business activity;
- Activities comply with applicable legal requirements; and
- Business operations are effective and efficient.

Creating and complying with strong and effective internal control systems is, ultimately, the responsibility of each employee with respect to his/her areas of operation.

### What are some situations that raise concerns?

- The same person is responsible for approving and reviewing certain payments.
- A person without proper decision authority is authorizing transactions, or a person without proper signing authority is signing contracts.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

- Do regularly assess your systems and processes for weaknesses, and make or suggest corrections to them if a significant weakness is identified.
- Do familiarize yourself with the internal controls processes applicable to your work.
- Do cooperate fully with Company Internal Controls personnel, as well as with the Company's independent auditors.

### Selected operating policies/procedures/practices

- auditnet.pg.com
- Company SAFE
  (Standards for Accounting and Financial Excellence)



16

PG000345



## 6. Behavior in the Workplace



Confidential                                                          PG000346



## Harassment/Discrimination

### Summary of Company policy statement

The Company's fundamental position is that all employees should treat their colleagues with respect. The Company will not engage, or authorize its employees to engage, in discrimination or harassment. Any form of retaliation against an employee who reports known or suspected discrimination or harassment is prohibited. Generally, discrimination is treating a person more or less favorably with respect to his/her employment (including recruiting, hiring, training, salary and promotion) than you otherwise would because of his/her race, gender, color, religion, national origin, age, sexual orientation, gender identity and expression, disability, or other non-job-related personal characteristic. Generally, harassment is any behavior related to a person's race, gender, color, religion, national origin, age, sexual orientation, gender identity and expression, disability or any other non-job-related personal characteristic that creates an intimidating, hostile or offensive work environment or unreasonably interferes with an with an employee's work performance.



Harassment may occur in many forms, including offensive remarks, unwelcome sexual advances, jokes and other verbal, graphic or physical conduct that creates an intimidating, hostile or offensive work environment.

### What are some situations that raise concerns?

- A person is denied a promotion because of his or her age, race, gender, or other non-job-related personal characteristic.
- A woman is made uncomfortable when subjected to sexually offensive jokes and/or comments by her male co-workers (possible harassment).
- An employee implies that she will provide positive performance feedback for her team leader if he will go out on a date with her.
- A manager withholds a pay increase from an employee he suspects made a claim of harassment against him.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

- **Don't engage in discrimination or harassment.**
- Do report immediately if you feel you are being harassed or discriminated against.
- Do report immediately if you know or suspect that others are being harassed or discriminated against.

**Selected operating policies/procedures/practices**

Appropriate Human Resources personnel.

15

Confidential

## Workplace Violence

### Summary of Company policy statement

Workplace violence means threats or acts of violence by Company employees against others, or against Company or third party property, that they come in contact with in their roles as employees. The Company does not permit workplace violence.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

• Don't engage in workplace violence of any type (including threats).

• Don't bring weapons onto Company property.

• Do immediately report if you suspect that workplace violence may occur.

• If you are a manager and possible workplace violence is reported to you, do take steps, first (with the help of appropriate Company Corporate Security personnel) to protect the people or property that were threatened and, then, to ensure the allegation is investigated and, if it is found to be substantiated, to ensure the behavior is addressed.

### Selected operating policies/procedures/practices

• Workplace Violence – Operating Guidelines and Procedures

## Substance Abuse

### Summary of Company policy statement

The Company does not tolerate the use of alcohol or drugs, while a person is working or not, in a way that can adversely affect the safe and successful conduct of Company business.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

• Don't possess illegal drugs, or any drugs you do not have the legal right to possess, while on Company property or while working.

• Don't work while under the influence of alcohol, illegal drugs or legal drugs used in an illegal manner.

• Don't engage in the sale or distribution of illegal drugs, or legal drugs in an illegal manner, on or off Company property, whether you are working or not.

• Don't engage in off-work use of alcohol or drugs in a way that adversely affects your ability to perform your job.

• Do disclose to your manager or appropriate Company medical personnel if you are taking any substance that will adversely affect your ability to perform your job, even if you are using the substance legally (i.e., certain drugs, even when used legally, can impair your ability to drive or operate heavy machinery).

### Selected operating policies/procedures/practices

• Employee Assistance Program

• For information, see your Human Resources site Health Services resources.



19



Confidential



### 7. Bribery and Improper Business Dealings



 PG000350



## Commercial Bribery

### Summary of Company policy statement

The Company does not engage in commercial bribery. Commercial bribery is giving to, or receiving from, Company customers or suppliers (or their representatives), any personal payments, bribes or kickbacks with the expectation or effect of obtaining more favorable business terms or opportunities than would otherwise be available.

### What are some situations that raise concerns?

- An employee is asked to pay a commission that seems large in relation to the services provided.
- An agent approaches a Company employee and explains that the agent has a "special relationship" with a certain customer or supplier and can arrange for the Company to receive preferential terms if the Company pays a fee to the agent.
- A customer's inventory manager offers a Company employee distribution exclusivity for a product category in return for a fee paid to that inventory manager.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

Don't engage in commercial bribery of any kind.

*Note: Receiving a bribe, such as an expensive gift from a potential supplier, is also prohibited, as described in the "Conflict of Interest" section of this Manual.*

### Selected operating policies/procedures/practices

- P&G Purpose, Values, and Principles (pvp.pg.com)
- Appropriate Company Legal personnel



22

Confidential



## Improper Payments to Government Officials

### Summary of Company policy statement

The Company prohibits improper payments to government officials. Improper payments are direct or indirect payments, whether in cash or in other things of value (such as lavish entertainment), to a government official or political party in order to influence acts or decisions, to receive special treatment or personal gain, or to obtain or retain business. While certain minor payments to certain non-U.S. government officials made to expedite or secure the performance of certain routine government actions may not violate the law, you must obtain the approval of the Legal Division prior to making such payments and any payments must be reported to appropriate Company Tax personnel. All employees must abide by the U.S. Foreign Corrupt Practices Act, as well as local laws concerning bribery.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

- Don't make improper payments to government officials, do consult with the Legal Division regarding the propriety of payments, and do report any such payments to appropriate Company Tax personnel.
- Don't enter into any transaction where there is suspicion that third parties are making improper payments to government officials for an improper purpose.

