# 12-338-cv

# United States Court of Appeals
## for the
# Second Circuit

PREDRAG CICVARA,

*Plaintiff-Appellant,*

– v. –

PROCTOR & GAMBLE CO., DURACELL,
LYNNE BURNETT,

*Defendants,*

– and –

GILLETTE CO., PROCTOR & GAMBLE CO., INC.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## JOINT APPENDIX
## Volume III of III (Pages A-583 to A-846)

SEYFARTH SHAW LLP
One Century Plaza, Suite 3500
2092 Century Park East
Los Angeles, California 90067
(312) 460-5831

    – and –

131 South Dearborn Street, Suite 2400
Chicago, Illinois 6063
(312) 460-5914

*Attorneys for Defendants-Appellees*

LAW OFFICE OF IGOR I. SIKORSKY, JR.
*Attorneys for Plaintiff-Appellant*
P.O. Box 38, 121 Perry Street
Unionville, Connecticut 06085
(860) 675-5313

i

# Table of Contents

**Page**

District Court Docket Sheet for Case No.
3:09-cv-02054-JCH ................................................................. A-1

Notice of Removal, Dated December 15, 2009 .......................... A-14

First Amended Complaint, Dated January 6, 2010 ..................... A-26

Plaintiff's Motion for Joinder and Remand to State Court,
Dated January 6, 2010 ........................................................... A-34

Answer and Affirmation Defenses, by Defendants The Gillette
Company and Proctor & Gamble Company, Inc. ("Proctor
& Gamble"), Dated January 22, 2010 .................................... A-37

Notice of Motion to Dismiss Count Eight and Lynne Burnett
from the Amended Complaint, Dated January 22, 2010 ......... A-48

Affidavit of Defendant Lynne Burnett, in Support of Motion
and in Opposition to Plaintiff's Motion, Dated
January 22, 2010 .................................................................... A-50

Defendant Burnett's Memorandum of Law in Support of her
Motion to Dismiss Count Eight to the Amended Complaint
and Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion to Remand to State Court and for Joinder,
Dated January 22, 2010 .......................................................... A-53

Plaintiff Cicvara's Objection to Defendant's Motion to Dismiss
Count Eight to the Amended Complaint with Annexed
Memorandum of Law in Opposition to Defendant's Motion
to Dismiss Count Eight to the Amended Complaint,
Dated February 12, 2010 ........................................................ A-69

Plaintiff's Cicvara's Memorandum of Law in Opposition
to Defendant's Motion to Dismiss Count Eight to the
Amended Complaint, Dated February 12, 2010 ..................... A-82

Defendant Lynne Burnett's Reply Memorandum of Law in
Further Support of her Motion to Dismiss Count Eight,
Dated February 25, 2010 ........................................................ A-93

Notice of Motion, by Plaintiff, for Leave to First Withdraw
Motion to Permit Joinder of an Additional Party and
Remand the Case to the Superior Court of Connecticut,
Dated March 22, 2010 ........................................................... A-104

ii

**Page**

Plaintiff's Motion to Compel Discovery and Supporting
Memorandum, Dated July 16, 2010 ........................................ A-106

Defendants' Memorandum of Law in Opposition to Plaintiff's
Motion to Compel Discovery, Dated July 7, 2010 ................. A-122

Exhibit A to Memorandum of Law -
Email from Predrag Cicvara to Bel Liu,
Sent June 10, 2009 ................................................ A-142

Minute Entry before the Hon. Janet C. Hall,
Held July 20, 2010 ................................................ A-144

Notice of Motion, by Defendants Proctor & Gamble,
for Summary Judgment, Dated April 15, 2011 ....................... A-145

Defendants' Memorandum of Law in Support of their Motion
for Summary Judgment, Dated April 15, 2011 ....................... A-147

Defendants' Statement of Undisputed Material Facts Pursuant
to Local Rule 56.1(a)(1), Dated April 15, 2011 ...................... A-177

Declaration of Edward Cerasia, for Defendants Proctor &
Gamble, in Support of Motion, Dated April 15, 2011 ........... A-194

Exhibit A to Cerasia Declaration -
Examination Before Trial ("EBT") of Plaintiff Predrag
Cicvara, Taken December 21, 2010 (excerpt pages) .............. A-196

Exhibit B to Cerasia Declaration -

(i) Proctor & Gamble Worldwide Business Conduct
Manual, Dated December 12, 2005
(Cicvara Deposition Exhibits 1–3) ..................................... A-215

(ii) Job Description (Cicvara Deposition Exhibit 4) ........... A-282

(iii) Email between Bel Liu and Predrag Cicvara, Sent
June 12, 2009 (Cicvara Deposition Exhibit 5) .................... A-284

(iv) Email between Bel Liu and Predrag Cicvara, Sent
June 12, 2009 (Cicvara Deposition Exhibit 6) .................... A-285

(v) Email between Bel Liu and Predrag Cicvara, Sent
June 12, 2009 (Cicvara Deposition Exhibit 7) .................... A-286

(vi) Email between Bel Liu and Predrag Cicvara, Sent
June 12, 2009 (Cicvara Deposition Exhibit 9) .................... A-287

iii

**Page**

(vii) Email between Bel Liu and Predrag Cicvara, Sent June 10, 2009 (Cicvara Deposition Exhibit 10) .................. A-288

(viii) Transcription of Conversation with Predrag Cicvara, Dated June 15, 2009 (Cicvara Deposition Exhibit 11)........ A-290

(ix) Email from Andrew Yau to Nitesh Singh, Sent June 14, 2009 (Cicvara Deposition Exhibit 12) .................. A-294

(x) Letter from Peggy Wilczewski to Predrag Cicvara, Dated June 16, 2009 (Cicvara Deposition Exhibit 13)........ A-295

(xi) Email from Peggy Wilczewski to Predrag Cicvara, Sent September 16, 2009, with Annexed Short Term Achievement Reward (Cicvara Deposition Exhibit 14)...... A-298

(xii) The Gillette Company, 1971 Stock Option Plan, Dated December 13, 2005 (Cicvara Deposition Exhibit 15).......................................................................... A-305

(xiii) Letter from Predrag Cicvara to Stock Option Administration, Dated July 3, 2009, with Annexed Notice of Exercise (Cicvara Deposition Exhibit 16) ...................... A-323

(xiv) Letter from Peggy Wilczewski to Predrag Cicvara, Dated July 6, 2009 (Cicvara Deposition Exhibit 17) .......... A-328

Exhibit C to Cerasia Declaration - Emails between Andrew Yau and Erik Lawson, Sent June 16, 2009 to June 25, 2009 ...................................... A-330

Exhibit D to Cerasia Declaration - Cicvara Stock Options/Future Shares Account Summary, Dated December 14, 2009 ...................................................... A-334

Declaration of Peggy Wilczewski, for Proctor & Gamble, in Support of Motion for Summary Judgment, Dated April 14, 2011 ............................................................ A-336

Exhibit A to Wilczewski Declaration - Email from Dina Schmude to Peggy Wilczewski, Sent June 11, 2009 ................................................................ A-343

Exhibit B to Wilczewski Declaration - Email from Peggy Wilczewski to Bel Liu, Sent June 11, 2009, with Annexed Phone Conversation Transcription ........ A-344

iv

**Page**

Exhibit C to Wilczewski Declaration -
Email from Peggy Wilczewski to Lynne Burnett, Sent
June 11, 2009, with Annexed Transcription of Telephone
Conversation between Bel Liu, Dina Schmude and
Peggy Wilczewski .................................................................. A-349

Exhibit D to Wilczewski Declaration -
Email from Bell Liu to Peggy Wilczewski,
with Attachments, Sent June 12, 2009 .................................... A-354

Exhibit E to Wilczewski Declaration -
Email from Peggy Wilczewski to Lynne Burnett,
with Attachments, Sent June 12, 2009 .................................... A-367

Exhibit F to Wilczewski Declaration -
Transcription of Conversation with Predrag Cicvara, Dated
June 15, 2009 (Cicvara Deposition Exhibit 11)
(Reproduced herein at pp. A-290–A-293) .............................. A-382

Exhibit G to Wilczewski Declaration -
Transcription of Telephone Conversation between
Predrag Cicvara and Peggy Wilczewski, Dated
June 15, 2009, and June 16, 2009 .......................................... A-383

Exhibit H to Wilczewski Declaration -
Letter from Peggy Wilczewski to Predrag Cicvara, Dated
June 16, 2009 (Cicvara Deposition Exhibit 13)
(Reproduced herein at pp. A-295–A-297) .............................. A-385

Exhibit I to Wilczewski Declaration -
Letter from Peggy Wilczewski to Predrag Cicvara, Dated
July 6, 2009 (Cicvara Deposition Exhibit 17)
(Reproduced herein at pp. A-328–A-329) .............................. A-385

Exhibit J to Wilczewski Declaration -
Email from Peggy Wilczewski to Predrag Cicvara,
Sent September 16, 2009, with Annexed Short Term
Achievement Reward (Cicvara Deposition Exhibit 14)
(Reproduced herein at pp. A-298–A-304) .............................. A-385

Declaration of Kevin Babis, for Defendants Proctor & Gamble,
in Support of Motion for Summary Judgment, Dated
April 15, 2011 ....................................................................... A-386

v

**Page**

Exhibit A to Babis Declaration -
Email from Kevin Babis to Dina Schmude,
Sent June 9, 2009 .................................................................. A-389

Exhibit B to Babis Declaration -
Transcription of Conversation with Predrag Cicvara, Dated
June 15, 2009 (Cicvara Deposition Exhibit 11)
(Reproduced herein at pp. A-290–A-293).............................. A-392

Plaintiff's Statement of Material Issues in Dispute,
Dated May 26, 2011 ................................................................ A-393

Exhibit A to Statement -
Email from Predrag Cicvara to Peggy Wilczewski,
Sent June 29, 2009 ................................................................ A-425

Exhibit B to Statement -

   (a) Proctor & Gamble — World Wide Business
   Conduct Manual ................................................................ A-426

   (b) The Gillette Company, 1971 Stock Option Plan,
   Dated December 13, 2005
   (Reproduced herein at pp. A-323–A-327)........................... A-490

   (c) Letter from Predrag Cicvara to Bel Liu ......................... A-491

   (f) EBT of Plaintiff Predrag Cicvara,
   Taken December 21, 2010.................................................. A-493

Exhibit C to Statement -
EBT of Plaintiff Predrag Cicvara, Taken December 21, 2010
(Reproduced herein at pp. A-493–A-691).............................. A-692

Exhibit D to Statement -
Motion by Plaintiff for Production of Documents,
Dated May 26, 2011 ................................................................ A-693

Exhibit E to Statement -
Defendants' Response and Objections to Plaintiff's Second
Request for Production of Documents with Annexed
Defendants' Response and Objection to Plaintiff's Second
Request for Interrogatories, Dated February 7, 2011.............. A-695

Exhibit F to Statement -

   (i) T-Mobile Bill, Dated July 9, 2009................................... A-716

vi

**Page**

(ii) Charted Timeline of T-Mobile Bill,
Dated June 8, 2009 ............................................................ A-718

Exhibit G to Statement -
Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion to Compel Discovery, Dated July 7, 2010
(Reproduced herein at pp. A-122–A-141)............................... A-720

Exhibit H to Statement -
Email between Andrew Yau and Erik Lawson,
Sent June 25, 2009 ........................................................... A-721

Exhibit I to Statement -
Letter from Peggy Wilczewski to Predrag Cicvara,
Dated June 16, 2009 ......................................................... A-723

Exhibit J to Statement -
Proctor & Gamble Severance Plan for Exempt Employees
— Summary Plan Description ................................................ A-725

Memorandum in Opposition to Gillette's Motion for Summary
  Judgment and in Support of Cicvara's Cross-Motion
  Argument Standard for Review, Dated May 26, 2011 ........... A-727

Notice of Cross-Motion, by Plaintiff, for Summary Judgment,
  Dated May 26, 2011 .......................................................... A-734

Memorandum of Law, by Plaintiff, in Support of Cross-Motion
  for Summary Judgment, Dated May 26, 2011 ....................... A-736

Plaintiff's Statement of Undisputed Material Facts Pursuant to
  Local Rule 56.1(A)(1), and in Support of Cross-Motion for
  Summary Judgment, Dated May 26, 2011 ............................ A-739

Affidavit of Plaintiff Predrag Cicvara,
  Sworn to May 31, 2011 ...................................................... A-742

Exhibit A to Cicvara Affidavit -
Letter from Peggy Wilczewski to Predrag Cicvara,
Dated June 16, 2009
(Reproduced herein at pp. A-295–A-297)............................... A-762

Exhibit B to Cicvara Affidavit -
Salary Increase Notification ................................................ A-763

**Page**

Exhibit C to Cicvara Affidavit -
Emails between Andrew Yau and Erik Lawson,
Sent June 16, 2009 to June 25, 2009
(Reproduced herein at A-330–A-333).................................... A-764

Exhibit D to Cicvara Affidavit -
Part 1 of Diversion (in Cicvara Deposition Exhibit B) ........... A-765

Exhibit E to Cicvara Affidavit -
Part 2 of Diversion (in Cicvara Deposition Exhibit C) ........... A-769

Exhibit F to Cicvara Affidavit -
Email from Rob DaPara to Predrag Cicvara,
Sent January 4, 2008 ............................................................... A-772

Exhibit G to Cicvara Affidavit -
T-Mobile Bill, Dated July 9, 2009
(Reproduced herein at A-716–A-717).................................... A-774

Exhibit H to Cicvara Affidavit -
Email from Dina Schmude to Bell Liu,
Sent June 10, 2009 ................................................................. A-775

Exhibit I to Cicvara Affidavit -
Letter from Michael Skiber to Proctor & Gamble,
Dated July 9, 2009.................................................................. A-779

Exhibit J to Cicvara Affidavit -

   (a) Proctor & Gamble — World Wide Business
   Conduct Manual
   (Reproduced herein at pp. A-426–A-489).......................... A-779

   (b) The Gillette Company, 1971 Stock Option Plan,
   Dated December 13, 2005
   (Reproduced herein at pp. A-323–A-327).......................... A-779

   (c) Letter from Predrag Cicvara to Bel Liu
   (Reproduced herein at p. A-491)........................................ A-779

   (f) EBT of Plaintiff Predrag Cicvara,
   Taken December 21, 2010
   (Reproduced herein at pp. A-493–A-691).......................... A-779

viii

**Page**

Exhibit K to Cicvara Affidavit -
Email from Predrag Cicvara to Peggy Wilczewski,
Sent June 29, 2009
(Reproduced herein at p. A-425) ............................................ A-779

Exhibit L to Cicvara Affidavit -
Handwritten Notes, Dated June 15, 2009 ............................... A-780

Defendants' Reply Memorandum of Law in Further Support
of their Motion for Summary Judgment, Dated
July 16, 2011 ......................................................................... A-790

Defendants' Memorandum of Law in Opposition to Plaintiff's
Cross-Motion for Summary Judgment, Dated
July 16, 2011 ......................................................................... A-804

Defendants' Local Rule 569(a)(2) Statement in Response
to Plaintiff's Statement of Undisputed Material Facts,
Dated July 16, 2011 ............................................................... A-814

Ruling re: Defendant's Motion for Summary Judgment
(Doc. No. 74) and Plaintiff's Cross-Motion for Summary
Judgment (Doc. No. 85), Entered November 11, 2011 ........... A-820

Judgment of the Hon. Janet C. Hall, Entered
November 30, 2011, Appealed From ...................................... A-833

Notice of Appeal, Dated January 19, 2012 ................................. A-834

Case 12-338, Document 58, 07/23/2012, 671468, Page10 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 91

1      Q.    Did you welcome it?

2      A.    I didn't do anything.  I didn't welcome.  I

3   didn't unwelcome.  Just I accepted it.  I didn't act upon

4   it, if you mean that.  I didn't try to do anything more

5   because she did that.  I was actually -- I was feeling

6   very strange when she put her hand on my thigh, I did,

7   but I didn't say anything because it was inside the car

8   and somehow I felt if I say something it will be very bad

9   to put her in such position, so I just kept my mouth

10  closed.

11     Q.    When you claim she touched your thigh, did she

12  rub your thigh or just put her hand on your thigh?

13     A.    She did put her hand and she didn't just keep

14  her hand, so it was a pressure, so.

15     Q.    But did she move it back and forth or she just

16  put it on and squeeze, what do you remember?

17     A.    I can't -- I wouldn't -- I don't know, I can't

18  say that, you know, for sure, but it was there and it was

19  there for more than just touching.

20     Q.    How long was it there, two seconds, three

21  seconds?

22     A.    No.  It was more than that.  She was

23  actually -- oh, that was when she was asking me about

24  Austin, Austin Lin.  That was actually -- when she put

25  her hand on my thigh she said you don't like Austin, do

Case 12-338, Document 58, 07/23/2012, 671468, Page11 of 273

CICVARA v. PROCTER & GAMBLE                    December 21, 2010

Page 92

1    you, and I said no, no, why would you say that, and she

2    said, well, he told me something about you, and then I

3    said, you know, we had this -- by the way, we had not

4    just one discussion about his expense report, that was

5    when he cheated.  He also wanted immediately after that

6    to go in Florida to some seminar and wanted us to pay for

7    his weekend in hotel, which I told him, look, Austin, you

8    maybe did this when you had Harley as a boss, just please

9    don't do it anymore, you can't do it, you can stay in

10   hotel paid by your own.  So he didn't like that either.

11        Q.   Let's get back to Bel for a minute.  When you

12   claim in the car she put her hand on your thigh and there

13   were other people in the car you said, she mentioned

14   whether you liked Andrew in front of --

15        A.   If I liked Austin.

16        Q.   Not Andrew, I'm sorry, Austin in front of other

17   people?

18        A.   In front of Willies, yes.  W-i-l-l-i-e-s, if

19   I'm not mistaken again.  I have his card.  And in front

20   of Dave Arnsperger, who was official QA auditor there in

21   Indonesia.

22        Q.   For Procter & Gamble?

23        A.   Yes.  He was in Indonesia, then he stayed in

24   Singapore, and then Lori came to Bangkok, she was auditor

25   in Bangkok and in China after that.

Case 12-338, Document 58, 07/23/2012, 671468, Page12 of 273

CICVARA v. PROCTOR & GAMBLE                                December 21, 2010

Page 93

```
 1        Q.    Let me ask you something about the time you

 2   said that you were in her room on June 8th, 2009.  Was

 3   that the only time that you went into her room anywhere?

 4        A.    No.   There was a time before that I went once

 5   in Indonesia.

 6        Q.    And how long did you stay that time?

 7        A.    I don't know.  15 minutes maybe.

 8        Q.    Did you ever hug her during that time in

 9   Indonesia?

10        A.    No.   No, I didn't hug her.  We were sitting

11   together on the sofa, but I didn't hug her, and as I said

12   I think she leaned on me again.  That was the time when

13   she told me that she was very unhappy with her marriage,

14   that her boss actually forced her to marry her husband,

15   that she has a relationship with the older gentleman,

16   which I suspect was her boss but she never told me that

17   so I cannot claim that, but from whatever she was talking

18   about it might have been her boss.

19              She was very -- in very unusual relationship

20   with Andrew.  She asked me to tell good things to Andrew

21   during the dinner on the 7th in Bangkok, when we came to

22   Bangkok, because she wanted more money from him.  So she

23   was very manipulative as well, which I did actually, I

24   did tell him, look, she's very valuable to your team,

25   because I think she is actually, she's very good in what
```

Case 12-338, Document 58, 07/23/2012, 671468, Page13 of 273

A-586

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 94

1    she's doing, more than good, and she's doing things that

2    you wouldn't expect from normal employee, like, you know,

3    trying to get certain type of control over certain people

4    that she's communicating with, like Austin, like Dave

5    Mathieu who was the designer of the new flashlights, like

6    Al Peterson.

7            She asked me straightforwardly during the

8    dinner in December 2008 in Hong Kong, do you want me to

9    find you a girl so that you can go to karaoke, which I

10   said very straightforward, no, I don't want you, and she

11   said, well, you know, there are certain people in

12   Duracell who are doing that every time they come, and she

13   mentioned Al Peterson.  I hope this is not going to kill

14   him, but she did say that.

15           So, you know, there is -- and then, you know,

16   she obviously tried to do similar thing to me, to have a

17   control, certain type of control over people which they

18   can exercise when they need to, which they did in my

19   case, they exercised the control over the people.  They

20   didn't like me in the position that I had.  And Austin

21   had that position before me, he was the guy who went

22   initially as I said to China to do the initial inspection

23   before the official one of five companies --

24       Q.    Okay.  You're now spinning off on a tangent.

25       A.    I'm just trying to explain certain things,

Case 12-338, Document 58, 07/23/2012, 671468, Page14 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 95

1   because Austin was the guy who went to human resources to

2   tell them, Austin Lin was the guy who told human

3   resources that I have improper things with Bel Liu.  How

4   would he know?

5        Q.   Do you know whether or not Bel ever told him?

6        A.   I don't know.  But that is answering your

7   question.  There is no business relationship supposed to

8   be between Bel Liu and Austin Lin from April 2008,

9   nothing, nothing.

10       Q.   But you already answered you have no idea if

11  she called him up to tell him that?

12       A.   Obviously she did, and I asked for records,

13  which were denied, you know, e-mail, telephone records

14  between Bel and Austin, that was never provided to me.

15       Q.   Okay.  Do you claim -- you understand that Bel

16  has -- had told the company that you made unwanted sexual

17  advances towards her?

18       A.   No.

19       Q.   You never knew that?

20       A.   No.  I knew what she said in her statement.

21       Q.   Okay.  Okay.  Then listen to my question, okay?

22       A.   Yeah.  I knew --

23       Q.   You understand and you know what her

24  allegations are, that you made unwanted sexual advances

25  and you engaged in other conduct towards her; you know

Case 12-338, Document 58, 07/23/2012, 671468, Page15 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 96

1    that she's claiming that, right?  I'm just asking you.

2        A.   Yeah.  She said that on Wednesday, June 10th.

3    Before that certain things happened, before she said

4    that.  And she apologized to me on Tuesday, she

5    apologized to me on Tuesday night, she said I did

6    terrible thing to you, and I asked what did you do, she

7    said I can't tell you, you will see one day.

8        Q.   Can you go back to please listen to my

9    question?

10       A.   Yes.  I want this to be put down.

11       Q.   But you know what --

12       A.   This is not my --

13       Q.   I ask the questions, you answer, okay?

14       A.   Yeah.  Well, I think it's --

15       Q.   You understand what it is that she claims

16   happened, which is you touched her inappropriately, you

17   kissed her inappropriately; do you understand that she

18   said that?

19       A.   I understand that she said that, yes.

20       Q.   That's all I'm asking.

21       A.   Yes, yes, yes, I understand what she said.

22       Q.   Okay.  Do you claim that she made that up in

23   order for you to get fired?

24       A.   She made up certain things that she said, yes.

25   I'm not saying she did that in order to get me fired,

Case 12-338, Document 58, 07/23/2012, 671468, Page16 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                          Page 97

1   because she apologized to me, she apologized to me twice,

2   once on Tuesday night and once on Wednesday morning, and

3   she apologized profusely, she said I'm so sorry that this

4   is happening to you but it was out of my control, that's

5   exactly what she said, she said out of my control.  Now

6   you think --

7        Q.   Did you ask her what she meant?

8        A.   Yes.  And she said I can't tell you, you will

9   see, I can't tell you.  Apologized to me.  Why would

10  somebody that I harassed apologize to me?

11       Q.   There's no question.

12       A.   She had all the time in the world --

13       Q.   There's no question, Mr. Cicvara.

14       A.   Okay.  I understand.

15            MR. CERASIA:  Mark that as 5 please.

16            (Cicvara Exhibit 5: Email - marked for

17  identification.)

18       Q.   Showing you what's been marked as Exhibit 5, if

19  you look down at the bottom, first of all it's a document

20  bearing number PG 470?

21       A.   Uh-huh.

22       Q.   Under the section marked SMS, the text, you see

23  it down at the bottom?

24       A.   Yeah.

25       Q.   Was (203)243-C079 either your cell phone or

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 98

1    BlackBerry number?

2        A.    BlackBerry number.

3        Q.    Okay.  And did you send this text message or

4    SMS to Bel?

5        A.    Yes.

6        Q.    Was this the day after you were in her hotel

7    room June 8th?

8        A.    Yes, it was.

9        Q.    When you say -- I think there's a typo there,

10   it says I hope you will, it says b-e-w, but I assume it's

11   to be be, be better soon, what was wrong with her?

12       A.    I don't know.  She was -- we were told that she

13   is not there the second day on audit.  I don't know what

14   was wrong.  She said she's -- the guy said she's sick.

15       Q.    Who told you that?

16       A.    After Yuen told Predrag I was -- let me just

17   take a look, because I don't want to guess.  I think this

18   gentleman, Yuen Yau.

19       Q.    Y-u-e-n?

20       A.    Y-u-e-n, and last name Y-a-u.  He told us that,

21   because he picked me and Lori at hotel that morning and

22   he said she's going to be out for today because she's

23   sick.

24       Q.    And then you say to her in this text feel

25   terrible that can't be with you and pamper you?

Case 12-338, Document 58, 07/23/2012, 671468, Page18 of 273

**A-591**

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 99

1      A.    Yes, I did say that.

2      Q.    How were you going to pamper her?

3      A.    Just to make her feel good.  I don't think --

4      Q.    Rub her feet?

5      A.    -- there was anything special in the word

6    pamper.  Maybe I used the wrong word.  Just -- you know,

7    just to make her feel good.  I still didn't understand

8    what I understood after the next message, which was, hey,

9    we are not a couple so why are you saying this, and I

10   just couldn't understand that coldness coming out of her

11   at that moment.  I was really shocked with that.

12                  MR. CERASIA:  Mark that as 6 please.

13     Q.    All right, Mr. Cicvara, why don't you give me

14   number 5, if you can give me that back, please.

15     A.    Sure.  I think you have to put --

16     Q.    Yeah, you've got to wait.  You took it from

17   her.  Give it back.

18     A.    Sorry.

19                  (Cicvara Exhibit 6: PG000471 - marked for

20   identification.)

21     Q.    Showing you what's been marked as Cicvara

22   Exhibit 6, which is another text message, it's PG 471.

23   If you look at the bottom, is that the reply you received

24   from Bel?

25     A.    Yes.

Case 12-338, Document 58, 07/23/2012, 671468, Page19 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 100

```
 1        Q.   And that's the reply to Exhibit 5; right?

 2        A.   Yes.

 3        Q.   Okay.

 4        A.   And that was really kind of shocking, the way

 5   she wrote it, because first of all I never thought that

 6   we are couples and I never thought we are lovers, and

 7   when she said please stop thinking about me that was

 8   really strange because she actually did everything in her

 9   power for me to think about her within six months, you

10   know, from December to June.

11        Q.   Right.

12        A.   I just couldn't, you know, get rid of her

13   messages, e-mail messages, which I asked for and they

14   were never produced because computer was -- disappeared.

15        Q.   So that's the reply.  But let me ask you this.

16   Do you have any female friends?

17        A.   Do I have any female friends?

18        Q.   Yeah.

19        A.   I probably do.

20        Q.   Any of them who get sick and you write to them

21   that you want to pamper them?

22        A.   No.  No.  No.  Sometimes maybe.  I don't know.

23   If I'm very close maybe I don't pamper but I would like

24   to help.

25        Q.   Right.  Pamper suggests that you wanted to be
```

Case 12-338, Document 58, 07/23/2012, 671468, Page20 of 273

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 101

1  something other than a friend, right?

2      A.   I understand and I am saying I might have used

3  the wrong word, and I have to explain one thing.  English

4  is not my native language, not that I'm trying to make

5  any excuses, but sometimes I'm going to use the wrong

6  word and I usually am given time to explain because

7  people are used to it.

8      Q.   Right.  But, frankly, with Bel you had feelings

9  other than just as a friend at that point?

10     A.   As I said, yeah, it is possible, yes.

11     Q.   Okay.  Do you know whether or not she was

12 offended by your conduct on June 8th in her hotel room?

13     A.   She never said that, never said that to me, and

14 as I said it was hotel room, she was on the phone with

15 her husband 15 minutes during this less than one hour

16 that I was in the room, she was on the phone with her

17 boss and left a message about certain pricing, and during

18 that I saw the message on her BlackBerry from her boss

19 which was telling, A, you are doing great job, the next

20 thing that we need to do is to find a way to sack the

21 gentleman who is manager of the Zhongshan factory, and

22 then when she saw me seeing that e-mail she said you are

23 seeing too much, you are not supposed to read this.  I

24 said, look, it was on your BlackBerry, and BlackBerry

25 don't have Chinese characters, so obviously they have to

Case 12-338, Document 58, 07/23/2012, 671468, Page21 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 102

1    send English messages on the BlackBerry, so I saw it,

2    what can I do, and she said you know too much, you are

3    not supposed to read these messages.  Obviously they

4    decided to sack the guy who it was --

5        Q.   Shock?

6        A.   Sack, s-a-c-k.  Sack the guy who headed the

7    Zhongshan operation of Practical because it was under his

8    umbrella that they send 46,000 of D flashlights

9    wrongfully.  What is really strange is he said to her we

10   have to find a way to sack this guy.  Well, I don't know

11   what that tells you about relationship between Andrew and

12   her.  It tells me a lot, so.

13       Q.   Let me ask you this.  Did she talk on the phone

14   or get this BlackBerry message before or after you rubbed

15   her back and her feet?

16       A.   For sure she talked to her husband after, and I

17   think she actually used her BlackBerry after I rub her

18   feet, yes, because she said I need to send -- I need to

19   actually tell my boss the pricing for the offer that we

20   are preparing for Duracell.  That was the moment that I

21   was under impression she left that on and there was a

22   recording on her boss' answering machine, which I was

23   told by Lynne Burnett at the beginning of the meeting

24   that there was a recording from what was going on in that

25   room and she can play it back to me.  I was embarrassed

Case 12-338, Document 58, 07/23/2012, 671468, Page22 of 273

A-595

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 103

1   to hear me, you know, saying things sort of, or, you

2   know, whatever it was in the room, so I said, no, you

3   don't have to play it because I know what happened in

4   that room and I was in that room.  She also mentioned,

5   you know, like cameras, but she mentioned specifically

6   there was a recording from her boss' answering machine of

7   what was going on in that room, which came out not to be

8   true as you know.  The recording was from Wednesday, June

9   10th, in the morning.  There was no ever any recording

10  from that room.

11              MR. CERASIA:  Can you mark this as 7.

12     A.   So I was lied to.

13     Q.   Okay.  There's no question.

14     A.   Okay.  I think it's important.  And it's not in

15  the notes.

16     Q.   There's no question.

17     A.   It's not in the notes, which means the notes

18  are not valid.  I never saw the notes too.

19     Q.   Mr. Cicvara, there's no question, please.

20     A.   Okay.  Good.  I got this --

21     Q.   There's no question.

22     A.   I'm saying I shouldn't be reading this.

23              (Cicvara Exhibit 7: PG000472 - marked for

24  identification.)

25     Q.   I'm showing you what's been marked as Exhibit

Case 12-338, Document 58, 07/23/2012, 671468, Page23 of 273

A-596

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 104

1    7, which is Bates number PG 472.  Let me ask you if this

2    is the response to your text message which was Exhibit 6?

3        A.   Right.  It says Thanks for the good time

4    though, P.  It might be.  I'm not sure that I ever

5    used --

6        Q.   Well, that's your --

7        A.   -- P point after I sent a message.  I usually

8    use either Predrag or I'm not using anything.  So

9    obviously it is, but somehow it doesn't look like I did

10   it.  It must have been a new computer --

11       Q.   Well, you were doing different things that you

12   had never done before according to you during that time,

13   right, like rubbing the feet --

14       A.   Oh, like rubbing another woman's feet, yes, I

15   would agree, yes, I was doing that.

16       Q.   All right.  I have no other question about

17   Exhibit 7.

18       A.   Okay.

19       Q.   Give it back.

20            MR. CERASIA:  Mark this as 8 please.

21            (Cicvara Exhibit 8: PG000473 - marked for

22   identification.)

23            (Cicvara Exhibit 9: PG000474 - marked for

24   identification.)

25       Q.   I'm going to show you what's marked as Exhibit

Case 12-338, Document 58, 07/23/2012, 671468, Page24 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                        Page 105

1    9, which is Bates number PG 474, it's a text message from

2    you June 10th, 2009 at 11:15.  And if you look at Exhibit

3    7, you had sent that at 11:14, right?

4          A.   That was June 9 and this is June 10.

5          Q.   Oh, it's a whole day difference.  Okay.  I

6    might have been looking at Exhibit 8.  Thank you for

7    correcting me.

8          A.   Okay.

9          Q.   So on the 10th you write to her, just wanted to

10   tell you that I am, and dot, dot, dot, just wanted to

11   tell you that I am still in a shock and disgusted by

12   myself and my poor judgment of things that were going

13   between us, forgive me if you can, P.

14         A.   Yeah.

15         Q.   What did you mean by that?

16         A.   I was trying to apologize for the thinking that

17   at some point it might be -- instead of friendship our

18   relationship might be a little bit more than that, and I

19   actually found out that it was very unusual that she sent

20   message as she did like we are not couple and we are not

21   this, so I apologized for me ever thinking about -- that

22   there could be something more going on between us than

23   that.  That was the reason why I did this.

24         Q.   Because you thought that there was more going

25   on between you, right?

Case 12-338, Document 58, 07/23/2012, 671468, Page25 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

```
 1      A.   As I said, I can't deny that it's crossed my
 2  mind, yes.  I wouldn't deny that.  And I also said that
 3  one of the things I really did wrong is I did wrong to my
 4  wife on whatever I did with this woman.  So that -- I
 5  feel strongly about that, but I didn't harm the company
 6  at all, at all.
 7      Q.   Then why were you in shock?
 8      A.   I don't know.  It might be a poor choice of
 9  words again.
10      Q.   You've got a lot of poor choice of words; do
11  you blame that again on your lack of command of the
12  English language?
13      A.   No, I don't blame it on lack of command.  I
14  blame it maybe on text messaging where you are expected
15  to send answer quickly.
16      Q.   Well, did anybody tell you you had a certain
17  amount of time to send her this text message?
18      A.   No, nobody told me that.  I had all the time in
19  the world to do it, but usually what I did when I
20  answered text message is I answered immediately.  You
21  will notice that from the text messages that were
22  exchanged.  You have the record.
23      Q.   Why were you disgusted with yourself?
24      A.   I don't know.  I thought that it's not a good
25  thing that you would go over friendship if the other
```

Case 12-338, Document 58, 07/23/2012, 671468, Page26 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 107

1   party doesn't want that and I realized that from her

2   message that was sent to me the day after, which was June

3   9th, so that's why.  Nothing that has to do anything with

4   whatever happened on June 8th.  As I told you nothing

5   happened there which I should be ashamed of.

6        Q.   Okay.  Why do you say that you had poor

7   judgment?

8        A.   Because I thought that there could be something

9   going on between us and it didn't, so I had poor

10  judgment.

11       Q.   And you were disappointed that there weren't --

12  there wasn't more going on between you than friendship?

13       A.   I think probably I was, yes, because it was six

14  months of her confining to me and causing some emotional

15  reaction on my part, yes, and I don't think it's

16  inappropriate.  It's maybe inappropriate for her to send

17  me that.  I don't think it's inappropriate in the sense

18  of me working for P&G.  I don't think that there's

19  anything inappropriate about that except maybe I should

20  have stopped that from the beginning but I didn't.

21       Q.   Because she was an employee of a contractor,

22  right?

23       A.   Not because of that.  Because she was an

24  employee of a company, not because of me having any

25  influence over her, because I didn't have that.

Case 12-338, Document 58, 07/23/2012, 671468, Page27 of 273

A-600

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 108

1      Q.    I'm not asking you about influence.

2      A.    Because she was an employee of another company,

3 yes.

4      Q.    That P&G had a business relationship with?

5      A.    That might be very poor judgment on my part,

6 yes, I would say so, but that's about it.

7      Q.    Why did you ask her to forgive you?

8      A.    Because I did say that there might be something

9 going on, yeah, and, you know, at some point I did, you

10 know -- I did massage her feet, which at some point she

11 said no and I said okay.  So, you know, we ate dessert

12 after that.  If I harassed her, that was in the hotel and

13 it was going on for 40 minutes, she could have screamed,

14 she could have called somebody, she could have said to

15 her husband on the phone there is a guy here, in Chinese.

16 She didn't.  She could have said to her boss there is

17 something going on.  She didn't.  She could leave the

18 message.  She didn't.  We sat down, we ate dessert, and

19 we amicably split.  I went to my room.  Nothing happened.

20      Q.    So you think just because she didn't scream or

21 tell anybody else that you think it was appropriate to do

22 what you did?

23      A.    No, no, no, I didn't do anything.  I said if I

24 did anything, she had all the means in the world to

25 express that something was wrong and she never did.  She

Case 12-338, Document 58, 07/23/2012, 671468, Page28 of 273

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

Page 109

1  never even told me that she felt bad.  She told me don't

2  rub -- don't rub my feet anymore; I stopped.

3          Q.    Why don't you look at Exhibit 8, which is a

4  June 10th, 2009 text message from you to Bel 6:27,

5  bearing Bates number PG 473.

6          A.    Okay.  Yes.

7          Q.    Did she --

8          A.    That was when she apologized to me.

9          Q.    Did you buy her a T-shirt?

10         A.    Yes.

11         Q.    And she returned it to you?

12         A.    She returned it to me after all this happened,

13 yes.

14         Q.    Why did you buy her a T-shirt?

15         A.    Because she was like, oh, I need to buy this

16 T-shirt, she bought two already, and then, well, I spent

17 already too much for this, oh, should I buy this T-shirt,

18 no, I spent too much already, and she's actually

19 collecting T-shirts from -- what's the name of the store

20 that the stars, the rock stars -- I forgot, it doesn't

21 matter -- Hard Rock Cafe, okay, so she's collecting those

22 shirts and she wanted to buy the shirt but she already

23 bought two, so I said I'll buy it as a present for you.

24 I paid with my personal card and my wife found that, so I

25 had something to explain to my wife about this.  But,

Case 12-338, Document 58, 07/23/2012, 671468, Page29 of 273

Case 3:09-cv-02054-JCH   Document 83-5   Filed 05/26/11   Page 110 of 199

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 110

```
 1   yes, I bought her a shirt and she returned -- she put it

 2   on the door outside of my room on Wednesday morning.  But

 3   you wouldn't talk about the other text message that I

 4   sent her, which was like why did you apologize to me.

 5        Q.   I didn't get to there, Mr. Cicvara.

 6        A.   Okay.  Sorry.

 7        Q.   Remember I ask the questions.

 8        A.   Sorry, sorry, you ask the questions.

 9        Q.   And according to her you sent this text message

10   before you saw her returning the shirt.  In the first

11   message you send to her, the first line says good

12   morning, still sleeping or don't want to answer after

13   all?

14        A.   Because I sent a message before this that she

15   didn't answer it, where it was the same question, what is

16   it that you did that you told me you were so sorry about

17   and that you told me you didn't have a way to influence

18   it?  She said that, she said I didn't have a way to

19   influence what happened.

20        Q.   But you don't know what -- you don't have --

21        A.   Let me see.  I actually wrote down what she

22   said.  I was left no choice; that's exactly what she

23   said.

24        Q.   When did you write that down in front of you,

25   at lunch?
```

A-603

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 111

1        A.    In front of me.  We talked in the car, and he,

2   my lawyer, asked me exactly please try to recall --

3              MR. SIKORSKY:  All right.  That's --

4        A.    -- what did she say exactly.  I was left no

5   choice, that was one sentence.  It was out of my control

6   and I really apologize to you, I did terrible thing to

7   you.

8              In the middle of the night I couldn't sleep

9   about thinking what the heck is terrible thing what she

10  did, and I asked once, she didn't answer, then I sent

11  another, and I said are you sleeping, I have a question,

12  why did you say I will understand, why are you sorry,

13  sent to her BlackBerry, okay, and she didn't answer this

14  one either, and then in the morning I found that shirt

15  outside of my room and that is when I went to her room

16  asking her, you know, why did you return this to me, I

17  bought it, it's a present, I bought it for you, keep the

18  present, and she kept it, and that is when I asked again

19  please tell me what did you do, because honestly I felt

20  she maybe said something to my wife, you know, like I had

21  a relationship, because I realized that she is -- I don't

22  even know how to say that, might be a little bit unstable

23  in relationships, so she was quick to make decisions like

24  decision don't come to my room and then five minutes

25  later come to my room, I changed my mind, decisions like

A-604

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 112

1   destroying life of other people quickly, you know, so I

2   felt all the time she might call my wife.  It never

3   crossed my mind that she would do what she did or Austin

4   did basically, because according to her she said I was

5   left no choice, it means like maybe I didn't think that

6   you deserved that, but Austin did what he did and Andrew

7   told me to follow.

8        Q.   You're just guessing now?

9        A.   No, no, I'm not guessing.

10       Q.   Well, did she ever tell you that?

11       A.   No.

12       Q.   Okay.  So you're guessing?

13       A.   Because she told me she can't tell me what she

14   did.  That's what she told me.  And she told me I really

15   apologize to you.

16       Q.   Right, and you're guessing what she meant?

17       A.   I am not guessing.

18       Q.   Well, she never told you, right?

19       A.   I'm not guessing.  I saw what e-mail Dina

20   Schmude sent to her where she was saying Austin came to

21   human resources, told us this and that.  Hey, who is

22   Austin?  Austin is the guy who hates me because I caught

23   him lying on his expense report, guy who hates his future

24   boss because he told me, he told me I can't really use up

25   the company the way I used to, to spend seven months

Case 12-338, Document 58, 07/23/2012, 671468, Page32 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 113

1    in -- seven weeks in China to inspect five factories.  I

2    spent two weeks in China inspecting five factories

3    together with Lori in December.  He spent six weeks, and

4    she told me she actually taught him Mandarin because he

5    speaks only Cantonese and she was his teacher for six

6    weeks in China.

7         Q.   So do you think that there was a conspiracy out

8    to get you?

9         A.   Yes, I think there was a conspiracy, yes.  I

10   think that Austin Lin wanted to retaliate to me, that's

11   one of the reasons why this happened to me.  The other

12   is -- there are three reasons, big reasons.  The second

13   reason is lack of work for Practical where Andrew found

14   the way to get leverage over Duracell by claiming that I

15   harassed her.

16        Q.   Okay.  Do you have any personal knowledge that

17   Practical ever got any additional orders --

18        A.   No, no.

19        Q.   Excuse me.

20        A.   I hope they didn't.

21        Q.   You've got to let me finish.  Do you have any

22   personal knowledge that after Andrew wrote an e-mail

23   telling Erik about your unwanted sexual advances towards

24   Bel that Practical got any future orders or additional

25   orders from Duracell because of that e-mail?

Case 12-338, Document 58, 07/23/2012, 671468, Page33 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                      Page 114

1        A.    Okay.  Let me just correct you in one thing.

2   You said unwanted sexual advances.  I said alleged

3   unwanted sexual advances.  Please, that's one thing.

4        Q.    That's not what his e-mail says.

5        A.    Second, I don't have any knowledge, yes.

6        Q.    That's all I want to know.

7        A.    And I hope they didn't because they don't

8   deserve it.  Their business practices are terrible,

9   dishonest too.

10        Q.    Do you know whether or not, sitting here today,

11  Austin Lin ever told anybody in human resources

12  specifically what Bel had alleged?

13        A.    They wrote it in the e-mail.

14        Q.    I'm asking you if you have personal knowledge.

15        A.    No, I didn't hear that, but I saw that written

16  in the e-mail.

17        Q.    There are no specifics in the e-mail, it's

18  just --

19        A.    Can we go through this?

20        Q.    We will at some point.

21        A.    Okay.  Good.

22        Q.    I'm asking you whether you have personal

23  knowledge.

24        A.    No problem.  And the third --

25        Q.    Why don't you answer my question first.

Case 12-338, Document 58, 07/23/2012, 671468, Page34 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 115

```
 1      A.    You didn't hear the biggest reason why I was
 2   fired.
 3      Q.    Why don't you answer my question.
 4      A.    Okay, I'll answer it when it comes to it.
 5      Q.    Do you have any personal knowledge that Austin
 6   Lin ever gave any specifics as to what Bel told him
 7   happened?
 8      A.    Nothing except whatever is written in that
 9   e-mail, and whatever is written we all know, it's
10   written.
11      Q.    Okay.  Right.  And what is the third reason
12   that you believe --
13      A.    Oh, the third reason is retaliation of certain
14   people in Duracell who didn't want me to go on with
15   whatever I found about the diversion of cells, millions
16   and millions of cells.
17      Q.    In 2007?
18      A.    Yes, that were shipped from U.S.A. to Hong Kong
19   and then on the ship to Latin America -- and then from
20   Hong Kong immediately shipped to Latin America and sold
21   to retailers in Latin America, Venezuela, Argentina and
22   some other states there.
23      Q.    The judge already ruled that's not relevant to
24   this case.
25      A.    Well, there will be another case I suppose.
```

A-608

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 116

1   You will be a very busy man.  And I have enough evidence,

2   so.  Because you did say unfounded claims in your

3   response.  I would like to see those unfounded claims.

4                MR. CERASIA:  Could you mark that as 10,

5   please.

6        A.   I apologize if I'm falling into flames

7   sometimes.  I will try to get calm.  It's just that I

8   want truth to come out, all of it.

9                (Cicvara Exhibit 10: PG000475-476 -

10  marked for identification.)

11       Q.   Why don't you take a look at what's been marked

12  as Exhibit 10.  It's two pages of e-mail identified as

13  PG 475 to 476.  Tell me after you've had a chance to look

14  at this.

15       A.   Yes.  Okay.

16       Q.   Am I correct that the bottom e-mail you wrote

17  an e-mail while you wore in the plane or typed the e-mail

18  while you were in the plane?

19       A.   I guess.

20       Q.   On the way back to the United States?

21       A.   No.  This was not written on the way back to

22  United States.

23       Q.   Where was it written?

24       A.   This was written on my way to China.

25       Q.   China?

Case 12-338, Document 58, 07/23/2012, 671468, Page36 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 117

```
 1      A.    Yes.

 2      Q.    From Indonesia or from --

 3      A.    I was doing a lot of work for company, so in

 4  less than two weeks I went to Indonesia, I had two

 5  quality assurance inspections there, then I went to

 6  Thailand, I had one quality assurance inspection there,

 7  then I went to China and I had another quality assurance

 8  there, and I returned to United States on Saturday, June

 9  13th, very late in the night.

10      Q.    So you were on the plane when you typed this?

11      A.    Yes, to China.

12      Q.    Right.  And you didn't see her after you sent

13  this message?

14      A.    No.

15      Q.    The last time you saw Bel was on June 8th or

16  June 9th?

17      A.    No.  It was June 10th when I went to her room

18  to return the returned T-shirt and that was when she

19  actually -- when you had those recordings that Lynne

20  Burnett says that there are recordings from the answering

21  machine of her boss, those recordings came out to be from

22  the answering machine of Austin Lin that he -- she called

23  in the morning, I don't know why, to probably record me

24  trying to threaten her, which I never wanted to, I was

25  just asking her what did you do.
```

Case 12-338, Document 58, 07/23/2012, 671468, Page37 of 273

A-610

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                          Page 118

1       Q.    Okay.  So the simple answer to my question is

2   the last time you saw her was June 10th?

3       A.    June 10th in the morning, yes, before I went to

4   the airport to China.

5       Q.    In the first line to her it says Hi ma Belle,

6   B-e-l-l-e, Hi, m-a, ma Belle?

7       A.    Yes.

8       Q.    What did you mean by that?

9       A.    It was between me and Bel.  It came out to be

10  the way of writing e-mails back and forth.  She liked it

11  a lot.  Ma Belle means there is a song from Beatles which

12  is Michelle, ma belle, so I told her that and then I used

13  ma Belle as my how are you Bel.  So it was just a polite

14  way of addressing her, nothing, between us again.

15      Q.    In the last sentence -- line of that first

16  paragraph it talks about your warm feelings about her?

17      A.    Yes.

18      Q.    And that's what you've already testified to or

19  is there something different?

20      A.    No.  I had feelings about her, yes, which were

21  pretty normal feelings about a human being.

22      Q.    And then it says my desire to protect you and

23  inexplicable closeness that I felt towards you all this

24  time?

25      A.    Yes.

Case 12-338, Document 58, 07/23/2012, 671468, Page38 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 119

1     Q.    What's the inexplicable closeness?

2     A.    That's -- I don't want to say because you are

3  going to attack me, but that's maybe a way of expressing

4  my thoughts in English, nothing -- it doesn't mean

5  anything special.  I felt close to that person, nothing

6  else, because of the --

7     Q.    You just said you don't want to say.  What is

8  it you don't want to say?

9     A.    No, no.  I don't want to say -- I don't want to

10 excuse myself because of my English language.  So, yes, I

11 felt close to that person and that's why I said that.

12    Q.    Okay.  What were you protecting her from?

13    A.    Oh, from the pain that she had; you know, she

14 was complaining about having broken heart because older

15 gentleman left her while she was married to her husband

16 three months in marriage, which I didn't know at the

17 time.  She told me that she's married only in June.  I

18 didn't know that she was married.  I didn't know she went

19 to Spain with her husband.  She never told me that.  She

20 said I'm going alone.

21    Q.    But you knew she was married when you rubbed

22 her feet?

23    A.    Yes, I did.  She told me that.

24    Q.    Second paragraph, it says, It was you whom I

25 chose to confine my thoughts when I had troubles.  Like

Case 12-338, Document 58, 07/23/2012, 671468, Page39 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 120

1    what?

2         A.    That means nothing, I'm really sorry.

3         Q.    You just write words you don't mean?

4         A.    No, I don't write words that I don't mean.

5    This was -- this e-mail is the worst thing and the worst

6    piece of written material that I ever did.  I did it

7    partially because I was still afraid that she might go to

8    my wife and tell her what was going on between me and

9    her, and I actually got the brunt of my wife in spite of

10   her telling me, because I was forced to tell my wife the

11   truth obviously and I did tell my wife the truth.  So

12   partially this e-mail was written as trying to appease

13   somebody who is dangerous.  So I did actually learn that

14   she can do very bad things and I was trying to protect

15   myself actually.  So I was trying to come out as good as

16   possible towards her and I really don't enjoy myself

17   writing these things but I did write them.  So this is to

18   the point exactly what I wrote.

19        Q.    So you say that what you wrote here is a lie?

20        A.    No.  It was trying -- I didn't lie.  I was

21   trying to appease a woman who was dangerous.

22        Q.    Is there anything in here that's not truthful?

23        A.    Oh, let me go through it.  Maybe there is.  If

24   I have to do it under oath I'll try to.  So let's go

25   sentence by sentence.

Case 12-338, Document 58, 07/23/2012, 671468, Page40 of 273

A-613

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 121

1            This paragraph is true.  This is no change

2    today --

3        Q.   Okay.  The question was whether there's

4    anything untruthful, it's either yes or no.

5        A.   No, there is nothing really untruthful here,

6    no.

7        Q.   In the last -- third paragraph, the second

8    sentence says I would love nothing more than to take back

9    few emotional outbreaks that I experienced last few days.

10   What emotional outbreaks did you have?

11       A.   I don't think I had any outbreaks.  I --

12   emotionally probably, I can say that, you know, doing

13   that rubbing of feet and getting close in that way it was

14   not really a good thing to do.  So it probably is the

15   only thing I could refer to that was experienced last few

16   days, and also the shock that I had when she sent me that

17   text message where she said we are really not lovers and

18   we are not couple, which meant actually I don't want to

19   go on with this relationship anymore, so it was kind of

20   surprising to me, it was a shock.

21       Q.   But what emotional outbreaks did you have?

22       A.   Well, maybe when I returned the e-mail, my

23   message I did say, you know, okay, thank you for whatever

24   and ever, yes, we are not, you don't have to state the

25   obvious.  It was not really the nice thing to say.  So I

Case 12-338, Document 58, 07/23/2012, 671468, Page41 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 122

1    had a few things which I could have worded probably

2    better than what I did actually.

3         Q.   It then says Had I known that I have risked

4    losing such a precious thing as our friendship, I

5    wouldn't ever have attempted what I so foolishly did.

6         A.   Which is --

7         Q.   What did you attempt?

8         A.   I didn't attempt physically anything, but in my

9    mind there was that thing about possibility that we have

10   more than just friendship, emotional, and I would stop

11   right there.

12        Q.   So you didn't really -- when you wrote the word

13   I wouldn't ever have attempted, you're now saying that

14   you never attempted anything?

15        A.   No, beyond what I did, I never attempted

16   anything, no.

17        Q.   And then it says you were misjudging the nature

18   of our closeness in the last few days.

19        A.   Yeah, because I told her there is more than

20   just friendship and then she said very coldly and calmly,

21   no, it's not even friendship.  The other reason why this

22   e-mail was written the way it is is I realized that I

23   will have to stay in business relationship and we are

24   coming here to business, so basically in order to try to

25   bridge the misunderstandings between us I did try to say

Case 12-338, Document 58, 07/23/2012, 671468, Page42 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 123

1   let's stay in friendship and let's forget what happened.

2   She did say pretty strongly that she didn't want what she

3   did, but she also apologized for what she did twice,

4   which is very important because you wouldn't do it if you

5   were harmed by somebody.  She also said in her statement,

6   if I'm not mistaken, we will come to that, but she said

7   that -- she said I never meant any harm, I never did any

8   harm to her, never, and was always very polite, that's

9   what she said.

10       Q.   Do you know if she was ever afraid of you?

11       A.   No, she never said that, so I wouldn't say that

12   she was -- ever had any reasons to be afraid of me.  I

13   never did anything to jeopardize her safety in any way,

14   and as I said it's not in my nature to be forceful with

15   any human being, let alone with a woman.  I wouldn't ever

16   do that.

17       Q.   The last sentence on the first page says, Maybe

18   the cultural differences that you so graciously tried to

19   point out in one of our conversations did ironically

20   played the part in what transpired lately.

21       A.   Yeah.

22       Q.   What do you mean by she so graciously tried to

23   point out; did she try to tell you at some other point

24   that you were just friends?

25       A.   No.  No, no, no, she didn't try to point that

Case 12-338, Document 58, 07/23/2012, 671468, Page43 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 124

```
 1    out.  I think in one of the conversations she did say

 2    that she would do a lot of things for the customers,

 3    things that her boss is asking her to do, she would just

 4    do it.  So I think that she once said that in China when

 5    somebody -- somebody is trying to be polite to the point

 6    where they wouldn't say no ever, and I think what I meant

 7    here is if you said one time you don't want any

 8    relationship with me over our friendship I would have

 9    accepted that immediately, which I did actually.

10         Q.   So you blamed her for not coming out so

11    strongly?

12         A.   No, no, I didn't blame her.  I didn't blame

13    her.  If you read this carefully there is no blame in

14    this.  It just said maybe ironically it played a little

15    bit of something.  Let me just read it.  I said maybe the

16    cultural differences that you so graciously tried to

17    point out in one of our conversations did ironically

18    played the part in what transpired lately.  So what I was

19    trying to say is if you ever just said no, I would accept

20    no, and when she said no I accepted no as a word.

21         Q.   And at the top of page 2 it says I believe if

22    you had taken a strong stance against my foolish attempts

23    to get more out of our relation stopping it from the very

24    beginning, I would have stopped then and would have still

25    be in that special relation with you that meant so much
```

Case 12-338, Document 58, 07/23/2012, 671468, Page44 of 273

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 125

1    to me.

2        A.   Yeah.

3        Q.   You again use the word attempts.  What attempts

4    did you make, what foolish attempts did you make to get

5    more out of the relationship other than rubbing her feet

6    and her back?

7        A.   Those were the attempts and it probably

8    switched in my mind at some point where I thought that

9    there is possibly more, and I'm not blaming anybody for

10   that, it's me.

11       Q.   And then you use some words that are harsh of

12   your conduct, where it says if she wasn't so polite and

13   she wasn't trying to hurt your feelings, you have

14   unconsciously encouraged my, and then you got in brackets

15   macho, possessive, blah, blah, blah, efforts to get

16   more --

17       A.   That might be massaging --

18       Q.   Excuse me.

19       A.   Okay.  Sorry.

20       Q.   -- to get more than you were ready to give.  So

21   you think that, you know, you were being possessive with

22   her?

23       A.   No, I don't think I have been possessive with

24   her.  I think exactly what I write here.

25       Q.   It says she encouraged your macho, possessive,

Case 12-338, Document 58, 07/23/2012, 671468, Page45 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 126

1    animouse, stupid efforts.

2        A.    Which is massaging her back and getting her to

3    the point where she actually said no, stop this, I don't

4    like this, and then I stopped it, and because of that I

5    think we lost the precious thing, which is friendship,

6    and if she said that before, I would stop.

7        Q.    And then you refer to yourself as a foolish

8    dirty old man.

9        A.    Oh, there you go.  Okay.  Foolish dirty old man

10   is something that is again between us, it was just

11   attempt to diffuse the situation to the point where we

12   could laugh it off, and I'll explain why.

13       Q.    How long did it take you to think of that

14   answer, since you got fired?

15       A.    No, no.  I didn't think of the answer.  I'm

16   telling the truth.  In the plane when we were flying to

17   Singapore she picked up the brochures of Singapore.  In

18   the brochure there was a sentence which was saying you

19   can take a tour in the topless bus.  I was laughing at

20   topless bus and telling her in the plane, wow, that must

21   be exciting to be in the topless bus.  I just said that,

22   didn't mean anything else.  I meant what I meant.  And

23   she read it and she said, well, you dirty old man.  So

24   what she meant by that is I meant topless as a meaning of

25   topless.  That became words between us.  I didn't think

Case 12-338, Document 58, 07/23/2012, 671468, Page46 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 127

1   about that or think that I was fired.  It was just a

2   thing that happened on the plane between us and she said

3   to me you dirty old man.  That's why I used it here,

4   nothing else.

5        Q.   And then in the next -- you skip a paragraph,

6   it says, Again I can only say I am sorry for what I did

7   to you and I know there is no real excuse for it.  What

8   is it that you did to her that you have no excuse for?

9        A.   You know, when she acted like she acted, when

10  she sent that text message where she said that there is

11  nothing between us, I have to tell you that was really

12  shocking to me, because I just couldn't understand it.

13  You know, she was confining to me things like her husband

14  went to China and had inappropriate relationship with

15  somebody.  She hated her husband.  She was confining to

16  me things like her boss was forcing her to marry the guy

17  so that he stops rumors about them going together on

18  trips, like if you are married woman that will stop the

19  rumors.  That came from her.  So she was confining to me

20  these things and then all of a sudden she's telling me

21  stop being close to me.  I was not even close to you, you

22  were close to me.  It was shocking to me.  I just

23  couldn't understand where this is coming from, so.

24        Q.   So she's telling you this stuff, but in

25  exchange you're rubbing her feet and her back and you're

Case 12-338, Document 58, 07/23/2012, 671468, Page47 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 128

1   saying that she was the one who was inappropriate but you

2   weren't?

3       A.   No, I'm not saying it was inappropriate.  I

4   said it was very inappropriate with respect to my wife,

5   nothing else.  I didn't -- I was never in the position to

6   make any decision about business relationships.

7       Q.   I know.  You said that about four times now.

8       A.   Well, I would like you to understand that.

9       Q.   That's what you keep saying.  All right.  And

10  her response to you was, I'm sorry because I don't love

11  you but I know you love me so.  I appreciated you in the

12  past because we were just friend.  What I cannot accept

13  is that -- is what you did in the last few days.  Without

14  those dirty things, we can be friend.

15      A.   You will have to ask her.

16      Q.   Well, you then respond to her and you never say

17  I haven't done any dirty things to you?

18      A.   No.  I just said I can promise that never again

19  I will be a dirty man and I did put this in parentheses

20  because that was meant again to be between me and her and

21  to laugh it off.

22      Q.   Oh, it's just a joke then?

23      A.   No, it's not just a joke.  It's something that

24  happened between me and her and she will understand in

25  what context this was.  So it's not just a joke.  And if

Case 12-338, Document 58, 07/23/2012, 671468, Page48 of 273

A-621

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 129

```
 1    you want to ask her what she meant by what I did in last
 2    few days ask her why did she apologize, ask her why did
 3    she do the same thing that she did to me to Al Peterson,
 4    tried to do it to Dave Mathieu, did it to Austin Lin,
 5    wanted me replaced because she counted Austin who was in
 6    charge of flashlights before I came will become in charge
 7    of flashlights again.  We never talked about what
 8    happened on the audit the first day, which actually was
 9    the trigger I think for whatever happened from that day
10    on, and actually changed her relationship with me
11    immediately.
12          Q.   By the way --
13          A.   So we talk about that or not?
14          Q.   Just so I'm clear, when you went to her room on
15    June 8th you were the one who first reached out to her to
16    find out if you could bring the special dessert to her
17    room, right?
18          A.   Yes.  I was, yes, but I didn't come uninvited.
19          Q.   I only had one question and you answered it.
20          A.   Okay.
21               MR. CERASIA:  Why don't we take a break.
22               THE VIDEOGRAPHER:  Off the record at 2:27
23    p.m.
24               (Recess:  2:27 to 2:37 p.m.)
25               THE VIDEOGRAPHER:  On the record at 2:37
```

A-622

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 130

1   p.m.

2   BY MR. CERASIA:

3       Q.   Mr. Cicvara, if an employee of a contractor

4   came to you and told you that she was subjected to

5   unwanted sexual advances or comments by your boss, do you

6   believe that you'd have an obligation under the Worldwide

7   Business Conduct Manual and policy to report that?

8       A.   Could you repeat that question.

9       Q.   Sure.  If an employee of a contractor of

10  Procter & Gamble came to you and said I've been subjected

11  to unwanted sexual advances or comments from your boss,

12  do you believe that you'd have an obligation under the

13  Worldwide Business Conduct Manual or the policies to

14  report that to the company?

15      A.   It depends on the situation.

16      Q.   What would it depend upon?

17      A.   It depends upon is it truth or not.

18      Q.   Is it what?

19      A.   Is the allegation truth or not.

20      Q.   So you think you first have to find out whether

21  or not it's true before you decide whether you have an

22  obligation to report it?

23      A.   First of all I think that employee of a

24  contractor of a company that works for Duracell or for me

25  have a right to go directly to human resources and report

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                      Page 131

1    their claim directly.

2         Q.   Okay.  That's not the question I asked.

3         A.   And they can also go to director of purchasing

4    if they actually contact that person and tell him about

5    this as well.  I don't understand why would somebody who

6    is contractor for Duracell go to a person who reports to

7    me and tell him to tell human resources about what is

8    happening with her.

9         Q.   That's not the question I asked you.  Why don't

10   you focus on the question I asked you.  If you can't

11   answer it tell me.

12        A.   I think I do understand what you are asking me,

13   and as I said if you think that that's true, you would

14   probably do it, yes, I would answer that, but I am glad

15   that I had, you know, other things too, that I said other

16   things, because it's important.  There is a way of

17   picking up the phone and call directly person you are

18   communicating with business-wise if you are making claim

19   of sexual harassment.  You don't afraid to do that.  If

20   you are harassed you pick up the phone and call the

21   person.

22        Q.   Okay.  That's not the question, Mr. Cicvara.

23        A.   Good.  I know what you asked me and I tried to

24   answer the best possible way I can.

25             MR. CERASIA:  Can you mark this please as

Case 12-338, Document 58, 07/23/2012, 671468, Page51 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 132

1    I think we're on 11.

2                    (Cicvara Exhibit 11: PG000498-501 -

3    marked for identification.)

4        Q.   Mr. Cicvara, I'm showing you what's been marked

5    as Exhibit 11, a series of notes identified with numbers

6    PG 498 through 501, and have you seen these before?

7        A.   I've seen this on May 28, 2010 --

8        Q.   Okay.

9        A.   -- when it was provided to us.

10       Q.   Okay.  The answer would be yes.

11       A.   Oh, yes.  I believe the answer was yes.

12       Q.   I just asked you whether you saw it.

13       A.   Yes, I did.

14       Q.   And isn't it true that on May 15th, 2009 you

15   met with --

16                    MR. SIKORSKY:  June 15th.  You just said

17   May I think.

18                    MR. CERASIA:  Oh, then I have the wrong

19   date.  Thank you, Igor.

20       A.   June.

21       Q.   Isn't it true on June 15th, which by the way is

22   my birthday, you'd think I'd remember the date, but June

23   15th, 2009 you met with Lynne Burnett, your boss Kevin

24   Babis, and Peggy Wilczewski?

25       A.   Yes, it's true.

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 133

1    Q.    And it was at that meeting that you were

2    notified that you were going to be terminated; correct?

3    A.    Correct.

4    Q.    Okay.  Do you have any reason to believe that

5    meeting did not start at 9:15 a.m.?

6    A.    It's irrelevant.  It doesn't matter.  It might

7    have been 9:14 or 9:17, it doesn't matter.

8    Q.    Did Kevin speak at all during the conversation,

9    during the meeting I mean?

10   A.    I don't think he did.  I also don't think he

11   did know that it was Austin Lin who reported this.

12   Q.    That's not the question.

13   A.    It is because he told me --

14   Q.    No, no.  You've got to just answer my

15   questions, okay?

16   A.    Okay, yeah.  He didn't know that, by the way.

17   Q.    Do you know whether or not Kevin knew what was

18   going to be discussed at this meeting?

19   A.    No, I didn't know that.  I was not told that he

20   knew or he doesn't know.

21   Q.    Do you know who made the decision to terminate

22   your employment?

23   A.    I believe that was Lynne Burnett.

24   Q.    And on what basis do you have that belief?

25   A.    Because she is a HR director.

Case 12-338, Document 58, 07/23/2012, 671468, Page53 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 134

```
 1        Q.    And you believe that just because of her title
 2   she's the one who made the decision to terminate your
 3   employment?
 4        A.    I think it's irrelevant because the decision --
 5        Q.    Well, I don't care what you think is
 6   irrelevant.
 7        A.    -- the decision to terminate my employment was
 8   made on the wrong premises.
 9        Q.    Okay.  That's not the question.
10        A.    It's irrelevant.
11        Q.    Why is it irrelevant?
12        A.    There were three people in the meeting.  At
13   some point of the meeting I was told that the people --
14   that these three people will go to a separate room and I
15   was to wait for their decision.  They went to a separate
16   room.  After they came back it was Lynne Burnett who told
17   me exactly this, you are terminated as of this date for a
18   cause.  She never said why.  In spite of the fact that
19   here it does say for harassment, it never said that.  She
20   never said why.  She said for the cause.  Who did the
21   decision it doesn't matter.
22        Q.    So the answer is you don't know who did the
23   decision?
24        A.    Is it Kevin Babis or Lynne Burnett, it doesn't
25   matter.
```

A-627

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 135

1      Q.    You know --

2      A.    The decision was wrong.

3      Q.    -- there's two things that you should do, A,

4   answer questions, and, B, not make decisions whether

5   something is irrelevant or relevant.  So just answer the

6   question.  So I assume from your answer, which is

7   evasive, that you do not know who made the decision to

8   terminate your employment?

9      A.    Sure I don't know.  I know who told me about

10  that.

11     Q.    Thank you.

12     A.    Lynne Burnett, she told me I was fired for the

13  cause.

14     Q.    Okay.  You said that.  Thank you.  Isn't it

15  true that Lynne told you during that meeting that she had

16  documentation of e-mails that you had between you and --

17  or text messages between you and Bel?

18     A.    I don't recall she said that.  I recall she

19  said there is a recording on her boss' answering machine,

20  and she also said I don't even know was it intentional or

21  not and it didn't matter, but she did say there is a

22  recording on her boss' answering machine of the things

23  that went on in the room, have you been in that room?

24  And I said yes.  The moment I said yes, I was fired,

25  regardless of what is written here.  So there was intent,

Case 12-338, Document 58, 07/23/2012, 671468, Page55 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 136

1    a pre-intent to fire me immediately when I say I was in

2    the room, which I never denied.  It was like she expected

3    me to struggle with the fact that I was in the room

4    because I was told there are cameras in hotel which can

5    prove that you went to her room uninvited.  This is very

6    important.  I'm stressing this.  I was told that I came

7    into her room uninvited, almost forcefully came into her

8    room.  No, I was not, and I said that.

9         Q.   Okay.  Mr. Cicvara, do you have any idea or any

10   personal knowledge as to what was considered or discussed

11   in making the decision to terminate your employment?

12        A.   No, I don't.

13        Q.   Okay.

14        A.   I never said -- heard that.

15        Q.   It says here when they asked you the question

16   at the bottom of page 1, did you take off your clothes in

17   her hotel room, and you said no?

18        A.   No, I didn't.

19        Q.   You never took off a shirt, you never took off

20   your socks?

21        A.   I took off my shorts, yes, because --

22        Q.   Your shorts?

23        A.   Yes, because I wouldn't lay on somebody's bed,

24   you know, even, you know, sit on somebody's bed without

25   taking off the stuff that I was out in.  So I --

Case 12-338, Document 58, 07/23/2012, 671468, Page56 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 137

```
 1        Q.   So you took your pants off?

 2        A.   I wouldn't say pants, because I had my shorts,

 3   it was 110 degrees.

 4        Q.   Okay.  When you say shorts, you mean like

 5   Bermuda shorts kind of shorts or do you mean shorts as

 6   in, you know, short term for underwear, what did you take

 7   off?

 8        A.   No, no, no.  I took Bermuda shorts, yes.  I had

 9   underwear on myself, yes.

10        Q.   Okay.  So you took your shorts off and you only

11   had your underwear on?

12        A.   Yes, I did.

13        Q.   Did you take your shirt off?

14        A.   No, I didn't.

15        Q.   So you had a shirt on and your underwear?

16        A.   Yes, as far as I -- yes, I think so.

17        Q.   Okay.  And do you believe that that was

18   appropriate conduct?

19        A.   No, I don't believe it was appropriate conduct,

20   but in the circumstances where somebody went directly

21   into the bed and dimmed the lights and I was left

22   basically with no choice but to sit down on her bed, I

23   actually did it just so that I don't, you know, spoil

24   somebody's bed sheets.

25        Q.   All right.  Was there something that you sat on
```

Case 12-338, Document 58, 07/23/2012, 671468, Page57 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                        Page 138

1    with your shorts, like you sat in mud or you sat on oil?

2        A.    No.  I just don't do that.

3        Q.    So you took your shorts off and sat on the bed

4    with your underwear to be polite?

5        A.    Yes, I did, yes.  Yes.  Before we go on can I

6    just say something?

7        Q.    No.  I don't have a question.

8        A.    Well, these notes here --

9        Q.    I don't have a question.

10       A.    There wasn't --

11       Q.    I don't have a question.

12       A.    Okay.

13       Q.    And then they asked you the question did you

14   tell her that you wanted to rape her?

15       A.    No, I never said that.  I never told her --

16       Q.    Did you ever say, look, it was in a hotel and

17   she was dressed in a way, I told her that I had a feeling

18   I would rape her --

19       A.    No.

20       Q.    -- but never had that in my mind and didn't

21   think she'd think about it seriously?

22       A.    No, I never said that.  I said I never said I

23   would rape her and that's what I said, and that's why I

24   said these notes don't reflect what was talking about at

25   that meeting, they don't reflect it.

Case 12-338, Document 58, 07/23/2012, 671468, Page58 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 139

```
 1              I wanted to say something and you cut me off.

 2    There is a question here which says did she invite you to

 3    her hotel room?  There is no answer here.  Why do you

 4    think there is no answer here?  There is another

 5    question, did she ask you to leave and did you refuse to

 6    leave?  There is no answer.  Why do you think there is no

 7    answer?  Do you think she didn't ask me that?  These

 8    notes are written --

 9         Q.   So you think if it said that you got invited

10    there it would be okay because you were in there and you

11    were a polite man and you took off your clothes to your

12    underwear --

13         A.   No, no.

14         Q.   -- you rubbed her feet and you rubbed her back

15    and that's okay?

16         A.   I never said that.  I said that I was lied to

17    when she said there is a recording from that room on her

18    boss' answering machine and she even added I don't care

19    was it intentional or not.  I was lied to.

20         Q.   Okay.  Did you --

21         A.   I said these notes don't have my answer to did

22    you go to her room, what -- did she invite you to her

23    hotel room.  I said yes, she invited me, and she said,

24    no, she said you came uninvited.  There is nothing about

25    that here.  Why?
```

Case 12-338, Document 58, 07/23/2012, 671468, Page59 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 140

1      Q.   Well, you told me that she didn't invite you,

2   you told me that you invited yourself and she said okay

3   after some time?

4      A.   No, I didn't invite myself.  I asked can I come

5   to your room to have dessert with you?  I didn't invite

6   myself.  I was told yes, come to my room, I changed my

7   mind, in her text message.  You know, she did choose text

8   messages to send to Duracell, but she never sent all text

9   messages, she never sent all her e-mails, and I told you

10  I need those e-mails and I was told computer disappeared,

11  there is no computer, there are no traces of e-mails.

12     Q.   Did you ever tell Peggy and Lynne and Kevin

13  that I'm a man and it looks like I could rape you like

14  that --

15     A.   No.

16     Q.   -- because she had very short shorts on?

17     A.   No, I never said I could rape you like that.  I

18  said when you do those things with your legs one could

19  rape you, and as I said she said then what is rape, and I

20  said whatever the rape is, and we went on about that

21  academically, nothing else.

22     Q.   Did you tell Bel she was showing off?

23     A.   No, I never said that to Bel and I never said

24  to these people that she was showing off.  I said she was

25  dressed very unusually and I was very surprised with that

Case 12-338, Document 58, 07/23/2012, 671468, Page60 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 141

1    when she called me in her room.  I never said that.

2        Q.   Did you ever tell them that you had a feeling

3    that you had to protect her from harm?

4        A.   Look, my English doesn't know for the term put

5    her in harm way.  I wouldn't ever say that.  So whatever

6    is written here is not true.  And I said, since I never

7    saw this before May 28th this could have been written in

8    a totally different way.  I don't know how are you going

9    to say that this is piece of evidence.  For what?  For

10   what somebody wanted to write down here?  Ask Kevin Babis

11   did she tell me that she had recordings from her room.

12   Ask Kevin Babis what I answered to the question did she

13   invite you to her hotel room.  Why it is not in the

14   notes?

15       Q.   Okay.

16       A.   Why was not I given these notes when I was

17   fired?

18       Q.   You said that.  Did you ever tell your wife

19   that you took your pants off in that room?

20       A.   What does it have to do with this case?

21       Q.   Did you ever tell your wife that you took your

22   pants off in her room?

23       A.   I'll answer it when you tell me what does it

24   have to do with this case.

25       Q.   You don't ask questions.  I ask questions.  You

Case 12-338, Document 58, 07/23/2012, 671468, Page61 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 142

1   answer questions.

2       A.   Yes, I did tell my wife.  I did tell my wife

3   many, many things about this, many more things about this

4   because she was curious to learn.  I did pass through

5   that in the last 18 months, yes.

6       Q.   And you think that somebody in your position as

7   the quality manager who is out to audit a contractor that

8   it was appropriate for you to be in the room of a general

9   manager of that contractor, A, with your underwear on

10  and, B, massaging her feet and rubbing her back, do you

11  think that's appropriate?

12      A.   I think under the circumstances where she was

13  not any better dressed than I was, even worse, when I

14  undressed myself, it might not be appropriate according

15  to some rules, written rules, but for that circumstances

16  it might be.

17      Q.   Did Bel ask you to take your clothes off?

18      A.   No.

19      Q.   Did she tell you to put your clothes back on?

20      A.   As a matter of fact, when she said no she --

21  for some reason after we discussed that thing about rape,

22  she got very mad at me, I don't know why, she went on,

23  she said I have to go to the bathroom and please put your

24  shorts on, I hate your underwear.  That's what she said,

25  I hate your underwear.  So I said okay and I did put it

Case 12-338, Document 58, 07/23/2012, 671468, Page62 of 273

A-635

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 143

1   on.  That was when she got very mad and she did tell me

2   to put my shorts on.  I did it, yes.

3        Q.   And did you have your shorts on --

4        A.   And I never said the same thing to her.

5        Q.   Did you rub her feet before or after you put

6   your shorts back on?

7        A.   Before.

8        Q.   So you were in your underwear when you rubbed

9   her feet and her back?

10       A.   Yes, but I was also in my underwear when she

11  called her boss and when I saw that e-mail and when she

12  told me, you know, this is not what you should see.  I

13  was also in my underwear 15 minutes when she talked to

14  her husband that she didn't mention and after that she

15  got mad at me and I put on -- we went to discuss a few

16  things and then we went to kitchen and we ate our

17  dessert, as I said we listened to the music, and that was

18  it for that night, so.

19       Q.   Do you think she provoked you or tricked you

20  into --

21       A.   Look, I don't want to think anything, I don't

22  want to assume anything, but I think they have a way of

23  doing business which is dishonest.  I think they are

24  actually trying to pinpoint people who are involved.  I

25  remember one day she told me something about Nitesh

Case 12-338, Document 58, 07/23/2012, 671468, Page63 of 273

A-636

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                        Page 144

1    Singh, S-i-n-g-h, she said I don't like him and I don't

2    like the way Duracell is changing their people so quickly

3    because I'm just used to somebody and then there is

4    somebody new, and she didn't like Nitesh because for some

5    reason obviously Nitesh didn't like her and it seems like

6    she was not used to that.

7         Q.   Did you think before June 8th when you went in

8    her room and you stripped down to your underwear that she

9    was a dishonest person before then?

10        A.   I didn't know many, many things about that

11   woman that I learned after, like, for example, about her

12   attempt to seduce Dave Mathieu, about e-mails from Austin

13   Lin, about relationship from Austin Lin.  I had my doubts

14   about that because there were other instances where she

15   was telling me I can call Austin any time in the night,

16   no problems.

17        Q.   When did you learn that information, after?

18        A.   After what?  After I was fired, yeah, I learned

19   this information about that she was trying to seduce Dave

20   Mathieu, and Brian Hesse, H-e-s-s-e, advised him to get

21   out of that possible relationship, so don't continue

22   having anything with that woman.

23        Q.   But you never thought it was appropriate to,

24   you know, figure out --

25        A.   It was appropriate to do what?

A-637

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 145

1     Q.   Well, if you'd let me finish a question I'd get

2   there.

3     A.   Okay.

4     Q.   You didn't think it was appropriate then to

5   find out who you were dealing with before you decided to

6   go in her room and strip down to your underwear?

7     A.   Well, unfortunately, yes.  Unfortunately I

8   didn't know many things.  As I told you I didn't know

9   that she was married.  She never told me.  I didn't know

10  that there was a relationship possible with her boss.  I

11  didn't know that she was on that trip in Spain with her

12  husband.  I didn't know many things.  I learned a lot

13  during that trip.  I learned a lot after that trip as

14  well, so.  One thing that I can tell you is there was

15  nothing I could have done to, you know, improve their

16  position with Duracell or to decrease their position with

17  Duracell.  One thing that might have triggered her

18  behavior is our findings during the quality audit, which

19  since you didn't ask me I never came to discuss that, but

20  if you want we can do that.

21          MR. CERASIA:  Can you mark this.

22    A.   We found out that they might be --

23    Q.   No, no, I don't have any question.

24    A.   -- below 50 percent in their score, so I think

25  they were very afraid of it on Monday.  On Tuesday we

Case 12-338, Document 58, 07/23/2012, 671468, Page65 of 273

A-638

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                          Page 146

1    actually did score them to 55 and that was a little bit

2    of this (indicating), a little bit.

3        Q.    What does this mean?

4        A.    This means that I discussed -- we discussed,

5    Lori discussed with me certain things that we found.  We

6    found inappropriate or falsifying documents.  They

7    falsified the quality records.  They were claiming that

8    the certain machine that they used to manufacture

9    reflectors were in good shape when actually for months

10   one part of that machine was not working.  Then they show

11   us the records which were showing that they were working

12   and they actually recorded every day off the instrument

13   that was broken and every day they recorded the right

14   thing.  So at some point I think they thought they're

15   going to fail, in their mind --

16       Q.    But this was after you were confronted with the

17   allegations?

18       A.    No.  No.  This was on June 8, during the day.

19   June 8 during the night she changed her mind and first

20   said don't come, I'm tired, and I said okay, and then she

21   said come, I'm not tired.

22       Q.    Let me ask you this.  Your claim that they got

23   scored at 55 percent, when do you claim that was

24   communicated to Practical?

25       A.    The day after.

Case 12-338, Document 58, 07/23/2012, 671468, Page66 of 273

A-639

CICVARA v. PROCTOR & GAMBLE                        December 21, 2010

Page 147

```
 1        Q.    The day after what?

 2        A.    After June 8th.  So it was communicated on June

 3   9 in the afternoon.  That night she apologized to me

 4   profoundly.  She said I'm so sorry but --

 5        Q.    I know.  You've been over this four times, but

 6   you don't know why she apologized, you're just surmising

 7   as to why she did.

 8        A.    Okay.

 9              MR. CERASIA:  Can you please mark this as

10   12.

11        Q.    Can I have that 11 back please?

12        A.    Are you finished with this?

13        Q.    For now.

14        A.    Let me just say something.

15        Q.    No.  You say nothing.  No, you say nothing.

16        A.    It says I was violating company PVP and I was

17   engaging in harassing behavior by harassing company

18   supplier.  That was never told, never said that to me.

19   She said you're fired because of --

20        Q.    Okay.  Thanks for letting me know.

21        A.    She never said because of what.

22        Q.    Okay.  There's no question pending.

23        A.    I asked in one of my e-mails please let me know

24   why I was fired.  The answer was you violated conduct

25   manual, Worldwide Conduct Manual.  There was no other
```

A-640

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 148

1   answer.  At this meeting I was told you are fired for

2   cause, nothing else.  That's how I was fired, in ten

3   minutes; nine years of work in ten minutes.

4        Q.   That's what happens when you strip to your

5   underwear.

6        A.   Sure, yes.  Good.  And that's why computer

7   disappeared with all the reports about the diversion.

8        Q.   I don't know what you're talking about,

9   Mr. Cicvara.

10        A.   I know you don't, because the judge says, and

11   you said it was unfounded claim in your answer.

12        Q.   Okay.  There's no question pending.

13        A.   Good.

14             (Cicvara Exhibit 12: PG000525 - marked

15   for identification.)

16        Q.   Okay, Mr. Cicvara, I'm showing you what's been

17   marked as Exhibit 12, which is identified as PG 525, it

18   is an e-mail of June 14th, 2009 from Andrew to Nitesh

19   Singh, and you understand that to be Andrew Yau?

20        A.   Yes.

21        Q.   And when did you first see this, during

22   discovery in the lawsuit?

23        A.   May 28th.

24        Q.   2010?

25        A.   Yes.

Case 12-338, Document 58, 07/23/2012, 671468, Page68 of 273

A-641

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 149

1      Q.    Second paragraph says I want to let you know in

2   no uncertain terms that he is no longer welcome in

3   Practical in the future, kindly send someone else for the

4   job next time.

5      A.    So?  What do you want me to say?

6      Q.    I didn't ask a question yet.

7      A.    Okay.

8      Q.    I'm just pointing you to something, okay?

9      A.    Okay.

10     Q.    So you got the chairman of Practical Lighting

11  saying that you're not welcome there anymore, right?

12     A.    Yeah.  That's the same chairman who is sending

13  e-mail messages to Bel saying we need to sack that guy

14  who is reporting to him.

15     Q.    Okay.  What's that have to do with the price of

16  tea in China?

17     A.    Nothing.  It has nothing to do with anything.

18     Q.    All right.  So Procter & Gamble, would you

19  agree that if one of their contractors said that they

20  didn't want you on site because you had been sexually

21  harassing one of its employees, that they should no

22  longer send you there, would you agree with that?

23     A.    Sure, as long as the investigation that will

24  prove that there were inappropriate sexual advances is

25  conducted in a proper way and they prove that that is

Case 12-338, Document 58, 07/23/2012, 671468, Page69 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 150

```
 1   true, yes, I would strongly agree with that.
 2          Q.   Okay.  Now what happens if by some chance it
 3   was investigated and the opposite conclusion was reached,
 4   and that being that, you know what, we heard what you
 5   said, Mr. Yau, but we've investigated and we don't
 6   believe that there's been inappropriate sexual
 7   advances --
 8          A.   And then you would --
 9          Q.   Can I finish?
10          A.   Yes.
11          Q.   Do you believe that Procter & Gamble at that
12   point should say to its contractor too bad, we're sending
13   Mr. Cicvara back to you no matter what you say?
14          A.   No.
15          Q.   You've got to respect the wish of the
16   contractor; right?
17          A.   Yeah, I would think that maybe they would
18   change the person, they will send another person, but
19   they will not fire the person, there is no reason to.
20   Why would you fire a person who is not guilty, because
21   somebody says that, is that enough reason?
22          Q.   Don't you believe that from Mr. Yau's point of
23   view, if he's the chairman of the company and he's
24   writing this to Nitesh Singh, that, you know, this is
25   something that is viewed as not being helpful to the
```

Case 12-338, Document 58, 07/23/2012, 671468, Page70 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 151

1    Practical-Duracell relationship?

2         A.    I found this very odd that he is actually

3    sending this e-mail to Nitesh Singh.

4         Q.    Why is that?

5         A.    Because Nitesh Singh reports to -- I forgot her

6    name, but she reports to Erik Lawson.  In normal

7    communication between Andrew and -- would go through Erik

8    Lawson.  I believe this was done on purpose so that he

9    has another person in Duracell who knows about alleged

10   sexual harassment so that it's like a stamp on my destiny

11   in Duracell, it's like it's not enough that it's HR, it's

12   not enough that it's Erik Lawson, let's put this guy too

13   in the game.  So I found this very odd that Andrew Yau

14   would contact person who is Nitesh Singh.  Yes, Nitesh

15   Singh was in charge of flashlights, but Andrew Yau never

16   contacted him before.  You can ask --

17        Q.    Do you have personal knowledge that he never

18   contacted him before?

19        A.    Not for this kind of matters, that's for sure.

20   Because this would be discussed between two persons who

21   are at the same level.  Like he did discuss later his

22   business with Duracell, where he send directly to Erik

23   Lawson and he told Erik, look, let's forget about this,

24   let's talk about business, you promised there will be

25   business coming and growing and I didn't see it, so now

Case 12-338, Document 58, 07/23/2012, 671468, Page71 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 152

1  it's time next time when we see each other let's talk

2  about business.  This was just, you know what, let's make

3  sure that this guy will never come here again.

4       Q.   That's part of your conspiracy theory, right?

5       A.   No.  There is no conspiracy theory.  That's

6  true.  There is no theory here.

7       Q.   Okay.  Do you know what --

8       A.   It's all facts.

9       Q.   Do you know what Mr. Singh's title was at P&G?

10      A.   A buyer.  Mr. Singh's title was a buyer for

11  flashlights and he reported to Christina Dilko and

12  Christina Dilko reported to Erik Lawson.  So Christina

13  Dilko was on my level and Nitesh Singh was on Austin's

14  level.  What I'm saying is it's not normal that general

15  manager or chairman of the company is going to send this

16  kind of e-mail to Nitesh Singh, and first of all Nitesh

17  is not the one who is actually deciding who is going to

18  be sent, it's my boss, Kevin Babis, not Nitesh.  Nitesh

19  has nothing to do with QA.

20      Q.   Do you know if Andrew Yau had a relationship

21  with Kevin?

22      A.   I don't know.

23      Q.   Okay.  But he had a relationship with Nitesh

24  Singh, right?

25      A.   I don't think he did, a relationship.  He just

Case 12-338, Document 58, 07/23/2012, 671468, Page72 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 153

1  knew him because he was buyer, nothing else.

2        Q.   On the day that you were fired do you recall

3  whether or not you called Peggy to ask her about your

4  stock options and your bonus?

5        A.   On the date when I was fired.  I'm not sure was

6  it on that date or day after.  I did call, yes, but I'm

7  not sure was it on that date or day after.

8        Q.   And you spoke to Peggy?

9        A.   Yes.

10       Q.   And she -- do you remember her telling you that

11  you could not exercise your stock options because they

12  were forfeited when you were terminated from the company?

13       A.   I remember that she said that, yes.

14       Q.   And in response to that did you call somebody

15  else in the stock option administration department?

16       A.   No.  I called them before.  I called them the

17  day before and they told me that I have 30 days to

18  exercise.

19       Q.   Do you remember who you spoke with in the stock

20  option administration?

21       A.   No.

22       Q.   When you called stock option administration to

23  ask questions about your ability to exercise your stock

24  options, did you tell them that you had been terminated

25  for cause?

Case 12-338, Document 58, 07/23/2012, 671468, Page73 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 154

```
 1      A.   Yes.

 2      Q.   Did you tell them the reasons you had been

 3  terminated, what the cause was?

 4      A.   No, because I didn't know that.

 5      Q.   Well, you knew the allegations against you were

 6  that you had engaged in inappropriate conduct towards

 7  Bel, right?

 8      A.   As I said, until today's date I really don't

 9  know why I was fired.  I don't know why I was fired.  I

10  asked not once, I asked many times and I asked in

11  writing, I said please, because I was advised by my

12  lawyers to ask, and I was always told you were terminated

13  because of violating Worldwide Conduct Manual.  Look --

14      Q.   So you were told the reason?

15      A.   No, I was not told the reason.  Because in

16  Worldwide Conduct Manual there are about 20,000 reasons

17  for why you can be fired, and I was asking for a reason,

18  specific reason, not violating conduct, tell me what did

19  I violate.  I don't know to this date why I was fired.

20  You are saying alleged harassment.  She did write that in

21  the notes, but I was never told that during the meeting.

22  I was only told you are fired for cause, as of this date,

23  that's it.

24      Q.   So all you did was you told the person in the

25  stock option administration that you were fired for
```

Case 12-338, Document 58, 07/23/2012, 671468, Page74 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 155

1    cause?

2         A.   For cause, yes.

3         Q.   You didn't give any specific facts, nothing?

4         A.   No, I didn't get into specifics because I

5    couldn't even tell specifics, I would be lying.

6         Q.   Right.  And you didn't know if this was a

7    person who had made decisions under the stock option

8    plan?

9         A.   She -- no, the person told me if you are fired

10   for cause, and she didn't tell me that there are

11   specifics, you have 30 days until when you left the

12   company to exercise those stock.  That is when I called

13   Peggy -- I think next day I called about that, and then I

14   was told that I was -- it was not a correct answer and

15   they regret that they gave me incorrect answer.  Then I

16   called Peggy about what is going on and asked her to

17   explain this to me.

18        Q.   Okay.

19        A.   And then she -- I was sent, you know, that

20   rules about how you exercise and I was told that because

21   of certain things materially injurious to the company, I

22   cannot exercise.  I think that's what came out.

23             MR. CERASIA:  Mark that as 13 please.

24             Do you have an exhibit there?

25             THE WITNESS:  No.  I don't have anything

Case 12-338, Document 58, 07/23/2012, 671468, Page75 of 273

```
                                                      Page 156

1    here.

2                    MR. CERASIA:  Okay.

3                    (Cicvara Exhibit 13: PG000506-508 -

4    marked for identification.)

5                    MR. CERASIA:  If you want to mark that as

6    14 while you're doing that, that would be great too.

7                    (Cicvara Exhibit 14: PG000516-522 -

8    marked for identification.)

9         Q.   Okay, Mr. Cicvara, showing you what's been

10   marked as Exhibit 13, which is a letter to you dated June

11   16th, 2009, identified as PG 506 to 507, from Peggy.

12        A.   Uh-huh.

13        Q.   Tell me after you've had a chance to review

14   that.

15        A.   Yeah, okay, I reviewed it.  I saw that letter

16   before.

17        Q.   And in this letter, if you look, it's the

18   second sentence of paragraph 1, it says as we discussed

19   earlier today your stock options were canceled because

20   your employment was terminated for cause; right, do you

21   see that?

22        A.   I would say that's probably not the only

23   reason.  It's not enough that it's terminated for cause,

24   there are other reasons here.  It's not just terminated

25   for cause you don't have right to options.  There must be
```

Case 12-338, Document 58, 07/23/2012, 671468, Page76 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 157

1   something else.

2        Q.    What do you mean by that?

3        A.    I mean that there should be either A, B or C

4   involved.

5        Q.    Well, the definition of discharge for cause

6   includes A, B or C?

7        A.    Yes.

8        Q.    Right, that's what the plan says?

9        A.    Exactly, yes.  The definition of discharge for

10  cause includes each of the following, yes, which is A, B

11  or C, yes.

12       Q.    Did you understand that that came directly from

13  the stock option plan?

14       A.    Yeah, I understood.

15             MR. CERASIA:  Can you mark that as 15

16  please.

17       A.    Just tell me which one of A, B and C is

18  applicable to this case.

19             (Cicvara Exhibit 15: PG000184-201 -

20  marked for identification.)

21       Q.    If you look at the second page of the letter,

22  Peggy tells you that she apologizes for any confusion

23  that resulted from conflicting information that you

24  received from the administrator in the stock option

25  department, right?

Case 12-338, Document 58, 07/23/2012, 671468, Page77 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 158

```
 1      A.    Yeah, sure.

 2      Q.    And then she tells you that the plan is clear

 3  and that the administrators didn't have access to all of

 4  the facts, right?

 5      A.    Sure.

 6      Q.    And then she enclosed a copy of the plan?

 7      A.    Yes.

 8      Q.    And I'm showing you what's been marked as

 9  Exhibit 15.  Is that the copy of the plan that she

10  enclosed?

11      A.    Yes.

12      Q.    Had you --

13      A.    That's the copy, yes.

14      Q.    Had you seen that plan before?

15      A.    Well, I'd probably seen it.  I didn't go

16  through it before this happened, but after this happened,

17  yes, I did.

18      Q.    Part of your compensation over prior years was

19  you received stock options that vested?

20      A.    2001, 2002, '3, '4 and '5, yes.

21      Q.    And those vested after three years --

22      A.    Yes.

23      Q.    -- from the granting?

24      A.    So all of them were vested, yes.  I could have

25  exercised them in 2006, but I didn't, or any year after
```

Case 12-338, Document 58, 07/23/2012, 671468, Page78 of 273

A-651

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 159

```
1    that.

2         Q.   Well, the last award you got was 2005, right?

3         A.   Yeah.

4         Q.   And it takes three years to vest?

5         A.   Yeah.  So 2008 I could have done that, but I

6    didn't.  But as I said, could you tell me which one of A,

7    B and C is applicable?

8         Q.   Let me have the documents back please.

9         A.   Sure.

10        Q.   Thank you.

11        A.   You're welcome.

12        Q.   And you also had a question to Peggy with

13   respect to your bonus, right?

14        A.   Well, I was told that I will receive my bonus.

15        Q.   Who told you that?

16        A.   She told me that.

17        Q.   Do you know what your bonus -- what amount of

18   bonus you expected to receive?

19        A.   That doesn't really matter, is it 3,000, 5,000,

20   10,000, it doesn't matter, it's a bonus.

21        Q.   Well, it matters because I'm asking the

22   question.

23        A.   I don't -- you know, 8 percent of my salary is

24   a target bonus, but bonus could be --

25        Q.   Is discretionary?
```

A-652

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

                                                              Page 160

1        A.    No.   It could be affected by many things.   It's

2    not discretionary, it's 8 percent of my salary, but it

3    does include, you know, how P&G performed in that year,

4    how the specific division of P&G performed.   There are

5    many things going into the formula.   So it could be 8

6    percent, it could be 5 percent, it could be 10 percent.

7    That's why I'm saying it's irrelevant, it's given.

8        Q.    I understand.   And you claim that there's no

9    discretion in it?

10       A.    I claim there is no discretion in it except

11   maybe in the case you are fired, maybe.   So I didn't

12   receive bonus, but I was told I will receive bonus, but,

13   hey, it doesn't matter, it really doesn't matter.   I was

14   told that I would receive bonus.

15       Q.    Look at Exhibit 14, please.

16       A.    Yes.

17       Q.    This is an e-mail that you sent to Peggy on

18   September 15th, 2009?

19       A.    Yes.

20       Q.    Where you ask her about the bonus, right?

21       A.    Yes.   And I said that last time we spoke you

22   have stated that while my options are not going to be

23   valid I will be eligible for bonus and will receive it in

24   September; that's what she said.

25       Q.    Okay.   And she wrote back to you, per the

Case 12-338, Document 58, 07/23/2012, 671468, Page80 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 161

1   attached guidelines, which are attached to the e-mail,

2   you must be an active employee as of June 30th of the

3   fiscal year to get the bonus?

4        A.    Perfectly clear.

5        Q.    And you were terminated before June 30th of the

6   fiscal year, right?

7        A.    As I said perfectly clear.

8        Q.    So do you admit that if you were fired that you

9   were not entitled to the bonus because you had not been

10  there on June 30th?

11       A.    I don't have to admit anything, it's here, it's

12  written.  I just say I was told differently, nothing

13  else, and I was told differently.  I have to admit I

14  probably didn't read this document carefully.  If I read

15  it, I probably would find the same thing, but as I said I

16  was told by human resources person that I would receive

17  it.  I wouldn't otherwise ask.

18       Q.    Okay.  But let's go back to the question.

19  Wouldn't you agree that under the short term achievement

20  award policy that you do not receive a bonus if you are

21  not employed on June 30th of that year?

22       A.    Just a second.

23            Yes, because it says remember you must be an

24  active employee on date of payment -- oh, these are stock

25  options, I'm sorry.  But it's probably the same thing,

CICVARA v. PROCTOR & GAMBLE                      December 21, 2010

Page 162

1    yes, I would agree.

2         Q.   Okay.  So you agree that you were not entitled

3    to a bonus for that year?

4         A.   Sure, if I am fired, no.  The question is why

5    I'm fired, but that's beyond the point.

6         Q.   But you were fired before June 30th of that

7    year?

8         A.   Sure.

9         Q.   So you were not an active employee; correct?

10        A.   True.  All I'm saying is I was told

11   differently, nothing else, and obviously anybody can tell

12   you anything, but what is written is true, so yes.

13        Q.   Did you ever rely on the statement that you

14   claim Peggy made to you that you would be eligible to

15   receive a bonus in September?

16        A.   In what sense?  I don't understand.

17        Q.   Did you make any decisions based on it, did you

18   spend the money?

19        A.   How would I spend the money that I don't have?

20        Q.   Okay.  According to this e-mail, in June of '09

21   you say she told you you're going to get your bonus and

22   you're going to get it in September?

23        A.   Yes.

24        Q.   Okay.  From June '09 to September '09 did you

25   make any decisions to spend money in reliance on your

Case 12-338, Document 58, 07/23/2012, 671468, Page82 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 163

1   belief that you were getting a bonus?

2        A.   No, I have not made any decisions.  I never do

3   that.

4        Q.   Okay.

5        A.   I spend only money that I have.

6        Q.   That you have in your hand?

7        A.   Lately I don't have much, but I don't spend

8   money that I don't have, so.  I didn't make any decision.

9   But my wife is working two jobs because that's the only

10  way we can pay for mortgage, so.

11                  MR. CERASIA:  Can you mark that as 16 and

12  17 please.

13                  (Cicvara Exhibit 16: PG000509-513 -

14  marked for identification.)

15                  (Cicvara Exhibit 17: PG000514-515 -

16  marked for identification.)

17       Q.   Did you have a chance to look at these?  Oh,

18  sorry.  They weren't handed to you.

19       A.   They weren't given to me.

20       Q.   Because I didn't give them to you, you're

21  right.

22       A.   I'm not trying to touch anything before I'm

23  given it.

24       Q.   Okay.  I'm showing you what's been marked as

25  Exhibit 16 and 17.  Exhibit 16 is a letter from you dated

CICVARA v. PROCTOR & GAMBLE                      December 21, 2010

Page 164

1    July 3 to Procter & Gamble addressed to the stock option

2    administrator and it's stamped as PG 509 through 512, and

3    16 -- or, excuse me, 17 is a July 6th, 2009 letter from

4    Peggy to you.

5        A.   Uh-huh.

6        Q.   Why did you send the letter of July 3 after

7    receiving Peggy's letter of June 16th telling you that

8    your options had been canceled?

9        A.   I sent it just to make sure that I did what I

10   thought I should be doing in the first 30 days after I

11   was fired.  So I did send it just to make a trace of

12   documents, if you wish, which is exactly what you are

13   showing me, and I was advised so by my lawyer at that

14   time.

15       Q.   That would be Mr. Skiber?

16       A.   Yes.

17       Q.   You say in the last paragraph, it says I fully

18   intend to exercise the final grant, 1,950 shares granted

19   6/16/2005 should it become economically feasible.  Were

20   those options underwater at the time?

21       A.   Yes.

22       Q.   Okay.  And then you receive in response a

23   letter from Peggy, July 6th, 2009, telling you that as

24   she explained to you in her June 16th, 2009 letter your

25   options were canceled pursuant to the terms of the plan

Case 12-338, Document 58, 07/23/2012, 671468, Page84 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                        Page 165

1   because you were terminated for cause, right?

2       A.   There was a question I asked that you never

3   answered and I don't think -- I'm not sure if you intend

4   to answer it.

5       Q.   I'm not here to answer questions.  I think I've

6   told you that a couple times.

7       A.   Okay.  I was asking A, B or C, but you didn't

8   answer it.

9       Q.   Sir, I don't answer questions.

10      A.   Because as I said terminated for cause is not

11  enough to stop somebody's options, there should be either

12  A, B or C.  I was clearly asking you which one of these

13  three is applicable to my case and I didn't hear an

14  answer.  It's the same thing as I asked why I was fired

15  and I never heard an answer.

16      Q.   Okay.  At any point after July 6th, 2009 after

17  you received the letter from Peggy --

18      A.   Yes.

19      Q.   -- did you ever submit any letter to Procter &

20  Gamble, to the stock option administration department,

21  appealing the decision?

22      A.   No.

23      Q.   No?

24      A.   No.  Why would I appeal the decision?

25      Q.   I don't know.  You never asked -- you never

Case 12-338, Document 58, 07/23/2012, 671468, Page85 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 166

```
 1   submitted anything in writing asking for a reason as to

 2   why you weren't given the options or for them to

 3   reconsider the decision?

 4        A.   Come on.

 5        Q.   I'm just asking whether you did it.

 6        A.   No, I didn't.

 7        Q.   Okay.  Are you taking notes?

 8        A.   No.

 9        Q.   What are you doing?

10        A.   I'm just going through the notes that I put

11   here and just putting plus, minus.  You have the copy of

12   it.

13        Q.   Okay.  What are the plus and minuses mean?

14        A.   It means like I did say something about this

15   and I should say something about which is minus.

16        Q.   Those are your notes that you took and you gave

17   us at the beginning of the deposition?

18        A.   Yes.

19             MR. CERASIA:  Okay.  Will you please mark

20   that as 18 please.

21        A.   Is that something I shouldn't be doing or can I

22   do that?

23        Q.   I'm just curious as to what notes you're

24   taking, that's all.  If you're taking notes at the

25   deposition I have a right to know what notes you're
```

Case 12-338, Document 58, 07/23/2012, 671468, Page86 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 167

1    taking.

2        A.    Okay.   That's good.   I'm not taking notes, just

3    signs.

4                    (Cicvara Exhibit 18: First Amended

5    Complaint - marked for identification.)

6        Q.    Showing you what's been marked as Exhibit 18,

7    which is a copy of the Amended -- First Amended Complaint

8    that was filed by your prior lawyer in this case on

9    January 6, 2010.   Have you ever seen this document

10   before?

11       A.    Yes.

12       Q.    Did you see it before it was filed?

13       A.    Oh, I believe I saw, yeah, the draft of it.

14       Q.    Do you understand everything in here to be true

15   and accurate?

16       A.    I think the question is too broad.   If you can

17   ask me specifically.

18       Q.    Okay.   Is there anything in here that's not

19   true or accurate?

20       A.    If you can ask me specifically I will answer

21   specifically.   I just don't want to make this statement

22   without looking.

23       Q.    You can look at it.

24       A.    Okay.   So can I look at it, can I take the time

25   and read?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 168

1      Q.    Sure.

2      A.    Okay.

3            MR. CERASIA:  We might as well cut while

4  he's reading the document.

5            THE VIDEOGRAPHER:  Off the record at 3:31

6  p.m.

7            (Recess:  3:31 to 3:46 p.m.)

8            THE VIDEOGRAPHER:  On the record at 3:46

9  p.m.

10 BY MR. CERASIA:

11     Q.    Okay.  Mr. Cicvara, I'm looking at the

12 complaint, amended complaint which is Exhibit 18, and the

13 question I had asked you was whether or not there's

14 anything in there that you believe to be -- that is not

15 true or accurate.

16     A.    Well, according to my knowledge I don't think

17 there is anything here that is not true.

18     Q.    Okay.

19     A.    Except maybe legal things about, you know --

20     Q.    I'm not asking you about legal things, just

21 really the facts.

22     A.    Okay, because I don't want -- yeah, okay.

23     Q.    As I understand it, you have essentially four

24 claims here, right?  You're seeking your -- the value of

25 stock options?

Case 12-338, Document 58, 07/23/2012, 671468, Page88 of 273

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 169

```
 1      A.    Yeah.

 2      Q.    Right?  You were seeking what you call a

 3  severance package; correct?

 4      A.    Yes.

 5      Q.    And then you said that you were seeking an

 6  annual bonus, right?

 7      A.    Yes.

 8      Q.    Okay.  My question was the annual bonus, were

 9  you seeking the annual bonus under the STAR plan?

10      A.    Yes.

11      Q.    Okay.  That we already addressed, right?

12      A.    We already addressed the case if you are fired

13  you don't have a right to have bonus, yes.  The question

14  is why was I fired.

15      Q.    I understand.  Is there any other bonus that

16  you are seeking other than the STAR bonus in this

17  lawsuit?

18      A.    No.  It was about that, yes.

19      Q.    Okay.  What is the severance package you're

20  referring to; is there any written document relating to

21  this severance package?

22      A.    I didn't receive any written document that I

23  recall about severance package, no, but there is a

24  severance package for people who are normally fired.  It

25  means normally without cause.
```

Case 12-338, Document 58, 07/23/2012, 671468, Page89 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 170

1      Q.    Oh, who are fired like in a reduction in force

2   or a layoff you mean?

3      A.    Yeah, yeah, yeah.

4      Q.    Okay.  So that's the kind of severance package

5   you think you're entitled to?

6      A.    Yes.  And that would be bonus too.

7      Q.    Pardon me?

8      A.    In that case it would be bonus as well because

9   if I were fired, you know, for no reason, then I'm not

10  sure that the bonus is not applicable, it probably is

11  prorated.

12     Q.    Okay.  So one of the elements of the severance

13  package would be a bonus and maybe salary or something;

14  is that what you're saying?  I'm just trying to

15  understand what you're saying.

16     A.    Well, usually when you fire people there is,

17  you know, a document which says if you worked for the

18  company let's say five years, I'm just giving an example,

19  then you have a right to have 26 weeks of pay plus

20  whatever, those kind of documents.

21     Q.    Were you ever involved in any situation where

22  any employee who reported to you was laid off?

23     A.    No.  No.

24     Q.    Are you aware of any employee who received

25  severance pay under this formula that you've discussed?

Case 12-338, Document 58, 07/23/2012, 671468, Page90 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 171

1      A.   Yes, many.  Many people who were let go after

2  P&G took over --

3      Q.   Oh, after the merger?

4      A.   -- Duracell or Gillette, they got severance

5  package.  Many people who were fired, people who are

6  normally fired they get severance package.

7      Q.   When you say normally fired --

8      A.   It means like --

9      Q.   Without cause?

10      A.   Yeah.  It means because of restructuring,

11  because of other issues.  Well, let's say without the

12  involvement of the employee.  It means like company made

13  decision to downsize for whatever reason --

14      Q.   Or go out of business?

15      A.   -- they usually get severance package.  That's

16  the package I'm talking about, yes.

17      Q.   Okay.  You're not aware of any employee who was

18  terminated for performance-related problems getting a

19  severance package, are you?

20      A.   No, I don't.  And I was not terminated for that

21  purpose.

22      Q.   I understand.  I'm just asking you.

23      A.   No, I was not terminated for that purpose, so

24  I -- and I am not aware of it, yes, that if you would be

25  terminated because of performance you might not, you

Case 12-338, Document 58, 07/23/2012, 671468, Page91 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 172

1    know, be receiving that, I don't know.  Maybe that's

2    true, I don't know.

3         Q.   Are you aware that your claim against Lynne

4    Burnett was dismissed?

5         A.   No, I was not aware of it.  Was it dismissed?

6         Q.   It was dismissed.

7         A.   Okay.

8         Q.   In July.

9         A.   So it's not on the case anymore?

10        Q.   Correct.

11        A.   Okay.  I was not aware of that.  Many things

12   happened between July and now, so, yeah.

13        Q.   What do you mean by that?

14        A.   Well, what I mean by that is I changed lawyers,

15   we asked for the postponement.  That's what I meant.

16                  MR. CERASIA:  Can you mark this, please,

17   as 19.

18                  (Cicvara Exhibit 19: Notes - marked for

19   identification.)

20        Q.   Mr. Cicvara, before I show you 19, which is the

21   last exhibit I have today, when you were in Bol's hotel

22   room on June 8th and you say she was speaking with her

23   husband, was she speaking in English or Chinese?

24        A.   Chinese.

25        Q.   The whole time?

Case 12-338, Document 58, 07/23/2012, 671468, Page92 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 173

```
 1      A.   The whole time.

 2      Q.   So you don't -- do you speak Chinese?

 3      A.   No.

 4      Q.   So you don't know what she said to her husband?

 5      A.   No.  And I'm not even sure that it was her

 6  husband.  I was told it was her husband.

 7      Q.   Well, she was speaking to somebody in Chinese?

 8      A.   Yes.  I don't know to whom.

 9      Q.   And you don't know what she said?

10      A.   No.

11      Q.   Okay.  I'm showing you Exhibit 19, which is one

12  of the documents you gave us at the beginning of the

13  deposition which was in your folder?

14      A.   Yeah.  You asked for it.  I didn't give it to

15  you.

16      Q.   What's that?

17      A.   You asked for it.

18      Q.   I asked for it and you gave it to me.  I didn't

19  wrestle you for it or anything like that.

20      A.   Yeah, okay, yeah.

21      Q.   What language is that written in?

22      A.   Croatian.  It probably is a mix between

23  Croatian and maybe there are some English words.

24      Q.   There's a few English words, maybe people's

25  names and months, but I don't know Croatian.
```

Case 12-338, Document 58, 07/23/2012, 671468, Page93 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                        Page 174

1       A.   It's Croatian language, yeah, and it's slang,

2   it's slang language too.

3       Q.   Okay.  And when was this written?

4       A.   Yesterday.

5       Q.   You prepared this yesterday?

6       A.   Yes.

7       Q.   Why did you prepare this?

8       A.   Because I wanted to refresh my memory about the

9   things that I would like to talk and I talked about a few

10  of them and I didn't talk about others.  I was not given

11  opportunity to talk.

12      Q.   Is there anywhere -- will you please look at

13  your original because I only have this copy here.

14      A.   Okay.

15      Q.   Is there anything in here that relates to Bel?

16      A.   Oh, yeah, there are things that relates to Bel,

17  yes.

18      Q.   Where, what page?

19      A.   Let me see.

20      Q.   And what number?

21      A.   Many pages.  It's on the page 1 there are

22  things with respect to Bel, on the page 2 there are

23  things that are indirectly related to Bel, and page 3

24  many things related to Bel, and if you want I can go one

25  by one and I can tell you.

Case 12-338, Document 58, 07/23/2012, 671468, Page94 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 175

```
 1      Q.    When did you write the handwriting on the

 2  bottom of page 3, yesterday or today?

 3      A.    Let me see.  On the bottom of page 3 this

 4  morning, part of it, and then there is something written

 5  here which I don't think you have.

 6      Q.    And when did you write that?

 7      A.    I don't think you have this thing which I

 8  added --

 9      Q.    At lunchtime?

10      A.    -- a few minutes now.

11            No, no.  I just added them a few minutes ago.

12  This thing I wrote this morning (indicating) because you

13  have a copy, so obviously it was written before I came

14  here.  And this is the thing I told you that she called

15  her boss and there was a message from her boss where he

16  was talking about how she's doing a nice job and the next

17  task is to find a way to sack the general manager of

18  Zhongshan factory in China, s-a-c-k, to get rid of

19  general manager in China, to find ways to do it, and she

20  said you saw too much, you're not supposed to read this.

21            MR. CERASIA:  I don't have any further

22  questions at this point, but I am going to reserve my

23  right to recall him based on this document and the other

24  documents that he gave us, some of which we didn't have.

25            THE WITNESS:  Well, you never asked for
```

Case 12-338, Document 58, 07/23/2012, 671468, Page95 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 176

1    this, and you did say that it was unfounded claim by

2    Predrag about diversion that took place, unfounded with

3    such strong evidence that only a blind man wouldn't see

4    it or --

5                    MR. CERASIA:  Mr. Cicvara.

6                    THE WITNESS:  -- a man with a very strong

7    power in Duracell would prevent it from being seen.

8                    MR. CERASIA:  Okay.  You need to

9    understand something because you weren't at the hearing

10   in July.  In July the judge said that anything that

11   happened back in 2007 or 2005, for that matter, or 2008

12   or 2004 was irrelevant and she was not going to order the

13   production of documents.

14                   THE WITNESS:  I agree.  I agree.  Yes.

15                   MR. CERASIA:  So I don't wear a robe, she

16   does, and that's the decision.

17                   THE WITNESS:  True.  For this case it is

18   irrelevant.  It might not be in the future, but that's

19   not --

20                   MR. CERASIA:  Are you threatening my

21   clients?

22                   THE WITNESS:  No.  Why would I threaten

23   anybody?  I mean who am I to threaten to anybody?

24                   MR. SIKORSKY:  I'm taking the position of

25   counsel, and I'm asking for a stipulation, that the claim

Case 12-338, Document 58, 07/23/2012, 671468, Page96 of 273

A-669

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 177

1   of whistle-blowing which was the subject of the

2   discussion before Judge Hall is not encompassed here and

3   in no way is res judicata for any further proceedings

4   that he may wish to raise.  Now, that's the position

5   you're taking and -- taken in the discovery and we're

6   free to proceed in any way that we feel appropriate.

7                   MR. CERASIA:  I have no idea what that

8   means, Igor.

9                   MR. SIKORSKY:  Okay.  Well, that's too

10  bad, but perhaps we'll have the opportunity to enlighten

11  you on that.

12                  Now, I'm going to show you -- are you

13  finished?

14                  MR. CERASIA:  Well, not today you're not

15  because it has nothing to do with discovery in this case.

16  The judge was very clear on that.

17                  MR. SIKORSKY:  Well, that will be decided

18  in due course.

19                  MR. CERASIA:  No.  It's already been

20  decided.  You weren't part of the case then.  The judge

21  already decided the scope of discovery.

22                  MR. SIKORSKY:  Are you saying I can't ask

23  questions about that?

24                  MR. CERASIA:  That's correct.  The judge

25  said that's not within the scope of discovery.

Case 12-338, Document 58, 07/23/2012, 671468, Page97 of 273

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 178

1                      MR. SIKORSKY:  Well, that's your

2     position.  I've got some questions to ask.  Let's go

3     through this.

4                      MR. CERASIA:  Well, no.  Excuse me.  You

5     should have read the hearing transcript before you came

6     today.

7                      MR. SIKORSKY:  I am --

8                      MR. CERASIA:  Have you read it?

9                      MR. SIKORSKY:  -- very well aware of his

10    rights, Counsel.

11    CROSS EXAMINATION

12    BY MR. SIKORSKY:

13        Q.   I'm going to go through some of the documents

14    that we've already given.  I'm going to ask you to go

15    through these one at a time and identify.  This, by the

16    way, is not a complete --

17        A.   Document, no.  This is just a part of it.

18        Q.   Well, can you identify what this page -- I'm

19    showing you now a document identified with a docket

20    number 391.  Can you identify that?

21        A.   Yeah.  That's the part of the hearings of

22    relationship between Mani Parmar and Ana Cardinale.  The

23    part which is -- Ana Cardinale, Cardinale is the famous

24    actress, C-a-r-d-i-n-a-l-e, and Ana is just A-n-a, and

25    Mani Parmar you already have.  There was a relationship

Case 12-338, Document 58, 07/23/2012, 671468, Page98 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 179

1    and there was a business side of that relationship that I

2    was very negatively affected with.  I only learned when I

3    got the documents --

4                MR. CERASIA:  Excuse me.  Before you get

5    into the question I'm objecting on the ground that it's

6    beyond the scope of discovery as ruled by the judge on

7    July 20th, 2010, and I suggest you read the transcript.

8    She ruled that any discovery --

9                MR. SIKORSKY:  Look, Counsel, I'm

10   entitled to put my exhibits in.

11               MR. CERASIA:  Have you read the

12   transcript?

13               MR. SIKORSKY:  I'll ask that that be

14   marked.

15               MR. CERASIA:  Okay.  Well, I'll have a

16   standing objection then because you didn't read the

17   transcript because I don't even know that there is one,

18   so why would you represent that there's -- you read a

19   transcript?

20               MR. SIKORSKY:  I said I haven't read it.

21   You asked me had I read one and I said I haven't.

22               MR. CERASIA:  You could have ordered one.

23   So then you don't know what her rulings were.

24               MR. SIKORSKY:  May that be marked as

25   Plaintiff's Number 1.

Case 12-338, Document 58, 07/23/2012, 671468, Page99 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 180

1              MR. CERASIA:  And I have an objection to

2    any questions relating to Mr. Parmar or Miss Cardinale.

3              THE WITNESS:  Okay.

4              MR. CERASIA:  Based on the judge's

5    ruling.

6              MR. SIKORSKY:  Let her mark those.

7              (Plaintiff's Exhibit A: PG000391 - marked

8    for identification.)

9         Q.   All right.  Now I'm showing you a second

10   document.  Can you identify that?  You don't need to

11   testify except as to my questions.  I just want you to

12   identify what that document is.

13             MR. CERASIA:  And what document are you

14   showing him?

15        A.   First part, important to remember, not

16   disclosed yet.  This is what I gave to Mr. --

17             MR. CERASIA:  Excuse me.  I need to know

18   what you're referring to.

19             MR. SIKORSKY:  Well, it's the second in

20   order of what we've already provided you.

21             MR. CERASIA:  Well, it's not the order

22   that I had.

23        A.   It says first part, important to remember, not

24   disclosed yet.

25             MR. SIKORSKY:  It's in the material that

Case 12-338, Document 58, 07/23/2012, 671468, Page100 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 181

1   we gave to you in the very beginning of the deposition.

2        A.    Three pages or four pages.  There are two

3   documents, one is called first part and the other is

4   called facts put in chronological order.  So these two

5   documents we can talk about --

6        Q.    Separate.

7        A.    -- separately.

8              MR. SIKORSKY:  Would you mark that.

9        A.    The first part is talking about alleged

10  diversion which took place in -- actually took place from

11  2002 until -- to the best of my knowledge until 2008 at

12  least, so six years of diversion going on where the cells

13  that were supposed to be put in the devices of OEM

14  manufacturers --

15             MR. CERASIA:  Okay.  That's another

16  subject that was ruled on by the judge, so I've got

17  another standing objection to questions relating to that

18  as being outside the scope of discovery as ruled by the

19  judge.

20             MR. SIKORSKY:  Can you mark that as

21  Exhibit B.

22             (Plaintiff's Exhibit B: Document entitled

23  First part, Important to remember - marked for

24  identification.)

25        Q.    (Handing.)

Case 12-338, Document 58, 07/23/2012, 671468, Page101 of 273

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

Page 182

```
 1      A.    So this document is just continuation of the

 2   other one and it's called Facts put in chronological

 3   order, for your reference.  This is just going on of the

 4   same thing and it gives a whole story about what was

 5   really going on and who was involved according to the

 6   best of my knowledge and it does have hard evidences for

 7   all what is stated here.  All these evidences were given

 8   to Rob DaPra.

 9                 MR. SIKORSKY:  Can you mark that as

10   Exhibit C.

11      A.    R-o-b, D-a and then capital P, but one word,

12   r-a, DaPra.  It's spelled as I told you, D small a,

13   capital P, small r-a, and he is Vice President of

14   Business Development.

15                 MR. CERASIA:  I have the same objection.

16                 MR. SIKORSKY:  Mark it please.

17                 (Plaintiff's Exhibit C: Document entitled

18   Facts put in chronological order - marked for

19   identification.)

20      Q.    (Handing.)

21      A.    This is an e-mail that Rob DaPra sent to me on

22   January 4th, 2008 where he was --

23                 MR. CERASIA:  Excuse me.  When you say

24   this, you've got to tell me what you're referring to.

25      A.    Oh, sorry.  It says subject in the e-mail which
```

Case 12-338, Document 58, 07/23/2012, 671468, Page102 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 183

1    was sent from Rob DaPra to Predrag Cicvara, it says

2    subject, summary of recent discussions.

3         Q.    Does it have a date?

4         A.    Yes.  Date is January 4th, 2008, and in this --

5               MR. SIKORSKY:  No.  Just I'll mark it.

6               MR. CERASIA:  Same objection.

7               THE WITNESS:   Can you just mark it.

8               (Plaintiff's Exhibit D: Email - marked

9    for identification.)

10        Q.    (Handing.)

11        A.    This next one is the page PG 486.  So this is

12   part of material you gave to us.  It says --

13        Q.    Well, all right, just the date.

14              MR. CERASIA:  Is this Exhibit E now?

15        A.    Exhibit E.  And the date is Tuesday, June 9,

16   2009.  It's sent from Dina Schmude to bell@practical.com

17   and it says that Austin Lin was the guy who came to human

18   resources and reported.

19              (Plaintiff's Exhibit E: Email - marked

20   for identification.)

21        Q.    Identify this (handing).

22        A.    This is the e-mail sent by Andrew Yau to Erik

23   Lawson which is telling about how the promises about

24   growing business with Duracell were not followed up, they

25   were working hard but they didn't see many orders coming

A-676

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 184

1    from Duracell.

2                   MR. CERASIA:  Is that 480?

3        A.   480 page, yes.  That's the telling about they

4    are true -- well, I'll not discuss this.  This is just in

5    evidence, nothing else.

6                   (Plaintiff's Exhibit F: PG000480 - marked

7    for identification.)

8                   MR. SIKORSKY:  Objection to this?

9                   MR. CERASIA:  No.  I produced that.

10       Q.   You can identify that from the number.

11       A.   Yeah.  This is PG 415 and 416 pages from the

12   charges for the telephone number 243 -- (203)243-0079,

13   which was my BlackBerry, where you can see that there

14   were five messages exchanged on June 8 starting with 6:57

15   a.m. Pacific Time, which was 8:57 p.m. Thailand time, and

16   going to 7:07 a.m. which is 9:07 p.m. Thailand time.

17   Those five messages were can I come to your room, no you

18   cannot, okay, oh, you can I changed my mind, okay, I'm

19   coming, even though it was I came uninvited to her room

20   according to her and according to Lynne Burnett.

21                  (Plaintiff's Exhibit G: PG000415-416 -

22   marked for identification.)

23       Q.   (Handing.)

24       A.   There are four pages coming.  So the first one

25   is future stock option lost Band 4.  It's telling about

Sanders, Gale & Russell
(203) 624-4157

Case 12-338, Document 58, 07/23/2012, 671468, Page104 of 273

Page 185

1   future stock options that might have been assigned to me

2   had I stayed in the same position and being promoted to

3   Band 4 after certain time.  So this is just an example of

4   the loss in wages, future wages.  And there are certain

5   assumptions there which are shown, they are written, so.

6       Q.   All right.

7       A.   That's the page about stock options.

8            MR. CERASIA:  Objection to that as well

9   based on the fact this was never produced to us in

10  discovery.

11           THE WITNESS:  You never asked for it.

12           (Plaintiff's Exhibit H: Future stock

13  options - marked for identification.)

14      Q.   (Handing.)

15      A.   The next page is calculation of bonuses that I

16  was entitled to in P&G and it was calculated 8 percent

17  for Band 3 and 15 percent for Band 4 with the assumption

18  that I would be Band 4 somewhere in 2013.  I already had

19  about 15 years in Band 3, so it would be a good

20  assumption.  So that's the page about bonuses.

21           MR. CERASIA:  And that was I?

22           MR. SIKORSKY:  I.

23           THE WITNESS:  That's I.

24           MR. CERASIA:  Object to that too

25  including on the grounds it was never produced to us.

Case 12-338, Document 58, 07/23/2012, 671468, Page105 of 273

A-678

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 186

1    I'm going to object to that too including on the grounds

2    it was never produced to us.

3         Q.   When was this -- when were these, all of this,

4    the statements of losses, when would you have prepared

5    those?

6         A.   1 believe somewhere in October of this year.

7         Q.   Of this year?

8         A.   Yes.

9         Q.   After the production -- after --

10        A.   After, yes, yes.

11             MR. CERASIA:  Under the Federal Rules of

12   Civil Procedure there's a continuing obligation to

13   produce documents.

14             MR. SIKORSKY:  Thank you, Counselor.

15             (Plaintiff's Exhibit I: Calculation of

16   bonus - marked for identification.)

17        Q.   (Handing.)

18        A.   The next one is talking about loss in salaries,

19   the first under assumption that I never found a job and

20   the second under assumption that I will find a job but it

21   does not pay the same that my job was.

22             MR. CERASIA:  And this will be J?

23             I'm going to object to this because it's

24   completely irrelevant, you don't have a claim for loss of

25   salary in the case, I don't know what it relates to, plus

Case 12-338, Document 58, 07/23/2012, 671468, Page106 of 273

A-679

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 187

1    it was never produced.

2                    THE WITNESS:  I believe if you'll look at

3    the number 7 there there is something.

4                    (Plaintiff's Exhibit J: Loss of salary -

5    marked for identification.)

6        Q.   (Handing.)

7        A.   Oh, the next one is a pension fund that usually

8    in P&G there is a formula of how you calculated pension

9    depending on how long have you been with P&G.  It could

10   be anywhere from 5 to 18 percent of your salary.  So this

11   is just what I lost just by not being in P&G from the

12   pension fund.

13                   MR. CERASIA:  This would be K?

14                   THE WITNESS:  I guess.

15                   MR. SIKORSKY:  J, K.

16                   MR. CERASIA:  I'm just going to object to

17   this on the grounds that it's not relevant, there's no

18   claim for lost pension in this case and it wasn't

19   produced to us.

20                   (Plaintiff's Exhibit K: Pension fund

21   document - marked for identification.)

22       Q.   (Handing.)

23       A.   And this is the page which shows that there was

24   a telephone communication with Spain, me calling Bel's

25   BlackBerry number, where she called me first and asked me

Case 12-338, Document 58, 07/23/2012, 671468, Page107 of 273

A-680

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 188

1   to call her back, which happened on January 22nd, 2009.

2   It's page 431.

3                    MR. CERASIA:  Pardon me, is this L?

4                    MR. SIKORSKY:  Yes.

5                    (Plaintiff's Exhibit L: PG000431 - marked

6   for identification.)

7        Q.   Now, just a few questions for you from the

8   direct.  Approximately when in time was the decision made

9   to return 46,000 items from Practical Lighting that had

10  been produced by Practical Lighting?

11       A.   In May 2009.

12       Q.   And did Bel call you concerning that decision?

13       A.   Yes.

14       Q.   And what did she say?

15       A.   She was asking me to try to alleviate that

16  position or to try to help her to go through it without

17  negative consequences for Practical.

18       Q.   And what was your response to her?

19       A.   Well, my response was that I don't have that

20  kind of decision-making authorities and that I am

21  firmly under the -- my position is firmly that it was

22  mistake, their error and they are responsible for it, so

23  that's my position about this.

24       Q.   But did you make any -- what reference did you

25  make, if any, concerning whether you had authority to --

Case 12-338, Document 58, 07/23/2012, 671468, Page108 of 273

A-681

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 189

```
 1      A.    I told her that --

 2      Q.    -- reverse that decision?

 3      A.    Well, I told her that it's out of my scope,

 4  that it's not my decision, I can only say, you know, from

 5  the quality point of view that the shipment was not good

 6  and it was not supposed to be accepted, but it's not my

 7  decision to reject that shipment, it was somebody else's.

 8  I didn't see the shipment.

 9      Q.    Did you note -- or what difference in her

10  attitude to you -- towards you did you notice after you

11  stated that you had no authority to --

12      A.    I believe that that might have been the start

13  of, you know, changes in the attitude.

14      Q.    What was -- can you describe the changes in

15  attitude that followed that?

16      A.    Probably it was colder to a point, which might

17  have led to certain other things.  It was not as warm as

18  before.

19      Q.    Counsel asked you a number of questions about

20  ethics and the ethical standards.  What was your -- can

21  you describe what --

22              THE VIDEOGRAPHER:  Your microphone.

23              MR. SIKORSKY:  Sorry.

24      Q.    Can you give us any examples of efforts that

25  you made to protect the interest of Duracell?
```

Case 12-338, Document 58, 07/23/2012, 671468, Page109 of 273

CICVARA v. PROCTOR & GAMBLE                                    December 21, 2010

1     A.     Yes.  I did -- it's ironic that this case is

2     actually about me being good to Duracell and P&G and

3     paying the price for it.  It's -- starting with this

4     46,000, going to that discovery on June 8 where I

5     discovered something very wrong with the documentation

6     and it might have played a part in what happened after

7     that.  I found in Indonesia that they actually used the

8     same pallets that were not allowed to be used again, and

9     I asked Bel Liu did you actually ship anything with these

10    pallets again, and the answer was no, while actually she

11    knew that they -- in the meantime they shipped a big

12    shipment of flashlights which took about five weeks to

13    come to P&G.  That shipment was rejected for the same

14    reason.  So they lied to us in order to get better score

15    and they did get a pretty good score in Indonesia.  She

16    knew that this was going to be caught as a lie at some

17    point because she knew that there is a risk that the same

18    thing is going to happen.  So it was a plain lie to me.

19           There were other instances that like she was

20    asking me to help her that time, I said no.  I actually

21    protected Duracell when I caught Austin Lin, just to get

22    whatever he got get back to me.  It was always me

23    defending Duracell.  Like in that diversion case as well

24    me defending.  As a manager of OEM Business Services one

25    of my tasks was to prevent diversion, and then I was

Case 12-338, Document 58, 07/23/2012, 671468, Page110 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 191

1   actually scolded because I found diversion and everything

2   was taken from me and I got an e-mail back, it was like,

3   hey, stop doing what you are doing, it's not your job.

4   It was part of my job to prevent this.  So by doing that

5   actually it was my opinion that I helped the company and

6   indirectly or directly I actually paid a big price for it

7   down the road, as judge, you know, ruled out.

8           I'm still wondering, I was told that it's going

9   to be processed through P&G channels, was it ever

10  processed, was it ever worked on in the legal channels of

11  P&G or not, because there were so many hard evidences

12  there that it was impossible, impossible not to make the

13  right decision about that, impossible.  So every time

14  that I was trying to protect and going according to the

15  rules of conduct manual, every time I paid for it dearly.

16          MR. SIKORSKY:  Okay.  I'd like to take a

17  five-minute break and see if we're finished with this.

18          MR. CERASIA:  Okay.

19          THE VIDEOGRAPHER:  Going off the record

20  at 4:25 p.m.

21          (Recess:  4:25 to 4:27 p.m.)

22          THE VIDEOGRAPHER:  On the record at 4:27

23  p.m.

24          MR. SIKORSKY:  I'm all through.  I'm

25  finished.

Case 12-338, Document 58, 07/23/2012, 671468, Page111 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 192

1                    MR. CERASIA:  Okay.  I have a couple

2     questions.

3     REDIRECT EXAMINATION

4     BY MR. CERASIA:

5          Q.    Exhibit B, when did you prepare this?

6          A.    Oh, this was not prepared.  This was from 2007,

7     original document.

8          Q.    You prepared it in 2007?

9          A.    This was sent to Rob DaPra in 2007.  This is

10    just a copy of the document.  He must be in the

11    possession of it or legal in P&G must be in possession of

12    it.

13         Q.    How about Exhibit C?

14         A.    Same thing.

15         Q.    2007?

16         A.    2007.  I have electronic files which are 2007.

17         Q.    Okay.

18         A.    I didn't touch them.  I didn't change them.

19         Q.    What do you mean you have electronic files,

20    where?

21         A.    On my computer.

22         Q.    Your home computer?

23         A.    Actually I gave them to my lawyer.  It was on

24    (indicating).

25         Q.    What else do you have on this -- what, do you

Case 12-338, Document 58, 07/23/2012, 671468, Page112 of 273

A-685

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 193

1    have a thumb drive?

2         A.    Yeah, I have a thumb drive, yeah.

3         Q.    You copied it from P&G?

4         A.    No.  It was on my hard disk, yes.

5         Q.    On your hard disk on your work laptop computer?

6         A.    No.  On the hard disk of something else.  It

7    was actually sent to me.  I'm sorry.  I'm sorry.

8         Q.    Was it sent to you at your address, at your

9    e-mail address at Procter & Gamble?

10        A.    No, no, no.  No.  It was sent at my home

11   address.

12        Q.    By whom?

13        A.    By a woman who copied files from my hard drive

14   and sent it to me.

15        Q.    When?

16        A.    I don't know when.  Probably in -- I don't

17   know.  Somewhere when I was fired.

18        Q.    After you were fired?

19        A.    Yes.

20        Q.    Who was the woman?

21        A.    A secretary in P&G.

22        Q.    Who is the secretary?

23        A.    Kevin Babis' secretary, whoever she is.

24        Q.    You called her and asked her for this

25   information?

Case 12-338, Document 58, 07/23/2012, 671468, Page113 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 194

```
 1      A.    I actually asked Kevin Babis for that

 2  information, I said there is a file on my disk which is

 3  called whatever it is called, and they copied it, they

 4  sent it to me, so.

 5      Q.    This was after you were fired?

 6      A.    After I was fired, yes.

 7      Q.    Okay.

 8      A.    Also it was Kevin Babis who told me about this

 9  shipment in July which was rejected from Indonesia from

10  Practical.

11      Q.    Exhibit H, when did you produce this?

12      A.    I believe in October, to the best of my

13  knowledge.

14      Q.    Of 2010?

15      A.    Yes.

16      Q.    And you prepared it?

17      A.    Yes.

18      Q.    Okay.

19      A.    I prepared it.

20      Q.    And how about Exhibit I?

21      A.    What is that?

22      Q.    (Indicating.)

23      A.    Oh, same thing.

24      Q.    You prepared it?

25      A.    Yes, I prepared it.
```

Case 12-338, Document 58, 07/23/2012, 671468, Page114 of 273

A-687

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 195

1    Q.    In October of 2010?

2    A.    Yes.

3    Q.    Exhibit J, salary?

4    A.    Same thing.

5    Q.    October of 2010 prepared by you?

6    A.    Same thing, yes.

7    Q.    Exhibit K --

8    A.    Yes.

9    Q.    -- prepared by you in October of 2010?

10   A.    Yeah, to the best of my knowledge.  It might

11   have been, you know, October 30th, November 1st, I don't

12   really know, it's not that relevant, but I prepared it,

13   yes.

14                    MR. CERASIA:  I have nothing else at this

15   time.

16                    THE VIDEOGRAPHER:  Off the record at 4:30

17   p.m.

18                    (Deposition adjourned:  4:30 p.m.)

19

20

21

22

23

24

25

Case 12-338, Document 58, 07/23/2012, 671468, Page115 of 273

A-688

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 196

```
 1                    I, PREDRAG CICVARA, have read the

 2      foregoing transcript of the testimony given at my

 3      deposition on December 21, 2010 and it is true and

 4      accurate to the best of my knowledge and belief as

 5      originally transcribed and/or with the changes as

 6      noted on the attached Correction Sheet.

 7

 8

 9                             ------------------------------

10                             PREDRAG CICVARA

11

12

13                    SUBSCRIBED AND SWORN TO BEFORE ME, the

14      undersigned authority, on this the _____ day

15      of_____, 2011.

16

17                             ------------------------------

18                             Notary Public

19

20

21

22      My commission Expires: _____

23

24

25
```

Case 12-338, Document 58, 07/23/2012, 671468, Page116 of 273

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

```
                                                    Page 197
 1                    WITNESS INDEX

 2                                                      PAGE

 3   Direct Examination by Mr. Cerasia                    5

 4   Cross Examination by Mr. Sikorsky                  178

 5   Redirect Examination by Mr. Cerasia               192

 6

 7

 8                    EXHIBIT INDEX

 9

10   CICVARA            DESCRIPTION                     PAGE

11

         1       P&G Worldwide Business Conduct Manual
12               Receipt Confirmation                     35

13       2       P&G Worldwide Business Conduct Manual    35

14       3       PG00C180-183                             35

15       4       Job description, PG000172-173            47

16       5       PG000470                                 97

17       6       PG000471                                 99

18       7       PG00C472                                103

19       8       PG000473                                104

20       9       PG000474                                104

21      10       PG000475-476                            116

22      11       PG000498-501                            132

23      12       PG000525                                148

24      13       PG000506-508                            156

25
```

Case 12-338, Document 58, 07/23/2012, 671468, Page117 of 273

A-690

CICVARA v. PROCTOR & GAMBLE                           December 21, 2010

```
                                                        Page 198
  1

  2                          EXHIBIT INDEX

  3                           (Continued)

  4

  5   CICVARA              DESCRIPTION                    PAGE

  6

  7      14      PGC00516-522                             156

  8      15      PGC00184-201                             157

  9      16      PGC000509-513                            163

 10      17      PGC00514-515                             163

 11      18      First Amended Complaint, 1/6/09          167

 12      19      Notes in foreign language                172

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24   NOTE:   Cicvara Exhibits retained by Attorney Cerasia.

 25
```

Case 12-338, Document 58, 07/23/2012, 671468, Page118 of 273

A-691

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 199

1                          EXHIBIT INDEX
2                          (Continued)
3
4
5    PLAINTIFF'S              DESCRIPTION                    PAGE
6        A     PG000391                                     180
7        B     Document, First Part - Important
               to Remember                                  181
8
         C     Document, Facts put in
9              chronological order                          182
10       D     Email to Predrag from Rob DaPra, 1/4/08      183
11       E     Email from Dina Schmude, 6/9/09              183
12       F     Email from Andrew to Erik Lawson,
               PG000480                                     184
13
         G     PG000415-416                                 184
14
         H     Future stock options Band 4                  185
15
         I     Calculation of bonus                         186
16
         J     Loss of salary document                      187
17
         K     Pension fund document                        187
18
         L     PG000431                                     188
19
20
21
22
23
     NOTE:  Plaintiff's Exhibits retained by Attorney
24   Sikorsky.
25

A-692

**EXHIBIT C TO STATEMENT -
EBT OF PLAINTIFF PREDRAG CICVARA, TAKEN DECEMBER 21, 2010
(REPRODUCED HEREIN AT PP. A-493–A-691)**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **PREDRAG  CICVARA,** | : | **CIVIL ACTION No:3:09-cv-25054(JCH)** |
| **Plaintiff,** | : | |
| | | |
| **V.** | : | |
| | | |
| **THE GILLETTE COMPANY and** | : | |
| **PROCTER & GAMBLE COMPANY** | : | |
| **and DURACELL.** | : | |
| **Defendants.** | : | **JANUARY 3, 2011** |

### MOTION FOR PRODUCTION

Plaintiff herein, pursuant to Federal rules, and the extension of time for Discovery ordered by the court, requests that the defendant produce for inspection and copying, the following: all requests being limited to the period from June 7, 2009 until July 15, 2009 unless specifically another date is requested. The request is as follows:

1. All e-mail messages exchanged in that period between Mark Berjolami and  Lynne Burnett, Duncan Adamson, Andrew Yau, Peggy Wilczewski, Kevin Babis and Erik Lawson.

2. All e-mail messages exchanged between Lynne Burnett and Kevin Babis, Erik Lawson, Mark Berjolami, Bel Liu, Andrew Yau, Austin Lin and Peggy Wilczewski.

3. All e-mail exchanges between Peggy Wilczewski and Bel Liu, Austin Lin, Dina Schmude, Nitesh Singh, Kevin Babis, Lynne Burnett, Erik Lawson and Mark Berjolami.

4. Produce the hand-written notes written by Peggy Wilczewski on or about June 15, 2009 at the meeting in which the plaintiff was discharged.

-2-

5.  All e-mail messages between Dina Schmude and Bel Liu, Austin Lin, Nitesh Singh,

    Kevin Babis, Lynne Burnett, Erik Lawson and Mark Berjolami.

6.  Expense reports for the China-Korea area for March through May 2009 of Austin Lin.

7.  The official Blackberry phone records and bills used by Austin Lin for the period May

    through July 2009.

 

 

Respectfully submitted

By _____

   Igor I. Sikorsky, Jr.
   P.O. Box 38
   Unionville, CT 06085
   (860) 675-5313
   CT Fed Bar No. 04233

### CERTIFICATION

This is to certify that the copy of the foregoing was sent by U.S. Mail to:
Attorney Edward Cerasia, II
Seyfarth Shaw, LLP-NY
620 Eight Avenue
New York, NY 10018

 

 

_____

   Igor I. Sikorsky, Jr.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PREDRAG CICVARA,

                 Plaintiff,

            v.

THE GILLETTE COMPANY and PROCTER &
GAMBLE COMPANY, Inc., DURACELL, AN ENTITY
OF UNKNOWN FORM and LYNNE BURNETT,

                 Defendants.

Civil Action No. 3:09-CV-2054
(JCH)

February 7, 2011

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' RESPONSES AND OBJECTIONS TO
## PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

      Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Civil

Rules of the Court, defendants The Gillette Company and The Procter & Gamble Company

(collectively, "Defendants"),[1] by and through their attorneys, hereby submit these responses and

objections to plaintiff Predrag Cicvara's Second Request for Production of Documents,[2] dated

January 3, 2011.

### I.

### RESERVATION OF RIGHTS

      Defendants respond to these document requests subject to the accompanying objections,

without waiving and expressly preserving all such objections. Defendants also submit these

---

[1]    On July 20, 2010, this Court granted defendant Lynne Burnett's ("Burnett's") motion to
dismiss the tortuous interference claim against her. Thus, Burnett is no longer a defendant in this
case. In addition, Duracell ceased being a legal entity as of January 1, 1999, and therefore is not
a proper defendant in this case.

[2]    Erroneously referred to by plaintiff as a "Motion for Production."

02/07/2011 17:48 FAX 1212 218 5270     SEYFARTH SHAW LLP                          004/023

responses subject to, without intending to waive, and expressly preserving: (a) any objections as

to privilege or work product and (b) the right to object to other discovery procedures concerning

the subject matter of the document requests to which they respond herein. These responses are

based on Defendants' present knowledge, information, and belief, and are subject to amendment

and supplementation as Defendants acquire additional information or documents and complete

their discovery of the facts underlying this case.

II.

**GENERAL OBJECTIONS**

1.     Defendants' objections to the document requests are prescribed by, and they

hereby respond in accordance with, the Federal Rules of Civil Procedure and the Local Civil

Rules of the Court.

2.     Defendants object to the document requests to the extent that they seek

information and documents not within Defendants' possession, custody, or control.

3.     Defendants object to the document requests to the extent that the documents

requested therein are equally accessible to, or in the possession of, Cievara and/or his counsel.

4.     Defendants object to the document requests to the extent that they call for a legal

conclusion.

5.     Defendants object to the document requests to the extent they seek attorney work

product, hearing and/or litigation or preparation materials, identification of documents prepared

after the commencement of this litigation, or communications protected by the attorney-client

privilege or any other applicable privilege.

6.     Defendants object to the document requests to the extent that they seek documents

concerning employees who were not, or are not, similarly-situated to plaintiff and, thus, purport

to seek documents that are neither relevant to the subject matter of this litigation nor reasonably

2

calculated to lead to the discovery of admissible evidence. Consequently, Defendants will only produce documents in their possession concerning similarly-situated management level employees who were eligible for stock options under the terms of the Gillette Company 1971 Stock Option Plan during the relevant time period.

7. Defendants object to the documents requests to the extent that they seek information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

8. Defendants object to the document requests to the extent that they call for disclosure of (i) confidential or proprietary business information and/or (ii) personal information about individuals who are not parties to this action, including present or former employees of Defendants.

9. Defendants object to the document requests to the extent that they are repetitive and call for documents already addressed in Defendants' Responses and Objections to plaintiff's First Request for Documents.

10. Each and every response to a document request is made subject to the foregoing General Objections, regardless of whether a General Objection or specific objection is stated in the response. The explicit reference to a General Objection or the making of a specific objection in response to a particular document request is not intended to constitute a waiver of the General Objections that are not specifically referenced in that response.

3

III.

## RESPONSES AND SPECIFIC OBJECTIONS
## TO CICVARA'S DOCUMENTS REQUESTS

Document Request No. 1: All e-mail messages exchanged in that period between Mark Berjolami [*sic*] and Lynne Burnett, Duncan Adamson, Andrew Yau, Peggy Wilczewski, Kevin Babis and Erik Lawson.

### Responses to Document Request No. 1:

Defendants object to this Request on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this Request on the grounds that it requests documents that the Court already ruled as irrelevant during its July 20, 2010 hearing.

Document Request No. 2: All e-mail messages exchanged between Lynne Burnett and Kevin Babis, Erik Lawson, Mark Berjolami [*sic*], Bel Liu, Andrew Yau, Austin Lin, and Peggy Wilczewski.

### Responses to Document Request No. 2:

Defendants object to this Request on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and purports to request documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this Request on the grounds that it requests documents that the Court already ruled as irrelevant during its July 20, 2010 hearing. Subject to, and without waiving, these objections, or the foregoing General Objections, Defendants generally refer plaintiff to the documents bearing Bates stamp numbers PG000477 through PG000479, PG000480 through PG000483, PG000581 through PG000585, PG000598 through PG000612, and PG000626 through PG000634, which were produced in response to plaintiff's

4

First Request for the Production of Documents, for all relevant e-mail communications involving

Burnett.

Document Request No. 3:  All e-mail messages exchanged between Peggy Wilczewski and Bel
Liu, Austin Lin, Dina Schmude, Nitesh Singh, Kevin Babis, Lynne Burnett, Erik Lawson, and
Mark Berjolami [sic].

### Responses to Document Request No. 3:

Defendants object to this Request on the grounds that it is overly broad, unduly

burdensome, vague, ambiguous, and purports to request documents that are neither relevant to

the subject matter of this litigation nor reasonably calculated to lead to the discovery of

admissible evidence. Defendants further object to this Request on the grounds that it requests

documents that the Court already ruled as irrelevant during its July 20, 2010 hearing.  Subject to,

and without waiving, these objections, or the foregoing General Objections, Defendants

generally refer plaintiff to the documents bearing Bates stamp numbers PG000477 through

PG000479, PG000480 through PG000483, and PG000546 through PG000635, which were

produced in response to plaintiff's First Request for the Production of Documents, for all

relevant e-mail communications involving Peggy Wilczewski.

Document Request No. 4: Produce the hand-written notes written by Peggy Wilczewski on or
about June 15, 2009 at the meeting in which the plaintiff was discharged.

### Responses to Document Request No. 4:

Defendants object to this Request on the grounds that it is overly broad, vague, and

ambiguous.  Subject to, and without waiving, these objections, or the foregoing General

Objections, Defendants refer plaintiff to the documents bearing Bates stamp numbers PG 000644

through PG 000650.

5

Dated this 7th day of February, 2011, at New York, New York.

SEYFARTH SHAW LLP

By _Edward Cerasia II_

Edward Cerasia II (ct 13096)
Hema Chatlani (phv 04023)
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendants

6

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing document to be served on

counsel of record for plaintiff by facsimile and U.S. first class mail, postage pre-paid, on this 7th

day of February 2011 at the following address:

> Igor I. Sikorsky, Jr., Esq.
> P.O. Box 38
> Unionville, CT 06085

Hema Chatlani

7

13110963v.2

02/07/2011 16:13 FAX  1212 216 8270        SEYFARTH SHAW  LLP                          ☒010/023

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PREDRAG CICVARA,                                :
                                                :
                  Plaintiff,                     :   Civil Action No. 3:09-CV-2054 (JCH)
                                                :
          v.                                     :   February 7, 2011
                                                :
THE GILLETTE COMPANY and PROCTER &               :
GAMBLE COMPANY, Inc., DURACELL, AN               :
ENTITY OF UNKNOWN FORM,                          :
                  Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANTS' RESPONSES AND OBJECTIONS TO
## PLAINTIFF'S SECOND REQUEST FOR INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Civil

Rules of the Court, defendants The Gillette Company and The Procter & Gamble Company

(collectively, "Defendants"),[1] by and through their attorneys, hereby submit these responses and

objections to plaintiff Predrag Cicvara's First Request for Interrogatories, dated January 3, 2011.

### I.

### RESERVATION OF RIGHTS

Any response to these interrogatories is made subject to Defendants' right to object to the

admission of any and all such responses on the grounds they are irrelevant to the issues in this

action or are otherwise inadmissible. Defendants respond to these interrogatories subject to the

accompanying objections, without waiving and expressly preserving all such objections.

---

[1]      On July 20, 2010, this Court granted defendant Lynne Burnett's ("Burnett's") motion to
dismiss the tortuous interference claim against her. Thus, Burnett is no longer a defendant in this
case. In addition, Duracell ceased being a legal entity as of January 1, 1999, and therefore is not
a proper defendant in this case.

Defendants also submit these responses subject to, without intending to waive, and expressly preserving: (a) any objections as to privilege or work product; and (b) the right to object to other discovery procedures concerning the subject matter of the interrogatories to which they respond herein. This response is based on Defendants' present knowledge, information, and belief and is subject to amendment and supplementation as Defendants acquire additional information or documents and completes its discovery of the facts underlying this case.

II.

## GENERAL OBJECTIONS

1.  Defendants' objections to the interrogatories are prescribed by, and they hereby respond in accordance with, the Federal Rules of Civil Procedure and the Local Civil Rules of the Court.

2.  Defendants object to the interrogatories to the extent that they exceed the 25 interrogatories permitted by Rule 33 of the Federal Rules of Civil Procedure.

3.  Defendants object to the interrogatories to the extent that they seek information and documents not within their possession, custody, or control.

4.  Defendants object to the interrogatories to the extent that the information and documents requested therein are equally accessible to, or in the possession of, plaintiff and/or his counsel.

5.  Defendants object to the interrogatories to the extent that they call for a legal conclusion.

6.  Defendants object to the interrogatories to the extent they seek attorney work product, hearing and/or litigation preparation materials, identification of documents prepared after the commencement of this litigation, or communications protected by the attorney-client privilege or any other applicable privilege.

2

7.     Defendants object to the interrogatories to the extent that they are not limited in time. Consequently, Defendants will only provide information covering the time period from June 2005 through November 16, 2009 (collectively, the "relevant time period"), unless otherwise noted.

8.     Defendants object to the interrogatories to the extent that they seek information concerning employees who were not, or are not, similarly-situated to plaintiff and, thus, purport to seek information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Consequently, Defendants will only produce information concerning similarly-situated management level employees who were eligible for stock options under the terms of the Gillette Company 1971 Stock Option Plan during the relevant time period.

9.     Defendants object to the interrogatories to the extent that they seek information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

10.     Defendants object to the interrogatories to the extent that they call for disclosure of (i) confidential or proprietary business information and/or (ii) personal information about individuals who are not parties to this action, including present or former employees of Defendants.

11.     Defendants object to the interrogatories to the extent that they are repetitive and call for information already addressed in Defendants' Answers and Objections to plaintiff's First Request for Interrogatories.

12.     Each and every response to an interrogatory is made subject to the foregoing General Objections, regardless of whether a General Objection or specific objection is stated in

3

02/07/2011 15:29 FAX 1212 218 5270     SEYFARTH SHAW LLP                    ☒013/023

the response. The explicit reference to a General Objection or the making of a specific objection

in response to a particular interrogatory is not intended to constitute a waiver of the General

Objections that are not specifically referenced in that response.

## RESPONSES AND OBJECTIONS
## TO PLAINTIFF'S INTERROGATORIES

Interrogatory No. 1: Was any written demand for performance improvement under Section A of
the termination of employment provisions of the Gillette Company Stock Option Plan ever
served to the plaintiff? If so, produce a copy of said document or documents.

**Response to Interrogatory No. 1:**

Defendants object to this Interrogatory on the grounds that it is vague and ambiguous,

and seeks information that is neither relevant to the subject matter of this litigation nor

reasonably calculated to lead to discovery of admissible evidence. Subject to, and without

waiving, these objections or the foregoing General Objections, Defendants state that plaintiff's

stock options were forfeited by operation of Section 6(f)(B) of the terms of the Gillette Company

1971 Stock Option (Amended and Restated as of December 13, 2005). Defendants further refer

plaintiff to their Response to Interrogatory No. 7 in plaintiff's First Request for Interrogatories.

Interrogatory No. 2: What conduct does the defendant claim was "gross misconduct" which
materially and demonstrably was injurious to the company?

**Response to Interrogatory No. 2:**

Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overly

broad, unduly burdensome, calls for a legal conclusion, is premature at this stage of the

discovery process, and purports to call for information more properly discovered by deposition.

Defendants further generally refer plaintiff to his deposition testimony, and to the documents

bearing Bates stamp numbers PG000487 through PG000501, PG000564 through PG000592,

PG000598 though PG000630, and PG000644 through PG000650.

4

Interrogatory No. 3:  Please list the names and titles of any director, officer, or employee who was denied his stock option between January 1, 2007 and December 31, 2009, given [sic] their name, title and date in which they were notified of any voiding of any stock options.

**Response to Interrogatory No. 3:**

Defendants object to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and purports to request information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and without waiving, these objections or the foregoing General Objections, Defendants further state that no similarly-situated management level employee at the Bethel, Connecticut, office had their stock options forfeited under Section 6(f)(B) of the terms of the Gillette Company 1971 Stock Option (Amended and Restated as of December 13, 2005). Defendants further refer plaintiff to their Response to Interrogatory No. 17 in plaintiff's First Request for Interrogatories.

Interrogatory No. 4:  State for the record the exact dates of the last two pages listed in the lawyer-client privilege law [sic] which was filed on July 2010 but request the exact dates when the documents ant [sic] titles for the documents were generated.

**Response to Interrogatory No. 4:**

Defendants object to this Interrogatory on the grounds that it is unclear, overly broad, vague, ambiguous, and seeks information protected by the attorney-client privilege.  Subject to, and without waiving, these objections or the foregoing General Objections, Defendants generally refer plaintiff to the "date" column in its July 12, 2010 privilege log for information regarding the dates of the withheld privileged documents.

Dated this 7th day of February, 2011, at New York, New York.

SEYFARTH SHAW LLP

By _____

Edward Cerasia II (ct 13096)
Hema Chatlani (phv 04023)
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendants

6

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing document to be served on

counsel of record for plaintiff by facsimile and U.S. first class mail, postage pre-paid, on this 7th

day of February 2011 at the following address:

Igor I. Sikorsky, Jr., Esq.
P.O. Box 38
Unionville, CT 06085

Hema Chatlani

8

13110781v.2

6-15-09

Where have you been the last week with Mr. Ber Lu.
Indonesia + Thailand of her

Did you see her for work + other times?
work, dinner after dinner
After dinner where?
In the bar
We have documentation — hotels have cameras,
emails + phone conversations.
I went to her room to discuss things of her.
What kinds of things?
Some are a bit personal of hers with me.

Did she invite me to her hotel room?
Did she ask you to leave + did you refuse to leave?

Did you touch her in any way?
Yes, I was sorry for her. She confided
certain things of me that I'd rather
not discuss here
I did not have many business discussions
in her hotel room. She confided to me
that she knew of somebody in her life.

Did you take off your clothes in her
hotel room? No.

CONFIDENTIAL                                                      PG 000644

Have you sent an email to her
   for her upon duty old man?

She was at some pt. misunderstanding
   my intention.

Did you tell her that you wanted to
   rape her?
Look it was in a hotel, & she was dressed in
   a way, I told her I had a feeling I
   could rape her but I never had that in
   my mind. I didn't think she'd think
   about it seriously.

What did you do or say to make her
   uncomfortable?
A asked if I could come to her room.
   She was dressed in very short shorts.
I've mean. I look like I could rape
   you like that. You are showing off.
I had a feeling of feel that was very
   warm to her as she confined certain
   things to me. I had the feeling I had
   to protect her from the harm. She would be
   in harms way by her experiences.
A wanted to help her about what
   I came to her room to tell to her.
She said don't touch me. I touched her hand

CONFIDENTIAL

she fell down. She talked about the
guy who left
I said I could rape you because
she was showing off.
She said please can you go + I left the room
I didn't want to harm her.

LB~ When you were in her hotel room – was she
afraid of you + she called her room
When she asked me to leave, I left

Never touched her, never chased her
never took your clothes off.

Did you ever come to her room
when she did not want you? No

Was she sick in bed when you went there?

She never told me she was sick

Where did this take place?
   In Bangkok –
Emporium Suite

We were in the restaurant of ___ ___
(Louis, PC, Mr. ___ + Andrew Bel.)

**CONFIDENTIAL**                                    PG 000846

A-712

I was stroking her head + tried to
get her head free (pt to his chest).

After we ate dessert I left.

How many nights did you go to her
hotel room? That was the night.

How many days were you together?
         Indiana   Surgeons (one night)
wed  7  8  9  10
   (for 6 days)

Did you attend the training?        Yes
Do you understand our comp. Policy?  Yes

Do you realize you were a comp rep +
        this is one of our suppliers?
I think what I did was not
     inappropriate.

Do you think that this you did your wife would find
   Strictly speaking   probably not.    [appropriate]

My wife might think I did something
inappropriate. She would like me to
    feel for other women.

What do you feel for Rel?

A have very warm feeling for Rel.
I feel she is probably in not too
good of a relation with her husband
She married & didn't feel me that
she was married.

How old is Rel?
30 I think
How old are you? 54

Is she attractive woman?
She's a good looking woman. I don't know if
she is attractive. This doesn't have anything
to do my attractiveness. This kind of relationship
didn't happen in ?
I'm not saying idk appropriate She email
thing about her. It was more than normal
relationship that is in a business relationship

If there a recording that you were being
asked to leave a room
you didn't, how do you explain that?
I left the room. Why is there a
recording?

CONFIDENTIAL

PG 000648

I left her room w/ out harming her.

She apologized to me + I didn't
understand why. She m/ss when she
didn't come. 2nd day of audit,
she apologized + said she was sorry
for what she did. Now I understand
why. Oh my god.

Why did you put her w/o she told held?
I tried to understand why she was
apologizing. I asked her why she held
because I couldn't sleep. I even sent her
one SMS message asking why
she was apologizing. She said you'll
understand one day.

Do you realize that has in all/job's
the comp. + you can be sued for
harassing histom'? I didn't want to
harass anybody.

Anything else that you'd like to
tell us?
Listen I think it's retarded that I'm
sorry if I did to harm the
company. I did not mean to
hurt anybody. She apologized to

CONFIDENTIAL

me I feel that to a point I
was provoked — I shouldn't be saying
this — if I was thinking of
things the way it turned out I
should not have been treating her the
way... It didn't come from one
day, I believe it came close in the
places I was the person who wanted
to confirm in, It was a bad relationship
between us I'm trying to explain
why maybe at some pt. it became
personal. when she told me to leave
her room, I left her room. There
was nothing between us.


Violation of PVP
  - engaging in ban behavior
       violated comp policy & PVP's
  - ban supplier


[?] telling Lynn that she
   has destroyed his life

Statement For: (203) 243-0079
Account Number: 506934409
Corporate ID : PROCTER AND GAMBLE

Customer Service Number    1-800-937-8997

Jun 12, 2009                                           Page   21   of 497

## ROAMING CHARGES - (Continued)

| Date | Call Destination | Time | Number Called | Call Type | Minutes | Airtime Charges | Toll Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Thailand (AIS) | | | | | | | | |
| 6/09/09 | United Sta, NO | 9:24 PM | 203-838-5877 | | 1 | $ 1.49 | $ - | $ 1.49 |
| Sub Total | | | | | 32 | $ 47.89 | $ - | $ 47.89 |
| SUBTOTAL | | | | | 149 | $ 554.51 | $ - | $ 554.51 |

## MESSAGING CHARGES

| Date | Service | Time | Destination | Message Type | Messages | | Direction | Total |
|---|---|---|---|---|---|---|---|---|
| 5/19/09 | Croatia | 9:11 AM | 386980501 | Text | 1 | | Incoming | $ 0.20 |
| 5/19/09 | Croatia | 9:12 AM | 385896965946 | Text | 1 | | Outgoing | $ 0.20 |
| 5/29/09 | Bridgeport, CT | 7:48 AM | 203-521-7550 | Text | 1 | | Outgoing | $ 0.20 |
| 6/03/09 | Hong Kong | 12:36 AM | 85296737194 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/04/09 | China | 1:04 AM | 8613825078627 | Roam Text | 1 | | Incoming | $ 0.20 |
| 6/04/09 | China | 1:41 AM | 8613825078627 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/04/09 | China | 1:44 AM | 8613825078627 | Roam Text | 1 | | Incoming | $ 0.20 |
| 6/05/09 | India | 9:43 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/05/09 | India | 10:00 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/06/09 | Hong Kong | 8:15 AM | 85296737194 | Roam Text | 1 | SINGAPORE | Outgoing | $ 0.35 |
| 6/06/09 | Hong Kong | 8:15 AM | 85296737194 | Roam Text | 1 | SINGAPORE | Outgoing | $ 0.35 |
| 6/06/09 | Hong Kong | 6:25 AM | 85296737194 | Roam Text | 1 | SINGAPORE | Outgoing | $ 0.35 |
| 6/06/09 | Hong Kong | 6:25 AM | 85296737194 | Roam Text | 1 | SINGAPORE | Outgoing | $ 0.35 |
| 6/07/09 | Cincinnati, OH | 1:41 AM | 513-237-4011 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/07/09 | Cincinnati, OH | 1:41 AM | 513-237-4011 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/07/09 | Cincinnati, OH | 5:24 AM | 513-237-4011 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/07/09 | Cincinnati, OH | 6:50 AM | 513-237-4011 | Roam Text | 1 | | Incoming | $ 0.20 |
| 6/07/09 | Hong Kong | 8:11 AM | 85296737194 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/07/09 | Hong Kong | 8:18 AM | 85296737194 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/08/09 | India | 3:43 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/08/09 | India | 3:43 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/08/09 | India | 4:01 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ 0.35 |
| 6/08/09 | Hong Kong | 6:57 AM | 85296737194 | Roam Text | 1 | BANGKOK | Outgoing | $ 0.35 |
| 6/08/09 | Hong Kong | 7:00 AM | 85296737194 | Roam Text | 1 | BANGKOK | Outgoing | $ 0.35 |
| 6/08/09 | Hong Kong | 7:05 AM | 85296737194 | Roam Text | 1 | BANGKOK | Outgoing | $ 0.35 |

The date and time for all messages corresponds to Pacific Time (PST/PDT).

Call Type: (A) Call Waiting (B) Call Forward (C) Conference Call (E) Date/Fax (F) Mobile2Mobile (G) Voicemail (H) Free Calls

(I) Intl Disc Call (J) Intl Disc Call to Mobile (K) WPS Call (T) T-Mobile Number (U) HotSpot Call (V) myFaves Call (X) T-Mobile @Home Call

Confidential                                                          PG000415



Statement For:     (203) 243-0079
Account Number:    306984499
Corporate ID :     PROCTER AND GAMBLE

Customer Service Number     1-800-937-8997

Jun 12, 2009                                              Page   22   of  497

## MESSAGING CHARGES - (Continued)

| Date | Service | Time | Destination | Message Type | Messages | | Direction | Total | |
|------|---------|------|-------------|--------------|----------|---|-----------|---|---|
| 4. 6/08/09 | Hong Kong | 7:05 AM | 85296737194 | Roam Text | 1 | BANGKOK | Outgoing | $ | 0.35 |
| 5. 6/08/09 | Hong Kong | 7:07 AM | 85296737194 | Roam Text | 1 | BANGKOK | Outgoing | $ | 0.35 |
| 6/08/09 | Hong Kong | 2:44 PM | 85296737194 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | Hong Kong | 2:49 PM | 85296737194 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | Hong Kong | 2:56 PM | 85296737194 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | Hong Kong | 3:00 PM | 85291057640 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | Bridgeport, CT | 5:09 PM | 203-521-2165 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | Hong Kong | 7:52 PM | 85291057640 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | Hong Kong | 8:05 PM | 85291057640 | Roam Text | 1 | | Incoming | $ | 0.20 |
| 6/08/09 | Hong Kong | 8:14 PM | 85291057640 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | Bridgeport, CT | 9:11 PM | 203-521-2165 | Roam Text | 1 | | Incoming | $ | 0.20 |
| 6/08/09 | Bridgeport, CT | 9:12 PM | 203-521-2165 | Roam Text | 1 | | Incoming | $ | 0.20 |
| 6/08/09 | Bridgeport, CT | 10:20 PM | 203-521-2165 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | India | 10:53 PM | 919958589850 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | China | 12:20 AM | 8613825078827 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/08/09 | India | 1:41 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | India | 1:45 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | India | 1:54 AM | 919958509850 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | India | 2:16 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | India | 2:17 AM | 919958589850 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | Bridgeport, CT | 10:05 AM | 203-521-2165 | Roam Text | 1 | | Incoming | $ | 0.20 |
| 6/09/09 | Bridgeport, CT | 10:07 AM | 203-521-2165 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | Hong Kong | 1:18 PM | 85291057640 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | Hong Kong | 3:27 PM | 85291057640 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | India | 7:47 PM | 919958589850 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| 6/09/09 | Hong Kong | 8:15 PM | 85291057640 | Roam Text | 1 | | Outgoing | $ | 0.35 |
| **SUBTOTAL** | | | | | **52** | | | **$** | **18.70** |

The date and time for all messages corresponds to Pacific Time (PST/PDT).

## DATA SERVICE CHARGES

| Date | Service | Megabytes | Total | |
|------|---------|-----------|-------|---|
| 5/10/09 | RIM Blackberry | 4.9296 | $ | - |
| **SUBTOTAL** | | **4.9296** | **$** | **-** |

Call Type: (A) Call Waiting (B) Call Forward (C) Conference Call (E) Data/Fax (F) Mobile2Mobile (G) Voicemail (H) Free Calls

(I) Intl Disc Call (J) Intl Disc Call to Mobile (K) WPS Call (T) T-Mobile Number (U) HotSpot Call (V) myFaves Call (X) T-Mobile @ Home Call

Confidential

Case 12-338, Document 58, 07/23/2012, 671468, Page145 of 273

A-718

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | **PART OF EXHIBIT F (Answers to Undspt. Facts) - EXACT EXPLANATION** | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | **Messages exchanged on Monday 6/8/2009 from 8:57 PM to 9:07 PM - Thailand (Bangkok) Time Zone per official T-Mobile bill for 203-255-7544** | | | | | | | |
| 4 | | | | | | | | | |
| 5 | Message # | **Time Stamp - USA PST - from P&G phone bill for 203-243-0049** | What was stated in the message per Predrag's Deposition Testimony? | | Time in Bangkok | | Time in Hong Kong | **Time that should have been shown on Bel's phone (HK)** | NOTES: |
| 6 | | | | | | | | | |
| 7 | 1 | 8:57 AM | Predrag: Can I come to your room to eat dessert with you? | | 8:57 PM | | 9:57 PM | 10:05 PM | |
| 8 | | | | | | | | | Bel's phone was off by 8 minutes ahead based on Singapore's record that Bel provided and Peggy captured (page 000612) - therefore the times in Column H - should have been times shown on the page 000612 - but they do not match! |
| 9 | 2 | 7:00 AM | Bel: No, I am tired | | 9:00 PM | | 10:00 PM | 10:08 PM | |
| 10 | | | | | | | | | |
| 11 | 3 | 7:05 AM | Predrag: OK - have a good night sleep then. | | 9:05 PM | | 10:05 PM | 10:13 PM | |
| 12 | | | | | | | | | |
| 13 | 4 | 7:05 AM | Bel: Hey, I changed my mind - you can come! | | 9:05 PM | | 10:05 PM | 10:13 PM | |
| 14 | | | | | | | | | |
| 15 | 5 | 7:07 AM | Predrag: OK - will be there in a minute. | | 9:07 PM | | 10:07 PM | 10:15 PM | |
| 16 | | | | | | | | | |
| 17 | | | | | | | | | |
| 18 | | **Messages that Bel Liu forwarded to Peggy Wilczewski, supposedly exchanged on 6/8/2009 - provided on the Bates page 000612 - listed chronologically** | | | | | | | |
| 19 | | | | | | | | | |
| 20 | Message # | **This should be (but it is not) recorded on the P&G phone bill for 203-243-0049 - USA PST - if Bel's statement were true (15 hours and 8 minutes subtracted)** | This is what Bel claims were the th econtents of the messages exchnaged. Notice the sixth message - supposedly sent by Predrag Cicvara at 7:05 AM | | Time in Bangkok | | Time in Hong Kong | **Time and text (column C) that Bel provided to Peggy - time is off Bel's phone - 8 minutes ahead.** | NOTES: |
| 21 | | | | | | | | | |
| 22 | 1 | 8:57 AM | Predrag: Hey if you want a company for desert let me know | | Not Important | | Not Important | 10:05 PM | 1. There is one more, obviously fabricated e-mail (six versus 5 that really were exchanged). |
| 23 | | | | | | | | | |
| 24 | 2 | 6:57 AM | Bel: I want to take a rest | | Not Important | | Not Important | 10:05 PM | |
| 25 | | | | | | | | | 2. Times on e-mails are not assigned properly. First three e-mails are obviously similar on Bel's statement - which means that she tampered with times - as times should have been as listed in the table above (Column B) |
| 26 | 3 | 6:58 AM | Predrag: Have a good night sleep and sweet dreams | | Not Important | | Not Important | 10:07PM | |
| 27 | | | | | | | | | |
| 28 | 4 | 7:01 AM | Bel: Sorry! I am not really well tonight. Anyway, Yuan left already. | | Not Important | | Not Important | 10:09 PM | |
| 29 | | | | | | | | | |
| 30 | 5 | 7:05 AM | Predrag: I know you are not and just wanted to be with you without dirty thoughts ...so let me know I need few minutes for e-mails and then can bring desert to your room if you want. (this is the message that was never written by Plaintiff) | | Not Important | | Not Important | 10:13 PM | 3. E-mail on 10:13 (Bel's phone time) was sent by Bel, not Predrag (see above) - and the text she sent to Peggy, see on the left, is completely fabricated |
| 31 | | | | | | | | | There is no logical sense in what is written in e-mails 4 - 5 and 6 |
| 32 | 6 | 7:07 AM | Predrag: OK just few minutes please. | | Not Important | | Not Important | 10:15 PM | |
| 33 | | | | | | | | | |
| 34 | | | | | | | | | |
| 35 | Note 1: | Time on the T-Mobile official bill is Pacific Standard Time in USA. It is 14 hours behind the Bangkok, Thailand time, and 15 hours behind Hong Kong / China time in summer. Bel's phone is on Hon... | | | | | | | |
| 36 | | Also, Bel's phone is 8 minutes ahead of the correct China time. | | | | | | | |
| 37 | Note 2: | Hong Kong / China time is 1 (one) hour ahead of Bangkok, Thailand time. | | | | | | | |
| 38 | | | | | | | | | |
| 39 | Note 3: | Why would Predrag write in his last message: OK - just a few minute please - if he sent (according to Bel) the fifth message two minutes earlier? OK - to what?? While it does have sense in the above table, it d... | | | | | | | |
| 40 | | any sense in the Bel's table. WHY? Because the messages in Bel's table are out of sync (and time stamps) they are tampered with, and the fact that she had added a message that did not exist, changed the flo... | | | | | | | |
| 41 | | conversation and made it a completely nonsensical. | | | | | | | |

Case 12-338, Document 58, 07/23/2012, 671468, Page146 of 273

A-719

| | J |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |
| 33 | |
| 34 | |
| 35 | g Kong time. |
| 36 | |
| 37 | |
| 38 | |
| 39 | oes not make |
| 40 | y of |
| 41 | |

A-720

**EXHIBIT G TO STATEMENT -
MEMORANDUM OF LAW, BY DEFENDANTS PROCTOR & GAMBLE AND LYNNE
BURNETT, IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY,
DATED JULY 7, 2010
(REPRODUCED HEREIN AT PP. A-122–A-141)**

**A-721**

-----Original Message-----
From: Lawson, Erik
Sent: Thursday, June 25, 2009 08:19
To: Wilczewski, Peggy; Burnett, Lynne
Subject: Fw: Duracell

This should be the last email trail on this topic and Practical would like to close the discussion at this point.

Sent from Blackberry

----- Original Message -----
From: andrew <andrew@j1-net.com>
To: Lawson, Erik
Sent: Thu Jun 25 00:09:35 2009
Subject: Re: Duracell

Dear Erik,

Thanks for the e mail. I just returned from HK and I spent enough time with Bel during this trip. She is handling it fine and definitely she would like, most of all,to forgive and forget about it. In a way, she also feel a bit guilty that Pregard lost his job because of this - and I told her not to feel that way as what happened is in the past and nothing can be done about it. So lets leave it this way - she totally understand and she can handle this.

I'll come to Hong Kong to have dinner with you on July 7. Lets meet at the Peninsula Hotel , the French restaurant - Geddi. It is on the side entrance on the 2 nd. floor. If you have any problem, please call  my HK mobile no. 94900537. Or else, I'll see you there.

There'll be a lot of issues we need to discuss in terms of business. Practical's hope has been on growing our business with Duracell - however, with all the hard work we put in during the last 2/3 years - our order book is not supporting our operation now and in the foreseeable future. This is the most urgent challenge facing Practical at the momment. We are very disappointed with the level of order for the Daylites, as well as other business with your company.

Please be rest assured that Bel is doing fine and she is committed to Practical and will alway do her best for both of our companies.

See you soon in Hong Kong and looking forwards to catching up with you.

1

Confidential

Best personal regards

Andrew

----- Original Message -----

    From: Lawson, Erik <mailto:lawson.ec@pg.com>
    To: Andrew <mailto:andrew@net1.ji-net.com>
    Sent: Wednesday, June 24, 2009 12:27 AM
    Subject: RE: Duracell


    Dear Andrew


    Thanks for the reply.  I understand this is an uncomfortable situation for Bel.  I am simply offering to apologize in person on behalf of P&G as Mr. Cicvara violated one of the most important beliefs of the Proctor and Gamble Company – trust.  We have great respect for Bel and she has done a terrific job working with Duracell.  This incident has been managed very confidentially within P&G and only myself, Human Resources and a few others in executive management are aware of the details.  Nitesh and the other people Bel works with are not aware of this situation nor do they know any details.  Bel should not feel uncomfortable working with Duracell and we hope she will continue in her position and work with us as we grow our business together.  Please make sure she understands this.


    I will be in Hong Kong the week of July 6th.  I arrive at the Hong Kong airport at 2:00 PM on the 7th and should be at the hotel by 5:00 PM.  If you are available, it would be good to meet, if not only for dinner.   As we assess the lighting business, there may be more opportunity for Practical.  If you're not available, Christina and Mike will likely be in China at the end of July/early August and they will find time to meet with your then.  I look forward to hearing from you.  Thanks.


    Regards,


    Erik Lawson

    Associate Director

    Procter & Gamble Company

    Durables Spend Pool

    Duracell GBU SPOC

    203-796-4092

    lawson.ec@pg.com

2

Confidential

PG000481

Text messages forwarded by Bel Liu to Peggy Wilczewski on Friday, June 12 at 6:54 am ET using Aicent MMS Virtual Delivery

P's msg on 6/6 21:23 in Singapore
Part 1 – Text
Hi Bel Tried to call you few minutes ago – just to let you know that I would like to bring you your sun protector and the shirt from Hard Rock Café – did noit want to come unannuinced to your room, If I said anything that have offended you I am sorry.

P's msg on 6/6 21:32 in Singapore
Part 1 – Text
You are breaking one of the four agreements by making (unwarranteed) assumptions about me or my intentions. I am too open and I like way too much to have any hidden ideas. ARE you angry at me????????

P's msg on 6/8 22:05 in Thailand
Part 1 – Text
Hey if you want a company for desert let me know!

B's reply on 6/8/22:05 in Thailand
Part 1 – Text
I want to take a rest.

P's message on 6/8 22:07 in Thailand
Part 1 – Text
Have a good night sleep and sweet dreams.

P's msg on 6/8 22:13 in Thailand
Part 1 – Text
I know you are not and just wanted to be with you without dirty thoughts...... so let me know I need few minutes for emails and then can bring desert to your room if you want.

B's reply on 6/8 22:09 in Thailand
Part 1 – Text
Sorry! I'm not really well tonight. Anyway, Yuen left already.

P's msg on 6/8 22:15 in Thailand
Part 1 – Text
OK just few minutes please

ONFIDENTIAL

| | |
|---|---|
| From: | Bel [bell@practical.com.hk] |
| Sent: | Friday, June 12, 2009 8:18 AM |
| To: | Wilczewski, Peggy |
| Cc: | Schmude, Dina |
| Subject: | RE: For your review |
| Attachments: | Notes from Bel Liu on 6-11-09.doc; Re: Please Read This E-mail; P's msg on 6/9; B's reply on 6/9; P's msg-II on 6/9; P's msg on 6/10; P's msg-II on 6/10 |

      

Notes from Bel Liu    Re: Please Read    P's msg on 6/9    B's reply on 6/9    P's msg-II on 6/9    P's msg on 6/10    P's msg-II on 6/10
on 6-11-09....       This E-mail

Peggy,
                                                                                Dear

I forwarded you 8 text messages that I couldn't convert them to email format this morning.
Let me know if you didn't receive them. I also attached Predrag's email and the 5
remaining messages as email format.

Besides, I amended the notes and highlighted in blues for my changes.  I added on some
memories and feelings. Please understand that I tried to be polite when hosting customer.

Andrew's email is andrew@ji-net.com. Let me know what else do you need.

Best regards,

Bel



Practical Group of Companies

Tel: +852 2332 1887

DL: +852 2781 3166

Fax: +852 2770 3754

www.practical.com.hk <http://www.practical.com.hk/>


Disclaimer

Information contained in this message is confidential and may be legally privileged. This
message is intended solely for addressee(s). If you are not the named addresses, you are
hereby notified that any use, dissemination, or reproduction is strictly prohibited and
may be unlawful.


From: Wilczewski, Peggy [mailto:wilczewski.pm@pg.com]
Sent: Friday, June 12, 2009 12:54 AM
To: Bel
Cc: Schmude, Dina
Subject: For your review

1

ONFIDENTIAL                                                                   PG  000613

Case 12-338, Document 58, 07/23/2012, 671468, Page152 of 273



June 16, 2009

Mr. Predrag Cicvara
2122 North Benson Road
Fairfield, CT  06824

Dear Predrag:

The purpose of this letter is to provide you with additional information regarding the treatment of your Gillette stock options as a result of your recent termination from the Company.  As we discussed earlier today, your stock options were cancelled because your employment was terminated for cause.

Section 6(f)(A) of The Gillette Company 1971 Stock Option Plan (the "Gillette Plan") states that "[i]f any employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment." The Gillette Plan's definition of "discharge for Cause" includes each of the following:

> (A)  the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board or the elected officer or manager believes that Participant has not performed his duties;

> (B)  the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or

> (C)  the Participant's conviction of a felony or a plea of nolo contendere by Participant with respect thereto.

I have enclosed a copy of The Gillette Company 1971 Stock Option Plan for your review.

I apologize again for any confusion that resulted from conflicting information provided by the Company's stock option administrators. However, the Gillette Plan is clear on this point and the administrators did not have access to all of the facts associated with your inquiry. I have also enclosed a copy of the Gillette Plan for your review.

Regards,

*Peggy Wilczewski*

Peggy Wilczewski
Sr. Human Resources Manager

Enclosure

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| PREDRAG CICVARA, | : | Civil Action No. 3:9-CV-2054 (JCH) (HF) |
| Plaintiff, | : | |
| | | |
| V. | : | |
| | | |
| THE GILLETTE COMPANY and PROCTER & | : | |
| GAMBLE COMPANY and DURACELL, AN ENTITY | : | |
| OF UNKNOWN FORM and LYNNE BURNETT. | : | |
| Defendants. | : | May 26, 2011 |

**MEMORANDUM IN OPPOSITION TO GILLETTE'S MOTION**
**OF SUMMARY JUDGMENT AND IN SUPPORT**
**OF CICVARA'S CROSS MOTION**
**ARGUMENT**
**STANDARD FOR REVIEW**

I.   THE STANDARD FOR SUMMARY JUDGMENT HAS REPEATEDLY BEEN

SET FORTH; SINCE THE ISSUES IN OPPOSITION TO GILLETTES

MOTION ARE MIRROR IMAGES OF PLAINTIFFS MOTION THIS

MEMORANDUM IS INTENDED TO SERVE IN OPPOSITION TO

GILLETTE'S MOTION AND IN SUPPORT OF CICVARA'S CROSS

MOTION.

The Court reviews a Motion requesting Summary Judgment asks whether the record

demonstrates that there were no genuine issues of material fact and that the moving party

was entitled to judgment as a matter of law. *Miller v. Wolpoff & Abramson, L.L.P.* , 321

F.3d 292, 300 (2nd Cir. 2003). In determining where there are genuine issues of material

fact, the Court is "required to resolve all ambiguities and draw all factual inferences in

favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336

F.3d 128, 137 (2d Cir. 2003) (quotation marks omitted). However, "conclusory

1

A-728

statements and mere allegations [are] not sufficient to defeat a summary judgment motion." *Davis v. State of New York,* 316 F.3d. 93, 100 (2d Cir. 2002).

In employment discrimination cases such as this one, "[i]t is now beyond a cavil that summary judgment may be appropriate even in the fact intensive context of discrimination cases," and that "the salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to . . . other areas of litigation." *Adbu-Brisson v. Delta Airlines, Inc.,* 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation marks omitted) *See also Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985) cert denied, 474 U.S. 829 (1985) (summary judgment appropriate in employment discrimination cases even though such cases involve the employer's intent or state of mind).

As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must do more than simply show that there is some metaphysical doubt as to material facts. . . . [H]e must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir. 2001) (citation and internal quotation marks omitted).

The same standard applies, of course to the defendant. What is sauce for the goose is sauce for the gander. The problem with defendant's argument is that this is <u>not</u> an employment discrimination case.

II.   GILLETTE FAILS TO OFFER ANY EVIDENCE THAT IT ACTED IN
      ACCORD WITH THE PLAINLY STATED REQUIREMENTS OF THE PLAN

As will be set forth the plan is specific on the standard for voiding stock options. There is no evidence whatsoever that meets the standard of "substantial and

2

demonstrable" damage to Gillette. Nor could there be because the factual chronology set forth by Gillette demonstrates conclusively that Gillette denied Cicvara stock options "automatically" upon termination.

III. IN CONTRAST CICVARA'S CASE IN CLEAR, SUPPORTED ENTIRELY WITH UNCONTESTED (AND UNCONTOVERTIBLE) FACTS.

Cicvara, in his cross motion, has demonstrated that he was denied stock options, "automatically" (a word used by Gillette) with no investigation concerning the need to allege demonstrable loss to Gillette. As Cicvara's affidavit affirms no such loss did or could have occurred.

IV. CICVARA CONTENDS THE PLAN'S LANGUAGE IS CLEAR AND UNAMBIGUOUS. HOWEVER, IF THERE BE ANY DOUBT ABOUT THE IMPORT OR INTENT OF THE PLAN THEN THE DOUBT SHOULD BE RESOLVED AGAINST THE PLAN'S SCRIBNER'S.

The law of contracts is so clear on this proposition that it would be an insult to the court to load down this file with citations. Simply stated, if there is ambiguity in contractual language it is to be construed against the entity responsible for the drafting.

There can be no question that contract rules apply in this case, since Gillette has repeatedly referred to the issues as ones of "contract" law.

It is a basic principle of law that the language of the plan should be interpreted if there are any ambiguity against Gillette.

In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.

3

*a.*     *Rationale.* Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party. The rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position, but it is not limited to such cases. It is in strictness a rule of legal effect. Sometimes called construction, as well as interpretation; its operation depends on the positions of the parties as they appear in litigation, and sometimes the result is hard to distinguish from a denial of effect to an unconscionable clause.

  <u>Restatement of contacts</u>. Section 206. To the effect discussing the general rule see <u>Semmes Motors v. Ford</u> 429, F.2d 1197 (2nd Cir. 1970).

V. PLAINLY SPOKEN GILLETTE <u>MIGHT</u> HAVE A RIGHT TO TERMINATE CICVARA,  IF THIS WAS IT'S THE ONLY MOTIVE  BUT IS GOVERNED BY ITS OWN PLAIN LANGUAGE TO HONOR THE STOCK OPTIONS.

  Gillette has repeatedly stated that the issue presented by the instant litigation is not an asserted claim of wrongful discharge but that the only issue is a contractual claim concerning the stock option plan.

  Gillette mistakes the basic issue which is <u>not</u> whether Gillette could terminate Cicvara, nor its motives for doing so, but whether Gillette followed its own Plan. Plaintiff

4

contends, and supports by Cicvara's affidavit that there was no demonstrable harm to Gillette.

Gillette claims it had an "automatic" right to terminate Cicvara. See Gillette's Statement of undisputed facts at paragraph 57. This is clearly not the language of 6(f)A or B and negates Gillette's position.

Many courts have distinguished between wrongful conduct and "gross" misconduct. For example, a hararasser's behavior may be "inconsiderate, rude, vulgar, uncooperative, unprofessional and unfair" but not be outrageous."

Miller v. Equitable Life Insurance Society, 181 Ill. App. 3d 954, 957, 537 N.E. 2d 887, 889 (1st Dist. 1989)).

Another case found a harasser's conduct was "insulting, undignified, annoying and perhaps representative of the rough edges of society, but not extreme or outrageous." Bowersox v. P.H. Glatfelter Co., 677 F. Supp. 307 (M.D. Pa. 1988).

These principles arc precedents for the court finding that Cicvara is entitled to his stock options while, as one treatis has stated, there are no hard and fast rules" therefore the issue of "gross" should be left to a jury. See Sexual Harassment by Alden and Moore section 8.

VI. GILLETTE CITED SECTION 6(f)A AS JUSTIFICATION FOR DENYING THE STOCK OPTIONS BUT FAILED TO FOLLOW THE PROCEDURES THEREIN.

Furthermore, Gillette's submission to this court states Cicvara was terminated pursuant to Section 6(f)A of the plan. See Attachment H. to Peggy W's affidavit. This section requires a demand for performance which was never made. Thus on the face of Gillette's own pleadings the voiding of his stock options was improper.

5

On this and this alone Gillette should be denied summary judgment since its own documents create an issue of fact, i.e. whether Cicvara was terminated pursuant to 6(f)A or 6(f)B.

## VII. WHILE CICVARA'S CONDUCT MIGHT BE DEEMED "INAPPROPRIATE" IT CANNOT BE SO DEEMED AS A MATTER OF LAW.

Cicvara was charged with what the court clearly could call "an unsolicited and uninvited" sexual overture, which even he admitted could be deemed "inappropriate." But Gillette asks this court to hold as a matter of law that this conduct was "Gross," denying that this was a question of fact for the jury to decide, not the court. A jury could find such conduct wrong, and a jury might sustain such conduct justified termination. But the language of the plan requires a higher standard and the word "gross" created a factual determination by a jury. Gillette's motion would remove from a jury the option to determine the level of sanctions Cicvara has incurred.

Courts have quite routinely upheld sexual harassment as grounds for termination. Such conduct clearly is adequate basis for termination. Hamilton v. Hudson (cited on page 12 of Gillette's brief).

But whether Cicvara's termination was justified is not the issue presented in this case. The plan specifically and clearly sets forth a higher standard for denial of earned and accrued options.

Simply stated, if after a jury trial with the same evidence presented to the court and a jury, would the court be justified in directing a verdict that as a matter of law, Cicvara's conduct meet the higher standard of "gross." That is what Gillette asks the court to do, contrary to precedents. Sexual Harassment supra.

6

The severity of "punishment" for misconduct is left, by the plain language, for determination by a jury.

The plaintiff will waive in this action only any claims to "unjust enrichment," severance pay and/or the claim of a bonus. This waiver is limited to the issues raised in this litigation, for the stock options as based as defendants motion is on contract law.

This waiver is limited to the instant action and Cicvara reserves the all rights to challenge the rightfulness of his termination. That issue has been expressly barred from this court's consideration by previous rulings in this case.

## CONCLUSION

The plaintiff claims to have proven by the facts alleged by Gillette and affirmed by the record before this court that Gillette's motion for Summary Judgment should be denied. Furthermore, the lack of any possible rebuttal evidence mandates granting Cicvara's cross motion for Summary Judgment.

Plaintiff

By _____ L/S _____
    Igor L Sikorsky, Jr.
    P.O. Box 38
    Unionville, CT 06085
    (860) 675-5313
    CT Fed Bar No. 04233

## CERTIFICATION

This is to certify that the copy of the foregoing was sent by U.S. Mail to:

    Attorney Edward Cerasia, II
    Seyfarth Shaw, LLP-NY
    620 Eight Avenue
    New York, NY 10018

_____ L/S _____
Igor I. Sikorsky, Jr.

7

**A-734**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **PREDRAG CICVARA,** | : | **Civil Action No. 3:09-CV-2054 (JCH) (HF)** |
| **Plaintiff,** | : | |
| | | |
| **V.** | : | |
| | | |
| **THE GILLETTE COMPANY and PROCTER &** | : | |
| **GAMBLE COMPANY and DURACELL, AN ENTITY** | : | |
| **OF UNKNOWN FORM and LYNNE BURNETT,** | : | |
| **Defendants.** | : | **May 26, 2011** |

### NOTICE OF CROSS MOTION
### FOR
### SUMMARY JUDGMENT

The Plaintiff respectfully moves for an order from the Court granting the Summary Judgment and the Amended Complaint in its entirety, pursuant to Fed. R. Civ. P. 56.

As set forth in Plaintiff's Memorandum of Law in Support of his Motion for Summary Judgment; Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1(a)(1); together with references to Defendants Admission of undisputed facts, and Affidavit of Plaintiff and upon all of the papers and proceedings herein, Plaintiff respectfully submits that he are entitled to an order granting Summary Judgment in his favor on the Amended Complaint.

Plaintiff

By _____ L/S _____
    Igor I. Sikorsky, Jr.
    P.O. Box 38
    Unionville, CT 06085
    (860) 675-5313
    CT Fed. Bar No. 04233

-2-

## **CERTIFICATION**

This is to certify that the copy of the foregoing was sent by U.S. Mail to:

      Attorney Edward Cerasia, II
      Seyfarth Shaw, LLP-NY
      620 Eight Avenue
      New York, NY 10018

              L/S
_____
Igor I. Sikorsky, Jr.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

**PREDRAG CICVARA,**         :     Civil Action No.3:09-CV-2054 (JCH) (HF)
              **Plaintiff,**         :


**V.**                   :


**THE GILLETTE COMPANY and PROCTER &**   :
**GAMBLE COMPANY and DURACELL, AN ENTITY** :
**OF UNKNOWN FORM and LYNNE BURNETT,**   :
                      **Defendants.**   :   May 26, 2011


## MEMORANDUM
## IN SUPPORT OF CROSS MOTION
## FOR SUMMARY JUDGMENT


Plaintiff here in submits his Motion for Summary Judgment, supported by a memorandum of

law in support as well as Plaintiff's memorandum in opposition to Defendants motion for

Summary Judgment. Since the issue are so interconnected Plaintiffs filing of memorandum,

statement of facts and supporting documents cover both Defendants Motion and Plaintiffs Cross

Motion.

## PRELIMINARY STATEMENT

Defendant mistakes the Plaintiff's cause and seeks to create a smoke careen by alleging sordid details of the clumsy and wrongful efforts of Predrag Cicvara to play the role of seduction in chief. This is not wrongful termination case. The repeated description Plaintiffs conduct (which even he admits were "inappropriate") only clouds the issue.

This case is not about whether Plaintiff's conduct Justifies Terminations. It is about whether Gillette acted in accord with its Stock option plan. It is to use Defendants language, about whether there is credible, admissible evidence that Gillette has offered no evidence, nor can it under the undisputed facts, that it followed its own plan.

Briefly stated Gillette seeks to misled the Court to cover up the fact that it confused its right to fire Cicvara with its duty to honor the terms of its Stock Option Plan. These are markedly different issues, governed by different legal standards.

The issue presented is not whether Gillette had grounds to terminate Cicvara; the issue is whether, without investigation and contrary to the Plans direct language Gillette was entitled to "automatically" revoke his Stock Options.

In its arguments seeking (successfully) to limit Plaintiffs Discovery efforts Gillette's repeatedly has argued that this case was limited to the stock option issue, rather than any claims concerning the motives to terminate Cicvara. So now it is strange that Gillette devotes all its memorandum to emphasis what Cicvara was accused of doing.

## MEMORANDUM
## OF LAW

Plaintiff herein relies on the memorandum submitted in opposition to Gillette's Motion.

WHEREFORE Cicvara states there is no material issue of fact concerning whether Gillette acted

in accord with its plan in "Automatically" denying the stock options.


Respectfully Submitted

By _____ L/S _____
        Igor I. Sikorsky, Jr.
        P.O. Box 38
        Unionville, CT 06085
        (860) 675-5313
        CT Fed Bar No. 04233


## CERTIFICATION

This is to certify that the copy of the foregoing was sent by U.S., Mail to:

        Attorney Edward Cerasia, II
        Seyfarth Shaw, LLP-NY
        620 Eight Avenue
        New York, NY 10018


        _____ L/S _____
        Igor I. Sikorsky, Jr.

A-739

### UNITED STATES DISTRICT COURT
### FOR DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **PREDRAG CICVARA,** | : | **Civil Action No.3:09-CV-2054 (JCH) (HF)** |
| **Plaintiff,** | : | |
| | | |
| **V.** | : | |
| | | |
| **THE GILLETTE COMPANY and PROCTOR &** | : | |
| **GAMBLE COMPANY and DURACELL, AN ENTITY** | : | |
| **OF UNKNOWN FORM and LYNNE BURNETT,** | : | |
| **Defendants.** | : | **MAY 26, 2011** |

### PLAINTIFFS STATEMENT OF UNDISPUTED
### MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(A)(1)
### IN SUPPORT OF HIS CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1(a)(1), respectfully submits this statement of undisputed

material facts in support of his cross-summary judgment motion and in opposition to Defendants

Motion for Summary Judgment (1).

1) The Plaintiff has no dispute with the facts as set forth in Defendants pleadings for

Paragraph 1 to 4.

2) The provision of 6(f)B states expressly that Plaintiff's must be found to  be guilty of

"gross misconduct which was <u>demonstrably</u> harmful to the Defendant".

3) There was not a scintilla of evidence offered of any "demonstrable harm to the

Defendant".

4) Plaintiff was terminated within one day his conduct came to the attention of the

Defendant and the next day after the investigations took place. These are the dates relied

on by the Defendant in its statement of undisputed facts.

5) The Defendant made no effort to ascertain any demonstrable harm to Gillette and

declared that his termination was "automatic". (see Defendants Statement at Para 57).

Case 12-338, Document 58, 07/23/2012, 671468, Page167 of 273

-2-

6) Pursuant to the plan Section 6 (f) (i) Plaintiff sought to exercise his options within the time set forth in the plan. (see Affidavit of Plaintiff).

7) The Defendant has refused and continues to refuse to honor Plaintiff election on the grounds that his termination for cause, "automatically" voided options.

8) At the time of his termination Plaintiff was entitled to options in the as set forth in Exhibit B attached.

9) Plaintiff was terminated on June 15, 2009 after a telephonic consultation with a Company Attorney and notified on June 16, 2009 that his options were terminated. (see Affidavit of Peggy Wilczewski, and Exhibit H, in Defendants Motion).

10) No effort what so ever was to investigate, whether the Plaintiff's conduct substantially and demonstrably adversely affected Gillette and / or its subsidiaries.

11) Plaintiff has exhausted all administrative and / or appeal remedies available to him.

12) If there were any remedies available Defendant has, waived such remedies.(Affidavit of Cicvara).

13) Gillette has offered no evidence or authorities that Plaintiff conduct was "gross misconduct" as a matter of law.

14) Gillette offered no evidence that Plaintiffs conduct materially and demons ratably was injuries to the Company.

15) Gillette made no effort to investigate to determine if there was injury to Gillette pursuant to terms of the Plan.

16) The letters of dismissal states Gillette terminated Cicvara because of an alleged violation of 6(f)A.

A-741

-3-

17) The terms of 6 f (A) expressly require a form of progressive discipline in the requirement

a failure to perform substantially his duties......

"after a written demand"

18) No "written demand" Pursuant to 6 f (A) was sent by Gillette and / or received by

Cicvara.


Plaintiff

By _____L/S_____
        Igor I. Sikorsky, Jr.
        P.O. Box 38
        Unionville, CT 06085
        (860) 675-5313
        CT Fed Bar No.04233


## CERTIFICATION

This is to certify that the copy of the foregoing was sent by U.S. Mail to:

    Attorney Edward Cerasia, II
    Seyfarth Shaw, LLP-NY
    620 Eight Avenue
    New York, NY 10018


        _____L/S_____
        Igor I. Sikorsky, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PREDRAG CICVARA, | : | Civil Action No.3:09-CV-2054(JCH) (HF) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| THE GILLETTE COMPANY and PROCTER | : | |
| & GAMBLE COMPANY and DURACELL. | : | |
| Defendants. | : | MAY 25, 2011 |

AFFIDAVIT
OF
PREDRAG CICVARA

Personally appeared Predrag Cicvara and gave oath to the facts herein after set forth:

1.  The factual data concerning my dates of hire, job duties and responsibilities as set forth in paragraphs 1 – 4 in Defendant's Statement of Undisputed Material Facts are accurate and agreed upon.

2.  On June 15, 2009 I was terminated for "Cause" by P&G Company. The specific reason for termination, at the time of termination, was never, either verbally or in written form, disclosed to me. The circumstances will be explained later in my affidavit. Let's, for now, concentrate on the stock options as a Count 1 of this particular case.

3.  The options that I have received are correctly listed in paragraphs 51 – 55 of Defendants' statement of Undisputed Material Facts.

4.  Following my termination I made a timely effort (in early July, 2009) to exercise the options accrued to me as an employee of the defendant. My attempt to exercise was denied, for the reason stated in the letter from Peggy Wilczewski, of Duracell's HR Department, sent on, or around June 16th, 2009 (Exhibit A).

5.  In this letter, Peggy Wilczewski wrote: "**Section 6 (f) (A)** of the Gillette Company 1971 states that "if any employee Participant is discharged for Cause, **as hereinafter defined**, all his options shall immediately be cancelled effective as of date of termination of his

1

employment". The Gillette Plan's definition of "discharge for Cause" includes each of the following:

(A) the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board of the elected officer or manager believes that participant has not performed his duties;

(B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or

(C) the Participant's conviction of a felony or a plea of nolo contendere by Participant with respect thereto. "

6. In her letter Peggy Wilczewski clearly stated that it is because of the **Section 6 (f) (A)** that I was denied in my attempt to exercise stock options. An **(A)** reason, cited above, refers to the continued failure (*by a participant*) to perform substantially his duties.

7. At no time throughout my employment I was given any of the procedural warnings mandated by said Section 6. (f) (A).

8. On the contrary, throughout my employment in Duracell, I was always an excellent worker, and have never received any yearly review that was less than fully satisfactory. I received the stock options rewards for my contribution to the company results in 2001, 2002, 2003, 2004 and 2005. In 2005 Gillette Company was acquired by P&G. In January 2005, I have also received an award from Duracell VP of Sales (Jim O'Donnell) for advancing and exponentially growing the Company's OEM business.

9. In May 2009 I received notice of an increase in my salary as set forth in Exhibit B hereto. On July 1, 2009 I was to be given even more responsibility, increasing number of direct reports to me from two to five (Cicvara Dep. page 16, and page 33).

10. Therefore the Section 6 (f) (A) couldn't be applicable at all in my case, and it could be attributed to a possible error by Ms. Peggy Wilczewski, as she may not be an expert in explaining, or did not really care to explain the legal issues to the already former employee,

whose life was destroyed by, amongst the others, her careless actions. Also, it is interesting that this error would be committed at the moment when Peggy was "apologizing" in this letter for another error committed by the stock administrator in Cincinnati who told me when I called, that in spite of the fact that I was terminated for "cause" I can exercise stock options within 30 days of the day of termination. The fact that I was told that, would actually contradict the statement from Mr. Muncy: "automatically cancelled as a result of his termination for cause", used throughout various documents served by the Defendant to Your Honor. The numerous errors that Duracell HR committed while giving these explanations, only confirm the fact that they did not even bother to precisely justify their actions, taking an arrogant position with the motto: "the facts are what we tell you that they are".

11. Inexplicably, in their July 7, 2010 document "Defendant Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery" at page 5 (8 of 20), served to Your Honor, the Defendant Lawyers repeated the same: "By letter, dated June 16, 2009, Wilczewski informed Cicvara that, pursuant to **Section 6 (f) (A)** of The Gillette Company 1971 Stock Options Plan, Cicvara's stock options were cancelled as a result of his termination for cause." This document was created more than one year after the letter (Exhibit A) was created and all that time was at Defendant hands to make a proper determination as to what exact paragraph was applicable in this particular case. What exact paragraph is applicable indeed? The short answer is – none.

12. It is obvious that the section 6 (f) (C) couldn't be applied as I was not convicted of a felony as required in sub-paragraph C of the aforementioned. Thus through logical deduction, one would have to conclude that it must be the condition listed in section 6 (f) under paragraph (B). During the deposition I have asked Edward Cerasia II, not once but twice, about what paragraph (A, B or C) is applicable in my case (Cicvara Dep. page 156-157, page 159) and finally, after the deposition (*and 18 months after my life was completely destroyed*) it seems that Defendant understood that the cancellation is not automatic, as now, they finally admitted and agreed, through their "Statement of Undisputed Facts" (page 13, paragraph 50) that it is indeed B paragraph that is applicable to this case (*except it actually is not, but it is the only one that makes some sense*). However that did not prevent Defendant's Lawyer to **wrongly claims**, throughout the document that Cicvara's stocks are "**automatically cancelled** as a result of his termination for cause" (Id. page 14, paragraph 57). Here, the Defendant is hoping that the

3

maxima: "A lie told often enough becomes truth" will work wonders in this case. Granted, they have found another person to "blame" as it was Mr. Jason Muncy – who has stated this, therefore the Defendant position is: It is not wrong, for Lynne Burnett, Peggy Wilczewski, and for the Defendant lawyer, to repeat this untrue statement numerous times throughout many documents served to the Court, as "Mr. Muncy stated that, so it must be true". It seems they are pretending that they don't understand that it is not Mr. Muncy opinion that counts, as it is completely irrelevant what he "thinks" or what his "opinion is". The only relevant thing here is The Gillette Company 1971 Stock Plan and what is written in it.

13. What is stated in paragraph (B) clearly defines that the condition for cancelling the options of somebody who was terminated for "Cause" is if: "the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or its subsidiary".

14. Therefore the part that Defendant would have to prove, which they failed to do, would be: "materially and demonstrably injurious to the company". They also would first have to prove that my conduct was illegal – which it was not, or that it represents "gross misconduct", which they do claim, but failed to prove, throughout their documents, in spite of the fact that they were carefully crafted the fabricated evidence to strengthen their case, and allowed the others (Bel Liu) to freely do that.  This will be explained later in my affidavit. However, just for the sake of argument, let's suppose here that I actually "did harass and did make unwanted sexual advances towards Bel Liu" and let's see if that qualifies for cancelling of my stock options. I will only list the facts.

15. Not only that the Defendant never even tried to prove that this statement indeed applies in my case, they actually refused to disclose the business results, level of their business with Practical, and lists of purchase orders issued by Duracell to Practical in the last several years, that Plaintiff had asked for repeatedly. Why? Because there was not any negative impact to Duracell business that Plaintiff's behavior, even if the Defendant allegations were true (*and they are obviously not*) would have caused.

16. The e-mail that Mr. Andrew Yau sent to Erik Lawson (Exhibit C), only confirms that Practical was in position to beg Duracell for more business (Cicvara Dep. page 23-24). Ironically, the accusations by Austin Lin are actually emphasized by Mr. Yau, for the reasons completely opposite from what paragraph B of the The Gillette Company 1971 Stock Plan is

4

asking for (negative impact to the company's results – a material impact). Andrew sets me up, using Bel (*and destroying my life in a process*) in order to gain leverage with Duracell, that in his mind, would enable Practical **to get more business from P&G, not less.**

17. Duracell business could not materially suffer, even if Practical would have decided to completely cease their cooperation with Duracell (jut the opposite of what they were actually doing). I have explained Duracell policy with the contractors, as always keeping them hungry and always having more than just one solution for what was needed from them (Cicvara Dep. pages 44-45).

18. Because my termination, for alleged "Cause" **did not cause any material losses to the company**, the stock options that I deserved and was awarded from 2001 until 2005, must be reinstated, even if it is assumed that I actually committed what Defendant is accusing me of (underline I did not). Since, in the paragraphs to follow, I will prove that, similarly as for the cancelled - already awarded options, my lost salaries, my lost bonuses, my lost pension contribution, my lost future stock options and my lost future raises and promotions are unjustly taken away from me, **by the illegal actions and decisions of the company's employees**, the decision about this case should be brought, without wasting any more of tax payers money – just by Your Honor, without even proceeding with the trial activities, as the ample evidence exist to support such a decision. So let's now continue to describe the other facts.


19. I was born on September 19, 1954 in former Yugoslavia. I graduated from secondary school in 1973, as the best student that ever attended the school and from college in 1977, at University of Zagreb, Croatia (Electrical Engineering – Control Systems Theory) as the second best student in Class of 1973. I got three Best Student Awards from the Rector of University of Zagreb during my studies. I married in 1983 with my wife Lillian and our son Viktor was born in 1984. In 1991, I was General Manager of "TPK – Service Division" in Zagreb, Croatia, on my way to become General Manager of the entire TPK company (about 4,000 employees). I have enrolled in the first (pilot) MBA program in Croatia, in 1990, a joined effort of Florida State University, Tallahassee, Florida and University of Zagreb – School of Economics, with the best GMAT (administered by University of Florida) score of all students who were accepted.

5

20. After the outbreak of a civil war in Yugoslavia, in 1991 we immigrated to USA in 1991. My wife acquired two Master Degrees, in French Language and Literature in 2002, and in Spanish Language, in 2008. She currently works (*very hard*) at two places (*as we had to survive on her income only*), as a World Language Teacher (French and Spanish Language) in a High School and as a Spanish Teacher at University. I have acquired Master of EE degree at Polytechnic University, Brooklyn, NY (Hawthorne, NY campus). Our son Viktor graduated from Fairfield High School in Fairfield, CT, in 2002, and was the first student from that school, in the last 25 years, who was chosen as one of two Presidential Scholars from the State of CT in 2002, when he, together with us, travelled to Washington DC in June, and spent four-days there, together with the other 119 presidential scholars for 2002, to meet, among the others, with the president George W. Bush. Viktor graduated from Columbia University, New York, NY in 2006, and is currently employed and lives in New York City.

21. On November 1st, 2000 I started to work for Duracell, at the time owned by The Gillette Company, as a Manager of WW Technical and Consulting Services. In April 2002, after massive resource cuts in the company, I got additional responsibilities that included forecasting, developing new business opportunities, analyzing business results, promoting new, more efficient processes, marketing and pricing responsibilities, all on top of my technical and consulting responsibilities.

22. Because of my extraordinary analytical abilities and my strong mathematical background, I was an instrumental part of the unprecedented growth of Duracell OEM sales business, that grew from about $18 MM and 75MM cells in 2002, to over $70MM and over 400MM cells in 2006-2007 fiscal year. Little did I know at that time that at least a part (but a significant one) of that growth was actually causing a great harm to Duracell as a company, as the whole profit that our OEM Sales Group generated (roughly about $40MM from 2002-2006) was nearly completely wiped out by the harm that the diversion sales, that must have been known to the very influential people within the company, caused to Duracell's net income (Cicvara Dep. pages 181-183, Exhibits D, E and F). Vast evidence of this activities existed on my business computer, which was very well known to the influential people in Duracell and P&G (please see statement of Rob DaPra on the page 2 of the Exhibit F).

23. In April 2008, I was transferred to QA Department where I held the position of Lighting QA Leader for a few months, and then I was promoted to the position of QA Manager

6

Case 12-338, Document 58, 07/23/2012, 671468, Page175 of 273

in July 2008. After that, due to the excellent job that I was doing at my position, there was a plan in place (by Kevin Babis, my supervisor) to broaden my responsibilities with a new position that would include five (up from two) people reporting to me, as of July 1st, 2009 (three of them being in Asia). This did not happen as I was terminated from my employment with P&G Company on June 15th, 2009.

24. From May 31, 2009 until June 13, 2009 I went on the multiple-country business trip to help in auditing of four different manufacturing facilities, belonging to three different companies. Mid part of this trip included the audit of two Practical's factories, one in Indonesia, called Era-Cipta, situated in Medan the other in Thailand, called Practical, situated in Bangkok. The first one was audited on June 4-5, the second on June 8-9. Bel Liu, from Hong Kong, Practical General Manager, was accompanying Duracell's audit team on these trips.

25. On June 8, 2009 I exchanged five (5) text messages with Bel in a period of 8:57 PM until 9:07 PM local Bangkok time (part of Exhibit G attached to this affidavit – Bates pages 000415 and 000416, Cicvara Dep. page 184, Cicvara Dep. Exhibit G). In the message #4, sent on 9:05 PM on June 8th, Bangkok time, Bel, freely and entirely by her our decision, invited me to come to her room, even though previously, in message #2, she stated that she is tired and want to rest, and then inexplicably changed her mind, which did make me wonder, but I did not give it too much thought. I answered, in the 5th message that I will come in a minute or so, which I did.

26. During about 50 minutes that I was in her room, she was on the phone with her husband for more than 15 minutes (Cicvara Dep. page 101-103). She also called her boss to give him some details for tomorrow's call to Duracell purchasing – as they were trying to lower their price for one of the flashlights in order to capture the business with Duracell that hey desperately needed (Cicvara Dep. Id.). The things that happen between us were somewhat sensual. I have never done anything to physically, or in any other way harm her (Cicvara Dep. page 68, pages 85-86). Bel Liu confirmed that in her statement to Peggy Wilczewski and Dina Schmude on June 11, 2009: "In conclude, he did the rude thing but he didn't threaten me or shout at me. Every word he said was gentle. He did not do any violent action." (Bates page 000617). .

27. On June 9th, 2009, Austin Lin, an employee of Duracell QA Department who reported to me at the time, went to Duracell HR to report that "Mr. Cicvara had made repeated unwanted sexual advances toward Ms. Liu during a business  trip in Asia" (Dina Schmude, Dec. page 1, par.3)

28. After my termination on June 15th, I thought about the motives that fueled the actions of Austin Lin, Andrew Yau (and indirectly Bel Liu, through the strong influence of Austin Lin and her boss Andrew Yau) and Lynne Burnett that directly caused my termination "for cause". Immediately after my termination, I suspected that my visit to Bel's room, of June 8th, was a set-up, but I was not sure that is the case, even though I stated that it was my belief during the deposition (Cicvara Dep. pages 111-115, pages 142-143, ). However, after carefully reviewing all material that was presented by Defendant on April 15th, 2011, **as parts of it were purposely not disclosed to Plaintiff during the discovery phase,** even after repeated requests and Defendants' claims that they have provided all of the evidence they had in their possession, the conclusion can be made, with certainty and by the independent observers as well, that this surely was the case. Three forces were at work to make sure that I will be fired from P&G in June 2009, and each one was additionally fueled by the other. The first one was Austin Lin's strong desire to retaliate to me (completely independent of the other two) that I will explain later. The second one was an attempt by Andrew Yau to gain a strong leverage with Duracell/P&G that would help Practical to accomplish multiple goals. The third one was the desire of certain people at Duracell helm, to get rid of the person (me) who have learned and alerted Duracell management (*I alerted them instead of P&G hot alert line and that was a terrible error on my part*) about the diversion of batteries to Latin America (Cicvara Dep. page 181-183). To them, the fact that they can accuse me of "sexual harassment" and get rid of me immediately (as they actually did on June 15th,2009) came as a god given gift (Cicvara Dep. page 7, page 12-13, page 14, page 191, Exhibits D, E and F).

29. Austin Lin made the decision to report me to HR entirely by himself, practically deciding in lieu of Bel Liu what "must be done"( Exhibit H - page 2, Cicvara Dep. page 95,). Austin Lin spent 7 weeks in China (although the work could have been completed in three weeks at most, Cicvara Dep. pages 112- 113) during February, March and April 2008. While in China, Bel Liu taught him Mandarin and he engaged in an intimate relationship with her, the fact that I have found only after I was terminated, on or about June 19, 2009 (Cicvara Dep. pages, 55-56, pages 112 -113), from Brian Hesse (Duracell) and David Mathieu (Ideaz). Brian and Dave are willing to support their statements as witnesses in the Court of Law, if required. In April 2009 Austin lied on his expense report from another long trip in China and Korea, where he added about 9 additional days of his own leisure, about seven of them spent in Korea (with his

8

girlfriend), to attend a one hour meeting with one company (Cicvara Dep. pages 56-57). I contacted Kevin Babis, my supervisor and we had a long conversation with Austin. Austin admitted to lying and paid certain portion of bills by his own money, and took several days of vacation to cover the days. However, this was never reported to HR, and only Kevin Babis, I and Austin Lin have any knowledge about it. The official expense trip records do exist in the P&G database but the Defendant stubbornly refused to produce them, even after my repeated requests.

30. While Defendant produced the declarations of Lynne Burnett, Peggy Wilczewski, Dina Schmude and Kevin Babis, they did not produce the declaration from Austin Lin, and they did not produce the declaration from Bel Liu either (for the very obvious reasons). Therefore all that Lynn, Peggy, Dina and Kevin are stating is just their opinion based on hear-says and lies fabricated by Bel Liu and Austin Lin. Produced declarations are not based on facts, because Defendant did not produce any facts, except for constantly trying to fabricate my statements starting with the "notes from the meeting on June 15, 2009" (**a document that is fabricated itself**) and then manufacturing their opinions by combining my statements from the manufactured notes or by misrepresenting my statements, partially, and sometimes entirely.

31. The second force was an attempt by Andrew Yau to try to gain a strong leverage with Duracell/P&G that will help Practical to accomplish multiple goals: a) To get rid of the person (myself) who discovered false QA records made by Practical during the first day of audit in Bangkok (June 8th, 2009), which was a threat for them to lose all of the business with P&G (QAKE score less than 50% - Cicvara Dep. pages 25-26, pages 145-146) and who contributed to the rejection of the shipment of 46,000 D flashlights in May 2009 (Cicvara Dep. pages 26-31, pages 60-61, page 188-189) as I always had the best intent to act justly and to protect best interests of the company I worked for (Cicvara Dep. page 46-47, page 190-191) - b) To gain more business from Duracell in times, as at the peak of the economic crisis, in June 2009 they desperately needed it (Cicvara Dep. page 21-23, ) knowing that their position was very weak (Cicvara Dep. pages 44-46) and by directly using my alleged "harassment" of their employee (Bel Liu), to put Duracell/P&G in a defensive position (Cicvara Dep. page 23-24). They had to act fast, as it was important to them to get the "harassment case" going on before the official audit results were disclosed and recorded in P&G database – as, in the case the score came out to be less than 50% the additional claims could easily be fabricated – that is for example: "Predrag

Cicvara wanted to retaliate to Bel Liu, because his "unwanted sexual advances" were not fulfilled by her". However, this further statements were not necessary, as their score was 55% (Lori and I agreed to give them a chance to improve), and I believe that fact they actually got the passing score (55%), coupled with the fact that it was Austin who reported "my misconduct", without even waiting for Bel's approval, contributed to the strong sense of guilt and suddenly found conscience by Bel Liu, leading her to profusely apologize to me for her actions, not once but twice, the first time during the night of June 9[th], 2009 (Cicvara Dep. pages 109-112).

32. So Mr. Andrew Yau decided to activate the controlling element that he carefully put in place over the years, through Bel Liu. One of her tasks indeed was to entertain Practical's customers in a strange way that would enable Practical to exert a strong control over their business partners after certain period of time (Cicvara Dep. pages 54-56, page 94).

33. The third force was a very subtle one and came from inside the Duracell high management structure. My termination on June 15th, 2009 was orchestrated by a person who must have been at the Duracell top position or very close to it, as the things that HR Department has done to get rid of me in the most surgical manner, couldn't have been done in a normal business environment that would allow the accused to at least learn who he is accused from, what is the true nature of allegations and what true evidence exist about the accusations. All of this was denied to me – as I was accused, investigated, prosecuted, judged and convicted all by the same set of people and all of it done in about 10 minutes on June 15th, 2009. I have talked about this in my deposition (Cicvara Dep. page 12-14, pages 115-116, page 140, pages 190-191), for example about the fact that my computer and my Blackberry just disappeared (Cicvara Dep. page 148) and Defendant never produced any documents that I have asked them to produce off of these two devices, in spite of the fact that my lawyer at the time asked Defendant, in his letter to a Duracell's lawyer, dated July 9, 2009, to preserve these devices as a part of a preservation of evidence (Exhibit I). Sure enough, in his e-mail about the diversion, Rob DaPra (Duracell VP of Business Development) mentioned the fact that all evidence for the diversion case was on my computer (Exhibit F, page 2) so it is no wonder the computer promptly disappeared, with all of the evidence related to the diversion case and to this case as well. Obviously, it was much more important for somebody in Duracell, to destroy the evidence for diversion, than to preserve the evidence about my wrongful termination but the act actually served their goals in both of these cases (leading to the tragic consequences for my life after the termination).

Here are just facts, and I would leave it to Your Honor to make conclusions about what was going on here.

34. On or about June 9th, 2009 Lynne Burnett (Lynne Burnett Dec. Page 2, Parag. 3) "gave Ms. Schmude guidance on how to handle Mr. Lin's report (*she knew it was Austin Lin who reported it and yet did not question the motives*), including that the Human Resources Organization should speak with Ms. Liu and Mr. Cicvara to investigate the allegations". This statement is very carefully constructed by Defendant lawyers, to exclude any single individual (*as if the Human Resources Organization could and should speak?*) from the responsibility to talk to me (at the same time as with Bel Liu) to determine if the accusations are real or not.

35. In the Defendant notes of Undisputed Facts, page 10, paragraph 37, it is written: "who (Lynne Burnett) advised Schmude (*this time it is a human being*) to investigate the incident by speaking with both Liu and Cicvara". Nobody from HR ever contacted me even if they had ample opportunities from June 9, 2009, until June13, 2009 when I left Asia flying back home from Hong Kong. They certainly did have time to talk and communicate to Bel Liu, constantly apologizing for inconvenience they have causing to her, and gave her ample of opportunities to add to her lies and manufactured "evidence" that will be proven later.

36. In Dina Schmude Declaration (page 1, paragraph 3) Dina stated: "Ms. Burnett advised me to investigate the allegations by speaking to Mr. Liu". There is absolutely no mentioning of speaking to Mr. Cicvara. This way, the Defendant lawyer has a construction where everybody can claim that the right orders were issued, but they were just misunderstood by Dina Schmude. Yet, does it relieve the head of Human Resources Department (Lynne Burnett) from the responsibility to conduct a just and proper investigation? No, it does not, and the point is Lynne Burnett did not want anybody to talk to me – her plan was to get rid of me on June 15th, in a surgical manner, which she did. In fact, instead of contacting me immediately and disclosing the allegations against me promptly, Duracell HR personnel spent all their efforts in collecting the additional proofs against me, even allowing the blatant manufacturing of the evidence as it will be proven later, once again under the motto: "Somebody else (Bel Liu) did it, and we just accepted her statements as the truth, so we are not responsible for our claims that we believe it is the truth". I am not sure if that is enough to legally protect them but Your Honor will certainly know that better than me.

Case 12-338, Document 58, 07/23/2012, 671468, Page180 of 273

37. There is nothing that Lynne Burnett did to investigate the motives of the person who actually initiated the case – Austin Lin. Was he in Liu's room on June 8th, 2009? No, he did not. Did Bel Liu told Austin to go to HR Department? No, she did not. Bel said to me, while she was apologizing that "she was left no choice" (Cicvara Dep. pages 96-97, pages 108-112). Also, Bel's own statement said that "…he (Austin) encouraged me to report to Andrew because Predrag made me felt fear of him (*that fear was never, ever disclosed to me by Bel, so I had no knowledge of it (Cicvara Dep. Pages 101-102), even if she had –which she did not – reason to feel the fear*) no matter what the excuse was". (Bates page PG 000617). This statement directly shows that Austin did not even warn Bel that he will be the one who will report this to HR, in fact "leaving her with no choice" – which were exactly the words Bel told me while apologizing. Also, at the same page she wrote: "I told Andrew (her boss, and quite possibly more than just a boss) that I spoke to Austin and he told me to follow what Austin tells me about reporting this to P&G team. I told him I felt bad about getting Predrag in trouble. Andrew told me not to being kind to Predrag. He said he was going to tell Nitesh (Singh) that Predrag is not to work with me". (Bates page 000617). The first time Bel Liu **spoke** (not counting e-mails) to HR was on June 11th, 2009 – way after June 9th, 2009 when Austin Lin reported this to HR.

38. Lynne Burnett also manipulated Kevin Babis, leaving him under impression that it was Bel Liu (or her boss Andrew Yau) who reported my alleged misconduct to HR, **by never disclosing to him that it was Austin Lin**. Had she done that Kevin would have questioned the motives behind Austin Lin's actions. But all that he (Kevin) learned about this case was what he has heard from Lynne Burnett during the meeting on June 15th – and we will soon come to these details.

39. After I returned home, on Saturday, June 13, very late at night, I went to work on early on Monday, June 15th, 2009. After sending few e-mails, ironically one of them to Bel Liu, where I sent her QAKE (Quality Assurance Key Elements) book in Chinese, as I promised, so that they can better prepare themselves for the follow up audits, Kevin Babis, my boss came to my room and told me that HR needs to talk to me about "certain things". Even then, I did not realize what I will soon face, as there was nothing to face really, except the fact that the emotional relationship existed between Bel and me, and that certainly is not the cause to fire anybody, especially not "for cause" with such severe consequences that my whole life is entirely (and very negatively) altered by what was done to me by Duracell HR Department. I remember

that I actually thought this might have to do something with what me and my boss Kevin Babis
talked to Austin Lin, who lied on his expense report back in April 2009 and we did not report it
to HR, as we wanted to give him the second chance.

40. After asking me do I know Bel Liu and did I visit her on June 8th in her room in
Bangkok hotel, she (Lynne Burnett), without waiting for my answer, proceeded by telling me
"we have recording from her boss (Andrew Yau) answering machine (Cicvara Dep. page 141),
with a lot of things that were told in that room while you were there" (which would be June 8,
2009). Then she continued with " I am not sure did she (Bel Liu) did it intentionally or not, but
one way or another we know what went between two of you in that room", adding immediately:
"Do you want us to bring the  recording so that you and we can hear it".(Cicvara Dep. pages
102-103). *This conversation was in its entirety omitted from the notes that were officially
provided by the Defendant, even though Lynne Burnett and Peggy Wilczewski stated that the
notes are "a true representation" of what was said during the meeting on June 15th* (Bates pages
000498-000501).

41. I was in a state of shock as I realized that something serious is happening. I
couldn't comprehend where all of this was coming from. I simply answered: "Yes I was in her
room on June 8[th]" and "no, there is no need to listen to the recording as I know exactly what was
going on between us and what we were talking about". In a hindsight that was a big mistake, as
from June 15, 2009 until May 28, 2010 when we received some of the documentation we asked
for, I was continuously under impression that June 8th recording really existed and that the
recording will show what I was stating all along – that there was nothing even close to "sexual
harassment, forced physical contact, me stating "I would rape you" etc. However, the particular
recording that Lynne Burnett mentioned was never produced during the document production
phase, and obviously did not even exist – therefore Lynne Burnett has intentionally lied during
this meeting (Cicvara Dep. 102-103). My statements cited above are *omitted from the notes that
were officially provided by the Defendant, even though Lynne Burnett and Peggy Wilczewski
stated that the notes are "a true representation" of what was said during the meeting on June
15[th]* (Bates pages 000498-000501).

42. The only recording that Defendant has is the recording from Bel's room from
June 10th, 2009, that only proves my statements that Bel apologized to me twice, as I was
continuously asking her why she is apologizing for. We included these two audio files for Your

13

Case 12-338, Document 58, 07/23/2012, 671468, Page182 of 273

Honor to hear and make a judgment herself, as Defendant did not include them in their set of documents (Exhibit J, parts d) and e) – on the USB flash memory).

43. Lynne also stated "you came to her room uninvited as she (Bel) told us that you just appeared on her room's door and she let you in because you were her customer and she did not want to offend you". I have strongly opposed such a statement as it was a blatant lie (Cicvara Dep. page 141). During the meeting I stated: "it is not true and it is easy to prove that she (Bel) invited me to come, as there are text messages on my Blackberry that can prove it easily". So, Lynn Burnett's statement cited here was another lie as she must have known, by reviewing Bates page 000612 (which she indeed did know according to her own Declaration, see page 2, paragraph 4), that I did not come uninvited, and that I was telling the truth about the text messages exchanged between us (as the page 000612 is all about these messages). Lynne Burnett answered: You can say whatever, but she (Bel) claims that you just appeared at her door uninvited" – which was partially true, as that actually was a part of Bel's statement. *This conversation was in its entirety omitted from the notes that were officially provided by the Defendant, even though Lynne Burnett and Peggy Wilczewski stated that the notes are "a true representation" of what was said during the meeting on June 15th* (Bates pages 000498-000501). Not only that it was omitted but the notes that were provided as an "official and true representation" from the June 15th meeting, do not list even one word of my answer, as there is only a question typed **"Did she invite you to her hotel room?",** followed immediately by another question but not typed in bold so that it appears as an answer: "Did she asked you to leave and did you refuse to leave?" – where another answer I have provided was also completely omitted from the notes.

44. During the meeting it was Peggy Wilczewski who was taking notes, on the block with small squares (mathematical paper) of a fairly small size, possibly compact and certainly smaller than the usual letter (A) size. I clearly remember that, as I know that at some point I thought how she is going through the pages rather quickly. Her task, by her our declaration and the declaration of Lynne Burnett, was to take the notes from the meeting, so one would certainly expect that the notes would reflect what Lynne Burnett said at the beginning of the meeting, not just that "there was a recording" but in much more details, exactly as it was told. One would also expect that such an important statement by me such as: "No, I did not come uninvited as she clearly invited me in her room (also Cicvara Dep. page 69-71) – and you can check that by

14

looking at text messages exchanged", would also be captured at the notes, especially because the notes were taking in a very busy manner by Peggy Wilczewski, and she went through a lot of those small pages in during a 10 minutes interrogation, as she was flipping them fairly quickly.

45. There are so many constructed statements in the "official notes" that I could lose hours trying to clarify what was really stated and how it was misconstrued by somebody in Human Resources – I can't say with certainty by whom. I will not do that here as it could be all proven during the trial if Your Honor chose to have one, after a careful review of evidence from both sides.

46. During the meeting I stated that I told Bel: "when you do such things with your legs, one could rape you" (Cicvara Dep. page 86-88, pages 138-141). Whatever <u>was constructed</u> in the notes later, especially with respect to the word "rape" is not true, as the only time that word was ever used was in the instant described above, and in the context described above. As I stated in my deposition, it might have been a poorly chosen word by me. However later it appeared on the notes that I said – this and that – not true – the only context that I mentioned the word "rape" was in that particular sentence as that is EXACTLY what I said to Bel that evening in June 8, 2009 so there is no doubt that anything else was ever told in relation with a word "rape" (Cicvara Dep. pages 86-88, pages 138-141).

47. The Defendant, however, is repeatedly and continuously using the lies like: a) "he said "I will rape you" combined with b) "I could rape you" and c) "egregious conduct of sexual harassment" throughout all of their documents submitted to the Court, even though I clearly explained what happened in many places during the deposition. For example I explained that what I did was "neither the violation of PVPs nor the violation of WW Conduct Manual" (Cicvara Dep. page 78). But the Defendants boldly follow the saying (I believe it may have been Vladimir Ilyich Lenin): "A lie repeated often enough becomes truth"- throughout all of the documents they submitted to the Court in the last 18 months, not just the set of April 15, 2011.

48. I was never given any notes after the meeting on June 15th, even to the extent where I would be asked just to confirm by my signature that the notes reflect what was stated on the meeting without asking me to agree with what was said. By failing to provide me with the notes, Defendant was given an option to tailor the notes later, to omit what they did not want to present and to add what they wanted to add, and to create newly constructed thoughts in the form of interpretations by the creator of the "new – official notes". The first time I saw the notes

15

(May 28th, 2010) -- I did not believe my eyes, and wanted to jump out of my skin. I just couldn't comprehend how so many lies could have been compiled on three pages of paper (even though many more pages must have actually been written during the interrogation).

49. Not only that I was not given the notes, I was never given the explanation why I was fired (Cicvara Dep, page 154). I was told at the end of the meeting by Lynne Burnett: "You are terminated with the cause, effective immediately". Then she left me with Kevin Babis and Peggy Wilczewski, to pick up my belongings (while the security guard was present at all times at my room door, with the dollies to transport the boxes with my belongings). This was the most embarrassing time of my life, as everybody who was passing by was aware of what was going on, and unfortunately, my room was at the longest possible distance from the lobby, so everybody could have seen me leaving the building in a presence of uniformed guard and Peggy from HR and my boss Kevin Babis - an excellent material for rumors that must have spread immediately throughout the building. Immediately after I had to face my wife, my son, my mother in law, my own mother and other members of my broader family. I have lost 20 pounds in the next two weeks, as was my wife too. Driving back to home on June 15, 2009, I was even contemplating suicide, for the first time in my life, that is how embarrassed and humiliated I felt (for what reason?). I took me one hour and a half to come home, even if it is a comfortable 35 minutes ride from Bethel to Fairfield, CT.

50. On June 29th, 2009 I sent an official e-mail to Peggy Wilczewski asking that P&G provides me with all of the documents (that should have included the notes from June 15th meeting) that were kept in my personal P&G files with respect to my termination from June 15th, 2009 (Exhibit K). I also asked to be provided with the specific reason of why I was terminated for cause. The official answer, sent a day later, on June 30, 2009, by Peggy Wilczewski (who copied Lynne Burnett on her e-mail, which indicates this was an official position of Duracell HR Department) was: 1. There are no any documents in your personal file that are related to your termination of June 15th, 2009, and 2. You were terminated for violating the WW P&G Conduct Manual. If this is not the blatant and arrogant obstruction of justice, I do not know what is? So, the notes from the meeting did not exist at that time? Does that statement mean that the notes were never taken? Because, if it does not, and notes were taken, than it is a plain obstruction of justice from the position of force. At that time Defendant obviously did not anticipate the possible lawsuit action by me, that is why such an abuse was taking place throughout the period

16

Case 12-338, Document 58, 07/23/2012, 671468, Page185 of 273

of June 9th, 2009 until the moment they were served the summon – in November 2009. This particular e-mail was never provided by the Defendant during the document production phase, when Plaintiff asked for the additional documents, on the contrary their answer was that they have already provided all documents that were in their possession.

51. The hand written notes from June 15th, meeting, were provided to Plaintiff only after repeated requests, and only in February 2011. These notes appeared to be the exact, now hand written, replica of the typed noted that have been produced by the Defendant after June 29, 2009 as an "official notes" from the meeting on June 15, 2009 – described above (Exhibit L). Notes are written on the A size paper, not on the smaller compact paper used during the interrogation on June 15th, 2009.

52. The other important document, that was never provided to the Plaintiff, in spite of the repeated requests to produce all of the available evidence, contains 8 (eight) text messages that Bel Liu forwarded to Peggy Wilczewski on June 11, 2009 (Bates page 000612 – a part of the Exhibit G).

53. If one is allowed to forward text message as an only proof of something relevant, one is given an ample opportunity to distort the original message as much as one wants. While the original message remains intact on their phone, the content of the forwarded one can be manufactured at will. So Bel (or somebody else who might have helped her to strengthen the "harassment" accusations), was given an additional opportunity to produce support for her statements, which she, without question, used to her advantage. She (they) made the first big mistake here, in wrongly counting the messages that were exchanged during the period of 8:57 PM through 9:07 PM in Bangkok, so the additional – **sixth message** was added which states: "I know you are not and just wanted to be with you without dirty thoughts....so let me know I need few minutes for e-mails and then can bring desert (sic) to your room if you want." This is the message that was never exchanged and was completely fabricated in an attempt to make my intentions to come to Bel's room "dirty". Fortunately, an official T-mobile bill exists for June 2009, for the Blackberry (203-243-0079) I used while I was employed in Duracell, where one can see that there were 5 messages exchanged, not six (Bates pages 000415 and 000416 – Exhibit G), and those five were sent in a very different times than the times that Bel produced in her e-mail. (Exhibit G – all parts). This is a direct proof that the statements provided by Bel Liu are fabricated, with the pure intention to get me fired from P&G and to use the fact that P&G

employee "harassed" the GM of their company to their business advantage – to gain more business from Duracell (e-mail from Andrew Yau to Erik Lawson, Exhibit C).

54. Interestingly enough, Lynne Burnett knows very well the protocols that accompany these kinds of cases, as proven by her immaculate handling of another case: Ana Cardinale and Mani Parmar case, where investigation lasted longer than two months (from September 27th, 2007 until November 30, 2007) and was conducted with her giving all of the evidence to the "accused pair", making sure that everybody got a signed copy of conclusions from the investigation, and refusing to accept the printed files as evidence, <u>because the original computer files were not preserved on the computer (and then the manipulation is possible "as we all know," in her own words); all this as opposed to having an "investigation" that lasted 10 minutes, giving the official answer to me that the notes do not exist at all in my personal HR file, and accepting forwarded text messages from Bel, that were obviously tampered with, as evidence in this case.</u> Enough said.

55. All of the above facts point out that I was wrongfully fired by Duracell/P&G, so I should be compensated for all of my salaries, bonuses, pension contributions and future stock options that I would have earned at my position and my future positions within P&G. All of my stock options, that I have earned so far, from 2001-2005 should be reinstated immediately as proven earlier in my affidavit.

56. I would just like to add two things. The first: It required a lot of efforts to write this affidavit, and all accompanying documents, but it felt very good to finally being able to tell the whole truth about this case. I was given 10 minutes on June 15th, 2009 and did not stand absolutely any chance to express the truth. Then I spent seven hours giving the deposition, on December 21, 2010, and was prevented throughout it to tell the truth, by the Defendant lawyer who led my deposition. So, finally, right now, I got the chance and I managed to write down at least a part of the story (although there are much more details that would additionally prove who is right and who is wrong here, if the case goes to the Court). The second: It is interesting to see how a big company like P&G is stubbornly defending their employees, that they chose to keep away from the justice, and at the same time not hesitating to destroy a life of an employee whose only wrongdoing was to protect the interests of that same company, and who paid a terrible price for those intentions. Let's face it – what P&G is directly protecting here is the "opinion of four employees about my behavior" that is not supported by any valid evidence as the sworn

18

statement by Austin Lin and Bel Liu were never provided and it was directly proven that there intentions were insincere, to say the least. What P&G is indirectly protecting here is the reputation of the company, as the last thing they want is the negative publicity that the "diversion case" would cause in public. Maybe that is the reason why three very high Duracell's officers were very quietly replaced in November 2010, without any announcement – just a few months ago: Mr. Mark Bertolami, Duracell President, Mr. Duncan Adamson, Duracell VP of Finance and Mr., Rick June, Duracell VP of Marketing. Interestingly enough, it seems that P&G actually learned about the diversion case only after I asked for the additional evidence in this case – in June 2010 – and these "quiet removals" (as there is not a single word anywhere in the press, even on the omnipotent Google search, about the "deserved retiring of hard contributors to the business etc") happened just four months later. Coincidence? Maybe, it is possible, or maybe not.

Similarly, the retiring of Lynne Burnett happened abruptly as of January 1, 2010 – just a month after the lawsuit by me was filed in the Court. Coincidence? Maybe, it is possible; or maybe not. Enough said.

57. At the end I would like to ask Your Honor for a favor: Please let me prove to the arrogant and self-assured Defendants that **"A lie told often enough (regardless of the number of people who repeat it) remains exactly what it is: Just a plain lie."** Thank you very much.


I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.


Dated this ___25th___ day of May 2011, at Fairfield, CT


_____L/S_____

Predrag Cicvara

**Exhibits to Cicvara affidavit:**

A) A Letter about the stock options from Peggy Wilczewski – June 16, 2009

B) Notice of raise in salary.

C) E-mail from Andrew Yau to Eric Lawson

D) Part 1 of diversion (in Cicvara Dep. Exhibit B)

E) Part 2 of diversion (in Cicvara Dep. Exhibit C)

F) E-mail from Rob DaPra (in Cicvara Dep. Exhibit D).

G) T-mobile bill for June 2009 – Bates pages 000415 and 00416 + Bates Page 000612 +
Exact Explanation Table

H) Dina Schmude e-mail about Austin reporting my harassment

I) Letter to Duracell's lawyer – from Michael Skiber – July 9, 2009

J) USB Memory Stick with the following files in the electronic form:

    a. P&GBusinessConductManualWBCMREDUCED_Single_Page.pdf
    b. 1971_SOP_plan_10_2004_Gillette_Stock_Plan.pdf
    c. Letter to Hong Kong – 10 minutes on Monday.doc
    **d. Page 000526 – audio file:**
    **e. Page 000527 – audio file:**
    f. Entire Deposition by Plaintiff – December 21, 2010 – 200 pages

K) E-mail to Peggy Wilczewski – June 29, 2009 and her answer June 30, 2009.

L) "Hand written official notes from June 15, 2009" provided only on February 7th,
2011.

A-762

**EXHIBIT G TO CICVARA AFFIDAVIT -
T-MOBILE BILL, DATED JULY 9, 2009
(REPRODUCED HEREIN AT A-716-A-717)**

Global
Compensation
System

**P&G**

**Restricted Data**

**Salary Increase Notification**
*for*

# PREDRAG CICVARA

We are pleased to inform you that effective
## Jun 1, 2009
you will receive an annual salary increase of
## 2,000

| | |
|---|---|
| **New Base Annual Amount:** | 152,116 |
| **Previous Annual Amount:** | 150,116 |
| **New Base Increase:** | 2,000 |
| **Percentage Increase:** | 1.33% |
| **Increase Interval:** | 14 |
| **Currency:** | USD |
| **Pay Frequency:** | 12 |

To determine your gross monthly salary increase, you should divide the annual gross salary amount by the number of salary months in a year in your home country, including any bonus months. The amounts shown are based on a 100% work schedule. Some bonus payments are not guaranteed payments and will depend on such things as company performance and your employment status. Please speak to your HR manager if you need clarification.

A-764

**EXHIBIT A TO CICVARA AFFIDAVIT -
LETTER FROM PEGGY WILCZEWSKI TO PREDRAG CICVARA, DATED JUNE 16, 2009
(REPRODUCED HEREIN AT PP. A-295–A-297)**

**EXHIBIT C TO CICVARA AFFIDAVIT -
EMAILS BETWEEN ANDREW YAU AND ERIK LAWSON,
SENT JUNE 16, 2009 TO JUNE 25, 2009
(REPRODUCED HEREIN AT A-330–A-333)**

FACTS PUT IN A CHRONOLOGICAL ORDER

1. The first time a possibility to switch USA AA and AAA cells in Korea with DCL cells was mentioned (I proposed it to - I really do not recall to whom - in Spring or Summer 2005 – in an e-mail – and copied Mani – who accidentally was in Asia at the business trip) – I was severely reprimanded – basically told to NEVER go above Mani's head without talking to him first.

2. Second time I have analyzed it, was after my business trip to Korea and Taiwan in May 2006 (I had a discussion with E.D. Hong – who basically proposed the same telling me that he already talked with majority of companies and that, if we price the product from DCL correctly – we were talking about 1 cent lower price – majority will actually switch to DCLK product). In the analysis I have shown that the margin is going to be increased by $700K. Not only that the effort was NOT made then to make the switch – my future trips to HK and Asia (and to Europe too) were abruptly STOPPED (and the trips were suppose to be a part of my "collection of value added ideas"). BTW in that report it was mentioned that the OVERALL number of ALL cells that Korea is consuming is 17M (and at that time the enormous increase of USA imported cells already has already occurred – in 2006 overall number of just AA cells exceeded 39M cells!!!!!). Could the reason for stopping me of my future trips was to immediately CUT even the slightest chance to possibly talk about the NUMBER of USA cells imported to Asia (and the reasons why that was happening???).

3. In June 2007 during our Global (WW) Sales meeting I was in the van with Josephine Chiu (who knows EVERYTHING and EVERYBODY in HK battery business) and Wendy Li and Alan Yu (they are covering China territories) – and I asked about the enormous number of AA cells imported from USA – mentioning Wah Tat company too. To my big surprise, not one out of these three (and obviously the biggest surprise to me was the fact that Josephine did not know it too) new or EVER heard about the Wah Tat company – and not one of these three new about the enormity of AA import from USA either. Unfortunately I left it at that – and the main reason for even asking this was actually to try to save us money in FY07-08 (by cutting all unnecessary costs) – one of the initiatives I started in May 2007. But now looking back at that fact – maybe the bell should have started ringing right there?

4. Edwin does not have the direct responsibility for any account in HK EXCEPT this one – Wah Tat. That is the fact.

5. At the beginning of our business with Wah Tat there was no SPR created whatsoever. We have started to sell AA (**ALL from USA FROM the very FIRST DAY!!!!!!!**) – even before it was mentioned as a business opportunity in

Edwin's weekly report. The copies of delivery reports and the first report were given to Nitin. The pricing of 9 cents even, begs **(at least)** three questions:

- Why would we give such a preferential pricing (BELOW the DC costs – that were $0.0905 until June 2006 and $0.105 as of July 2006 until June 2007) to the company that is NOT strategically important at all??
- Why USA CT was important for the **remote controllers** that we all know could as well run satisfactorily on zinc carbon batteries – therefore 5% better performance of US CT could NOT be a factor at ell.
- Why there was absolutely no word about "such a big and important business opportunity – no special HIGH volumes bidding – involved (where the approval is asked from financial and supply chain people too) – if this was a customer important enough that we had to give them a price BELOW the costs!!!

6. In the first few reports the columns that showed the product origin were hidden!

7. The HK administrator Yoko Co went to maternity leave somewhere in February 2006. At that time the replacement was hired for her – and PROMPTLY fired almost immediately (maybe few days) – with the comments that she is "destroying OEM business". After that NO reports (weekly delivery or monthly Top 50) were sent to Bethel until Yoko came back from the maternity leave (May 2007). Could it be that the replacement was smart and realized that while in the weekly delivery report the FE Global shipment were marked as an USA product (which it **had to be – since that document is obviously used as an order placement and shipping preparation database)** at the same time in the monthly delivery report this company and cells were presented as DCL product (with DCL costs and a POSITIVE margin). BTW Mani was at the business trip in HK around that time too.

8. After her return from the maternity leave Yoko Co was promoted to a supervisor (supposedly, because of her very hard work) and first got an administrator (Kenix Hui) – to help her with the delivery reports and orders, and after that she was also put in charge of the person (although only a temporary addition – but still a full time worker) – who is providing forecasts to USA and to DCL. That created a big friction in HK because hard working sales persons (especially Josephine) were not pleased with such developments (and Josephine would actually comment these things during our San Diego meeting too). The question here is "why" there was such a big need to get not one but basically two people to do the same job that Yoko was doing before alone?

9. In a meantime there was always a lots of noise here, and some sales people were given really hard time here in USA, with a constant pounding of possibilities of product diversion (from USA) and "we do not know what is really happening on a PPD side of the USA business" served ideas. Let's not forget that 90% of our

Case 12-338, Document 58, 07/23/2012, 671468, Page194 of 273

business is GENERATED in Asia – and that really the biggest threats of diversions are actually coming from there (not from USA).

10. In September 2006 – prompted by something (I really do not know what) Mani decided that the Asian business must be covered by SPRs. That is how the first SPR that I have ever seen for Wah Tat – was generated (Edwin was listed on it as a sales person in charge) – and that is where the CHINA cost was used and China cells were listed as cells used for that particular customer. An error?? Possible. But then, why I was told by Mani in May 2007 – when I asked why are we selling USA cells to Wah Tat? - : "Edwin never told me he switched to USA product!" – and yet THERE WAS NO SWITCH whatsoever – from the day 1 the product sold to FE –Global and later to Wah Tat was of USA manufacturing origin!! Could it be that the SPR was generated just to have a cover in case somebody is asking about this in the future?? A copy of that SPR I gave to Nitin too – do not know does the original still exist or not?

11. All that time (until very recently) the weekly delivery file submitted by Yoko Co – was so called "running file" where the file is changed on the fly – as the business go on – and re-submitted always under the same name "Delivery.xls"). Windows would not allow two files under the same name be opened or stored in the same directory. However I filed these files under weeks and months – so I do have copies "frozen" in times – and that was THE ONLY POSSIBLE WAY to prove that the product shipped from the day 1 was actually USA product – because it was clearly stated on the weekly delivery file!!! Yoko couldn't foresee what and how am I filing this files – so in her (and quite possibly some other) people mind everything was clean – because an SPR shows Chinese product and the only other officially submitted document – Top 50 report – also showed the same Chinese product – so a margin was positive and there was absolutely NO REASON to worry for anybody who would see these documents – that is UNTIL it is uncovered what is really going on – in which case these documents could become self-incriminatory ones (an SPR from September 2006 might have been destroyed lately??).

12. The moment Nitin brought up the question of possible diversion from HK to Latin America – weekly reports (as of December 2007) STOPPED to have USA mark close to Wah Tat – instead it was only a star sign. Coincidence – possible. But it could be just prevention too – do not risk that possibly, people who are receiving this report could see that USA sign and maybe somehow make a connection??? Again, nobody on that side – and even here could not have known that Nitin will ever come in the possession of knowledge about what was actually stated in the weekly reports per se (and only those are revealing the real truth).

13. Mani and Ana took vacation days (from December 19th 2007) for the rest of the year. Even though both of them are technically OUT of this group activities, the drawer that contains all SPRs is locked (for the first time that I can recall it was

ever done – since I am in this group). Why??? Even the normal activities needed every day in this group would be prevented because of such an act. Could it be a prevention of possible "sniffing" into the other data there, because some uncomfortable questions Mani have been facing lately could have come ONLY with the knowledge of what was being on the SPRs – so let's lock it while we are not here?

FIRST PART – IMPORTANT TO REMEMBER – FEW THINGS NOT DISCLOSED
YET – and the SECOND PART (The most of it)

1. Hong Kong finance does not have ability to pin-point individual account
   financials. I was told this is the case by the financial person in the OEM Sales
   Group.
2. In January 2003 (or 2004) – when our costs went down – what were the ONLY 2
   companies to receive an IMMEDIATE DISCOUNT and lower price (December
   versus January comparisons) – Dynax and Fibrotec.
3. If you look at the weekly delivery HK report itself -- there is a stress on the USA
   cells there – to the point that it was mathematically precisely calculated EACH
   week – where the number is. WHY? (because "both sides" needed to know how
   big a monthly payout should be).
4. Yet – in spite of the mathematically extremely precise accounting for USA cells
   (and a different color on the reports) – the claims from Mani and Edwin were:
   • That USA cells started to be shipped to both Wah Tat and Fibrotec ONLY
     somewhere between September 2006 and May 2007 ("because Edwin did not
     inform Mani of the switch"). This in spite the fact that USA cells were
     shipped to both years before that.
   • In November 2007, Mani (and Edwin – since supposedly he was asked to
     provide help too) COULDN'T remember AT ALL that there is only ONE
     company that could possibly divert a large amount of USA AA cells to Latin
     America (from Hong Kong) – WAH TAT. Why both of them couldn't
     remember? – if they knew very well who was the company?
5. FE Global was presented as a NEW BUSINESS win. Incidentally Dynax was
   NOT announced as a business loss at that time. Why? Because they thought that
   would be the most convenient way to hide how long the business existed with
   Dynax-FE Global. Dynax, was officially buried (so all the traces to the USA cells
   business there were to be "forever forgotten") – and "new" business started.
6. Incidentally – when FE-Global started to take a lot USA AA cells – at about the
   same time one could see that Fibrotec focused on the AAA USA cells only (and
   before that it was AAA and AA – both). It is almost as if these two companies
   were governed with the same man (since they are both extremely MINUTE and
   small companies – it is quite possible).
7. It appears that the switch from FE-Global to Wah Tat was done solely for the
   convenience of us shipping DIRECTLY to the re-packaging company -- so that
   the shipments to Latin America are easier done – and the cost of shipping from
   FE Global to Wah Tat was PAID for by P&G (Duracell) – to minimize the costs
   for the Buyer and just increase the red numbers on our already eroded margins!
8. So, if we assume that 1 cent that was bellow the costs was given back, and then
   ONLY one cent for the convenience of closing eyes on the diverting – it is 2 cents
   per cell of paybacks. The low of big numbers comes to play here – 2 cents times
   say about 70 millions in the last two years is about  $1.4 million dollars – MOST
   probably in cash – since that is the HARDEST way to uncover an illegal

Case 12-338, Document 58, 07/23/2012, 671468, Page197 of 273

operation and the HARDEST one to prove too. This immediately places a big problem on the receiving end, which is how to distribute this money properly among the involved ones (since one is in USA, one is in Hong Kong and the third one is in ..... – not counting small fish in Hong Kong – which probably got the small money too).

9. To accommodate for the necessary moves to be able to distribute (and launder) the money, numerous trips of certain personnel were required. The trips were mostly between HK and USA and vice-versa, depending on who would travel where and for what reasons. But, as required, they happened also between HK and Europe and vice-versa, and then between Europe and USA too, and sometimes vice-versa. The most important thing is – they all required physical connections.

10. To make these trips "necessary" reasons for them should exist. So, the number of USA Sales meetings increased to about three per year, plus the Yearly sales meeting, plus the CE Show and some other shows (CEBIT – Asian CES etc.) as well, plus the "meetings to discuss strategic direction of our group etc. All these meetings had one thing in common – necessity that certain people always attend them IN PERSON. Again on top of these trips, there were USA visits to Asia – for one reason or another – but WHAT really can prove the point here is the fact that even when the travelling was solely for the Japan (new rechargeable cells) needs – the way was found to either go to HK or to get the other to come to Japan. WHY?

11. Talk about January 16, 2008 teleconference with HK – and what was said.

12. Mike Dixon's appointment to lead USA sales personnel did not make much sense at all – because of geographical reasons and the fact that Pat Deen should have been a logical person for such a position (but he was constantly referred to as a "stupid" Pat Deen etc.). The good reason though was – it would give him numerous excuses to be able to come to USA as needed – many times per year.

13. The appointment to lead the NA sales with Mike Dixon came about (the preparation for the move) – by my judgment – in May-June 2007 timeframe. Just about time when the first "unexpected blow" came upon the "GRAND plan" – which was the fact that a supply chain planning group COMPLAINED about the unexpectedly HIGH USA AAA and AA cells for ASIA. One thing has nothing to do with the other – but it looks a bit as a divine intervention – because blows starting to happen one after another from this point on. Or, maybe it was not a divine intervention, but something much more to the earth - the GREED became too big – and the volumes were too carelessly increased because the business was booming for everybody involved (and our margin was quickly shrinking as well). And about that time the house addition started – and could not be stopped – so the selling continued even though it appeared risky – and everything went quite well until November, 2007 and the diverting story.

14. The second blow (end of November 2007) - was the fact that the link was established between the diverted cells in Latin America and Hong Kong – something that planners of the "GRAND plan" did not counted on – because as grand as it was it became much more vulnerable the moment this link was discovered. And it was. The quick patch was tried – a second SPR for Wah Tat – also with the Chinese cells (in order to put it through quickly) – and to present

that the biggest consumer of USA AA is actually using Chinese cells – to hide the FACTS. At this point – the "we do not know" behavior became the mantra (and was supported by providing Nitin with the Top 20 report – that shows Wah Tat as a company which is BUYING Chinese AA cells. WHY??????

15. The third and final blow to the plan came with the fact that weekly delivery reports were "frozen in time" for every week in the last 6 years – which established very STRONG and UNDENIABLE proof that the shipments to Wah Tat (Dynax, FE Global) and Fibrotec were made for years before the May 2007.

16. How to prove this? I will stop my writing here – this can be talked over if there is a desire in the company – if not I believe there are some other options for truth to come up at the end.

Predrag Cicvara
Duracell Global OEM Sales Group
The Procter & Gamble Company
Phone: 203-796-4252 Fax: 513-386-2021
cicvara.p@pg.com

**From:** DaPra, Rob
**Sent:** Friday, January 04, 2008 11:35 AM
**To:** Cicvara, Predrag
**Cc:** Wilczewski, Peggy
**Subject:** SUMMARY OF RECENT DISCUSSIONS

Predrag,

I am writing this note to you as a record of our recent discussions and a summary of my understanding of the situation which you have brought to my and others attention over the past month (inclusive of the recent holiday period). This note is written in a very fact based approach so please do not assume there is any particular points of view being put forth by myself. I want to be consistent with our conversations over the past month and focus at this stage only on the facts.

> It is my understanding that you have alleged that Mani Parmar and Edwin Ko have conspired to intentionally divert product by arranging for the sale of product to a customer(s) at a favorable price point(s) which would facilitate such customer(s) to resell such product into channels which such product was not intended for.
> You have alleged that such actions have been intentional and that Mani and Edwin behaved in such a way to prevent others from uncovering their alleged actions
> You have alleged that Mani has intentionally destroyed P&G materials which relate to the matter at hand
> You have assembled data, which you have provided on separate occasions to Nitin Batra and myself; it is your contention that such data supports your allegations against Mani and Edwin
> You have communicated your beliefs, allegations and the basis of those allegations in a number of ways over the course of the past month:
　　>> To me verbally on several occasions
　　>> To me, Nitin Batra, Lynn Mepham and Mark Bertolami in writing via email on multiple occasions
　　>> Provided me a written summary (not in electronic form) of your allegations and the basis of such
> In our last conversation on Wednesday January 2 I directed you to cease spending any time on this matter. I asked you if you understood this direction and you confirmed that it was clear and that you would no longer spend any time acting on your beliefs or thinking (to the extent possible) about the matter.
> My direction to you was based on the following:
　　>> Appropriate P&G personnel will handle this matter
　　>> Appropriate P&G personnel will determine when and how the matter is dealt with
　　>> Appropriate P&G personnel will be responsible for making any final determination with respect to this matter
　　>> It is not your role to conduct investigations nor are you experienced in investigating such matters at P&G
　　>> Given your position within the department you may not be perceived as being independent with respect to this matter and you should not be involved in any further investigation (in fact I had requested several weeks ago that you cease spending time on this matter)
　　>> Your role and the best use of your time at this point is to drive value in our current OEM business by looking at future opportunities
> I did not communicate to you during our discussions nor am I doing so here, who the appropriate P&G personnel are that will be managing this matter ; it is important that you trust your supervisor to make the appropriate decisions. All documents you have given to me and Nitin are in the hands of the P&G legal

group.
> If at any time you feel that the matter is not being properly dealt with you can contact either HR here in Bethel or the P&G personnel at the 800# provided on the internet to report such matters. You indicated to me that you understood this, that in discussions with your family that you have considered (although concluded not necessary at this time) to retain your own counsel with respect to this matter.
> You have confirmed to me that you have provided 100% of the materials / data which you have collected which forms the basis of your conclusions; that you have no other data in your possession other than what may / may not be stored on your computer
> You have indicated that your computer is soon to be replaced and that you have requested that this replacement not take place. The reason you stated was your concern that the IT department may "lose" a portion of the data stored on the computer during the transfer. You stated that this concern is based on your understanding of potential "relationships" between people in IT with certain persons who may have a connection to this matter and who might wish, in your judgment, that such data be destroyed. In our discussion I agreed with your request.

At this point I am communicating that this matter will be addressed by the appropriate P & G personnel and you should no longer be involved . Your allegations are serious and P&G will take actions which are deemed appropriate in the situation. If anything in this note is incorrect please let me know.


Regards,

Rob

Vice President Strategic Planning, Business Development and Alliances
Duracell Global Business Management Group
Phone - 203-796-4362
Fax - 866-734-7906

**A-774**

From:          Schmude, Dina
Sent:          Wednesday, June 10, 2009 11:52 AM
To:            bell@practical.com.hk
Cc:            Wilczewski, Peggy
Subject:       RE: Austin Lin - follow up to conversaton

Attachments:   image001.gif



Image001.gif (6 KB)


Bel,


Tomorrow at 19:30 your time is perfect.   Peggy and I will call you then.


Regards,

Dina



From: Bel [mailto:bell@practical.com.hk]
Sent: Wednesday, June 10, 2009 10:52 AM
To: Schmude, Dina; Bel
Cc: Wilczewski, Peggy
Subject: Re: Austin Lin - follow up to conversaton


Dear Dina,

Thanks for your prompt response.
As I just returned to HK today, I will only be available to talk at 07:30 your time
tomorrow/ 19:30 my time tomorrow. You may call me at (852) 9673 7194.

Regards,

Bel

Sent via BlackBerry® from 3


From: "Schmude, Dina"
Date: Tue, 9 Jun 2009 13:11:39 -0400
To: <bell@practical.com.hk>
Subject: Austin Lin - follow up to conversaton

Bel,

1

NFIDENTIAL                                    PG  000560

Austin Lin contacted me today to let me know that you shared with him a concern that how one of our employees, Predrag Cicvara, made unwelcome advances to you. I want to reassure you that both myself and my manager, Peggy Wilczewski, take your complaint very seriously and are fully committed to investigate this matter.

I realize there is a significant time difference between here and Hong Kong so we would like to find out when you can be available for a phone call. We would like to ask questions about the situation with Predrag so we can better understand what has taken place.

Please let us know the phone number to use to contact you and what time of day is the best to reach you. Once you send that, we will set up a time to speak with you.

Again, let me reassure you that we take these complaints very seriously and will make this investigation a top priority.

Regards,

Dina Schmude

Human Resources Manager

203-796-4080

866-498-1862 Fax

FIDENTIAL

PG  000561



**LAW OFFICE OF**
**Michael E. Skiber, LLC**

# THE LAW OFFICE OF MICHAEL E. SKIBER, LLC**
## 135 ELM STREET, BRIDGEPORT, CT 06604

**LICENSED IN CONNECTICUT AND NEW YORK.

July 9, 2009

*Sent Via Facsimile (203)796-4518 and Registered Mail Return Receipt Requested*
Procter & Gamble
Corporate Counsel Duncan Sparkes,
14 Research Dr
Bethel, CT 06801-1000

        **Re:** Predrag Cicvara

Dear Mr. Sparkes:

    Please be advised that this office represents Mr. Predrag Cicvara in legal claims against the Procter & Gamble Company and/or Duracell.

    As you probably are aware, Mr. Cicvara was a hard-working and valuable employee of both Gillette and Procter & Gamble for nearly a decade. During his dedicated service, Mr. Cicvara earned substantial stock option compensation. Regrettably, it is our understanding that P&G intends to snatch away Mr. Cicvara's options without proper legal authority. Accordingly,

    **DEMAND IS HEREBY MADE FOR PROCTER AND GAMBLE TO IMMEDIATELY HONOR MR. CICVARA'S EXERCISE OF HIS VESTED STOCK OPTIONS PURSUANT TO THE JULY 3, 2009 REQUEST TO EXERCISE.**

    Should you choose to ignore our demand, this office is prepared to immediately assert Mr. Cicvara's rights and seek any and all legal and equitable remedies available in the appropriate jurisdiction.

    In anticipation of court action, we request you preserve any tangible and intangible evidence related to Mr. Cicvara's employment, including but not limited to: emails, computer records, phone logs, blackberry messages, tape recordings, written correspondence, and personnel files. Do not contact Mr. Cicvara regarding this matter. Any correspondence concerning this matter must be directed to this office only. I look forward to your anticipated cooperation in reaching a mutually agreeable resolution in this matter.

                  Very Truly Yours,

cc:  Predrag Cicvara             Michael E. Skiber, Esq.

A-778

Dear Mr. Sparkes:

Please be advised that this office represents Mr. Predrag Cicvara in legal claims against the Procter & Gamble Company and/or Duracell.

As you probably are aware, Mr. Cicvara was a hard-working and valuable employee of both Gillette and Procter & Gamble for nearly a decade. During his dedicated service, Mr. Cicvara earned substantial stock option compensation. Regrettably, it is our understanding that P&G intends to snatch away Mr. Cicvara's options without proper legal authority. Accordingly,

**DEMAND IS HEREBY MADE FOR PROCTER AND GAMBLE TO IMMEDIATELY HONOR MR. CICVARA'S EXERCISE OF HIS VESTED STOCK OPTIONS PURSUANT TO THE JULY 3, 2009 REQUEST TO EXERCISE.**

Should you choose to ignore our demand, this office is prepared to immediately assert Mr. Cicvara's rights and seek any and all legal and equitable remedies available in the appropriate jurisdiction.

In anticipation of court action, we request you preserve any tangible and intangible evidence related to Mr. Cicvara's employment, including but not limited to: emails, computer records, phone logs, blackberry messages, tape recordings, written correspondence, and personnel files. Do not contact Mr. Cicvara regarding this matter. Any correspondence concerning this matter must be directed to this office only. I look forward to your anticipated cooperation in reaching a mutually agreeable resolution in this matter.

Very Truly Yours,

Michael E. Skiber, Esq.

cc:   Predrag Cicvara

---

CONNECTICUT:   (203) 615-0090
NEW YORK:         (917) 670-5800

EMAIL: SKIBERLAW@GMAIL.COM
FACSIMILE: (203) 335-0607

---

TRANSMISSION VERIFICATION REPORT

| | |
|---|---|
| TIME | : 07/09/2009 08:58 |
| NAME | : |
| FAX | : 2033350607 |
| TEL | : 3350607 |
| SER.# | : 000J5J781788 |

| | |
|---|---|
| DATE,TIME | 07/09  08:57 |
| FAX NO./NAME | 12097964518 |
| DURATION | 00:00:27 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

A-779

**EXHIBIT J TO CICVARA AFFIDAVIT -**
**(A) PROCTOR & GAMBLE — WORLD WIDE BUSINESS CONDUCT MANUAL**
**(REPRODUCED HEREIN AT PP. A-426–A-489)**


**EXHIBIT J TO CICVARA AFFIDAVIT -**
**(B) THE GILLETTE COMPANY, 1971 STOCK OPTION PLAN, DATED DECEMBER 13, 2005**
**(REPRODUCED HEREIN AT PP. A-323–A-327)**


**EXHIBIT J TO CICVARA AFFIDAVIT -**
**(C) LETTER FROM PREDRAG CICVARA TO BEL LIU**
**(REPRODUCED HEREIN AT P. A-491)**


**EXHIBIT J TO CICVARA AFFIDAVIT -**
**(F) EBT OF PLAINTIFF PREDRAG CICVARA, TAKEN DECEMBER 21, 2010**
**(REPRODUCED HEREIN AT PP. A-493–A-691)**


**EXHIBIT K TO CICVARA AFFIDAVIT -**
**EMAIL FROM PREDRAG CICVARA TO PEGGY WILCZEWSKI, SENT JUNE 29, 2009**
**(REPRODUCED HEREIN AT P. A-425)**

A-780

02/07/2011 18:48 FAX  1212 218 5270        SEYFARTH SHAW  LLP                    ☒017/023

6-15-09

Where had you been the last nite with Mr. Bel Li.
Andrews & Thailand of his

Did you see her for mtgs. & other times?
mtgs, dinner after dinner
After dinner where?
In the bar
W. have documented — hotels have cameras
emails & phone conversation
I went to her room to discuss things of his
what kinds of things?
Some are a bit personal w/ her & with me.

Did she invite me to her hotel room?
Did she ask you to leave + did you refuse to leave?

Did you touch her in any way?
Yes, I was sorry for her, She confirm
certain things of me that I'd rather
not discuss here
I did not have many human discussion
in her hotel room. She confirm to me
that she broke up somebody in her life.

Did you take off your clothes in her
hotel room? No

CONFIDENTIAL                                                          PG 000644

02/07/2011 15:52 FAX  1212 218 5270      SEYFARTH SHAW  LLP                    @018/023

Have you sent an email to her
for her your dirty old man?

She was at some pt. misunderstanding
my intentions

Did you tell her that you wanted to
rape her?
Look it was in a hotel pt. we were dressed in
a way. I told her I had a feeling I
could rape her but I never had them
very much. I don't think she'd think
about it seriously

What did you do or say to make her
uncomfortable?
I asked if I could come to her room.
She was dressed in very short shorts.
I've mean. I looks like I could rape
you. Like that. You are showing off.
I had a feeling of Bill that was very
warm to her on the confined certain
things to me. I had the feeling I had
to protect her from the harm. She could be
in harms way by her boyfriends.
I wanted to help her about what
I came to her room to tell to her.
She said don't touch me. I touched her hand.

A-782

she feed her; she talked about the
guy who left
I said I could rape you because
she was showing off
she said please can you go + I left the room.
I didn't want to harm her.

LB> When you were in her hotel room – was she
afraid of you + she called her room.
When she asked me to leave, I left

Never touched her never chased her
never took your clothes off.

Did you ever come to her room
when she did not want you? No

Was she sick in bed when you went there?

She never told me she was sick

When did this take place?
        In Bangkok –
        Emporium Suite

We were in the restaurant of __ why from
(Louis Pc., Mr. _____ Andrew Bel.)

I was stroking her head - tried to get her head here (pt to his chest).

After we ate dinner I left.

How many nights did you go to her hotel room? That was the night

How many days were you together? Indonesia Singapore (one night) wed 7 8 9 10 (for 6 days)

Did you attend harr training? Yes Do you understand our comp. policy? Yes

Do you realize you were comp rep + their one of our suppliers? I think what I did was not inappropriate.

Do you think the things you did you wife would find appropriate Strictly speaking probably not.

Any wife might think I did something inappropriate. She would like me to feel for other reason.

CONFIDENTIAL                                    PG 000647

What do you feel for Rel?

I have very warm feeling for Rel.
I feel she is probably in not too
good of a relation with her husband.
She's married & didn't tell me that
she was married.

How old is Rel?
30 I think
How old are you? 54

Is she a attractive woman?
She's a good looking woman. I don't know if
she is attractive. This doesn't have anything
to do my attractiveness. This kind of relationship
didn't happen in ?
I'm not saying it's appropriate. I sent email
things about her. It was more than normal
relationship that is in a business relationship

RB→  If there is a recording that is you being
     asked to leave a room
         you didn't, how do you explain that?
     I left the room. Why is there a
     recording?

02/07/2011 19:17 FAX   1212 218 5270        SEYFARTH SHAW  LLP                    ☒022/023

I left her room w/ not harming her.

She apologized to me + I didn't understand why. She m??t when she didn't come. 2nd day of audit, she apologized + said she was sorry for what she did. Now I understand why. Oh my god.

Why did you put her w/o she had told? I tried to understand why she was apologizing. I asked her who she told. Because I couldn't sleep. I even sent her one SMS message asking why she was apologizing. She said you'll understand one day.

Do you relize that how is illegal + the comp. + you can be sued for harassing her here? I didn't want to harm anybody.

Anything else that you'd like to tell me?
Listen I think this a natural that I'm sorry if I did to harm the company. I did not mean to hurt anybody. She apologized to

CONFIDENTIAL                                                                    PG 000649

me. I feel that to a point I
was provoked — I wouldn't be saying
this — if I was thinking of
things the way it turned out I
should not have been searching for the
any. It didn't come from one
day. I believe it came close in the
sense I was the person who wanted
to confine in. It was a was relationship
when we I'm trying to explain
why maybe at some pt. it become
personal when she told me to leave
her room, I left her room. There
was nothing between us.


Violation of PVPs
- engaging in bad behavior
     violated comp policy & PVPs
- harassment

Pauline told Connor that she
has destroyed his life.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
PREDRAG CICVARA,                                               :      Civil Action No. 3:09-cv-2054
                                                               :      (JCH) (HF)
             Plaintiff,                                        :
                                                               :
                                                               :
      v.                                                       :      June 16, 2011
                                                               :
THE GILLETTE COMPANY and PROCTER &                             :
GAMBLE COMPANY and DURACELL, AN ENTITY                         :
OF UNKNOWN FORM and LYNNE BURNETT,                             :
                                                               :
             Defendants.                                       :
                                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN
## FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Edward Cerasia II (ct 13096)
Hema Chatlani (phv 04023)
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendants
The Gillette Company
and The Procter & Gamble Company

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

I.     PRELIMINARY STATEMENT ..................................................................... 1

II.    ARGUMENT .................................................................................................. 2

     A.     THE SPECULATIVE ASSERTIONS IN CICVARA'S RULE 56(a)2
           STATEMENT AND AFFIDAVIT DO NOT COMPLY WITH L. CIV.
           RULE 56(a)3 OR THIS COURT'S PREVIOUS ORDER ...................................... 2

          1.     Each of the Statements In The Company's Local Rule 56(a)1
              Statement Should Be Deemed Admitted ...................................................... 3

          2.     Cicvara's Self-Serving Affidavit Should Be Stricken Because It Is
              Not Based On Personal Knowledge............................................................. 4

          3.     This Court Should Strike the Allegations in Cicvara's Moving
              Papers That Refer to Matters Which This Court Has Already Ruled
              To Be Irrelevant ......................................................................................... 5

     B.     CICVARA FAILS TO PRESENT ANY EVIDENCE
           DEMONSTRATING THAT HE IS OWED THE VALUE OF HIS
           STOCK OPTIONS........................................................................................... 6

          1.     The Clear And Unambiguous Terms Of The Plan Provide That An
              Employee's "For Cause" Termination Results In The Automatic
              Forfeiture Of His Stock Options................................................................. 6

          2.     The Undisputed Evidence Establishes That Cicvara Engaged In
              Behavior That The Company Reasonably Determined Constituted
              Gross Misconduct ...................................................................................... 7

III.   CONCLUSION.............................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Betancourt v. Slavin,*
   676 F. Supp. 2d 71 (D. Conn. 2009)......................................................................4

*Bowersox v. P.H. Glatfelter Co.,*
   677 F. Supp. 307 (M.D. Pa. 1988)......................................................................7

*Byrnie v. Town of Cromwell Bd. of Educ.,*
   243 F.3d 93 (2d Cir. 2001)......................................................................7

*Eiden v. McCarthy,*
   531 F. Supp. 2d 333 (D. Conn. 2008)......................................................................3

*Farina v. Branford Bd. of Educ.,*
   2010 U.S. Dist. LEXIS 99730 (D. Conn. Sept. 22, 2010)........................................3

*Goenaga v. March of Dimes Birth Defects Found.,*
   51 F.3d 14 (2d Cir. 1995)......................................................................2

*McNally v. Stewart,*
   618 F. Supp. 2d 168 (D. Conn. 2009)......................................................................5

*Miller v. Equitable Life Assurance Soc.,*
   181 Ill. App. 3d 954 (Ill. App. Ct. 1st Dist. 1989)..................................................7

*Nanos v. City of Stamford,*
   609 F. Supp. 2d 260 (D. Conn. 2009)......................................................................4

*Noonan v. Staples, Inc.,*
   556 F.3d 20 (1st Cir. 2009)......................................................................9

*Rossi v. W. Haven Bd. of Educ.,*
   359 F. Supp. 2d 178 (D. Conn. 2005)......................................................................5

*Sellers v. M.C. Floor Crafters, Inc.,*
   842 F.2d 639 (2d Cir. 1988)......................................................................2

*Wagner v. Nat'l City Bank,*
   2010 U.S. Dist. LEXIS 50789 (D. Conn. May 21, 2010)........................................4

*Weir v. Anaconda Co.,*
   773 F.2d 1073 (10th Cir. 1985)......................................................................9

*Welland v. Citicorp, Inc.,*
   2003 U.S. Dist. LEXIS 22721 (S.D.N.Y. Dec. 17, 2003)........................................9

**RULE**

Local Civil Rule 56(a)3 .................................................................................................3

## I.   **PRELIMINARY STATEMENT**

Defendants The Gillette Company and The Procter & Gamble Company (collectively, the "Company") respectfully submit this reply memorandum in further support of their motion for summary judgment seeking dismissal of Cicvara's remaining claims in the Amended Complaint.[1]

In response to the Company's summary judgment motion, Cicvara has voluntarily withdrawn his claims in Counts Two through Seven of his Amended Complaint, but has held on to his cause of action in Count One for breach of contract seeking to recover the value of his forfeited stock options. Even so, Cicvara has not presented any evidentiary support for his sole remaining claim. Instead, Cicvara's opposition papers consist entirely of conclusory allegations, self-serving statements supported solely by his baseless Affidavit, and conspiracy theories and allegations that this Court already ruled are irrelevant to this case. Cicvara's Affidavit and the remainder of his opposition papers simply ignore that, under Fed. R. Civ. P. 56(e), he must present *admissible* evidence, and not his own conjecture, that the Company breached any agreement with him for stock options. This he has not done.

Astonishingly, despite admitting throughout his deposition testimony and again in his opposition papers that he engaged in sexual misconduct toward Liu that "might be deemed inappropriate," (Pl.'s Br. at 6), Cicvara now alleges that his behavior was not harmful to the Company and, according to him, did not constitute gross misconduct. His arguments, however, completely ignore the comprehensive and controlling case law cited in the Company's moving

---

[1]     The abbreviated and capitalized terms used in this reply memorandum are defined in Defendants' Memorandum Of Law In Support Of Their Motion For Summary Judgment ("Defs.' Br."). Plaintiff's Memorandum Of Law In Opposition To Defendants Motion For Summary Judgment" will be cited herein as "Pl.'s Br."

brief showing that the Company, and not Cicvara, had *sole discretion* to determine whether his

actions constituted "gross misconduct which [was] materially and demonstrably injurious to the

Company or the subsidiary." (Defs.' Br. at 11-12.)  Further, Cicvara conveniently overlooks his

role as a representative of the Company when traveling abroad; stripping down to his underwear

and sitting on the bed of a supplier's female employee while mentioning the word "rape" is

simply not the type of representation the Company contemplated.  As the Company's moving

papers make clear, Cicvara's atrocious conduct negatively affected its reputation, strained its

relationship with Practical Lighting, and disturbed Liu, who complained about his conduct.  The

Company was well within its discretion in determining that Cicvara's behavior constituted gross

misconduct that was materially and demonstrably injurious to the Company, resulting in an

automatic forfeiture of his stock options under the terms and conditions of the Plan.  Because no

reasonable jury could conclude otherwise, the Company respectfully requests that the Court

grant its motion for summary judgment and dismiss Cicvara's Amended Complaint in its

entirety.

## II.   ARGUMENT

**A.   THE SPECULATIVE ASSERTIONS IN CICVARA'S RULE 56(a)2 STATEMENT AND AFFIDAVIT DO NOT COMPLY WITH L. CIV. RULE 56(a)3 OR THIS COURT'S PREVIOUS ORDER**

The self-serving, conclusory, argumentative, contradictory statements and mere denials

contained in Cicvara's Local Rule 56(a)2 Statement and his Affidavit are insufficient to defeat

the Company's summary judgment motion and should be stricken.  *E.g., Goenaga v. March of

Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (a plaintiff cannot defeat summary

judgment by ignoring or misstating the record or by relying on "unsupported [factual] assertions

. . . conjecture or surmise" or "'upon the mere allegations or denials of the adverse party's

pleading'") (citation omitted); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir.

2

1988) (affidavits must be based on personal knowledge). Cicvara's 56(a)2 Statement and

Affidavit are devoid of any citations to admissible evidence, are not based on personal

knowledge, and are replete with references to allegations that this Court has repeatedly stated are

*irrelevant* to this case, and thus cannot be used to refute the Company's motion for summary

judgment.

### 1.   Each of the Statements In The Company's Local Rule 56(a)1 Statement Should Be Deemed Admitted

Local Civil Rule 56(a)3 requires that "[e]ach statement of material fact by . . . an

opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2

Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to

testify as to the facts at trial and/or (2) evidence that would be admissible at trial." L.R. 56(a)3.

The Local Rule cautions that "failure to provide specific citations to evidence in the record as

required by this Local Rule may result in the Court deeming certain facts that are supported by

the evidence admitted in accordance with Rule 56(a)1." L.R. 56(a)3. Cicvara's lengthy and

conclusory Rule 56(a)2 Statement utterly fails to cite to *any* admissible evidence and instead is

replete with conclusory, argumentative, and contradictory statements without any citations to the

record. (*E.g.*, Pl.'s 56(a)2, ¶¶ 5-8, 14, 15, 23-25, 27, 28, 30, 31, 33-35, 36-40, 42-48, 50, 56-58,

60-64).[2] As such, the statements in the Company's Rule 56(a)1 Statement, which are aptly

supported by citations to the record, should be deemed admitted. *E.g., Farina v. Branford Bd. of

Educ.*, 2010 U.S. Dist. LEXIS 99730, at *5 n.3 (D. Conn. Sept. 22, 2010) (this Court held that

facts contained in defendant's Local Rule 56(a)1 statement are "deemed admitted" because

---

[2]   Cicvara does not even bother to admit or deny certain paragraphs, (*e.g.*, Defs.' 56(a)1,
¶¶ 9-13, 16-22, 26, 29, 32, 41, 49 and 65), rendering the statements in these paragraphs admitted,
*Eiden v. McCarthy*, 531 F. Supp. 2d 333, 338 (D. Conn. 2008) (deeming admitted any statement
which plaintiff failed to admit or deny).

plaintiff's opposing statements contained unsupported denials without "any specific citation to the record."); *Wagner v. Nat'l City Bank*, 2010 U.S. Dist. LEXIS 50789, at *6 n.2 (D. Conn. May 21, 2010) (same); *Nanos v. City of Stamford*, 609 F. Supp. 2d 260, 263 (D. Conn. 2009) (deeming facts admitted where plaintiff's opposition did not cite to admissible evidence and instead "add[ed] commentary or analysis not related to the existence or non-existence of the facts alleged by the City").

### 2.  Cicvara's Self-Serving Affidavit Should Be Stricken Because It Is Not Based On Personal Knowledge

Cicvara desperately seeks to create an issue of fact by submitting a rambling Affidavit, in which he claims that the Company acted "illegally" in terminating him for cause, (Pl.'s Aff., ¶ 18), and that nearly every person he worked with conspired to terminate his employment, remarkably all for different reasons, (*id.*, ¶¶ 28-38). These far-fetched allegations make sweeping accusations against several employees and conclusions about matters which Cicvara does not have any personal knowledge. For example, Cicvara speculates that Lin informed the Company's Human Resources division about Liu's complaint because Lin wanted to hide alleged fraudulent business expense reports, (*id.*, ¶ 29), Yau falsified the incident with Liu in an attempt to "gain a strong leverage" with the Company, (*id.*, ¶¶ 31, 32), a mysterious "person who must have been at the Duracell top position or very close to it" wanted to "get rid" of Cicvara to "destroy" evidence and avoid "negative publicity" of alleged wrongdoings within the Company that Cicvara supposedly uncovered, (*id.*, ¶¶ 28-38, 56), and the Company supposedly "learned" about this alleged wrongdoing in June 2010, when Cicvara asked for discovery in this case, and thereafter "very quietly replaced" three of its executives, (*id.*, ¶ 56). These completely preposterous allegations must be stricken because they are not based on any personal knowledge or evidentiary support, and are wholly insufficient to withstand summary judgment. *E.g.*,

4

*Betancourt v. Slavin*, 676 F. Supp. 2d 71, 80 (D. Conn. 2009) ("A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form, unsupported by any contemporaneous records, is insufficient to preclude summary judgment."); *McNally v. Stewart*, 618 F. Supp. 2d 168, 174 (D. Conn. 2009) (this Court "disregard[ed] bald assertions" in plaintiff's affidavit "because such statements 'lack sufficient foundation to permit its use to defeat a properly supported motion for summary judgment'") (quoting *Rossi v. W. Haven Bd. of Educ.*, 359 F. Supp. 2d 178, 182 (D. Conn. 2005)).

### 3.   This Court Should Strike the Allegations in Cicvara's Moving Papers That Refer to Matters Which This Court Has Already Ruled To Be Irrelevant

On June 16, 2010, Cicvara filed a motion to compel discovery seeking documents related to Company employees who had no involvement in the decision to terminate his employment or the cancellation of his stock options. (Docket Entry No. 39.) The motion sought, among other things, documents concerning an alleged affair between two Company employees, Mani Parmar and Ann Cardinale, documents regarding an alleged "illegal" diversion of Duracell batteries from Hong Kong to Latin America, and documents concerning Lin's expense reports. On July 20, 2010, this Court denied Cicvara's motion to compel and held that these matters were wholly irrelevant to his claims. Notwithstanding that ruling, Cicvara filed a second motion to compel on February 25, 2011, (Docket Entry No. 68), once more seeking discovery of these matters. On April 6, 2011, this Court again held that Cicvara was not entitled to this discovery. (Docket Entry No. 73.)

Despite the Court's rulings, Cicvara once more refers to these irrelevant allegations throughout his Rule 56(a)2 statement, again speculating that his termination was motivated by his unsubstantiated conspiracy theories. (*See, e.g.*, Pl.'s 56(a)2, ¶¶ 14, 25, 27, 36, 50, 56, 57, 58, 60, 61; Pl.'s Aff., ¶¶ 29, 33, 39, 54, 56.) This Court should strike these unsubstantiated

5

allegations because they are wholly inappropriate, irrelevant, and completely ignore the Court's previous Orders.

**B.     CICVARA FAILS TO PRESENT ANY EVIDENCE DEMONSTRATING THAT HE IS OWED THE VALUE OF HIS STOCK OPTIONS**

Even affording Cicvara all the inferences granted in favor of the non-moving party on a motion for summary judgment, he still failed to present any evidence of a breach of contract. The undisputed evidence before this Court demonstrates that Cicvara engaged in admittedly inappropriate sexual behavior toward Liu, resulting in his termination for cause and the automatic forfeiture of his stock options pursuant to Section 6(f) of the Plan. (Defs.' Br. 9-14.)

**1.     The Clear And Unambiguous Terms Of The Plan Provide That An Employee's "For Cause" Termination Results In The Automatic Forfeiture Of His Stock Options**

Cicvara admits in his opposition papers that the Plan's language is "clear and unambiguous," yet contends, without any citation to relevant case law, that the Company breached the terms and conditions of the Plan. (Pl.'s Br. at 3.) Cicvara's argument is belied by the undisputed evidence presented by the Company. Pursuant to the clear and unambiguous terms of the Plan, "[i]f an employee Participant is discharged for Cause . . . all his options shall *immediately* be cancelled effective as of the date of termination of his employment." (Defs.' 56(a)1, ¶ 50.) (emphasis added). Section 6(f)(B) of the Plan specifically defines "Cause" as "the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary." (*Id.*)[3]

---

[3]     As a last-ditch effort to preserve his breach of contract claim, Cicvara argues that the Company terminated his employment pursuant to Section 6(f)(A) of the Plan and not Section 6(f)(B). (Pl.'s Br. at 5-6.) However, the Company has consistently informed Cicvara that he was terminated because of his behavior toward Liu, and not because of poor performance. (*See* Defs.' 56(a)1, ¶ 48.) Although Cicvara correctly points to a typographical error on Peggy

6

The evidence presented by the Company – and undisputed by Cicvara – makes clear that

Cicvara was terminated for cause under the terms of the Plan, resulting in the automatic

forfeiture of his stock options and precluding any claim for a breach of contract.  At most,

Cicvara demonstrates only that he disagrees with the Company's decision to terminate his

employment, which he believes was not "proper."  (Pl.'s 56(a)2, ¶¶ 61-64.)  However, Cicvara

ignores the case law cited in the Company's moving papers showing that the Company was well

within its discretion in determining that his *admitted* sexual behavior toward Liu constituted

"gross misconduct" under the terms of the Plan.  Cicvara cannot ask this Court to reevaluate the

Company's business decision based on his unsubstantiated personal opinion that his sexual

conduct toward Liu was not gross misconduct and was not harmful to the Company.  *See, e.g.,*

*Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) ("[The court's] role is

. . . not to act as a super personnel department that second guesses employers' business

judgments.").[4]  Because Cicvara was terminated for cause under the terms of the Plan, his stock

options were automatically forfeited, precluding any claim for breach of contract.

**2.     The Undisputed Evidence Establishes That Cicvara Engaged In Behavior
        That The Company Reasonably Determined Constituted Gross Misconduct**

The record before the Court reveals that the Company had a sufficient and reasonable

basis for concluding, after engaging in a thorough investigation of the matter, that Cicvara's

unwanted sexual advances toward Liu constituted gross misconduct.  The Company began its

---

Wilczewski's June 16, 2009, correspondence to him, (Wilczewski Decl., Ex. H), that error does
not transform his termination into one for poor performance under Section 6(f)(A).

[4]      Cicvara cites to *Miller v. Equitable Life Assurance Soc.*, 181 Ill. App. 3d 954 (Ill. App.
Ct. 1st Dist. 1989), and *Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307 (M.D. Pa. 1988) in
support of his argument that he did not engage in gross misconduct.  (Pl.'s Br. at 5.)  However,
both of these cases discuss the standard for reviewing an intentional infliction of emotional
distress claim, and have absolutely no bearing on a Company's decision to terminate an
employee for cause for engaging in sexual harassment.

investigation by interviewing Liu and reviewing her documentation of highly disturbing e-mails and text messages sent by Cicvara. (Defs.' 56(a)1, ¶¶ 32-35.)[5] Although Cicvara claims that "nobody else from Duracell[] ever contacted Plaintiff to try to get his side of the story," (Pl.'s 56(a)2, ¶¶ 37, 38, 39 & 40), the record reveals otherwise.  In truth, the Company did not complete its investigation until after meeting with Cicvara on June 15, 2011, to ascertain his version of the events. (Defs.' 56(a)1, ¶ 44.)  During that meeting, Cicvara *corroborated* Liu's allegations by admitting, among other things, that he had touched Liu while in her hotel room and by stating, "Look, it was in a hotel and she was dressed in a way.  I told her I had a feeling I would rape her but I never had that in my mind and I didn't thin[k] she'd think about it seriously." (*Id.*, ¶ 45.)  After listening to Cicvara admit to visiting Liu's room, touching her, and using the word "rape," Burnett, Wilczewski, and Babis more than reasonably concluded that Cicvara's behavior warranted the termination of his employment for cause. (*Id.*, ¶ 48.)[6]

Cicvara now argues, without any citation to the record or to case law, that his actions did not injure the Company; however, he ignores that he was entrusted with acting as the face of the Company, (Defs.' 56(a)1, ¶ 14), and made inappropriate sexual advances while acting as a Company representative – an egregious act which the Company reasonably viewed as reflecting

---

[5]   Cicvara claims in his opposition papers that the Company did not produce the text messages reflected in the document identified with Bates number PG000612 prior to filing its motion for summary judgment. (Pl.'s 56(a)2, ¶ 27.)  The Company produced that document on December 14, 2010, and in fact referred to the document in its Responses and Objections to Plaintiff's Second Request for Production of Documents. (*See* Pl.'s 56(a)2, Ex. E, at 4.)  Cicvara's accusatory statement that the Company "intentionally, never produced" this document because it "is trying to construct the story that could better justify their act of firing Plaintiff for cause," (Pl.'s 56(a)2 ¶ 27), only highlights that his claims are based completely on conjecture and not on a review of the actual evidence.

[6]   Although Cicvara now claims that he never told Liu he had a "feeling [he] would rape her," he nonetheless *admits* that he told her "one could rape you." (Pl.'s 56(a)2 ¶ 30.)  Regardless of the semantics, the record evidence is clear that Cicvara admittedly used the word "rape" with Liu – either telling her that he "could rape" her or that he "would rape" her.

negatively on its reputation and impairing its relationship with Practical – in addition to harming an employee of a Company supplier. More importantly, Cicvara ignores the clear case law which establishes that the Company – *and not Cicvara* – had sole discretion to determine whether his behavior constituted "gross misconduct." (Defs.' Br. at 13-14.)  Cicvara cannot ask this Court to overturn the Company's business decision absent a showing that the Company acted arbitrarily, capriciously, or in bad faith – a showing which he has not made here. *See Welland v. Citicorp, Inc.*, 2003 U.S. Dist. LEXIS 22721, at *35-36 (S.D.N.Y. Dec. 17, 2003) (holding that company had a reasonable basis for terminating the employee for cause when he violated company policy by accepting gifts from a company vendor, resulting in the forfeiture of his unvested stock options, and the company's decision should be set aside *only if* the employer's decision was arbitrary and capricious), *aff'd*, 116 Fed. Appx. 321, 322 (2d Cir. 2004) (summary order); *Noonan v. Staples, Inc.*, 556 F.3d 20, 33-34 (1st Cir. 2009) (explaining that courts are not "super personnel departments" and may perform only a "a limited review" of an employer's decision that an employee was terminated "for cause" under the terms of a stock option agreement "to determine if it was arbitrary, capricious, or made in bad faith") (citations and quotations omitted); *Weir v. Anaconda Co.*, 773 F.2d 1073, 1080 (10th Cir. 1985) (although employee's stock option agreement did not define "for cause," Tenth Circuit held that the determination that plaintiff's termination for poor performance was a "for cause" termination was not arbitrary, in bad faith, or fraudulent).

Cicvara's inability to support his sole remaining claim with any admissible facts demonstrates that the Company did not act arbitrarily, capriciously, or in bad faith in determining that his lewd behavior toward Liu constituted gross misconduct. Therefore, summary judgment is warranted on Count One.

A-803

### III.   **CONCLUSION**

For the foregoing reasons, and the reasons set forth in the Company's moving papers, the Court should grant the Company's motion for summary judgment; grant to the Company its attorneys' fees and costs in this case; and grant to the Company such other and further relief as the Court may deem just and proper.

Dated this 16th day of June, 2011, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP

By  _s/ Edward Cerasia II_
   Edward Cerasia II (ct 13096)
   Hema Chatlani (phv 04023)
   620 Eighth Avenue, 32nd Floor
   New York, New York 10018
   (212) 218-5500
   ecerasia@seyfarth.com

Attorneys for Defendants
  The Gillette Company
  and The Procter & Gamble Company

10

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------ x

PREDRAG CICVARA,
                                Plaintiff,

                  v.

THE GILLETTE COMPANY and PROCTER &
GAMBLE COMPANY and DURACELL, AN ENTITY
OF UNKNOWN FORM and LYNNE BURNETT,

                     Defendants.

------------------------------------------ x

Civil Action No. 3:09-cv-2054
(JCH) (HF)

June 16, 2011

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Edward Cerasia II (ct 13096)
Hema Chatlani (phv 04023)
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendants
The Gillette Company
and The Procter & Gamble Company

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

I.    PRELIMINARY STATEMENT .................................................................................... 1

II.   ARGUMENT................................................................................................................ 2

      A.    CICVARA'S CROSS-MOTION SHOULD BE DENIED AS UNTIMELY ......... 2

      B.    CICVARA'S RULE 56(a)1 STATEMENT DO NOT COMPLY WITH LOCAL
            CIVIL RULES 56(a)1 AND 56(a)3 AND MUST BE STRICKEN ON THIS
            BASIS ................................................................................................................ 3

      C.    CICVARA HAS NOT ESTABLISHED THAT HE IS ENTITLED TO
            SUMMARY JUDGMENT ON HIS BREACH OF CONTRACT CLAIM ........... 4

III.  CONCLUSION............................................................................................................ 6

A-806

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alliance Sec. Prods. v. Fleming Co.,*
  471 F. Supp. 2d 452 (S.D.N.Y. 2007)...................................................................4

*Banco Cent. de Para. v. Para. Humanitarian Found., Inc.,*
  2005 U.S. Dist. LEXIS 293 (S.D.N.Y. Jan. 6, 2005)........................................3, 4

*Barkley v. Olympia Mortg. Co.,*
  2010 U.S. Dist. LEXIS 95060 (E.D.N.Y. Sept. 13, 2010)....................................3

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)...............................................................................................4

*Jessamy v. City of New Rochelle,*
  292 F. Supp. 2d 498 (S.D.N.Y. 2003)...................................................................4

*Julian v. Equifax Check Servs.,*
  178 F.R.D. 10 (D. Conn. 1998)..............................................................................2

*Kimbro v. I.C. Sys.,*
  336 F. Supp. 2d 188 (D. Conn. 2004)....................................................................4

*Lewis v. Sieminski,*
  2010 U.S. Dist. LEXIS 99775 (D. Conn. Sept. 22, 2010)....................................3

*Martin v. Town of Westport,*
  558 F. Supp. 2d 228 (D. Conn. 2008)....................................................................3

*NAS Elecs., Inc. v. Transtech Elecs. Pte Ltd.,*
  262 F. Supp. 2d 134 (S.D.N.Y. 2003)...................................................................2

*Nat'l State Bank v. Fed. Res. Bank,*
  979 F.2d 1579 (3d Cir. 1992)................................................................................4

*Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.,*
  373 F.3d 241 (2d Cir. 2004)..................................................................................5

**RULES**

Fed. R. Civ. P. 16(f)...................................................................................................2

Fed. R. Civ. P. 56(a)...................................................................................................4

Local Civil Rule 56(a)(1).............................................................................................3

A-807

Local Civil Rule 56(a)3 ...................................................................................................3

## I.   **PRELIMINARY STATEMENT**

Defendants The Gillette Company and The Procter & Gamble Company (collectively, the "Company") respectfully submit this memorandum in opposition to plaintiff Predrag Cicvara's ("Cicvara's") cross-motion for summary judgment on his first cause of action for breach of contract seeking the value of his forfeited stock options.

Cicvara's cross-motion for summary judgment should be denied because it is untimely, procedurally defective, and completely meritless. He filed his motion forty-six days after the Court-imposed deadline of April 15, 2011 for filing *all* dispositive motions. Therefore, the Court should deny his motion on this ground alone. In any event, Cicvara's Local Civil Rule 56(a)1 Statement of Undisputed Material Facts ("56(a)1 Stmt."), submitted in support of his cross-motion, does not contain even *one* citation to admissible evidence and is replete with unsupported legal conclusions, which also warrants denial of the cross-motion.

In addition to its lateness and procedural infirmities, Cicvara's cross-motion is completely lacking in merit, as evidenced by his three-page "memorandum," which is utterly devoid of any case law or legal argument. Cicvara maintains in this memorandum that he "relies on the memorandum submitted in opposition to Gillette's Motion" in support of his cross-motion. Cicvara's opposition papers, however, also *completely* lack any case law or cognizable legal arguments which would entitle him to summary judgment in this case. Instead, as set forth in the Company's moving and reply papers, Cicvara cannot prevail on his breach of contract claim because he has not conclusively established that he performed under the terms and conditions of the Gillette Company 1971 Stock Option Plan (the "Plan"), or that the Company breached the terms of the Plan. As the party who bears the burden of proof on these issues, his failure to show undisputed facts warranting summary judgment dooms his motion. For these

reasons, and for the reasons set forth in the Company's motion for summary judgment, Cicvara's cross-motion should be denied and summary judgment should be granted to the Company.

## II.   ARGUMENT

### A.   CICVARA'S CROSS-MOTION SHOULD BE DENIED AS UNTIMELY

On February 23, 2011, this Court issued an Order directing that the parties file *all* dispositive motions by April 1, 2011.  (Docket Entry No. 67.)  On March 17, 2011, the Company filed a motion for an extension of time to file dispositive motions, which this Court granted, and on March 21, 2011, this Court issued an Order extending the time for filing dispositive motions to April 15, 2011.  (Docket Entry No. 71.)

On May 31, 2011, well over a month past the Court's deadline for filing dispositive motions, Cicvara filed the instant cross-motion for summary judgment.  At no point prior to filing his motion did Cicvara seek an extension of his time to file dispositive motions, nor has he submitted any excuse for his untimely filing.  Rule 16(f) of the Federal Rules of Civil Procedure provides the Court with broad discretion to impose sanctions where, as here, a party has failed to comply with a pretrial order.  The Company submits that the Court should impose sanctions here in the form of dismissal of Cicvara's cross-motion for summary judgment as untimely.  *See, e.g., Julian v. Equifax Check Servs.*, 178 F.R.D. 10, 17 (D. Conn. 1998) (dismissing motion for partial summary judgment filed after the dispositive motion deadline set by the court); *NAS Elecs., Inc. v. Transtech Elecs. Pte Ltd.*, 262 F. Supp. 2d 134, 150 (S.D.N.Y. 2003) (explaining that plaintiffs' cross-motion for summary judgment should be denied as procedurally defective because "it was filed after the time for serving dispositive motions had passed").

2

**B.    CICVARA'S RULE 56(a)1 STATEMENT DO NOT COMPLY WITH LOCAL CIVIL RULES 56(a)1 AND 56(a)3 AND MUST BE STRICKEN ON THIS BASIS**

Local Rule 56(a)1 states that "[t]here shall be annexed to a motion for summary judgment a document entitled 'Local Rule 56(a)1 Statement,' which sets forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." Local Rule 56(a)3 mandates that "[e]ach statement of material fact by a movant in a Local Rule 56(a)1 Statement . . . be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." Cicvara's 56(a)1 Statement is *completely* devoid of citations to admissible evidence, and as such should be stricken and his cross-motion for summary judgment denied. *See, e.g., Martin v. Town of Westport*, 558 F. Supp. 2d 228, 232 (D. Conn. 2008) (explaining that "each statement of material fact . . . must be followed by a specific citation" to admissible evidence); *Lewis v. Sieminski*, 2010 U.S. Dist. LEXIS 99775, at *10-11 (D. Conn. Sept. 22, 2010) (denying plaintiff's motion for summary judgment for failure to comply with Local Rule 56(a)(1)); *see also Barkley v. Olympia Mortg. Co.*, 2010 U.S. Dist. LEXIS 95060, at *41 (E.D.N.Y. Sept. 13, 2010) ("[D]enial of the . . . motion for summary judgment in this case is appropriate because they have failed to identify undisputed material facts, supported by admissible evidence, which would permit the court to evaluate and provide the factual bases for their instant motion for summary judgment."); *Banco Cent. de Para. v. Para. Humanitarian Found., Inc.*, 2005 U.S. Dist. LEXIS 293, at *24 (S.D.N.Y. Jan. 6, 2005) ("The Court's role is not to wander aimlessly through the record in search of evidence that substantiates the allegations in the Rule 56.1 statement. When the movant is responsible for forcing the Court into this role, the Court is completely justified in denying the motion in its entirety.").

3

While the lack of citations alone warrants exclusion of Cicvara's 56(a)1 Statement, his submission also should be stricken because it is replete with legal arguments, (*e.g.*, 56(a)(1) Stmt., ¶¶ 13, 14), that are wholly inappropriate in a statement of undisputed material facts. *See, e.g., Alliance Sec. Prods. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007)("[L]legal arguments . . . belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact."), *aff'd*, 290 Fed. Appx. 380 (2d Cir. 2008); *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 509 n.12 (S.D.N.Y. 2003) (disregarding "self-serving and legally conclusory statement" in Rule 56.1 statement). In sum, the legal conclusions in Cicvara's Rule 56(a)1 Statement and the absence of any record evidence to support his "facts" provides a basis for denying Cicvara's cross-motion. *See Banco Cent. de Para.*, 2005 U.S. Dist. LEXIS 293, at \*24.

## C.   CICVARA HAS NOT ESTABLISHED THAT HE IS ENTITLED TO SUMMARY JUDGMENT ON HIS BREACH OF CONTRACT CLAIM

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To carry its initial burden, the moving party must show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If the moving party bears the ultimate burden of proof at trial, the standard is more stringent." *Kimbro v. I.C. Sys.*, 336 F. Supp. 2d 188, 190 (D. Conn. 2004); *see also Nat'l State Bank v. Fed. Res. Bank*, 979 F.2d 1579, 1580 (3d Cir. 1992) ("Where the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent."). The complete lack of citations to the record in Cicvara's Local Rule 56(a)1 not only demonstrates that his cross-motion is procedurally defective, but also shows that he does not have *any* admissible evidence entitling him to summary judgment on his breach

4

of contract claim. *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir.

2004) (explaining that in determining "whether the moving party has met this burden of showing

the absence of a genuine issue for trial, the district court . . . must be satisfied that the citation to

evidence in the record supports the assertion").

Rather, as set forth in detail in the Company's motion for summary judgment, the

Company is entitled to summary judgment because it did not breach any agreement owed to

Cicvara. The Company respectfully refers the Court to its motion for summary judgment and

accompanying papers, which demonstrate that the Company terminated Cicvara's employment

for cause only after an investigation revealed that Cicvara visited the hotel room of Bel Liu

("Liu"), a female manager of a Company supplier known as Practical Lighting Company

("Practical Lighting"), stripped down to his underwear, massaged her feet and back despite the

fact that she had not asked him to do so, and admittedly told her that "one could rape [her]."

Based on its findings at the conclusion of its investigation, the Company reasonably concluded

that Cicvara's outrageous behavior violated its policy against harassment and its Purpose, Values

and Principles ("PVPs"), and accordingly terminated his employment for cause. As a result of

that termination for cause, Cicvara's stock options were cancelled by operation of the terms of

the Gillette Company 1971 Stock Option Plan (the "Plan"), which states that an employee

forfeits his stock options if he is terminated for "gross misconduct which is materially and

demonstrably injurious to the Company or the subsidiary." (Defs.' Br. at 9-14.) For these

reasons, Cicvara cannot prove that he complied with his obligations under the Plan or that the

Company breached any duty it owed to him under the Plan, which are crucial elements of his

breach of contract claim. Consequently, the Court should deny Cicvara's cross-motion for

5

summary judgment and grant the Company's motion for summary judgment dismissing

Cicvara's claims in Count One of the Amended Complaint.

### III.   CONCLUSION

For the foregoing reasons, and the reasons set forth in the Company's motion for

summary judgment, the Court should deny Cicvara's cross-motion for summary judgment and

grant the Company's motion for summary judgment; grant to the Company its attorneys' fees

and costs in this case; and grant to the Company such other and further relief as the Court may

deem just and proper.

Dated this 16th day of June, 2011, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP

By   s/ Edward Cerasia II
   Edward Cerasia II (ct 13096)
   Hema Chatlani (phv 04023)
   620 Eighth Avenue, 32nd Floor
   New York, New York 10018
   (212) 218-5500
   ecerasia@seyfarth.com

Attorneys for Defendants
   The Gillette Company
   and The Procter & Gamble Company

6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
PREDRAG CICVARA,                          :    Civil Action No. 3:09-cv-2054
                                          :    (JCH) (HF)
        Plaintiff,                      :
                                          :
     v.                                  :    June 16, 2011
                                          :
THE GILLETTE COMPANY and PROCTER &        :
GAMBLE COMPANY and DURACELL, AN ENTITY    :
OF UNKNOWN FORM and LYNNE BURNETT,        :
                                          :
        Defendants.                     :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' LOCAL RULE 56(a)2 STATEMENT IN RESPONSE TO
## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 56(a)2, defendants The Gillette Company and The Procter &

Gamble Company ("P&G") (collectively, the "Defendants" or the "Company") respectfully

submit this response to plaintiff Predrag Cicvara's ("Cicvara's") Statement of Undisputed

Material Facts in opposition to his cross-motion for summary judgment.[1]

     1.     Undisputed.

---

[1]     The responses set forth herein are followed by citations to the Company's Local Civil
Rule 56(a)1 Statement of Material Facts ("Defs.' 56(a)1") (Docket Entry No. 74). The Company
incorporates herein all citations to the record provided in Defs.' 56(a)1. Copies of all deposition
testimony, deposition exhibits, and other documents cited herein are annexed to the Declaration
of Edward Cerasia II, Esq., dated April 15, 2011 (Docket Entry No. 75), the Declaration of
Lynne Burnett, dated April 11, 2011 (Docket Entry No. 78), the Declaration of Peggy
Wilczewski, dated April 14, 2011 (Docket Entry No. 77), the Declaration of Dina Schmude,
dated April 14, 2011 (Docket Entry No. 76), and the Declaration of Kevin Babis, dated April 15,
2011 (Docket Entry No. 79), submitted with the Company's motion for summary judgment.

2.    Disputed. Section 6(f)(B) of The Gillette Company 1971 Stock Option Plan (the

"Plan") does not state that an employee "must be found to be guilty of 'gross misconduct.'"

Rather, Section 6(f) states:

> If an employee Participant is discharged for Cause, as hereinafter
> defined, all his options shall immediately be cancelled effective as
> of the date of termination of his employment. For the purposes of
> the Plan . . . a discharge for "Cause" shall have occurred where a
> Participant is terminated because of
>
> . . . .
>
> (B) the Participant's engaging in illegal conduct or gross
> misconduct which is materially and demonstrably injurious to the
> Company or the subsidiary.

(Defs.' 56(a)1, ¶ 50.)

3.    Disputed. Cicvara engaged in admitted sexual misconduct during a business trip

to Asia which negatively affected the Company's reputation, caused Bel Liu ("Liu"), a general

manager at Practical Lighting ("Practical"), a Company Supplier, to complain about him, and

strained the Company's relationship with Practical. (*Id.*, ¶¶ 20-37, 42, 43.) After a thorough

investigation, the Company determined that Cicvara's employment should be terminated for

cause because of his gross misconduct. (*Id.*, ¶¶ 38-48.)

4.    Disputed. The Company learned about Cicvara's inappropriate conduct on June

9, 2009, and conducted an investigation of the matter from June 9, 2009 through June 15, 2009.

(*Id.*, ¶¶ 36-47.) The Company terminated Cicvara's employment on June 15, 2009, the same

date that Lynne Burnett ("Burnett"), Kevin Babis ("Babis") and Peggy Wilczewski

("Wilczewski") spoke with Cicvara regarding the incident and Cicvara admitted, among other

things, that he told Liu "I could rape you." (*Id.*, ¶¶ 44-48.)

5.    Disputed. The Company made significant efforts at investigating the matter,

which including speaking with Liu, reviewing text messages and e-mails authored by Cicvara,

2

and speaking with Cicvara regarding the allegations against him. (*Id.*, ¶¶ 37-47.) At the conclusion of this comprehensive investigation, the Company terminated Cicvara's employment for violating the Company's Purpose, Values and Principles and company policy by engaging in harassing behavior toward a company supplier. (*Id.*, ¶ 48.)

      6.     Disputed. Cicvara sought to exercise his stock options after these options were already forfeited by the terms of the Plan. (*Id.*, ¶ 61.)

      7.     Undisputed in part and disputed in part. The Company cannot allow Cicvara to exercise his stock options because these options were forfeited pursuant to Section 6(f) of the Plan. (*Id.*, ¶¶ 50, 57, 60, 61.)

      8.     Disputed. At the time of his termination, Cicvara could not exercise his stock options because he had been terminated for cause, resulting in the forfeiture of his stock options under Section 6(f) of the Plan. (*Id.*, ¶¶ 50, 57, 60, 61.)

      9.     Undisputed in part and disputed in part. The Company agrees that Cicvara was terminated on June 15, 2009; however, his termination occurred during an in-person meeting at a conference room in the Company's Bethel, Connecticut office. (*Id.*, ¶¶ 44, 48.) The Company thereafter notified Cicvara on June 16, 2009, and again on July 6, 2009, that his stock options had been forfeited. (*Id.*, ¶¶ 58-61.)

      10.    Disputed. As stated in response to paragraph 5, the Company made significant efforts at investigating the matter, which including speaking with Liu, reviewing text messages and e-mails authored by Cicvara, and speaking with Cicvara regarding the allegations against him. (*Id.*, ¶¶ 37-47.) At the conclusion of this comprehensive investigation, the Company terminated Cicvara's employment for violating the Company's Purpose, Values and Principles and company policy by engaging in harassing behavior toward a company supplier. (*Id.*, ¶ 48.)

Case 12-338, Document 58, 07/23/2012, 671468, Page244 of 273

11.     Disputed.  The Company does not understand which "administrative and/or appeal remedies" Cicvara references in this statement.

12.     Disputed.  Although the Company does not understand which "administrative and/or appeal remedies" Cicvara references in this statement, it states that it has not "waived" any such remedies.

13.     Disputed.  The Company had sole discretion to determine whether Cicvara's actions constituted "gross misconduct which [was] materially and demonstrably injurious to the Company or the subsidiary." (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment at 11-12.) Further, the Company reasonably concluded that Cicvara's inappropriate sexual advances toward Liu constituted gross misconduct. (Defs.' 56(a)1, ¶¶ 48, 57.)

14.     Disputed.  As the Company stated in response to paragraph 3, Cicvara engaged in inappropriate sexual behavior while on a business trip, which impacted the Company's reputation, caused harm to Liu, who complied about Cicvara, and impaired the Company's relationship with Practical.  (*Id.*, ¶¶ 20-37, 42, 43.)

15.     Disputed.  As stated in response to paragraphs 5 and 10, the Company thoroughly investigated the matter by speaking with Liu and Cicvara and reviewing text messages and e-mails authored by him.  (*Id.*, ¶¶ 37-47.)  The Company terminated Cicvara's employment for cause only after its comprehensive investigation. (*Id.*, ¶ 48.)

16.     Disputed.  The Company is not aware of any "letters of dismissal" that state that it terminated Cicvara because of a violation of Section 6(f)(A) of the Plan.  The Company admits, however, that Wilczewski erroneously cited to Section 6(f)(A) of the Plan in her June 16, 2009 correspondence to Cicvara. (Wilczewski Decl., Ex. H.)  However, the Company had made clear

4

at all times that it was terminating Cicvara's employment because of his inappropriate behavior toward Liu, and not because of poor performance.  (Defs.' 56(a)1, ¶ 48.)

17.     Disputed.  Section 6(f)(A) defines "cause" as the "Participant's continued failure to perform substantially his duties with the Company . . . after a written demand for performance is delivered to the Participant."  (Cicvara Dep. Ex. 15 at PG000191-92.)  Cicvara, however, was terminated pursuant to the definition of "cause" found in Section 6(f)(B) of the Plan and not the definition in Section 6(f)(A).  (Defs.' 56(a)1, ¶ 48.)

18.     Undisputed in part and disputed in part.  The Company agrees that it did not provide Cicvara with a written demand pursuant to Section 6(f)(A); however, the Company had no obligation to do so because Cicvara's employment was terminated pursuant to Section 6(f)(B) of the Plan and not Section 6(f)(A).  (Defs.' 56(a)1, ¶ 48.)

**DEFENDANTS' LOCAL RULE 56(a)2 STATEMENT
OF DISPUTED MATERIAL FACTS**

19.     Pursuant to Local Rule 56(a)2, the Company states that there are no material facts as to which it is contended there is a genuine issue to be tried and therefore the Company is entitled to summary judgment.  The Company further states that, at the very least, all of the

above facts show that there are issues of fact precluding Cicvara's cross-motion for summary

judgment.

Dated this 16th day of June, 2011, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP

By   s/ Edward Cerasia II
     Edward Cerasia II (ct 13096)
     Hema Chatlani (phv 04023)
     620 Eighth Avenue, 32nd Floor
     New York, New York 10018
     (212) 218-5500
     ecerasia@seyfarth.com

     Attorneys for Defendants
      The Gillette Company
      and The Procter & Gamble Company

A-820

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PREDRAG CICVARA, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:09-cv-2054 (JCH) |
| | : | |
| v. | : | |
| | : | |
| THE GILLETTE COMPANY, et al., | : | NOVEMBER 22, 2011 |
| Defendants. | : | |

### RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 74) & PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT (DOC. NO. 85)

### I.   INTRODUCTION

This case arises from the termination of the employment of the plaintiff, Predrag Cicvara, as a Quality Assurance Manager for The Gillette Company, a subsidiary of The Proctor and Gamble Company (together, "Gillette"). In his Amended Complaint, Cicvara asserts breach of contract and unjust enrichment claims with regard to stock options, severance pay, and an annual bonus, as well as a statutory claim for unpaid wages under Connecticut General Statutes § 31-72.

On April 15, 2011, Gillette filed a Motion for Summary Judgment. Doc. No. 74. In response, Cicvara withdrew six of his claims, leaving only the breach of contract claim as to his stock options. Cicvara also filed a Cross Motion for Summary Judgment on the stock options claim. Doc. No. 85. For the following reasons, the court grants the defendants' Motion for Summary Judgment and denies the plaintiff's Motion.

1

## II.   FACTS[1]

Cicvara began his employment with Gillette on or about November 1, 2000.

Defendant's Local Rule 56(a)(1) Statement (hereinafter "Def.'s 56(a)(1) St."), ¶ 11.

From approximately June 1, 2008, until his termination on June 15, 2009, Cicvara held

the position of Quality Assurance Manager ("QA Manager") for Gillette's Duracell

division.  Id. ¶ 12.  As a QA Manager, Cicvara was required to interact with Gillette's

suppliers on all quality-related issues and to participate in audits of the suppliers'

factories.  Id. ¶ 15.  His job description explicitly included the following responsibility:

"Provide professional representation of Duracell/P&G per the P&G Worldwide Business

Conduct Manual.  This is vitally important in dealing with Contractors and Suppliers in

that plans, decisions, and commitments could have significant impact from a financial

and/or confidentiality perspective."  Id. ¶ 14; Cicvara Dep. Ex. 4.

### A.  Plaintiff's Conduct in Thailand

In June 2009, Cicvara traveled to Indonesia, Thailand, and China to audit four

factories owned by Practical Lighting ("Practical"), one of Gillette's flashlight suppliers.

Def.'s 56(a)(1) St., ¶¶ 22, 16.  Prior to the audits, the relationship between Practical and

Gillette had become "strained" when Practical learned that Gillette had contracted with a

competitor to produce certain models of its "Daylite" flashlight.  Id. ¶ 19.  In response,

Gillette contracted with Practical to produce Daylite models utilizing type "C" and "D" cell

Duracell batteries. Id. ¶ 19.

---

[1] In his response to Gillette's Statement of Undisputed Material Facts, the plaintiff frequently fails to comply with the requirements of Local Rule 56(a)(2). Where Gillette's asserted fact is supported by evidence in the record and Cicvara has either (1) failed to provide specific citations to support his denial of the fact, or (2) merely added commentary that does not deny the existence of the fact, the court will deem the fact to be admitted. L.R. 56(a)(3) ("[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted.")

Practical's Chairman, Andrew Yau, and its general manager, Bel Liu, traveled from Practical's headquarters in Hong Kong to meet with Cicvara and Gillette's auditors at the factories. Id. ¶¶ 20-22. Liu was one of Gillette's primary contacts at Practical, and Cicvara and she had met on two prior occasions. Id. ¶¶ 20-21.

On June 8, 2009, while in Thailand, Cicvara had dinner with Yau, Liu, and another Practical employee. Id. ¶ 26. Liu left dinner early, because she was not feeling well. Id. After dinner, Cicvara sent Liu a text message and asked if he could bring dessert to her hotel room. Id. ¶ 27. Liu initially said no, but, in a subsequent text message, she consented to a visit. Cicvara Dep. at 69, lines 21-25. At some point after he entered Liu's hotel room, Cicvara removed his shorts and sat on her bed in his underwear. Id. at 136-38. He proceeded to massage her feet and back. Liu, who had not requested a massage, asked him to stop. Id. at 71-72, 126. At some point before leaving the hotel room, Cicvara said to Liu, "[W]hen you do that with your legs one could rape you." Id. at 86, lines 22-25.

The following day, June 9, Liu spoke with Austin Lin, a Gillette employee with whom she had worked previously. Def.'s 56(a)(1) St., ¶¶ 36, 24. Liu told Lin of Cicvara's behavior the night before. Lin encouraged her to report the incident to Andrew Yau, Practical's Chairman. Id. ¶ 36.

Also on June 9, Cicvara sent Liu the following text message: "I hope you will bew [sic] better soon. Feel terrible that can't be with you and pamper you." Id. ¶ 32. Liu responded, "Thx P. I'm fine but I have to re-emphasize that we are not either couples or lovers. Pls stop thinking about me." Id. Cicvara replied, "Right. No need to emphasize the obvious. Thx for the good time though. P." Id.

3

Case 12-338, Document 58, 07/23/2012, 671468, Page250 of 273

On either June 9 or 10,  Liu left a Hard Rock Café shirt—which Cicvara had

purchased for her earlier—outside his hotel room door.  Compare Def.'s 56(a)(1) St., ¶

31, with  Pl.'s 56(a)(2) St. at 13.  Upon discovering it, Cicvara went to Liu's room to ask

why she had returned the gift. Def.'s 56(a)(1) St., ¶ 51.  At this point, Liu called Andrew

Lin, a Gillette employee with whom she had worked previously.  Id.  Part of the ensuing

conversation between Liu and Cicvara was recorded on Lin's voicemail.  Id.

On June 10, Cicvara texted: "Just wanted to tell you that I am still in a shock and

disgusted by myself and my poor judgment of things that were going btw us.  Forgive

me if you can. P."  Cicvara Dep. at 105, lines 4-14.  On a flight from Thailand to China

later the same day, Cicvara wrote Liu an email that included the following passage:

> I would love nothing more than to take back few emotional outbreaks that I
> experinced [sic] last few days. Had I known that I would have risked losing
> such a precious thing as our friendship, I wouldn't have ever attempted
> what I so foolishly did misjudging the nature of our closeness in the last
> few days.
>
> Maybe the cultural differences that you so graciously tried to point out in
> one of our conversations did ironically played the part in what transpired
> lately.  I believe if you had taken a strong stance against my foolish
> attempts to get more out of our relation stopping it from the very
> beginning, I would have stopped then and would have still be in that
> special relation with you that meant so much to me.  By being so polite
> and trying not to hurt my feelings, you have unconciously [sic] encouraged
> my (macho? possessive? animouse? [sic] stupid?) efforts to get more than
> you were ready to give.

Def.'s 56(a)(1) St., ¶ 34. Liu responded, "I'm sorry because I don't love you but I

know you love me so.  I appreciated you in the past because were just friend.

What I cannot accept is what you did in the last few days.  Without those dirty

things we can be friends."  Id. ¶ 35.  Cicvara replied, "I can promise that never

again I will be a 'dirty man' with you."  Id.

4

B.    Gillette's Response

At some point after speaking to Liu on June 9, Austin Lin told Dina Schumde,

Gillette's Human Resource Manager in Bethel, Connecticut, about the incident in Liu's

hotel room.  Def.'s 56(a)(1) St., ¶ 36.  Schmude, in turn, reported the incident to Lynn

Burnett, Gillette's Global Human Resources Director.  Id. ¶ 37.

On June 11, Schmude and Senior Human Resources Manager, Peggy

Wilczewski, discussed the incident with Liu by phone.  Id. ¶ 38.  The following day, Liu

forwarded copies of some of the text message and e-mails Cicvara and she had

exchanged during the trip.  Id. ¶ 40.  She also reviewed and edited Wilczewski's notes

of their phone interview for accuracy.  Id.

On June 14, Andrew Yau, Practical's Chairman, emailed Nitesh Singh, Gillette's

Senior Purchasing Manager, to let him know that Cicvara had made "inappropriate

sexual advances toward [Liu]" and that Cicvara was no longer welcome at Practical.  Id.

¶ 42; Cicvara Dep. Ex. 12.

On June 15, Burnett, Wilczewki, and Cicvara's supervisor, Kevin Babis, met with

Cicvara to discuss Liu's allegations.  Id. ¶ 44.  At the meeting, Cicvara admitted that he

had gone to Liu's hotel room on June 8 and that, while there, he had touched her.  Id. ¶

45.  He also admitted that he made the comment, "When you do such things with your

leg, one could rape you."  Id.; Pl.'s 56(a)(2) at 23.

At the end of the meeting, Burnett, Babis, and Wilczewski left the room to confer

privately.  Id. ¶ 48.  After unanimously deciding that Cicvara's misconduct warranted

termination, they informed Cicvara that he was being discharged from his position at

Gillette.  Id.

C.    Forfeiture of Plaintiff's Stock Options

Over the course of his employment at Gillette, Cicvara was awarded several thousand stock options pursuant to the Gillette 1971 Stock Option Plan ("the Plan"). Section 6(f) of the Plan provides: [I]f an employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment. Cicvara Dep. Ex. 15 at 8. The Plan further states that "a discharge for 'Cause' shall have occurred where a Participant is terminated because of . . . (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary." Id. at 8-9.

The Plan is administered by a Compensation Committee, which is granted express authority to "decide all questions and settle all controversies and disputes which may arise in connection with the Plan." Id. at 2.  The Plan further provides that "[a]ll decisions, determinations and interpretations of the Committee shall be binding on all parties concerned." Id. at 2.

Finally, the Plan states that it, and each option issued under it, "shall be governed by and construed in accordance with the laws of the State of Ohio." Id. at 16.

Cicvara attempted to exercise his stock options on July 2, 3009.  Def.'s 56(a)(1) St., ¶ 61. Gillette rejected the attempt, maintaining that, because Cicvara had been terminated for cause, his stock options were automatically forfeited pursuant to Section 6(f) of the Plan.  Id.

6

### III.    SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

### IV.    DISCUSSION

A.    Applicable Law

The Plan provides that it and each option issued under it "shall be governed by and construed in accordance with the laws of the State of Ohio." Cicvara Dep. Ex. 15 at 16.  Under Connecticut law, a choice-of-law clause will typically be given effect,

provided the choice was made in good faith. <u>Messler v. Barnes Group, Inc.</u>, 1999 WL 61034, at *3 (Conn. Super. Feb. 1, 1999).  Here, neither party disputes the validity of the Plan's choice of Ohio law.  Accordingly, the court looks to Ohio law to evaluate Cicvara's breach of contract claim regarding the termination of his stock options.

     B.   <u>Scope of Review</u>

     To prevail on his breach of contract claim, Cicvara must establish the existence of a contract, performance by him, a breach by Gillette, and damage or loss to him. <u>See, e.g.</u>, <u>Doner v. Snapp</u>, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994).  Gillette does not dispute that the Plan constituted a contract, but it argues that Civara cannot establish that he performed and that Gillette breached its duties under the Plan.  Def.'s Mem. in Supp. at 10.

     As discussed earlier, the Plan provides that, if an employee is fired for "Cause," his stock options shall "immediately be cancelled." Cicvara Dep. Ex. 15 at 8.  Further, it defines "Cause" to include "gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary." <u>Id.</u> at 8–9.  Cicvara argues that the determination of whether he performed and Gillette breached is dependent on a determination of whether his behavior in Thailand can fairly be considered "gross misconduct which is materially and demonstrably injurious to the company or the subsidiary."  While acknowledging that his behavior "could be deemed inappropriate," Cicvara contends that the question of whether it rose to the level of "gross misconduct" is a disputed issue of fact that must be decided by the jury. Pl.'s Mem. in Opp. at 6.

     Gillette, on the other hand, argues that "an employer's decision to terminate an employee's non-ERISA benefits, such as stock options, should be set aside only if the

8

employer's decision was arbitrary and capricious." Def.'s Mem. in Supp. at 13. Under this standard of review, the court need not make an independent determination of whether Cicvara's behavior was, in fact, gross misconduct. Instead, it simply needs to decide whether Gillette had "a reasonable basis" for its own determination. Id.

The court's survey of Ohio law reveals no decisions that specifically address the extent to which a court should review a company's decision to terminate an employee's stock options. As such, the court must "carefully predict how [Ohio's] highest court would resolve [the issue]." Travelers Ins. Co. v. Carpenter, 411 F.3d 323, 329 (2d Cir. 2005) (internal quotation marks and citations omitted). In doing so, the court should "give the fullest weight to pronouncements of the state's highest court . . . while giving proper regard to relevant rulings of the state's lower courts." Maska U.S., Inc. v. Kansa Gen. Ins. Co., 198 F.3d 74, 78 (2d Cir. 1999). Finally, it "may also consider decisions in other jurisdictions on the same or analogous issues." Id.; see also Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 299 (2d Cir. 2000) (finding that the New York Court of Appeals would likely "follow the majority of states" on an issue); Vigortone AG Prods., Inc. v. PM AG Prods. Inc., 316 F.3d 641, 644 (7th Cir. 2002) ("[T]he best guess is that the state's highest court, should it ever be presented with the issues, will line up with the majority of the states.")

Several courts outside of Ohio have held that, where a stock option plan expressly grants an employer discretion to interpret its terms, the employer's decision to cancel an employee's options is subject only to arbitrary-and-capricious review. See, e.g., Noonan v. Staples, Inc., 556 F.3d 20, 33 (1st Cir. 2009) (surveying decisions in other states and predicting that the Massachusetts Supreme Court would overturn an

9

employer's determination that an employee engaged in "willful misconduct" only if that decision was "arbitrary, capricious, or made in bad faith"); Weir v. Anaconda Co., 773 F.2d 1073, 1078 (10th Cir. 1985) (under Kansas law, "the plan committee's decision [to terminate stock options] must be upheld if it was properly within the committee's discretion and not arbitrary, in bad faith, or fraudulent"); Welland v. Citigroup, 2003 WL 22973574, at *11 (S.D.N.Y. 2003) ("Under New York law, an employer's decision regarding non-ERISA benefits may be set aside only where it was made in bad faith was arbitrary or was the result of fraud."); W.R. Berkley Corp. v. Hall, 2005 WL 406348, at *4 (Del. Super. Feb. 16, 2005) ("[W]hen a stock option committee is vested with final, binding, and conclusive authority to determine a participant's right to receive or retain benefits, that decision made in accordance with the provisions of the agreement will not be second guessed by the Court absent a showing of fraud or bad faith."); McIntyre v. Phila. Suburban Corp., 90 F. Supp.2d 596, 600 (E.D. Pa. 2000) (holding that a compensation committee's decisions regarding administration of a stock option plan should be afforded significant deference).

Furthermore, while Ohio courts have not addressed the standard of review for termination of employee stock options, they have approved limited review in the context of other employment benefit disputes. See, e.g., Rehor v. Ohio Case Western Reserve University, 331 N.E. 2d 416, 422 (Ohio 1975) (upholding a university board's contractually reserved right to change the retirement age for tenured faculty members where such change was reasonable and uniformly applicable); State ex rel. Merrill v. Greenbaum, 84 N.E.2d 253, 255 (Ohio Ct. App. 1948) (interpreting pension fund rule stating that a board "may" grant benefits to eligible employees as conferring discretion

10

to deny benefits to any employee so long as that denial was not "captious, arbitrary, or

unreasonable"). Additionally, in breach of contract suits for wrongful discharge, Ohio

courts have expressed a reluctance to second-guess an employer's interpretation of

what constitutes "cause" for termination.  See, e.g., Washington v. Cent. State Univ.,

699 N.E.2d 1016, 1019 (Ohio Ct. Cl. 1998) ("The court has previously acknowledged

that it may not substitute its judgment for that of the employer and may not second-

guess the business judgments of employers making personnel decisions.") (internal

citations omitted"); Lynch v. EG&G Mound, Inc., 1999 WL 34790, at *8 (Ohio Ct. App.

Jan. 29, 1999) (stating same general rule).

In light of these precedents and the Plan language stating that Gillette's

Compensation Committee "shall have authority . . . to decide all questions and settle all

controversies and disputes which may arise in connection with the Plan," Cicvara Dep.

Ex. 15 at 1–2, the court predicts that the Ohio Supreme Court would hold that Gillette's

decision that Cicvara had engaged in "gross misconduct which is materially and

demonstrably injurious to the company or the subsidiary" may be reviewed only to

determine if it was arbitrary, capricious, or made in bad faith.

C.    Reasonableness of Gillette's Determination

On the basis of the evidence presented, no rational trier of fact could find that

Gillette failed to exercise its discretion reasonably and in good faith.  Cicvara disputes

none of the following:  Gillette received information suggesting that he had made

unwanted sexual advances toward Bel Liu, an employee of Practical, a Gillette supplier.

When contacted by Gillette representatives, Liu confirmed the allegations and provided

copies of emails and text messages that corroborated her version of events.

11

Additionally, Cicvara does not dispute that Gillette's relationship with Practical was already strained prior to this incident, or that, upon learning of the incident, Practical's Chairman informed Gillette that Cicvara was no longer welcome at his company's facilities. Finally, while Cicvara challenges the accuracy of Wilczewski's notes from the meeting at which he was terminated, Pl.'s 56(a)(2) at 21, he does no dispute that, at this meeting, he admitted that he went to Liu's hotel room, touched her, and said, "When you do such thing[s] with your legs, one could rape you." Id. at 24.

In the face of the aforementioned undisputed facts, no rational juror could find that Gillette lacked a reasonable, good faith basis to determine, first, that Cicvara had engaged in gross misconduct, and, second, that this misconduct was materially and demonstrably injurious to Gillette.[2] As a result, Cicvara cannot show that Gillette breached a contractual duty when it terminated his stock options pursuant to Section 6(f)(B) of the plan, and Gillette is entitled to summary judgment on this claim.

## V.  CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 74) is **granted**, and the plaintiff's Cross Motion for Summary Judgment (Doc. No. 85) is **denied**.

---

[2] Cicvara questions Lin's motives for reporting the incident in Bangkok, alleging that Lin and Liu had an "intimate relationship." Pl.'s 56(a)(2) St. at 17. He further suggests that Yau and Liu conspired to entrap him, id. at 20, and that Yau intended "to use [the] alleged sexual harassment of Bel Liu as leverage, to improve his business with Duracell." Id. at 17. Lin's, Liu's, and Yau's motivations or biases, however, are irrelevant to the question of whether Gillette's evaluation of the information they provided regarding Civara's conduct—the essence of which was admitted to by Cicvara—was arbitrary, capricious, or made in bad faith.

12

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 22nd day of November, 2011.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PREDRAG CICVARA,

v.                                          3:09cv2054(JCH)

GILLETTE CO.,
DURACELL,
LYNNE BURNETT,
PROCTOR & GAMBLE CO., INC.

## J U D G M E N T

This matter came on before the Honorable Janet C. Hall, United States District

Judge, as a result of defendants' Motion for Summary Judgment, plaintiff''s Cross

Motion for Summary Judgment, and Motion to Dismiss filed by defendant Lynne

Burnett.

The Court has reviewed all of the papers filed in conjunction with the motions.

On November 22, 2011, the court entered a Ruling granting defendants' Motion and

denying plaintiffs' Motion.   In addition, on July 22, 2010, the court entered an order, on

the record, granting Motion to Dismiss as to defendant Lynne Burnett.

Therefore, it is ORDERED and ADJUDGED that judgment is entered for the

defendants, against the plaintiff, and the case is closed.

Dated at Bridgeport, Connecticut, this 29th day of November, 2011.

Robin D. Tabora, Clerk

By /s/ Bernadette J. DeRubeis
Deputy Clerk

Entered on Docket _____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**FILED**

2012 JAN 19 A 9:26

U.S. DISTRICT COURT
BRIDGEPORT, CONN

CICVARA, PREDRAG               :   3:9-CV-2054(JCH) (HF)
          Plaintiff,            :

V.                             :   NOTICE OF APPEAL

THE GILLETTE COMPANY et al     :
          Defendant.            :   JANUARY 19, 2012


Notice is hereby given that PREDRAG CICVARA Plaintiff in the above-named case hereby

appeal to the United States Court of Appeals for the Second Circuit from the final judgment

entered in this action on the 13th day of December 2011.


Igor I. Sikorsky, Jr.
P.O. Box 38
Unionville, CT 06085
(860) 675-5313
CT Fed Bar No.:04233

A-835

APPEAL, CLOSED, EFILE

## U.S. District Court
## United States District Court for the District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:09−cv−02054−JCH

Cicvara v. Gillette Co et al
Assigned to: Judge Janet C. Hall
Cause: 28:1332 Diversity−Notice of Removal

Date Filed: 12/17/2009
Date Terminated: 11/30/2011
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Diversity

**Plaintiff**

**Predrag Cicvara**

represented by **Igor I. Sikorsky , Jr.**
PO Box 38
Unionville, CT 06085
860−675−5313
Fax: 860−675−7104
Email: igorbox38@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael E. Skiber**
Law Office of Michael E. Skiber, LLC
135 Elm Street
Bridgeport, CT 06604
203−615−0090
Email: skiberlaw@gmail.com
*TERMINATED: 11/05/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Gillette Co**

represented by **Edward Cerasia , II**
Seyfarth Shaw , LLP− NY
620 Eighth Avenue
New York, NY 10018
212−218−5611
Fax: 917−344−1272
Email: ecerasia@seyfarth.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hema Chatlani**
Seyfarth Shaw − 8th Ave NY
620 Eighth Ave
New York, NY 10018−1405
212−218−5514
Fax: 917−344−1232
Email: hchatlani@seyfarth.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard I. Scharlat**
Greenberg, Traurig
Met Life Bldg.
200 Park Ave.
New York, NY 10166
Email: rscharlat@seyfarth.com
*LEAD ATTORNEY*

ATTORNEY TO BE NOTICED

**Defendant**

**Proctor &Gamble Co**
*TERMINATED: 01/06/2010*

represented by **Edward Cerasia , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard I. Scharlat**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Duracell**

**Defendant**

**LYNNE BURNETT**
*TERMINATED: 07/22/2010*

represented by **Edward Cerasia , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hema Chatlani**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard I. Scharlat**
Greenberg, Traurig
200 Park Ave.
New York, NY 10166
Email: rscharlat@sevfarth.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Proctor &Gamble Co., Inc**

represented by **Edward Cerasia , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hema Chatlani**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard I. Scharlat**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/17/2009 | 1 | NOTICE OF REMOVAL from JD of Fairfield, case number FBT–CV09–5028901–S., filed by Gillette Co, Proctor &Gamble Co. (Attachments: # 1 Exhibit)(Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 2 | NOTICE of Appearance by Richard I. Scharlat on behalf of Gillette Co, Proctor &Gamble Co (Bauer, J.) (Entered: 12/22/2009) |

| 12/17/2009 | 3 | NOTICE of Appearance by Edward Cerasia, II on behalf of Gillette Co, Proctor &Gamble Co (Bauer, J.) (Entered: 12/22/2009) |
|---|---|---|
| 12/17/2009 | 4 | Compliance with Standing Order by Gillette Co, Proctor &Gamble Co (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 5 | NOTICE of No Pending Motions by Gillette Co, Proctor &Gamble Co (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 6 | Corporate Disclosure Statement by Gillette Co, Proctor &Gamble Co. (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 7 | ELECTRONIC FILING ORDER -- PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Janet C. Hall on 12/17/09. (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 8 | PROTECTIVE ORDER. Signed by Judge Janet C. Hall on 12/17/09. (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | 9 | Order on Pretrial Deadlines: Motions to Dismiss due on 3/17/2010. Amended Pleadings due by 2/15/2010 Discovery due by 6/18/2010 Dispositive Motions due by 7/18/2010. Signed by Clerk on 12/17/09. (Bauer, J.) (Entered: 12/22/2009) |
| 12/17/2009 | | Filing fee: $ 350.00, receipt number B018994 (Jaiman, R.) (Entered: 12/22/2009) |
| 12/22/2009 | 10 | Consent MOTION for Extension of Time until January 22, 2010 (pursuant to Local Rule 7(b)) to file a responsive pleading to Plaintiffs Complaint re: 1 Notice of Removal by Gillette Co, Proctor &Gamble Co. (Attachments: # 1 Certificate of Service)(Cerasia, Edward) (Entered: 12/22/2009) |
| 12/23/2009 | 11 | ORDER granting 10 Motion for Extension of Time. The court expects this will be the only extension. SO ORDERED by Judge Janet C. Hall on 12/23/09. (Volek, J.) (Entered: 12/23/2009) |
| 12/29/2009 | | Answer deadline updated for Gillette Co to 1/22/2010; Proctor &Gamble Co to 1/22/2010. (DeRubeis, B.) (Entered: 12/29/2009) |
| 01/06/2010 | 12 | NOTICE of Appearance by Michael E. Skiber on behalf of Predrag Cicvara (Skiber, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 13 | First MOTION to Amend/Correct *COMPLAINT ONCE AS A MATTER OR COURSE* by Predrag Cicvara.Responses due by 1/27/2010 (Skiber, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 14 | AMENDED COMPLAINT *ONCE AS A MATTER OF COURSE* against all defendants, filed by Predrag Cicvara.(Skiber, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 15 | First MOTION to Remand to State Court *AND JOINDER OF PARTY* by Predrag Cicvara.Responses due by 1/27/2010 (Skiber, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 16 | First Memorandum in Support re 15 First MOTION to Remand to State Court *AND JOINDER OF PARTY* filed by Predrag Cicvara. (Skiber, Michael) Modified on 1/22/2010 TO CREATE DOCKET ENTRY RELATIONSHIP TO DOC #17 (Simpson, T.). (Entered: 01/06/2010) |
| 01/06/2010 | 17 | MOTION for Joinder by Predrag Cicvara --ORIGINALLY E-FILED IN ERROR AS PART OF DOCUMENT # 15; REDOCKETED TO PROPERLY IDENTIFY AS A TWO PART MOTION (Simpson, T.) (Entered: 01/22/2010) |
| 01/11/2010 | | Summons Issued as to LYNNE BURNETT. (Simpson, T.) (Entered: 01/11/2010) |
| 01/22/2010 | 18 | ANSWER to 14 Amended Complaint with Affirmative Defenses. *dated 1/22/2010* by Gillette Co, LYNNE BURNETT, Proctor &Gamble Co.(Scharlat, Richard) (Entered: 01/22/2010) |
| 01/22/2010 | 19 | CERTIFICATE OF SERVICE by Gillette Co, Proctor &Gamble Co., Inc re 18 Answer to Amended Complaint (Scharlat, Richard) (Entered: 01/22/2010) |
| 01/22/2010 | 20 | MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint* by Gillette Co, LYNNE BURNETT, Proctor &Gamble Co., |

| | | Inc.Responses due by 2/12/2010 (Attachments: #_1 Affidavit of Lynne Burnett dated 1/16/2010 in support of motion, #_2 Certificate of Service dated 1/22/2010)(Scharlat, Richard) (Entered: 01/22/2010) |
|---|---|---|
| 01/22/2010 | 21 | Memorandum in Support re_20 MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint dated 1/22/2010 and in opposition to plaintiff's motion to remand to state court and for joinder* filed by Gillette Co, LYNNE BURNETT, Proctor &Gamble Co., Inc, Proctor &Gamble Co. (Scharlat, Richard) (Entered: 01/22/2010) |
| 02/12/2010 | 22 | OBJECTION re_20 MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint* filed by Predrag Cicvara. (Attachments: #_1 Memorandum in Support OBJECTION TO MOTION TO DISMISS)(Skiber, Michael) (Entered: 02/12/2010) |
| 02/12/2010 | 23 | RESPONSE re_18 Answer to Amended Complaint *REPLY TO SPECIAL DEFENSES* by Predrag Cicvara. (Attachments: #_1 Affidavit CERTIFICATION OF SERVICE)(Skiber, Michael) (Entered: 02/12/2010) |
| 02/12/2010 | 24 | CERTIFICATE OF SERVICE by Predrag Cicvara *OBJECTION TO MOTION TO DISMISS* (Skiber, Michael) (Entered: 02/12/2010) |
| 02/12/2010 | 25 | Memorandum in Opposition re_20 MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint* filed by Predrag Cicvara. (Skiber, Michael) (Entered: 02/12/2010) |
| 02/25/2010 | 26 | REPLY to Response to_20 MOTION to Dismiss *dated 1/22/2010 Count Eight and Lynne Burnett from the amended complaint* filed by LYNNE BURNETT. (Attachments: #_1 Certificate of Service)(Cerasia, Edward) (Entered: 02/25/2010) |
| 03/08/2010 | 27 | NOTICE TO COUNSEL/PRO SE PARTIES, ( Rule 26 Meeting Report due by 3/29/2010). Signed by Clerk on 3/8/10. (Gutierrez, Y.) (Entered: 03/10/2010) |
| 03/19/2010 | 28 | NOTICE OF E–FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Conference set for 3/24/2010 02:00 PM in Chambers Room 417, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. Counsel are requested to participate in this conference via telephone. This conference call is to be arranged between counsel. Once all parties are on the line, please telephone chambers at (203) 579–5554 (Volek, J.) (Entered: 03/19/2010) |
| 03/22/2010 | 29 | First MOTION to Withdraw_15 First MOTION to Remand to State Court *AND_17 Motion for Joinder of Party Lynne Burnett* by Predrag Cicvara. (Attachments: #_1 Affidavit Certificate of Service)(Skiber, Michael) Modified on 3/23/2010 TO CREATE DOCKET ENTRY RELATIONSHIP TO DOC #17 (Simpson, T.). (Entered: 03/22/2010) |
| 03/24/2010 | 30 | Joint REPORT of Rule 26(f) Planning Meeting. (Attachments: #_1 Joint Statement Pursuant to Clerks Order Dated March 8, 2010)(Cerasia, Edward) (Entered: 03/24/2010) |
| 03/24/2010 | 31 | Minute Entry. Telephone Conference held before Judge Janet C. Hall on 3/24/2010: granting as of right_13 Motion to Amend/Correct; granting_29 Motion to Withdraw; withdrawing_15 Motion to Remand to State Court; withdrawing_17 Motion for Joinder, for the reasons stated on the record. 15 minutes (Court Reporter T. Fidanza.) (Volek, J.) (Entered: 03/24/2010) |
| 03/31/2010 | 32 | SCHEDULING ORDER re:_30 Joint REPORT of Rule 26(f) Planning Meeting. Discovery due by 8/1/2010 Dispositive Motions due by 9/1/2010 Status Report due by 6/30/2010 Trial Brief due by 9/1/2010. Signed by Judge Janet C. Hall on 3/31/2010. (Simpson, T.) (Entered: 03/31/2010) |
| 05/20/2010 | 33 | MOTION for Leave to Appear Pro Hac Vice Attorney Hema Chatlani. Filing Fee $25.00. Receipt Number B019726. by LYNNE BURNETT, Gillette Co, Proctor &Gamble Co., Inc. (Simpson, T.) Modified on 5/21/2010 (Villano, P.). (Entered: 05/20/2010) |

| 05/20/2010 | 34 | ORDER granting 33 Motion for Attorney Hema Chatlani to Appear Pro Hac Vice. Signed by Clerk on 5/20/2010. (Simpson, T.) Modified on 5/21/2010 (Villano, P.). Modified on 5/21/2010 (Villano, P.). (Entered: 05/20/2010) |
|---|---|---|
| 05/21/2010 | 35 | Docket Entry Correction re 33 MOTION for Leave to Appear Pro Hac Vice Attorney Hema Chatlani. Filing Fee $25.00. Receipt Number B019726., 34 Order on Motion to Appear. Corrected attorney's name that is appearing pro hac vice (Villano, P.) (Entered: 05/21/2010) |
| 06/01/2010 | 36 | PROPOSED ORDER *GOVERNING THE TREATMENT OF CONFIDENTIAL MATERIAL, filed* by LYNNE BURNETT, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Text of Proposed Order)(Cerasia, Edward) (Entered: 06/01/2010) |
| 06/09/2010 | 37 | NOTICE of Appearance by Hema Chatlani on behalf of LYNNE BURNETT, Gillette Co, Proctor &Gamble Co., Inc (Chatlani, Hema) (Entered: 06/09/2010) |
| 06/14/2010 | 38 | MOTION for Extension of Time until July 15, 2010 Rule 26(a)(2)(B) Disclosures 32 Scheduling Order, by Predrag Cicvara. (Skiber, Michael) (Entered: 06/14/2010) |
| 06/16/2010 | 39 | MOTION to Compel *Production of Documents* by Predrag Cicvara.Responses due by 7/7/2010 (Attachments: # 1 Affidavit Certification of Service, # 2 Exhibit Notice of Manual Filing)(Skiber, Michael) (Entered: 06/16/2010) |
| 06/17/2010 | 40 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing as to 39 MOTION to Compel Production of Documents set for 6/29/2010 10:30 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. (Volek, J.) (Entered: 06/17/2010) |
| 06/22/2010 | 41 | Consent MOTION to Continue *, filed* by LYNNE BURNETT, Gillette Co, Proctor &Gamble Co., Inc. (Cerasia, Edward) (Entered: 06/22/2010) |
| 06/23/2010 | 42 | ORDER granting 41 Motion to Continue. A rescheduled calendar will issue. SO ORDERED by Judge Janet C. Hall on 6/23/10. (Volek, J.) (Entered: 06/23/2010) |
| 06/25/2010 | 43 | NOTICE OF rescheduled E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing as to 39 MOTION to Compel Production of Documents previously set for 6/29/2010 10:30 AM has been RESCHEDULED for 7/20/2010 03:30 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. (Volek, J.) (Entered: 06/25/2010) |
| 06/30/2010 | 44 | Joint STATUS REPORT *of COUNSEL, submitted in accordance with Judge Janet C. Hall's 3/31/10 SCHEDULING ORDER REGARDING CASE MANAGEMENT PLAN [Docket Entry No. 32], filed* by LYNNE BURNETT, Predrag Cicvara, Gillette Co, Proctor &Gamble Co., Inc. (Cerasia, Edward) (Entered: 06/30/2010) |
| 07/07/2010 | 45 | Memorandum in Opposition re 39 MOTION to Compel *Production of Documents* filed by LYNNE BURNETT, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Exhibit A, # 2 Certificate of Service)(Cerasia, Edward) (Entered: 07/07/2010) |
| 07/13/2010 | 46 | Sealed Document: Exhibits A—E to the Motion to Compel Discovery and Supporting Memorandum by Predrag Cicvara re 39 MOTION to Compel *Production of Documents*. (Simpson, T.) (Entered: 07/13/2010) |
| 07/22/2010 | 47 | Minute Entry. Proceedings held before Judge Janet C. Hall: Hearing held on 7/20/10, granting 38 Motion for Extension of Time nunc pro tunc; denying without prejudice to renew 39 Motion to Compel, and taking under advisement remaining request; granting 20 Motion to Dismiss, all as stated on the record. The plaintiff is granted leave to file a Second Amended Complaint. Total Time: 1 hours and 20 minutes. (Court Reporter T. Fidanza.) (Volek, J.) Modified on 7/29/2010 to correct motion relief(DeRubeis, B.). (Main Document 47 replaced on 7/29/2010) (DeRubeis, B.). (Entered: 07/22/2010) |

| | | |
|---|---|---|
| 07/27/2010 | 48 | Joint MOTION for Extension of Time *re: Docket Entry #32* Scheduling Order, by LYNNE BURNETT, Predrag Cicvara, Gillette Co, Proctor &Gamble Co., Inc, Duracell. (Cerasia, Edward) Modified on 7/28/2010 (Simpson, T.). (Entered: 07/27/2010) |
| 07/28/2010 | | Docket Entry Correction re 48 Joint MOTION for Extension of Time MODIFIED TO ADD DEFENDANT DURACELL AS A FILER TO THE DOCKET ENTRY (Simpson, T.) (Entered: 07/28/2010) |
| 07/29/2010 | 49 | Docket Entry Correction: Minute Entry corrected to reflect motion relief. Proceedings held before Judge Janet C. Hall: Hearing held on 7/20/10, granting 38 Motion for Extension of Time nunc pro tunc; denying without prejudice to renew 39 Motion to Compel, and taking under advisement remaining request; granting 20 Motion to Dismiss, all as stated on the record. The plaintiff is granted leave to file a Second Amended Complaint. Total Time: 1 hours and 20 minutes. (Court Reporter T. Fidanza.) (Volek, J.) Modified on 7/29/2010 to correct motion relief (DeRubeis, B.). (Main Document 47 replaced on 7/29/2010) (DeRubeis, B.) (Entered: 07/29/2010) |
| 07/29/2010 | 50 | ORDER granting 48 Joint MOTION for Extension of Time re: Docket Entry # 32 Scheduling Order, by LYNNE BURNETT, Predrag Cicvara, Gillette Co, Proctor &Gamble Co., Inc, Duracell. The court notes that it does not recall suggesting plaintiff "file additional document requests." He is not barred from doing so, but he and the defendant should be mindful that the court does not expect to extend these deadlines. SO ORDERED by Judge Janet C. Hall on 7/29/2010. (DeRubeis, B.) (Entered: 07/29/2010) |
| 07/29/2010 | | Set Deadlines/Hearings: Discovery due by 12/15/2010 Dispositive Motions due by 1/17/2011 Trial Brief due by 1/17/2011 (DeRubeis, B.) (Entered: 07/29/2010) |
| 08/19/2010 | 51 | NOTICE by LYNNE BURNETT, Gillette Co, Proctor &Gamble Co., Inc (Attachments: #1 Exhibit A to Defendants' Letter Notice, #2 Exhibit B to Defendants' Letter Notice, #3 Exhibit C to Defendants' Letter Notice, #4 Exhibit D to Defendants' Letter Notice)(Cerasia, Edward) (Entered: 08/19/2010) |
| 09/02/2010 | 52 | NOTICE: If any discovery issues from the motions addressed on the record on 07/20/10 (Doc. nos. 47 &49) remain pending after the filing of Defendants' Notice (Doc. no. 51), Plaintiff is directed to file a pleading raising those issues. Otherwise the court will assume those issues have been resolved. SO ORDERED by Judge Janet C. Hall on 09/02/10. (Hobbs, J.) (Entered: 09/02/2010) |
| 09/28/2010 | 53 | MOTION for Michael E. Skiber to Withdraw as Attorney by Predrag Cicvara. (Attachments: #1 Affidavit Certification of Service)(Skiber, Michael) (Entered: 09/28/2010) |
| 09/28/2010 | 54 | Second STATUS REPORT *of COUNSEL, submitted (jointly) in accordance with Judge Janet C. Hall's 3/31/10 SCHEDULING ORDER REGARDING CASE MANAGEMENT PLAN [Docket Entry No. 32], filed* by LYNNE BURNETT, Gillette Co, Proctor &Gamble Co., Inc, Predrag Cicvara . (Cerasia, Edward) Modified on 9/29/2010 (Simpson, T.). (Entered: 09/28/2010) |
| 09/29/2010 | | Docket Entry Correction re 54 Status Report MODIFIED TO ADD PLAINTIFF AS A FILER TO THE DOCKET ENTRY (Simpson, T.) (Entered: 09/29/2010) |
| 09/30/2010 | 56 | NOTICE to PLAINTIFF re 53 MOTION for Michael E. Skiber to Withdraw as Attorney. Reset Deadlines as to 53 MOTION for Michael E. Skiber to Withdraw as Attorney.(Responses due by 10/21/2010, ). Signed by Judge Janet C. Hall on 9/30/2010. (Simpson, T.) (Entered: 10/05/2010) |
| 10/04/2010 | 55 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing on 53 Motion to Withdraw set for 10/27/2010 10:30 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall (Hobbs, J.) (Entered: 10/04/2010) |
| 10/26/2010 | 57 | NOTICE of Appearance by Igor I. Sikorsky, Jr on behalf of Predrag Cicvara *Lead Counsel* (Sikorsky, Igor) (Entered: 10/26/2010) |

| 10/27/2010 | 58 | NOTICE re 55 Calendar Entry. The hearing on Attorney Skiber's Motion to Withdraw is canceled in light of the Notice of Appearance filed by Attorney Sikorsky. So ordered by Judge Janet C. Hall on 10/27/10. (Hobbs, J.) (Entered: 10/27/2010) |
|---|---|---|
| 11/05/2010 | 59 | ORDER granting 53 Motion to Withdraw as Attorney. Attorney Michael E. Skiber terminated. SO ORDERED by Judge Janet C. Hall on 11/5/2010. (DeRubeis, B.) (Entered: 11/05/2010) |
| 12/10/2010 | 60 | MOTION for Extension of Time , *filed* by LYNNE BURNETT, Gillette Co, Proctor &Gamble Co., Inc. (Cerasia, Edward) (Entered: 12/10/2010) |
| 12/10/2010 | 61 | First MOTION for Extension of Time until March 10, 2010 *For Present Counsel of Plaintiff* Plaintiff to Conclude Discovery by Predrag Cicvara. (Sikorsky, Igor) (Entered: 12/10/2010) |
| 12/13/2010 | 62 | ORDER granting 60 Motion for Extension of Time; granting in part 61 First MOTION for Extension of Time for Present Counsel of Plaintiff to Conclude Discovery by Predrag Cicvara. Discovery is to be completed by February 15, 2011 and dispositive motions by March 15, 2011. SO ORDERED by Judge Janet C. Hall on 12/13/2010. (DeRubeis, B.) (Entered: 12/13/2010) |
| 12/13/2010 | | Set Deadlines/Hearings: Discovery due by 2/15/2011 Dispositive Motions due by 3/15/2011 (DeRubeis, B.) (Entered: 12/13/2010) |
| 12/27/2010 | 63 | Third STATUS REPORT *filed* by LYNNE BURNETT, Predrag Cicvara, Gillette Co, Proctor &Gamble Co, Proctor &Gamble Co., Inc. (Chatlani, Hema) (Entered: 12/27/2010) |
| 02/14/2011 | 64 | Second MOTION for Extension of Time until 03/20/2011 *of Discovery Time* Discovery by Predrag Cicvara. (Sikorsky, Igor) (Entered: 02/14/2011) |
| 02/15/2011 | 65 | ORDER granting in part to 3/1/2011 64 Second MOTION for Extension of Time for Discovery Time by Predrag Cicvara. SO ORDERED by Judge Janet C. Hall on 2/15/2011. (DeRubeis, B.) (Entered: 02/15/2011) |
| 02/15/2011 | | Set Deadlines/Hearings: Discovery due by 3/1/2011 (DeRubeis, B.) (Entered: 02/15/2011) |
| 02/23/2011 | 66 | LETTER MOTION for Extension of Time by Gillette Co, Proctor &Gamble Co., Inc. (DeRubeis, B.) (Entered: 02/23/2011) |
| 02/23/2011 | 67 | ORDER granting 66 Letter Motion for Extension of Time. The court, treating this as a Motion to Extend the dispositive motion deadline, grants the motion to 4/1/2011. SO ORDERED by Judge Janet C. Hall on 2/23/2011. (DeRubeis, B.) (Entered: 02/23/2011) |
| 02/23/2011 | | Set Deadlines/Hearings: Dispositive Motions due by 4/1/2011 (DeRubeis, B.) (Entered: 02/23/2011) |
| 02/25/2011 | 68 | First MOTION to Compel *Prodution of Documents* by Predrag Cicvara.Responses due by 3/18/2011 (Sikorsky, Igor) (Entered: 02/25/2011) |
| 03/10/2011 | 69 | Memorandum in Opposition re 68 First MOTION to Compel *Production of Documents* filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co, Proctor &Gamble Co., Inc. (Cerasia, Edward) (Entered: 03/10/2011) |
| 03/17/2011 | 70 | MOTION for Extension of Time until April 15, 2011 To File A Dispositive Motion by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co, Proctor &Gamble Co., Inc. (Cerasia, Edward) (Entered: 03/17/2011) |
| 03/21/2011 | 71 | ORDER granting 70 MOTION for Extension of Time until April 15, 2011 To File A Dispositive Motion by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co, Proctor &Gamble Co., Inc. SO ORDERED by Judge Janet C. Hall on 3/21/2011. (DeRubeis, B.) (Entered: 03/21/2011) |
| 03/21/2011 | | Set Deadlines/Hearings: Dispositive Motions due by 4/15/2011 (DeRubeis, B.) (Entered: 03/21/2011) |

| 03/28/2011 | 72 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Conference re 68 Motion to Compel set for 4/6/2011 12:00 PM in Chambers Room 417, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. Counsel are requested to participate in this conference via telephone. This conference call is to be arranged between counsel. Once all parties are on the line, please telephone chambers at (203) 579-5554. (Hobbs, J.) (Entered: 03/28/2011) |
|---|---|---|
| 04/06/2011 | 73 | Minute Entry. Proceedings held before Judge Janet C. Hall: Motion Hearing re 68 First MOTION to Compel held on 4/6/2011. Ruling on the record denying 68 Motion to Compel. Defendant will provide additional disclosure as directed on the record. Total Time: 15 minutes(Court Reporter T. Fidanza) (Hobbs, J.) (Entered: 04/06/2011) |
| 04/15/2011 | 74 | MOTION for Summary Judgment by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc.Responses due by 5/6/2011 (Attachments: # 1 Memorandum in Support, # 2 Statement of Material Facts, # 3 Proof of Service)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 75 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Edward Cerasia II filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, Part 1 of 2, # 3 Exhibit B, Part 2 of 2, # 4 Exhibit C–D)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 76 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Dina Schmude filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Exhibit A–C)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 77 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Peggy Wilczewski filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Exhibit A–J)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 78 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Lynne Burnett filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Exhibit A–B)(Cerasia, Edward) (Entered: 04/15/2011) |
| 04/15/2011 | 79 | AFFIDAVIT re 74 MOTION for Summary Judgment Signed By Kevin Babis filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Exhibit A–B)(Cerasia, Edward) (Entered: 04/15/2011) |
| 05/03/2011 | 80 | First MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Summary Judgment until 05/27/2011 by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/03/2011) |
| 05/04/2011 | 81 | ORDER granting 80 Motion for Extension of Time to File Response/Reply re 74 MOTION for Summary Judgment. Responses due by 5/27/2011. SO ORDERED by Judge Janet C. Hall on 5/4/2011. (DeRubeis, B.) (Entered: 05/04/2011) |
| 05/26/2011 | 82 | First MOTION for Leave to File Excess Pages by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/26/2011 | 83 | First Statement of Material Facts re 74 MOTION for Summary Judgment *Material Facts In Dispute* filed by Predrag Cicvara. (Attachments: # 1 Exhibit Email June 29, 2009, # 2 Exhibit PGConduct Manual, # 3 Exhibit 1971 SOP plan 10 2004, # 4 Exhibit Letter to HK jULY 20, 2009, # 5 Exhibit Complete Depo Dec. 21, 2010, # 6 Exhibit Complete Deposition Dec. 21, 2010, # 7 Exhibit Motion for Production Jan. 3, 2011, # 8 Exhibit Defendant's Responses and Objections Feb. 7, 2011, # 9 Exhibit Blackberry Bill June 2009, # 10 Exhibit Explanation Table, # 11 Exhibit Sixth Text Message Bel Liu, # 12 Exhibit Def. Mem. of Law Opp. Plantiff July 7, 2010, # 13 Exhibit Email June 25, 2009, # 14 Exhibit Stock Options Letter June 16, 2009)(Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/26/2011 | 84 | First Memorandum in Opposition *To Gillette's* re 74 MOTION for Summary Judgment filed by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/26/2011 | 85 | First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment* by Predrag Cicvara.Responses due by 6/16/2011 (Sikorsky, Igor) (Entered: 05/26/2011) |

| 05/26/2011 | 86 | First Memorandum in Support re 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment Memorandum In Support of Cicvara's Cross Motion For Summary Judgment* filed by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/26/2011) |
|---|---|---|
| 05/26/2011 | 87 | First Statement of Material Facts re 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment*, 74 MOTION for Summary Judgment *Plaintiff's Statement Of Undisputed Material Facts Pursuant To Local Rule 56.1(A)(1)* filed by Predrag Cicvara. (Sikorsky, Igor) (Entered: 05/26/2011) |
| 05/27/2011 | 88 | ENTERED IN ERROR − First EXHIBIT *Affidavit Of Predrag Cicvara May 25, 2011* by Predrag Cicvara re 84 Memorandum in Opposition to Motion, 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment*, 74 MOTION for Summary Judgment. (Attachments: # 1 Exhibit Stock Options Letter June 16, 2009, # 2 Exhibit Notice Salary Increase June 1, 2009, # 3 Exhibit Email Andrew Yau June 25, 2009, # 4 Exhibit Facts In Chronological Order 12−21−2007, # 5 Exhibit First Part More... 2−11−2008, # 6 Exhibit Email Rob DaPra Jan. 4, 2008, # 7 Exhibit Blackberry Bill June 2009, # 8 Exhibit Exact Explanation Table, # 9 Exhibit Sixth Text Message Bel Liu, # 10 Exhibit Email Austin Lin June 9, 2009, # 11 Exhibit Letter To Duracell Lawyer July 9, 2009, # 12 Exhibit PGBusiness Conduct Manual, # 13 Exhibit 1971 SOP Plan 10 2004 Gillette Stock Plan, # 14 Exhibit Letter To HK July 20, 2009, # 15 Exhibit Complete Deposition Cicvara Dec. 21, 2010, # 16 Exhibit Email Cicvara Wilczewski June 29 2009, # 17 Exhibit Hand Written Notes Wilcz After June 30 2009)(Sikorsky, Igor) Modified on 5/31/2011 (Simpson, T.). (Entered: 05/27/2011) |
| 05/31/2011 | 89 | First AFFIDAVIT re 84 Memorandum in Opposition to Motion, 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment*, 74 MOTION for Summary Judgment *dated May 25, 2011* Signed By Predrag Cicvara filed by Predrag Cicvara. (Attachments: # 1 Exhibit Stocks Options Letter Peggy Wilcz June 16, 2009, # 2 Exhibit Notice Salary Increase June 1, 2009, # 3 Exhibit Email Andrew Yau To Lawson June 25, 2009, # 4 Exhibit FACTS PUT IN A CHRONOLOGICAL ORDER Orig. Date 12−21−2007, # 5 Exhibit FIRST PART more and the part of second Orig. Date 2 11 2008, # 6 Exhibit Email Rob DaPra Jan. 4, 2008, # 7 Exhibit Blackberry Bill June 2009, # 8 Exhibit EXACT EXPLANATION TABLE, # 9 Exhibit Page 00612 Sixth Text Message Bel Liu, # 10 Exhibit Email Austin Lin Reporting June 9, 2009, # 11 Exhibit Letter To Duracell Lawyer Skiber July, 9 2009, # 12 Exhibit PGBusiness Conduct Manual Manual WBCM REDUCED Single Page, # 13 Exhibit 1971 SOP plan 10 2004 Gillette Stock Plan, # 14 Exhibit Letter to HK 10 minutes on Monday Orig. File July, 20 2009, # 15 Exhibit Complete Deposition Cicvara Dec. 21, 2010, # 16 Exhibit Email Cicvara Wilczewski June 29, 2009, # 17 Exhibit Hand Written Notes Wilcz After June 30, 2009)(Sikorsky, Igor) (Entered: 05/31/2011) |
| 06/01/2011 | 90 | First MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Summary Judgment until June 17, 2011 by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co, Proctor &Gamble Co., Inc. (Cerasia, Edward) (Entered: 06/01/2011) |
| 06/02/2011 | 91 | ORDER granting 90 Motion for Extension of Time to File Response/Reply re 74 MOTION for Summary Judgment. Reply due by 6/17/2011. SO ORDERED by Judge Janet C. Hall on 6/2/2011. (DeRubeis, B.) (Entered: 06/02/2011) |
| 06/04/2011 | 92 | First CERTIFICATE OF SERVICE by Predrag Cicvara re 89 Affidavit,,,,, *to provide a certificate of service for document 89* (Sikorsky, Igor) (Entered: 06/04/2011) |
| 06/06/2011 | 93 | ORDER denying 82 Motion for Leave to File Excess Pages. There is no limit on exhibit pages. As best as the court can determine, plaintiff's memorandum does not exceed the page limit. SO ORDERED by Judge Janet C. Hall on 6/6/2011. (DeRubeis, B.) (Entered: 06/06/2011) |
| 06/16/2011 | 94 | REPLY to Response to 74 MOTION for Summary Judgment filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Proof of Service)(Cerasia, Edward) (Entered: 06/16/2011) |

| 06/16/2011 | 95 | Memorandum in Opposition re 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment* filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc. (Attachments: # 1 Proof of Service)(Cerasia, Edward) (Entered: 06/16/2011) |
| 06/16/2011 | 96 | Statement of Material Facts re 85 First MOTION for Summary Judgment *Notice of Cross Motion For Summary Judgment Defendants' Local Rule 56(a)2 Statement* filed by LYNNE BURNETT, Duracell, Gillette Co, Proctor &Gamble Co., Inc. (Cerasia, Edward) (Entered: 06/16/2011) |
| 11/22/2011 | 97 | RULING granting 74 Motion for Summary Judgment; denying 85 Motion for Summary Judgment. Signed by Judge Janet C. Hall on 11/22/2011. (Oliver, T.) (Entered: 11/22/2011) |
| 11/30/2011 | 98 | JUDGMENT entered in favor of Duracell, Gillette Co, Proctor &Gamble Co., Inc against Predrag Cicvara.<br><br>For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms.html. Signed by Clerk on 11/29/2011. (Oliver, T.) (Entered: 11/30/2011) |
| 11/30/2011 | | JUDICIAL PROCEEDINGS SURVEY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey (Oliver, T.) (Entered: 11/30/2011) |
| 12/21/2011 | 99 | First MOTION for Extension of Time until 01/25/2012 *For Plaintiff, Predrag Cicvara* To Perfect An Appeal 98 Judgment, 97 Order on Motion for Summary Judgment, by Predrag Cicvara. (Sikorsky, Igor) (Entered: 12/21/2011) |
| 12/22/2011 | 100 | ORDER granting 99 Motion for Extension of Time for good cause shown. SO ORDERED by Judge Janet C. Hall on 12/22/2011. (Lienke, J) (Entered: 12/22/2011) |
| 01/19/2012 | 101 | NOTICE OF APPEAL as to 98 Judgment by Predrag Cicvara. Filing fee $ 455, receipt number CTXB00001587. (Oliver, T.) (Entered: 01/19/2012) |

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

DENNIS JACOBS
CHIEF JUDGE

CATHERINE O'HAGAN WOLFE
CLERK OF COURT

Date: January 26, 2012
Docket #: 12-338cv
Short Title: Cicvara v. Gillette Co et al

DC Docket #: 09-cv-2054
DC Court: CT (NEW HAVEN)
DC Judge: Hall

## DOCKETING NOTICE

A notice of appeal filed by Appellant Cicvara in the above referenced case was docketed today as 12-338. This number must appear on all documents related to this case that are filed in this Court. For pro se parties the docket sheet with the caption page, and an Acknowledgment and Notice of Appearance Form are enclosed. In counseled cases the docket sheet is available on PACER. Counsel must access the Acknowledgment and Notice of Appearance Form from this Court's website http://www.ca2.uscourts.gov.

The form must be completed and returned within 14 days of the date of this notice. The form requires the following information:

YOUR CORRECT CONTACT INFORMATION: Review the party information on the docket sheet and note any incorrect information in writing on the Acknowledgment and Notice of Appearance Form.

The Court will contact one counsel per party or group of collectively represented parties when serving notice or issuing our order. Counsel must designate on the Acknowledgment and Notice of Appearance a lead attorney to accept all notices from this Court who, in turn will, be responsible for notifying any associated counsel.

CAPTION: This Court must use the district court caption See FRAP 12(a), 32(a). Please review the caption carefully and promptly advise this Court of any improper or inaccurate designations in writing on the Acknowledgment and Notice of Appearance form. If a party has been terminated from the case the caption may reflect that change only if the district court judge ordered that the caption be amended.

A-846

APPELLATE DESIGNATIONS: Please review whether appellant is listed correctly on the party listing page of the docket sheet and in the caption. If there is an error, please note on the Acknowledgment and Notice of Appearance Form. Timely submission of the Acknowledgment and Notice of Appearance Form will constitute compliance with the requirement to file a Representation Statement required by FRAP 12(b).

For additional information consult the Court's instructions posted on the website.

Inquiries regarding this case may be directed to 212-857-8551.