# 12-338-cv

## United States Court of Appeals
### for the
## Second Circuit

PREDRAG CICVARA,

*Plaintiff-Appellant,*

– v. –

PROCTOR & GAMBLE CO., DURACELL,
LYNNE BURNETT,

*Defendants,*

– and –

GILLETTE CO., PROCTOR & GAMBLE CO., INC.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## JOINT APPENDIX
## Volume II of III (Pages A-283 to A-582)

SEYFARTH SHAW LLP
One Century Plaza, Suite 3500
2092 Century Park East
Los Angeles, California 90067
(312) 460-5831

– and –

131 South Dearborn Street, Suite 2400
Chicago, Illinois 6063
(312) 460-5914

*Attorneys for Defendants-Appellees*

LAW OFFICE OF IGOR I. SIKORSKY, JR.
*Attorneys for Plaintiff-Appellant*
P.O. Box 38, 121 Perry Street
Unionville, Connecticut 06085
(860) 675-5313

i

# Table of Contents

**Page**

District Court Docket Sheet for Case No.
3:09-cv-02054-JCH ................................................................ A-1

Notice of Removal, Dated December 15, 2009 ......................... A-14

First Amended Complaint, Dated January 6, 2010 .................... A-26

Plaintiff's Motion for Joinder and Remand to State Court,
Dated January 6, 2010 ........................................................... A-34

Answer and Affirmation Defenses, by Defendants The Gillette
Company and Proctor & Gamble Company, Inc. ("Proctor
& Gamble"), Dated January 22, 2010 .................................... A-37

Notice of Motion to Dismiss Count Eight and Lynne Burnett
from the Amended Complaint, Dated January 22, 2010 ......... A-48

Affidavit of Defendant Lynne Burnett, in Support of Motion
and in Opposition to Plaintiff's Motion, Dated
January 22, 2010 .................................................................... A-50

Defendant Burnett's Memorandum of Law in Support of her
Motion to Dismiss Count Eight to the Amended Complaint
and Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion to Remand to State Court and for Joinder,
Dated January 22, 2010 .......................................................... A-53

Plaintiff Cicvara's Objection to Defendant's Motion to Dismiss
Count Eight to the Amended Complaint with Annexed
Memorandum of Law in Opposition to Defendant's Motion
to Dismiss Count Eight to the Amended Complaint,
Dated February 12, 2010 ........................................................ A-69

Plaintiff's Cicvara's Memorandum of Law in Opposition
to Defendant's Motion to Dismiss Count Eight to the
Amended Complaint, Dated February 12, 2010 ..................... A-82

Defendant Lynne Burnett's Reply Memorandum of Law in
Further Support of her Motion to Dismiss Count Eight,
Dated February 25, 2010 ........................................................ A-93

Notice of Motion, by Plaintiff, for Leave to First Withdraw
Motion to Permit Joinder of an Additional Party and
Remand the Case to the Superior Court of Connecticut,
Dated March 22, 2010 ............................................................ A-104

ii

**Page**

Plaintiff's Motion to Compel Discovery and Supporting
Memorandum, Dated July 16, 2010 ........................................ A-106

Defendants' Memorandum of Law in Opposition to Plaintiff's
Motion to Compel Discovery, Dated July 7, 2010 .................. A-122

Exhibit A to Memorandum of Law -
Email from Predrag Cicvara to Bel Liu,
Sent June 10, 2009 ................................................................. A-142

Minute Entry before the Hon. Janet C. Hall,
Held July 20, 2010 ................................................................. A-144

Notice of Motion, by Defendants Proctor & Gamble,
for Summary Judgment, Dated April 15, 2011 ....................... A-145

Defendants' Memorandum of Law in Support of their Motion
for Summary Judgment, Dated April 15, 2011 ....................... A-147

Defendants' Statement of Undisputed Material Facts Pursuant
to Local Rule 56.1(a)(1), Dated April 15, 2011 ..................... A-177

Declaration of Edward Cerasia, for Defendants Proctor &
Gamble, in Support of Motion, Dated April 15, 2011 ........... A-194

Exhibit A to Cerasia Declaration -
Examination Before Trial ("EBT") of Plaintiff Predrag
Cicvara, Taken December 21, 2010 (excerpt pages) .............. A-196

Exhibit B to Cerasia Declaration -

(i) Proctor & Gamble Worldwide Business Conduct
Manual, Dated December 12, 2005
(Cicvara Deposition Exhibits 1–3) ..................................... A-215

(ii) Job Description (Cicvara Deposition Exhibit 4) ........... A-282

(iii) Email between Bel Liu and Predrag Cicvara, Sent
June 12, 2009 (Cicvara Deposition Exhibit 5) .................... A-284

(iv) Email between Bel Liu and Predrag Cicvara, Sent
June 12, 2009 (Cicvara Deposition Exhibit 6) .................... A-285

(v) Email between Bel Liu and Predrag Cicvara, Sent
June 12, 2009 (Cicvara Deposition Exhibit 7) .................... A-286

(vi) Email between Bel Liu and Predrag Cicvara, Sent
June 12, 2009 (Cicvara Deposition Exhibit 9) .................... A-287

iii

**Page**

(vii) Email between Bel Liu and Predrag Cicvara, Sent
June 10, 2009 (Cicvara Deposition Exhibit 10) .................. A-288

(viii) Transcription of Conversation with Predrag Cicvara,
Dated June 15, 2009 (Cicvara Deposition Exhibit 11)........ A-290

(ix) Email from Andrew Yau to Nitesh Singh, Sent
June 14, 2009 (Cicvara Deposition Exhibit 12) .................. A-294

(x) Letter from Peggy Wilczewski to Predrag Cicvara,
Dated June 16, 2009 (Cicvara Deposition Exhibit 13)........ A-295

(xi) Email from Peggy Wilczewski to Predrag Cicvara,
Sent September 16, 2009, with Annexed Short Term
Achievement Reward (Cicvara Deposition Exhibit 14)...... A-298

(xii) The Gillette Company, 1971 Stock Option Plan,
Dated December 13, 2005 (Cicvara Deposition
Exhibit 15).......................................................................... A-305

(xiii) Letter from Predrag Cicvara to Stock Option
Administration, Dated July 3, 2009, with Annexed Notice
of Exercise (Cicvara Deposition Exhibit 16) ...................... A-323

(xiv) Letter from Peggy Wilczewski to Predrag Cicvara,
Dated July 6, 2009 (Cicvara Deposition Exhibit 17) .......... A-328

Exhibit C to Cerasia Declaration -
Emails between Andrew Yau and Erik Lawson,
Sent June 16, 2009 to June 25, 2009 ...................................... A-330

Exhibit D to Cerasia Declaration -
Cicvara Stock Options/Future Shares Account Summary,
Dated December 14, 2009 ...................................................... A-334

Declaration of Peggy Wilczewski, for Proctor & Gamble,
in Support of Motion for Summary Judgment,
Dated April 14, 2011 .............................................................. A-336

Exhibit A to Wilczewski Declaration -
Email from Dina Schmude to Peggy Wilczewski,
Sent June 11, 2009 ................................................................. A-343

Exhibit B to Wilczewski Declaration -
Email from Peggy Wilczewski to Bel Liu, Sent June 11,
2009, with Annexed Phone Conversation Transcription ........ A-344

iv

**Page**

Exhibit C to Wilczewski Declaration -
Email from Peggy Wilczewski to Lynne Burnett, Sent
June 11, 2009, with Annexed Transcription of Telephone
Conversation between Bel Liu, Dina Schmude and
Peggy Wilczewski ................................................................ A-349

Exhibit D to Wilczewski Declaration -
Email from Bell Liu to Peggy Wilczewski,
with Attachments, Sent June 12, 2009 .................................... A-354

Exhibit E to Wilczewski Declaration -
Email from Peggy Wilczewski to Lynne Burnett,
with Attachments, Sent June 12, 2009 .................................... A-367

Exhibit F to Wilczewski Declaration -
Transcription of Conversation with Predrag Cicvara, Dated
June 15, 2009 (Cicvara Deposition Exhibit 11)
(Reproduced herein at pp. A-290–A-293).............................. A-382

Exhibit G to Wilczewski Declaration -
Transcription of Telephone Conversation between
Predrag Cicvara and Peggy Wilczewski, Dated
June 15, 2009, and June 16, 2009 .......................................... A-383

Exhibit H to Wilczewski Declaration -
Letter from Peggy Wilczewski to Predrag Cicvara, Dated
June 16, 2009 (Cicvara Deposition Exhibit 13)
(Reproduced herein at pp. A-295–A-297).............................. A-385

Exhibit I to Wilczewski Declaration -
Letter from Peggy Wilczewski to Predrag Cicvara, Dated
July 6, 2009 (Cicvara Deposition Exhibit 17)
(Reproduced herein at pp. A-328–A-329).............................. A-385

Exhibit J to Wilczewski Declaration -
Email from Peggy Wilczewski to Predrag Cicvara,
Sent September 16, 2009, with Annexed Short Term
Achievement Reward (Cicvara Deposition Exhibit 14)
(Reproduced herein at pp. A-298–A-304).............................. A-385

Declaration of Kevin Babis, for Defendants Proctor & Gamble,
in Support of Motion for Summary Judgment, Dated
April 15, 2011 ....................................................................... A-386

v

**Page**

Exhibit A to Babis Declaration -
Email from Kevin Babis to Dina Schmude,
Sent June 9, 2009 .................................................................. A-389

Exhibit B to Babis Declaration -
Transcription of Conversation with Predrag Cicvara, Dated
June 15, 2009 (Cicvara Deposition Exhibit 11)
(Reproduced herein at pp. A-290–A-293)............................... A-392

Plaintiff's Statement of Material Issues in Dispute,
Dated May 26, 2011 ................................................................ A-393

Exhibit A to Statement -
Email from Predrag Cicvara to Peggy Wilczewski,
Sent June 29, 2009 ................................................................. A-425

Exhibit B to Statement -

    (a) Proctor & Gamble — World Wide Business
    Conduct Manual ................................................................ A-426

    (b) The Gillette Company, 1971 Stock Option Plan,
    Dated December 13, 2005
    (Reproduced herein at pp. A-323–A-327).......................... A-490

    (c) Letter from Predrag Cicvara to Bel Liu ........................ A-491

    (f) EBT of Plaintiff Predrag Cicvara,
    Taken December 21, 2010.................................................. A-493

Exhibit C to Statement -
EBT of Plaintiff Predrag Cicvara, Taken December 21, 2010
(Reproduced herein at pp. A-493–A-691)............................... A-692

Exhibit D to Statement -
Motion by Plaintiff for Production of Documents,
Dated May 26, 2011 ................................................................ A-693

Exhibit E to Statement -
Defendants' Response and Objections to Plaintiff's Second
Request for Production of Documents with Annexed
Defendants' Response and Objection to Plaintiff's Second
Request for Interrogatories, Dated February 7, 2011.............. A-695

Exhibit F to Statement -

    (i) T-Mobile Bill, Dated July 9, 2009................................. A-716

vi

**Page**

(ii) Charted Timeline of T-Mobile Bill,
Dated June 8, 2009 ............................................................. A-718

Exhibit G to Statement -
Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion to Compel Discovery, Dated July 7, 2010
(Reproduced herein at pp. A-122–A-141).............................. A-720

Exhibit H to Statement -
Email between Andrew Yau and Erik Lawson,
Sent June 25, 2009 ............................................................ A-721

Exhibit I to Statement -
Letter from Peggy Wilczewski to Predrag Cicvara,
Dated June 16, 2009 .......................................................... A-723

Exhibit J to Statement -
Proctor & Gamble Severance Plan for Exempt Employees
— Summary Plan Description ................................................ A-725

Memorandum in Opposition to Gillette's Motion for Summary
Judgment and in Support of Cicvara's Cross-Motion
Argument Standard for Review, Dated May 26, 2011 ............ A-727

Notice of Cross-Motion, by Plaintiff, for Summary Judgment,
Dated May 26, 2011 .......................................................... A-734

Memorandum of Law, by Plaintiff, in Support of Cross-Motion
for Summary Judgment, Dated May 26, 2011 ....................... A-736

Plaintiff's Statement of Undisputed Material Facts Pursuant to
Local Rule 56.1(A)(1), and in Support of Cross-Motion for
Summary Judgment, Dated May 26, 2011 ............................ A-739

Affidavit of Plaintiff Predrag Cicvara,
Sworn to May 31, 2011 ...................................................... A-742

Exhibit A to Cicvara Affidavit -
Letter from Peggy Wilczewski to Predrag Cicvara,
Dated June 16, 2009
(Reproduced herein at pp. A-295–A-297).............................. A-762

Exhibit B to Cicvara Affidavit -
Salary Increase Notification .................................................. A-763

**Page**

Exhibit C to Cicvara Affidavit -
Emails between Andrew Yau and Erik Lawson,
Sent June 16, 2009 to June 25, 2009
(Reproduced herein at A-330–A-333).....................................A-764

Exhibit D to Cicvara Affidavit -
Part 1 of Diversion (in Cicvara Deposition Exhibit B)...........A-765

Exhibit E to Cicvara Affidavit -
Part 2 of Diversion (in Cicvara Deposition Exhibit C)...........A-769

Exhibit F to Cicvara Affidavit -
Email from Rob DaPara to Predrag Cicvara,
Sent January 4, 2008 ...............................................................A-772

Exhibit G to Cicvara Affidavit -
T-Mobile Bill, Dated July 9, 2009
(Reproduced herein at A-716–A-717).....................................A-774

Exhibit H to Cicvara Affidavit -
Email from Dina Schmude to Bell Liu,
Sent June 10, 2009 .................................................................A-775

Exhibit I to Cicvara Affidavit -
Letter from Michael Skiber to Proctor & Gamble,
Dated July 9, 2009...................................................................A-779

Exhibit J to Cicvara Affidavit -

    (a) Proctor & Gamble — World Wide Business
    Conduct Manual
    (Reproduced herein at pp. A-426–A-489)..........................A-779

    (b) The Gillette Company, 1971 Stock Option Plan,
    Dated December 13, 2005
    (Reproduced herein at pp. A-323–A-327)..........................A-779

    (c) Letter from Predrag Cicvara to Bel Liu
    (Reproduced herein at p. A-491).......................................A-779

    (f) EBT of Plaintiff Predrag Cicvara,
    Taken December 21, 2010
    (Reproduced herein at pp. A-493–A-691)..........................A-779

viii

**Page**

Exhibit K to Cicvara Affidavit -
Email from Predrag Cicvara to Peggy Wilczewski,
Sent June 29, 2009
(Reproduced herein at p. A-425)............................................. A-779

Exhibit L to Cicvara Affidavit -
Handwritten Notes, Dated June 15, 2009................................ A-780

Defendants' Reply Memorandum of Law in Further Support
of their Motion for Summary Judgment, Dated
July 16, 2011 .......................................................................... A-790

Defendants' Memorandum of Law in Opposition to Plaintiff's
Cross-Motion for Summary Judgment, Dated
July 16, 2011 .......................................................................... A-804

Defendants' Local Rule 569(a)(2) Statement in Response
to Plaintiff's Statement of Undisputed Material Facts,
Dated July 16, 2011................................................................ A-814

Ruling re: Defendant's Motion for Summary Judgment
(Doc. No. 74) and Plaintiff's Cross-Motion for Summary
Judgment (Doc. No. 85), Entered November 11, 2011........... A-820

Judgment of the Hon. Janet C. Hall, Entered
November 30, 2011, Appealed From...................................... A-833

Notice of Appeal, Dated January 19, 2012 ................................ A-834

A-283

**Job Qualification 7:**   BS in Electrical Engineering or equivalent. Prefer training / certification in Six Sigma, MQS, QAKE, and the Quality Pillar of IWS.

**Other Information:**   Travel can be domestic and / or international (20 - 25 %).

**Related Website:**

Confidential

P's msg on 6/9                                              Page 1 of 1



**From:**  Bei [beii@practical.com.hk]
**Sent:**  Friday, June 12, 2009 3:02 AM
**To:**    Bei
**Subject:** P's msg on 6/9

After Yuen told Predrag I was on sick leave.

----- SMS -----
From: +12032430079
Sent: Jun 9, 2009 10:52
Subject: I hope you will bew better soon.

I hope you will bew better soon. Feel terrible that can't be with you and pamper you.
Sent via BlackBerryR from 3

12/14/2009

Confidential                                              PG000470

A-285

B's reply on 6/9                                                                 Page 1 of 1

**From:** Bel [bell@practical.com.hk]
**Sent:** Friday, June 12, 2009 3:04 AM
**To:** Bel
**Subject:** B's reply on 6/9



------ SMS ------
To: +12032430079
Sent: Jun 9, 2009 11:04
Subject: Thx P.

Thx P. I'm fine but I have to re-emphasis that we are not either couples or lovers. Pls stop thinking about me.
Sent via BlackBerryR from 3

12/14/2009

Confidential                                                        PG000471

P's msg-II on 6/9                                                    Page 1 of 1



From:     Bel [bell@practical.com.hk]
Sent:     Friday, June 12, 2009 3:07 AM
To:       Bel
Subject:  P's msg-II on 6/9

------ SMS ------
From: +12032430079
Sent: Jun 9, 2009 11:14
Subject: Right.

Right. No need to emphasize the obvious. Thx for the good time though. P.
Sent via BlackBerryR from 3

12/14/2009

A-287

P's msg-II on 6/10                                                          Page 1 of 1

**From:**    Bei [bell@practical.com.hk]
**Sent:**    Friday, June 12, 2009 3:12 AM
**To:**      Bei
**Subject:** P's msg-II on 6/10

After he left the hotel for airport

----- SMS ------
From: +12032430079
Sent: Jun 10, 2009 11:15
Subject: Just wanted to tell you that I am...

Just wanted to tell you that I am still in a shock and disgusted by myself and my poor judgment of things that were going btw us. Forgive me if you can. P.

Sent via BlackBerryR from 3

12/14/2009

Confidential                                                          PG000474

Case 12-338, Document 59-1, 07/23/2012, 671476, Page15 of 151

**A-288**

Re: Please Read This E-mail                                                      Page 1 of 2

| | |
|---|---|
| **From:** | Cicvara, Predrag [IMCEAEX-_O=PG_OU=FIRST+20ADMINISTRATIVE+20GROUP_CN=RECIPIENTS_CN=CICVARA+2EP@excl |
| **Sent:** | Wednesday, June 10, 2009 6:49 AM |
| **To:** | bell@practical.com.hk |
| **Subject:** | Re: Please Read This E-mail |

Life seems better now Bel. It would be very difficult without you. Listening (still in the car with Lori, River and Tanya) to Ali Farka song Ai Du (blues you listened to in Singapore). Sweet memories!

I can promise that never again I will be a "dirty man" with you.

Thank you.

Predrag Cicvara

—— Original Message ——
From: Bel <bell@practical.com.hk>
To: Cicvara, Predrag
Cc: Bel <bell@practical.com.hk>
Sent: Wed Jun 10 03:42:01 2009
Subject: Re: Please Read This E-mail

I'm sorry because I don't love you but I know you love me so. I appreciated you in the past because we were just friend. What I cannot accept is what you did in the last few days. Without those dirty things, we can be friend.
I'm on the way to airport now. Will call you in about 30 mins.

Bel

Sent via BlackBerry® from 3

From: "Cicvara, Predrag"
Date: Wed, 10 Jun 2009 02:51:19 -0400
To: <bell@practical.com.hk>
Subject: Please Read This E-mail

Hi ma Belle,

Having nothing more urgent to occupy my mind in the plane I am thinking about all the wonderfull moments that I had a privilege to experience in the last year or so, all connected to you. From your Bethel's visit last year, to our December's moments together, through the European winter, our exchange of short e-mails while traveling, receiving a postcard from you, my warm feelings about you, my desire to protect you and inexplicable closeness that I felt towards you all this time.

It was you whom I chose to confine my thoughts when I had troubles, and it appeared you chose the same by starting to confine your personal dilemmas and doubts to me. I have cherished our secret friendship deeply all the way feeling extremely strong respect for you as a person, successful business woman, as a woman and as a friend.

This is NOT changed today I guess I have desire to say and would like you to understand. I would love nothing more than to take back few emotional outbreaks that I experienced last few days. Had I known that I have risked losing such a precious thing as our friendship, I wouldn't ever have attempted what I so foolishly did misjudging the nature of our closeness in the last few days.

Maybe the cultural differences that you so graceously tried to point out in one of our conversations did ironically played the

Re: Please Read This E-mail

part in what transpired lately. I believe if you had taken a strong stance against my foolish attempts to get more out of our relation stopping it from the very beginning, I would have stopped then and would have still be in that special relation with you that meant so much to me. By being so polite and trying not to hurt my feelings you have unconciously encouraged my (macho? possessive? animouse? stupid?) efforts to get more than you were ready to give.

Foolish dirty old man! How quickly such a wonderfool friendship (at least on my part) could be destroyed!?

So I guess I am trying to tell you that regardless of what your decision about us and our friendship will be, I still will have all these little precious pieces of happiness deeply carved in my memory and nothing will take these from me ever.

I can only hope that you will understand me and remain beeing my true friend in the future. Again I can only say I am sorry for what I did to you and I know there is no real excuse for it. Not sure that I described correctly what I really feel but probably can't do it better anyway. Maybe, just maybe you could understand what went wrong a bit better.

I hope I will have a strength to send this e-mail after landing.

Sorry if reading this stream of thoughts took too much of your time, which I know you don't have much of. I simply had to write it.

Your friend Predrag


Predrag Cicvara

Confidential                                                          PG000476

A-290

Monday, June 15, 2009

Conversation with Predrag Cicvara in conf room 1W02 @ 9:15 am

Present:  Lynne Burnett, Kevin Babis, and Peggy Wilczewski

Lynne took the lead on asking questions of Predrag with Kevin Babis assisting.
Peggy recorded notes of the conversation.

Where have you been the last week with Ms. Bel Liu?
I've been in Indonesia and Thailand with her.

Did you see her for meetings and other times?
I saw her for meetings, dinner, and after dinner.

After dinner where?
In the bar.

Lynne shared that we have documentation of emails and a recorded phone
conversation.  She shared too that hotels have cameras in elevators and in lobby
areas on the main level and the floors outside the elevators.

Did you go to her room?
Yes

Why did you go to her room?
I went to her room to discuss things with her.

What kinds of things?
Some are a bit personal with her and with me.

Did she invite you to her hotel room?
Did she ask you to leave and did you refuse to leave?

Did you touch her in any way?
Yes, I was sorry for her.  She confined certain things to me that I'd rather not discuss
here.  I did not have many business discussions in her hotel room.  She confined to me
that she broke with somebody in her life.

Did you take off your clothes in her hotel room?
No.

Have you sent an email to her for being a dirty old man?
She was at some point misunderstanding my intentions.

Did you tell her that you wanted to rape her?

Confidential

A-291

Look, it was in a hotel and she was dressed in a way. I told her that I had a feeling I would rape her but I never had that in my mind and I didn't thin she'd think about it seriously.

**What did you do or say to make her uncomfortable?**
I asked if I could come to her room and she was dressed in very short shorts. I'm a man and it looks like I could rape you like that. You are showing off. I had a feeling with Bel that was very warm to her as she confined certain things to me. I had the feeling I had to protect her from the harm. She could be in harms way by her boyfriend. I wanted to help her about what I came to her room to talk to her. She said don't touch me. I touched her because she felt pain. She talked about the guy who left. I said I could rape you because she was showing off. She said please can you go and I left the room. I didn't want to harm her.

**When you were in her hotel room, was she afraid of you and she called her boss?**
When she asked me to leave, I left.

**You never touched her, never chased her, never took your clothes off? Did you ever come to her room when she did not want you?**
No.

**Was she sick in bed when you went there?**
She never told me she was sick.

**Where did this take place?**
In Bangkok at the Emporium Suites.

We were in the restaurant with the Laurie, Mr. ?????, Andrew, Andrew's wife.

I was stoking her head and tried to get her head here (pointing to his chest).

After we ate desert, I left.

**How many nights did you go to her hotel room?**
That was the night.

**How many days were you together?**
For 6 days.

**Did you attend sexual harassment training?**
Yes.

**Do you understand our company policy?**
Yes.

**Do you realize you were a company representative and this is one of our suppliers?**

Confidential

Case 12-338, Document 59-1, 07/23/2012, 671476, Page19 of 151

I think what I did was not inappropriate.

**Do you think the things you did your wife would find it appropriate?**
Strickly speaking, probably not. My wife might think I did something inappropriate. She wouldn't like me to feel for other woman.

**What do you feel for Bel?**
I have very warm feeling for Bel. I feel she is probably in not too good of a relation with her husband. She's married and didn't tell me that she was married.

**How old is Bel?**
30 I think.

**How old are you?**
54

**Is she an attractive woman?**
She a good looking woman. I don't know if she is attractive. This doesn't have anything to do with attractiveness. This kind of relationship didn't happen in ???. I'm not saying it's appropriate. She emailed things about her. It was more than a normal relationship that is in a business relationship.

**If there is a recording that you are asked to leave a room and you didn't, how do you explain that?**
I left the room. Why is there a recording? I left the room without harming her.

She apologized to me and I didn't understand why. The night when she didn't come on 2nd day of audit, she apologized and said she was sorry for what she did. Now I understand why. Oh my God.

**Why did you ask her who she had told?**
I tried to understand why she as apologizing. I asked her who she told because I couldn't sleep. I even sent her an SMS message asking why she was apologizing. She said you'll understand one day.

**Do you realize that harassment is illegal and the company and you can be sued for harassing behavior?**
I didn't want to harass anybody.

**Is there anything else that you'd like to tell us?**
Listen... I .... This is a situation that I'm sorry if I did to harm the company. I did not mean to hurt anybody. She apologized to me. I fell that to a point I was provoked. I shouldn't be saying this. If I was thinking of things the way it turned out, I should not have been touching her the way....It didn't come from one day. I believe it came close in the sense I was the person she wanted to confine in. It was a warm relationship between

PG000500

us. I'm trying to explain why maybe at some point it became personal. When she told me to leave the room, I left her room. There was nothing between us,

*Lynne Burnett, Kevin Babis, and Peggy Wilczewski asked Predrag to remain in the conference room while they left to discuss their decision about the matter. After about 10 minutes, they returned to the conference room where Predrag was waiting.*

**Lynne informed Predrag that he was being terminated from the company because he had violated our company PVPs and company policy by engaging in harassing behavior by harassing a company supplier.**

Predrag told Lynne that she has destroyed his life.

At @ 10 am Peggy and Kevin escorted Predrag to his office so he could gather his belongings. Peter from Security met them there with packing boxes. Predrag took about an hour to go through his things and pack them up in one box. He did not want to take her personal books (he was asked twice) and did not want to gather his things from the fitness center. Peggy told him that she would get his belongings from the fitness center and send them to him. Predrag left the building at about 11 am. Before he left, he told Peggy in the lobby that she has destroyed his life.

Confidential

From:    andrew [andrew@ji-net.com]
Sent:    Sunday, June 14, 2009 10:44 PM
To:      Singh, Nitesh
Subject: Private

## PRIVATE AND CONFIDENTIAL

## Dear Nitesh,

**Prediag - your factory auditor from Duracell, has been making inappropriate sexual advances towards Bel during his last trip to Practical. She is very upset and so am I.**

**I want to let you know in no uncertain terms that he is no longer welcome in Pracical in the future. Kindly send someone else for the job next time.**

**I do not want to blow this up unncessarily so I come to you as you know everyone involved. Kindly help us in handling this problem.**

**Thanks and regards**

**Andrew**

*P&G*



June 16, 2009

Mr. Predrag Cicvara
2122 North Benson Road
Fairfield, CT 06824

Dear Predrag:

The purpose of this letter is to provide you with additional information regarding the treatment of your Gillette stock options as a result of your recent termination from the Company. As we discussed earlier today, your stock options were cancelled because your employment was terminated for cause.

Section 6(f)(A) of The Gillette Company 1971 Stock Option Plan (the "Gillette Plan") states that "[i]f any employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment." The Gillette Plan's definition of "discharge for Cause" includes each of the following:

> (A)  the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board or the elected officer or manager believes that Participant has not performed his duties;

> (B)  the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or

> (C)  the Participant's conviction of a felony or a plea of nolo contendere by Participant with respect thereto.

I have enclosed a copy of The Gillette Company 1971 Stock Option Plan for your review.

PG000506

I apologize again for any confusion that resulted from conflicting information provided by the Company's stock option administrators. However, the Gillette Plan is clear on this point and the administrators did not have access to all of the facts associated with your inquiry. I have also enclosed a copy of the Gillette Plan for your review.

Regards,

*Peggy Wilczewski*

Peggy Wilczewski
Sr. Human Resources Manager

Enclosure

Confidential

PG000507

Confidential

PG000508

A-298

## Wilczewski, Peggy



| | |
|---|---|
| **From:** | Wilczewski, Peggy |
| **Sent:** | Wednesday, September 16, 2009 10:31 AM |
| **To:** | Predrag Cicvara |
| **Subject:** | RE: FY08-09 Bonus |
| **Attachments:** | STAR Bonus Information.pdf |

Predrag,

Per the attached guidelines, you must be an active employee as of June 30 (the close of the fiscal year for which the award is payable) to receive an award. Since you were terminated prior to this date, you are not eligible to receive a STAR award for 08-09.

Peggy

**From:** Predrag Cicvara [mailto:predrag.cicvara@gmail.com]
**Sent:** Tuesday, September 15, 2009 6:46 AM
**To:** Wilczewski, Peggy
**Subject:** FY08-09 Bonus

Hi Peggy,

Last time we spoke about my options and bonus, in June 2009, you have stated that, while my options are not going to be valid anymore, I will be eligible for bonus and will receive it in September 2009.

Could you please check this and let me know when can I expect payment, and in what form (electronic transfer to my account on file with P&G, or check in the mail?).

Thank you very much for your help.

Best regards,

Predrag

1

Confidential

# Short Term Achievement Reward (STAR)

## Purpose

The Short Term Achievement Reward (STAR) program is designed to support outstanding P&G business results. The purpose of the STAR program is to reward truly outstanding business achievements with compensation greater than competitive market levels. It also puts pay at risk to encourage our leaders to overcome challenges and win in the marketplace. At the same time, the STAR program rewards collaboration among business units to help P&G meet or exceed its objectives.

## Eligibility

Employees at Band 3 and above who worked at least 4 weeks during the fiscal year are eligible for any STAR award that will be paid for that year.

### Newly Eligible Participants

There are a few notes relevant to first time STAR participants:

- Newly promoted Band 3 participants and new hires will receive a prorated STAR award based on time worked at Band 3 as recorded in SAP as the official record date.
- Previous Band 2 assignments will not be considered when assigning STAR units to newly promoted Band 3s.
- All newly eligible participants during the fiscal year will receive their award in cash (excluding Belgium). Please review the section on Award Payment Preferences.
- Acquisitions and divestitures could be treated differently. Make sure you reference these guidelines for your specific situation.

### Company Separations

For reasons other than retirement or special circumstances agreed to by P&G in advance, you must be an active employee as of June 30 (the close of the fiscal year for which the award is payable) to receive an award.