### Selected operating policies/procedures/practices

- P&G Purpose, Values, and Principles (pvp.pg.com)
- Appropriate Company Legal personnel

## Money Laundering and Product Diversion Avoidance

### Summary of Company policy statement

Money laundering is an attempt by individuals or organizations to hide the proceeds of their crimes or to make those proceeds look legitimate. Diversion occurs when products sold by the Company are distributed into markets or sold to customers other than originally intended in violation of a contract, law or regulation. The Company forbids knowingly engaging in transactions that facilitate money laundering or result in unlawful diversion.

### What are some situations that raise concerns?

Certain types of activity should trigger consideration of whether the Company is being used to help launder money or divert products:

- Orders or purchases that are inconsistent with a customer's normal business;
- Requests to make or accept payments in cash;
- Unusually complex deal structures;
- Deal or payment structures that appear to have no reasonable relationship to the underlying business transaction;
- Unusually favorable payment terms;
- Requests to make payments to, or accept payments from, third parties;
- Requests to make payments to, or accept payments from, a country where the entity with which you are dealing does not do business;
- Excessive customer focus on shipment and title transfer terms for cross-border transactions; or
- Requests to ship product to a country different from the country where the related customer payments originate,

23

Confidential



PG000352

**What are the Worldwide Business Conduct Standards?**
**(What do I need to do or refrain from doing?)**

• Do make payments for goods and services provided to the Company only by Company check, draft, credit card, or other approved and documented transfer. These payments should be payable to the person or entity legally entitled to receive payment, unless an exception is approved in advance by appropriate Company Tax and Legal personnel.

• Don't make payment to a person or entity in a country other than the country in which the person or entity resides or does business, or has delivered the goods or provided the services, unless appropriate Company Tax and Legal personnel have determined in advance that such a payment will not violate applicable legal requirements.

• Do conduct business only with customers that are willing to provide you with the information necessary for you to determine they are engaged in legitimate business activities and are using funds derived from legitimate sources.

• Don't accept third party checks for payment. Sales should be collected in checks, electronic transfers or money orders indicating the customer as the payer. The use of cash should be kept to a minimum, with a mitigating circumstance being the absence of a safe, secure local banking system.

• Don't ship customer orders in a manner inconsistent with standard procedures unless an exception is approved in advance by appropriate Company Tax and Legal personnel.

**Selected operating policies/procedures/practices**

• Company SAFE
  (Standards for Accounting and Financial Excellence)

• Policy and Procedures for the Prevention of Diversion

• Appropriate Company Legal personnel



24

Confidential





## 8. Confidentiality

Confidential

PG000354



**Summary of Company policy statement**

The Company requires you to keep the Company's confidential information confidential. Confidential information means:

- non-public information known to you as a result of your position with the Company that might be of use to competitors or harmful to the Company if disclosed; and
- non-public and personally identifiable information you obtain from other employees, customers or consumers.

If you have a legal obligation with respect to confidential information from a former employer when you join the Company, the Company expects you to not use or disclose that information in the course of your work for the Company. Similarly, the Company expects that departing employees will not disclose the Company's confidential information after they leave the Company.

You should not put yourself in situations where you could accidentally disclose confidential information, such as reading or discussing confidential information in public places or leaving important information, computers, etc. unattended.

*Note: There are special rules that apply to certain types of information received from employees, customers, suppliers and consumers. You should see the "Privacy" and "Fair Dealing and Fair Competition" sections of this Manual for those rules.*

**What are some situations that raise concerns?**

- In order to get important work done, an employee discusses confidential information on a cell phone while in a restaurant.
- While using a laptop on an airplane, an employee allows confidential information to be visible to those sitting around him/her.
- An employee accepts a job with a Company competitor, and then advises the competitor not to pursue a research project similar to one s/he was involved with at the Company that turned out to be a "dead end."
- An employee discusses Company trade secrets at an industry conference.
- An employee discusses confidential information with a neighbor.
- An employee aware of confidential Company plans for an acquisition or divestiture shares those plans with an individual who does not have a need to know those plans.



26

Confidential

**What are the Worldwide Business Conduct Standards?**
**(What do I need to do or refrain from doing?)**

- Unless you are legally required to disclose certain information, don't knowingly disclose significant confidential information to anyone (other than Company employees or third parties who have a legitimate, need-to-know, basis for knowing the information in order to further the Company's business interests) who does not have a clear duty or obligation to keep the information confidential (for example, a person who has signed a "Confidential Disclosure Agreement," or CDA, with the Company).

- If you believe you have a legitimate need to disclose confidential information to someone who does not have a clear duty or obligation to keep the information confidential, do make a request for a waiver in advance to your manager. Your manager will make a determination on your request after he or she consults with appropriate Company Corporate Security and Legal personnel and possibly other appropriate functions.

- If you have a legal obligation with respect to confidential information from a former employer when you join the Company, don't use or disclose that information in the course of your work for the Company.

**Selected operating policies/procedures/practices**

- Company Information Security Program (security.pg.com)



PG000356



Confidential





## 9. Conflicts of Interest

Confidential



## Business, Financial and Personal Relationships

### Summary of Company policy statement

All employees are obligated to act at all times solely in the best interests of the Company. A conflict of interest arises when you have a personal relationship or financial or other interest that could interfere with this obligation, or when you use your position with the Company for personal gain. The Company requires that you disclose all potential conflicts of interest and that you promptly take actions to eliminate the conflict when the Company requests you to do so.

### What are some situations that raise concerns?

* When an employee or a member of his/her household or immediate family, has a significant financial or other interest in a person or company that competes with the Company (small investments, such as minor stock ownership that is part of a mutual fund or other pooled investment vehicle where the employee does not make the investment decisions, are not normally considered "significant").

* When a member of an employee's household or immediate family is a supplier or customer, or an employee of a supplier or customer, of the Company; or when an employee or a member of his/her household or immediate family has a significant financial interest in a supplier or customer of the Company.

* When a member of an employee's household or immediate family competes with the Company or is employed by a person or company that competes with the Company.

* When a member of an employee's immediate family is an employee of the Company, and the employee is in a position to influence employment decisions concerning that family member.

* When an employee has a romantic relationship with another employee who is in a direct or indirect reporting relationship with him/her.

* When an employee has a romantic relationship with a current or potential supplier, contractor or customer (or an employee of any such entity) when the Company employee has direct or indirect decision-making authority or influence with respect to the underlying business relationship.