If you have earned a STAR award and leave the Company prior to the STAR payment date, you will receive a cash payment in September or as soon thereafter as possible. Stock options can only be issued to active employees.

### Change in Band

STAR Target Percents are dependent on your band worked throughout the year. If you work more than one band in a fiscal year, each STAR target percent will be adjusted based on the time at each band. For example, an employee who is promoted from Band 3 to Band 4 effective April 1 would have a STAR target of 10% [(8% X 9 months) + (15% X 3 months) = 9.8% rounded up to 10%]. Reductions in band will follow the same calculation regardless of whether the move was voluntary or involuntary.

Confidential

PG000517

A-300

**Retirements / Special Separations**
If you retire or separate under approved special circumstances you must work at least four weeks of the fiscal year to be eligible for an award. Your award will be prorated based on the number of days worked in the fiscal year.

**Leave of Absence (LOA), Disability (DB), Working Less Than Full Time (LTFT)**
If you work less than 2/3 (35 weeks) of the fiscal year due to LOA/DB/LTFT, your STAR award is prorated. Prorata factors are scaled from 100% at 35 weeks worked or more, down to 0% for less than four weeks. If you work less than full time, such as a reduced work schedule, the equivalent in full time weeks worked will determine the appropriate prorata factor. Because time away from work is tracked in differently around the world, we gather the **number of weeks physically worked** directly from HR and/or line managers and the corresponding prorata factor is used to calculate your award. Vacation time and holidays will not be counted as time worked when it is taken adjacent to or in the middle of a Leave.

The following table shows the prorata percent used at certain numbers of weeks worked. Questions about individual situations should be directed to your local HR resource.

| Weeks Worked (or equivalent) | Prorata % |
|---|---|
| 35-52 | 100% |
| 34 | 97% |
| 33 | 94% |
| 32 | 91% |
| 31 | 88% |
| 30 | 85% |
| 29 | 83% |
| 28 | 80% |
| 27 | 77% |
| 26 | 74% |
| 25 | 71% |
| 24 | 68% |
| 23 | 65% |
| 22 | 62% |
| 21 | 59% |
| 20 | 56% |

| Weeks Worked (or equivalent) | Prorata % |
|---|---|
| 19 | 54% |
| 18 | 51% |
| 17 | 48% |
| 16 | 45% |
| 15 | 42% |
| 14 | 39% |
| 13 | 36% |
| 12 | 33% |
| 11 | 30% |
| 10 | 27% |
| 9 | 25% |
| 8 | 22% |
| 7 | 19% |
| 6 | 16% |
| 5 | 13% |
| 4 | 10% |
| 0-3 | 0% |

PG000518

## STAR Award Calculation

The formula for the STAR award calculation is:

**(Base Salary) x (STAR Target Percent) x (Business Unit Performance Factor) x (Total Company Results Factor) x (Prorata Factor if applicable)**

*Annualized Base Salary* as of June 30 will be used in calculating the STAR award.

| Level | STAR Target* as % of Base Salary |
|---|---|
| Band 3 | 8% |
| Band 4 - Associate Director | 15% |
| Band 5 - Director | 25% |
| Band 6 - Vice President | 45% |

Band 7 and above are handled by Executive Compensation and approved by the Compensation Committee.

The **Business Unit Performance Factor** is assigned to each business unit as a measure of success based on a retrospective assessment of unit performance over the fiscal year. Business unit factors range from 53% to 167% with a target of 100%. Business Unit Results are determined by the STAR Committee in August after fiscal year results are known. The chart below shows STAR measures that are assessed however the STAR Committee (CEO, CFO, CHRO) will take into consideration any factors that have had a significant impact on the units' results.

| MEASURE | GBU | DEVELOPED MDO | DEVELOPING MDO | GBS | CF |
|---|---|---|---|---|---|
| TSR | X | | X | | |
| After Tax Profit | X | | X | | |
| Volume | X | X | X | | |
| Net Sales | X | X | X | | |
| Value Share | X | X | X | | |
| Free Cash Flow | X | | X | | |
| Value Contribution | | X | | | X |
| Competitive Assessment | X | X | X | | |
| Cross Organization Input | X | X | X | X | X |
| Organization Head Self Assessment | X | X | X | X | X |

The **Total Company Results Factor** measures the Total Company success based on a formula that includes Earnings Per Share (EPS) growth and Organic Sales Growth over the fiscal year.  It ranges from 80% to 130%, also with a 100% target. It is applied to all STAR award calculations and is used to encourage collaboration among all Business Units.  The grid on the following page shows how these two factors combine to determine the Company Results Factor.  We use a more complete table of Factors that includes the full range of Organic Sales Growth factors and EPS Growth rates.

PG000519

For FY 09/10, we are adjusting our one year targets for the Total Company Results Factor in recognition of the reality faced in the global economy, but still focusing on the need to get back on track versus our long term goals.

- If we meet the top of the range in our external guidance (3% Organic Sales and 4% EPS growth) we will earn a 100% Total Company Results Factor.
- If we exceed external guidance, but fall short of our long term goals (5% Organic Sales and 10% EPS growth) the payout will stay at 100%.
- We can earn a factor greater than 100% if we exceed our long term goals.

| | Organic Sales Growth | | | |
|---|---|---|---|---|
| | 80% | 93% | 93% | 93% |
| | 86% | 100% | 100% | 101% |
| | 86% | 100% | 100% | 121% |
| | 95% | 108% | 108% | 130% |

## STAR Units

STAR Units are used to link you with the Business Unit(s) in which you made a significant contribution during the fiscal year. Each of the Global Business Units (GBUs), some GBU sub-units, Market Development Organizations (MDOs), Corporate Functions (CF) and Global Business Services (GBS) are identified as single STAR units. Individual STAR Unit assignments are confirmed by Business Unit's Human Resources.

### STAR Unit Weighting

The STAR Units are weighted depending on the type of assignment and business unit. Each GBU determines the weighting of their STAR units. Some individuals have "double-hatted" roles, where weights will be split evenly between GBUs.

### Transfer in assignment during fiscal year

In the event you transfer to another business unit during the year, each business unit is considered as if they were in effect for the entire year. Automatically, the highest business unit factor is used to calculate your STAR award. Note: Base salary as of June 30 is used in calculating all STAR awards regardless of assignments.

## Award Timing and Payment Forms

STAR awards are calculated after the close of the fiscal year. Payments start on September 15 or as soon thereafter as possible. You will receive an Individual Award Summary that details your STAR Target, your Business Unit Performance Factor(s) for each STAR Unit, the Corporate Adjustment Factor (and Prorata factor if needed) used to determine your award. The summaries are distributed to participants' salary managers in mid August.

Confidential

A-303

Generally, STAR awards are paid in cash however, you can choose your upcoming award in forms other than cash, such as stock options. This selection must be made before the end of the calendar year preceding the award date. In order to determine how many stock option shares should be granted we use the following formula:

STAR Award (converted to US$ if needed) ÷ stock price at close on grant date x 4.0 and then rounded up to the next whole share.

This formula, which is reviewed annually, currently yields 4.0 option shares for each theoretical share of stock. This means that a before-tax award equivalent to 100 shares of P&G stock translates to 400 stock option shares. Specific stock option terms and conditions are provided in the annual preference materials. For example, employees can keep STAR stock options as long as they leave the Company in good standing.

Remember you must be an active employee on date of payment to receive stock options. The award form choices and relevant considerations are explained at the time award payment preference materials are distributed. STAR awards for those who become eligible within the fiscal year are paid in cash. You can view your payment form at any time on Employee Resources > Compensation Program > Incentive Compensation > Award Payment Preferences.

If you selected stock options in the previous calendar year, you will be informed of your stock option details via email within two weeks of the September 15 grant date.

PG000521

# Award Payment Preferences

## Preference Process

In November of each year, if you have previously received a STAR payment, you are given the opportunity to select your payment choice for your upcoming awards payable in the following calendar year. There are various selections such as cash, stock options, local deferrals, and restricted stock units. Not all award forms are available for all plans or participants. You must make your selections in the calendar year prior to the award payment and these selections **cannot be** changed after the beginning of the calendar year of payment due to tax and legal restrictions. This link to the Award Payment Preferences website provides information about the most recent choices. Selections are not binding on the Company.

Confidential

# THE GILLETTE COMPANY
## 1971 STOCK OPTION PLAN
### (Amended and Restated as of December 13, 2005)



1.  PURPOSE. The purpose of the 1971 Stock Option Plan (hereinafter referred to as the "Plan") is to provide a special incentive to selected key salaried employees of The Gillette Company (hereinafter referred to as the "Company") and of its subsidiaries and to the non-employee members of the Board of Directors of the Company to promote the Company's business.  The Plan is designed to accomplish this purpose by offering such employees and non-employee directors a favorable opportunity to purchase shares of the common stock of the Company so that they will share in the success of the Company's business.  For purposes of the Plan a subsidiary is any corporation in which the Company owns, directly or indirectly, stock possessing fifty percent or more of the total combined voting power of all classes of stock or over which the Company has effective operating control.

1.1  ASSUMPTION OF THE PLAN.  As of the Effective Time, The Procter & Gamble Company, an Ohio corporation, has assumed the Plan according to the Merger Agreement.  Unless otherwise specified, amendments to the Plan made in connection with the Merger Agreement shall be effective upon the Effective Time.  Should the Merger not become effective, the Plan shall revert to the form as last amended by The Gillette Company through October 2004, without prejudice to any Awards then outstanding.

2.  ADMINISTRATION.  The Plan shall be administered by the Compensation Committee heretofore established by the Board of Directors of the Company, no member of which shall be an employee of the Company or of any subsidiary.  The Committee shall have authority, not inconsistently with the Plan, (a) to determine which of the key salaried employees of the Company and its subsidiaries shall be granted options; (b) to determine whether the options granted to any employees shall be incentive stock options within the meaning of the Internal Revenue Code or non-qualified stock options or both; provided, however, that with respect to options granted after December 31, 1986, in no event shall the fair market value of the stock (determined at the time of grant of the options) subject to incentive stock options within the meaning of the Internal Revenue Code which first became exercisable by any employee in any calendar year exceed $100,000 (and, to the extent such fair market value exceeds $100,000, the later granted options shall be treated as non-qualified stock options); (c) to determine the time or times when options shall be granted to employees and the number of shares of common stock to be subject to each such option provided, however, subject to adjustment as provided in Section 9 of the Plan, in no event shall any employee be granted options covering more than 1,250,000 shares of common stock in any calendar year; (d) with respect to options granted to employees, to determine the option price of the shares subject to each option and the method of payment of such price; (e) with respect to options granted to employees, to determine the time or times when each option becomes exercisable and the duration of the exercise period; (f) to prescribe the form or forms of the instruments evidencing any options granted under the Plan and of any other instruments required under the Plan and to change such forms from time to time; (g) to make all determinations as to the terms of any sales of common stock

PG000184

-2-

of the Company to employees under Section 8 of the Plan; (h) to adopt, amend and rescind rules and regulations for the administration of the Plan and the options and for its own acts and proceedings; and (i) to decide all questions and settle all controversies and disputes which may arise in connection with the Plan. All decisions, determinations and interpretations of the Committee shall be binding on all parties concerned.

3. PARTICIPANTS. The participants in the Plan shall be such key salaried employees of the Company or of any of its subsidiaries, whether or not also officers or directors, as may be selected from time to time by the Committee in its discretion, subject to the provisions of Section 8 of the Plan. In addition, each non-employee director shall be a participant in the Plan. In any grant of options after the initial grant, or any sale made under Section 8 of the Plan after the initial sale, employees who were previously granted options or sold shares under the Plan may be included or excluded.

4. LIMITATIONS. No option shall be granted under the Plan and no sale shall be made under Section 8 of the Plan after April 21, 2005, but options theretofore granted may extend beyond that date. Subject to adjustment as provided in Section 9 of the Plan, the number of shares of common stock of the Company, which may be delivered under the Plan, shall not exceed 198,800,000 in the aggregate. To the extent that any option granted under the Plan shall expire or terminate unexercised or for any reason become unexercisable as to any shares subject thereto, such shares shall thereafter be available for further grants under the Plan, within the limit specified above.

5. STOCK TO BE DELIVERED. Stock to be delivered under the Plan may constitute an original issue of authorized stock or may consist of previously issued stock acquired by the Company, as shall be determined by the Committee. The Committee and the proper officers of the Company shall take any appropriate action required for such delivery.

6. TERMS AND CONDITIONS OF OPTIONS GRANTED TO EMPLOYEES. All options granted to either non-employee directors or employees shall be subject to Paragraphs (3) and (4) of Section 6(c) below. All options granted to employees under the Plan shall be subject to all the following additional terms and conditions (except as provided in Sections 7 and 8 of the Plan) and to such other terms and conditions as the Committee shall determine to be appropriate to accomplish the purposes of the Plan:

(a) Option Price. The option price under each option shall be determined by the Committee and shall be not less than 100 percent of the fair market value per share at the time the option is granted. If the Committee so directs, an option may provide that if an employee Participant who was an employee participant at the time of the grant of the option and who is not an officer or director of the Company at the time of any exercise of the option, he shall not be required to make payment in cash or equivalent at that time for the shares acquired on such exercise, but may at his election pay the purchase price for such shares by making a payment in cash or equivalent of not less than five percent of such price and entering into an agreement, in a form prescribed by the Committee, providing for payment of the balance of such price, with interest at a specified rate, but not less than four percent, over a period not to exceed five years and containing such other provisions as the Committee in its discretion determines. In

Confidential

PG000185

Case 12-338, Document 59-1, 07/23/2012, 671476, Page34 of 151

-3-

addition, if the Committee so directs, an option may provide for a guarantee by the Company of repayment of amounts borrowed by the Participant in order to exercise the option, provided he is not an officer or director of the Company at the time of such borrowing, or may provide that the Company may make a loan, guarantee, or otherwise provide assistance as the Committee deems appropriate to enable the Participant to exercise the option, provided that no such loan, guarantee, or other assistance shall be made without approval of the Board of Directors as required by law.

(b) Period of Options. The period of an option shall not exceed ten years from the date of grant.

(c) Exercise of Option.

(1) Each option held by a participant other than a non-employee director should be made exercisable at such time or times, whether or not in installments, as the Committee shall prescribe at the time the option is granted. In the case of an option held by a participant other than a non-employee director which is not immediately exercisable in full, the Committee may at any time accelerate the time at which all or any part of the option may be exercised.

(2) Options intended to be incentive stock options, as defined in the Internal Revenue Code, shall contain and be subject to such provisions relating to the exercise and other matters as are required of incentive stock options under the applicable provisions of the Internal Revenue Code and Treasury Regulations, as from time to time in effect, and the Secretary of the Committee shall inform optionees of such provisions.

(3) Payment for Delivery of Shares. Upon exercise of any option, payment in full in the form of cash or a certified bank, or cashier's check or, with the approval of the Secretary of the Committee, in whole or part Common stock of the Company at fair market value, which for this purpose shall be the closing price on the business day preceding the date of exercise, shall be made at the time of such exercise for all shares then being purchased thereunder, except in the case of an exercise to which the provisions of the second sentence of Section 6(a) above are applicable.

The purchase price payable by any person, other than a non-employee director, who is not a citizen or resident of the United States of America and who is an employee of a foreign subsidiary at the time payment is due shall, if the Committee so directs, be paid to such subsidiary in the currency of the country in which such subsidiary is located, computed at such exchange rate as the Committee may direct. The amount of each such payment may, in the discretion of the Committee, be accounted for on the books of such subsidiary as a contribution to its capital by the Company. The Company shall not be obligated to deliver any shares unless and until, in the opinion of the Company's counsel, all applicable federal and state laws and regulations have been complied with, nor, in the event the outstanding common stock is at the time listed upon any stock exchange, unless and until the shares to be delivered have been listed or authorized to be added to the list

-4-

upon official notice of issuance upon such exchange, nor unless or until all other legal matters in connection with the issuance and delivery of shares have been approved by the Company's counsel. Without limiting the generality of the foregoing, the Company may require from the Participant such investment representation or such agreement, if any, as counsel for the Company may consider necessary in order to comply with the Securities Act of 1933 and may require that the Participant agree that any sale of the shares will be made only on the New York Stock Exchange or in such other manner as is permitted by the Committee and that he will notify the Company when he makes any disposition of the shares whether by sale, gift, or otherwise. The Company shall use its best efforts to effect any such compliance and listing, and the Participant shall take any action reasonably requested by the Company in such connection. A Participant shall have the rights of a shareholder only as to shares actually acquired by him under the Plan.

(4)(a)  Notwithstanding any other provision of this Plan, upon the occurrence of a Change of Control, as hereinafter defined, all outstanding options held by employee Participants and non-employee directors which are not yet exercisable shall become immediately exercisable and all the rights and benefits relating to such options including, but not limited to, periods during which such options may be exercised shall become fixed and not subject to change or revocation by the Company except as otherwise provided under Section 6(i).

(b) In the event that, within two years of a Change of Control, the employment of an employee Participant is terminated by the Company for any reason other than for Cause, or the employee Participant terminates employment for Good Reason, or the service as a director of a non-employee director is terminated, the applicable exercise period for all options, other than options granted prior to June 21, 2001 and designated as incentive stock options hereunder, then held by him shall be the greater of (i) a period of two years from the date of termination, and (ii) the post-termination exercise period otherwise applicable to the employee Participant under Section 6(f), or to the non-employee director under Section 12(d); provided, however, that in no event shall any option be exercisable beyond ten years from its date of grant.

(c) A Change of Control shall mean the occurrence of any of the following events:

(1) The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then-outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (B) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that, for purposes of this Paragraph (1), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Company, (ii) any acquisition by the Company, (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained

Confidential                                                                                         PG000187

-5-

by the Company or any of its subsidiaries or (iv) any acquisition by any corporation pursuant to a transaction that complies with clauses (A), (B) and (C) of Paragraph (3) below;

(2) Individuals who, as of December 16, 1999, constitute the Board of Directors (the "Board") of the Company (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; *provided, however,* that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board;

(3) Consummation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"), in each case, unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of the then-outstanding shares of common stock and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then-outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such corporation, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board providing for such Business Combination; or

(4) Approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

Confidential                                                                     PG000188

Case 12-338, Document 59-1, 07/23/2012, 671476, Page37 of 151

-6-

(d) For the purposes of the Plan, unless otherwise provided under the terms of an employment agreement with the Company or any of its subsidiaries, in which case the definition contained therein shall control, an employee Participant shall be treated as terminating his employment for "Good Reason" if he does so as a direct result of:

(i) the assignment to the Participant of any duties materially inconsistent in any respect with the Participant's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as in effect immediately prior to the Change of Control, or any other action by the Company or its subsidiaries that results in a diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and that is promptly remedied by the Company and/or the subsidiary;

(ii) a decrease in the Participant's compensation, other than an isolated, insubstantial and inadvertent failure not occurring in bad faith and that is promptly remedied by the Company and/or the subsidiary; or

(iii) the Company's or the subsidiary's requiring the Participant to be based at any office or location other than (A) the office or where the Participant was based and performed services immediately prior to the Change of Control or (B) any other location less than 35 miles from such office, or the Company's or the subsidiary's requiring the Participant to travel on business to a substantially greater extent than required immediately prior to the Change of Control.

(d) Nontransferability of Options.

(1) Except as provided in Paragraphs (2) and (3) below, no option may be transferred by a Participant otherwise than by will or the laws of descent and distribution, and during the Participant's lifetime the option may be exercised only by him.

(2) In the case of options other than (i) those options designated as incentive stock options or (ii) those options excluded from the application of this Paragraph pursuant to a Schedule to this Plan, the Committee in its sole and exclusive discretion may provide in the option agreement covering an option granted hereunder (either at the time of grant or, with the consent of the Participant, at any time thereafter) that the Participant may transfer by gift all or any part of such option to (x) his spouse, child, grandchild or other "family member" (as such term is defined for purposes of applicable securities and tax laws), to a trust having only family members as beneficiaries or to a partnership or company having only family members as partners or owners, or (y) a charitable organization described in Section 501(c)(3) of the Internal Revenue Code. Any options so transferred shall remain subject to the otherwise applicable terms of the option agreement and this Plan, and also shall be subject to such terms and conditions as the Committee may prescribe. Subsequent transfers of options shall be permitted under this Paragraph only to the extent, and subject to the rules, prescribed by the Committee.

Case 12-338, Document 59-1, 07/23/2012, 671476, Page38 of 151

-7-

(3) A Participant may transfer all or any part of an option granted hereunder to a former spouse pursuant to the terms of a qualified domestic relations order. Any options so transferred shall remain subject to the otherwise applicable terms of the option agreement and this Plan. No subsequent transfers of options shall be permitted under this Paragraph.

(e) Nontransferability of Shares. If the Committee so determines, an option granted to an employee may provide that, without prior consent of the Committee, shares acquired by exercise of the option shall not be transferred, sold, pledged or otherwise disposed of within a period not to exceed one year from the date the shares are transferred to the Participant upon his exercise of the option or prior to the satisfaction of all indebtedness with respect thereto, if later.

(f) Termination of Employment. The provisions of this Subsection (f) shall govern in the event of the termination of a Participant's employment with the Company and its subsidiaries. If the employment of an employee Participant terminates for any reason other than his death, he may (unless discharged for Cause as hereinafter defined) thereafter exercise his option as provided below:

(i) If such termination of employment is voluntary on the part of the employee Participant, he may exercise his option only within 30 days after the date of termination of his employment (unless a longer period not in excess of three months is allowed by the Committee).

(ii) If such termination of employment is involuntary on the part of the employee Participant, he may exercise his option only within three months after the date of termination of his employment.

(iii) If such termination of employment is on account of the employee Participant's total and permanent disability, he may exercise (I) any option granted prior to January 1, 2002 within the period ending one year after the date of termination of his employment, and (II) any option granted after December 31, 2001 within the period ending three years after the date of termination of his employment.

(iv) If such termination of employment is on account of the employee Participant's retirement (as defined below), he may exercise (I) any option granted prior to January 1, 1994, other than an option designated as an incentive stock option hereunder, within the period ending two years after his retirement date, (II) any option granted after December 31, 1993 and prior to April 17, 1997, other than an option designated an incentive stock option hereunder, within the period ending three years after his retirement date, (III) any option granted prior to April 17, 1997 and designated an incentive stock option hereunder within the period ending three months after his retirement date, (IV) any option granted after April 16, 1997 and prior to January 1, 2002 within the period ending five years after his retirement date and (V) any option granted after December 31, 2001 over the remaining option period, provided that an option described in clause

-8-

(IV) or (V) which was designated at grant as an incentive stock option shall cease to qualify as an incentive stock option under the Internal Revenue Code if not exercised within three months after his retirement date. For the purposes of his Plan, an employee Participant's termination of employment is on account of "retirement" if either (A) at the time the Participant leaves the employ of the Company and its subsidiaries, the Participant qualifies for an early or normal retirement pension under the terms of a retirement plan maintained by or to which the Company or any subsidiary contributes for the benefit of the Participant, (B) the Participant leaves the employ of a subsidiary that does not maintain or contribute to a retirement plan for the benefit of the Participant, and at such time the Participant would have qualified for an early or normal retirement pension under the terms of The Gillette Company Retirement Plan had the individual been a participant of that plan, or (C) solely in the case of a Company-initiated termination of employment (other than for Cause), at the time the Participant leaves the employ of the Company and its subsidiaries, the sum of Participant's attained age and years of service (each measured in full and partial years) totals at least 80. An employee Participant's "retirement date", as used in this paragraph, means the first day the Participant is no longer on the active payroll of the Company or any subsidiary following the Participant's retirement.

The Committee may, in its sole discretion, terminate any such option at or any time after the date of termination of the Participant's employment (and prior to the expiration of the exercise periods specified above), if it deems such action to be in the best interests of the Company. In no event may any Participant exercise any option that was not exercisable on the date he ceased to be an employee, except (A) as to options granted prior to January 1, 2002, those options granted at least one year prior to Participant's cessation of employment on account of retirement or total and permanent disability and (B) as to options granted after December 31, 2001, if the Participant's cessation of employment is on account of retirement or total and permanent disability. In no event may any Participant exercise any option after the expiration of the option period. For the purposes of this Subsection (f), a Participant's employment shall not be considered terminated in the case of a sick leave or other bona fide leave of absence approved by the Company or a subsidiary in conformance with the applicable provisions of the Internal Revenue Code or Treasury Regulations, or in the case of a transfer to the employment of a subsidiary or to the employment of the Company.

If an employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment. For the purposes of the Plan, unless otherwise provided under the terms of an employment agreement with the Company or any of its subsidiaries, in which case the definition contained therein shall control, a discharge for "Cause" shall have occurred where a Participant is terminated because of:

(A) the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from

Case 12-338, Document 59-1, 07/23/2012, 671476, Page40 of 151

-9-

incapacity due to physical or mental illness), after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board or the elected officer or manager believes that Participant has not performed his duties;

(B)  the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or

(C)  the Participant's conviction of a felony or a plea of nolo contendere by Participant with respect thereto.

(g) Death.  In the event a Participant dies while holding options granted hereunder, (I) any option granted prior to January 1, 2002 may be exercised within a period not to exceed one year after the date of death, and (II) any option granted after December 31, 2001 may be exercised within a period not to exceed three years after the date of death, as to all or any of the shares covered by such option, by his executor or administrator of the person or persons to whom the option is transferred by will or the applicable laws of descent and distribution, and except as so exercised the option shall expire after the expiration of such period.  In no event, however, may any option be exercised after the expiration of the option period.

(h) Deferral Election.  In accordance with such rules and procedures as the Committee may prescribe from time to time, if provided by the Committee, in its sole and exclusive discretion, in the option agreement covering an option granted hereunder, a Participant may elect to defer the delivery of the shares acquired upon the exercise of the option; provided that such election may not be made with respect to any incentive stock option or any option transferred pursuant to the provisions of Section 6(d) above.  The Participant's deferral election must be made at least six months prior to the date such option is exercised or at such other time as the Committee may specify.  Payment of the option exercise price must be made in the form of shares of common stock which the Participant has held for at least six months.  Deferral elections will be allowed only for option exercises that occur while the Participant is an active employee of the Company and its subsidiaries or is actively serving as a non-employee director, as the case may be.  Any election to defer the delivery of the stock shall be irrevocable as long as the Participant remains an employee of the Company and its subsidiaries or a non-employee director, as the case may be.

Upon the exercise of an option as to which a deferral election has been made in accordance with this Subsection (h), the Company shall credit to a bookkeeping account a number of deferred stock units equal to the number of shares that otherwise would have been delivered to the Participant.  During the period of deferral, the deferred stock units shall accrue dividends at the rate paid upon the Company's common stock, which dividend equivalents shall be credited in the form of additional deferred stock units. Deferred stock units shall be distributed in shares of common stock (with cash payment in lieu of any fractional share) upon the Participant's termination of employment with the Company and its subsidiaries or following the date the Participant's membership on the Board of Directors ceases, as the case may be, or if the Participant's termination is on account of retirement, at such other date or dates as may be

Case 12-338, Document 59-1, 07/23/2012, 671476, Page41 of 151

-10-

approved by the Committee over a period extending no later than 10 years following such termination date.

The Committee may, in its sole discretion, allow for the early distribution of an employee Participant's deferred stock units in the event of an immediate and heavy financial hardship or in the event of the death or disability of the Participant.  Distribution on account of financial hardship shall be limited to the amount necessary to satisfy the hardship.  In addition, the Committee in its discretion may direct the distribution of an employee Participant's deferred stock units if it believes such action is in the best interest of the Company.  Deferred stock units shall not be assigned or alienated by any Participant, and shall not be subject to attachment, garnishment, encumbrance, pledge or charge of any nature.

(i)  Additional Conditions of Option Awards.  Unless otherwise provided pursuant to an employment agreement between an employee Participant and the Company, the following additional provisions shall govern options awarded under the Plan.

(1) With respect to any option granted prior to June 21, 2001, and to any option granted on June 21, 2001 under The Gillette U.K. Approved Stock Option Plan ("2001 UK approved option"), the Committee may, in its sole discretion, cancel any such option at or any time after the date of termination of an employee Participant's employment (and prior to the expiration of the exercise periods specified above), if it deems such action to be in the best interests of the Company.

(2) With respect to any option granted on or after June 21, 2001 (other than any 2001 UK approved option) ("covered option"), the following terms and conditions shall apply:

(a)  Unless otherwise provided pursuant to a termination settlement agreement with the Company or any of its subsidiaries, while the Participant is employed by the Company and for a period of eighteen (18) months after the termination or cessation of such employment for any reason, the Participant shall not directly or indirectly:

(i)  as an employee, consultant, independent contractor, officer, director, individual proprietor, investor, partner, stockholder, agent, principal, joint venturer, or in any other capacity whatsoever (other than as the holder of not more than one percent of the combined voting power of the outstanding stock of a publicly held corporation or company), be employed, work, consult, advise, assist, or engage in any activity regarding any business, product, service or other matter which: (A) is substantially similar to or competes with any business, product, service or other matter regarding which the Participant worked for the Company, or any of its subsidiaries, during the three (3) years prior to Participant's termination of employment; or (B) concerns subject matters about which Participant gained proprietary information of the Company, or any of its subsidiaries, during the three (3) year period prior to the Participant's termination of employment;

-11-

(ii) either alone or in association with others, solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contacted, solicited or served, directly or indirectly, by Participant while employed by the Company; or

(iii) either alone or in association with others: (A) solicit or encourage any employee or independent contractor of the Company to terminate his/her relationship with the Company; or (B) recruit, hire or solicit for employment or for engagement as an independent contractor, any person who is or was employed by the Company at any time during the Participant's employment with the Company; provided, that this Paragraph (iii) shall not apply to such person whose employment with the Company has been terminated for a period of six months or longer.

(b) The Participant shall not disclose or use at any time any secret or confidential information or knowledge obtained or acquired by the Participant during, after, or by reason of, employment with the Company or any of its subsidiaries, as provided under applicable law and any and all agreements between the Participant and the Company or any of its subsidiaries regarding Participant's employment with the Company or the subsidiary.

(c) In accordance with any and all agreements between the Participant and the Company or any of its subsidiaries regarding the Participant's employment, the Participant shall disclose promptly and transfer and assign to the Company all improvements and inventions in certain fields made or conceived by the Participant during employment with the Company or the subsidiary and within the prescribed periods thereafter.

(d) To the extent permitted by law, the Participant shall not make, publish or state, or cause to be made, published or stated, any defamatory or disparaging statement, writing or communication pertaining to the character, reputation, business practices, competence or conduct of the Company, its subsidiaries, shareholders, directors, officers, employees, agents, representatives or successors.

(3) The geographic scope of the provisions of Paragraph (2)(a) above shall extend to anywhere the Company or any of its subsidiaries is doing business, has done business or intends to do business.

(4) If any restriction set forth in Paragraph (2)(a) above is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

Case 12-338, Document 59-1, 07/23/2012, 671476, Page43 of 151

-12-

(5) In the event of a Change of Control, the restrictions contained in Paragraphs (2)(a)(i), (2)(a)(iii) and (2)(d) above shall cease and the Participant shall no longer be bound by the obligations thereunder.