* When an employee receives significant gifts or other significant consideration as a result of his/her position with the Company (apart from approved compensation paid by the Company). The terms "significant" and "significant consideration" refer to items that are major enough that they could create the impression or expectation (perceived, or otherwise) that the giver will be rewarded with business, favoritism, or some other obligation from the employee or the Company.



30



What are some situations that raise concerns? (cont'd)

- Business Meals that are minor in terms of the overall relationship with the giver are generally not considered "significant," but the Company should pay for the meal expenses on a relatively equal number of occasions. As an example, a reception/dinner following attendance at a trade event may be accepted.

- Token Gifts that are minor in terms of the overall relationship with the giver are generally not considered "significant." Examples of these gifts may be t-shirts, inexpensive pens, mugs, cups, calendars, etc.

- Expensive Gifts, by their nature, are considered "significant" and generally should not be accepted, except when it would be embarrassing or impolite to decline the gift. In these situations, the gift should be accepted on behalf of the Company and turned over for Company use.

- Event Tickets that are generally available to the public are generally not considered "significant." This includes private box access to events where general admission access is available to the public. Employees may accept these gifts but must reimburse the giving party for the face value of the ticket. If the gift is an access ticket with no indicated face value, reimbursement should be based upon the fair market value of the ticket. Employees should consult the Ethics Committee if there is any uncertainty regarding the status of any Event Tickets they have been offered.

- Elite Event Tickets refers to the relatively small handful of elite events where tickets are not realistically accessible to members of the general public or are available only at a very high premium over face value. Examples may include, but are not limited to: The Olympics, World Cup championship matches, the Super Bowl, The World Series, Wimbledon tennis, The Masters Golf Tournament, league championship matches of top professional soccer leagues, and awards shows such as The Oscars and The Grammys. These Elite Event Tickets will be considered "significant consideration" in almost all cases. However, the Company recognizes that there may be rare circumstances where an employee's attendance at one of these elite events can provide significant benefits to the Company. Therefore, employees may petition the Ethics Committee for permission to accept these gifts at the invitation of a person or entity with whom the Company has a business relationship. If the Ethics Committee approves the employee's attendance, the Company will pay the costs of the employee's attendance to avoid the impression or expectation (perceived, or

otherwise) that the giver will be rewarded with business, favoritism, or some other obligation from the employee or the Company. Employees should consult the Ethics Committee if there is any uncertainty regarding the status of any tickets (Event Tickets or Elite Event Tickets) they have been offered.

• When an employee is a director or officer of another company. This does not apply to positions with trade associations that an employee accepts at the request of the Company, or positions with non-profit charitable or religious organizations that do not interfere with an employee's work for the Company.

• When a member of the Board of Directors of the Company is a director or officer of another company in violation of the provisions of the Company's Corporate Governance Guidelines.

• When an employee has an outside business or other interest that diverts significant time or attention from his/her work for the Company, or that involves ideas or opportunities that the employee became aware of as an employee of the Company or that the employee developed as part of his or her employment with the Company.

• When an employee is involved in or closely related to the purchase of a commodity for the Company and s/he trades in that commodity for his/her personal account.

• When an employee is involved with an outside business that engages in business transactions with the Company.

What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

• If you find yourself in one of the situations described in the examples above, or if there is another significant issue that might give the appearance of interfering with your obligation to act solely in the best interests of the Company, do disclose the potential conflict as described below. Many of these potential conflicts can be resolved.

• If you become aware of a potential conflict of interest with respect to another employee or member of the Board of Directors, do report the potential conflict as described below.

- If you have a potential conflict, report it to your manager (or, if you are a principal officer appointed by the Company's Board of Directors, or a member of the Board of Directors of the Company, to the Secretary of The Procter & Gamble Company). Reporting forms are available on-line at wwbcm.pg.com or through appropriate Human Resources personnel.

31

- If you believe another employee (other than a principal officer appointed by the Board of Directors of the Company) has a potential conflict, report it to the employee's manager, your manager, or through the Company's AlertLine as described in the Summary of References section of this Manual.
- If you believe a principal officer appointed by the Company's Board of Directors, or a member of the Board of Directors of the Company, has a potential conflict, report it to the Secretary of The Procter & Gamble Company or through the Company's AlertLine, each as described in the Summary of References portion of this Manual.
- If an employee has reported a potential conflict to you, report it to the appropriate Company Legal personnel.

Once a potential conflict is reported, the Company (or the Board of Directors of the Company for principal officers and members of the Board of Directors of the Company) will determine whether the conflict is material and, if so, whether remedial actions will be taken or whether the conflict will be waived.

- Don't fail to take remedial actions concerning a conflict of interest when requested to do so by the Company.

Selected operating policies/procedures/practices

- P&G Purpose, Values, and Principles (pvp.pg.com)

## Improper Use of Company Assets

### Summary of Company policy statement

The Company does not permit improper use of Company assets. Improper use occurs when you use Company property or information for personal gain or advantage, or for the advantage of others outside the Company, such as friends or family members. Improper use also occurs when Company property or technology is used for more than limited or incidental personal use or used in violation of other Company policies.

**What are some situations that raise concerns?**

- An employee takes samples of Company products home without a valid business purpose.
- An employee uses his/her Company credit card for personal items (except in situations where it would be difficult to avoid, such as ordering a movie in a hotel room while on a business trip, when the movie is automatically charged to the room—in such cases the individual should reimburse the Company for the personal expenses).
- An employee uses Company equipment (such as telephones, computers, copiers, fax machines or personal digital assistants) or office supplies for more than limited or incidental personal use.
- When an employee uses Company information to trade in securities or advise others to trade in securities as described in the "Trading in Securities" section of this Manual.

**What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)**

- Don't use Company property or information for non-business purposes, except for limited or incidental personal use.
- Do reimburse the Company if you have made personal charges on your Company credit card.

Selected operating policies/procedures/practices

- Business Travel Policy – Corporate Charge Card







10. Fair Dealing and Fair Competition



## Treating Customers Appropriately

### Summary of Company policy statement

The Company treats all customers equitably and does not give any customer an unfair advantage over another competing customer. The Company does not discriminate by customer size, type, channel, or business strategy.

### What are some situations that raise concerns?

* An employee applies pressure to secure a customer's agreement to resell a Company product only at a specified resale price or within a specified price range.
* An employee terminates sales to a customer because other customers have complained about its resale pricing.
* An employee provides marketing incentives to a customer, but not to a similarly-situated competitor of that customer.



### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

* Do give competing customers within a given market equal opportunities to qualify for the same prices, terms of sale or trade promotions.
* Don't give special items (i.e., event tickets) to a customer, unless the customer is chosen to receive the item through a process that provided an equal opportunity to all competing customers within the customer's market.
* Don't pressure or agree with a customer about specific prices that the customer will charge for Company products.
* Don't terminate a relationship with a customer based on discussions or agreements with any other customer.
* Don't restrict customers to selling Company products only to certain people or entities, or only in certain geographies, without the approval of appropriate Company Legal personnel.
* Don't enter into agreements that prohibit a customer from purchasing products from a competitor of the Company, or that require a customer to purchase all or most of its requirements from the Company, without the approval of appropriate Company Legal personnel.
* Don't require a customer to purchase a less desirable Company product in order to be able to purchase a more desirable Company product without the advance approval of appropriate Company Legal personnel.
* Do ensure that all your category management recommendations are based on objective data and focused on the benefits of the Company's products, rather than the negatives of competitors' products.
* Don't strategize with a customer regarding specific pricing or promotion of private label products that compete with the Company's products.
* Don't share a customer's confidential business information with competitors of that customer.

### Selected operating policies/procedures/practices

* Company Customer Practices Guidelines

34

Confidential



## Treating Suppliers Appropriately

**Summary of Company policy statement**

The Company allows suppliers to compete equitably for the Company's business based on the total value offered to the Company by that supplier.

**What are some situations that raise concerns?**

- A supplier solicits an employee to consider the supplier for business and, because the employee knows the individuals representing that supplier socially, s/he decides to purchase from that supplier.
- An employee creates criteria for a supplier that can be met only by a particular supplier who has offered him/her sports tickets, expensive dinners, or unique outings.
- An employee expects suppliers to regularly contribute to a local charitable campaign in which s/he is heavily involved.
- An employee asks a supplier to match the price the Company is currently paying to another company for a good/service, and then shares confidential details of the current arrangement with the potential supplier.

**What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)**

- Do base your decisions regarding purchases of materials or services for the Company solely on the merits, on a total value basis, of the available offers.
- Don't make purchasing decisions on the basis of reciprocal deals (i.e., where a supplier promises to purchase certain Company products if the Company will purchase some of the supplier's products).

- Don't engage in transactions where the Company receives a price for goods from a supplier that you know to be better than the price charged to another competing purchaser without consulting with appropriate Company Legal personnel.
- If you make purchasing decisions for the Company, don't solicit any supplier or potential supplier on behalf of charitable, civic or other organizations. (Solicitations that would personally benefit you are prohibited as discussed under "Conflicts of Interest" above.)
- Don't share a supplier's confidential business information with the competitors of that supplier.

**Selected operating policies/procedures/practices**

Additional information can be obtained by contacting the Company's Vice-President, Corporate Purchases. For the name and contact information of the individual currently holding this position, please go to wwbcm.pg.com or contact appropriate Company Legal or Human Resources personnel.

35



PG000364



## Advertising and Promoting to Consumers Appropriately

**Summary of Company policy statement**

The Company does not permit its advertising or promotions for its products to be false or misleading.

**What are some situations that raise concerns?**

- Exaggerated or unsupported advertising claims are made to compete with a competitor that is doing the same.
- Incomplete, inadequate or misleading disclosures in Company advertising lead consumers to infer an incorrect unsupported conclusion.
- Advertising is distributed to the public before testing supporting the claims made in the advertising has been completed.

**What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)**

- Do tell the truth in Company advertising and promotions.
- Don't make a substantive claim about a Company product, or a competitor's product, or a comparison with a competitor's product, that has not been substantiated through objective product testing based on sound statistical and scientific principles.
- Don't run any advertisement or promotion that has not been reviewed by appropriate Company Legal personnel.

**Selected operating policies/procedures/practices**

Additional information can be obtained by contacting the offices of Manager, Global Advertising Development, by viewing the Guidelines for Approving Advertising, or by contacting appropriate Company Legal personnel.



36

PG000365



## Treating Competitors Appropriately

### Summary of Company policy statement

The Company's goal is to win consumers for its products by virtue of the products' quality and value, and not by creating unfair disadvantage for its competitors.

### What are some situations that raise concerns?

- An employee making a category management presentation to a customer recommends a new shelf space allocation and/or product distribution that is unsupported by reasonable marketplace data.
- An employee damages a competitor's products or advertising materials in a customer's store, or removes or obscures such products without appropriate direction from the customer's management to do so.
- An employee pressures a customer to disclose non-public information about competitor plans.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

- Don't sell Company products for less than the cost of producing them, except as approved by appropriate Company Legal personnel.
- Don't use Company relationships with customers to encourage them to treat competitors unfairly.
- Don't engage in conduct that is designed to damage competitors, rather than to legitimately build the Company's business for the ultimate benefit of consumers.
- Don't obtain a competitor's trade secrets or confidential information by theft, deception, misrepresentation, promises or threats, or when you have reason to suspect that such information has been obtained in one of these ways.
- Don't attempt to pass off Company products as the products of a competitor by simulating the competitor's packaging or brand names.

### Selected operating policies/procedures/practices

- Competitive Intelligence Net (cinet.internal.pg.com)

## Fair Competition

### Summary of Company policy statement

- The Company does not make any agreements or arrangements with competitors with the intention of diminishing vigorous and fair competition between them.
- The Company unilaterally and independently determines the prices and terms of sale for Company products and services.

### What are some situations that raise concerns?

- An employee engaged in category management meets with a competitor to develop a joint recommendation to the customer.
- An employee tacitly agrees with a competitor that the competitor will follow the Company's price changes and/or vice versa.
- An employee shares information with a competitor, either directly or through a trade association, that will "signal" the competitor about how much promotional activity both companies should engage in during the next quarter.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

- Don't meet directly with any employee of a competitor outside the auspices of a trade association unless the purpose and substance of the meeting has been approved by appropriate Company Legal personnel.
- Don't join a trade association (any organization where competitors may meet) unless your membership has been approved by appropriate Company Legal personnel.
- Don't engage in joint activity with a competitor unless the activity has been approved by appropriate Company Legal personnel.
- If a competitor is a supplier or customer, do take care that information you share with the competitor will not have the effect of reducing vigorous and fair competition between the competitor and the Company.
- Don't attempt to coordinate price changes with competitors.