(6) If the Company reasonably determines that a Participant has materially violated any of the Participant's obligations under Paragraph (2) above, or if a Participant is terminated for Cause, then, in addition to any other remedies at law or in equity it may have, the Company shall have the following rights and remedies:

(a) The Company may cancel any and all covered options granted to the Participant, including grants that according to their terms are vested, effective as of the date on which such violation began (the "Violation Date"); and

(b) The Company may demand the return of any gain realized by the Participant as a result of the Participant's exercise of any covered option during the period commencing one year prior to the Participant's termination of employment and continuing through the Violation Date. Upon demand, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of such exercises. At the option of the Company, such payment shall be made by returning to the Company the number of shares of common stock of the Company which the Participant received in connection with such exercise (with the Company then refunding the option price paid by the Participant), or in cash in the amount of the gain realized. If after such demand the Participant fails to return said shares or amounts, the Company shall have the right to offset said amounts against any amounts, including compensation, owed to the Participant by the Company or to commence judicial proceedings against the Participant to recover said shares or amounts.

(7) The non-competition restrictions set forth in Paragraph (2)(a) supersede any non-competition restrictions of less than eighteen (18) months in duration set forth in any agreement between a Participant and the Company or any subsidiary or predecessor.

7. REPLACEMENT OPTIONS. The Company may grant options under the Plan on terms differing from those provided for in Section 6 of the Plan where such options are granted in substitution for options held by employees of other corporations who concurrently become employees of the Company or a subsidiary as the result of a merger or consolidation of the employing corporation with the Company or subsidiary, or the acquisition by the Company or a subsidiary of property or stock of the employing corporation. The Committee may direct that the substitute options be granted on such terms and conditions as the Committee considers appropriate in the circumstances.

Notwithstanding anything contained in this Plan, the Committee shall have authority, with respect to any options granted or to be granted to employees or outstanding installment Purchase Agreements of participants other than non-employee directors under this Plan, to extend the time for payment of any and all installments, to modify the amount of any installment, to amend outstanding option certificates to provide for installment payments or to take any other action which it may, in its

Case 12-338, Document 59-1, 07/23/2012, 671476, Page44 of 151

-13-

discretion, deem necessary, provided that: (1) interest on the unpaid balance under any outstanding Purchase Agreement at the rate of at least four percent (4%) per annum shall continue to be due and payable quarterly during the period of any deferral of payment; (2) all such installment Purchase Agreements and unexercised options, shall at all times be in accordance with the applicable provisions of Regulation G of the Board of Governors of the Federal Reserve System, as from time to time amended, and with all other applicable legal requirements; (3) no such action by the Committee shall jeopardize the status of stock options as incentive stock options under the Internal Revenue Code.

8.  FOREIGN EMPLOYEES.  The Company may grant options under the Plan on terms differing from those provided for in Section 6 of the Plan where such options are granted to employee Participants who are not citizens or residents of the United States of America if the Committee determines that such different terms are appropriate in view of the circumstances of such Participants, provided, however, that such options shall not be inconsistent with the provisions of Section 6(a) or Section 6(b) of the Plan.

In addition, if the Committee determines that options are inappropriate for any key salaried employees who are not citizens or residents of the United States of America, whether because of the tax laws of the foreign countries in which such employees are residents or for other reasons, the Board of Directors may authorize special arrangements for the sale of shares of common stock of the Company to such employees, whether by the Company, or a subsidiary, or other person.  Such arrangements may, if approved by the Board of Directors, include the establishment of a trust by the foreign subsidiary, which is the employer of the key salaried employees, designated by such subsidiary, to whom the shares are to be sold.  Such arrangements shall provide for a purchase price of not less than the fair market value of the stock at the date of sale and a maximum annual grant per participant of options to purchase 1,250,000 shares of common stock and may provide that the purchase price be paid over a period of not more than ten years, with or without interest, and that such employees have the right, with or without payment of a specified premium, to require the seller of the shares to repurchase such shares at the same price, subject to specified conditions.  Such arrangements may also include provisions deemed appropriate as to acceleration or prepayment of the balance of the purchase price, restrictions on the transfer of the shares by the employee, representations or agreements by the employee about his investment purposes and other miscellaneous matters.

9.  CHANGES IN STOCK.  In the event of a stock dividend, split-up or combinations of shares, recapitalization or merger in which the Company is the surviving corporation, or other similar capital change, the number and kind of shares of stock or securities of the Company to be subject to the Plan and to options then outstanding or to be granted thereunder, the maximum number of shares or securities which may be issued or sold under the Plan, the maximum annual grant for each participant, the automatic annual grant for each non-employee director, the option price and other relevant provisions shall be appropriately adjusted by the Board of Directors of the Company, whose determination shall be binding on all persons.  In the event of a consolidation or a merger in which the Company is not the surviving corporation or which results in the acquisition of substantially all the Company's outstanding stock by a single person or entity or by a group of persons and/or entities acting in concert, or in the event of complete liquidation of the Company, all

PG000196

-14-

outstanding options shall thereupon terminate, provided that (i) at least twenty days prior to the effective date of any such consolidation or merger, the Board of Directors shall with respect to employee participants either (a) make all outstanding options immediately exercisable, or (b) arrange to have the surviving corporation grant replacement options to the employee Participants and (ii) in the case of option grants to non-employee directors, all outstanding options not otherwise exercisable shall become exercisable on the twentieth day prior to the effective date of the merger.

10. **EMPLOYMENT RIGHTS.** The adoption of the Plan does not confer upon any employee of the Company or a subsidiary any right to continued employment with the Company or a subsidiary, as the case may be, nor does it interfere in any way with the right of the Company or a subsidiary to terminate the employment of any of its employees at any time.

11. **AMENDMENT OF PLAN OR OPTIONS.** The Board of Directors of the Company, or the Compensation Committee of the Board of Directors if and to the extent authorized, may at any time or times amend the Plan or amend any outstanding option or options or arrangements established under Section 8 of the Plan for the purpose of satisfying the requirements of any changes in applicable laws or regulations or for any other purpose which may at the time be permitted by law, provided that (except to the extent required or permitted under Section 9 of the Plan and, with respect to clauses (b) and (f) below, except to the extent required or permitted under Section 7 of the Plan) no such amendment shall, without the approval of the stockholders of the Company, (a) increase the maximum number of shares available under the Plan or the maximum annual grant per participant other than as permitted under Section 9 of the Plan, (b) reduce the minimum option price of options thereafter to be granted below the price provided for in Section 6(a) of the Plan, except that the Plan may be amended to provide that the minimum option price of non-qualified stock options thereafter to be granted to employees may be not less than 95% of the fair market value at the date of grant if the Board determines that such amendment is necessary for tax reasons to carry out the objectives of the Plan, (c) reduce the price at which shares of common stock of the Company may be sold under Section 8 of the Plan below the price provided for in said Section 8, (d) reduce the option price of outstanding options, (e) extend the time within which options may be granted, or (f) extend the period of an outstanding option beyond ten years from the date of grant; and further provided no such amendment shall adversely affect the rights of any Participant (without his consent) under any option theretofore granted or other contractual arrangements theretofore entered into or after a Change of Control deprive any Participant of any right or benefit which became operative in the event of a Change of Control.

12. **TERMS AND CONDITIONS OF OPTIONS GRANTED TO NON-EMPLOYEE DIRECTORS.** Effective at the close of business on the second business day after the 1992 Annual Meeting of Shareholders of the Company and on the second business day after each Annual Meeting thereafter, each non-employee director shall be automatically granted a non-incentive stock option to purchase 4,000 shares (5,000 shares for options granted after 2001 and before 2004, and 7,500 shares for options granted after 2003) of the common stock of the Company under the generally applicable provisions of the Plan and upon the following specific terms and conditions:

Confidential

Case 12-338, Document 59-1, 07/23/2012, 671476, Page46 of 151

-15-

(a) Option Price. The option price under each option shall be the fair market value on the date of grant, which for this purpose is defined as the average between the high and the low price of the common stock as reported by the New York Stock Exchange.

(b) Option Period. The period of an option shall be ten years from the date of grant.

(c) Option Exercisability. Each option granted prior to 2001 shall become exercisable in full on the earlier of the first Annual Meeting following the date of grant or the first anniversary of the date of grant, except as otherwise provided under Paragraph (4) of Section 6(c) of the Plan. Each option granted after 2000 shall become exercisable ratably over a three year period (for options granted after 2003, this means 2,500 after one year, an additional 2,500 after two years and the remaining 2,500 after three years) on the earlier of the Annual Meeting or the anniversary of the date of grant in each such year, except as otherwise provided under Paragraph (4) of Section 6(c) of the Plan.

(d) Exercise Period. Any option, otherwise exercisable, may be exercised during the period a non-employee director remains a member of the Board of Directors and for a period of three months following the date a non-employee director ceases to be a director; provided that, in the case where the non-employee director either has attained age 65 or has served as a non-employee director for at least five years when membership on the Board of Directors ends, all of that non-employee director's options shall be exercisable for a period of two years with respect to options granted before 1994, three years for options granted after 1993 and before 2001, five years for options granted after 2000 and before 2002, and the remaining option period for options granted after 2001, each such period commencing on the date membership on the Board of Directors ceases.

If a non-employee director dies while a member of the Board of Directors, or following the date membership on the Board of Directors ceases while an option remains exercisable in accordance with the preceding paragraph, then (I) for options granted before 2002, at any time or times within one year after that non-employee director's death, and (II) for options granted after 2001, at any time or times within three years after that non-employee director's death, that non-employee director's option may be exercised in accordance with the provisions of Section 6(g) of the Plan. In no event shall any option be exercised after the expiration of the option period.

13. GOVERNING LAW.

(a)     **Prior to Effective Time:** Except as to matters concerning the issuance of shares or other matters of corporate governance, which shall be construed under the General Corporation Law of the State of Delaware, the Plan and each Award issued under it shall be governed by the laws of the Commonwealth of Massachusetts, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Plan to the substantive law of another jurisdiction. Recipients of an option under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of Massachusetts, to resolve any and all issues that may arise out of or relate to the Plan or any option.

Confidential

Case 12-338, Document 59-1, 07/23/2012, 671476, Page47 of 151

-16-

(b)    **Upon and following Effective Time:** The Plan and each option issued under it shall be governed by and construed in accordance with the laws of the State of Ohio, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Plan to the substantive law of another jurisdiction. Recipients of an option under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of Ohio, to resolve any and all issues that may arise out of or relate to the Plan or any option.

## 14, SPECIAL MERGER PROVISIONS

**14.1    Acceleration of Options.** Notwithstanding any other provision in the Plan, each option outstanding under the Plan (the "Accelerated Options") shall be vested and fully exercisable effective immediately prior to the Effective Time as determined by the Authorized Officer.

**14.2    Special Merger Elections.** Under procedures established by the Authorized Officer, each holder of an Accelerated Option may exercise such Accelerated Option immediately prior to the Effective Time, in whole or in part, and in respect thereof shall be entitled to receive, at such holder's election, either (i) the Merger Shares or (ii) a cash payment equal to the product of (A) the excess (if any) of the per share value of the Merger Shares over the per share exercise price, multiplied by (B) the number of Shares with respect to which the Accelerated Option is exercised, in each case subject to applicable withholding taxes.

**14.3    Termination Following the Effective Time.** Unless otherwise provided under the terms of an employment agreement with the Company or its subsidiaries, notwithstanding any other provision in the Plan, a termination of employment for Good Reason within two (2) years of the Effective Time shall be treated for purposes of Accelerated Options the same as (A) a Special Separation or (B) in the case of a Participant eligible for retirement under the Company's benefit plans, as a Retirement.

**14.4 Post-Merger Conversion of Outstanding Accelerated Options.** Each Accelerated Option outstanding at the Effective Time (together, "Gillette Stock Options") shall cease to represent a right to acquire Shares and, after the Effective Time, shall be deemed an option to acquire, on the same terms and conditions as were applicable under the Gillette Stock Option (but taking into account any applicable changes thereto provided for in this Plan as revised or by reason of the Merger Agreement), that number of Shares of Parent Common Stock determined by multiplying the number of Shares subject to such Gillette Stock Option by the Exchange Ratio, rounded, if necessary, to the nearest whole share of Parent Common Stock, at a price per share (rounded to the nearest one-hundredth of a cent) equal to the per share exercise price specified in such Gillette Stock Option divided by the Exchange Ratio; *provided, however,* that in the case of any Gillette Stock Option to which Section 421 of the Code applies by reason of its qualification under Section 422 of the Code, the option price, the number of shares subject to such option and, except to the extent otherwise required by the Plan as revised, the terms and conditions of exercise of such option shall be determined in a manner consistent with the requirements of Section 424(a) of the Code.

**14.5    Provisions concerning Options to Nonemployee Directors.** Options held by Nonemployee Directors of The Gillette Company immediately prior to the Effective Time must be exercised within the term of the original grant or within five (5) years from the Effective Time, whichever is shorter.

PG000199

Case 12-338, Document 59-1, 07/23/2012, 671476, Page48 of 151

-17-

**14.6    Assumption of Gillette Stock Options and Certain Undertakings.** Subject to the terms of the Merger Agreement, on the Effective Time The Procter & Gamble Company shall assume the Plan (as revised herein) and each Gillette Stock Option. To the extent permitted by law but not in derogation of the provisions of this Article 14, The Procter & Gamble Company shall take such reasonable steps as may be necessary to cause the Gillette Stock Options which qualified under Section 422 of Code as incentive stock options prior to the Effective Time to continue to qualify as incentive stock options of The Procter & Gamble Company after the Effective Time.

14.7   **Special Separation.** In the case of a Special Separation, any option must be exercised within the term of the original grant or five (5) years from the date of Special Separation, whichever is shorter.

## 15.  DEFINITIONS

Whenever used in the Plan, the following terms shall have the meanings set forth below, and when the meaning is intended, the initial letter of the word shall be capitalized.

15.1   **"Accelerated Options"** has the meaning accorded such term in Article 14.

15.2   **"Authorized Officer"** means each of (i) the Chairman, Chief Executive Officer and President, (ii) the Vice Chairman, (iii) the Senior Vice President, Finance, and Chief Financial Officer, (iv) the Senior Vice President, Strategy and Business Development, (v) the Senior Vice President and General Counsel, (vi) the Secretary and (vii) such other officers of the Company as any of the foregoing may designate in writing.

15.3   **"Board"** or **"Board of Directors"** means the Board of Directors of the Company.

15.4   **"Closing"** means the closing of the Merger upon the terms and subject to the conditions set forth in Article 6 of the Merger Agreement

15.5   **Committee"** means:

   (a)     If describing rights, obligations, conditions, and/or circumstances prior to the Effective Time, the Compensation and Human Resources Committee of the Board of The Gillette Company.

   (b)     If describing rights, obligations, conditions, and/or circumstances at or following the Effective Time, the Compensation & Leadership Development Committee (or its functional successor by another name) of The Procter & Gamble Company

15.6   **"Company"** means:

   (a)     If describing rights, obligations, conditions, and/or circumstances prior to the Effective Time, The Gillette Company, a Delaware corporation;

   (b)     If describing rights, obligations, conditions, and/or circumstances at or following the Effective Time, The Procter & Gamble Company, an Ohio corporation.

15.7   **"Effective Time"** has the meaning accorded such term in the Merger Agreement.

Confidential                                                                                          PG000200

Case 12-338, Document 59-1, 07/23/2012, 671476, Page49 of 151

A-322

-18-

**15.8** **"Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time, or any successor act thereto.

**15.9** **"Exchange Ratio"** has the meaning accorded such term in the Merger Agreement.

**15.10** **"Merger"** means the consummation of the transactions contemplated by the Merger Agreement.

**15.11** **"Merger Agreement"** means the Agreement and Plan of Merger dated as of January 27, 2005 among The Procter & Gamble Company, Aquarium Acquisition Corp. and The Gillette Company.

**15.12** **"Merger Shares"** has the meaning accorded such term in the Merger Agreement.

**15.13** **"Nonemployee Director"** has the same meaning set forth in Rule 16b-3 promulgated under the Exchange Act, or any successor definition adopted by the United States Securities and Exchange Commission.

**15.14** **"Parent"** means The Procter & Gamble Company.

**15.15** **"Parent Common Stock"** has the meaning accorded such term in the Merger Agreement.

**15.16** **"Participant"** means any eligible person to whom an Award is granted.

**15.17** **"Plan"** means The Gillette Company 1971 Stock Option Plan as from time to time amended and in effect.

**15.18** **"Retirement"** means:  (a) retirement in accordance with the provisions of any appropriate retirement plan of the Company or any of its subsidiaries; or (b) termination of employment under the total and permanent disability provision of any retirement or disability plan of the Company or any of its subsidiaries or any plan to which the Company or its subsidiaries contribute for purposes of the retirement or disability of Employees.

15.19 **"Share"** means a Share of common stock of the Company

15.20 **"Special Separation"** means any termination of employment that occurs prior to the time a Participant is eligible to retire, except a termination for Cause or a voluntary resignation that is not initiated or encouraged by the Company.

15.21 **"Subsidiary"** means any corporation or other entity, whether domestic or foreign, in which the Company has or obtains, directly or indirectly, a proprietary interest of more than fifty percent (50%) by reason of stock ownership or otherwise.

PG000201

Jul 03 09 10:28a    Lillian Ciovara                        203-255-7644          p.1

July 3, 2009

TE-3 G.O. Box 5B
Two Procter & Gamble Place
Cincinnati, OH 45202

    Re:    Stock Options Exercise and Cash Liquidation

Dear Stock Option Administration,

    I am writing to request a complete exercise and cash liquidation of my stock option
awards resulting from my employment with Gillette and Procter & Gamble. Per the Attached
Notice to Exercise Forms (2 Sets), I direct you to immediately exercise and completely liquidate,
for cash, the following share grants:

| Grant Date: | Shares | Type |
|---|---|---|
| 6/21/2001 | 1950 | ISO |
| 6/20/2002 | 1950 | ISO |
| 6/19/2003 | 1950 | ISO |
| 6/19/2003 | 975 | NQ |
| 6/17/2004 | 812 | ISO |
| 6/17/2004 | 1626 | NQ |
| TOTALS | 9263 | |

    Please take note on the Notice to Exercise Forms that I am no longer an employee of
P&G, but I fully intend to exercise the final grant (1950 shares granted on 6/16/2005) should it
become economically feasible. Thank you for your prompt attention in this matter and if there
are any questions or concerns, please contact me at (203) 255-7544.

                                    Very Truly Yours,

                                    Predrag Ciovara

                                    Predrag Ciovara

Confidential

PG000509

**NOTICE TO EXERCISE 0805**
Please complete and return to Stock Option Administration. Your request cannot be processed without a legible, fully completed notice.

| Global Compensation Payments Stock Option Administration | Phone: 813-983-5050 FAX: 813-983-0168 www.pg.com/investment/stock_options.html | TE-3 G.O, Box 65 Two Procter & Gamble Plaza Cincinnati, OH 45202 |

**CHOOSE GRANT DATE TO EXERCISE**

| 6 | 21 | 2001 | for | 1950 | shares Type (circle one)  NQ  ISO  Other |
| 6 | 20 | 2002 | for | 1350 | shares Type (circle one)  NQ  ISO  Other |
| 6 | 19 | 2003 | for | 1950 | shares Type (circle one)  NQ  ISO  Other |
| 6 | 19 | 2003 | for | 375 | shares Type (circle one)  NQ  ISO  Other |

**CHOOSE METHOD OF EXERCISE** (Note: exercise of a SAR will automatically result in cash. Skip to next section.)

**U.S. CITIZENS, PERMANENT RESIDENTS (U.S. Green Card), or currently residing in the U.S:** choose one of the following methods:

To receive Cash, select ⇩    To receive Stock, select one of the following four methods: ⇩

**Sell All:**
Broker sells all shares indicated above.
You receive cash.
_X_ Sell at Market
___ Sell at Limit $_____

[Contact Stock Option Administration for cash payment amount]

**Sell to Cover:**
Pay no cash. Broker sells enough shares to cover option cost and taxes.
You receive the balance of shares.
___ Sell at Market
___ Sell at Limit $_____
___ Deposit the resulting shares to my SIP account.
___ Mail the resulting shares to me at my home address.

**Pay Cash:**
Pay cash to cover option cost and taxes. You receive shares.
___ Enclosed is a check for US$ _____ payable to P&G.
___ I have transmitted US$ _____ via wire transfer.
___ Deposit the shares to my SIP account.
___ Mail the shares to me at my home address.

**Pay Cash, Cover Taxes with Shares:**
Pay cash to cover option cost (option price x shares).
P&G withholds shares to cover taxes.
___ Enclosed is a check for US$ _____ payable to P&G.
___ I have transmitted US$ _____ via wire transfer.
___ I authorize P&G to determine the number of shares to withhold from me in order to pay applicable taxes and to transfer shares from me to P&G
___ Deposit the resulting shares to my SIP account.
___ Mail the shares to me at my home address.

**Share Exchange:**
Pay no cash. Cover option cost with currently owned shares. P&G withholds shares to cover taxes.
___ I wish to tender shares of P&G stock, which I certify that I have owned for at least six months, in full payment of my option cost. Under existing law, I am entitled to keep my current shares. I authorize P&G to determine the number of shares necessary to pay my option cost and applicable taxes and to issue to me the remaining shares.
___ Deposit the resulting shares to my SIP account.
___ Mail the stock to me at my home address.

**RESIDENTS OF:** Algeria, Azerbaijan, Bangladesh, Bosnia, China, Colombia, Croatia, Greece, India, Indonesia, Italy, Kazakhstan, Lebanon, Malaysia, Morocco, Russia, South Africa, South Korea, Sri Lanka, Thailand, Turkey, Ukraine, United Arab. Emer., Uzbekistan, Vietnam, Yugoslavia check below:

___ **Sell All:** Broker sells all shares indicated above. You receive cash.
___ Sell at Market
___ Sell at Limit $_____

**ALL OTHER OPTIONEES:** choose one of the following methods:

To receive Cash, select ⇩    To receive Stock, select one of the following two methods: ⇩

**Sell All:**
Broker sells all shares indicated above.
You receive cash.
___ Sell at Market
___ Sell at Limit $_____

[Contact Stock Option Administration for cash payment amount]

**Sell to Cover:**
Pay no cash. Broker sells enough shares to cover option cost and taxes.
You receive the balance of shares.
___ Sell at Market
___ Sell at Limit $_____
___ Deposit the resulting shares to my SIP account.
___ Mail the resulting shares to me at my home address.

**Pay Cash:**
Pay cash to cover option cost and taxes. You receive shares.
___ Enclosed is a check for US$ _____ payable to P&G.
___ I have transmitted US$ _____ via wire transfer.
___ Deposit the shares to my SIP account.
___ Mail the shares to me at my home address.

*If Limit is not reached by the time of expiration for the grant series indicated above, the grant will expire unexercised.

**CERTIFICATION OF EMPLOYMENT INTENT (required for "active" employees)**

Confidential

PG000510

**NOTICE TO EXERCISE (page two)**

The right to exercise any stock option or stock appreciation right under The Procter & Gamble Stock Plans is conditional upon certification by the recipient at the time of exercise that the recipient intends to remain in the employ of the Company or one of its subsidiaries for at least one year following the date of exercise. To comply with this certification provision, select one of the following:

☐ 1. I intend to remain in the employ of the Company or one of its subsidiaries (except in the case of retirement or disability) for at least one year following the date of exercise.

_____   _____
Optionee Signature              Date

OR:

☐ 2. I intend to leave the Company or one of its subsidiaries within one year following the date of exercise, but I have no intent to engage in any activity that would violate the non-compete, which I have read and understand.
*I also understand that it is my responsibility to have this "Notice to Exercise" approved by my Vice President.*

_____  _____  _____  _____  _____
Optionee Signature    Date    Vice President Signature*    Date    Print Vice President Name

*This confirms, as required by the Compensation Committe, that the optionee has not acted significantly contrary to the best interests of the Company.

**INDICATION OF INTERNATIONAL ASSIGNMENTS:**

While you were a P&G employee, please list the countries you have worked in from 1992 -- present, as well as the assignment type you had in that country (e.g. WEB/International Manager or local employee):

| location | dates worked in that location | assignment type |
|---|---|---|
| location | dates worked in that location | assignment type |
| location | dates worked in that location | assignment type |

**BANK INFORMATION (required for "Sell All" method of exercise and exercise of Stock Appreciation Rights)**

By using this application, I hereby authorize P&G to initiate electronic entries to the financial institution named within this application. If technical problems occur which prohibit electronic entries being made, a regular check will be issued.

Payee Bank Name: **WACHOVIA BANK, N.A.**   Payee Bank Location: **FAIRFIELD, CT**
City, State

Payee Bank Transit Route #: **021 101 108**   Payee Bank Account #: **101 004156 2800**
(9 digits)

If your account is with a non-US Bank, the following information is also required. Your bank can provide this information:

Correspondent Bank Name: _____   Correspondent Bank Location: _____
City, Country

Correspondent Bank Account #: _____

DISCLAIMER: Procter & Gamble shall have no responsibility for the failure to complete, for any reason, any requested transaction. In the event that the sale price on "Market" orders is lower then the grant price, you must pay the difference to The Company.

**AUTHORIZATION** ✓

X Regardless of the Company's withholding obligations, I understand I'm responsible for any taxes due as a result of the exercise.

X **PREDRAG CICVARA**   *Predrag Cicvara*   **07/02/2009**
Name (please print)         Signature              Date

P&G Employment Status: active / retired / (separated) (circle one)   P&G Global ID **00145927** (if known)   Phone # **203-255-7544**

U.S. Social Security # **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**   E-Mail Address **predrag.cicvara@gmail.co**

Home Address **2122 NORTH BENSON ROAD**   **FAIRFIELD**   **CT**   **06824**
(Street)                    (City)   (State)   (Zip)

P&G Office Address **DURACELL**   **BETHEL**   **CT**   **USA**
(Legal Entity/Company Name)   (City)   (State)   (Country)

## NOTICE TO EXERCISE 05/05

Please complete and return to Stock Option Administration. Your request cannot be processed without a legible, fully completed notice.

| Global Compensation Payments - Stock Option Administration | Phone: 513-[illegible] FAX: 513-[illegible] www.pg.com/investors/stock_options.html | TE-3 G.O. Box [illegible] Two Procter & Gamble Plaza Cincinnati, OH [illegible] |
|---|---|---|

**CHOOSE GRANT DATE TO EXERCISE**

6 / 17 / 2004 for 912 shares Type (circle one) NQ (ISO circled) Other
6 / 17 / 2004 for 1576 shares Type (circle one) (NQ circled) ISO Other
__ / __ / __ for __ shares Type (circle one) NQ ISO Other
__ / __ / __ for __ shares Type (circle one) NQ ISO Other

**CHOOSE METHOD OF EXERCISE (Note: exercise of a SAR will automatically result in cash, skip to next section.)**

**U.S. CITIZENS, PERMANENT RESIDENTS (U.S. Green Card), or currently residing in the U.S.:** choose one of the following methods:

To receive Cash, select: ⇩ — To receive Stock, select one of the following four methods: ⇩

**Sell All:** (circled)
Broker sells all shares indicated above.
You receive cash.
X Sell at Market
__ Sell at Limit $__________*

__ **Sell to Cover:**
Pay no cash. Broker sells enough shares to cover option cost and taxes.
You receive the balance of shares.
__ Sell at Market
__ Sell at Limit $__________*
__ Deposit the resulting shares to my SIP account.
__ Mail the resulting shares to me at my home address.

Contact Stock Option Administration for cash payment amount

__ **Pay Cash:**
Pay cash to cover option cost and taxes. You receive shares.
__ Enclosed is a check for US$ __________ payable to P&G.
__ I have transmitted US$ __________ via wire transfer.
__ Deposit the shares to my SIP account.
__ Mail the shares to me at my home address.

__ **Pay Cash, Cover Taxes with Shares:**
Pay cash to cover option cost (option price x shares).
P&G withholds shares to cover taxes.
__ Enclosed is a check for US$ __________ payable to P&G.
__ I have transmitted US$ __________ via wire transfer.
__ I authorize P&G to determine the number of shares to withhold from me in order to pay applicable taxes and to transfer shares from me to P&G
__ Deposit the resulting shares to my SIP account.
__ Mail the shares to me at my home address.

__ **Share Exchange:**
Pay no cash. Cover option cost with currently owned shares. P&G withholds shares to cover taxes.
__ I wish to tender shares of P&G stock, which I certify that I have owned for at least six months, in full payment of my option cost. Under existing law, I am entitled to keep my current shares. I authorize P&G to determine the number of shares necessary to pay my option cost and applicable taxes and to issue to me the remaining shares.
__ Deposit the resulting shares to my SIP account.
__ Mail the stock to me at my home address.

**RESIDENTS OF:** Algeria, Azerbaijan, Bangladesh, Bosnia, China, Colombia, Croatia, Greece, India, Indonesia, Italy, Kazakhstan, Lebanon, Malaysia, Morocco, Russia, South Africa, South Korea, Sri Lanka, Thailand, Turkey, Ukraine, United Arab. Emer., Uzbekistan, Vietnam, Yugoslavia check below:

__ **Sell All:** Broker sells all shares indicated above. You receive cash.
__ Sell at Market
__ Sell at Limit $__________*

**ALL OTHER OPTIONEES:** choose one of the following methods:

To receive Cash, select: ⇩ — To receive Stock, select one of the following two methods: ⇩

__ **Sell All:**
Broker sells all shares indicated above.
You receive cash.
__ Sell at Market
__ Sell at Limit $__________*

__ **Sell to Cover:**
Pay no cash. Broker sells enough shares to cover option cost and taxes.
You receive the balance of shares.
__ Sell at Market
__ Sell at Limit $__________*
__ Deposit the resulting shares to my SIP account.
__ Mail the resulting shares to me at my home address.

Contact Stock Option Administration for cash payment amount

__ **Pay Cash:**
Pay cash to cover option cost and taxes. You receive shares.
__ Enclosed is a check for US$ __________ payable to P&G.
__ I have transmitted US$ __________ via wire transfer.
__ Deposit the shares to my SIP account.
__ Mail the shares to me at my home address.

*If Limit is not reached by the time of expiration for the grant series indicated above, the grant will expire unexercised.

**CERTIFICATION OF EMPLOYMENT INTENT** *(required for "active" employees)*

**NOTICE TO EXERCISE (page two)**

The right to exercise any stock option or stock appreciation right under The Procter & Gamble Stock Plans is conditional upon certification by the recipient at the time of exercise that the recipient intends to remain in the employ of the Company or one of its subsidiaries for at least one year following the date of exercise. To comply with this certification provision, select one of the following:

☐  1. I intend to remain in the employ of the Company or one of its subsidiaries (except in the case of retirement or disability) for at least one year following the date of exercise.

_____    _____
Optionee Signature                                            Date

**OR:**

☐  2. I intend to leave the Company or one of its subsidiaries within one year following the date of exercise, but I have no intent to engage in any activity that would violate the non-compete, which I have read and understand.
*I also understand that it is my responsibility to have this "Notice to Exercise" approved by my Vice President.*

_____  _____  _____  _____  _____
Optionee Signature         Date      Vice President Signature       Date      Print Vice President Name

*This confirms, as required by the Compensation Committee, that the optionee has not acted significantly contrary to the best interests of the Company.