### Selected operating policies/procedures/practices

- Appropriate Company Legal personnel
- Corppolicies.pg.com
- Company Customer Practices Guidelines

37

PG000366



Confidential

PG000367





**11. Lobbying**

Confidential



### Summary of Company policy statement

As a corporate citizen, the Company often takes a position on issues of public policy that could impact our business, and engages in efforts to affect legislation or government policy. The Company does not make, directly or indirectly, contributions of money or other things of value to any person or political party for the purpose of obtaining or retaining business.

### What are some situations that raise concerns?

- An employee is approached by a government official and advised that a payment to the official's campaign will result in favorable permit treatment with respect to a facility the Company is building.



### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

- Don't use Company funds to make a contribution to any political candidate or party without the express written permission of the Ethics Committee. (Corporate contributions to individuals or political parties are prohibited by law in a number of countries).

- Don't use any Company facilities, including conference facilities, office supplies, mail service, telephones, fax machines and computers, for political campaigning, political fundraising or partisan political purposes without the express written permission of the Ethics Committee.

- Don't assist any political candidate's campaign while you are on the job or on Company property unless authorized by the Ethics Committee.

- Don't contact a government official for the purpose of affecting legislation or government policy on behalf of the Company unless your efforts have first been reviewed with appropriate Company Government or External Relations personnel.

- Do ensure that any activities you undertake for the purpose of affecting legislation or government policy on behalf of the Company are reported to appropriate Company Tax personnel.

### Selected operating policies/procedures/practices

Additional information can be obtained by contacting the offices of: the Chief External Relations Officer; the Vice-President, National Government Relations; the Vice-President, State & Local Government Relations; or appropriate Company Legal personnel. For the name and contact information of the individual(s) currently holding the positions, please go to wwbcm.pg.com or contact appropriate Company Legal or Human Resources personnel.

40

Confidential





**12. Privacy**



**Summary of Company policy statement**

In the course of its business, the Company collects personally-identifiable information ("PII") from a variety of groups, including consumers, suppliers, customers, employees, candidates for employment and shareholders. PII is information that either alone, or in conjunction with other collected information, specifically identifies an individual person (such as name and address together, or national identification number alone).

The Company wishes to create an environment of confidence and trust that encourages people to share their personal information with the Company. This allows the Company to better understand their needs and thus to provide them with superior information, services and products. In order to do this, all employees of the Company should, in addition to meeting all applicable legal requirements concerning privacy, strive to protect individuals' PII as if it were their own. This includes providing notice of types of use, choices concerning use, ability to access/update, and providing reasonable protection for PII.

**What are some situations that raise concerns?**

- The Company provides information received from consumers to a retailer or supplier that has inadequate privacy protections.

- PII collected from an employee is shared with another employee who does not have a legitimate business need to know.

- Data can be processed offshore less expensively than in the country where it is collected, and the data is transferred without following the proper procedures.

- PII that was collected for research purposes is used to send targeted marketing messages, without the permission of the individual involved.



42

Confidential

What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

When your job involves collecting or handling personally-identifiable information:

- Don't collect or use PII, except for a proper business purpose.
- Don't share PII that has been collected with anyone except those with a legitimate business reason for obtaining the information.
- Do take reasonable security precautions with respect to any PII that has been placed in your possession.
- Do inform individuals about the PII that is being collected about them, and how it will be used (including whether it will be transferred to third parties).
- Do offer consumers, suppliers and customers a choice about whether their PII will be used for purposes other than the purpose for which it was originally collected.
- Do take reasonable steps to delete a consumer's, supplier's, or customer's PII from Company records when the consumer, supplier or customer requests that you do so.
- Do provide individuals with the opportunity to correct PII about them that is in the Company's records (this does not, of course, include information the Company generates about employees, such as potential future assignments, salary planning, etc., or information that is subject to a potential legal or employment dispute).

- Don't intentionally collect PII from children without specific approval from appropriate Company Legal personnel.
- Do take steps to ensure that suppliers adhere to the Company's privacy policies and guidelines when working on Company business.

Selected operating policies/procedures/practices

Additional information on local requirements and practices can be obtained by visiting the Company's Privacy Central on the Intranet, or by contacting the offices of the Global Privacy Executive. For the name and contact information of the individual currently holding this position, please go to wwbcm.pg.com or contact appropriate Company Legal or Human Resources personnel.



42



Confidential





### 13. Safety, Health & Environmental

Confidential



## Product Safety

### Summary of Company policy statement

- The Company's products and packages will be safe for consumers and the environment when used as intended.
- The Company will seek to ensure that our operations are safe for our employees, neighbors and the environment.
- The Company will meet or exceed all applicable legislative and regulatory requirements with respect to product safety and labeling.
- The Company will provide interested parties with relevant and appropriate factual information about the safety of our products and packaging.



### What are some situations that raise concerns?

- A product developer observes a potential safety concern during a home use panel by consumers.
- The Company receives consumer comments alleging a safety issue with one of the Company's products.
- A toxicologist observes during a safety evaluation that an ingredient used in Company products causes an unexpectedly high adverse response in a laboratory test.
- New research is published raising unforeseen questions about the safety of one of the ingredients used in Company products.
- New laws or regulations are passed that may affect how the safety of Company products should be evaluated.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

- Do ensure that safety considerations and appropriate legal analysis are part of any product development effort in which you are involved.
- Do ensure that any safety concerns that you know have been raised about a product in development are promptly reported to appropriate Company Product Safety and Legal personnel for evaluation.
- Do ensure that any reports of product safety concerns that have been raised about Company products in the market have been properly reported to appropriate Company Product Safety or Legal personnel for assessment and resolution.
- Do address and resolve in a timely manner any legal compliance issues that have been identified.

### Selected operating policies/procedures/practices

Additional information can be obtained by contacting the offices of: R&D Manager for Product Safety and Regulatory Affairs. For the name and contact information of the individual currently holding this position, please go to wwbcm.pg.com or contact appropriate Company Legal or Human Resources personnel.

46

Confidential

## Employee Safety

### Summary of Company policy statement

The Company strives to provide a safe and healthy working environment for its employees. Nothing, including urgent business needs, justifies circumventing Company safety practices.