**INDICATION OF INTERNATIONAL ASSIGNMENTS:**

While you were a P&G employee, please list the countries you have worked in from 1992 – present, as well as the assignment type you had in that country (e.g. WCBA/International Manager or local employee):

_____    _____    _____
location                                    dates worked in that location              assignment type

_____    _____    _____
location                                    dates worked in that location              assignment type

_____    _____    _____
location                                    dates worked in that location              assignment type

**BANK INFORMATION (required for "Sell All" method of exercise and exercise of Stock Appreciation Rights)**

By using this application, I hereby authorize P&G to initiate electronic entries to the financial institution named within this application. If technical problems occur which prohibit electronic entries being made, a regular check will be issued.

| Payee Bank Name: | WACHOVIA BANK, N.A. | Payee Bank Location: | FAIRFIELD, CT |
| | | | City, State |
| Payee Bank Transit Route #: | 021 101 108 | Payee Bank Amount #: | 101 004 155 2800 |
| | (9 digits) | | |

If your account is with a non-US Bank, the following information is also required. Your bank can provide this information:

| Correspondent Bank Name: | _____ | Correspondent Bank Location: | _____ |
| | | | City, Country |
| Correspondent Bank Account #: | _____ | | |

**DISCLAIMER:** Procter & Gamble shall have no responsibility for the failure to complete, for any reason, any requested transaction. In the event that the sale price on "Market" orders is lower than the grant price, you must pay the difference to The Company.

**AUTHORIZATION**    ✓

X Regardless of the Company's withholding obligations, I understand I'm responsible for any taxes due as a result of the exercise.

x   *PREDRAG CICVARA*          *Predrag Cicvara*          *07/02/2009*
Name (please print)                          Signature                                    Date

P&G Employment Status  active / retired (circle one) **(Separated)**   P&G Global ID *00148927*   Phone # *203-255-7544* (if known)

U.S. Social Security # *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*   E-Mail Address *predrag.cicvara@gmail.com*

Home Address *2122 NORTH BENSON ROAD*   *FAIRFIELD*   *CT*   *06824*
(Street)                          (City)     (State)   (ZIP)

P&G Office Address *DURACELL*   *BETHEL*   *CT*
(Legal Entity/Company Name)          (City)          (Country)

*P&G*



July 6, 2009

Mr. Predrag Cicvara
2122 North Benson Road
Fairfield, CT  06824

Dear Predrag:

We are in receipt of your letter faxed on July 3, 2009 to Procter and Gamble Stock
Option Administration.  I am sending this letter to remind you that your stock options
were cancelled on your last day of employment, June 15, 2009 and, as such, your notice
to exercise received on July 3, 2009, was denied.

As previously explained in my letter to you dated June 16, 2009, your stock options were
cancelled pursuant to The Gillette Company 1971 Stock Option Plan (Gillette Plan)
because you were terminated for cause.  Please refer to my June 16, 2009 letter and the
copy of the Plan that I provided to you for additional explanation.

Regards,

Peggy Wilczewski
Sr. Human Resources Manager

Confidential

PG000514

**A-329**

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

7005 3110 0000 2996 4858

Sent To: Mr. Predrag Cicvara
Street, Apt. No.; or PO Box No. 2122 North Benson Rd
City, State, ZIP+4 Fairfield CT 06824

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Predrag Cicvara
2122 North Benson Road
Fairfield, CT   06824

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)    B. Date of Delivery
P C Tcvara   7/8/09

C. Signature
X _____   ☐ Agent   ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Transfer from service label)   7005 3110 0000 2996 4858

PS Form 3811, March 2001   Domestic Return Receipt   102595-01-M-1424

Confidential   PG000515

-----Original Message-----
From: Lawson, Erik
Sent: Thursday, June 25, 2009 08:19
To: Wilczewski, Peggy; Burnett, Lynne
Subject: Fw: Duracell

This should be the last email trail on this topic and Practical would like to close the discussion at this point.

Sent from Blackberry

----- Original Message -----
From: andrew <andrew@ji-net.com>
To: Lawson, Erik
Sent: Thu Jun 25 00:09:35 2009
Subject: Re: Duracell

Dear Erik,

Thanks for the e mail. I just returned from HK and I spent enough time with Bel during this trip. She is handling it fine and definitely she would like, most of all,to forgive and forget about it. In a way, she also feel a bit guilty that Pregard lost his job because of this - and I told her not to feel that way as what happened is in the past and nothing can be done about it. So lets leave it this way - she totally understand and she can handle this.

I'll come to Hong Kong to have dinner with you on July 7. Lets meet at the Peninsula Hotel , the French restaurant - Geddi. It is on the side entrance on the 2 nd. floor. If you have any problem, please call  my HK mobile no. 94900537. Or else, I'll see you there.

There'll be a lot of issues we need to discuss in terms of business. Practical's hope has been on growing our business with Duracell - however, with all the hard work we put in during the last 2/3 years - our order book is not supporting our operation now and in the foreseeable future. This is the most urgent challenge facing Practical at the momment. We are very disappointed with the level of order for the Daylites, as well as other business with your company.

Please be rest assured that Bel is doing fine and she is committed to Practical and will alway do her best for both of our companies.

See you soon in Hong Kong and looking forwards to catching up with you.

1

Confidential

Best personal regards

Andrew

----- Original Message -----

> From: Lawson, Erik <mailto:lawson.ec@pg.com>
> To: Andrew <mailto:andrew@net1.ji-net.com>
> Sent: Wednesday, June 24, 2009 12:27 AM
> Subject: RE: Duracell


Dear Andrew


Thanks for the reply.  I understand this is an uncomfortable situation for Bel.  I am simply offering to apologize in person on behalf of P&G as Mr. Cicvara violated one of the most important beliefs of the Proctor and Gamble Company – trust.  We have great respect for Bel and she has done a terrific job working with Duracell.  This incident has been managed very confidentially within P&G and only myself, Human Resources and a few others in executive management are aware of the details.  Nitesh and the other people Bel works with are not aware of this situation nor do they know any details.  Bel should not feel uncomfortable working with Duracell and we hope she will continue in her position and work with us as we grow our business together.  Please make sure she understands this.


I will be in Hong Kong the week of July 6th.  I arrive at the Hong Kong airport at 2:00 PM on the 7th and should be at the hotel by 5:00 PM.  If you are available, it would be good to meet, if not only for dinner.  As we assess the lighting business, there may be more opportunity for Practical.  If you're not available, Christina and Mike will likely be in China at the end of July/early August and they will find time to meet with your then.  I look forward to hearing from you.  Thanks.


Regards,


Erik Lawson

Associate Director

Procter & Gamble Company

Durables Spend Pool

Duracell GBU SPOC

203-796-4092

lawson.ec@pg.com

2

Confidential

PG000481

From: Andrew [mailto:andrew@net1.ji-net.com]
Sent: Monday, June 22, 2009 2:18 AM
To: Lawson, Erik
Subject: Re: Duracell


Dear Erik,,


Thank you for the kind e mail. I met with Bel Liu this morning in Hong Kong and informed her of the situation.


The best is to forgive and forget. What is done is done and it is unfortunate and it does happens.


I would let it be in the past as I told Bel this morning. Its better not to embarrass her again by bringing this up.


Thanks again and it is unfortunate..


Regards


Andrew

----- Original Message -----

From: Lawson, Erik <mailto:lawson.ec@pg.com>

To: andrew <mailto:andrew@ji-net.com>

cc: Wilczewski, Peggy <mailto:wilczewski.pm@pg.com>

Sent: Tuesday, June 16, 2009 12:42 AM

Subject: Duracell


Dear Andrew,


3

Confidential

PG000482

I am aware of the unfortunate situation that occurred last week when our employee, Predrag Cicvara, was conducting an audit.  This is to advise you that he is no longer employed by Procter & Gamble and neither you nor you employees need to be concerned about interacting with him in the future.  We regret that this situation occurred, and we moved quickly to remedy the situation.

Please accept our apologies and assurances that this will have no adverse impact on our ongoing working relationship.  It is regrettable this unfortunate incident tarnishes a long and productive relationship between our two companies.  Inappropriate behavior is against our company policy and is not tolerated under any circumstances.

We'd like to also apologize to Ms. Bel Liu.  We admire her employee's courage in bringing forth this information.  Can you suggest what we might do to make appropriate apologies to her?  Please advise what you think would be most appropriate – a letter of apology, a small gift as a token of our appreciation, or any other ideas.

Will you please inform Ms. Bel Liu that Predrag Cicvara is no longer an employee of P&G?  If either you or Ms. Liu have any questions, please do not hesitate to contact me or Peggy Wilczewski, with whom Ms. Liu spoke with last week.

Thank you,

Erik Lawson

Associate Director

Procter & Gamble Company

Durables Spend Pool

Duracell GBU SPOC

203-796-4092

lawson.ec@pg.com

4

Confidential

PG000483

A-334

Confidential

Confidential

A-336

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------- x

PREDRAG CICVARA,

        Plaintiff,

        v.

THE GILLETTE COMPANY and PROCTER &
GAMBLE COMPANY and DURACELL, AN ENTITY
OF UNKNOWN FORM and LYNNE BURNETT,

        Defendants.

------------------------------------------- x

Civil Action No.3:09-cv-2054
(JCH) (HF)

April 14, 2011

**DECLARATION OF
PEGGY WILCZEWSKI**

I, PEGGY WILCZEWSKI, declare under the penalty of perjury:

    1.    I am currently employed by The Procter & Gamble Company (the "Company"), global company providing branded products and services in over 80 countries worldwide, as the Senior Human Resources Manager for its Bethel, Connecticut office. I submit this Declaration, which is based upon personal knowledge and my review of records maintained by the Company in the regular course of its business, in support of the defendants' motion for summary judgment.

    2.    I began my employment with the Company in September 1995, when I started working for Duracell, Inc. ("Duracell"). Duracell merged with and into The Gillette Company ("Gillette"), global supplier of various personal care products, on December 31, 1997, and ceased being a legal entity as of January 1, 1998. In 2005, the Company purchased Gillette.

    3.    Throughout my employment with the Company, I held several positions of increasing seniority within the Human Resources Organization until on or about February 2006, when I was promoted to Senior Human Resources Manager, the position I currently hold. As

Senior Human Resources Manager, I am responsible for recruiting and training employees, assisting with employee development, and investigating allegations of employee misconduct.

4.      In early-June 2009, I learned from Dina Schmude, an employee in the Human Resources Organization in Bethel, that Austin Lin, a Company employee, had reported to her possible misconduct by plaintiff Predrag Cicvara. Specifically, I learned that Bel Liu, who was an employee of a Company supplier named Practical Lighting, told Mr. Lin that Mr. Cicvara had made repeated unwanted sexual advances toward Ms. Liu during a business trip in Asia.

5.      Thereafter, on June 11, 2009, Ms. Schmude and I called Ms. Liu in Hong Kong and spoke with her for approximately an hour and half regarding Mr. Lin's allegation. Both Ms. Schmude and I took notes of our conversation with Ms. Liu. During that call, Ms. Liu told us that Mr. Cicvara repeatedly made unwanted sexual advances toward her while he was in Asia auditing Practical Lighting's facilities. Specifically, Ms. Liu said that Mr. Cicvara visited her hotel room in Thailand when she was sick, removed his pants, refused to leave when asked, inappropriately touched her, and told her that he wanted to "rape" her. Ms. Liu also stated that Mr. Cicvara sent her several inappropriate e-mail and text messages. It appeared to me that Ms. Liu was upset as she spoke to us about the events that occurred in Asia.

6.      After ending our call, Ms. Schmude and I combined our notes from our conversation with Ms. Liu into one document. Thereafter, I sent Ms. Liu two e-mails; in the first e-mail, I asked Ms. Liu to forward the text messages and e-mails exchanged between her and Mr. Cicvara to Ms. Schmude and myself, and in the second e-mail, I attached our notes from the call and asked Ms. Liu to review them for accuracy. A true and correct copy of each of these e-mails is attached hereto as Exhibits A and B, respectively.

2

7.      I later forwarded my notes from our conversation with Ms. Liu to Lynne Burnett,
who was then the Company's Global Human Resources Director in Bethel and my supervisor. A
true and correct copy of my e-mail to Ms. Burnett forwarding these notes is attached hereto as
Exhibit C.

8.      The next day, June 12, 2009, Ms. Liu e-mailed her corrections to our draft notes
to Ms. Schmude and me. In her cover e-mail, Ms. Liu explained that she had tried to be polite
with Mr. Cicvara, whom she viewed as a customer. Ms. Liu also attached an e-mail chain and
five text messages exchanged between her and Mr. Cicvara, and explained that she had
forwarded an additional eight text messages that she could not convert to an e-mail format to my
mobile phone. In these text messages, Mr. Cicvara admitted his conduct and at one point
referred to himself as a "dirty old man." A true and correct copy of the e-mail message with
attachments that I received from Ms. Liu on June 12, 2009, is attached hereto as Exhibit D.

9.      Later that day, I typed the additional text messages that I received from Ms. Liu
onto a Microsoft Word document. The additional text messages revealed that Mr. Cicvara
repeatedly asked Ms. Liu if he could visit her room on June 8, until Ms. Liu finally relented. I
thereafter forwarded Ms. Liu's e-mail and all of the text messages to Ms. Burnett. A true and
correct copy of my June 12, 2009 e-mail and attachments to Ms. Burnett is attached hereto as
Exhibit E.

10.     Thereafter, on June 15, 2009, I, along with Ms. Burnett and Kevin Babis, who
was Mr. Cicvara's manager, met with Mr. Cicvara in a conference room and interviewed him
regarding Ms. Liu's allegations. I took notes of the meeting, while Ms. Burnett took the lead in
asking questions. A true and correct copy of my notes is attached hereto as Exhibit F.

3

Case 12-338, Document 59-1, 07/23/2012, 671476, Page66 of 151

11.     During the June 15 meeting, Mr. Cicvara admitted that he had visited Ms. Liu's hotel room while in Asia, and that he had touched Ms. Liu while in her room.  When Ms. Burnett asked Mr. Cicvara whether he told Ms. Liu that he wanted to "rape" her, Mr. Cicvara stated: "Look, it was in a hotel and she was dressed in a way.  I told her that I had a feeling I would rape her but I never had that in my mind and I didn't thin[k] she'd think about it seriously." (Exhibit F.)  Mr. Cicvara suggested that Ms. Liu's attire excused or prompted his comment; he stated that Ms. Liu was "dressed in very short shorts," which prompted him to tell her, "I'm a man and it looks like I could rape you like that.  You are showing off." (*Id.*)  I was shocked that Mr. Cicvara admitted to telling Ms. Liu that he could "rape her," which I viewed as serious misconduct and a violation of the Company's policy against harassment and the Company's Purpose, Values and Principles ("PVPs"), which Cicvara, and every employee of the Company, received.

12.     At the end of our interview, Ms. Burnett asked Mr. Cicvara to remain in the conference room while she, Mr. Babis, and I stepped out of the room to discuss the matter with each other.  After speaking for approximately ten minutes, the three of us unanimously decided that the Company should terminate Mr. Cicvara's employment for engaging in his egregious misconduct in violation of the Company's policy and PVPs.  We then returned to the conference room, and Ms. Burnett told Mr. Cicvara that his employment was being terminated for violating the Company's harassment policy and PVPs.

13.     In my view, Mr. Cicvara engaged in egregious misconduct toward Ms. Liu. While the Company did not condone any such conduct, Mr. Cicvara's conduct was particularly troubling because, as a management employee, he was representing the Company while on business trips.  His misconduct negatively reflected on the Company as a whole and detrimentally impacted the Company's relationship with Practical Lighting.  In fact, I later

learned that, at around the same time that we were investigating Mr. Cicvara's conduct, the

Chairman of Practical Lighting, Andrew Yau, sent an e-mail to Nitesh Singh, the Company's

Senior Purchasing Manager, informing Mr. Singh that Mr. Cicvara was no longer welcome at

Practical and that the Company should send someone else for future audits.

14.     On the same day of his termination, Mr. Cicvara contacted me and asked whether

he would receive a bonus for the year and whether he could still exercise certain stock options

that he had with the Company. I informed him that I would research his questions.

15.     I relayed Mr. Cicvara's question regarding his stock options to Ms. Burnett, who

contacted Jason Muncy, one of the Company's in-house attorneys who advises the business on

securities and corporate law. Later on that same day, Ms. Burnett and I participated in a

telephone conference with Mr. Muncy. During that conference call, Ms. Burnett explained the

reasons for Mr. Cicvara's termination and Mr. Muncy stated that Mr. Cicvara's stock options

were automatically cancelled as a result of his termination for cause. Mr. Muncy pointed us to

Section 6(f) of The Gillette Company 1971 Stock Option Plan (the "Plan"), which states that an

employee's stock options are automatically forfeited if the employee is terminated for cause.

That section defines "Cause" as, among other things, engaging in "gross misconduct."

16.     I agreed with Mr. Muncy. It was clear to me that Mr. Cicvara had engaged in

gross misconduct and, therefore, by the express terms of the Plan, he forfeited his stock options

by virtue of his termination for cause.

17.     The next day, on June 16, 2009, I spoke with Mr. Cicvara and erroneously told

Mr. Cicvara that he would receive a bonus when they were paid out in September 2009. I also

informed Mr. Cicvara that his stock options had been automatically forfeited. Mr. Cicvara

informed me that he received conflicting information the previous day when he called the stock

5

plan administration number. Mr. Cicvara stated that the administrator informed him that employees terminated for cause could exercise their options within thirty days of their termination. I told Mr. Cicvara that I would call the stock plan administrator and clarify the issue. After speaking with the stock plan administrator, I called Mr. Cicvara again and informed him that the information I had provided to him earlier was correct and that he could not exercise his stock options because they had been forfeited by virtue of Section 6(f) of the Plan. I further explained to him that the erroneous information relayed to him by the stock plan administrator did not change the clear terms of the Plan, which determined how options are handled and which stated that options are forfeited if an employee is terminated for cause. A true and correct copy of my notes from the various calls I had with Mr. Cicvara discussing his stock options is attached hereto as Exhibit G.

18. Later that day, I sent Mr. Cicvara a letter memorializing our last conversation and explaining that the stock plan administrator provided incorrect information because she did not know all of the relevant facts regarding Mr. Cicvara's termination for cause. I reiterated that Mr. Cicvara could not exercise his stock options because of his misconduct, which constituted grounds for forfeiture under the Plan. A true and correct copy of my June 16, 2009, letter to Mr. Cicvara is attached hereto as Exhibit H.

19. Notwithstanding our conversations, Mr. Cicvara attempted to exercise his stock options on July 3, 2009. The Company rejected his attempt because his stock options already had been cancelled. On July 6, 2009, I sent Mr. Cicvara a second letter once more explaining that his stock options had been forfeited because he had been terminated for cause. A true and correct copy of my July 6, 2009, letter is attached hereto as Exhibit I.

6

Case 12-338, Document 59-1, 07/23/2012, 671476, Page69 of 151

20.   On September 15, 2009, Mr. Cicvara sent me an e-mail inquiring about the status of his bonus.  I responded that he was not entitled to a bonus.  I attached a copy of the Company's Short Term Achievement Reward ("STAR") plan and explained that, pursuant to the terms of the STAR plan, Mr. Cicvara had to be employed on June 30th, the date that bonuses are paid, to be entitled to a bonus.  A copy of my e-mail to Mr. Cicvara is attached hereto as Exhibit J.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this _14_ day of April, 2011, at Bethel, Connecticut.

_Peggy Wilczewski_
Peggy Wilczewski

7

| | |
|---|---|
| From: | Schmude, Dina |
| Sent: | Thursday, June 11, 2009 10:42 AM |
| To: | Wilczewski, Peggy |
| Subject: | Re: Follow up to our conversation |

Thanks Peggy for sending this.  Do you want me to write up the draft of the timeline?  I am up in a couple of minutes, but can start it right after.

Dina

----- Original Message -----
From: Wilczewski, Peggy
To: Bel <bell@practical.com.hk>
Cc: Schmude, Dina
Sent: Thu Jun 11 10:10:19 2009
Subject: Follow up to our conversation

Bel,


We want to thank you again for sharing with us the events that took place this past week while you were traveling with Predrag for the Singapore and Thailand audits.  We know this was not an easy matter to discuss and appreciate your openness with us.


We are in the process of typing up the notes we took down during our conversation and will send them to you shortly so you can verify that the information we captured was accurate.


In the meantime, please forward the text message conversations you had with Predrag this week to our cell phones.  Those numbers are as follows:


203 - 300 - 1274 (Peggy's phone)


203 - 278 - 4657 (Dina's phone)


Also please send us the email Predrag sent you apologizing for his behavior.


If you could send us the contact information (email address and phone number) for your supervisor, Andrew Yau, we'd appreciate it.


Best regards,


Peggy and Dina


1

NFIDENTIAL

| From: | Wilczewski, Peggy |
|---|---|
| Sent: | Thursday, June 11, 2009 12:54 PM |
| To: | Bel |
| Cc: | Schmude, Dina |
| Subject: | For your review |

Attachments: Notes from Bel Liu on 6-11-09.doc

Bel,

We want to thank you again for sharing with us the events that took place this past week while you were traveling with Predrag for the Singapore and Thailand audits. We know this was not an easy matter to discuss and appreciate your openness with us.

We have typed up the notes we took down during our conversation today. Please review them as soon as you can and let us know of any changes. If possible, please send us any corrections before the end of the week. (We realized this request is for a quick turn around but we would like to address this situation as soon as possible.)

In the meantime, please forward the text message conversations you had with Predrag this week to our cell phones. Our numbers are as follows:

203 – 300 - 1274 (Peggy's phone)

203 – 278 – 4657 (Dina's phone)

Also please send us as soon as you can the email Predrag sent you apologizing for his behavior.

If you could send us the contact information (email address and phone number) for your supervisor, Andrew Yau, we'd appreciate it. We'd like to let him know that we have this investigation underway.

Best regards,

Peggy and Dina

CONFIDENTIAL

Phone conversation with Bel Liu of Practical Lighting and

At 7:30 am (ET) Dina Schmude and Peggy Wilczewski called Bel in Hong Kong (9 011 852 9673 7194) as they had scheduled this time to speak together.

Peggy and Dina told Bel that they were aware that she had called Austin Lin earlier in the week to tell him that Predrag Cicvara, of Duracell's quality team, had made unwelcome advances to her and that they needed for her to share with her everything that took place even though this could be difficult to discuss — especially with 2 people she did not know and that this was a phone conversation and not an in-person meeting.

They asked Bel to tell them about her role at Practical in Hong Kong. Bel said she is the GM and has been there for 6 years and handles questions about quotes, quality issues, and other things. Peggy and Dina then asked Bel questions to better understand what took place with Predrag and why he made her uncomfortable.

Q: How long have you known Austin?
A: Since March of last year.

Q: How long have you known Predrag?
A: Since June or July of last year. Predrag replaced Austin in the role working with us.

Q: How did things start off with Predrag?
A: He treated me as a friend and we sometimes talked of business and sometimes personal things.

Q: How often did you meet with Predrag?
A: We met 3 times in person. In September of last year when I made the trip to Bethel to meet the purchasing team. In December 2009 when he came to China for the factory audit. And the third time a few days ago for the audit in Indonesia and Thailand. Before the Bethel trip, we mostly emailed and it was mostly about business.

Q: How was your meeting with him last September in Bethel? Did he do anything to make you uncomfortable at that visit?
A: No, that was okay.

Q: How about last December's trip when you met in China?
A: No, that was okay. The uncomfortable things started a few days ago. Since I'm Chinese, it is difficult for me to discuss this and he is a customer. It was uncomfortable physical contact. He helped me type, tried to kiss me, moved his hands around my body.

Q: Where did this happen?
A: It took place in Indonesia last Friday in my hotel room. It was after we had lunch and he came to my room. On the second night in Singpore, he seemed to want to do something with me. He asked me if I wanted to come to his room, and I said no. He sent

me a text message saying he wanted to return the sun protector and T-shirts we bought that day. He hugged and kissed me. I told him I did not like it and did not want it. He said he wanted to please me. He said I'm attracted to you. I want you to be my friend but I hope it will be more than a friend. I said he had to leave and he asked why. He is a customer so I tried to be polite. I told him my company paid for my room and it is for me only. He said I know you don't love me but you like me. I did not reply. Then when we went to the factory audit in Singapore, I was quiet.

Q: It would help us to better understand the things that happened during your travels with Predrag if we could go in order. Can you describe for us what happened in the following days?

A: On Friday, after working we had a drink with the other P&G auditor, Dave (Arnsperger). After we finished our drinks Predrag asked me if he could see my room to look at the view. I was not comfortable with this but since he is the customer I let him come to my room. I work with many customers and I am never approached this way, I knew something was wrong. He hugged me in my room so I opened the door and asked him to leave. He asked me do you want to try? Are you enjoying it? I clearly said no that I didn't like it. I told him that he should think about your wife and your son. I told him I did not like it. He told me that he just wanted to touch me. I told him he was a dirty old man and he said yes I am. I told him we are neither a couple or lovers so please stop thinking about me. And then finally he left.

On Saturday we were in Singapore he asked me if I wanted to come to his room and I said I did not. He then found an excuse to come to my room. He told me that he fell in love with me. I opened the door to show him again that I wanted him to leave.

On Monday we left Singapore for Thailand. Dave remained in Singapore to do other audit work there. We had dinner with our team. It was me, Predrag, my boss (Andrew Yau), and the other managing director from my company (Yuen Yau). Laurie (Leach), the other P&G auditor, came late that night and was not there in time to meet us for dinner. After dinner I went to my room as I felt sick. Predrag sent me a text asking if he could see me. I told him no. Then he was standing at my door. I let him in the room. I don't know how to reject a customer. He brought dessert with him as his excuse to come in the room. I laid on the bed because I did not feel well. He turned off the lights in the room and tried to get on my bed. I was very sick and could not move. I asked him not to touch me and told him I was serious. He tried to give me a massage. I told him I did not want him to touch me. I would not even have wanted my husband to touch me as I felt so sick. He then put his hand on my body and I was I was not feeling well and couldn't struggle. He kissed my eyes and chin and when he tried to kiss my lips, I turned my face. I kept saying don't touch me. He said I just want to touch you. Then he took off his clothes except for his underwear. He was still on the bed. I asked him to leave. He said you don't want to see my belly. I said I don't want to see you.

I then escaped from my bed. I did not look at him. I turned away and told him to put on his clothes. I told him that I did not want to put on the light and see his naked body. He

did get dressed and I put the light on. I was angry and shouted to him and told him I hated what he did. He tried to hold me and kiss me. I struggled and ran to the corner of my room. He chased me and asked me what happened. I told him that it was very late and that he had to go. I told I have to sleep. Finally he left. He was in my room for about an hour.

The next day was Tuesday. I told Andrew and Yuen that I was sick and stayed in my room that day. I told Andrews that I had some uncomfortable physical contact from Predrag. I told Andrew that I spoke to Austin and he told me to follow what Austin tells me about reporting this to the P&G team. I told him I felt bad about getting Predrag in trouble. Andrew told me not to be kind to Predrag. He said he was going to tell Nitesh (Singh) that Predrag is not to work with me.

Predrag sent me a text message and I told him that we were not lovers. I went to dinner that night. At dinner were Laurie, Andrew, Andrew's wife, Predrag, and Yuen. Predrag behaved himself in front of the others. After dinner he asked for a little chat. I rejected his request. I could not tolerate any more. Predrag, Laurie, and I all went back to our rooms. All was fine while Laurie was there. Laurie had checked in to the hotel after us so she was on the 32nd floor and Predrag and I were on the 38th floor. When the elevator got to the 38th floor, we got out into the lobby area on that floor. He approached me on the 38th floor lobby. He touched my body and kissed me and asked if I wanted to talk. I told him I needed to get packed to leave the next day. Finally he let go after kissing me. I told him that I was sorry. He asked me why I said that. He asked if I said that because I did not love him. I told him it is out of my control. Predrag then asked if I told Andrew what had happened. I was afraid of him.

The next day, Wednesday, we were still in Indonesia. I saw Predrag in the morning. We were all getting ready to travel that day. I decided to return to him the T-shirt he bought me in Singapore. I put it outside his room on the floor of the hallway. I went back to my room. He came to my room, pushed the door open and asked why I returned the T-shirt. He asked if I had told anyone. I told him that I was afraid of him. Predrag said he was surprised I was afraid of him. I tried calling Austin but reached his voicemail. *(Presumably this is when Austin's voicemail recorded the conversation between Predrag and Bel.)* He asked me who I was calling. I did not respond. He then left as he had to check out and meet Laurie at 8 am who was waiting for him in the lobby. He left down and sad. He then left for China with Laurie and I went home to Hong Kong.

Since he left, he sent me an email apologizing to me. He called me at my time Wednesday night and said he was sorry to make me afraid of him. He sent me a text message apologizing.

Peggy and Dina told Bel that they will write up the notes from this conversation and send them to her to review for accuracy. They also told Bel that they would keep her apprised of the situation and want to reach out to her supervisor, Andrew, to let him know of our investigation. Bel was asked to send them Andrew's email and phone information. We

Case 12-338, Document 59-1, 07/23/2012, 671476, Page75 of 151

A-348

asked her not to communicate any more with Austin about this matter as it is important that he not be involved while we conduct our investigation.  They also told her that they would like her to send the text messages and emails to them and would provide their cell numbers so she could do so.

The conversation concluded at 9 am ET.

ONFIDENTIAL

PG  000580

Case 12-338, Document 59-1, 07/23/2012, 671476, Page76 of 151

A-349

From:           Wilczewski, Peggy
Sent:           Thursday, June 11, 2009 1:00 PM
To:             Burnett, Lynne
Cc:             Schmude, Dina
Subject:        Our draft notes
Attachments:    Notes from Bel Liu on 6-11-09.doc

Lynne,

Attached is as copy of the notes Dina and I recorded today when we spoke with Bel Liu of Hong Kong. I have sent the notes to Bel asking her to review them to ensure we correctly captured what she shared with us. It was hard for her to talk about this. We could tell that speaking about it was upsetting and sometimes she flip flopped from one day's events to another so we want to be sure we have the right sequence of events.

She has text messages and email(s) from him that we've asked her to send us. If this documentation turns out to be what she described, I think we'll have a lot of information to support her side of the story. I don't think she wants to get him in trouble. We told her that people are responsible for their actions and that if any disciplinary action is taken against him, it would be as a result of his actions.

If you get some free time this afternoon, let me know.

Peggy

NFIDENTIAL

PG  000581

**Thursday, June 11, 2009**
Phone conversation with Bel Liu of Practical Lighting and

At 7:30 am (ET) Dina Schmude and Peggy Wilczewski called Bel in Hong Kong (9.011 852 9673 7194) as they had scheduled this time to speak together.