### What are some situations that raise concerns?

- A poorly-designed new process leads to employee health and safety issues.
- An employee observes an unsafe practice by a fellow employee or a contractor.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

- Don't intentionally place yourself or a fellow employee, contractor or consultant in a situation that poses significant risks to your/his/her physical safety.
- Do report any significant safety issues you are aware of to appropriate Company Safety or Legal personnel.
- Do address and resolve in a timely manner any legal compliance issues that have been identified.
- Do promptly report any health allegations or issues to your site health services (medical) unit.

### Selected operating policies/procedures/practices

- healthnet.pg.com

## Environmental Quality

### Summary of Company policy statement

- The Company will meet or exceed all applicable environmental legal requirements.
- The Company will assess our environmental performance with a focus on continuous improvement.
- The Company will provide interested parties with appropriate factual information about the environmental aspects of Company operations and products.

### What are some situations that raise concerns?

- The Company receives questions or comments from consumers or neighbors alleging that Company products or operations are causing harm to the environment.
- Company scientists or engineers conduct an analysis during a project indicating that a product or operation may have negative environmental consequences.
- New research is published that indicates the ingredients used in Company products may raise unforeseen questions about the environmental aspects of the products.
- New laws or regulations are passed that may affect how the environmental aspects of our products or operations should be evaluated.



47

PG000376



**What are the Worldwide Business Conduct Standards?**
(What do I need to do or refrain from doing?)

- Do ensure that environmental considerations are part of any product development effort or manufacturing project you are involved in.
- Do ensure that any environmental concerns that you know have been raised about a product that is in development, or a manufacturing project that is being considered, have been reported to appropriate Company personnel responsible for environmental safety assessment before the product is placed on the market or the project is finalized.
- Do ensure that any reports of environmental concerns about Company operations or products in the market have been properly reported to appropriate Company environmental personnel for assessment and resolution.

**Selected operating policies/procedures/practices**

Additional information can be obtained by contacting the offices of: R&D Manager for Product Safety and Regulatory Affairs. For the name and contact information of the individual currently holding this position, please go to wwbcm.pg.com or contact appropriate Company Legal or Human Resources personnel.



48

PG000377





**14. Trading in Securities**

Confidential



**Summary of Company policy statement**

The Company does not permit you to use, or assist others in using, information you learn about the Company or a third party through your work for the Company to profit in the stock market.

**What are some situations that raise concerns?**

• An employee learns that the Company will be awarding a large piece of business to a publicly traded supplier and suggests to his/her cousin that the cousin should buy stock in the supplier.

• An employee learns that the Company will have unexpectedly high earnings this quarter, and urges his/her parents, who are planning to sell a large block of stock in the Company, to wait until the earnings announcement is made.

• An employee obtains non-public information that the Company is about to purchase a publicly traded company and purchases shares in the company before the acquisition plans are publicly known.

**What are the Worldwide Business Conduct Standards?**
**(What do I need to do or refrain from doing?)**

• Don't trade in Company stock, or a third party's stock, based on significant information you learned about the Company or the third party as a result of your work for the Company, when that information is not public.

• Don't provide third parties with "tips" about the Company's stock, or a third party's stock, when you could not trade in the stock yourself because of the requirement described in the previous sentence.

• If you are on the Company's "insider trading list," don't engage in transactions involving Company stock, unless you are in one of the prescribed "trading windows" or unless you have obtained approval from the Company Legal personnel in charge of United States securities law compliance.

• Don't trade in Company stock, or a third party's stock, if you are directed not to engage in such transactions by the Legal Division.

**Selected operating policies/procedures/practices**

• P&G Purpose, Values, and Principles (pvp.pg.com)
• Insider Trading Policy
• the Secretary of The Procter & Gamble Company



58





15. AlertLine

Confidential



**What is it?**

The AlertLine is a toll-free number that can be called by any employee or other interested person, twenty-four hours a day, seven days a week, to report any concerns about violations of the Company's Worldwide Business Conduct Standards.

The AlertLine is not staffed or monitored by Company personnel. All calls can be completely anonymous if the caller desires.

The AlertLine can take calls in most languages spoken by employees around the world.

Calls made to the AlertLine are reported to Company Corporate Security and Legal personnel located at the Company's headquarters in Cincinnati, who will ensure appropriate investigation and follow-up of all calls. Callers are given a confidential identification number so they can inquire about the status of their reported concern.

Callers from the United States, Canada and Puerto Rico can reach the Company AlertLine toll free at **1-800-683-3738**.

Callers from outside of the United States, Canada and Puerto Rico can reach the Company AlertLine by calling, collect, country code 01 and then 704-544-7434. When the line is answered, the AlertLine operator will obtain the services of a translator so you may proceed in your native language if you wish.

You may also contact the Company AlertLine through:

Regular mail sent to:
**AlertLine-P&G**
**PMB 3767**
**13950 Ballantyne Corporate Place**
**Charlotte, NC 28277**

Electronic mail sent to: **pghotline@alertline.com**



52

Confidential

PG000381





16. Special Legal Issues

Confidential



## Boycotts

**What is the issue?**

Laws of the United States of America ("U.S.") prohibit U.S. companies from cooperating with certain boycotts of other countries and require them to report requests for information or action that would further such a boycott. Other countries may have similar laws, consult with appropriate Company Legal contacts before engaging in any such actions.

**What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)**

As with all other legal requirements, do understand the legal requirements as they apply to your business and do abide by these requirements.

**Additional information or resources**

Appropriate Company Legal personnel.

## Customs

**What is the issue?**

All countries have specific legal requirements concerning the movement of goods across their borders.

**What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)**

As with all other legal requirements, do understand the legal requirements as they apply to your business and do abide by these requirements.

**Additional information or resources**

Appropriate Company Legal personnel and CBD management.



54

PG000383

## Export Restrictions

### What is the issue?

Laws in many countries prohibit directly or indirectly exporting (or even carrying across the border) to certain other countries some commodities, software, technology and other items.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

As with all other legal requirements, do understand the legal requirements as they apply to your business and do abide by these requirements. If it appears that the laws of two countries may conflict with one another, do consult with appropriate Company Legal personnel about what to do.

### Additional information or resources

Appropriate Company Legal personnel and CBD management.