Peggy and Dina told Bel that they were aware that she had called Austin Lin earlier in the week to tell him that Predrag Cievara, of Duracell's quality team, had made unwelcome advances to her and that they needed for her to share with her everything that took place even though this could be difficult to discuss --- especially with 2 people she did not know and that this was a phone conversation and not an in-person meeting.

They asked Bel to tell them about her role at Practical in Hong Kong.  Bel said she is the GM and has been there for 6 years and handles questions about quotes, quality issues, and other things.  Peggy and Dina then asked Bel questions to better understand what took place with Predrag and why he made her uncomfortable.

Q: How long have you known Austin?
A: Since March of last year.

Q: How long have you known Predrag?
A: Since June or July of last year.  Predrag replaced Austin in the role working with us.

Q: How did things start off with Predrag?
A: He treated me as a friend and we sometimes talked of business and sometimes personal things.

Q: How often did you meet with Predrag?
A: We met 3 times in person.  In September of last year when I made the trip to Bethel to meet the purchasing team.  In December 2009 when he came to China for the factory audit.  And the third time a few days ago for the audit in Indonesia and Thailand.  Before the Bethel trip, we mostly emailed and it was mostly about business.

Q: How was your meeting with him last September in Bethel?  Did he do anything to make you uncomfortable at that visit?
A: No, that was okay.

Q: How about last December's trip when you met in China?
A: No, that was okay.  The uncomfortable things started a few days ago.  Since I'm Chinese, it is difficult for me to discuss this and he is a customer.  It was uncomfortable physical contact.  He helped me type, tried to kiss me, moved his hands around my body.

Q: Where did this happen?
A: It took place in Indonesia last Friday in my hotel room.  It was after we had lunch and he came to my room.  On the second night in Singpore, he seemed to want to do something with me.  He asked me if I wanted to come to his room, and I said no.  He sent

me a text message saying he wanted to return the sun protector and T-shirts we bought that day. He hugged and kissed me. I told him I did not like it and did not want it. He said he wanted to please me. He said I'm attracted to you. I want you to be my friend but I hope it will be more than a friend. I said he had to leave and he asked why. He is a customer so I tried to be polite. I told him my company paid for my room and it is for me only. He said I know you don't love me but you like me. I did not reply. Then when we went to the factory audit in Singapore, I was quiet.

Q: It would help us to better understand the things that happened during your travels with Predrag if we could go in order. Can you describe for us what happened in the following days?

A: On Friday, after working we had a drink with the other P&G auditor, Dave (Amsperger). After we finished our drinks Predrag asked me if he could see my room to look at the view. I was not comfortable with this but since he is the customer I let him come to my room. I work with many customers and I am never approached this way, I knew something was wrong. He hugged me in my room so I opened the door and asked him to leave. He asked me do you want to try? Are you enjoying it? I clearly said no that I didn't like it. I told him that he should think about your wife and your son. I told him I did not like it. He told me that he just wanted to touch me. I told him he was a dirty old man and he said yes I am. I told him we are neither a couple or lovers so please stop thinking about me. And then finally he left.

On Saturday we were in Singapore he asked me if I wanted to come to his room and I said I did not. He then found an excuse to come to my room. He told me that he fell in love with me. I opened the door to show him again that I wanted him to leave.

On Monday we left Singapore for Thailand. Dave remained in Singapore to do other audit work there. We had dinner with our team. It was me, Predrag, my boss (Andrew Yau), and the other managing director from my company (Yuen Yau). Laurie (Leach), the other P&G auditor, came late that night and was not there in time to meet us for dinner. After dinner I went to my room as I felt sick. Predrag sent me a text asking if he could see me. I told him no. Then he was standing at my door. I let him in the room. I don't know how to reject a customer. He brought dessert with him as his excuse to come in the room. I laid on the bed because I did not feel well. He turned off the lights in the room and tried to get on my bed. I was very sick and could not move. I asked him not to touch me and told him I was serious. He tried to give me a massage. I told him I did not want him anyone to touch me. I would not even have wanted my husband to touch me as I felt so sick. He then put his hand on my body and I was I was not feeling well and couldn't struggle. He kissed my eyes and chin and when he tried to kiss my lips, I turned my face. I kept saying don't touch me. He said I just want to touch you. Then he took off his clothes except for his underwear. He was still on the bed. I asked him to leave. He said you don't want to see my belly. I said I don't want to see you.

I then escaped from my bed. I did not look at him. I turned away and told him to put on his clothes. I told him that I did not want to put on the light and see his naked body. He

ONFIDENTIAL

A-352

did get dressed and I put the light on. I was angry and shouted to him and told him I hated what he did. He tried to hold me and kiss me. I struggled and ran to the corner of my room. He chased me and asked me what happened. I told him that it was very late and that he had to go. I told I have to sleep. Finally he left. He was in my room for about an hour.

The next day was Tuesday. I told Andrew and Yuen that I was sick and stayed in my room that day. I told Andrews that I had some uncomfortable physical contact from Predrag. I told Andrew that I spoke to Austin and he told me to follow what Austin tells me about reporting this to the P&G team. I told him I felt bad about getting Predrag in trouble. Andrew told me not to be kind to Predrag. He said he was going to tell Nitesh (Singh) that Predrag is not to work with me.

Predrag sent me a text message and I told him that we were not lovers. I went to dinner that night. At dinner were Laurie, Andrew, Andrew's wife, Predrag, and Yuen. Predrag behaved himself in front of the others. After dinner he asked for a little chat. I rejected his request. I could not tolerate any more. Predrag, Laurie, and I all went back to our rooms. All was fine while Laurie was there. Laurie had checked in to the hotel after us so she was on the 32nd floor and Predrag and I were on the 38th floor. When the elevator got to the 38th floor, we got out into the lobby area on that floor. He approached me on the 38th floor lobby. He touched my body and kissed me and asked if I wanted to talk. I told him I needed to get packed to leave the next day. Finally he let go after kissing me. I told him that I was sorry. He asked me why I said that. He asked if I said that because I did not love him. I told him it is out of my control. Predrag then asked if I told Andrew what had happened. I was afraid of him.

The next day, Wednesday, we were still in Indonesia. I saw Predrag in the morning. We were all getting ready to travel that day. I decided to return to him the T-shirt he bought me in Singapore. I put it outside his room on the floor of the hallway. I went back to my room. He came to my room, pushed the door open and asked why I returned the T-shirt. He asked if I had told anyone. I told him that I was afraid of him. Predrag said he was surprised I was afraid of him. I tried calling Austin but reached his voicemail. *(Presumably this is when Austin's voicemail recorded the conversation between Predrag and Bel.)* He asked me who I was calling. I did not respond. He then left as he had to check out and meet Laurie at 8 am who was waiting for him in the lobby. He left down and sad. He then left for China with Laurie and I went home to Hong Kong.

Since he left, he sent me an email apologizing to me. He called me at my time Wednesday night and said he was sorry to make me afraid of him. He sent me a text message apologizing.

Peggy and Dina told Bel that they will write up the notes from this conversation and send them to her to review for accuracy. They also told Bel that they would keep her apprised of the situation and want to reach out to her supervisor, Andrew, to let him know of our investigation. Bel was asked to send them Andrew's email and phone information. We

ONFIDENTIAL

asked her not to communicate any more with Austin about this matter as it is important that he not be involved while we conduct our investigation.  They also told her that they would like her to send the text messages and emails to them and would provide their cell numbers so she could do so.

The conversation concluded at 9 am ET.

NFIDENTIAL

A-354

| | |
|---|---|
| From: | Bel [bel@practical.com.hk] |
| Sent: | Friday, June 12, 2009 8:18 AM |
| To: | Wilczewski, Peggy |
| Cc: | Schmude, Dina |
| Subject: | RE: For your review |
| Attachments: | Notes from Bel Liu on 6-11-09.doc; Re: Please Read This E-mail; P's msg on 6/9; B's reply on 6/9; P's msg-II on 6/9; P's msg on 6/10; P's msg-II on 6/10 |

      

Notes from Bel Liu   Re: Please Read   P's msg on 6/9   B's reply on 6/9   P's msg-II on 6/9   P's msg on 6/10   P's msg-II on 6/10
on 6-11-09....   This E-mail

Dear

Peggy,

I forwarded you 8 text messages that I couldn't convert them to email format this morning. Let me know if you didn't receive them. I also attached Predrag's email and the 5 remaining messages as email format.

Besides, I amended the notes and highlighted in blues for my changes.  I added on some memories and feelings. Please understand that I tried to be polite when hosting customer.

Andrew's email is andrew@ji-net.com. Let me know what else do you need.


Best regards,

Bel


Practical Group of Companies

Tel: +852 2332 1887

DL: +852 2781 3166

Fax: +852 2770 3754

www.practical.com.hk <http://www.practical.com.hk/>


Disclaimer

Information contained in this message is confidential and may be legally privileged. This message is intended solely for addressee(s). If you are not the named addressee, you are hereby notified that any use, dissemination, or reproduction is strictly prohibited and may be unlawful.

From: Wilczewski, Peggy [mailto:wilczewski.pm@pg.com]
Sent: Friday, June 12, 2009 12:54 AM
To: Bel
Cc: Schmude, Dina
Subject: For your review

1

ONFIDENTIAL

PG  000613

Case 12-338, Document 59-1, 07/23/2012, 671476, Page82 of 151

Bel,


We want to thank you again for sharing with us the events that took place this past week while you were traveling with Predrag for the Singapore and Thailand audits.  We know this was not an easy matter to discuss and appreciate your openness with us.


We have typed up the notes we took down during our conversation today.  Please review them as soon as you can and let us know of any changes.  If possible, please send us any corrections before the end of the week.  (We realized this request is for a quick turn around but we would like to address this situation as soon as possible.)


In the meantime, please forward the text message conversations you had with Predrag this week to our cell phones.  Our numbers are as follows:


203 – 300 – 1274 (Peggy's phone)


203 – 278 – 4657 (Dina's phone)


Also please send us as soon as you can the email Predrag sent you apologizing for his behavior.


If you could send us the contact information (email address and phone number) for your supervisor, Andrew Yau, we'd appreciate it.  We'd like to let him know that we have this investigation underway.


Best regards,


Peggy and Dina


2


ONFIDENTIAL

PG 000814

**Thursday, June 11, 2009**
Phone conversation with Bel Liu of Practical Lighting and

At 7:30 am (ET) Dina Schmude and Peggy Wilczewski called Bel in Hong Kong (9 011 852 9673 7194) as they had scheduled this time to speak together.

Peggy and Dina told Bel that they were aware that she had called Austin Lin earlier in the week to tell him that Predrag Cicvara, of Duracell's quality team, had made unwelcome advances to her and that they needed for her to share with her everything that took place even though this could be difficult to discuss — especially with 2 people she did not know and that this was a phone conversation and not an in-person meeting.

They asked Bel to tell them about her role at Practical in Hong Kong. Bel said she is the GM and has been there for 6 years and handles questions about quotes, quality issues, and other things. Peggy and Dina then asked Bel questions to better understand what took place with Predrag and why he made her uncomfortable.

Q: How long have you known Austin?
A: Since March of last year.

Q: How long have you known Predrag?
A: Since June or July of last year. Predrag replaced Austin in the role working with us.

Q: How did things start off with Predrag?
A: He treated me as a friend and we sometimes talked of business and sometimes personal things.

Q: How often did you meet with Predrag?
A: We met 3 times in person. In September of last year when I made the trip to Bethel to meet the purchasing team. In December 2009 when he came to China for the factory audit. And the third time a few days ago for the audit in Indonesia and Thailand. Before the Bethel trip, we mostly emailed and it was mostly about business.

Q: How was your meeting with him last September in Bethel? Did he do anything to make you uncomfortable at that visit?
A: No, that was okay.

Q: How about last December's trip when you met in China?
A: No, that was okay. The uncomfortable things started a few days ago. Since I'm Chinese, it is difficult for me to discuss this and he is a customer. It was uncomfortable physical contact. He ~~helped me type~~ hugged me tight, tried to kiss me, moved his hands around my body.

Q: Where did this happen?
A: It took place in Indonesia last Friday in my hotel room. It was after we had ~~lunch~~ dinner and he came to my room. On the second night in Singpore, he seemed to want to

do something with me. He asked me if I wanted to come to his room, and I said no. He sent me a text message saying he wanted to return the sun protector and T-shirts we bought that day. He hugged and unusually kissed me. I told him I did not like it and did not want it. He said he wanted to please me. [He said I'm attracted to you. I want you to be my friend but I hope it will be more than a friend] this dialogue took place in Thailand. I said he had to leave and he asked why. He is a customer so I tried to be polite. I told him my company paid for my room and it is for me business only. He said you can treat me as a friend, not customer; I know you don't love me but you like me. I did not reply. Then when we went to the factory audit in ~~Singapore~~ Thailand, I was quiet. He asked me are you mad with me.

Q: It would help us to better understand the things that happened during your travels with Predrag if we could go in order. Can you describe for us what happened in the following days?

A: On Thursday, we had dinner with Dave and Willies (the representative of Practical's Indonesia factory) in Indonesia. Except Willies, we both drank little beers. Predrag held my hands in front of everyone after dinner when we were walking toward the lift lobby of restaurant. He stopped doing it after we left the lift to get on the car returning to hotel. On Friday, after working we had a drink with the other P&G auditor, Dave (Arnsperger). After we finished our drinks Predrag asked me if he could see my room to look at the view. I was not comfortable with this but since he is the customer I let him come to my room. I work with many customers and I am never approached this way, I knew something was wrong. He hugged me in my room so I opened the door while he was still hugging me and asked him to leave. He asked me do you want to try? Are you enjoying it? I clearly said no that I didn't like it. I told him that he should think about your wife and your son. I told him I did not like it. [ He told me that he just wanted to touch me. I told him he was a dirty old man and he said yes I am] it was the conversation happened in Thailand, not Indonesia. [ I told him we are neither a couple or lovers so please stop thinking about me ] it was the text message I sent him on 6/9. And then finally he left. I can describe that the thing happened in Indonesia was just slightly more than a casual talk.

On Saturday we were in Singapore he asked me if I wanted to come to his room and I said I did not. He then found an excuse to come to my room. He told me that he fell in love with me. I opened the door to show him again that I wanted him to leave. And then I sent a text message to Austin telling him I was afraid of Predrag but I had to pretend I was not because I didn't want to give him hard feeling.

On ~~Monday~~ Sunday we left Singapore for Thailand. Dave remained in Singapore to do other audit work there. Predrag told me he wanted to have connected room when checking in the hotel. We had dinner with our team. It was me, Predrag, my boss (Andrew Yau), and the other managing director from my company (Yuen Yau). Laurie (Leach), the other P&G auditor, came late that night and was not there in time to meet us for dinner. After dinner Yuen was be with me and Predrag returning to hotel because Yuen needed to take back his briefcase in my room. Predrag sent me text message after we returned to our own rooms asking if Yuen left or not. He finally came in my room but

Case 12-338, Document 59-1, 07/23/2012, 671476, Page85 of 151

I could not recall what happened on that night because we drank certain red wine at dinner. I believe he didn't stay in my room for long time.

On Monday, after dinner I went to my room as I felt sick. Predrag sent me a text asking if Yuen left again as he could see me. I told him no. Then he was standing at my door. I let him in the room. I don't know how to reject a customer. He brought dessert with him as his excuse to come in the room. I laid on the bed because I did not feel well. He turned off the lights in the room and tried to get on my bed. I was very sick and could not move. I asked him not to touch me and told him I was serious. He tried to give me a massage. I told him I did not want him anyone to touch me. He said I just wanted you to be pleased. [ I would not even have wanted my husband to touch me as I felt so sick ] this is what my approach when I come across periodical sick, not what I told Predrag. He then put his hand on my body and I was I was not feeling well and couldn't struggle. Then he kissed my arms and legs but I didn't look at him because I was so uncomfortable so I needed to stay there. [ He kissed my eyes and chin (actually he kissed every inch of my face) and when he tried to kiss my lips, I turned my face] this happened in the lift lobby on Tuesday night, not Monday. I kept saying don't touch me. He said I just want to touch you. Then he took off his clothes except for his underwear. He was still on the bed. I asked him to leave. He said you don't want to see my belly. I said I don't want to see you.

After I relieved from sick, I then escaped from my bed. I did not look at him. I turned away and told him to put on his clothes. I told him that I did not want to put on the light and see his naked body. He did get dressed the shirt only and was quite unwilling to put on his pants so I put the light on. I was angry and shouted to him and told him I hated what he did. Then he finally dressed on his pants. He tried to hold me and kiss me. I struggled and ran to the corner of my room. When he was on my bed, I ran to sofa. He came to me and put me on bed again and said I want to rape you but I didn't understand the word "rape" at that moment so I asked what is rape. I somehow hurt his forehead when struggling with him on the bed. He chased me and asked me what happened. I told him that it was very late and that he had to go. I told I have to sleep. Finally he left. He was in my room for about an hour. In conclude, he did the rude thing but he didn't threaten me or shout at me. Every word he said was gentle. He did not do any violent action. I was afraid of him because he has such intention of the dirty thing.

The next day was Tuesday. I had a call to Austin telling him what had happened on last night and he encouraged me to report to Andrew because Predrag made me felt fear of him no matter what the excuse was. I told Andrew and Yuen that I was sick and stayed in my room that day. I told Andrews that I had some uncomfortable physical contact from Predrag. I told Andrew that I spoke to Austin and he told me to follow what Austin tells me about reporting this to the P&G team. I told him I felt bad about getting Predrag in trouble. Andrew told me not to be kind to Predrag. He said he was going to tell Nitesh (Singh) that Predrag is not to work with me.

Predrag sent me a text message after Yuen told him I was not available to accompany them for the audit and I told him that we were not lovers. I went to dinner that night. At

dinner were Laurie, Andrew, Andrew's wife, Predrag, and Yuen. Predrag behaved himself in front of the others. [ After dinner he asked for a little chat. I rejected his request. I could not tolerate any more] it was happened on the 38th floor. Predrag, Laurie, and I all went back to our rooms. All was fine while Laurie was there. Laurie had checked in to the hotel after us so she was on the ~~32nd~~ 33rd floor and Predrag and I were on the 38th floor. When the elevator got to the 38th floor, we got out into the lobby area on that floor. He approached me on the 38th floor lobby. He touched my body and kissed me and asked if I wanted to talk. I told him I needed to get packed to leave the next day. Finally he let go after kissing me. I told him that I was sorry. He asked me why I said that. He asked if I said that because I did not love him. I told him it is out of my control. Predrag then asked if I told Andrew what had happened. I was afraid of him. I said you shouldn't do it. He asked shouldn't do what. I said you shouldn't hold me like this. I asked if he could remember I told him I don't like and I don't want. He also said sorry to me but I told him it's too late.

The next day, Wednesday, we were still in ~~Indonesia~~ Thailand. I ~~saw~~ didn't see Predrag in the morning. ~~We were all getting~~ He was ready to travel that day. I decided to return to him the T-shirt he bought me in Singapore. I put it outside his room on the floor of the hallway. I went back to my room. He came to my room, pushed the door open and asked why I returned the T-shirt. He asked if I had told anyone. I told him that I was afraid of him. Predrag said he was surprised I was afraid of him. I tried calling Austin but reached his voicemail. *(Presumably this is when Austin's voicemail recorded the conversation between Predrag and Bel.)* He asked me who I was calling. I did not respond. He then left as he had to check out and meet Laurie at 8 am who was waiting for him in the lobby. He left down and sad. He then left for China with Laurie and I went home to Hong Kong.

Since he left, he sent me an email apologizing to me. He called me at my time Wednesday night and said he was sorry to make me afraid of him. He sent me a text message apologizing.

Peggy and Dina told Bel that they will write up the notes from this conversation and send them to her for review for accuracy. They also told Bel that they would keep her apprised of the situation and want to reach out to her supervisor, Andrew, to let him know of our investigation. Bel was asked to send them Andrew's email and phone information. We asked her not to communicate any more with Austin about this matter as it is important that he not be involved while we conduct our investigation. They also told her that they would like her to send the text messages and emails to them and would provide their cell numbers so she could do so.

The conversation concluded at 9 am ET.

CONFIDENTIAL

Case 12-338, Document 59-1, 07/23/2012, 671476, Page87 of 151

A-360

**From:** Ciovara, Predrag
**Sent:** Wednesday, June 10, 2009 6:49 AM
**To:** bell@practical.com.hk
**Subject: Re: Please Read This E-mail**

Life seems better now Bel. It would be very difficult without you. Listening (still in the car with Lori, River and Tanya) to Ali Farka song Ai Du (blues you listened to in Singapore). Sweet memories!

I can promise that never again I will be a "dirty man" with you.

Thank you.


Predrag Ciovara

----- Original Message -----
From: Bel <bell@practical.com.hk>
To: Ciovara, Predrag
Cc: Bel <bell@practical.com.hk>
Sent: Wed Jun 10 03:42:01 2009
Subject: Re: Please Read This E-mail

I'm sorry because I don't love you but I know you love me so. I appreciated you in the past because we were just friend. What I cannot accept is what you did in the last few days. Without those dirty things, we can be friend. I'm on the way to airport now. Will call you in about 30 mins.

Bel

Sent via BlackBerry® from 3


From: "Ciovara, Predrag"
Date: Wed, 10 Jun 2009 02:51:19 -0400
To: <bell@practical.com.hk>
Subject: Please Read This E-mail


Hi ma Belle,

Having nothing more urgent to occupy my mind in the plane I am thinking about all the wonderfull moments that I had a privilege to experience in the last year or so, all connected to you. From your Bethel's visit last year, to our December's moments together, through the European winter, our exchange of short e-mails while traveling, receiving a postcard from you, my warm feelings about you, my desire to protect you and inexplicable closeness that I felt towards you all this time.

It was you whom I chose to confine my thoughts when I had troubles, and it appeared you chose the same by starting to confine your personal dilemmas and doubts to me. I have cherished our secret friendship deeply all the way feeling extremely strong respect for you as a person, successful business woman, as a woman and as a friend.

This is NOT changed today I guess I have desire to say and would like you to understand. I would love nothing more than to take back few emotional outbreaks that I experienced last few days. Had I known that I have risked losing such a precious thing as our friendship, I wouldn't ever have attempted what I so foolishly did misjudging the nature of our closeness in the last few days.

Maybe the cultural differences that you so graceously tried to point out in one of our conversations did ironically played the part in what transpired lately. I believe if you had taken a strong stance against my foolish attempts to get more out of our relation stopping it from the very beginning, I would have stopped then and would have still be in

CONFIDENTIAL

that special relation with you that meant so much to me. By being so polite and trying not to hurt my feelings you have unconciously encouraged my (macho? possessive? animouse? stupid?) efforts to get more than you were ready to give.

Foolish dirty old man! How quickly such a wonderfool friendship (at least on my part) could be destroyed!

So I guess I am trying to tell you that regardless of what your decision about us and our friendship will be, I still will have all these little precious pieces of happiness deeply carved in my memory and nothing will take these from me ever.

I can only hope that you will understand me and remain beeing my true friend in the future. Again I can only say I am sorry for what I did to you and I know there is no real excuse for it. Not sure that I described correctly what I really feel but probably can't do it better anyway. Maybe, just maybe you could understand what went wrong a bit better.

I hope I will have a strength to send this e-mail after landing.

Sorry if reading this stream of thoughts took too much of your time, which I know you don't have much of. I simply had to write it.

Your friend Predrag


Predrag Clovara

CONFIDENTIAL

A-362

From:   Bel [bel@practical.com.hk]
Sent:   Friday, June 12, 2009 3:02 AM
To:     Bel
Subject: F's msg on 6/9

After Yuen told Predrag I was on sick leave.

----- SMS -----
From: +12012430079
Sent: Jun 9, 2009 10:52
Subject: I hope you will bew better soon.

I hope you will bew better soon. Feel terrible that can't be with you and pamper you.
Sent via BlackBerryR from 3

ONFIDENTIAL

A-363

**From:** Bel [bel@practical.com.hk]
**Sent:** Friday, June 12, 2009 3:04 AM
**To:** Bel
**Subject:** B's reply on 6/9

——— SMS ———
To: +12032430079
Sent: Jun 9, 2009 11:04
Subject: Thx P.

Thx P. I'm fine but I have to re-emphasis that we are not either couples or lovers. Pls stop thinking about me.
Sent via BlackBerryR from 3

CONFIDENTIAL

From:      Bel [bel@practical.com.hk]
Sent:      Friday, June 12, 2009 3:07 AM
To:        Bel
Subject:   P's msg-ll on 6/9

——— SMS ———
From: +12032430079
Sent: Jun 9, 2009 11:14
Subject: Right.

Right. No need to emphasize the obvious. Thx for the good time though. P.
Sent via BlackBerryR from 3

From:     Bel [bell@practical.com.hk]
Sent:     Friday, June 12, 2009 3:11 AM
To:       Bel
Subject:  F's msg on 6/10

Before he found the shit I left him

---- SMS ----
From: +12032430079
Sent: Jun 10, 2009 06:27
Subject: Gd mrng.

Gd mrng. Still sleeping or don't want to answer after all?

Are u sleeping? I hv a Q - why did you say I will understand why are you sorry??
Sent via BlackBerryR from 3

ONFIDENTIAL

From:      Bel [bell@practical.com.hk]
Sent:      Friday, June 12, 2009 3:12 AM
To:        Bel
Subject:   P's msg-ll on 6/10

After he left the hotel for airport

------ SMS ------
From: +12032430079
Sent: Jun 10, 2009 11:15
Subject: Just wanted to tell you that I am...

Just wanted to tell you that I am still in a shock and disgusted by myself and my poor judgment of things that were going btw us. Forgive me if you can. P.

Sent via BlackBerryR from 3

ONFIDENTIAL

| | |
|---|---|
| From: | Wilczewski, Peggy |
| Sent: | Friday, June 12, 2009 11:30 AM |
| To: | Burnett, Lynne |
| Subject: | FW: For your review |
| | |
| Attachments: | Notes from Bel Liu on 6-11-09.doc; Re: Please Read This E-mail; P's msg on 6/9; B's reply on 6/9; P's msg-II on 6/9; P's msg on 6/10; P's msg-II on 6/10; Text messages fwded from Bel Liu - 6-12-09.doc |

      

Notes from Bel Liu on 6-11-09...    Re: Please Read This E-mail    P's msg on 6/9    B's reply on 6/9    P's msg-II on 6/9    P's msg on 6/10    P's msg-II on 6/10



Text messages fwded from Bel L...

Lynne,

The first 8 text messages that she sent me I typed up and attached to this file.  I had to get them from my BB as she could not send them in an email like she did with the others she has attached here.

I'm reworking the notes document I sent you yesterday to incorporate the changes she sent. I have to move a few things around.

Let me know if you want me to send my notes stuff to legal once I get the changes completed.  Or I can send it to you so you can forward it to them.

Thanks,

Peggy

---

From: Bel [mailto:bel@practical.com.hk]
Sent: Friday, June 12, 2009 8:18 AM
To: Wilczewski, Peggy
Cc: Schmude, Dina
Subject: RE: For your review

Dear Peggy,

forwarded you 8 text messages that I couldn't convert them to email format this morning.

1

                                                PG  000598

Let me know if you didn't receive them. I also attached Predrag's email and the 5 remaining messages in email format.

Besides, I amended the notes and highlighted in blues for my changes. I added on some memories and feelings. Please understand that I tried to be polite when hosting customer.

Andrew's email is andrew@i-net.com. Let me know what else do you need.

Best regards,

Bel

Practical Group of Companies

Tel: +852 2332 1887

DL: +852 2781 3166

Fax: +852 2770 3754

www.practical.com.hk <http://www.practical.com.hk/>

Disclaimer

Information contained in this message is confidential and may be legally privileged. This message is intended solely for addressee(s). If you are not the named addressee, you are hereby notified that any use, dissemination, or reproduction is strictly prohibited and may be unlawful.

From: Wilczewski, Peggy [mailto:wilczewski.pm@pg.com]
Sent: Friday, June 12, 2009 12:54 AM
To: Bel
Cc: Schmude, Dina
Subject: For your review

Bel,

We want to thank you again for sharing with us the events that took place this past week while you were traveling with Predrag for the Singapore and Thailand audits. We know this was not an easy matter to discuss and appreciate your openness with us.

We have typed up the notes we took down during our conversation today. Please review them as soon as you can and let us know of any changes. If possible, please send us any corrections before the end of the week. (We realized this request is for a quick turn around but we would like to address this situation as soon as possible.)

In the meantime, please forward the text message conversations you had with Predrag this week to our cell phones. Our numbers are as follows:

2

203 – 300 – 1274 (Peggy's phone)

203 – 278 – 4657 (Dina's phone)

Also please send us as soon as you can the email Predrag sent you apologizing for his behavior.

If you could send us the contact information (email address and phone number) for your supervisor, Andrew Yau, we'd appreciate it.  We'd like to let him know that we have this investigation underway.

Best regards,

Peggy and Dina

3

PG  000600

A-370

**Thursday, June 11, 2009**
Phone conversation with Bel Liu of Practical Lighting and

At 7:30 am (ET) Dina Schmidt and Peggy Wilczewski called Bel in Hong Kong (9 011 852 9673 7194) as they had scheduled this time to speak together.

Peggy and Dina told Bel that they were aware that she had called Austin Lin earlier in the week to tell him that Predrag Cicvara, of Duracell's quality team, had made unwelcome advances to her and that they needed for her to share with her everything that took place even though this could be difficult to discuss — especially with 2 people she did not know and that this was a phone conversation and not an in-person meeting.

They asked Bel to tell them about her role at Practical in Hong Kong. Bel said she is the GM and has been there for 6 years and handles questions about quotes, quality issues, and other things. Peggy and Dina then asked Bel questions to better understand what took place with Predrag and why he made her uncomfortable.

Q: How long have you known Austin?
A: Since March of last year.

Q: How long have you known Predrag?
A: Since June or July of last year. Predrag replaced Austin in the role working with us.

Q: How did things start off with Predrag?
A: He treated me as a friend and we sometimes talked of business and sometimes personal things.

Q: How often did you meet with Predrag?
A: We met 3 times in person. In September of last year when I made the trip to Bethel to meet the purchasing team. In December 2009 when he came to China for the factory audit. And the third time a few days ago for the audit in Indonesia and Thailand. Before the Bethel trip, we mostly emailed and it was mostly about business.

Q: How was your meeting with him last September in Bethel? Did he do anything to make you uncomfortable at that visit?
A: No, that was okay.

Q: How about last December's trip when you met in China?
A: No, that was okay. The uncomfortable things started a few days ago. Since I'm Chinese, it is difficult for me to discuss this and he is a customer. It was uncomfortable physical contact. He ~~helped me type~~ hugged me tight, tried to kiss me, moved his hands around my body.

Q: Where did this happen?
A: It took place in Indonesia last Friday in my hotel room. It was after we had ~~lunch~~ dinner and he came to my room. On the second night in Singapore, he seemed to want to

Case 12-338, Document 59-1, 07/23/2012, 671476, Page98 of 151

A-371

do something with me. He asked me if I wanted to come to his room, and I said no. He sent me a text message saying he wanted to return the sun protector and T-shirts we bought that day. He hugged and unusually kissed me. I told him I did not like it and did not want it. He said he wanted to please me. [He said I'm attracted to you; I want you to be my friend but I hope it will be more than a friend] this dialogue took place in Thailand. I said he had to leave and he asked me why. He is a customer so I tried to be polite. I told him my company paid for my room and it is for me business only. He said you can treat me as a friend, not customer; I know you don't love me but you like me. I did not reply. Then when we went to the factory audit in ~~Singapore~~ Thailand, I was quiet. He asked me are you mad with me.