## Government Contracts

### What is the issue?

Many countries place strict legal requirements on companies that do business with the government. For example, in the U.S., businesses selling products to the U.S. government are required to include a number of special terms in their contracts with the government.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

As with all other legal requirements, do understand the legal requirements as they apply to your business and do abide by these requirements.

### Additional information or resources

Appropriate Company Legal personnel

## Restricted Countries

### What is the issue?

Laws of the United States of America ("U.S.") prohibit U.S. companies from doing business with citizens/companies/ representatives of certain countries. Other countries may have similar laws.

### What are the Worldwide Business Conduct Standards? (What do I need to do or refrain from doing?)

As with all other legal requirements, do understand the legal requirements as they apply to your business and do abide by these requirements.

### Additional information or resources

Appropriate Company Legal personnel.

55

PG000384



Confidential



## Summary of References

Here you will find a consolidated listing of contacts and materials that support and are the foundation for the Worldwide Business Conduct Manual. The details provide further information on Company standards, policies, and expected behaviors. This section is also replicated to include printable documents and web links at wwbcm.pg.com on the Company Intranet.

**Key Contacts**

AlertLine: Toll free number that can be used to report any concerns about violations of the Worldwide Business Conduct Manual. Inquiries from the United States, Canada, and Puerto Rico can be made by calling: 1-800-683-3738. Other locations can call collect to country code 01 and then 704-544-7434. Reporting can also be done through electronic mail to pghotline@alertline.com, or regular mail to:

    AlertLine – P&G
    PMB 3767
    13950 Ballantyne Corporate Place
    Charlotte, NC 28277

Company Ethics Committee: Organization responsible for maintenance, oversight, and final interpretation of the content of the Worldwide Business Conduct Manual. Only organization authorized to review exception/waiver requests. The Company Ethics Committee currently consists of the Company's Global Human Resources Officer, Chief Financial Officer, and Chief Legal Officer and can be reached via electronic mail at Ion ethicscommittee.im@pg.com and through regular Company mail to Ethics Committee; C-2, Box 5 at the Company's General Offices.

Secretary of The Procter & Gamble Company: An Officer of The Procter & Gamble Company and a member of the Company's Legal Division. The Corporate Secretary can be reached via electronic mail at Ion corpsecretary.im@pg.com and through regular Company mail to Corporate Secretary; C-2, Box 5 at the Company's General Offices.

**Company Policy Information Referenced in the Worldwide Business Conduct Manual**

Company Values (corppolicies.pg.com): Compilation of many of the Company's Corporate Policy Statements. This information is accessible on the Company Intranet.

Business Travel Policy – Corporate Charge Card (esconnect.pg.com): This details the guidelines for Company-issued charge cards. This information is accessible on the Company Intranet.

Customer Practices Guidelines: Provides common, consistent guidelines and expectations on how the Company works with customers across business units and geographies. The full policy is accessible and printable at wwbcm.pg.com.

Guidelines for Approving Advertising (agencypolicies.pg.com): Guidance and policies to help insure that our advertising is in compliance with local laws and regulations and that that we are appropriately sensitive to potential corporate or external relations issues. This information is accessible on the Company Intranet.

Policy and Procedures for the Prevention of Diversion: Policy to advise certain MDO employees of the risk for diversion of our products and the potential impact on our operations. Supports the Company's position against diversion for business operations outside of the European Union. The full policy is accessible and printable at wwbcm.pg.com.

57

Confidential

Insider Trading Policy: Provides guidance to employees who, as a result of their employment, become aware of material, undisclosed information about the Company or about any other publicly traded company. The full policy is accessible and printable at wwbcm.pg.com.

Workplace Violence – Operating Guidelines and Procedures: Guidelines and procedures for addressing workplace violence, including preemptive danger recognition and crisis management. The full policy is accessible and printable at wwbcm.pg.com.

Intranet Web Links to Key Information Referenced in the Worldwide Business Conduct Manual

wwbcm.pg.com: The electronic, on-line version of the Worldwide Business Conduct Manual. Site includes even more comprehensive data and resources on Company policies, guidelines, and standards. Also includes updated materials between printings, including relevant personnel listings.

auditnet.pg.com: The employees' link to Internal Controls. Here, you will find several items that will be of help, including control self-assessment tools and guidance, key reference materials, frequently asked questions, and an electronic bulletin board to post specific questions to be addressed by Internal Controls personnel.

cinet.internal.pg.com: The homepage for Competitive Intelligence. Site includes all Competitive Intelligence policies, procedures, and standards. Also includes training materials and an electronic bulletin board for sharing CI activities.

healthnet.pg.com: Comprehensive site for health services resources. Includes Q&A, Employee Assistance Program (EAP), disaster response, and healthy lifestyle tips.

security.pg.com: The Information Security website. The employees' source for policy, standards, procedures, and guidance on protecting P&G information. Site includes guidance on information classification, password usage, 3rd-party contracts, etc. Training materials are also available.

privacy.pg.com: Privacy Central website. This privacy resource center includes guidelines and principles, as well as training. There is also an area for Q&A and information on the Company Privacy Council.

pvp.pg.com: This website details the Company's Purpose, Values, and Principles. The fundamental Values of Leadership, Ownership, Integrity, Passion for Winning, and Trust help the Company achieve our Vision and our Promise.

safe.pg.com: Standards for Accounting and Financial Excellence (SAFE). This site contains the accounting, finance, and stewardship standards that we use to manage the business. Comprehensive listing of Finance & Accounting guidance— including accounting policies, financial analysis standard practices, forecasting principles, Internal Controls, etc.

58

Confidential



Confidential



Touching lives, improving life. P&G

© 2004 P&G
Unauthorized reproduction or use is prohibited



# our values

P&G is its people and the values by which we live. We attract and recruit the finest people in the world. We build our organization from within, promoting and rewarding people without regard to any difference unrelated to performance. We act on the conviction that the men and women of Procter & Gamble will always be our most important asset.



**P&G Values**
Integrity
Leadership
Ownership
Passion for Winning
Trust

 

P&G Brands and P&G People are the
foundation of P&G's success.
P&G People bring the values to life
as we focus on improving
the lives of the world's consumers.

**Integrity**
- We always try to do the right thing.
- We are honest and straightforward with each other.
- We operate within the letter and spirit of the law.
- We uphold the values and principles of P&G in every action and decision.
- We are data-based and intellectually honest in advocating proposals, including recognizing risks.