Q:  It would help us to better understand the things that happened during your travels with Predrag if we could go in order. Can you describe for us what happened in the following days?

A:  On Thursday, we had dinner with Dave and Willies (the representative of Practical's Indonesia factory) in Indonesia. Except Willies, we both drank little beers. Predrag held my hands in front of everyone after dinner when we were walking toward the lift lobby of restaurant. He stopped doing it after we left the lift to get on the car returning to hotel. On Friday, after working we had a drink with the other P&G auditor, Dave (Arnsperger). After we finished our drinks Predrag asked me if he could see my room to look at the view. I was not comfortable with this but since he is the customer I let him come to my room. I work with many customers and I am never approached this way, I knew something was wrong. He hugged me in my room so I opened the door while he was still hugging me and asked him to leave. He asked me do you want to try? Are you enjoying it? I clearly said no that I didn't like it. I told him that he should think about your wife and your son. I told him I did not like it. [ He told me that he just wanted to touch me. I told him he was a dirty old man and he said yes I am] it was the conversation happened in Thailand, not Indonesia. [ I told him we are neither a couple or lovers so please stop thinking about me ] it was the text message I sent him on 6/9. And then finally he left. I can describe that the thing happened in Indonesia was just slightly more than a casual talk.

On Saturday we were in Singapore he asked me if I wanted to come to his room and I said I did not. He then found an excuse to come to my room. He told me that he fell in love with me. I opened the door to show him again that I wanted him to leave. And then I sent a text message to Austin telling him I was afraid of Predrag but I had to pretend I was not because I didn't want to give him hard feeling.

On ~~Monday~~ Sunday we left Singapore for Thailand. Dave remained in Singapore to do other audit work there. Predrag told me he wanted to have connected room when checking in the hotel. We had dinner with our team. It was me, Predrag, my boss (Andrew Yau), and the other managing director from my company (Yuen Yau). Laurie (Leach), the other P&G auditor, came late that night and was not there in time to meet us for dinner. After dinner Yuen was be with me and Predrag returning to hotel because Yuen needed to take back his briefcase in my room. Predrag sent me text message after we returned to our own rooms asking if Yuen left or not. He finally came in my room but

NFIDENTIAL

I could not recall what happened on that night because we drank certain red wine at dinner. I believe he didn't stay in my room for long time.

On Monday, after dinner I went to my room as I felt sick. Predrag sent me a text asking if Yuen left again as he could see me. I told him no. Then he was standing at my door. I let him in the room. I don't know how to reject a customer. He brought dessert with him as his excuse to come in the room. I laid on the bed because I did not feel well. He turned off the lights in the room and tried to get on my bed. I was very sick and could not move. I asked him not to touch me and told him I was serious. He tried to give me a massage. I told him I did not want him anyone to touch me. He said I just wanted you to be pleased. [ I would not even have wanted my husband to touch me as I felt so sick ] this is what my approach when I come across periodical sick, not what I told Predrag. He then put his hand on my body and I was I was not feeling well and couldn't struggle. Then he kissed my arms and legs but I didn't look at him because I was so uncomfortable so I needed to stay there. [ He kissed my eyes and chin (actually he kissed every inch of my face) and when he tried to kiss my lips, I turned my face] this happened in the lift lobby on Tuesday night, not Monday. I kept saying don't touch me. He said I just want to touch you. Then he took off his clothes except for his underwear. He was still on the bed. I asked him to leave. He said you don't want to see my belly. I said I don't want to see you.

After I relieved from sick, I then escaped from my bed. I did not look at him. I turned away and told him to put on his clothes. I told him that I did not want to put on the light and see his naked body. He did get dressed the shirt only and was quite unwilling to put on his pants so I put the light on. I was angry and shouted to him and told him I hated what he did. Then he finally dressed on his pants. He tried to hold me and kiss me. I struggled and ran to the corner of my room. When he was on my bed, I ran to sofa. He came to me and put me on bed again and said I want to rape you but I didn't understand the word "rape" at that moment so I asked what is rape. I somehow hurt his forehead when struggling with him on bed. He chased me and asked me what happened. I told him that it was very late and that he had to go. I told I have to sleep. Finally he left. He was in my room for about an hour. In conclude, he did the rude thing but he didn't threaten me or shout at me. Every word he said was gentle. He did not do any violent action. I was afraid of him because he has such intention of the dirty thing.

The next day was Tuesday. I had a call to Austin telling him what had happened on last night and he encouraged me to report to Andrew because Predrag made me felt fear of him no matter what the excuse was. I told Andrew and Yuen that I was sick and stayed in my room that day. I told Andrews that I had some uncomfortable physical contact from Predrag. I told Andrew that I spoke to Austin and he told me to follow what Austin tells me about reporting this to the P&G team. I told him I felt bad about getting Predrag in trouble. Andrew told me not to be kind to Predrag. He said he was going to tell Nitesh (Singh) that Predrag is not to work with me.

Predrag sent me a text message after Yuen told him I was not available to accompany them for the audit and I told him that we were not lovers. I went to dinner that night. At

NFIDENTIAL

dinner were Laurie, Andrew, Andrew's wife, Predrag, and Yuen. Predrag behaved himself in front of the others. [ After dinner he asked for a little chat. I rejected his request. I could not tolerate any more] it was happened on the 38th floor. Predrag, Laurie, and I all went back to our rooms. All was fine while Laurie was there. Laurie had checked in to the hotel after us so she was on the 92nd 33rd floor and Predrag and I were on the 38th floor. When the elevator got to the 38th floor, we got out into the lobby area on that floor. He approached me on the 38th floor lobby. He touched my body and kissed me and asked if I wanted to talk. I told him I needed to get packed to leave the next day. Finally he let go after kissing me. I told him that I was sorry. He asked me why I said that. He asked if I said that because I did not love him. I told him it is out of my control. Predrag then asked if I told Andrew what had happened. I was afraid of him. I said you shouldn't do it. He asked shouldn't do what. I said you shouldn't hold me like this. I asked if he could remember I told him I don't like and I don't want. He also said sorry to me but I told him it's too late.

The next day, Wednesday, we were still in Indonesia Thailand. I saw didn't see Predrag in the morning. We were all getting He was ready to travel that day. I decided to return to him the T-shirt he bought me in Singapore. I put it outside his room on the floor of the hallway. I went back to my room. He came to my room, pushed the door open and asked why I returned the T-shirt. He asked if I had told anyone. I told him that I was afraid of him. Predrag said he was surprised I was afraid of him. I tried calling Austin but reached his voicemail. *(Presumably this is when Austin's voicemail recorded the conversation between Predrag and Bel.)* He asked me who I was calling. I did not respond. He then left as he had to check out and meet Laurie at 8 am who was waiting for him in the lobby. He left down and sad. He then left for China with Laurie and I went home to Hong Kong.

Since he left, he sent me an email apologizing to me. He called me at my time Wednesday night and said he was sorry to make me afraid of him. He sent me a text message apologizing.

Peggy and Dina told Bel that they will write up the notes from this conversation and send them to her to review for accuracy. They also told Bel that they would keep her apprised of the situation and want to reach out to her supervisor, Andrew, to let him know of our investigation. Bel was asked to send them Andrew's email and phone information. We asked her not to communicate any more with Austin about this matter as it is important that he not be involved while we conduct our investigation. They also told her that they would like her to send the text messages and emails to them and would provide their cell numbers so she could do so.

The conversation concluded at 9 am ET.

ONFIDENTIAL

A-374

**From:** Cicvara, Predrag
**Sent:** Wednesday, June 10, 2009 6:49 AM
**To:** bell@practical.com.hk
**Subject:** Re: Please Read This E-mail

Life seems better now Bel. It would be very difficult without you. Listening (still in the car with Lori, River and Tanya) to Ali Farka song Ai Du (blues you listened to in Singapore). Sweet memories!

I can promise that never again I will be a "dirty man" with you.

Thank you.


Predrag Cicvara

----- Original Message -----
From: Bel <bell@practical.com.hk>
To: Cicvara, Predrag
Cc: Bel <bell@practical.com.hk>
Sent: Wed Jun 10 03:42:01 2009
Subject: Re: Please Read This E-mail


I'm sorry because I don't love you but I know you love me so. I appreciated you in the past because we were just friend. What I cannot accept is what you did in the last few days. Without those dirty things, we can be friend. I'm on the way to airport now. Will call you in about 30 mins.

Bel

Sent via BlackBerry® from 3


----

From: "Cicvara, Predrag"
Date: Wed, 10 Jun 2009 02:51:19 -0400
To: <bell@practical.com.hk>
Subject: Please Read This E-mail


Hi ma Belle,

Having nothing more urgent to occupy my mind in the plane I am thinking about all the wonderfull moments that I had a privilege to experience in the last year or so, all connected to you. From your Bethel's visit last year, to our December's moments together, through the European winter, our exchange of short e-mails while traveling, receiving a postcard from you, my warm feelings about you, my desire to protect you and inexplicable closeness that I felt towards you all this time.

It was you whom I chose to confine my thoughts when I had troubles, and it appeared you chose the same by starting to confine your personal dilemmas and doubts to me. I have cherished our secret friendship deeply all the way feeling extremely strong respect for you as a person, successful business woman, as a woman and as a friend.

This is NOT changed today I guess I have desire to say and would like you to understand. I would love nothing more than to take back few emotional outbreaks that I experienced last few days. Had I known that I have risked losing such a precious thing as our friendship, I wouldn't ever have attempted what I so foolishly did misjudging the nature of our closeness in the last few days.

Maybe the cultural differences that you so graceously tried to point out in one of our conversations did ironically played the part in what transpired lately. I believe if you had taken a strong stance against my foolish attempts to get more out of our relation stopping it from the very beginning, I would have stopped then and would have still been in

)NFIDENTIAL

Case 12-338, Document 59-1, 07/23/2012, 671476, Page102 of 151

that special relation with you that meant so much to me. By being so polite and trying not to hurt my feelings you have unconciously encouraged my (macho? possessive? animouse? stupid?) efforts to get more than you were ready to give.

Foolish dirty old man! How quickly such a wonderfool friendship (at least on my part) could be destroyed!?

So I guess I am trying to tell you that regardless of what your decision about us and our friendship will be, I still will have all these little precious pieces of happiness deeply carved in my memory and nothing will take these from me ever.

I can only hope that you will understand me and remain beeing my true friend in the future. Again I can only say I am sorry for what I did to you and I know there is no real excuse for it. Not sure that I described correctly what I really feel but probably can't do it better anyway. Maybe, just maybe you could understand what went wrong a bit better.

I hope I will have a strength to send this e-mail after landing.

Sorry if reading this stream of thoughts took too much of your time, which I know you don't have much of. I simply had to write it.

Your friend Predrag


Predrag Cievara

ONFIDENTIAL

**A-376**

From:      Bel [bell@practical.com.hk]
Sent:      Friday, June 12, 2009 3:02 AM
To:        Bel
Subject:   P's msg on 6/9

After Yuen told Predrag I was on sick leave.


----- SMS -----
From: +12032430079
Sent: Jun 9, 2009 10:52
Subject: I hope you will bew better soon.


I hope you will bew better soon. Feel terrible that can't be with you and pamper you.
Sent via BlackBerryR from 3

CONFIDENTIAL

**From:** Bel [bell@practical.com.hk]
**Sent:** Friday, June 12, 2009 3:04 AM
**To:** Bel
**Subject:** B's reply on 6/9

------ SMS ------
To: +12032430079
Sent: Jun 9, 2009 11:04
Subject: Thx P.

Thx P. I'm fine but I have to re-emphasis that we are not either couples or lovers. Pls stop thinking about me.
Sent via BlackBerryR from 3

CONFIDENTIAL

PG  000608

From:    Bei [bei@practical.com.hk]
Sent:    Friday, June 12, 2009 3:07 AM
To:      Bei
Subject: P's msg-II on 6/9

---- SMS ----
From: +12032430079
Sent: Jun 9, 2009 11:14
Subject: Right.

Right. No need to emphasize the obvious. Thx for the good time though. P.
Sent via BlackBerryR from 3

ONFIDENTIAL

A-379

**From:** Bei [bei@practical.com.hk]
**Sent:** Friday, June 12, 2009 3:11 AM
**To:** Bei
**Subject:** P's msg on 6/10

Before he found the shirt I left him

—— SMS ——
From: +12032430079
Sent: Jun 10, 2009 06:27
Subject: Gd mng.

Gd mng. Still sleeping or don't want to answer after all?

Are u sleeping?  I hv a Q – why did you say I will understand why are you sorry??
Sent via BlackBerryR from 3

CONFIDENTIAL

A-380

From:       Bel [bel@practical.com.hk]
Sent:       Friday, June 12, 2009 3:12 AM
To:         Bel
Subject:    P's msg-ll on 6/10

After he left the hotel for airport


----- SMS -----
From: +12032430079
Sent: Jun 10, 2009 11:15
Subject: Just wanted to tell you that I am...

Just wanted to tell you that I am still in a shock and disgusted by myself and my poor judgment of things that were going btw us. Forgive me if you can. P.

Sent via BlackBerryR from 3

CONFIDENTIAL

Case 3:09-cv-02054-JCH   Document 77-1   Filed 04/15/11   Page 44 of 67

**Text messages forwarded by Bel Lin to Peggy Wilczewski on Friday, June 12 at 6:54 am ET using Aicent MMS Virtual Delivery**

P's msg on 6/6 21:23 in Singapore
Part 1 – Text
Hi Bel Tried to call you few minutes ago – just to let you know that I would like to bring you your sun protector and the shirt from Hard Rock Café – did noit want to come unannunced to your room, If I said anything that have offended you I am sorry.

P's msg on 6/6 21:32 in Singapore
Part 1 – Text
You are breaking one of the four agreements by making (unwarranteed) assumptions about me or my intentions.  I am too open and I like way too much to have any hidden ideas.  ARE you angry at me????????

P's msg on 6/8 22:05 in Thailand
Part 1 – Text
Hey if you want a company for desert let me know!

B's reply on 6/8/22:05 in Thailand
Part 1 – Text
I want to take a rest.

P's message on 6/8 22:07 in Thailand
Part 1 – Text
Have a good night sleep and sweet dreams.

P's msg on 6/8 22:13 in Thailand
Part 1 – Text
I know you are not and just wanted to be with you without dirty thoughts…… so let me know I need few minutes for emails and then can bring desert to your room if you want.

B's reply on 6/8 22:09 in Thailand
Part 1 – Text
Sorry!  I'm not really well tonight.  Anyway, Yuen left already.

P's msg on 6/8 22:15 in Thailand
Part 1 – Text
OK just few minutes please

ONFIDENTIAL

A-382

**EXHIBIT F TO WILCZEWSKI DECLARATION -
TRANSCRIPTION OF CONVERSATION WITH PREDRAG CICVARA,
DATED JUNE 15, 2009 (CICVARA DEPOSITION EXHIBIT 11)
(REPRODUCED HEREIN AT PP. A-290–A-293)**

A-383

Phone calls with Predrag Cicvara (PC)

**Monday, June 15, 2009** (sometime in the early afternoon)
PC called me (Peggy) to ask what happens to his stock options and bonus. I said she
would research his questions and get back to him. PC said he would call me the
following day.

**Tuesday, June 16, 2009 (by 9 am)**

PC called and I told him that she researched the answers to his questions. I told him that
he is unable to exercise stock options since they terminated when he was terminated from
the company. I also told him that he will be paid his bonus when they are paid in
September. PC told me that he called the stock administration number yesterday and was
told he had 30 days to exercise is Gillette options. PC asked me to verify this information
since it is different from what I was sharing with him. I asked him for the name and
number of the person in stock administration who he talked to. He said Donna at
513.983.5050. I told him I would call Donna to check on this and that I would call him
back.

10:40 am – PC left me a voicemail message. He was asking about the options and asked
203.255.7544.

He said "my whole life depends on this and you know I wouldn't play with that if she
didn't told me yesterday very clearly what my options are".

**Tuesday, June 16, 2009**

I returned PC's call at about noon. (I had just received a call from Lynne Burnett letting
me know that PC had called stock option administration again and they advised him to
call me.) I told him that what I had told him earlier that day --- that his stock options
went away when he was terminated --- was the correct information. He said he was told
yesterday by the stock plan administration that he had 30 days to exercise his options. I
apologized for the error and explained to him that regardless as to what he was told, he
did not have the opportunity to exercise them once he was terminated, which took place
yesterday. Whether he was told 5 days, 30 days, or 100 days, it would not have changed
the fact that per the plan document, he could not exercise any options following his
termination.

PC said that I terminated his career yesterday and his life today. He said he would lose
his house and everything. He said those were options he earned during his 9 years at
Duracell.

I told him that I realize this information is not what he wanted to hear but that he asked
me yesterday to find out what happens to his options and his bonus and that I did so. I
told him I researched this yesterday afternoon for him and found the plan document for

Confidential

A-384

the stock option plan.  I also told him that the plan indicates that when someone is terminated for cause, they lose their options.

PC said that he did not steal from anyone and did not harm anyone.  He said he did nothing against the company.  He said the only person he harmed was himself.  He asked how I could do this to him?  He asked how I could treat a human being like this?  He said I had taken everything from him.
I told him I could not comment on those things but that I would be able to send him a copy of the plan document so he could understand the information I was sharing with him.

He asked me what he can do about all this?  I told him that the decision on his options was not mine to make but that the plan document determines how options are handled.

I asked him for his mailing address and said I would send this document to him in the next mail to leave the building which I thought was tomorrow morning.  He said ok and we ended the call.

Confidential

A-385

**EXHIBIT H TO WILCZEWSKI DECLARATION -**
**LETTER FROM PEGGY WILCZEWSKI TO PREDRAG CICVARA, DATED JUNE 16, 2009**
**(CICVARA DEPOSITION EXHIBIT 13)**
**(REPRODUCED HEREIN AT PP. A-295–A-297)**


**EXHIBIT I TO WILCZEWSKI DECLARATION -**
**LETTER FROM PEGGY WILCZEWSKI TO PREDRAG CICVARA, DATED JULY 6, 2009**
**(CICVARA DEPOSITION EXHIBIT 17)**
**(REPRODUCED HEREIN AT PP. A-328–A-329)**


**EXHIBIT J TO WILCZEWSKI DECLARATION -**
**EMAIL FROM PEGGY WILCZEWSKI TO PREDRAG CICVARA, SENT SEPTEMBER 16,**
**2009, WITH ANNEXED SHORT TERM ACHIEVEMENT REWARD**
**(CICVARA DEPOSITION EXHIBIT 14)**
**(REPRODUCED HEREIN AT PP. A-298–A-304)**

A-386

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------- x

PREDRAG CICVARA,  :  Civil Action No.3:09-cv-2054
  :  (JCH) (HF)
      Plaintiff,  :
  :
  :
      v.  :  April 15, 2011
  :
THE GILLETTE COMPANY and PROCTER &  :  **DECLARATION OF**
GAMBLE COMPANY and DURACELL, AN ENTITY  :  **KEVIN BABIS**
OF UNKNOWN FORM and LYNNE BURNETT,  :
  :
      Defendants.  :
  :

-------------------------------------------- x

I, KEVIN BABIS, declare under the penalty of perjury:

1.      I am currently employed by The Procter & Gamble Company (the "Company") as

Associate Director, Duracell Quality Assurance & Engineering Services. I submit this

Declaration, which is based upon personal knowledge and my review of records maintained by

the Company in the regular course of its business, in support of the defendants' motion for

summary judgment.

2.      In June 2009, I learned from Dina Schmude and Peggy Wilczewski that they were

investigating allegations that Predrag Cicvara, one of my direct reports, had made inappropriate

sexual advances toward Bel Liu, who was an employee of a Company supplier named Practical

Lighting, during an audit of Practical's facilities in Asia. In connection with that investigation, I

forwarded to Ms. Schmude an e-mail I had received earlier in the year from Mr. Cicvara

enclosing his travel itinerary for the audit in Asia. A true and correct copy of my e-mail to Ms.

Schmude is attached hereto as Exhibit A.

Case 12-338, Document 59-1, 07/23/2012, 671476, Page114 of 151

3.      Thereafter, on June 15, 2009, I, along with Ms. Wilczewski and Lynne Burnett, who at that time was the Company's Global Human Resources Director in Bethel, Connecticut, met with Mr. Cicvara in a conference room and interviewed him regarding Ms. Liu's allegations. Ms. Burnett took the lead in asking questions, while Ms. Wilczewski took notes of the meeting. I reviewed Ms. Wilczewski's notes and believe they are a true and accurate reflection of the meeting.  A copy of Ms. Wilczewski's notes is attached hereto as Exhibit B.

4.      During that meeting, Mr. Cicvara admitted that he had visited Ms. Liu's hotel room while in Asia, touched Ms. Liu despite the fact that she had not asked him to do so, and told Ms. Liu that he "had a feeling [he] would rape her."  I was appalled that Mr. Cicvara admitted to telling Ms. Liu that he could "rape her," which I viewed as egregious misconduct by him and a clear violation of the Company's policy against harassment and its Purpose, Values and Principles ("PVPs").

5.      At the end of our interview, Ms. Burnett asked Mr. Cicvara to remain in the conference room while she, Ms Wilczewski, and I stepped out of the room to discuss the matter. After speaking for approximately ten minutes, the three of us unanimously decided that the Company should terminate Mr. Cicvara's employment for engaging in his egregious misconduct in violation of the Company's policy and PVPs.  We then returned to the conference room, when Ms. Burnett told Mr. Cicvara that his employment was being terminated for violating the Company's harassment policy and PVPs.

6.      In my view, Mr. Cicvara engaged in egregious misconduct toward Ms. Liu, which violated the Company's policies and PVPs, negatively reflected on the Company as a whole, and detrimentally impacted the Company's relationship with Practical Lighting.

2

Case 12-338, Document 59-1, 07/23/2012, 671476, Page115 of 151

A-388

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this _15_ day of April, 2011, at Bethel, Connecticut.

Kevin Babis

3

**Schmude, Dina**

| | |
|---|---|
| **From:** | Babis, Kevin |
| **Sent:** | Tuesday, June 09, 2009 2:12 PM |
| **To:** | Schmude, Dina |
| **Subject:** | TRAVEL |

Dina,

I wanted to share Predrag's travel schedule with you.

Below is Predrag's travel itinerary. He had 4 audits planned. The first 2 were in Indonesia. Predrag was partnering with a lead auditor by the name of Dave Amsperger. The next 2 audits were in Thailand and China. Predrag was partnering with lead auditor by the name of Lori Leach. 2 employees that operate out of the ATC offices at DCL, - River Lee and Tanya Xu are expected to connect with Predrag on the final audit.

I have never been to these contractors and can't add anything more.

Kevin

Kevin Babis, Associate Director
Duracell QA & Engineering Services
Office:  203-731-6441
Mobile: 203-300-6107

**From:** Cicvara, Predrag
**Sent:** Friday, May 29, 2009 10:20 AM
**To:** Babis, Kevin
**Subject:** FW: TRAVEL INVOICE FOR CICVARA/PREDRAG DEPARTS 31May. ID: WBQ2PE

Hi Kevin,

Attached is my itinerary. The Cathay Pacific portion of the trip is in Business Class (over the ocean and to Jakarta) and the rest are economy class tickets.

Thank you for allowing me to use business class.

So here is the itinerary:

Sunday morning, May 31st – leaving USA
Monday night, June 1st – arriving to Jakarta, Indonesia via HK
June 2-3 – FDK audit (Li Coin cells)
Wednesday, June 3rd – afternoon – travel to Medan Indonesia
June 4th-5th (ERA Cipta audit – Practical – Indonesia - flashlights)
Saturday, June 6th – travel to Singapore (no direct flights to Bangkok)
Sunday, June 7th – travel to Bangkok
June 8th-9th – Practical Thailand audit (flashlights)
Wednesday, June 10th – travel to China (Guangzhou)

1

Confidential

PG000541

June 11th-12th – **Emerson audit** (chargers)
Friday, June 12th - travel to HK
Saturday, June 13th – travel back to USA

By traveling through HK on my return flight, I was able to save a significant amount on a business class fare.

Best regards, Predrag

Dina,
Predrag Cicvara
Duracell Quality Assurance
The Procter & Gamble Company
Phone: 203-796-4252 Fax: 513-386-2021
cicvara.p@pg.com

---

**From:** pgus@bcdtravel.com [mailto:pgus@bcdtravel.com]
**Sent:** Friday, May 22, 2009 4:59 PM
**To:** Cicvara, Predrag
**Cc:** PREDRAG_CICVARA@PG.COM
**Subject:** TRAVEL INVOICE FOR CICVARA/PREDRAG DEPARTS 31May. ID: WBQ2PE



This is a SEND ONLY address. Please do not reply to this email, email box is not monitored.

Call 866-377-8774 for travel assistance 24/7.

To view your trip online please go to My.pg.com > Employee Resources > Travel & Expenses > Planning a Trip > My Travel Plans

**Travel Tips**

Limit your mobile phone and blackberry usage when traveling outside your home country to
avoid the expensive roaming charges. Mobile phone rates can be $3-5 a minute when roaming
internally and blackberry rates even higher!
Fly coach - airfares can be 60% or more cheaper than business class!

Before you leave, remember to check for important travel information that may apply to your trip. The links below include the latest
information for immigration requirements, safety and security, and medical needs.

International SOS Travel Assistance Program Emergency evacuation, country information, and medical assistance for travelers

P&G Travel Security Safety and Security Information

P&G Travel Health Do you need vaccinations or health advice?

CIBT Passport and Visa Check your visa and passport requirements with CIBT

To view your trip online you can also go to www.ViewTrip.com

Invoice

Electronic Ticket Number: 1607536451055
Invoice Number: EZ0037778
Ticket Amount: $6,576.11
Form of Payment: AX***********1008

This ticket information applies to the following trip(s):

2

PG000542

Cathay Pacific Flight 841 from New York to Hong Kong on May 31
Cathay Pacific Flight 719 from Hong Kong to Jakarta on June 01
Cathay Pacific Flight 712 from Singapore to Bangkok on June 07
Cathay Pacific Flight 840 from Hong Kong to New York on June 13

Electronic Ticket Number: 6187536451057
Invoice Number: EZ0037779
Ticket Amount: $367.00
Form of Payment: AX************1008

This ticket information applies to the following trip(s):

Silkair Flight 233 from Medan to Singapore on June 06

Electronic Ticket Number: 2177536451058
Invoice Number: EZ0037780
Ticket Amount: $505.69
Form of Payment: AX************1008

This ticket information applies to the following trip(s):

Thai Airways International Flight 668 from Bangkok to Guangzhou on June 10
China Southern Airlines Flight 357 from Guangzhou to Hong Kong on June 12

Email generated on 22May/8:58 PM UTC

3

Confidential

A-392

**EXHIBIT B TO BABIS DECLARATION -
TRANSCRIPTION OF CONVERSATION WITH PREDRAG CICVARA, DATED JUNE 15,
2009 (CICVARA DEPOSITION EXHIBIT 11)
(REPRODUCED HEREIN AT PP. A-290–A-293)**

A-393

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **PREDRAG CICVARA,** | : | **Civil Action No. 3:09-CV-2054(JCH) (HF)** |
| **Plaintiff,** | : | |
| | | |
| **V.** | | |
| | | |
| **THE GILLETTE COMPANY and PROCTER &** | : | |
| **GAMBLE COMPANY and DURACELL, AN ENTITY** | : | |
| **OF UNKNOWN FORM and LYNNE BURNETT** | : | |
| **Defendants.** | : | **May 26, 2011** |

### PLAINTIFF'S
### STATEMENT OF MATERIAL
### ISSUES IN DISPUTE

1) Was Plaintiff's conduct "gross misconduct" <u>as a matter of law</u>?

2) Prior to voiding Plaintiff's stock options did Defendant make a good faith effort (or for that matter any effort) to determine what effect plaintiff's conduct had on Gillette business?.

3) Can Defendant rely on conclusory allegations unsubstantiated to meet the specific language of the plan?.

4) Whether if there are any ambiguities in the plan, should any ambiguity be construed against the drafters of the plan?.

5) Did Gillette comply with the provisions of 6(f)A which were stated to be the basis of termination?.

6) Did Gillette terminate Cicvara based on section 6(f) A or 6(f) B, <u>contrasting Gillette's statement in Para 50 and Peggy Wilczewski's letter Ex.H)</u> of her affidavit in Gillette's Motion for Summary Judgment

7) Did any termination for cause "automatically" (Gillette's word) void Cicvara's stock option, or did the language of the Plan create a factual issue?.

8) Defendants paragraph 48 is disputed in that nothing in the record permits the statement that the Plaintiff's conduct "reflected poorly on the company and negatively affected the company's relationship" since absolutely no evidence was offered to support this allegation and therefore it is disputed.

**Plaintiff's Answers to the "Defendant's Statement of Undisputed Material Facts"**

Throughout this document, as well as the other documents submitted to the Court, Defendant is using the Plaintiff's Deposition by pulling out the pieces from Plaintiff's statements and answers, creating either half-truths or plain lies, in an attempt to paint the picture that would benefit them, misrepresenting and skewing Plaintiff's words and constantly distorting the truth. Generally Defendant is using two shady principles in building their case – the first one follows the quote: "A lie told often enough becomes truth" (Rule #1), and the second principle is: "use only a part of the statements or sentences, presented in a way that will skew the truth to your advantage" (Rule #2). The other two documents that Defendant is using very often are the fabricated "Official notes" from the termination meeting held in Duracell on June 15, 2009, and the statement of Bel Liu about alleged Plaintiff misconduct, that is full of lies. Defendant did not produce the Declaration under oath from neither Bel Liu, nor Austin Lin, two individuals that initiated the allegations, which, after only a few days (in fact in just one full day; from June 11 to June 12, 2009) of investigation, conducted only unilaterally, with Bel Liu, but not with Plaintiff, and without checking any of the many untruthful statements or plain lies from Bel Liu, resulted in a swift and surgical Plaintiff's termination "for Cause", that was obviously pre-planned and prepared by Duracell HR, and executed in the morning, on Monday, June 15th, 2009.