**Leadership**
- We are all leaders in our area of responsibility, with a deep commitment to deliver leadership results.
- We have a clear vision of where we are going.
- We focus our resources to achieve leadership objectives and strategies.
- We develop the capability to deliver our strategies and eliminate organizational barriers.

**Ownership**
- We accept personal accountability to meet the business needs, improve our systems and help others improve their effectiveness.
- We all act like owners, treating the Company's assets as our own and behaving with the Company's long-term success in mind.

**Passion for Winning**
- We are determined to be the best at doing what matters most.
- We have a healthy dissatisfaction with the status quo.
- We have a compelling desire to improve and to win in the marketplace.

**Trust**
- We respect our P&G colleagues, customers and consumers, and treat them as we want to be treated.
- We have confidence in each other's capabilities and intentions.
- We believe that people work best when there is a foundation of trust.



  

Confidential

# )ur principles



iese are the
inciples and
pporting
haviors, which
w from our
rpose and Values.





P&G

**e Show Respect**
**· All Individuals**
Ve believe that all
ndividuals can and want
o contribute to their
ullest potential.
Ve value differences.
Ve inspire and enable
eople to achieve high
xpectations, standards
nd challenging goals.
Ve are honest with
eople about
heir performance.

**e Interests**
**The Company**
**d The Individual**
**e Inseparable**
Ve believe that doing
vhat is right for the
usiness with integrity will
ead to mutual success for
oth the Company and
he individual. Our quest
or mutual success ties
is together.
Ve encourage stock
wnership and
wnership behavior.

**We Are Strategically**
**Focused In Our Work**
• We operate against clearly
  articulated and aligned
  objectives and strategies.
• We only do work and only
  ask for work that adds value
  to the business.
• We simplify, standardize and
  streamline our current work
  whenever possible.

**Innovation Is The**
**Cornerstone of Our Success**
• We place great value on big,
  new consumer innovations.
• We challenge convention
  and reinvent the way we do
  business to better win in
  the marketplace.

**We Are Externally Focused**
• We develop superior
  understanding of consumers
  and their needs.
• We create and deliver
  products, packaging and
  concepts that build winning
  brand equities.
• We develop close, mutually
  productive relationships
  with our customers and
  our suppliers.
• We are good corporate citizens.
• We incorporate sustainability
  into our products, packaging
  and operations.

**We Value Personal Mastery**
• We believe it is the
  responsibility of all individuals
  to continually develop
  themselves and others.
• We encourage and
  expect outstanding
  technical mastery and
  executional excellence.

**We Seek to Be The Best**
• We strive to be the best in all
  areas of strategic importance
  to the Company.
• We benchmark our
  performance rigorously
  versus the very best internally
  and externally.
• We learn from both our
  successes and our failures.

**Mutual Interdependency**
**Is a Way of Life**
• We work together with
  confidence and trust across
  business units, functions,
  categories and geographies.
• We take pride in results from
  reapplying others' ideas.
• We build superior
  relationships with all
  the parties who contribute
  to fulfilling our Corporate
  Purpose, including
  our customers,
  suppliers, universities
  and governments.

Confidential



Confidential

DEFENDANT'S
[stamp illegible]

| | | | |
|---|---|---|---|
| **Hiring Manager Name:** | Harley Ballew Jr | **Date Posted:** | |
| **Hiring Manager Email:** | ballew.hg@pg.com | | |
| **Contact Name:** | Dina Schmude | **Anticipated Start Date:** | |
| **Contact Email:** | schmude.dl@pg.com | | |
| **Organization Name:** | Duracell | **Anticipated Length of Assignment:** | 3 Years |
| **Business Unit:** | Corporate Functions - Research & Development | **Full Time/Part Time:** | Full Time |
| **Function/Sub-Function:** | Research & Development - Quality Assurance | **Number of Positions Available:** | 1 |
| **Country:** | United States | **Pre-Selected Candidate:** | No |
| **City:** | Bethel, CT | **Job Level:** | Band 3 |
| **Site:** | Duracell | | |
| **Applicants Accepted From Outside Job Location Country:** | No | **Eligible Geography:** | Within commuting distance of job location only. |
| **Relocation Expenses Paid:** | Yes | | |
| **Business Purpose of Job:** | Electrical Devices Quality Leader | | |

**Important Responsibilities of Job:**
Single Point of Contact (SPOC) for all Duracell Lighting products (Duracell & Garrity branded).
Direct responsibility for P&G Quality Systems (QAKE) integration at Garrity sites.
Responsible for monitoring customer / consumer complaint information and managing corrective and preventative actions to resolve issues.
Coordinate transition of consumer service information into the P&G system.
Design approval of all Duracell electrical devices (Lighting, Chargers, and Licensing).

**Job Qualification 1:**
Single Point of Contact (SPOC) for all Duracell Lighting products (Duracell & Garrity branded). Responsible to fulfill qualification of new lighting products within launch plan timing. Provide timely responses to any lighting questions from Bethel or field personnel. Responsible for all Quality activities on the lighting team.

**Job Qualification 2:**
Direct responsibility for P&G Quality Systems (QAKE) integration at Garrity sites. Define plan and manage project to implement QAKE at all Garrity sites. This will include the Ashaway Pack Center. This position will supervise the Quality Technician at the Ashaway facility. Maintain QAKE capability (QAC scores) at all lighting product Contractors.

**Job Qualification 3:**
Responsible for monitoring customer / consumer complaint information and managing corrective and preventative actions to resolve issues. Review complaint data from lighting products and ensure effective corrective and preventative actions are implemented. This information also provides product improvement information for new product launches.

**Job Qualification 4:**
Coordinate transition of consumer service information into the P&G system. Facilitate changes to packaging to include the P&G consumer service 1-800 number and ensure proper information is provided to consumer service representatives to respond to consumer complaints and / or questions.

**Job Qualification 5:**
Design approval of all Duracell electrical devices (Lighting, Chargers, and Licensing). Ensure proper testing and validation is completed and acceptable for all electrical devices. Ensure design qualification documentation is completed before approval.

**Job Qualification 6:**
Provide professional representation of Duracell / P&G per the P&G World Wide Business Conduct Manual. This is vitally important in dealing with Contractors and Suppliers in that plans, decisions, and commitments could have significant impact from a financial and / or confidentiality perspective.

Confidential