**Paragraphs 1, 2, 3, and 4** are true statements.

**Paragraph 5.**

When Defendant stated: "Cicvara read the Conduct Manual *"a couple of times"* (Id. at 36, Cicvara Dep. Ex.1)" the Defendant failed to disclose the Cicvara's statement that immediately follows: *"Yes, I was trying to find certain things in it"* (Cicvara Dep. page 36.). Plaintiff was trying to find what is it that he has done "per WW Conduct Manual" that caused P&G decision to fire him with the cause? Plaintiff has never received an answer to his very directly worded question in his e-mail from June 29, 2009 to Duracell's HR representative Peggy Wilczewski (Exhibit A, Cicvara Dep. Page 147-148): Please provide to me: "A copy of an Employee Manual or a Company Policy where it is stated that in case an employee violates *a particular policy, he/she can be immediately "Terminated for Cause".* The answer from Peggy Wilczewski and Lynne Burnett was: (Id.) "You were fired for violating the "WW Conduct Manual"", but no specifics were offered. The specific reason for firing was never disclosed to Plaintiff during the termination meeting on June 15, 2009 (why would Plaintiff asked for it repeatedly, if it were told?). Plaintiff did not, to this date, ever receive a reason. Therefore Defendant either did not want to provide the answer, or did not know what to answer. The answer oscillated between: "romantic relationship with the supplier", which is partially true, through the "harassing of supplier" which is completely untrue and never proven by Defendant in any instance, to the "sexually harassing the supplier" that is a complete lie. The cause for firing "for Cause" was never established, as it was deemed unnecessary, as Defendant probably never expected that the matter will come to Court <u>where only facts are important and not beliefs, opinions or following of orders from above.</u>

**Paragraph 6.**

Defendant is trying to involve a "conflict of interest" here, in spite of the fact that Plaintiff clearly stated that even if he had a romantic relationship with the contractor it would be: "against company policy to have such a relationship only if the decision-making authority is involved". Cicvara explained that he did not have any decision making authority, and never was the main Quality Assurance Auditor who has an authority, he just accompanied them for technical explanations (Cicvara Dep, pages 80-81-82).

Plaintiff stated his position about having a romantic relationship with the contractor very clearly – and said: That it is against company policy to have such a relationship only if the

decision-making authority is involved" – <u>and he explained that he did not have any decision</u> <u>making authority</u>, and never was the main Quality Assurance Auditor who has an authority – just accompanied them for technical explanations (Cicvara Dep, pages 80-81-82).

<u>Paragraph 7.</u>

Defendant is using the "doing the right thing" statements to try to prove what? These same statements from WW Conduct Manual should apply to all employees, including Lynne Burnett, Peggy Wilczewski and Dina Schmude, especially the statement: "<u>Am I being</u> <u>truthful and honest?</u>" It will be hard for Burnett and Wilczewski to answer "yes" to that question, after falsifying the notes from the meeting on June 15th, 2009; after allowing Bel Liu to falsify the text messages exchanged with Cicvara, after lying about "the recording from Bel's room from the night of June 8[th], 2009, that was recorded on Bel's boss' answering machine" and then omitting that same statement from the notes, omitting to put Cicvara's statement "No, I did not come to her room uninvited – she invited me to come in. She sent me an SMS inviting me to her room" on the notes, just to record the most obvious lies. I do not need to mention all of the fabrications that these individuals have done, as majority of them were mentioned in my affidavit. However, to further prove my point, I have attached an Exhibit B – part c) - an electronic file (MS Word), written on July 20, 2009, named "Letter to Hong Kong – 10 minutes on Monday.doc". Please check the date the file was created as that is altered only when something is changed in the file and then saved to preserve new version – which proves that the content of that file was written on July 20, 2009. I intended to send that letter to Bel Liu, but my lawyer at the time advised me not to do that. From that file it is clear that all what I stated here and in my affidavit, as well as pointed out in the numerous pages during my deposition, is true and it is also clear that the notes from the termination meeting on June 15, 2009, <u>were fabricated</u> <u>with the intent to: cover up the lies told during that meeting, omit some of my statements, and</u> <u>completely twist and alter my other statements.</u> This letter to Bel Liu was my naïve attempt to plead to Bel's conscience and ethics, as at that time I still did not  have her statement, I did not realize that she falsified the text messages we have exchanged before I came to her room on June 8th, 2009 (*as the Bates page 000612 was produced only on April 15, 2011 by Defendants*) and I did not realize that she attempted to gather "more evidence" by setting up another event on June 10, 2009 – where she was ready to record my words after I would come to her room to return the T-shirt she left out of my hotel room door earlier that morning. These recordings (*from June 10,*

4

*not June 8, 2009 as Lynne Burnett lied*) are also put onto the USB memory (Exhibit B, files d)
and e)) as they actually prove my statements that she has apologized to me – and stated again
"that she cannot tell me what is that terrible thing that she has done to me". How interesting it is,
that the "most important evidence (?) used against Cicvara, to prove his guilt during the meeting
on June 15[th], 2009 (*and than promptly and entirely removed from the fabricated meeting notes*)
is not used at all by Defendant in his documentation served to the Court on April 15[th], 2011, but
ironically it is used by Plaintiff to prove the facts he is pointing to.

**Paragraph 8.**

The statements cited in this paragraph are correct with respect to the WW Conduct
Manual Harassment Policies. However, here again there is a Rule #2 at its best. Cicvara always
treated everybody he was communicating with, with the utmost respect, including Bel Liu, and
Cicvara agreed that all the statements cited in this paragraph were true and that it "would be a
serious misconduct if I (Cicvara) made (*but I did not*) unwelcomed, etc.. (Cicvara Dep, page 43).
Also Cicvara stated that the proper investigation would be needed to prove the allegations
(Cicvara Dep. page 39) which was never done by P&G.

Defendant is also trying to connect Plaintiff, artificially, with the Harassment /
Discrimination policy and then continue with the same (Rule #2) approach by introducing terms:
"intimidating, hostile or offensive" manner, and immediately jumping to the "prohibiting him
from making sexual advances toward customers, contractors or employees" without offering any
proof of such alleged behavior by Plaintiff, using again Plaintiff's own words, from the cited
page 43 of the deposition, but to construct the sentence with the different meaning.

**Paragraph 14.**

In the paragraph 14 Defendant is using the well known facts trying to paint the
portrait of Cicvara as being opposed to the values prescribed by the WW Conduct Manual.
Nothing further from the truth. By carefully reading the pages that Defendant is pointing to, and
some additional pages that Defendant is avoiding, one can easily see that Plaintiff actually was
punished by the company for standing by the principles prescribed by that same WW Conduct
Manual. Plaintiff caught Austin Lin stealing money and days from P&G and had to endure a
terrible retaliation action and its consequences, from that same individual, that was unreservedly
supported by the company officials (not just from HR) as they did not do anything to check the
validity, correctness and sincerity of Austin Lin's actions and motives. Then Plaintiff protected

the company interests by uncovering falsified statements by Practical's QA officials, and by justly defending the P&G Company positions and interests in the accident that destroyed the packaging of about 46,000 D type Daylite flashlight shipped from Practical, China. The reward for those Plaintiff's just actions was the "harassment set-up" manufactured by Bel Liu and her boss, executed by Bel Liu and Austin Lin (who had a romantic relationship ongoing between them) that again was wholeheartedly supported by the Duracell officials (not just HR). And finally, Plaintiff discovered and reported a terrible diversion scheme inside the Duracell, where tens of millions of dollars of profit were stolen from the P&G taxpayers (from the company bottom line),  that actually was the main reason why he was finally terminated in a such surgical and overwhelmingly cruel way (Cicvara Dep. page 12-14, page 46-48, pages 57-58, pages 112-115, page 130-131, **pages 189-191**).

One thing is very worth mentioning here. The Plaintiff deposition has 195 effective pages of text. Only 71 out of 195 pages are used by Defendant in their documentation. That is a fact that is telling by itself – as it was the deposition hosted by Defendant, where evidence was supposed to be collected that overwhelmingly would prove that Defendant was right in his actions that led to the Plaintiff termination. However, only 71 pages were used, which is less than 37% - means only a bit over every third page produced, was actually used by Defendant, and even then the Plaintiff statements are often skewed and twisted (Rule #2). Then Defendants packaged them in sets of fours, so that is not obvious how many exactly were actually used. What is the real reason why the rest of 124 pages were never shown to Your Honor by Defendant? One can judge only by actually reading the whole deposition, and that is the reason why the entire text of the deposition is part of the Plaintiff's documentation (Exhibit B, **electronic file f, Exhibit C – paper version**)

**Paragraph 15.**

In this paragraph Defendant is presenting the words that Defendants' lawyer used, as being stated by Cicvara (using Rule #2). On page 24 of the deposition notes, the question (Cicvara was asked) is: "You have referred to the fact that you audited one of…" and then uses that to construct the sentence which included: "….and auditing the suppliers' factories…". However, Defendant heard from Cicvara not once but many times during the deposition: "I could audit only internally. So ..I was always accompanying other auditors.." (Cicvara Dep. page 32), and then "I was there only to help (her) from the technical point of view" (Id.).  Then again later

Cicvara stated: "..don't forget I am not the leading auditor, I'm there just in technical capacity.." (Cicvara Dep. page 82). Yet Defendant picked only the page from the deposition that suited their goals (*even if by construction*), misrepresenting the truth again. Speaking about the deposition, Plaintiff will include the complete transcript of the deposition to the documentation that will be submitted to the court as an Exhibit C (paper version) – as there is no reason to pick the pages – to the contrary, it is Plaintiff's position that after reading the deposition in its entirety, coupled with the additional evidence in other exhibits and all submitted documents from both parties, Your Honor will be able to decide the just outcome of this case, even without the trial.

**Paragraph 23**.

Many statements in this paragraph are incorrect. However, they are not so important, as it was already proven that Bel Liu intentionally lied and falsified the material evidence she provided to Duracell HR. Since Duracell HR did not provide the sworn statement by Bel Liu – everything that she provided to Duracell HR is nothing more than hear-say and should not be regarded by the Court as admissible evidence.

**Paragraph 24.**

The importance of this paragraph is that it introduces Austin Lin. Bel Liu surely contacted Austin Lin numerous time before that day and numerous time after, but even if it was the first time since June 1, 2009, there was plenty of time to think about how two of them (Austin and Bel Liu) could retaliate to Plaintiff. Even though Defendant knew that it was Austin Lin who reported alleged harassment of Bel Liu, allegedly committed by Plaintiff, P&G HR personnel did not do absolutely anything to investigate the motives behind such a behavior. Also, repeated requests to produce the e-mails and phone records between Bel Liu and Austin Lin were stubbornly denied by Defendant as being: "vague, ambiguous, and seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to discovery of admissible evidence". With all due respect to the Defendant lawyers, it is not up to them to unilaterally prevent Plaintiff from receiving important evidence just by issuing statements as the one cited above. The last time Plaintiff asked for the production of evidence of e-mails exchanged between Bel Liu and Austin Lin, this time with a very specific time frame (from June 7, 2009 until July 15th, 2009), was on January 3, 2011 in the Motion for Production Letter (Exhibit D, page 2, part of paragraph 5). There were seven requests in this Motion from the Plaintiff, in seven different paragraphs. To mud the water, the Defendant inexplicably, but understandably, as this was,

throughout this period of 18 months, a part of their shady strategy, actually produced answers, not to seven but only to the first four Plaintiff's requests, pretending that the second page of Plaintiff document did not exist at all. That would be again use of Rule #2 at its best, as the second page actually asked for these evidences: E-mails between Austin Lin and Bel Liu (already cited Exhibit D, paragraph 5), then: The expense reports for the China – Korea trip of Austin Lin, from March through May 2009 (Exhibit D, paragraph 6), and then: The official Blackberry phone records and bills used by Austin Lin for the period May through July, 2009 (Exhibit D, paragraph 7). Arrogance again: We (the Omnipotent) stated that this is not connected to the case, and we have the right to withhold the obvious evidence as we please. No comments Your Honor. The Defendant answers to Plaintiff Motion for Production is included, in its entirety, with all 23 pages, as the Exhibit E, hereto. Again, this is a blatant obstruction of justice, possibly even purposely introduced "error" just to avoid producing of documents that could further damage the credibility of the Defendant actions. Let's face it – it is an answer of utmost arrogance to be able to claim that e-mails exchanged between Austin Lin and Bel Liu are "irrelevant for this case" and that "they will not lead to the discovery of permissible evidence". Let's not forget that it is Austin Lin who reported the case to HR and whose sworn statement was not produced by Defendant. And it is also Bel Liu, who supposedly was harassed by Plaintiff, but who served lots of lies and untruthful statements to Defendants and whose sworn statement also was not produced in the documents submitted to the Court by Defendant.

**Paragraph 25.**

The statement "Cicvara, Liu, Yau and Yuen Yau" in this paragraph, is incorrect. Only Plaintiff, Bel Liu and Dave Arnsperger, the official QAKE auditor from P&G, traveled, and did not traveled directly to Bangkok, but traveled through Singapore as there were no direct flights from Medan to Bangkok (Cicvara Dep. page 73). During the flight Bel put her head on Plaintiff's shoulder and teased him with "You are the dirty old man" under circumstances that Plaintiff clearly described in his deposition "when referring to the double deck bus without the upper roof – as being topless" (Cicvara Dep. Page 126 – 129). The fact this was written by Plaintiff in his e-mail to Bel Liu was repeatedly used by the Defendants to help them in painting the Plaintiff as being villain and sexually aggressive person (Rule #1 again), while in fact these words were used by Bel Liu, not by Plaintiff and became a kind of teas/joke between Plaintiff and Bel Liu (Id. page 126-129).

8

In the chronology of the events listed by the Defendant, certain things that were happening in Indonesia are completely missing as well as the trip to Singapore and things that were happening there, as explained above. For example Bel Liu grabbed the Plaintiff's thigh while driving in the SUV in Medan and asked him: "You don't like Austin Lin do you?" (Cicvara Dep. pages 72-73 and 90-92). On that same page (Cicvara Dep. page 92) Plaintiff also explained how Austin cheated on his expense report and again wanted to take advantage from the company on the following trip to Florida seminar in May 2009.

**Paragraph 27.**

This paragraph contains several untrue statements by Defendant. Defendant is desperately trying to alter Bel Liu's statement that was cited through numerous places in the Defendant documents previously: "Predrag was suddenly standing at my door", after she mentioned only two text messages (Dep. of Peggy W. Bates page PG000583). Realizing from the hard evidence (Bates pages 000415-000416 and Cicvara Dep. Pages 69-71 and page 140) that Bel did not tell the truth, Defendant is here constructing Bel statement around that fact: "Although Liu initially said no, Cicvara **continue to press her** (*a blatant lie directly by the Defendant – not by Bel Liu, as Plaintiff did not press Bel Liu at all*) until Liu finally relented because she did not want to offend her customer". So all of the sudden, now Defendant, that have stated that Plaintiff came to Bel's room uninvited as one of the starting points during the dismissal meeting on June 15th (Cicvara Dep. pages 139, 140, 141) is taking a completely opposite stance! Why? Because it is trying to construct the story that could better justify their act of firing Plaintiff for cause (after 10 minutes of "investigation"), after they learned and realized that Bel did not  state the facts truthfully in her phone conversation with Peggy Wilczewski and Dina Schmude, and she in fact willfully invited Plaintiff to come to her room. This is the reason why they produced the document that was, intentionally, never produced before, provided on the Bates page 000612 (a part of Exhibit F, hereto). Bel Liu was given an opportunity to **forward** the SMS messages exchanged between her and Cicvara in a period from 8:57 PM until 9:07 PM Thailand time. When messages are forwarded the text of the original message can be altered without limitations. That is exactly what Bel did – she has altered the content of certain messages. However, she has made **a simple but extremely significant error**, as in her desire to add more fuel to her accusations, she miscounted the number of messages that were exchanged and **created the sixth message that did not exist** at all. On the official T-mobile bill it is clearly

stated that they were five messages exchanged in this time period – not six (Exhibit F – phone bill pages 000415 and 000416). The message Bel invented was: " I know you are not and just wanted to be with you without dirty thoughts …….so let me know I need few minutes for e-mails and then can bring desert (sic) to your room if you want" and she invented it for the obvious reasons – to fortify her own lies (*Plaintiff never sends such wordy text messages anyway*).The second big error that she has done was that **the time stamps** on the messages she has forwarded **are all wrong** (as she injected one message, she lost the track of the proper timing of messages). Bel's phone was 8 minutes ahead, which is clearly explained in the table that is a part of the Exhibit F, and which is visible from the other messages she has listed on that page, sent in Singapore, (*that are also tampered with, as four messages were exchanged, not just two, and she has altered both of the messages she has sent to Peggy Wilczewski, adding similar comments to make them "dirty, and in process of doing it made them long as well – very uncharacteristic for the SMSs*). However, inexplicably, some of the messages correspond to that time gap, but others do not. So **there exist not just one, but two hard proofs** that **she has purposely falsified the text messages that were exchanged between her and Plaintiff**. Now, if her statement were truthful, she wouldn't have to do that, as it would have been sufficient to just send the messages that would have matched the official records (see Exhibit F explanations, on the table that is a part of that exhibit).

The fact that these messages were fabricated and falsified begs some more questions about the credibility of Lynne Burnett and Peggy Wilczewski. They both new, before June 15, 2009,  that there exist a record that shows text messages were exchanged, yet Lynne Burnett stated during the June 15, 2009 termination meeting that Plaintiff came to Bel's room uninvited and "just appeared at Bel's room door". Even after Cicvara explained about the text messages and stated that he was invited and the text messages from his Blackberry will show that fact, Lynne Burnett stated: Yes, but she (Bel Liu) claims the opposite, therefore you came uninvited". However, **mysteriously this entire conversation is missing from the "official notes"** from that meeting that were in fact **manufactured by Peggy Wilczewski**, but we will come to these details later. It is also worth mentioning here that the Bates page 000612 was never submitted to the Plaintiff as a part of Production of documents phase, even if Plaintiff repeatedly asked for additional documents. This shows that Defendant used plain lies in his Documents presented to the Court, as for example the Defendant stated: "Defendants further stated that they have been

unable to locate additional responsive documents. Thus Defendants have fully responded to this Document Request". (Exhibit G - Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery, from July 7, 2010, page 12, Response to Request No.20). Also, on page 3 (Id.) there is the following statement: "Despite Defendants' representations to Cicvara's counsel that they are unaware (?) of and cannot locate (?) any additional documents responsive to the document requests, Cicvara stubbornly, and without any legitimate basis, insists that P&G is withholding certain documents". Also on page 14 (Id.) in paragraph 30 there is the following statement: "they (Defendant) produced all responsive documents in their possession (?). Despite that representation, Cicvara boldly maintains that additional documents existed between Practical and P&G regarding the litigation. Again, Defendants have complied with this Request, and are not aware (?) of any additional responsive documents." So here in one document, there are three plain lies served by Defendants to Your Honor, since the Bates page 000612 was received on June 12, 2009, and clearly was in the Defendant possession all the time, including July 7, 2010, and until April 15, 2011, when the document was finally – but even this time – only indirectly given to the Plaintiff. And now it appears that **Cicvara was right in insisting, "being bold", and "being stubborn"**, although the insistence was based on Cicvara's beliefs that there exists **another audio recording – the one Lynne Burnett started her interrogation with – from the Bel's room on the night of June 8, 2009,** supposedly recorded on the Bel's boss answering machine – a blatant lie by Lynne Burnett.. How do you legally qualify (or classify) such repeated statements (*lies?*) by Defendant,  when a piece of evidence, as important as page 000612, was continuously withheld from the Plaintiff, until now, when it is presented to the Court, and only now Plaintiff came into the possession of it. This is why Plaintiff stated that: "She never sent all text messages" during his deposition (Cicvara Dep. page 140), not knowing that all the time the Defendant were in the possession of some of  the additional ones – Bates page 000612, although most of them were falsified, as can be seen from the evidence in Exhibit F.

There are other plain lies in the Defendant document in the Exhibit G which Defendants used to lie directly to the Court. On the page 4 (Exhibit G - Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery, from July 7, 2010, page 4.) Defendants stated: "On or about June 9, 2009, Liu called Andrew Yau, Chairman of Practical Group of Companies, and informed him that Cicvara made unwanted sexual advances toward Liu during the course of their travel together. **Yau subsequently alerted P&G**

11

**Human Resources Department to Liu's** allegations. Upon hearing of the incident, Peggy Wilczewski ……etc". At that time most of the e-mails were released and it was a well known fact that Austin Lin was the person who initiated the HR investigation, not Andrew Yau – yet there is this inexplicable statement found here. On the page 15, in the paragraph about the request #33 (Id.) there is the following statement by the Defendant: "There is no evidence of Lin's "significant expense account fraud", let alone that it had any impact on Cicvara's termination". Again a plain lie as Cicvara stated in his deposition (Cicvara Dep. pages 56-57, pages 112-113) and the one they could have easily check by simply reviewing his expense account records, or by simply asking Kevin Babis, which they continuously refused to do. Then they go on: "It is also irrelevant, given that Cicvara *admitted to inappropriate sexual behavior towards Liu*" (Id.). Another lie as Cicvara never admitted that (Cicvara Dep. page 78, page 108). Defendant is just repeating the lie after lie, following his modus operandi that is at its best display throughout this particular document – the Rule #1: "A lie repeated often enough becomes truth".

Also, Plaintiff did not bring "special dessert" for Bel, he brought his own dessert, and Bel had her identical dessert. It was mango with rice – Thailand specialty, bought for all dinner participants on the night of June 8th, 2009, outside of the hotel where the dinner was held, and given to each of participants by Yuan Yau who brought it from outside. Therefore Plaintiff did not: "went to Liu's room with the "special dessert" for her" but simply brought his own dessert with him, so that Plaintiff and Liu could eat the desserts together, each its own one, as that was his intent when asking her: "Do you want to eat the desserts together" in his text message to her (the first of five exchanged ones).

**Paragraph 28.**

Plaintiff did not claim that "he inexplicably stripped off his pants" in his deposition but rather he explained it in details (Cicvara Dep. 136-138).

**Paragraph 30.**

Many statements in paragraph 30 are again just plain lies. What the Plaintiff said was: "When you do the things like that (with your legs), one could rape you", which was very clearly explained during the deposition (Cicvara Dep. Page 140, Page 138, and pages 86-88). Plaintiff never said: "I want to rape you" which again is repeatedly used by Defendant in many documents served to the Court, again in an effort to portray the plaintiff as being "sexually

abusive" and as acting in the "harassing manner" towards the supplier, which is not true **(Rule #1 at work)**. Plaintiff also stated it and accurately described why he said that, and the "academic discussion about what "rape" means" that followed it, during the June 15th termination meeting in Duracell, but it was wrongly (and obviously with the intent) interpreted in the officially fabricated notes from the meeting <u>(that were never seen by the Plaintiff before May 28, 2010 and never reviewed or signed by the Plaintiff)</u>.

Also, Defendant failed to mention here that Bel called her boss while Plaintiff was in her room that night, and could have told him about the "harassing that she experienced" if she really did, as the call came after her feet were massaged and after she said: "Don't do it anymore" (Cicvara Dep. page 83, Pages 101-102). She also talked to her husband as well, in Chinese for at least 15 minutes and could have alarmed him, and she did not (Cicvara, Dep. Page 108). She could have screamed, she could have called somebody and she did not (Id. page 108). <u>Why? Because absolutely no reasons existed for her (Bel Liu), to behave in such a way and she did not. It is as simple as that.</u>

**Paragraph 31.**

The statement in this paragraph is wrongly dated, just one of many mistakes (again) committed by the Defendant. The shirt was left on Wednesday, June 10th, 2009, not on Tuesday, June 9th, 2009. It is important, as the recording that was mentioned in this paragraph, and that was used as a preamble to the June 15th termination meeting in Duracell, actually happened on the morning June 10th, and it was recorded on Austin Lin's answering machine, **not during the night on June 8th, and recorded on Andrew Yau's answering machine as Lynne Burnett intentionally lied during that meeting** (and her statement was never captured in the notes from the meeting). In the recording  you can hear Cicvara asking her why she has apologized and who knows what was going on (emotionally) between them? Plaintiff explained this in more details during the deposition when he stated that Bel was asked: "Why did you apologize to me" repeatedly by the Plaintiff and her answers were: "They did not leave me any choice" and "I can't tell you as you will be very angry on me" (Cicvara Dep. page 96-97 and pages 109-111)

**Paragraph 33.**

In this paragraph Defendant did not explain why the Plaintiff said that "he was in shock and…used poor judgment" (Rule #2). The plaintiff clearly explained that by stating: "because I thought that there could be something going on between us and it did not, so I had

Case 12-338, Document 59-1, 07/23/2012, 671476, Page133 of 151

poor judgment" (Cicvara Dep. pages 105-107) and also describing "as poor judgment" his decision not to leave the hotel room after certain things happened in Bel's hotel room on June 8[th], 2009 (Cicvara, Dep. page 88). "Shocked" was explained also as Plaintiff stated that "the it was kind of shocking, the way she wrote this…….". (Cicvara Dep. page 99).

**Paragraphs 34 & 35.**

As pointed out by Defendant the Plaintiff explained in details why the e-mails were written the way they did in his deposition (Cicvara Dep. Pages 116-129). What was not mentioned by Defendant is the explanation for the "dirty old man" phrase explained already in the answers above – to the paragraph 25 and also in the Cicvara's Deposition  (Id. pages 126-127).

**Paragraph 36.**

In this paragraph Defendants again are playing with words, following the famous statement by Lenin, as they do throughout their documents hoping it will materialize: "A lie told often enough becomes the truth"

This paragraph continue to show deep connection between Bel Liu and Austin Lin, an American of Taiwanese origin, who worked in Duracell's Quality Assurance Department before Plaintiff was transferred there (Cicvara Dep. Page 14). Defendant did not disclose the following important facts about Austin Lin:

Austin Lin spent 7 weeks in China in March/April 2008, while the business he has done could have been completed in just two to three weeks. He was spending lots of time with Bel Liu and they become very intimate during that period. In his deposition Plaintiff mentioned their intimacy and how " he learned a lot of things about them in 18 months since he was fired" (Cicvara Dep. Page  31, page 54), the bag that Austin bought for Bel as a present in September 2008 (Id. page 55), about Bel stating repeatedly, many, many times that Austin was "a very good friend of her" (Id. page 55). Plaintiff also learned about their intimate relationship from Brian Hesse (an Associate marketing Director in charge of flashlights in Duracell) and Dave Mathieu (Ideaz Company – the designer of Daylite line of flashlights) and that these people are willing to confirm their statements as witnesses in the Court of Law (Id. pages 55-56). Also that Bel Liu wanted strongly and openly to seduce Dave Mathieu (Id. Page 55).

It is very important to stress that HR personnel did not ever try to understand why it was Austin Lin who came to HR offices and claimed that Plaintiff is making sexual advances

14

towards Bel Liu, and harassing her. If they were asking themselves why, they could have had a different way of checking Austin's claims and Bel's statements, especially after realizing that she has stated they were good friends from March 2008. They have never asked an obvious question – why would somebody **who was not suppose to have any business contact** with Austin Lin for at least 14 full months (from April 1, 2008 when Plaintiff was transferred to Quality Assurance Department) ever go to that person to report "harassment" (Cicvara dep. Page 95).

" In April 2009 Austin Lin lied on his expense report to the company when he went into China and Korea" (Cicvara Dep. Page 56). He was caught by the Plaintiff and the matter was discussed between Plaintiff's boss Kevin Babis, Plaintiff and Austin Lin (Id, pages 56 and 57). Plaintiff was never allowed to complete his statement at that moment in the deposition, so here it comes: the unfortunate part about this is that Austin was humiliated in front of Kevin Babis, the director of QA for Duracell, which did not spell well for his career in Duracell. Therefore he was looking for revenge against the Plaintiff and the opportunity served itself soon after Austin talked to Bel several times during Plaintiff's trip to Asia in June. Lynne Burnett, Peggy Wilczewski and Dina Schmude did not know that this ever happened, as Kevin did not have any reason to tell them, as he could not connect Austin Lin with this case, from whatever he has learned about it during the ten minute interrogation on June 15, 2009. Kevin Babis was, most likely, never told by HR that it was Austin Lin (Cicvara Dep. page 133) who reported Plaintiff's alleged misconduct to HR. Kevin Babis was under the impression that it was Bel Liu herself, and also that the recording from her boss' answering machine mentioned by Lynne Burnett during the termination meeting really existed (the same way as Plaintiff had that same impression until May 28, 2010 and even later). **So, Kevin Babis was also lied to by HR personnel (even if indirectly), and also being used up by Lynne Burnett and Peggy Wilczewski**. If he was told, Kevin, most likely (this is Plaintiff's assumption, not the statement), would have had disclosed the facts he knew about Austin Lin to HR and they might have (although that probably would not change anything, as there were much stronger Duracell's authorities than what Kevin was, directing the moves of HR personnel from the shadow, and through Lynne Burnett) conducted the whole investigation in a different manner (Cicvara Dep. page 133). The fact they all did not know all facts prevented them from acting correctly **but still does not relieve them from the responsibility to conduct the investigation in a just manner that allows the person to defend himself by disclosing to him all relevant facts that he**

15

should know. On the contrary, such an important fact – that Austin, and not Bel, was the person who reported the alleged misconduct (Cicvara Dep Page 95), Plaintiff learned only after receiving the first set of production documents on May 28, 2010 – almost a full year after being terminated "for cause".

**Paragraphs 37, 38, 39 & 40.**

Lynne Burnett "advised Schmude to investigate the incident by speaking with both Liu and Cicvara" (paragraph 37). However, while Bel Liu was given every opportunity to voice her opinion about what happened between June 3rd and June 10th, 2009, in a period from June 9th through June 12th, 2009 and later, Dina Schmude and nobody else from Duracell, ever contacted Plaintiff to try to get his side of the story, to provide him with the facts and to allow him to defend himself in a normal, legal and human way. While Plaintiff was working very hard during his trip to protect the interest of the company and to do as much work as possible during the two weeks he spent on the trip, Duracell HR was calmly preparing the "evidence" that would enable them to terminate Plaintiff after 10 minutes of interrogation on June 15th, 2009 and after nine years of the hard work the Plaintiff invested in The Company. They had a chance to talk to Plaintiff throughout the week of June 8th but they chose not to, intentionally. Why? One can only conclude that either this statement by Defendant is not true, or Dina Schmude who was instructed "to investigate the incident by speaking with both Liu and Cicvara" purposely did not do the second part of what she was instructed to do, violating basic Plaintiff's legal rights.

It was already pointed out that Bel Liu's statement (paragraph 38) is full of lies and half-truths constructed in a manner that guarantees that the Plaintiff would be at least removed from his position and prohibited to interact with the Practical Company in the future. However, they are not so important, as it was already proven that Bel Liu intentionally lied and falsified the material evidence she provided to Duracell HR. Since Duracell HR did not provide the sworn statement by Bel Liu – everything that she provided to Duracell HR is nothing more than hearsay and should not be regarded by the Court as admissible evidence. During the trial, it would be easy to prove all of the lies, and there are many (more than a dozen), in Bel's statement.

Regarding Bel's overall statement about what happened on the night of June 8th, 2009, Plaintiff gave very exhaustive deposition to the Defendant describing what happened and why (Cicvara Dep. page 83, pages 101-103, pages 140 – 145).

16

From paragraphs 39.and 40.it was obvious that Bel Liu was offered to carefully review her own statements, as written down by Dina Schmude and Peggy Wilczewski, which is a normal and expected procedure in such cases. Yet the Plaintiff was completely denied that opportunity, as even the notes from the termination meeting on June 15th, 2009, were not shown to him at all, even after his direct request by e-mail sent to Peggy Wilczewski, to be provided with the "documents related to his termination" (Exhibit A).

**Paragraphs 42 &43.**

The purpose of an E-mail sent by Andrew Yau to Nitesh Singh was described by the Plaintiff in his deposition as just an additional insurance by one of his executors (Austin Lin, Andrew Yau, Lynne Burnett) to make sure that Plaintiff will never again act as a QA manager again (Cicvara Dep. pages 148-153).

The statement by the Defendant (Paragraph 43) that "Mr. Yau noted a few days later to Eric Lawson, the Company's Associate Director that Practical was "very disappointed" with its business with the company" very accurately describes the state of the business relationship between Practical and Duracell. Indeed as Plaintiff pointed out in his deposition, Practical was not chosen to manufacture Duracell Daylite models AA and AAA that were launched to the market as the first models of new line of Duracell flashlights. They were very unhappy that this business was assigned to their competitor Smartlite (Cicvara Dep. page 21). They were promised by Duracell the C and D models of the same line, however, the development was very slow and they felt they were losing the business and importance to Duracell (Cicvara Dep. page 22). Their manufacturing facility in China was completely empty at the time the initial QA audit was performed in December 2008 (the Plaintiff was there and witnessed it), a factory that could employ more than 800 people and had 15 manufacturing lines. Bel Liu was angrily complaining about these facts to the Plaintiff during the QA audit (Id. page 22).

In his e-mail from June 25, 2009, it was obvious that Mr. Andrew Yau's intention was to use alleged sexual harassment of Bel Liu as leverage, to improve his business with Duracell (Exhibit H, Cicvara Dep. page 23, 24) by stating: "There will be a lot of issues we need to discuss in terms of business. Practical's hope has been on the growing our business with Duracell – however with all the hard work we put in during the last 2 to 3 years **our order book is not supporting our operation  now and in the foreseeable future. This is the most urgent challenge facing Practical at the moment**. We are very disappointed with the level of order for

the Daylites, as well as other business with your company." This statement clearly asks for significantly more business with Duracell – and the leverage immediately follows – same e-mail continues with: "Please be rest assured that Bel is doing fine and she is committed to Practical and will alway (sic) do her best for both of our companies." (Exhibit H). In this same exhibit – on the second page there is an interesting statement by Erik Lawson: "This incident has been managed very confidentially within P&G (*for the obvious reasons*) and only myself, Human Resources and **a few others in executive (!!!) management** are aware of the details." These words point out **that Mark Bertolami must have known about all of the details of my termination "for Cause" as I suspected,** as he was Lynne Burnett's direct supervisor, and he was the person who chose Lynne Burnett for the Duracell HR position at the time when nobody in P&G wanted to come to Duracell (in 2007) as there was a word that P&G will sell Duracell, as the Duracell technically heavy main business drivers (batteries) did not fit in the P&G business model. This is important because there had to exist a very strong reason for Lynne Burnett to leave the position of HR Director in P&G (that has 120,000 employees) and come to be a HR Director in Duracell Headquarter only – with mere 400 people in Bethel, CT. In other words, her transfer was, probably, a forced act – certainly not because P&G was happy with her performance, and she must have been very thankful to the person who decided to accept her and allow her to continue to receive a salary belonging to a Director's position. The previous HR Director in Duracell was at a Band 4 level (per P&G classification) but Lynne Burnett had a Band 5 level, which she probably maintained while at Duracell. It would be interesting to learn what was the real reason behind Lynne Burnett retirement at the end of 2009 (January 1, 2010), as well as find the real reasons for the quiet replacement of Mark Bertolami (Duracell President), Duncan Adamson (VP of Finance) and Rick June (VP of Marketing – also chosen directly by Mark Bertolami in or about February 2008), that happened in October 2010 and was completed on January 1, 2011.

To make matters worse for Practical, their first shipment of 46,000 D type Daylite flashlights, was rejected by Duracell, because they have used inexpensive, low quality pallets for overseas transport, that were not approved by Duracell. Bel Liu contacted Plaintiff by phone and e-mails practically begging him to help Practical and do not reject the shipment. However, Plaintiff resisted (Cicvara Dep. pages 26-31, pages 57-58, page 188). This additionally affected already very bad state of their business with Duracell and caused a lot of strains in their

18

organization. Mr. Andrew, together with Bel Liu was quietly plotting the way to get rid of the General Manager of their Zhongshan facility (where the 46,000 flashlights were manufactured and packaged for transport) – actually telling Bel Liu – "you are doing great job, the next thing *we need to do is to find the way to sack manager of the Zhongshan factory" in his e-mail to Bel* that Plaintiff saw on Bel's Blackberry while he was in her room on June 8th, 2009 (Cicvara Dep. pages 101-102). Bel then said to the Plaintiff: "you know too much, you are not supposed to read these messages" (Id. page 102).

During the audit at their factory in Medan, Indonesia, Plaintiff asked a direct question about the usage of the prohibited pallets in that factory, the same type that caused the disaster with their first shipment of D type Daylites. They provided an incorrect statement that they did not use this type of pallets there (in Medan, Indonesia) for the overseas shipments, after Plaintiff found the same type of pallets on the manufacturing floor there, even though they new at that time that another shipment was indeed on its way from Indonesia to USA, where the same type of pallets was used. Sure enough, another shipment was affected and returned to them (Cicvara Dep. page 190). This certainly did not help Practical to get more work from Duracell. Duracell has a smart policy with contractors, always making sure that there is never a dependency on any single one, making sure there is always a replacement ready. Also, there was never any contract signed with them; Duracell always operated on issuing specific purchase order every time they needed new set of flashlights. That way all flashlights manufacturers were kept in total dependency of Duracell, and always hungry for business, it was never the other way around (Cicvara Dep. page 44-45). That is why the Plaintiff's alleged harassment of Bel Liu was looking as such a strong card in the hands of Andrew Yau, and he attempted immediately to use it as leverage and to the advantage of Practical – to get more orders from Duracell as soon as possible (Cicvara Dep. pages 22-23).

In June 2009 the economic crisis in the entire world was at its peak and the overall level of business for any company, but especially for the company that depends a lot on western economies and the consumer spending in western world, such as a flashlight manufacturers, Practical being just another one of many, were in fairly tough positions, as the level of orders from all of their customers was at a low point. Practical knew that they would need to score more than 50% on the initial audit in their factories if they are to remain on the approved vendors list for P&G. That is why it is important to understand that, what had happened during the day on

<u>June 8th</u>, the first day of the official QAKE audit there (usually a two-day event), had a very strong influence on the events during the evening of June 8th (in Bel Liu's hotel room) and the events after that as well.

During the day on June 8, 2009, false statements were discovered by the Plaintiff, due to his technical knowledge, which was the reason and the purpose of his attendance on the QA audits (Cicvara Dep. pages 32-33). Lori Leach (an official auditor) then started to scrutinize many other things during that day and it was, to say the least, a disastrous day for Practical. They were very afraid of not passing 50% threshold that would automatically disqualify them from the approved contractors list (Cicvara Dep. page 25, pages 146-147). They considered that Plaintiff started it and wanted to retaliate and gain the leverage with Duracell to improve their business position at the same time. Bel was a logical choice, as it seems she was usually used for these kinds of tasks anyway (Cicvara Dep. pages 54-56, page 61, pages 74-75, pages 94-95, pages 144-145). That may explain why Bel first stated (at 9:00 PM Bangkok time) that she is tired (in the exchange of text message on the night of June 8, 2009), but after 5 minutes (at 9:05 PM – Bangkok time) she sent an SMS stating that she wants me to come to her room. In those 5 minutes the plan might have been made, by her boss Andrew Yau, to destroy my life forever, for his own advantage, and he succeeded handsomely, at least in that part – to remove me forever from the QA position I was in, and destroy my life in the process. They had an excellent ally in Austin Lin, who also waited for a chance to retaliate to me for many reasons (Cicvara Dep. page 24-25, page 56-57, page 67, page 92, and another excellent partner (even if not expected by them) among the Duracell's highest ranked management individuals.

**Paragraphs 44, 45, 46, 47 & 48**

The Plaintiff asked a very simple question in his e-mail to Peggy Wilczewski on June 29, 2009: "What is the specific reason that I was fired with "the Cause"?" (Exhibit A). The answer, received on June 30, 2009 was a very vague statement: "You were terminated for Cause, because you violated WW Conduct Manual."

The Plaintiff <u>was not offered to read the notes from the termination meeting,</u> conducted by Lynne Burnett, Peggy Wilczewski and Kevin Babis, after the hearing was over, and to agree or disagree on the content (representation of the conversation during the meeting), let alone to sign the notes, after he was told that his employment is terminated for cause. The plaintiff was never given a copy of the notes <u>even when he was directly asking for them in his e-</u>

mail to Peggy Wilczewski (Exhibit A, page 1) when the answer was: "There is no documentation in your personnel file that references your recent termination." (Id. Page 2)

If the notes did not exist on June 29th, 2009, one could ask **how they magically appeared** during production of documents phase, on May 27, 2010. Also, it is a bit ironic that these same people (Dina Schmude, Peggy Wilczewski and Lynne Burnett) were making absolutely sure that what they wrote as Bel's statements is "confirmed by Bel for accuracy" (Bates pages PG000584, Declaration of Peggy Wilczewski page 2, paragraph 6), and yet denied completely, not even mentioning, those same rights to the Plaintiff while making a decision with the catastrophic consequences for his life and life of his immediate and broader family members. The fact the notes were not seen by Plaintiff until May 28, 2010 is a direct violation of his basic rights as a human being, and just one of many others violation of basic rights to defend himself from false accusations, committed by the P&G company towards the Plaintiff.

The notes, when later produced, omitted many statements by Plaintiff that denied the alleged harassment behavior towards Bel Liu, and pointed out the lies that were used by Bel Liu and Lynne Burnett in constructing the set of assumptions that led to Plaintiff's firing for "Cause". Plaintiff pointed out on these discrepancies throughout his deposition (Cicvara Dep. pages 138-141). Also, the notes purposely omitted a blatant, pompously announced lie (actually two lies) with which Lynne Burnett started the meeting with Plaintiff on June 15th, 20009: "We have a recorded conversation, of what went on between you and Bel Liu during your **uninvited** (Lie #1) visit to her hotel room on June 8[th], 2009 that **was left on her boss' (Andrew Yau) answering machine (Lie #2)" (Cicvara Dep. page 84).** Burnett even went on to add on to her own lie, and stated (speaking under her chin, to herself, but yet load enough that all could hear it): "we are not sure did Bel recorded it by leaving her phone on accidentally or intentionally, but it does not make any difference, good thing that she did that." Then she has asked Plaintiff: "Do you want to hear the recording, we have it and we can bring it in the room?" to which Plaintiff answered: "No, I know exactly what happened in Bel's hotel room on the night of June 8th, 2009, and there is no need to listen to it now". Not a single word of this conversation is reproduced in the notes that were served to the Plaintiff and to this Court as part of the production of documents. It is not difficult to conclude why. These lies, told by Lynne Burnett, can be easily proved by cross-examination of Peggy Wilczewski, Lynne Burnett and Kevin Babis during the trial, as it would be very hard, and very unlikely, for all three of them to deny, under the oath,

that this conversation have happened. Plaintiff pointed this out during his deposition very strongly (Cicvara Dep. Pages 69-71, 101-103 and pages 132 through 145, specifically for these lies – on pages 69, 70, 102, 103, 135 and 139). In the letter that Plaintiff intended to send to Bel Liu, written on July 20, 2009, one can see that all what was stated above by Plaintiff is true (Exhibit **B**, electronic file c)) as it was written way before (in July 2009) Plaintiff has gotten any documents from Defendants (in May 2010). Just to stress a well known fact: **An electronic file cannot be saved without the time stamp being changed. Since the time stamp on this file is July 20, 2009 – all that was written in that file was written on or before July 20, 2009. Therefore Plaintiff statements about what was stated during the termination meeting are completely accurate.**

The lie about "coming to Bel's room uninvited" was pointed out by Plaintiff during his deposition (Id. Page 70-71, page 139). Also, it was proven above, in answers to paragraph 27 – so it is not going to be repeated here.

It is important to stress that Plaintiff immediately denied that he "came to Bel's hotel room uninvited" by answering to Lynne Burnett's question with: " No, I did not come uninvited, in fact Bel invited me to come. We have exchanged text messages, where I asked Bel: Can I come to your room to eat dessert that we both got after dinner together? Bel's answer initially was "No, I am tired now" but then she changed her mind and sent another text message where she directly invited me to her hotel room (Cicvara Dep. Pages 69 and 70). Lynne Burnett then said exactly: "Whatever you say, but she claims that you were "just suddenly standing at her hotel room door" (Dep.of Peggy W. Bates page PG000603)". Not a single word of this conversation is captured in the notes produced by Defendant, and again it is easy to figure out why? Defendants took full and unscrupulous advantage of the fact that notes were never reviewed or seen by Plaintiff, and then picked and chose to put in the notes only their skewed interpretation of the conversation that was going on during those 10 minutes that irreversibly destroyed all aspects of Plaintiff's life.

Bel's lie that "Predrag was suddenly standing at my door", after she mentioned only two text messages, the first one Plaintiff asking her can I come to the room, and the second one her answering: No I am tired  (Id. Page 000583) can be  materially proven as a lie by reviewing the text message records from Plaintiff's official business Blackberry (Exhibit F, Bates pages

000415-000416) where it is clearly stated that five messages were exchanged between Bel Liu and Predrag, as Plaintiff pointed out during his deposition (Cicvara Dep. Pages 69-71, page 140, page 146).The messages were: to Bel (8:57 PM – Thailand time, June 8th, 2009): "Can I come to your room". From Bel (9:00 PM) "No, I am tired", To Bel (9:05 PM): "OK then, good night"; **From Bel – immediate answer (9:05 PM): "I changed my mind – you can come"** and the final one to Bel (9:07 PM): "OK then see you soon" (times on the official phone records are 14 hours behind – Pacific Standard Time – USA- Bates pages 415-416). What Bel did with **those five messages**, as **she transformed them in six, with the different time stamps** – was already described above in the paragraph 27, and it does not need to be repeated here.

The second lie from Lynne Burnett is also easy to prove, as the only recordings that Defendant produced are two audio files **from Austin Lin's answering machine** (Exhibit B, electronic audio files d) page 000526, and e) page 000527). The recording took place around 7 AM Thailand Time, on Wednesday, June 10th, 2009. There is absolutely nothing about what went on in the room on June 8th, 2009 on these recordings. That morning Plaintiff left Thailand and flew to China and he brought back the T-shirt he bought for Bel Liu in Hard Rock Café in Singapore – on Saturday, June 6th, 2009. Bel "returned" the T-shirt by leaving it on the outside side of the Plaintiff hotel room door, most likely actually setting him up again as she hoped that Plaintiff might say something that would further strengthen hers and Austin Lin's false accusations which did not work as planned – but it did not matter, because HR personnel had an intent to fire Plaintiff anyway, without ever attempted to check any of the statements form Austin and Bel Liu.

The explanation of what went on during Plaintiff's visit of Bel's room on June 8th, 2009, with respect to the phone calls and recordings was provided by Plaintiff during the deposition (Cicvara Dep. Page 101-103). During the deposition Plaintiff repeatedly stated that his words were not captured in the notes, like when he said that "There is a question here which says did she invite you to her hotel room? There is no answer here. Why do you think there is no answer here? There is another question, did she ask you to leave and did you refuse to leave? There is no answer." (Cicvara, Dep. Page 139).

Plaintiff never stated "I am a man and it looks like I could rape you like that. You are showing off" (Page 000499) and that is just plain fabricated lie that was the notes writer's free interpretation of what actually was said in the room during the interrogation. What Plaintiff said

was: "When you do such thing with your legs one could rape you" and then Bel and him had an academic discussion about meaning of the word rape as Bel asked Plaintiff: What is rape? (Cicvara Dep. pages 86-88, page 138). Also, Cicvara did not admit to saying "one could rape you" but "when you do such thing with your legs, one could rape you" – **again the words are pull out of context and only partially cited to paint very different picture** – the one Defendants want to paint (same as the "termination for cause" is enough to lose the stock options used later – forgetting three additional conditions for this to happen, the same "Rule #2" approach).

Plaintiff never admitted, <u>because he couldn't, as he never said those words,</u> that he told Liu "I could rape you" – just "**When you do such thing with your legs, one could rape you**" which is a big difference (even if it were "When you do such thing with your legs, I could rape you" – it would still be a big difference). Bel Liu ended her statement about what happened in her room on June 8th with "he did not threaten me or shout at me, he was gentle and **he did not do any violent action**". Again Lenin's: "A lie told often enough becomes the truth" – this seems to be the modus operandi of the Defendants' lawyers (as well as pulling the statements out of context and using them as a fully contained ones).

**<u>Paragraph 50, 56, 57, 58, 60 and 61.</u>**

Once one understands the Defendants motto (rules #1 and #2 previously defined), it is easy to see the patterns. Here the "Rule #2" is in place again, as it was throughout the last 18 months. Defendants are pretending that they do not understand very logical rules.

So here is an exact and very simple explanation of the logic contained in the Section 6 of The Gillette Company 1971 Stock Options Plan (**Exhibit B, electronic file b)**), in the further text called "Plan", that would result in the cancellation of the participants options:

**Condition #1**:  <u>The participant must be terminated.</u> In the "Plan" it would correspond to the **section 6 (f) only**.

**Condition #2**:  It is not enough that participant is just terminated; <u>he must be terminated "for Cause".</u> In the "Plan" it would correspond to the next to the last paragraph on the page 8 that states:

"If an employee Participant is discharged for Cause", **as hereinafter defined** *(this is preamble of the Condition #3)*, "all his options shall immediately be cancelled effective

24

as of the date of termination of his employment. For the purposes of the Plan, unless otherwise provided under the terms of an employment agreement with the Company or any of its subsidiaries, in which case the definition contained therein shall control" (*this is not the case with the Plaintiff*) "a discharge for "Cause" shall have occurred where a Participant is terminated because of:" (*it is here that the definitions of possible - A, B or C - Conditions #3 will be written – and we will see all three in the continuation of what follows in the "Plan"*).

**Condition #3**:          It is not enough that participant is just terminated "for Cause"; in addition to that, at least **one of the three conditions listed under A, B or C also must be fulfilled.** In the "Plan" these conditions are stated in the text that immediately follows the one stated above in the Condition #2 (Exhibit B, file b), page 8 – last paragraph)":

    (A) the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from incapacity due to physical or mental illness) after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board or elected officer or manager believes that participant has not performed his duties;

    (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or

    (C) the Participant's conviction of a felony or a plea of nolo contendere by participant with respect thereto.

So, there it is – very simple, very easy to understand and very straightforward. Even if one assumes that Plaintiff is underlined terminated for the right and just reasons (*which he is certainly not and it is a matter of dispute*), and even if one assumes that Plaintiff is terminated for "Cause" for the right and just reasons (*which he is certainly not and it is a matter of dispute*), it **is still far from enough, for the cancellation of his stock options.** These two (Condition #1 and Condition #2 together) conditions only satisfy 6 (f) alone but; in addition, the Condition #3 **must be fulfilled as well.**

So let's now analyze the three possible variations (A, B or C) of the Condition #3 – following the Defendants' documentation chronologically.

In her letter to Plaintiff, sent on June 16, 2009 Peggy Wilczewski stated that the Plaintiff stock options were cancelled due to the Section 6 (f) (A) – please see an Exhibit I, page 1, the beginning of paragraph 2: "Section 6 (f) (A) of The Gillette …..".

However, it is undisputed fact that Plaintiff has never received any written demand for his performance, from anybody in Duracell, during his employment there that lasted almost nine years. On the contrary, Plaintiff has an excellent work performance year in, year out and was on his way to receive more responsibilities as of July 1, 2009 (Cicvara Dep. page 16). Therefore it is easily proven that the actions of Defendants, when they canceled my stock options for the reason stated in the Exhibit I, were illegal, as the condition #3 - option (A) – was not fulfilled.

On July 7, 2010 in the Defendant s' Memorandum of Law in Opposition to Plaintiff Motion to Compel Discovery (Exhibit G) the following statements can be found:

On the page 1 (or 4 of 20) in the second paragraph: "…..because the options were cancelled by operation of the terms of the Stock Option Plan when he was terminated for cause". This is **an incorrect statement** as it does not specify three necessary conditions described above. It is the beginning of the repeated application of the combinations of the Defendant's Rule #1 (*repeat lies*) and Rule #2 (*use skewed or partial statements to your advantage*) to the stock options issue.

On the page 5 (or 8 of 20) at the top of the page: "..Wilczewski informed Cicvara that pursuant to Section 6 (f) (A) of The Gillette Company Stock options Plan, Cicvara's stock options were cancelled as a result of his termination for cause". This particular statement is complete and it adheres to the requirements of the "Plan" as it specifies all three required conditions: 6 (f) (A). The problem is – the condition (A) cannot be applied to the Plaintiff as already was explained above.

After the deposition by Plaintiff, in which Plaintiff himself asked about the Condition #3 (Cicvara Dep. page 156-157, page 159), the Defendant changed their definition of the reasons for the cancellation of stock options from 6 (f) (A) described above (as they realized it did not make much sense) to the newly defined 6 (f) (B) reason – specified in the paragraph 50 – this time finally the same way as it is described above. While this could seem more appropriate way

26

to justify the Plaintiff's stock cancellations, it will later be proven that it cannot be applied to this case. It should be stated that this switch in the Defendant's reasoning more than 18 months after the cancellation occurred should not be tolerated, but that will be proven irrelevant anyway. Before the proof though, let's just go through the documentation provided by Defendant to prove how, by spreading the lies and untruthful statements throughout the submitted documents, they are trying to divert the focus from the simple facts that point just to the opposite of what the are trying to prove. Here we are:

In the paragraph 57: "at which point Muncy stated that Cicvara's stock options were automatically cancelled as a result of his termination for cause". Here, by using the incorrect statement of Mr. Muncy Defendant is trying to justify the illegal actions of Peggy Wilczewski and Lynne Burnett that led to the cancellation of Plaintiff' stock options. Then the text continues by repeating: "to Section 6 (f) of the Plan, which states that an employee's stock options are automatically forfeited if the employee is terminated for "Cause"". Well this is not only incorrect; it is a plain lie, as, by looking at the document in question, **this statement simply does not exist there**, as everything that relates to the stock options in connection with the termination for Cause in the Exhibit B – b)), was written above, while explaining the necessary Conditions #1, #2 and #3. <u>Therefore this statement is a lie, and a lie remains a lie, regardless was it Mr. Muncy, or Wilczewski in her declaration, or Burnett in her declaration – all of them hopefully know how to read and could have read the Exhibit B (file b)) by themselves.</u>

In paragraph 58: "and informed Cicvara that he could not exercise the options because they were forfeited by virtue of his termination for cause (Cicvara Dep. at 153)". While Defendants obviously understand (*at least now after 18 months of pretending differently*) that all three Conditions needs to be met, and they are actually fulfilling those in the newly invented reason, under the paragraph 50 (6(f) (B)), they still repeat the incorrect and illegal statement by Peggy Wilczewski, even as they must have realized it is incorrect. What follows is interesting as <u>the fact that the stock administrator told Plaintiff that he could exercise the stocks, even though the Plaintiff stated that he was terminated for "Cause", proves that indeed the stock are NOT automatically cancelled because of the termination for "Cause" per se. Again it would be funny, if it did not cause such tragic consequences for the Plaintiff, to observe, how illogical the next sentence was: "Cicvara, however, did not provide the administrator with the details regarding the</u>

ground for his termination. **What grounds? If it is automatic, it is automatic isn't it? Or it is not all of the sudden?**

In paragraph 59 the story continues: "Wilczewski informed Cicvara that she would call the stock plan administrator and clarify the issues". Again the statement deserves a good laugh (*what is to be clarified, if it is automatic*) as it cannot contradict more the previous statement by Mr. Muncey, Wilczewski in her declaration, and Burnett in her declaration too: "that options are forfeited if an employee is terminated for cause". It is amazing how strong the level of arrogance is here – as either the Defendants treat the Court and all involved in this case as totally incapable to see how grotesque this contradiction is (throughout all of the submitted documents) or they, in their arrogance, are not aware of the enormous mess that they are causing by repeating their untruthful and contradictory statements. We can go on and on with similar examples not only in this particular document (in the following paragraphs) but in all of them, but that would not serve the purpose anymore, and would just be the waste of time.

It is obvious that the section 6 (f) (C) couldn't be applied as Plaintiff was not convicted of a felony as required in sub-paragraph C of the aforementioned.

What is stated in paragraph (B) clearly defines that the condition (#3) for cancelling the options of somebody who was terminated for "Cause" is if: "the Participant's engaging in illegal conduct or gross misconduct **which is materially and demonstrably injurious** to the Company or its subsidiary".

Therefore the part that Defendant would have to prove, which they absolutely failed to do, would be: "materially and demonstrably injurious to the company". They also would first have to prove that Plaintiff conduct was illegal – which it was not, or that it represents "gross misconduct", which they do claim, but failed to prove, throughout their documents, in spite of the fact that they carefully crafted the fabricated evidence to strengthen their case, and allowed the others (Bel Liu) to freely do the same, as explained above.

The Defendant never even tried to prove that this statement indeed applies in this case. Defendants stubbornly and repeatedly refused to disclose the business results, level of their business with Practical, and lists of purchase orders issued by Duracell to Practical in the last several years, that Plaintiff had asked for many times. Why? Because **there was not any negative impact to Duracell business that Plaintiff's behavior, even if the Defendant allegations were true,** (*and they are obviously not*) would have caused to the Duracell business.

28

The e-mail that Mr. Andrew Yau sent to Erik Lawson (Exhibit H), only confirms that Practical was in position to beg Duracell for more business (Cicvara Dep. page 23-24). Ironically, the accusations by Austin Lin are actually emphasized by Mr. Yau, for the reasons completely opposite from what paragraph B of the The Gillette Company 1971 Stock Plan is asking for (negative impact to the company's results – a material impact). Andrew sets me up, using Bel (*and destroying my life in a process*) in order to gain leverage with Duracell, that in his mind, would enable Practical **to get more business from P&G, not less.**

Duracell business could not materially suffer, even if Practical would have decided to completely cease their cooperation with Duracell (jut the opposite of what they were actually doing). Plaintiff have explained Duracell policy with the contractors, as always keeping them hungry and always having more than just one solution for what was needed from them (Cicvara Dep. pages 44-45).

Because Plaintiff's termination, for alleged "Cause" **did not cause any material losses to the company**, the stock options that Plaintiff deserved and was awarded from 2001 until 2005, must be reinstated, even if it is assumed that Plaintiff actually committed what Defendants are accusing him of  (**which he did not**). From all of the previous answers to the Defendants' Undisputed Facts, from Plaintiff's Affidavit and all other Plaintiff's documents provided, it is very obvious that, not only already awarded stock options, but also Plaintiff's lost salaries, lost bonuses, lost pension contribution, lost future stock options and lost future raises and promotions are unjustly taken away from him, **by the illegal actions and decisions of the Duracell / P&G employees**. Therefore, the decision about this case should be brought, without wasting any more of tax payers' money – just by Your Honor, without proceeding with the trial activities, as the ample evidence exist to support such a decision.

**Paragraphs 51-55**

The statements listed in these paragraphs are true and correct.

**Paragraphs 61 through 64.**

The statements in these paragraphs are all true, under <u>one condition - that is not fulfilled in this case</u>. In order for them to be true, Defendant needs to prove that the Plaintiff <u>was terminated for the reasons that are justified, true and properly investigated</u>. If the termination process involved illegal activities by the Defendants then all the truths listed in these paragraphs are entirely irrelevant, as the Plaintiff shouldn't have been terminated to start with. That is a

factual matter of dispute for this Count, as is for some other Counts – **was the decision by Defendants to terminate the Plaintiff for "Cause" proper, just and was it based on the facts that were thoroughly checked, screened, and unquestionably truthful?** After going through the evidence and the hard facts that Plaintiff pointed out, it will be impossible to characterize the Defendants actions as being honest, justified and truthful, as they were just the opposite of that.


**Paragraphs 66 through 68.**

The statement form the Defendant that Plaintiff did not see any written document referring to a severance package is true only with the respect to the P&G company. Plaintiff actually has in his possession The Gillette Company Severance Plan for Exempt Employees – Summary Plan Description (Exhibit J). P&G Company acquired The Gillette Company in 2005 (Wilczewski Decl. paragraph 1).

Since all legal rights that employees in The Gillette Company had, are preserved after the acquisition of The Gillette Company by P&G, it is obvious that there exists the similar plan within P&G Company, although it could be a bit different. It certainly does exist, as the employees are terminated (without the "Cause") daily within P&G for various business reasons. What Defendants are stating in a paragraph 66. is just the fact that they have never provided a written document that describes the employee rights to a severance package to Plaintiff even though Plaintiff repeatedly asked for such a document specifically.

Having said that, the Plaintiff agrees with the Defendants' statement in paragraph 68. Plaintiff indeed was not laid off or terminated without cause. **Plaintiff was improperly and unjustly terminated (for "Cause"), by the illegal action of several individuals that will cast a dark shadow over the Duracell and P&G reputation, if it goes unpunished.**

<u>List of Exhibits used in this document:</u>

A) E-mail to Peggy Wilczewski – June 29, 2009 and her answer June 30, 2009.

B) USB Memory Stick with the following files in the electronic form:

   a. P&GBusinessConductManualWBCMREDUCED_Single_Page.pdf
   b. 1971_SOP_plan_10_2004_Gillette_Stock_Plan.pdf
   c. Letter to Hongkong – 10 minutes on Monday.doc
   d. Page 000526 – audio file: Morning of June 10, Bangkok, Bel's Hotel Room, 1 minute, Austin Lin's answering machine
   e. Page 000527 – audio file: Morning of June 10, Bangkok, Bel's Hotel Room, 1 minute, Austin Lin's answering machine
   f. Entire Deposition by Plaintiff – December 21, 2010 – 200 pages

C) Complete transcript from the Cicvara Deposition – December 21, 2010

D) Plaintiff Motion for Production of Documents (January 3, 2011)

E) Defendant Responses and Objections to Plaintiff's Second Request for Production of Documents, from February 7, 2011

F) T-mobile bill for June 2009 – Bates pages 000415 and 00416 + Bates Page 000612 + Exact Explanation Table

G) Defendant s' Memorandum of Law in Opposition to Plaintiff Motion to Compel Discovery, July 7, 2010

H) E-mail from Andrew Yau to Eric Lawson from June 25, 2009.

I) A Letter about the stock options from Peggy Wilczewski – June 16, 2009

J) The Gillette Company Severance Plan for Exempt Employees – Summary Plan Description

A-424

Respectfully Submitted

By_____L/S_____

    Igor I. Sikorsky, Jr.
    P.O. Box 38
    Unionville, CT 06085
    (860) 675-5313
    CT Fed Bar No. 04233

## **CERTIFICATION**

This is to certify that the copy of the foregoing was sent by U.S. Mail to:

Attorney Edward Cerasia, II
Seyfarth Shaw, LLP-NY
620 Eight Avenue
New York, NY 10018

L/S
_____
Igor I. Sikorsky, Jr.