



Touching lives, improving life. P&G

Unauthorized reproduction or use is prohibited

© 2004 P&G

A-490

**EXHIBIT B TO STATEMENT -**
**(B) THE GILLETTE COMPANY, 1971 STOCK OPTION PLAN, DATED DECEMBER 13, 2005**
**(REPRODUCED HEREIN AT PP. A-323–A-327)**

A-490

**EXHIBIT B TO STATEMENT -**
**(B) THE GILLETTE COMPANY, 1971 STOCK OPTION PLAN, DATED DECEMBER 13, 2005**
**(REPRODUCED HEREIN AT PP. A-323–A-327)**

1. I have been questioned for about 10 minutes on Monday, June 15th, 2009 after I came to work, by HR director, my boss and one other person, about what have happened during the night of June 8th, in your room in Emporium Suite hotel in Bangkok. I was told that there is a recording from the events that night, that was accidentally or not, recorded on the answering machine of your boss (Andrew).

2. I did not deny that something was going on. Did not want to listen to the recording. I just told them the truth; what was going on that night was a consensual relationship between two adult persons who knew each other before and had a friendly and emotional relationship going on for few months already. I told them that you have sent me a message that I can come to your room (to eat the dessert together). Also, I told them that nothing was forced upon any of us while being together and that at any point in time what was going on could have been stopped by either one of us – which eventually did happen at the moment when we just ate desserts and I have left the room w/o any harm happened to any of us.

3. I was promptly "terminated for Cause" which meant that I was escorted from the building half an hour later. I was paid only until June 15, 2009. All my stock options (value was several hundreds thousand dollars) were cancelled immediately, even though I got them from 2001-2005 and never exercised them. I was fired without any severance payment either.

4. What this means to me – my whole life is destroyed. I lost my job in a situation where it will be very hard for me to find another due to the economic situation in USA and partially due to my age. I will lose my house if I don't find a job fast, which is very unlikely. My marriage is destroyed as well, my family is all against me, for good reasons, and my son may be psychologically affected possibly for the rest of his life.

My question to you Bel is why? I remember you have called your boss in the course of that evening to let him know what the final numbers are for the bidding tomorrow. It is quite possible that the phone was then left on, and that next morning when you were faced with the recordings, you, in order to protect yourself, your marriage and integrity of your position at Practical just told your boss that it was me who came to room uninvited and that you were "victimized". That may have prompted him to report it immediately and you just went on with it.

While I can understand that, please try to understand my situation right now – the gravity of it is such that I still am trying to comprehend it. What you can do to help me is just to write the statement of your own, explaining that we knew each other for quite some time, that there was an exchange of e-mails going back and forth, since January 2009, that what happened that night was in no way harmful to you, but it was just a consensual relationship between two of us that eventually ended up without any harm to any of us. Also, you could say that it was you who sent the text message that I can come to your room to eat the dessert together.

Please keep in mind that even with such a statement there is not much I can do to ease my position, but I might be able to try to at least decrease the financial damage to my family. The embarrassments I have gone through by being terminated on the spot, by being judged by my wife, son and family, and the one where I can hardly face anybody I have known from Duracell (last 9 years of my life) because "there are something bad about him – if he has been terminated on the spot" are punishments that even if were not coupled with the financial disaster and lack of work (which they are) are bad enough to burry me forever.

So please, understand that what I am asking for you to do is a just and correct thing to be done. You will not risk anything – your job is secure, your marriage is secure, and the statement may help me to at least try to start gather some pieces of my shattered life together. Think about it and do what the right thing is.

Predrag

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:09-CV-2054 (JCH)

----------------------------------------------------x

PREDRAG CICVARA,                                  :

                          Plaintiff,              :

                                                  :

        -versus-                                  :

                                                  :

THE GILLETTE COMPANY and PROCTER &                :

GAMBLE COMPANY, Inc., DURACELL, AN                

ENTITY OF UNKNOWN FORM and LYNNE                  :

BURNETT,                                          

                          Defendants.

----------------------------------------------------x

            Videotaped Deposition of PREDRAG CICVARA,

        taken pursuant to Notice and the Federal Rules of

        Civil Procedure, at the law offices of Levett

        Rockwood P.C., 33 Riverside Avenue, Westport,

        Connecticut, before June Keefer, RMR, RPR, Licensed

        Shorthand Court Reporter, License No. 108, a Notary

        Public in and for the State of Connecticut, on

        December 21, 2010, at 10:03 a.m.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page8 of 96

A-494

CICVARA v. PROCTOR & GAMBLE                         December 21, 2010

```
                                                    Page 2
 1    A P P E A R A N C E S:
 2
 3
              For the Plaintiff:
 4
              LAW OFFICES OF IGOR I. SIKORSKY, JR., P.C.
 5            121 Perry Street
              P.O. Box 38
 6            Unionville, Connecticut 06085
              Tel: (860)675-5313
 7            By:  IGOR I. SIKORSKY, JR., ESQ.
 8
 9
              For the Defendants:
10
              SEYFARTH SHAW LLP
11            620 Eighth Avenue
              New York, New York 10018-1405
12            Tel: (212)218-5500
              By:  EDWARD CERASIA, II, ESQ.
13                    -AND-
                    HEMA CHATLANI, ESQ.
14
15
16
17    A L S O    P R E S E N T:
18
              LOUISE S. BROCK, Senior Counsel
19            Legal Division
              The Procter & Gamble Company
20            299 East Sixth Street
              Cincinnati, Ohio 45202
21
22            CHAD ROY, Videographer
              Geomatrix Productions
23            270 Amity Road
              New Haven, Connecticut 06525
24
25
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page9 of 96

A-495

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 3

```
1                  S T I P U L A T I O N S

2

3

4          IT IS HEREBY STIPULATED AND AGREED by and

5   between counsel for the respective parties hereto that

6   all technicalities as to the proof of the official

7   character of the authority before whom the deposition is

8   to be taken are waived.

9

10          IT IS FURTHER STIPULATED AND AGREED by and

11   between counsel for the respective parties that any

12   defects in the notice are waived.

13

14          IT IS FURTHER STIPULATED AND AGREED by and

15   between counsel for the respective parties hereto that

16   the deposition may be signed before any Notary Public.

17

18          IT IS FURTHER STIPULATED AND AGREED by and

19   between counsel for the respective parties hereto that

20   all objections, except as to form, are reserved to the

21   time of trial.

22

23

24

25
```

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 4

1              THE VIDEOGRAPHER:  On the record at 10:03

2    a.m.

3              MR. CERASIA:  This is the deposition of

4    Predrag Cicvara recorded on December 21st, 2010, in

5    Westport, Connecticut.  This deposition is being taken in

6    the case of Predrag Cicvara versus The Gillette Company,

7    Procter & Gamble Company, Inc., Duracell An Entity of

8    Unknown Form, and Lynne Burnett, and was noticed by

9    myself, Edward Cerasia, Seyfarth Shaw, as counsel for the

10   Defendants.  The videotape operator is Chad Roy of

11   Geomatrix Productions, 270 Amity Road, in New Haven,

12   Connecticut.

13             As far as stipulations, I assume you'll

14   have your client read and sign the transcript.

15             MR. SIKORSKY:  Yes; otherwise standard

16   stipulations here.  We certainly waive any questions as

17   to the competency of the court stenographer, notice

18   because --

19             MR. CERASIA:  We've agreed on the date.

20             MR. SIKORSKY:  -- we agreed on the date

21   here, after several postponements, as I recall it.

22             MR. CERASIA:  And we'll retain the

23   original of the exhibits in our office.

24             MR. SIKORSKY:  Yes.

25             MR. CERASIA:  We'll supply you with

Case 12-338, Document 59-3, 07/23/2012, 671476, Page11 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 5

```
1    copies obviously.

2                    My name is Edward Cerasia, II, from

3    Seyfarth Shaw.  Mr. Cicvara --

4                    MR. SIKORSKY:  My name is Igor Sikorsky.

5    I represent the Plaintiff in this action.

6                       *        *        *

7    P R E D R A G    C I C V A R A,

8    2122 North Benson Road, Fairfield, Connecticut 06824,

9        called as a witness, having been first duly sworn by

10       June Keefer, a Notary Public in and for the State of

11       Connecticut, was examined and testified as follows:

12   DIRECT EXAMINATION

13   BY MR. CERASIA:

14       Q.   Good morning, Mr. Cicvara.  I introduced myself

15   before the deposition.  As you know, I and my law firm

16   are counsel to the Defendants in the lawsuit that you

17   filed in Federal District Court in Connecticut against

18   Gillette and Procter & Gamble.  Have you ever given a

19   deposition before?

20       A.   No.

21       Q.   Have you ever been a witness in any kind of

22   proceeding where you gave sworn testimony?

23       A.   No.

24       Q.   Okay.  Let me just go over a couple of rules

25   and what's going to take place today.  First of all, it's
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page12 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 6

1   important both for the stenographer as well as the

2   videographer that the two of us have to wait for each

3   other to finish speaking before we speak.  You may

4   anticipate some of my questions, but please let me finish

5   them before you speak, okay?

6        A.   Okay.

7        Q.   The other thing is you have to verbalize your

8   responses, so you can't wave your arms, nod your head;

9   you have to give a yes or no answer or other verbal

10  response, okay?

11       A.   Yes.

12       Q.   If at any point you don't understand one of my

13  questions, will you please let me know that?

14       A.   Sure.

15       Q.   Okay.  If you don't say anything to me about

16  whether or not you understand a question, I'm going to

17  assume that you do understand my questions, okay?

18       A.   Okay.

19       Q.   You realize that you're under oath?

20       A.   Yes.

21       Q.   Okay.  And you realize that it's your

22  obligation to give truthful answers to the best of your

23  ability?

24       A.   Yes.

25       Q.   Did you do anything to prepare for this

Case 12-338, Document 59-3, 07/23/2012, 671476, Page13 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                    Page 7

1    deposition today?

2         A.   Yeah.  I read a few things that were in the

3    material that you supplied.

4         Q.   Do you remember what it was that you read?

5         A.   Yeah, I remember.  There were many things,

6    like, for example, some things that Bel Liu said to

7    Duracell people when she was giving her deposition to

8    them or I don't know do you call it deposition, but it's

9    when she talked to the personnel from human resources.  I

10   also did read the certain documents that you might not

11   have possession of, which the documents that are about

12   whistle-blowing case, which I did brought to the

13   attention of people in Duracell in 2007, in December.

14   There were a few other documents, but they were all

15   supplied more or less by you.

16        Q.   You have a folder in front of you.  What's that

17   folder?

18        A.   There are certain things in it which I might

19   use to refresh my memory, so.

20        Q.   Did you review those documents before today?

21        A.   Yes.

22        Q.   Did you review them to refresh your memory in

23   preparation for your deposition testimony today?

24        A.   Yes.

25        Q.   May I see those documents?

A-500

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 8

```
 1     A.    Yeah, sure, you can see them.

 2     Q.    Have you taken any kind of medication that

 3  would either impact your ability to understand my

 4  questions today or to give truthful answers?

 5     A.    No.

 6     Q.    Have you consumed any alcohol in the last 12

 7  hours?

 8     A.    No.

 9     Q.    Did you speak to anybody in preparation for

10  your deposition today?

11     A.    No, except to my lawyer a few minutes, no.

12     Q.    Did you meet with him to prepare for this

13  deposition?  I don't want to know what was discussed.

14  I'm just wondering if you met with him.

15     A.    He just came to my house and we drove to here

16  because he lives about one-hour-and-a-half driving up in

17  Connecticut.

18     Q.    So how long were you in the car together today?

19     A.    Oh, ten minutes, fifteen minutes.

20     Q.    From Fairfield?  Do you still reside in

21  Fairfield?

22     A.    Yes.

23     Q.    Have you ever been a party to a lawsuit before?

24     A.    Yeah, against my neighbor.  That was something

25  about him putting the addition to his house which was
```

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 9

```
 1   against the zoning regulations.

 2        Q.   You sued your neighbor to stop the addition?

 3        A.   No, not to stop, just to change it.

 4        Q.   To change it?

 5        A.   Yes, according to the rules.

 6        Q.   When was that, sir?

 7        A.   2004.

 8        Q.   Was that in State Court, Federal Court or some

 9   kind of zoning court?

10        A.   I believe it was in State Court or -- I don't

11   really know.

12        Q.   Did you have a lawyer?

13        A.   Yes.

14        Q.   Who was your lawyer?

15        A.   I don't recall.  It was not that important.

16        Q.   Other than the lawsuit where you sued your

17   neighbor somewhere around 2004, have you been a party to

18   any other kind of lawsuit?

19        A.   No.

20        Q.   Have you ever been involved in any kind of

21   arbitration or government agency proceeding?

22        A.   No.

23        Q.   Have you ever been arrested?

24        A.   No.

25        Q.   Have you ever been convicted of a crime?
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page16 of 96

A-502

CICVARA v. PROCTOR & GAMBLE                         December 21, 2010

Page 10

```
 1    A.    No.

 2    Q.    You said you resided in Fairfield?

 3    A.    Yes.

 4    Q.    And how long have you resided there?

 5    A.    Twelve years.

 6    Q.    Where did you reside before Fairfield?

 7    A.    In Bethel, Connecticut.

 8    Q.    And how long were you in Bethel?

 9    A.    Oh, from 1993 to 1998.

10    Q.    Who do you reside with?

11    A.    My wife and my son.

12    Q.    How old is your son, sir?

13    A.    He's twenty-six.

14    Q.    And what's your wife's name?

15    A.    Lillian, L-i-l-l-i-a-n.

16    Q.    And how long have you been married?

17    A.    It will be from 1983, so 27 years.

18    Q.    How long have you been in the United States?

19    A.    Since 1991, September.

20    Q.    And where did you reside before then?

21    A.    In Zagreb, Croatia.

22    Q.    Is that where you were born?

23    A.    No.  I was born in Stara Morivica, Yugoslavia.

24  I have to spell it.  But is it important where I was

25  born?
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page17 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 11

```
 1       Q.    No, no.

 2       A.    S-t-a-r-a, and then the second word is

 3   M-o-r-i-v-i-c-a.

 4       Q.    And that's Yugoslavia?

 5       A.    Yeah.  That was Yugoslavia at that time.

 6       Q.    Right.

 7       A.    So I'm just being precise.

 8       Q.    When did you first become employed with

 9   Duracell or Gillette?

10       A.    November 1st, 2000.

11       Q.    And who was your employer at that time or what

12   entity was your employer as you understood it?

13       A.    It was Duracell Corporation or Duracell, part

14   of Gillette Company.

15       Q.    And that was in Bethel?

16       A.    Bethel, Connecticut.

17       Q.    What role were you hired into?

18       A.    Manager of Worldwide Technical Services in the

19   OEM sales group.

20       Q.    What does OEM stand for, for the record?

21       A.    Original equipment manufacturer.

22       Q.    And what were your job duties as the Manager of

23   Worldwide Technical?

24       A.    I was in charge of technical issues which

25   salespeople were experiencing in that group.  Also in
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page18 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 12

1    charge of their computers, programs that we developed to

2    help them to sell direct to OEM manufacturers.  It means

3    like, if I have to clarify, Duracell is manufacturer of

4    batteries and part of what OEM sales group was doing is

5    selling batteries directly to manufacturer of devices so

6    that when you open up the device batteries would be

7    included.  It means like it's a part of marketing

8    basically.  And the sale price of such batteries is

9    usually much, much less than the retail price, which

10   opens up possibility for diversion, which was part of

11   whistle-blowing case.  And part of my duties, not only as

12   Worldwide Technical manager, but after that where I

13   became Manager of OEM Business Services, it means like I

14   actually was in charge of technical, also in charge of

15   marketing, forecasting, pricing, all that you can

16   imagine, because there was a big cut in Duracell in April

17   2002 when I got that position and part of my position was

18   to prevent diversion sales, which is very important in

19   this story.

20        Q.   Did you say diversion sales?

21        A.   Yes.  That's the sales where you would sell

22   supposedly to the OEM manufacturer who would then resell

23   that to retail, and that will open up a possibility to

24   get a pretty hefty profit on it, because we would sell --

25   double As sell for 10 cents and Duracell is selling those

Case 12-338, Document 59-3, 07/23/2012, 671476, Page19 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 13

1    cells for 40 cents to retail and you are paying, you

2    know, anywhere from 50 to a dollar per cell.  So the

3    difference is 30 cents per cell.  C-e-l-l, it means like

4    a piece of battery, double A.  And the difference is 30

5    cents.  If you sell 10 million per year, that opens up

6    possibility of gaining $3 million.  And diversion that I

7    found in 2007 was selling more than 10 million, it was

8    selling 70 million cells per year.

9        Q.   Okay.  This raises another issue with respect

10   to the rules for the deposition.  I'm going to ask you

11   questions.  I'm going to just ask that you answer the

12   questions that I ask you, okay?

13       A.   Okay.

14       Q.   And if I want more information I'll let you

15   know, okay?

16       A.   Yeah.  I would answer clearly to your question,

17   except you will have to give me space to explain how that

18   affects whatever we are actually talking about here.

19       Q.   Okay.  If you don't understand one of my

20   questions, you can let me know.

21       A.   I'll ask, yes.

22       Q.   When you were the Manager of OEM Business

23   Services, right --

24       A.   Yes.

25       Q.   -- did you -- who did you report to at that

Case 12-338, Document 59-3, 07/23/2012, 671476, Page20 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 14

1    time?

2        A.    When I was Manager of Business Services I

3    reported to Mani Parmar.  M-a-n-i, that's the first name.

4    The last name is P-a-r-m-a-r.

5        Q.    And you held the position of Manager of OEM

6    Business Services from, what, 2002 to 2008?

7        A.    From April of 2002 until March 31st, 2008.

8        Q.    And then in March -- or excuse me, April 1st of

9    2008 you had a new role as the Duracell Lighting Quality

10   Leader?

11       A.    I have to correct you.  I didn't have new role.

12   I was transferred to that role, to the role of, yes,

13   exactly what you said, Duracell Lighting Quality Leader,

14   which pretty soon became something else in a few months.

15       Q.    Okay.  But the Duracell Lighting Quality Leader

16   role was different than the manager of OEM; right?

17       A.    Yes.

18       Q.    Whether it was a transfer or whatever, you had

19   a new job and a new role?

20       A.    Yes, because partially I was asking for that

21   because I didn't want to report to the person that I told

22   or was sure was responsible for diversion.

23       Q.    Okay.  So in the role as the Duracell Lighting

24   Quality Leader you started to report to Harley Ballew?

25       A.    Yes.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page21 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 15

```
 1        Q.    That's B-a-l-l-e-w?

 2        A.    Yes.

 3        Q.    Was there anybody else that you reported to at

 4   that time?

 5        A.    Yeah.  I reported to Kevin Babis a few months

 6   after that because I was kind of promoted to the position

 7   of QA manager.  B-a-b-i-s, Kevin.

 8        Q.    How long did you remain in the role of Duracell

 9   Lighting Quality Leader?

10        A.    Just two months or three months maybe.

11        Q.    So until the summer of --

12        A.    Yes.

13        Q.    -- 2008?

14        A.    Yes.

15        Q.    So your last year of employment at the company

16   what was your title?

17        A.    QA manager.

18        Q.    And you stopped reporting to Haley, right?

19        A.    Yes, and I started to --

20        Q.    Or Harley, I'm sorry.

21        A.    Harley, yes.  And I started to report to Kevin

22   Babis.

23        Q.    Okay.  And what was your -- what were your job

24   duties as a QA manager from about June of 2008 through

25   June of 2009?
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page22 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 16

```
 1        A.    I was in charge of contractors.  That's a broad

 2   definition, but contractors.  And just to make things

 3   clear, Duracell bought many things directly from many

 4   other companies and when they came in the form that is

 5   ready to be sold directly to the shelves in retail, so if

 6   you can brought product directly from the manufacturer,

 7   which usually was in China to the retail, then in P&G

 8   terms it is contractor.  So I was in charge of

 9   contractors, and Duracell had about let's say anywhere

10   from 45 to 55 contractors at any given time in the world.

11   That's throughout the world, so China, Indonesia, Taiwan,

12   Japan, Europe, everywhere.  And also I was on my way to

13   become a section head in QA, which was I supposed to

14   become on July 1st, 2009 and I never did because I was

15   fired.

16        Q.    Did you have a good working relationship with

17   Kevin Babis?

18        A.    Excellent.

19        Q.    Did you have any animosity or hostility towards

20   him?

21        A.    No.

22        Q.    Did he ever exhibit any kind of animosity or

23   hostility toward you?

24        A.    No.

25        Q.    Did you trust him?
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page23 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 17

1      A.   Oh, I don't know.  I honestly cannot answer

2   that, because, you know, from the professional point of

3   view I didn't have any reason not to trust him, but, you

4   know -- and as I said we had an excellent relationship,

5   but to trust somebody you have to have a little bit

6   deeper thing.

7      Q.   Right, but from your professional dealings with

8   him you had no reason not to trust him?

9      A.   No.

10      Q.   In your dealings with him as your manager did

11   you find him to be a fair person?

12      A.   Yes.

13      Q.   Did you find him to be an honest person?

14      A.   I don't know.

15      Q.   In your dealings with him as a manager.

16      A.   In my dealings with him, yes, yeah, I would say

17   so.

18      Q.   Yeah, I'm just asking about your dealings with

19   him.

20      A.   Yeah, yeah.

21      Q.   Now, going back to when you said you were in

22   charge of contractors, does contractors also include

23   companies that supplied parts to the company?

24      A.   No.  No.  That was the distinction.  Whenever

25   somebody supplies the part, that is part for a product

Case 12-338, Document 59-3, 07/23/2012, 671476, Page24 of 96

CICVARA v. PROCTOR & GAMBLE                        December 21, 2010

Page 18

1   that is later manufactured, in P&G world that's not

2   contractor, so that's either supplier, vendor or you call

3   it whatever your name, whatever name you want.  The

4   definition of contractor is somebody who is supplying the

5   product that is already packaged in Duracell packaging

6   which is ready to be sent to the shelves in retail.

7        Q.   So it is the final product?

8        A.   The final product, yes.  It means like Duracell

9   would put its name on the products.  And that's usual,

10  you know, that's not just Duracell, everybody is doing

11  that.  So it includes different types of batteries that

12  Duracell did not manufacture but it did sell under

13  Duracell name, and it did include flashlights, you know,

14  memory cards, all these other things that are not

15  directly connected to the batteries.

16       Q.   Are you familiar with a company out of Hong

17  Kong called Practical Lighting?

18       A.   Yes.

19       Q.   And is Practical Lighting one of the

20  contractors?

21       A.   Oh, I have to correct you.  I'm sorry.  When

22  you said out of Hong Kong, they don't have name Practical

23  Lighting in Hong Kong; they have some other name.  They

24  cannot use that name in Hong Kong because it's already

25  sold to somebody.  So I think, I believe their name in

Case 12-338, Document 59-3, 07/23/2012, 671476, Page25 of 96

CICVARA v. PROCTOR & GAMBLE                                December 21, 2010

Page 19

1   Hong Kong is World Hint, I'm not sure, World Hint,

2   H-i-n-t, but I'm not sure even in that, but it's

3   different.  In Hong Kong per se it's a different name,

4   but it's Practical, yes.

5        Q.   Okay.  Where was -- where did you understand

6   Practical Lighting to be based out of?

7        A.   I had very good understanding of it.  Practical

8   Lighting had three manufacturing facilities.  One

9   facility was in Zhongshan, China.  It's

10  Z-h-o-n-g-s-h-a-n, Zhongshan, okay, that's in China.  The

11  other facility is in Bangkok, Thailand.  And the third

12  facility is in Medan, M-e-d-a-n, Indonesia.  So they had

13  three manufacturing facilities, and the third facility

14  didn't have even name Practical.  The name Practical was

15  only in Thailand and in Zhongshan in China.  The third

16  facility, let me try to refresh my memory just a second.

17  Oh, okay.  So here you can actually see exactly, if you

18  want, this P.T. Era Cipta, that's the name of the

19  company.

20       Q.   Can I see the card you're looking at?

21       A.   Yeah, sure.  That's the director.

22       Q.   What are the other cards that you have in your

23  hand?

24       A.   Oh, the other card, this is the owner of the

25  Practical Company, Mr. Andrew Yau.  I have Yuen Yau,

Case 12-338, Document 59-3, 07/23/2012, 671476, Page26 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 20

```
 1   which is Practical Flashlight Company in Thailand.  And I

 2   have Mr. Willies Kurniawan, P.T. Cipta Elektrik

 3   Kreasindo; that is the second part of the P.T. Era Cipta

 4   in Indonesia, which is son of the owner, who actually

 5   drove us when we were doing audit in Indonesia.

 6               MR. SIKORSKY:  May we have those copied

 7   and then put in?

 8               MR. CERASIA:  Sure, that's what I'll do.

 9               MR. SIKORSKY:  Just a photocopy, since

10   they've become part of the testimony.

11               THE WITNESS:  These are originals, maybe

12   I would like to have them.

13       Q.   Andrew Yau --

14       A.   Yes.

15       Q.   -- was the chairman of Practical?

16       A.   Yes; correct.  He was the boss of Bel Liu,

17   B-e-l, L-i-u.

18       Q.   And he ran the Practical Company was your

19   understanding?

20       A.   Plus he ran some -- many other businesses.

21       Q.   Okay.  I need to go back to a question I asked

22   before you told me what the different name of Practical

23   was, maybe in Hong Kong.  Was Practical one of the

24   contractors that you've identified?

25       A.   Yes.  Yes, one of the contractors, with the
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page27 of 96

A-513

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 21

1    three manufacturing facilities, yes.

2         Q.    Correct.  And it was a contractor with respect

3    to the flashlights?

4         A.    Yes.

5         Q.    Which ones, the Daylite?

6         A.    Well, no.  There were many other contractors

7    for flashlights.

8         Q.    No.  I'm just asking about Practical, what did

9    it contract --

10        A.    Yeah, and in order for me to answer I have to

11   explain.  So if you allow me I will try to explain.

12   Daylite is a new product that Duracell launched and there

13   are many different types of flashlights for Daylite, it's

14   double A, triple A, there is a C and D, so five models at

15   least.  Two first models that were launched were not

16   given to Practical, they were given to Smart Light which

17   was another Chinese company that manufactured for

18   Duracell, which actually Practical didn't like, and they

19   didn't know that at the point.  We were trying not to

20   interfere with the businesses between the companies, but

21   they come to know it, and I don't even know how, but they

22   come to know it, so they actually make a lot of pressure

23   to Duracell to give them C and D businesses for Daylite,

24   which we did.

25             So that answers your question, yes, they were

Case 12-338, Document 59-3, 07/23/2012, 671476, Page28 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 22

1    involved in the Daylite product, but they were not

2    involved at the beginning, which they didn't like at all,

3    because they felt they're losing business that they are

4    entitled to have.  So I think it's very important to say

5    that.

6         Q.   So the relationship at some point was a little

7    bit strained --

8         A.   Yes.

9         Q.   -- is that fair to say?

10        A.   Yes.

11        Q.   Because Mr. Yau and the folks at Practical were

12   upset with Duracell that they weren't getting more of the

13   business?

14        A.   Exactly.

15        Q.   What year was that?

16        A.   We launched Daylite in 2008 at the end.  So

17   basically the Daylite started to be, you know, processed

18   and manufactured throughout -- to be designed and

19   manufactured, double A and triple A, first two models, in

20   2008 throughout the year, and that was all with Smart

21   Light.  So the first time that Practical got involved was

22   towards the end of 2008 where they get D cell flashlight,

23   Daylite, and they were supposed to get certain orders by

24   the end of 2008 which they didn't, which again made them

25   very, very unhappy because their manufacturing facility

Sanders, Gale & Russell
(203) 624-4157

Case 12-338, Document 59-3, 07/23/2012, 671476, Page29 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 23

1   in China was practically empty.  In December 2008 when I

2   went there to audit that facility their manufacturing in

3   China was completely stopped, they didn't have one person

4   on the manufacturing floor of the factory that was pretty

5   big and had probably more than 15 lines of manufacturing,

6   not one of them was open, and Bel Liu was really

7   complaining about that, telling that, you know, Duracell

8   promised them that there will be orders coming and orders

9   didn't come.

10      Q.   And did Mr. Yau also complain, too, that you

11   know of?

12      A.   No, I don't know about that, because I

13   didn't -- I was not in contact with Mr. Yau.  I

14   actually -- I know that he did in one of his e-mails

15   where he used up whatever happened to his advantage where

16   he actually -- when he sent e-mail, and I think that

17   e-mail might be there in the set of documents that I

18   brought here, is where he sent e-mail at the end of, you

19   know, correspondence about my firing, sent e-mail to Erik

20   Lawson, telling him, look -- Eric, E-r-i-c, and

21   L-a-w-s-o-n, who is director of sales in Duracell, sent

22   him an e-mail telling him, look, let's forget what

23   happened and let's concentrate on business.  It means

24   like actually what he wanted is he used up whatever

25   happened to concentrate on business and then he said in

Case 12-338, Document 59-3, 07/23/2012, 671476, Page30 of 96

A-516

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 24

1   his e-mail you promised that the business is going to

2   grow with Practical, we expected lots of orders and it

3   never come, so maybe when we see each other next time we

4   should sit down and talk about how this is going to

5   change, which means that he actually used my firing and

6   my alleged harassing of Bel Liu, alleged harassing of Bel

7   Liu, in order to gain leverage over Duracell, which he

8   actually did straightforwardly in that e-mail.

9                   MR. CERASIA:  By the way, Erik is with a

10  K.

11                  THE WITNESS:  Oh, I'm sorry.

12                  MR. CERASIA:  That's okay.  And Daylite

13  is D-a-y-l-i-t-e.

14                  THE WITNESS:  D-a-y-l-i-t-e, yes.  It's a

15  very unusual spelling.  It's probably to avoid certain

16  things and to give it brand mark.

17      Q.   You've referred to the fact that you audited

18  one of Practical's facilities in China.  What do you mean

19  by auditing the facility?

20      A.   Well, auditing is about a two-day event where

21  you go over what they call QAKE 1 through 19, Q-A-K-E

22  capitalized, 1 through 19, which means Quality Assurance

23  Key Elements 1 through 19, which is P&G quality assurance

24  way of auditing facilities, and again this is important

25  for the whole story so I'll give a little bit of

Case 12-338, Document 59-3, 07/23/2012, 671476, Page31 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                        Page 25

1    background here.

2            All contractors are measured the same way as

3    would be the manufacturing facility of P&G in United

4    States.  So regardless of where in the world that

5    facility is they have to have at least 85 percent out of

6    100 percent to be proclaimed eligible to do business with

7    P&G.  If the company, the contractor on the first audit

8    doesn't have 50 percent, and, you know, the way of how

9    this is measured is not important, but if they don't have

10   50 percent they are out of business with P&G and there is

11   no way back.  So if on the initial audit the score is

12   below 50 percent that company is out of business with the

13   P&G, and keep that in mind, please, because it will

14   become very important when we come to the audit of

15   Practical Company in Bangkok, Thailand, which was from --

16   it was done on June 8 and 9, 2009.

17       Q.   Let's go back to the C and D cell Daylite that

18   Practical was manufacturing.  When do you claim that they

19   started to manufacture those?

20       A.   Oh, this is also important for the story.  They

21   were supposed to start that manufacturing in December.

22   People who designed that, the man who designed the

23   flashlights, two people, one is called Dave Mathieu --

24       Q.   Can I interrupt you for a minute?

25       A.   Yes.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page32 of 96

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 26

```
 1        Q.   Because I just asked a specific question and
 2   you need to answer my question.  I asked you when.  I
 3   didn't want the background.  I just asked when.  You need
 4   to answer my questions.  So can you tell me when they
 5   started to manufacture the C and D cell Daylites?
 6        A.   They started to see people to discuss design in
 7   summer of 2008.  That's important because --
 8        Q.   It may be important to you, Mr. Cicvara.  I'm
 9   just here to ask you questions.  You need to answer my
10   questions.  My question was when they started to
11   manufacture, that's what I'd like to know.  If you don't
12   know the answer, then just tell you don't know the
13   answer.
14        A.   I know the answer.  I just have to think about
15   that.  They were promised to have it in December.  They
16   started to -- the first run somewhere in -- I think in
17   March 2009, so it was the first run that was supposed to
18   be qualified because it has to be qualified before it
19   goes into manufacturing, and they manufactured the first
20   46,000 of flashlights in April and May 2009.  The first
21   shipment of those flashlights -- do you want me to answer
22   this or it's not important?
23        Q.   So they first manufactured 46,000 in April or
24   May of 2009; correct?
25        A.   Yes.
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page33 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

---

Page 27

1      Q.    Okay.  That was my question.

2      A.    Okay.  Should I go on with the shipment?

3      Q.    No, because I didn't ask you yet about the

4   shipment.

5      A.    Okay.  Good.  Okay.

6      Q.    And those 46,000, they were C and D cell or

7   they were C cell or D cell or what were they?

8      A.    They were only D cells.

9      Q.    D cells.  During the time that you worked at

10   the company up until -- let me go back.  You were let go

11   from the company on June 15th, 2009?

12     A.    Yeah, correct.

13     Q.    Up until June 15th, 2009 did Practical

14   manufacture anything other than the D cell Daylites?

15     A.    Yeah, Practical manufactured many other

16   flashlights for Duracell, but I don't know that there was

17   order placed; I don't recall that there was.

18     Q.    You don't know if it was what?

19     A.    I don't know that ordered -- that we ordered

20   any other flashlights at that point.  I think that the

21   only big order we had was 46,000 D flashlights.  They

22   were manufacturing flashlights for Duracell before, not

23   just -- this was a new product.

24     Q.    I understand.

25     A.    So, yeah, I remember we placed order for

Case 12-338, Document 59-3, 07/23/2012, 671476, Page34 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 28

1    certain other types of flashlights to their Indonesia

2    facility, to their facility in Indonesia, where they

3    shipped that in July 2009 and they had problem with that

4    shipment, similar problem that they had with the shipment

5    of 46,000, which we never accepted.

6         Q.    Let's just go through up to June 15th, 2009.

7    If I want to go past that date today I'll let you know,

8    okay?

9         A.    Yeah.

10        Q.    Okay.  Because you don't have any idea what

11   happened, no personal knowledge of what happened at the

12   company after June 15th, 2009, do you?

13        A.    I have a certain idea about certain things,

14   yes.

15        Q.    Okay.  But you weren't there anymore?

16        A.    No, but I talked to people.

17        Q.    And you claim that the 46,000 D cells that were

18   manufactured in April or May of 2006 -- or, pardon me,

19   2009 were not accepted?

20        A.    No, they were not accepted because there was a

21   problem with them and the problem was that they used

22   pallets which were not approved for the ocean transfer,

23   they were very prone to get humidity in and that humidity

24   reflected very badly to the corrugated paper that these

25   flashlights were packaged in and they were put in the

Case 12-338, Document 59-3, 07/23/2012, 671476, Page35 of 96

A-521

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 29

1   container, because it was contained, humidity was

2   contained, those corrugated boxes got humid, then the

3   blister packs got humid and then it all fell to each

4   other, so when we opened up the container the flashlights

5   were not usable, you couldn't send them to the shelves,

6   so we sent that back to Practical, 46,000 flashlights.

7        Q.   Okay.  When is it --

8        A.   They were not happy with that either.

9        Q.   When do you claim that you sent those back?

10       A.   Oh, somewhere in May we had made decision.  I

11   don't know when they were physically sent back, but we

12   made decision we are not going to accept these

13   flashlights, so we didn't pay for that either.

14       Q.   Who made that decision?

15       A.   That decision was not made only by me.  I was

16   part of the decision because I had quality assurance on

17   my -- as my responsibility, so as a quality assurance I

18   did make partially the decision, but the one who made

19   decision finally was probably Erik Lawson, who is

20   director of purchasing in Duracell.

21       Q.   Did you yourself physically inspect the

22   flashlights?

23       A.   No.  No.  The flashlights --

24       Q.   Someone just reported to you?

25       A.   Yeah, the flashlights were sent to some -- I

Case 12-338, Document 59-3, 07/23/2012, 671476, Page36 of 96

CICVARA v. PROCTOR & GAMBLE                                    December 21, 2010

1    believe it was in either Illinois or Indiana or somewhere

2    in the warehouse.  So they were not accepted because they

3    were just not accepted in the warehouse because the

4    goods --

5         Q.   It sounded like a packaging defect?

6         A.   A packaging issue, yes.  So 46,000 flashlights,

7    whatever, you know, that we paid Practical that's about

8    $500,000 I believe, we didn't pay that and they had to,

9    you know, take them back and probably pay for the

10   shipping back too.

11        Q.   Did you ever have any communication with

12   Mr. Yau about the rejection of that shipment?

13        A.   No.

14        Q.   Did you ever have any communication with Miss

15   Liu about that shipment?

16        A.   Sure, yes.  Miss Liu, she did call me and she

17   asked me to help her to push this through and to claim

18   that this was not quality issue, which I didn't want to

19   do.  I did say straightforwardly that there is no doubt

20   that it's their responsibility, that our drawings for the

21   pallets, p-a-l-l-a-t-e-s I believe, maybe two t's, I'm

22   not sure, but pallets to be used are to be stamped for

23   the ocean transport and they didn't use the approved

24   pallets, they used some other pallets which I suppose

25   were much less -- less cost than the approved was, so in

Case 12-338, Document 59-3, 07/23/2012, 671476, Page37 of 96

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 31

1   order to cut the cost they actually did big damage to

2   themselves and to Duracell as well.

3        Q.   Other than you, are there any other people who

4   did quality assurance with respect to -- just with

5   respect to Practical as a contractor?

6        A.   Yeah, I mean there was a group of people.

7   Austin Lin was one of the persons who actually was

8   inspecting their facilities initially in March, and I

9   would say at the end of February 2008 and in March 2008

10  he spent six or seven weeks in China.  By the way, only

11  two weeks were supposed to be spent with regards to, as I

12  said one inspection is two days.  He spent seven weeks in

13  China inspecting five or six facilities where he could

14  have spent two weeks.

15       Q.   Okay.  Let's just focus on my question.  Who

16  were the other people who had responsibility with respect

17  to quality assurance concerning Practical?

18       A.   Austin Lin was one of them.  I can't recall the

19  name of the other employee, I'm sorry.  Fernando, I

20  don't -- I can't recall his last name.  But two employees

21  that were basically in that group before I came they were

22  actually involved in quality and any one of us could

23  perform the same function.  So it could be Austin Lin, it

24  could be Fernando I'm not sure, and it could be me.

25       Q.   When you went and did the audit you said in

Case 12-338, Document 59-3, 07/23/2012, 671476, Page38 of 96

CICVARA v. PROCTOR & GAMBLE                         December 21, 2010

Page 32

```
 1    December of 2008 --
 2         A.   Yeah.
 3         Q.   -- were you alone or was there someone else
 4    from P&G?
 5         A.   No, I was not the main auditor ever.  I was --
 6    I could audit, but I could audit only internally.  So the
 7    reason why I was accompanied -- I was always accompanying
 8    other auditors, and the main auditor was Lori Leach,
 9    L-o-r-i, L-e-a-c-h, Lori Leach, and she was actually
10    appointed as a P&G auditor for all Duracell contractors
11    until we audit all of them.  So Lori Leach was always the
12    main auditor and she would be the one who would lead the
13    audit.  I was there only to help her from the technical
14    point of view because her background was from the dog
15    food.  You know, one of the things that P&G is involved
16    with, I think Iams, they bought that company, so she came
17    from that background.  She was excellent QA auditor but
18    she didn't have technical knowledge about --
19         Q.   With respect to flashlights?
20         A.   With respect to flashlights and batteries.  So
21    it was always somebody from our group would actually go
22    and accompany her because she lacked the technical
23    knowledge.
24         Q.   Is there somebody named River?
25         A.   River.  Yes, the River was -- he was a Chinese
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page39 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 33

1    person and he was also accompanying her sometimes, yes,

2    and he would accompany us or he was accompanying us on

3    the audit for Zhongshan factory, yes, because we didn't

4    know Chinese and sometimes it was important.  So River

5    was supposed to be part of my group.  As I said, I was

6    supposed to become section head and he was supposed to

7    report to me as well.

8        Q.   Did Lori ever report to you?

9        A.   No, no.  Lori was independent.  She came from

10   Ohio.  Whenever she went to trips she lived in Ohio and

11   she's a P&G employee, not Duracell.

12       Q.   All right.  Did River ever report to you?

13       A.   He was supposed to report to me, but no.

14       Q.   No, no.  Answer my question, sir.

15       A.   No, he never reported to me, no.

16       Q.   And how about Austin Lin?

17       A.   Yes, Austin was reporting to me, yes.

18       Q.   Did he report to you right up until the date of

19   your termination in June of 2009?

20       A.   Yes, yes; correct.

21       Q.   And how about a woman named Tanya?

22       A.   Tanya was not reporting to me again.  She was

23   supposed to, but, no.  And she accompanied us on our

24   audits in China, on our last audit in Emerson,

25   E-m-e-r-s-o-n, factory in China.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page40 of 96

CICVARA v. PROCTOR & GAMBLE                                    December 21, 2010

Page 34

1        Q.    And she was a quality assurance person as well?

2        A.    Yes, and she was also inspector that we used

3   very heavily on inspecting flashlights, Daylite

4   flashlights especially, before the shipments are sent to

5   U.S.A., but she actually worked same as River, she worked

6   in Chinese Duracell factory.

7        Q.    Now, the position that you hold over the last

8   year of your employment as the QA manager reporting to

9   Kevin Babis --

10       A.    Yes.

11       Q.    -- would you consider that to be a very

12   important role for the company?

13       A.    Yes, it was important.  I wouldn't say very

14   important.  It was important, yes.

15       Q.    Okay.  And in that role that you were the

16   Duracell face from a quality point of view to the

17   contractors?

18       A.    Yeah.

19       Q.    And you had interaction with the contractors;

20   right?

21       A.    Yes, I had interactions with the contractors,

22   yes.

23       Q.    On important quality issues?

24       A.    On every quality issues, on each and every

25   quality issue, not just important or not important, every

Case 12-338, Document 59-3, 07/23/2012, 671476, Page41 of 96

A-527

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 35

1   quality issue, starting with any document, with

2   everything that you can imagine from the quality point of

3   view, so yes.

4       Q.   And your relationship with those contractors

5   was important for Duracell's business, right?

6       A.   Yes.  Yes, it was.

7              MR. CERASIA:  Why don't we take a break

8   because there are some documents here that Mr. Cicvara

9   gave us that we have not seen before.  They were never

10  produced to us.  So I'd like to make copies of these.  I

11  don't know if you want to look at them first.  I don't

12  know if you've seen them.

13             MR. SIKORSKY:  Yes, if you want to mark

14  them for identification.

15             THE VIDEOGRAPHER:  Off the record at

16  10:52 a.m.

17             (Recess:  10:52 to 11:09 a.m.)

18             (Cicvara Exhibits 1 through 3: Described

19  in Index - marked for identification.)

20             THE VIDEOGRAPHER:  On the record at 11:09

21  a.m.

22  BY MR. CERASIA:

23      Q.   Mr. Cicvara, I'm going to show you what's been

24  marked as Cicvara Deposition Exhibits Numbers 1 and 2.

25  If you'd take a look at Exhibit 1, it's a document

Case 12-338, Document 59-3, 07/23/2012, 671476, Page42 of 96

Page 36

1   entitled P&G Worldwide Business Conduct Manual Receipt

2   Confirmation.

3        A.   Yes.

4        Q.   And my question is, is that your signature

5   there?

6        A.   Yes.

7        Q.   Okay.  And that's dated 12/12/2005; correct?

8        A.   Yes.

9        Q.   And the second document you have in front of

10  you is a copy of the Worldwide Business Conduct Manual.

11  Have you seen that document before?

12       A.   Sure, I did, yes.  I actually read it a couple

13  of times.

14       Q.   You read it a couple of times?

15       A.   Yes, trying to find certain things in it.

16       Q.   Did you read it when you were employed with

17  Procter & Gamble?

18       A.   Yeah.  Everybody had to read it, so.  This is

19  stating that I actually did read it.

20       Q.   Why don't you take a look at the -- put Exhibit

21  1 to the side for a minute.  Take a look at Exhibit 2.

22  If you go to at the bottom you'll see there's small

23  numbers in the bottom right-hand?

24       A.   Yeah, sure.

25       Q.   And I'll refer to those numbers so we know

Case 12-338, Document 59-3, 07/23/2012, 671476, Page43 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 37

1   we're on the same page literally, okay?

2        A.   Okay.  Excellent.

3        Q.   If you look at page 330, which is the letter to

4   Dear Fellow Employees.

5        A.   Yes.

6        Q.   If you look at paragraph 4, starting with the

7   sentence, P&G has been built through the character of its

8   people through generations.

9        A.   Sure.

10       Q.   Do you see that?

11       A.   Yes.

12       Q.   And then it refers to in our purpose, values

13   and principles; do you see that?

14       A.   Yes.

15       Q.   Have you heard of the PVPs before?

16       A.   Yes, I did hear about that.

17       Q.   Okay.  I'm going to show you what's been marked

18   as Exhibit 3, which is a copy of the PVPs, and tell me if

19   you've seen that before, sir.

20       A.   Yes, I've seen that before.

21       Q.   And you saw that while you were employed by the

22   company?

23       A.   I believe I did.  I can't really recall that I

24   read it carefully, but, yes, I did see it.

25       Q.   Go back to the letter I was reading from on

Case 12-338, Document 59-3, 07/23/2012, 671476, Page44 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 38

1   Exhibit 2.  Put Exhibit 3 just to the side for a minute.

2   So in that sentence it says, in our purpose, values and

3   principles and in how well we live them as individuals

4   and as a company, right, and then it says It is

5   consistent with our historic principle of doing the right

6   thing, period.

7        A.   Yes.

8        Q.   Integrity, trust and respect for others have

9   been fundamental P&G values since the company was founded

10  in 1837.

11       A.   Yep.

12       Q.   Did you understand that P&G lived by the PVPs?

13       A.   Sure, and I actually lived by PVPs as well.

14       Q.   And you believe that as a management level

15  employee of Procter & Gamble that it was important for

16  you to act with integrity?

17       A.   Yes.

18       Q.   So that the contractors and people with whom

19  you dealt trusted you; right?

20       A.   Yes.

21       Q.   And it was important for you as a manager of

22  the company to treat others with respect; right?

23       A.   Yes.

24       Q.   And you would have expected any employee to

25  report to you to also carry out those PVPs; right?

Case 12-338, Document 59-3, 07/23/2012, 671476, Page45 of 96

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

Page 39

```
 1        A.    Yes.

 2        Q.    And that applied regardless of who you were

 3   dealing with, right, whether it was a fellow employee of

 4   Procter & Gamble or whether it was a supplier or a

 5   contractor; right?

 6        A.    Sure.  Yeah, I would agree with that.

 7        Q.    And do you believe that as a manager at P&G it

 8   was your responsibility to be accountable for your own

 9   actions?

10        A.    And for the action of people who reports to me

11   too, very accountable.

12        Q.    As a manager do you think it was appropriate

13   for the company to terminate the employment of

14   individuals who did not carry out the PVPs?

15        A.    It depends.  It depends of is the investigation

16   carried out in a proper way and if the person who would

17   be discharged was given the right or was given

18   opportunity to explain things, and if after that

19   explanation and he would be given an opportunity, the

20   people who are responsible for firing still think that

21   that's the right thing to do, yes, I would say that's the

22   right thing to do, yes.

23        Q.    So if there was a determination, if you as a

24   manager determined that somebody violated the PVPs, you

25   think it would be appropriate for you to terminate their
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page46 of 96

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 40

1   employment?

2        A.   I would like you to be much more specific in

3   what you just said.  What does it mean violate?  I don't

4   understand that at all.

5        Q.   Okay.  That's fair enough.

6        A.   Violation of PVP doesn't tell me anything, I'm

7   sorry.

8        Q.   Okay.  Why don't you look at the document

9   numbered Exhibit 2 on page PG 346.

10       A.   346, okay.

11       Q.   It's section 6, called behavior in the

12   workplace.

13       A.   Okay.  Yep.

14       Q.   Do you remember being familiar with this

15   harassment discrimination policy?

16       A.   I don't really particularly remember that, but

17   I probably read it, yes.

18       Q.   Did you understand as a management level

19   employee of Procter & Gamble that it was against company

20   policy to make sexual advances towards women?

21       A.   I'm sorry, I don't understand that question.

22   Could you be more specific.

23       Q.   Sure.  Did you understand in your role as, for

24   example, QA manager --

25       A.   Yes.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page47 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 41

1      Q.    -- did you understand during the time that last

2    year you were employed that company policy prohibited you

3    from making sexual advances towards either female

4    customers or contractors or employees?

5      A.    Yes, I understood that, yes.

6      Q.    And did you understand that you could be fired

7    from Procter & Gamble if you in fact had made sexual

8    advances towards female contractors or employees?

9      A.    It would depend on the circumstances I would

10   say.

11     Q.    What do you mean by that?

12     A.    I wouldn't say that straightforwardly if I made

13   any sexual advances to contractor that I would be fired.

14   I don't think that that's written anywhere in here.  If

15   you find it you can read it to me.  I would really

16   appreciate that.

17     Q.    If you look at the summary of company policy

18   statement.

19     A.    Where is the summary?

20     Q.    That's on this page that you're looking at.

21     A.    Okay.

22     Q.    It's on the left-hand side.

23     A.    Okay.

24     Q.    It says the company's fundamental position is

25   that all employees should treat their colleagues with

Case 12-338, Document 59-3, 07/23/2012, 671476, Page48 of 96

A-534

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

Page 42

1    respect.

2         A.   Yes.

3         Q.   You agree with that; right?

4         A.   Yes, I would agree with that.

5         Q.   And then it says the company will not engage or

6    authorize its employees to engage in discrimination or

7    harassment.

8         A.   Yes.

9         Q.   You agree with that too; correct?

10        A.   Yes, I would, yes.

11        Q.   Okay.  And now if you look at the second column

12   it says what are some situations that raise concerns; do

13   you see that?

14        A.   Yes.

15        Q.   Okay.  In the second bullet point it says a

16   woman is made uncomfortable when subjected to sexually

17   offensive jokes and/or comments by her male co-workers,

18   possible harassment; do you see that?

19        A.   Yeah, I see it.  Possible harassment, yeah.

20        Q.   And you would agree that that would raise

21   concerns; correct?

22        A.   Yes, sure.

23        Q.   And then below that it says what are the

24   Worldwide Business Conduct Standards; right?

25        A.   Uh-huh.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page49 of 96

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 43

1       Q.   And then in parentheses it says what do I need

2   to do or refrain from doing?

3       A.   Yes.

4       Q.   It's kind of a guide to you, right, as an

5   employee?

6       A.   Oh, sure, and I would strongly agree that's a

7   guide, yes.

8       Q.   And it says one of the things don't engage in

9   discrimination or harassment?

10      A.   Agreed, yeah.

11      Q.   Did you understand under the company's policy

12  in its Worldwide Business Conduct Manual that if you made

13  an unwelcomed sexual advance towards a contractor that

14  that would be a violation of the policy?

15      A.   Yes, if I made unwelcomed sexual advances to

16  the contractor it would be violation of this policy, yes,

17  I do agree with that wholeheartedly.

18      Q.   And you would agree with me that that would be

19  serious misconduct; right?

20      A.   That would be a serious misconduct if I had

21  done that, yes.  If I harassed a contractor it would be a

22  serious misconduct, I would agree with that, yes.

23      Q.   And would you agree that that would be -- that

24  kind of conduct would be something that could injure the

25  company's relationship with the employee of that

Case 12-338, Document 59-3, 07/23/2012, 671476, Page50 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 44

```
 1    contractor?

 2         A.    Well, it would depend on the circumstances.

 3         Q.    But it could; right?

 4         A.    Yeah, it could, I agree, it could, but it would

 5    depend on the circumstances as I said.

 6         Q.    Sure.  But would you agree with me that in your

 7    position as a quality assurance that the contractors that

 8    you dealt with it was important for you to establish a

 9    trusting relationship with them on a business point of

10    view?

11         A.    Oh, yes, I would agree, yes.

12         Q.    And that if they didn't trust you as a quality

13    assurance manager that that would have a negative impact

14    on Duracell's business?

15         A.    Sure, I would agree with that.

16         Q.    And vice versa?

17         A.    And vice versa, yes, I would agree with that,

18    yes.

19         Q.    Because Duracell needed those contractors in

20    order to help it make a profit; right?

21         A.    Absolutely.  Absolutely.

22         Q.    So --

23         A.    Duracell needed those contractors, yes.  Don't

24    forget, though, that Duracell had many contractors and

25    some of them didn't like position that they were in, so
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page51 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 45

1    what I'm saying is Duracell didn't depend on contractors

2    to the point that it will affect their business at any

3    point.  Duracell always had very smart policy about

4    contractors and never put their eggs in one basket.  It

5    means like even if they lost Practical, even if they lost

6    Practical completely, it wouldn't affect that business at

7    all, because there was other -- there were other

8    companies that could have done the same thing as

9    Practical and they already had tools to do the same thing

10   as Practical.  I'm just saying that's --

11       Q.   That's your opinion?

12       A.   No.  That's my statement, and that's not

13   hypothetical, that's true.

14       Q.   Well, you don't know it's true because during

15   the time that you were at the company it never severed

16   its relationship with Practical?

17       A.   No, no.  I don't even know what happened with

18   Practical.  I'm just saying it is true, because of the

19   facts that I know about the equipment that is in

20   possession of certain other companies that they can do

21   things that Practical could do, but nevertheless I agree

22   with what you said, yes.

23       Q.   And it was also important for Duracell to

24   protect its reputation with contractors; correct?

25       A.   Correct, yes, and especially reputation as

Case 12-338, Document 59-3, 07/23/2012, 671476, Page52 of 96

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 46

1   being very straightforward with the things that were

2   performed in auditing, so that if the company A were

3   audited and company A had 60 then you would say company B

4   if it had 60 you would expect more or less the same

5   circumstances as the company A had.  So if B and A had

6   the same score you would expect that those two companies

7   are equitable.  It's very important.

8       Q.   As far as Duracell's reputation, it obviously

9   can only impact its reputation through its managers like

10  yourself; right?

11      A.   Yeah, through every employee, not just

12  managers.

13      Q.   Right, I understand.

14      A.   Yes.

15      Q.   But you as a manager, let's just focus on you

16  for a minute, your conduct impacted Duracell's

17  reputation, whether negative or positive; correct?

18      A.   Yes.

19      Q.   All right.  So that your -- what you wanted to

20  do is you -- your charge from the company, so to speak --

21      A.   Yes.

22      Q.   -- was to act in accordance with its PVPs so

23  that you would enhance its reputation in the industry;

24  correct?

25      A.   Correct, yes, and I actually did act in

Case 12-338, Document 59-3, 07/23/2012, 671476, Page53 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 47

1    accordance to PVP, and because I acted in accordance to

2    PVP I actually paid the consequences dearly, and I'll try

3    to explain that when the time comes.

4                  MR. CERASIA:  Mark this as Exhibit 4

5    please.

6                  (Cicvara Exhibit 4: Job description -

7    marked for identification.)

8         Q.    You can give me back Exhibit 2 for now.

9         A.    This too?

10        Q.    No, no.  I'm going to have you hold that right

11   now.  I have a couple questions about Exhibit 3.  So

12   you're on the page marked with 181; correct?

13        A.    Yes.

14        Q.    Okay.  And this is of Exhibit 3, the values,

15   and it lists five values here; correct?

16        A.    Yes.

17        Q.    Integrity, leadership --

18        A.    Yes.

19        Q.    -- ownership, passion for winning, and trust;

20   right?

21        A.    Yes.

22        Q.    And it was your responsibility as an employee

23   of Procter & Gamble --

24        A.    Yes.

25        Q.    -- to live by these five principles?

Case 12-338, Document 59-3, 07/23/2012, 671476, Page54 of 96

CICVARA v. PROCTOR & GAMBLE                    · December 21, 2010

Page 48

1      A.    Yeah, true.

2      Q.    No question about it; right?

3      A.    No question about it.

4      Q.    And you were judged in your performance on

5  whether or not you lived by these principles and values;

6  right?

7      A.    I wish I was.  I wish I was.

8      Q.    You don't believe you were?

9      A.    No.  I was until certain date in time and then

10  I was not, yes, especially when I was Manager of OEM

11  Business Services when Mani Parmar was my boss.  So I

12  wish I was, yes.

13      Q.    Right now I just want to focus on the last year

14  of your employment, okay, and if I'm interested in any

15  other aspects of your employment we'll go back to it by

16  date, all right, but I'm just interested about whether

17  when you were a quality assurance manager reporting to

18  Kevin.

19      A.    Okay.

20      Q.    Okay?

21      A.    Good.

22      Q.    All right.

23      A.    I'll try not to go there too much, but if I

24  need to explain something I'll probably go there.

25      Q.    You understood that as a quality manager that

Case 12-338, Document 59-3, 07/23/2012, 671476, Page55 of 96

A-541

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 49

1   you were always supposed to try to do the right thing;

2   correct?

3       A.   Yes, which I always did.

4       Q.   And that you knew that you had to be honest and

5   straightforward in your dealings with contractors?

6       A.   Yes.

7       Q.   And that you had to respect the employees of

8   those contractors with whom you dealt; right?

9       A.   Sure, I understand that.

10      Q.   And that you were held personally accountable

11  for your conduct towards those employees of contractors;

12  correct?

13      A.   Yes.

14      Q.   Why don't you take a look at what's been

15  marked as Cicvara Exhibit 4 --

16      A.   Yeah, okay.

17      Q.   -- which is a job description.

18      A.   This description was just for the few months.

19      Q.   This was the job description you had when you

20  reported to Harley Ballew?

21      A.   Yes.

22      Q.   And it was for the time period of roughly you

23  thought from March -- or, excuse me, April 1 until --

24      A.   July probably.

25      Q.   July of 2008?

Case 12-338, Document 59-3, 07/23/2012, 671476, Page56 of 96

CICVARA v. PROCTER & GAMBLE                      December 21, 2010

Page 50

1        A.    Yes.  Just to be -- I don't even know, but just

2   to be straight.

3        Q.    Roughly about that time period?

4        A.    Roughly, yes.

5        Q.    I understand that it's your best guess.  Did

6   your job duties when you became a quality assurance

7   manager change at all from this job?

8        A.    Yes.  Yes.  They changed considerably, because

9   I got two employees who are reporting to me.  Before this

10  Austin Lin was not a person who reported to me, he was a

11  person who reported to Harley.  Francisco Restrepo was

12  the other which I couldn't remember.  So Francisco,

13  F-r -- Francisco is Francisco.  Restrepo is

14  R-e-s-t-r-e-p-o.  Okay.

15       Q.    So Francisco and Austin started reporting to

16  you when you became a quality assurance manager?

17       A.    Yes.

18       Q.    So they reported to you roughly your last 11

19  months of employment at Procter & Gamble?

20       A.    Roughly, yes, you're right.

21       Q.    Okay.

22       A.    And they brought certain things with them which

23  they used to do before which I couldn't agree with, which

24  particularly affected Austin Lin very heavily.

25       Q.    Okay.  Why don't you look at qualification

Case 12-338, Document 59-3, 07/23/2012, 671476, Page57 of 96

A-543

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 51

1   number 6 on Exhibit 4 right on the first page right at

2   the bottom.

3        A.   Okay.  It says -- could I read that?

4        Q.   You can read it to yourself right now.

5        A.   Okay, excellent.

6        Q.   Tell me when you're done.  You should read

7   anything I give you.

8        A.   Okay.  Thank you.  Yes.

9        Q.   So job qualification number 6, which refers to

10  the P&G Worldwide Business Conduct Manual?

11       A.   Correct.

12       Q.   Do you believe that that was one of your job

13  qualifications when you were --

14       A.   Sure.

15       Q.   You've got to let me finish.

16       A.   Yeah, I believe that was.

17       Q.   You've got to let me finish.  Do you believe it

18  was one of your job qualifications when you were a

19  quality manager from July of 2008 through June 15th,

20  2009?

21       A.   Yes.  It was my duty to do according to this

22  not only from July to June 2009, but I would say

23  throughout my employment.  So that is nothing new there.

24       Q.   So job qualification 6 applied to every

25  position you held at the company?

Case 12-338, Document 59-3, 07/23/2012, 671476, Page58 of 96

A-544

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 52

```
 1       A.   Yes, every position, and not only me but every
 2   employee.
 3       Q.   I understand.
 4       A.   So if I find that employees who are not doing
 5   their job according to this, it's my duty to report that
 6   too, which I did.
 7       Q.   Can you give me Exhibits 3 and 4.
 8       A.   Yes.
 9       Q.   I'm done with those for now.
10       A.   Sure (handing.)  Okay.
11       Q.   I just want to make sure that, you know, you
12   don't leave home with them, it's a holiday present or
13   something.
14       A.   Yeah, I have that at home.  Don't worry about
15   that.
16       Q.   When did you first meet Bel?
17       A.   You mean first -- I think in September 2008
18   when Practical visited Duracell with respect to Daylite
19   development.
20       Q.   Right.  And when I refer to Bel, you understand
21   I'm speaking about Bel you pronounce her name Liu?
22       A.   Yes.
23       Q.   L-i-u?
24       A.   L-i-u, yes.
25       Q.   I'll refer to her as Bel, though, okay?
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page59 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 53

```
 1      A.    Okay.

 2      Q.    All right.  So you first met her in September

 3 of '08 when she came to Bethel, Connecticut?

 4      A.    Yes.

 5      Q.    Between September of '08, counting that trip,

 6 until your last day of employment on June 15th of 2009,

 7 how many times did you -- how many different trips did

 8 you see Bel on?

 9      A.    Two.

10      Q.    Two?

11      A.    Yes.

12      Q.    When else, other than September of '08 when was

13 the next time?

14      A.    The next time was December 2008 in China and

15 then it was June 2009 first in Indonesia and then in

16 Thailand.

17      Q.    So you saw her a total of three times?

18      A.    Yes.

19      Q.    Three different times?

20      A.    Three times, yes.

21      Q.    Multiple-day trips some of them; right?

22      A.    Correct, yes.

23      Q.    And what was her role within Practical as you

24 understood it?

25      A.    That was, as I understood she was general
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page60 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 54

1    manager of Practical, and if I'm not mistaken she became

2    vice president of Practical recently, but I'm not sure.

3        Q.   So while you knew her during that, you know,

4    eight, nine month period she was a general manager at

5    Practical?

6        A.   Yes, she was general manager at Practical.

7        Q.   Do you know what her job responsibilities

8    entailed?

9        A.   She was always in contact with design people in

10   Duracell, with marketing people in Duracell, with program

11   management in Duracell, with purchasing people in

12   Duracell, with QA people in Duracell.  So she was

13   basically in contact with everybody in Duracell,

14   everybody, very, very -- position which entailed many,

15   many different venues, and she was very strongly aligned

16   with Austin Lin.

17       Q.   What do you mean by strongly aligned?

18       A.   I mean that during the course of 18 months that

19   I was without work, since I was fired, I learned a lot of

20   things about Austin Lin and Bel Liu, but I actually

21   noticed things even before that.

22            So, for example, in September when she visited

23   Duracell she -- Austin Lin was not there, he had to go

24   somewhere, but she told me that Austin bought a bag for

25   her and that he told her that I will show her how to come

Case 12-338, Document 59-3, 07/23/2012, 671476, Page61 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 55

1    to his office to pick up the bag.  So she went in and

2    she -- I actually showed her the way and she picked up

3    the bag.  In the meantime she told me that Austin is very

4    good friend of her, and she told me that repeatedly,

5    many, many times.  She had a relationship with Austin

6    Lin, a relationship.  I'm not sure what the level of that

7    relationship was, but it was certainly stronger than

8    relationship that she had with me.  And there are

9    witnesses who could say that in summer 2008 Bel Liu tried

10   to seduce Dave Mathieu and in those attempts to seduce

11   Dave Mathieu she actually showed him very -- I don't know

12   how to say that politely, but raunchy e-mails from Austin

13   Lin that she received and she showed them to Dave trying

14   to make him jealous, and there are witnesses who can say

15   that, including Dave Mathieu, who was the one who was

16   object of her intense desire to have a relationship with

17   him.

18          That's about -- what I know about Bel Liu is

19   that she is a very complex person.  She had relationship

20   with Austin Lin, she wanted to have a relationship with

21   Dave Mathieu, but then Brian Hesse, H-e-s-s-e, who was in

22   contact with Dave and who was in charge of Daylite design

23   program advised Dave not to get into relationship with

24   Bel because his opinion about Bel was that she wants to

25   control people in Duracell so that they have control of

Case 12-338, Document 59-3, 07/23/2012, 671476, Page62 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 56

1    Practical business with Duracell through the people that

2    she's interacted with.

3         Q.   Do you claim that Brian ever told you that?

4         A.   Yes, he told me that, and he's ready to testify

5    about that, and he also saw the e-mails from Austin Lin

6    sent to Bel Liu.  And about Austin I have to tell you

7    something.  Austin, and you probably know because I

8    noticed you are laughing --

9         Q.   I'm not laughing, sir.

10        A.   You were, you know, grimacing.

11        Q.   Okay, whatever.

12        A.   Whatever, yeah, I would say so.  But Austin Lin

13   lied on his expense report to the company when he went in

14   China and Korea in March and April 2009.  He went to

15   Seoul, Korea, and he spent seven days there for a meeting

16   that lasted one hour, and the reason why he did that is

17   that he had a girlfriend, his girlfriend lives, she lives

18   in Seoul, in Korea, and he spent seven days with her on

19   account of the company.  He also spent four days a week

20   before that, after they finished their work in Fushun, in

21   China, and I don't know how to spell that correctly but

22   that's where the Nanfu factory is which is owned by

23   Duracell, he spent last four days there in a resort,

24   hotel, you know, resort in China, paid for by P&G, and

25   seven days after that in Seoul paid for by P&G.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page63 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 57

1          I caught him lying on his expense report.

2    Kevin Babis knows about this.  My big mistake was I

3    didn't go to human resources to tell them about this, I

4    went to my boss, who was Kevin Babis and told him, look,

5    we have a problem with this guy, and then we resolved the

6    problem eye to eye with Austin Lin, and he actually

7    admitted to whatever he was doing, he took some days

8    vacation, Kevin Babis, you know, said we will give you

9    two or three days, it doesn't matter, you had a tough

10   assignment in Nanfu, which is true, and he didn't like me

11   after that at all, so this might play a little bit of

12   what happened after that.

13          And by the way, I want to tell this because

14   it's important.  Please let me finish.

15   Q.   No, no.  There's no question pending, sir.

16   A.   Oh, I'm sorry.  We will come to that at some

17   point, so then I'll tell you.  Just go on.

18   Q.   All right.  Other than seeing Miss Liu on three

19   separate trips or occasions that you've identified,

20   September and December 2008, June 2009, did you speak

21   with her on the phone?

22   A.   Oh, sure, yes.

23   Q.   Regularly?

24   A.   No, no, no, we never spoke regularly on the

25   phone.  I spoke to her on the phone when she asked me to

Case 12-338, Document 59-3, 07/23/2012, 671476, Page64 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 58

1    help her about that case when the shipment was rejected.

2    She directly asked me to try to help her with that, and I

3    said, look, it is my position as a QA manager of P&G that

4    this is very straightforward and it is -- the one who is

5    responsible is Practical and you guys will have to

6    have -- you know, to brunt the consequences for that.

7            She also called me from Spain, I believe it was

8    January 22, and I know for sure it was January 22 because

9    on that record I found that I called her BlackBerry, she

10   just got BlackBerry and she was very excited about that

11   and she wanted to try it, so she called me from the

12   normal phone to my office phone asking me to call her in

13   Spain on the BlackBerry number, which I did, just to try

14   the number, and by the way she was in Spain on the trip

15   and she asked me if I can help her with that.  Do you

16   want me to continue or you want me to answer the

17   question?

18       Q.   Well, number one, I just want you to answer the

19   question, but you've identified January 22, I assume

20   that's 2009?

21       A.   Yes.

22       Q.   Because before September of 2008 you didn't

23   know Bel, did you?

24       A.   No.  Maybe I did know Bel as a person in

25   Practical, maybe we exchanged some e-mail messages about

Case 12-338, Document 59-3, 07/23/2012, 671476, Page65 of 96

A-551

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 59

1   quality assurance, the requirements which I sent

2   regularly to everybody.  In that sense, yes, but not in

3   person.  So first time I saw Bel was in September 2008,

4   yes.

5        Q.   Okay.  Between September of 2008 and the next

6   time you saw her in December of 2008 when you saw her in

7   China, did you have any phone contact with her then?

8        A.   No, not phone contact, just e-mails, and

9   e-mails were going back and forth about when are we going

10  to come to audit Zhongshan factory, and that was just

11  part of the trip where we were actually auditing five

12  companies within a span of probably from Monday through

13  Friday, so 13 or 12 days in China.

14       Q.   Okay.  There were e-mails of a business nature

15  between September and December of 2008; right?

16       A.   Yes.

17       Q.   Okay.  And how about between the trip in China

18  and January 22nd, 2009, did you have any phone calls with

19  Bel?

20       A.   I didn't have any phone calls.  I had a lot of

21  e-mails because she sent e-mails to me.

22       Q.   Okay.  Hold on.  Just answer my question.  My

23  question dealt with phone calls, okay?

24       A.   No, I didn't have any phone calls I'm pretty

25  sure.  Oh, there were phone calls in December, yes, but

Case 12-338, Document 59-3, 07/23/2012, 671476, Page66 of 96

CICVARA v. PROCTOR & GAMBLE                      December 21, 2010

Page 60

1    not after that.

2          Q.    Okay.   Well, I'm asking once you left the China

3    trip in December of '08 and January 22 of 2009 if there

4    were any phone calls.

5          A.    No, not that -- I can't recall that, no.

6          Q.    Okay.   Let's go back to the January 22, 2009

7    call.

8          A.    Yes.

9          Q.    So did you call her to see if her new

10   BlackBerry would work?

11         A.    Yes.

12         Q.    Did you have a conversation with her then?

13         A.    Yeah, I had a conversation about how are you

14   doing and what were you doing.   I believe they were in

15   Barcelona, and since I was in Barcelona I think I asked

16   her if they've seen Sagrada Familia or some other stuff

17   there, you know, like Casa Mila or some other things that

18   Gaudi did.  K-a-u-d-i, that's an architect in Spain.

19         Q.    How long did that conversation last?

20         A.    I don't know.   A few minutes.   It was just to

21   check, nothing else.   And I was very surprised --

22         Q.    Okay, I don't have any questions pending, okay?

23         A.    Okay.   We'll come to it.

24         Q.    And then you said that there was a conversation

25   that you had with her in May of '09 that dealt with the

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 61

1   rejected shipments as a result of the poor packaging?

2        A.    Correct; yes.

3        Q.    Okay.  Let's talk between January 22nd, 2009

4   and the conversation you had with her in May, do you

5   recall any phone calls with her during that time?

6        A.    No, I don't.  It's possible, but I don't

7   recall, and even if it was, it was business, and I don't

8   recall I actually had, but there were many, many e-mails,

9   many e-mails going back and forth, especially from her,

10  especially from Spain, many e-mails in March about her

11  buying a motorcycle and trying to ask me to get her -- is

12  she going to buy black or white or red, many e-mails

13  about certain gentleman who broke her heart, older

14  gentleman who promised to her that he's going to bring

15  her to United States with him and then he dumped her for

16  his girlfriend which actually later on became his wife.

17  She never told me she's married and it seems that her

18  trip to Spain was actually her wedding trip.  Never told

19  me she was with her husband.  In December she told me she

20  was not married and she actually married in December.  I

21  learned that later.  And she married because her boss

22  told her to marry in order to prevent the rumors between

23  her and her boss.  That's her word, and I'm under oath.

24        Q.    You claim she told you that?

25        A.    Yes, she told me that.  Her boss told her to

Case 12-338, Document 59-3, 07/23/2012, 671476, Page68 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 62

1   marry her husband.  She didn't like her husband, she just

2   married him.

3        Q.   Who do you claim her boss was?

4        A.   Her boss is Andrew Yau.

5        Q.   Andrew Yau?

6        A.   Andrew Y-a-o or u, I'm not sure.  I'm not sure.

7   I think it's u.  That's kind of weird, isn't it?  Oh, by

8   the way, she also asked me --

9        Q.   There's no question pending.

10       A.   Yeah.  I'm trying to explain about her

11  character.

12       Q.   Yeah, I understand, but, you know --

13       A.   I think it's very important for the story.

14       Q.   Mr. Cicvara, let me explain something.

15       A.   Yes.

16       Q.   Did you ever get invited to a party?

17       A.   Oh, yeah.

18       Q.   Okay.  And you go to somebody's house for a

19  party, right?

20       A.   Uh-huh.

21       Q.   Yes?

22       A.   Yes.

23       Q.   Okay.  And the host throws the party?

24       A.   Sure.

25       Q.   Decides what drinks to give, what food to

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 63

1   provide; correct?

2        A.   Yeah, yeah.

3        Q.   You don't tell them what drinks to provide,

4   what food to provide?

5        A.   Oh, if I like certain drinks I would tell them.

6        Q.   Beforehand?

7        A.   I would tell them, you know, I like this

8   particular wine, if you have it I would be really happy.

9        Q.   Okay.  I get that.  You know, today I'm taking

10  your deposition, it's like my party.

11       A.   Oh, I'm sorry, I didn't catch it.  Okay.

12       Q.   I get to ask the questions that I want to ask.

13  You may not like my questions, you might think I should

14  ask you other questions, but it's my prerogative.

15       A.   Oh.

16       Q.   Okay?  So I'm going to ask you the questions, I

17  want you to answer them, because the more and more you

18  just keep speaking the longer we're going to be here.

19       A.   I don't mind.  I thought --

20       Q.   You may not mind --

21       A.   I thought --

22       Q.   Excuse me.  I'm not done, sir.

23       A.   I thought the issue here is to learn the truth,

24  isn't it?

25       Q.   Okay.  I'm going to ask you the questions,

Case 12-338, Document 59-3, 07/23/2012, 671476, Page70 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 64

1   you're going to answer them.  I don't want you to keep

2   going on and talking about other things that you think

3   are important.

4        A.    Why?

5        Q.    Because that's not what we're doing here today.

6   You're here to answer my questions.

7        A.    Oh, I'm really sorry.  I thought we are here to

8   learn the truth about the case.

9              MR. SIKORSKY:  Just for the record let me

10  say --

11       Q.    I do want you to testify to the truth, but

12  you're answering my questions, you're not just here to

13  give a speech and a narrative, okay?

14       A.    Okay.

15             MR. SIKORSKY:  But I would want to make

16  it clear that I listened carefully to the responses of my

17  client, I think the questions are very frequently

18  open-ended, for example on the whole relationship with B,

19  you asked general questions and he's tried to be as

20  honest as he could about answering them.

21             MR. CERASIA:  I haven't said anything

22  about his honesty.  I just want him to answer my

23  questions.

24             MR. SIKORSKY:  All right.  He will do

25  that, but he will also answer them as completely as

Case 12-338, Document 59-3, 07/23/2012, 671476, Page71 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 65

1    they're called for.

2              MR. CERASIA:  Many of them call for

3    one-word answers, yes or no, and he goes on for two

4    pages, so I don't think it's necessary.

5         A.   Well, I'm really sorry.  I think this is the

6    time to tell the truth about this.  You know, I didn't

7    have time to tell the truth in ten minutes interrogation

8    that was done on June 15th.

9         Q.   Okay.  There's no question, Mr. Cicvara, okay?

10        A.   Okay.

11        Q.   On the trip -- or, excuse me, the time that you

12   saw Bel Liu in September of 2008, did you ever kiss her?

13        A.   No.

14        Q.   Did you ever hug her?

15        A.   No.

16        Q.   How about in December when you saw her in

17   China, did you ever kiss her?

18        A.   No.

19        Q.   Or did you ever hug her?

20        A.   No.

21        Q.   How about when you saw her in June of 2009, did

22   you ever hug her?

23        A.   Well, I hugged her when I saw her in the

24   airport like I hug the other people as well, hi, how are

25   you, yes, I did.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page72 of 96

A-558

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

```
                                                    Page 66
    1        Q.    You only hugged her once?

    2        A.    No.  I hugged her many times and she hugged me

    3   too.

    4        Q.    Okay.  Did you ever kiss her --

    5        A.    No.

    6        Q.    -- on the trip -- excuse me.  You've got to let

    7   me finish.  Remember we had that rule from the beginning?

    8        A.    You said did I ever kiss her.

    9        Q.    Excuse me.  I didn't finish.

   10        A.    My answer is no.

   11        Q.    You didn't let me finish.

   12        A.    I'm sorry.  Then finish.

   13        Q.    My question was going to be, you might have

   14   anticipated it, as I told you at the beginning of the

   15   deposition you would, but my question was on the trip in

   16   June of 2009 did you ever kiss her?

   17        A.    No.

   18        Q.    Did you ever try to kiss her on the trip in

   19   June of 2009?

   20        A.    No.  I have never tried to kiss her on my trip

   21   in June 2009, and I have very specific reasons for why I

   22   didn't try to kiss her.  Do you want to hear the reason

   23   or it's enough to say no?

   24        Q.    I haven't asked you any more questions.

   25        A.    Okay.
```

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 67

1      Q.   How many times do you claim that you hugged her

2  on the trip in June of 2009?

3      A.   I don't know.  I can't claim.  Maybe two or

4  three times.  She hugged me.  She put her hand on my

5  thigh when we were driving in the SUV in Indonesia.  Then

6  she told me you don't like Austin, do you?

7      Q.   Don't like what?

8      A.   You don't like Austin, do you?  And I said why

9  would you say that?  And she said he told me that, you

10 don't like him, do you?

11     Q.   What was your response?

12     A.   I said we had our, you know, disagreement on

13 certain issues, but I like Austin as much as anybody else

14 in the company.  So I was trying to be, you know, polite

15 and give her a polite answer about that.

16          Oh, by the way, that thing about Austin, he

17 also wanted to --

18     Q.   There's no question.

19     A.   Okay.  Sorry.  I just tried to put things into

20 perspective.

21     Q.   No question.  When you hugged Bel on the trip

22 in June of 2009 was there anybody present when you hugged

23 her?

24     A.   I don't recall.  I don't think there was

25 anybody present when I hugged her, no.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page74 of 96

A-560

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 68

1       Q.    One time --

2       A.    Except that time at the airport.

3       Q.    So one time was at the airport?

4       A.    Yeah.

5       Q.    And where were the -- what were the other

6   times?

7       A.    Well, the other times were on June 8th in the

8   room, you know, in that room.

9       Q.    When you say in that room, you're referring to

10  her hotel room?

11      A.    Yes, to the hotel room where she invited me to

12  come.  This is very important.  I would like you to put

13  that in.  She invited me to come to the room.

14      Q.    Did you ever -- when you hugged her did you

15  ever put your hands on her body other than her back?

16      A.    No.  No, I never touched her body.  I never

17  touched her breasts, if you mean that.  I never touched

18  any part of her body which would be considered private,

19  never.  I touched her back, I touched her legs, I

20  massaged her feet for a while, which I'm actually ashamed

21  of doing because I usually do that to my wife, ashamed of

22  doing now, but I never touched her body in a sexual

23  sense, never.

24      Q.    Why did you massage her legs and her feet?

25      A.    Because she told me that she felt bad, that she

Sanders, Gale & Russell
(203) 624-4157

Case 12-338, Document 59-3, 07/23/2012, 671476, Page75 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 69

1    felt -- she didn't feel good, and when I came to her

2    room --

3         Q.    Was that in her room?

4         A.    Yes.   When I came to her room, she opened up

5    dressed very inappropriately.   When I say that I mean she

6    was dressed nearly undressed and it was very, very

7    unusual because I was before in her room and she would

8    never be dressed like that, especially when she called me

9    to come.

10        Q.    Okay.   What do you mean by she was dressed

11   inappropriately?

12        A.    She was dressed in shorts which was very, very

13   short, very, very short, naked legs, dressed in a blouse

14   which was white, clear basically, nearly clear, so you

15   would -- you know, you would kind of see her through it,

16   and I was very surprised because the reason I actually

17   asked her can I come to your room to have dessert with

18   you, before that we had dinner and after dinner there was

19   a special dessert brought to each of us which was mango

20   with rice, which was very special, which was special

21   dessert for Thailand.   I sent text message to her asking

22   her I would like to come to your room to have dessert

23   with you.   The second text message was I don't want you

24   to come, I'm tired.   The third was, okay, I accept that,

25   from me.   The fourth was I changed my mind, you can come

Case 12-338, Document 59-3, 07/23/2012, 671476, Page76 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 70

1    to my room.  And the fifth was, okay, I'm coming.  All of

2    that within a span of five minutes and all of that I gave

3    you the proof on that -- those two pages of text

4    messaging.

5              Just for the record it says that all messages

6    are outgoing there, but there is a technical explanation

7    about that, which is -- oh, I think it's very important.

8    Again you can laugh.

9         Q.   I'm smiling because, you know what, you're

10   going on and on and on.  I can't even get a question in.

11   You're talking about subject matters that --

12        A.   You know why I'm going on and on and on,

13   because I was told --

14        Q.   Excuse me.

15        A.   -- that I came to her room unannounced, which

16   is not true, and I felt very strongly about that.

17        Q.   I'm asking you very simple questions and you're

18   going on to talk about -- giving answers to questions I

19   never even asked.  So here's my question --

20        A.   But it's very important.

21        Q.   It might be important, and I never said we

22   won't get to it, but can you please just answer the

23   question?

24        A.   I'll try to.  Sorry.

25        Q.   All you just talked about, the exchange back

Case 12-338, Document 59-3, 07/23/2012, 671476, Page77 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 71

1   and forth by text messages, was this June 8th, 2009 that

2   you're referring to?

3        A.   Yes, it was June 8th, 2009 between 8 -- I would

4   say 8:50 p.m. Thailand time and 9:05 p.m. Thailand time,

5   so in the span of five or ten minutes.  That time,

6   Pacific Time is between 7:00 something a.m.  I'm telling

7   that because everything that you have, all the trace of

8   records that you have, phone records, are Pacific Time

9   U.S.A. and there is a 14 hours difference.  It's not that

10  easy to decipher.  It's very important, though.

11       Q.   And when you said you massaged her feet and her

12  legs, that was on June 8th, 2009?

13       A.   Yes.

14       Q.   Is that the only time that you claim that you

15  touched her other than hugging her?

16       A.   Yes.

17       Q.   You never touched her any other time?

18       A.   No, not in that sense, no.

19       Q.   Did she ask you to massage her feet?

20       A.   She didn't object.

21       Q.   Did she ask you to massage her feet?

22       A.   No.

23       Q.   Did she ask you to massage her legs?

24       A.   I didn't massage her legs, just her back.  I'm

25  sorry.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page78 of 96

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 72

```
1        Q.    I think you testified that you massaged her

2    feet and her legs.

3        A.    I didn't massage her legs.  I massaged her feet

4    and back.

5        Q.    And her back?

6        A.    Yeah.

7        Q.    Did she ask you to massage her back?

8        A.    She didn't ask me to massage anything, but --

9        Q.    You just -- so you did it on your own?

10        A.    Yes, I did it on my own, yes.

11        Q.    Okay.  And do you think it was appropriate for

12    you as a quality manager to massage the feet of a general

13    manager for a contractor?

14        A.    In the circumstances that we were on, yes, in

15    the circumstances that we were on I would say that,

16    because she did -- as I said she touched my leg when we

17    were driving in the SUV in Indonesia.

18        Q.    You said she touched your tie.

19        A.    (Indicating.)

20        Q.    Oh, your thigh?

21        A.    Thigh, not this tie (indicating).  She put her

22    hand on my thigh.  She was sitting in front.  I was

23    sitting in back.  She put it and she actually did grab my

24    thigh, and the man who was next to me who was auditor in

25    Indonesia, Dave Arnsperger -- girl, I'm not sure how to
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page79 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 73

1     spell it, I'll try to spell it if it's important -- he

2     might have seen that and he didn't say anything, he was

3     polite.

4          Q.   You don't know if he saw it?

5          A.   I don't -- I think he saw it, he just was

6     pretending that he don't see it.

7          Q.   Did you ask him if he saw it?

8          A.   No, I didn't, I didn't.  I made the mistake of

9     not evidencing certain things.

10         Q.   How many days before you decided to massage her

11    feet and her back do you claim that she touched your

12    thigh?

13         A.   I'll tell you exactly the dates.  Just let me

14    think about that.  I started in Indonesia on some other

15    company and I started it on Tuesday, January 2nd I

16    believe, so January 2nd -- no, June 2nd and June 3rd,

17    2009 I was in that other company in Indonesia, then we

18    flown to Medan, Indonesia, so I think it was -- it was

19    Thursday June 4th or 5th, I don't know.

20         Q.   So three or four days before you massaged her

21    feet and her back you claim she touched your thigh?

22         A.   Yes, and she put her head here (indicating),

23    she leaned on me when we were driving in taxi in

24    Singapore.  She did many, many things that were kind of

25    like this is allowed between us.  Also she claimed I

Case 12-338, Document 59-3, 07/23/2012, 671476, Page80 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 74

1    actually hold her hand, you can read that in her

2    statement, she actually held my hand when we were coming

3    out and then she let it go and then she --

4         Q.   Let's try to focus day by day, okay?

5         A.   Okay.

6         Q.   Because you're going all over the place.

7         A.   Okay.  Good.  We'll try to focus.

8         Q.   So between June 4th or 5th and June 8th was

9    there any kind of physical touching between the two of

10   you?

11        A.   Physically just what I explained right now.

12        Q.   Her hand on your thigh?                    .

13        A.   Her hand on my thigh, her head on my shoulder

14   (indicating), leaning on me in taxi.

15        Q.   Was anybody else in the taxi or just the two of

16   you?

17        A.   No.  Just the two of us.

18        Q.   Where were you going or coming from?

19        A.   It was in the taxi in Singapore.  That was not

20   in Indonesia.  That was when we were coming from the

21   airport to Singapore and it was when we were leaving

22   Singapore as well.  It was in the plane from Medan,

23   Indonesia to Singapore as well.

24        Q.   She put her head on your shoulders?

25        A.   Yes, she did.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 75

```
 1        Q.    Did you ever tell her not to do that?

 2        A.    No, I didn't.

 3        Q.    Why not?

 4        A.    Because, as I said, there were exchanges of

 5   numerous e-mails where, you know, I came to basically

 6   become close to her through those e-mails and I would say

 7   it was mostly on her part, I never, you know, went into

 8   the intimate details about my life but she went into

 9   intimate details about her life.  As I said, she did say

10   in her e-mails that there was an older gentleman she had

11   a relationship with that broke her heart in March.  She

12   did say in e-mail that she went to Rod Stewart concert in

13   Hong Kong in March.  She did ask me about what kind of

14   motorcycle should I buy, this or that, she sent me a

15   picture of that.  She sent me a picture with Brian Hesse

16   and Dave Mathieu and her being on the resort in Thailand

17   in summer 2008 when she proposed to me, when I said I

18   will have to schedule the audit of Practical in Thailand,

19   she said when we finish audit I offer you a weekend in a

20   resort in Thailand, which I didn't know what to do with

21   that, I didn't even know how to tell my wife, should I

22   tell her, how to explain that I'm staying a weekend

23   after.  I didn't ever respond to that e-mail because I

24   didn't know what to respond.  It was very unusual to me

25   that somebody is offering that, like we can spend
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page82 of 96

A-568

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 76

1   weekend.

2        Q.   But you didn't stay away from her, what you did

3   was you then went to her room four days later and you

4   rubbed her feet and her back, right?

5        A.   No, I didn't.  Yes, I didn't stay away from

6   her, and that was --

7        Q.   Why not?

8        A.   Because I -- basically to a point I believe I

9   was attracted to her, yes, and she actually played the

10  attraction card with me pretty strongly.

11       Q.   So you wanted to have a relationship with her

12  that was other than business, right?

13       A.   I am not sure that that's a correct statement.

14       Q.   Let me ask you this, Mr. Cicvara.  You had been

15  employed at that point for about eight-plus years by

16  Procter & Gamble; correct?

17       A.   Yes.

18       Q.   Had you ever had any occasion prior to then

19  where you would give a massage either on the feet or the

20  back to any other contractor or supplier or employee of

21  Procter & Gamble?

22       A.   No.  No.

23       Q.   Okay.  So this was -- according to you this is

24  the first time that you ever engaged in that kind of

25  conduct?

Case 12-338, Document 59-3, 07/23/2012, 671476, Page83 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 77

1       A.    Yes.  Yes.

2       Q.    Isn't it true that at that time you wanted to

3   have a relationship with Bel that was other than a

4   professional relationship?

5       A.    As I said, I'm not really sure that that's --

6   the way you said it it's true.  I would agree that there

7   was something going on, yes, but I'm not sure that I

8   wanted to have a relationship.  It just happened that

9   that day was very unusual behavior of her which actually

10  probably prompted me to think that there could be

11  something between us more than just friendship, and

12  according to her it was wrong.  According to her it was

13  wrong.

14      Q.    Okay.  Did you feel coerced into rubbing her

15  feet?

16      A.    No.

17      Q.    Did you feel coerced into rubbing her back?

18      A.    No.

19      Q.    You did that voluntarily?

20      A.    Yes.

21      Q.    Do you believe that was consistent with the

22  PVPs, that you would massage --

23      A.    I wouldn't --

24      Q.    Excuse me.

25      A.    I wouldn't agree with that.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page84 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                    Page 78

1        Q.    Excuse me.

2              That you would massage the feet or back of a

3    general manager of a contractor, do you think that was

4    consistent with the PVP?

5        A.    That is a very convoluted question.  I'm not

6    sure how to answer that.  I don't think that there is

7    anything in PVP which says anything about massaging feet

8    of anybody, but if you want me to answer that question I

9    would say that under the circumstances, under what was

10   going on in e-mails from her in the last six months

11   before that, I wouldn't think that that's something that

12   would violate any PVP values or anything that was written

13   in the conduct manual.  My behavior certainly didn't

14   violate that.  What I violated is my wife's trust.  That

15   I -- you know, there is nothing I can say about that.  I

16   am very ashamed of what I did to my wife.  But I'm not

17   ashamed of what I did to her and I never in any

18   circumstances crossed the line of doing something

19   inappropriate, doing -- whenever -- if she said no, I

20   would stop doing things, if she said no.  And when she

21   said no I did stop doing things.  So I wouldn't say that

22   that was violation of PVPs, no, and I wouldn't say that

23   was violation of conduct manual, no.

24       Q.    You wouldn't?

25       A.    No, I wouldn't.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page85 of 96

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 79

     1        Q.    Do you think that a personal relationship --

     2   did you consider what you had with her as a personal

     3   relationship?

     4        A.    Yes, to a point, yes.

     5        Q.    Would you describe it as a romantic

     6   relationship?

     7        A.    It's possible, yes.  I wouldn't deny that.

     8   Yeah, it's possible to describe it that way.

     9        Q.    Let me show you page PG 359 of Exhibit 2, the

    10   business conduct manual, all right?

    11        A.    Okay.

    12        Q.    If you look at that document, it talks about --

    13   the title of it is business, financial and personal

    14   relationships, right?

    15        A.    Okay.

    16        Q.    And on the left-hand side it says all employees

    17   are obligated to act at all times solely in the best

    18   interest of the company, right?

    19        A.    Yes, which I did, in the best interest of the

    20   company.

    21        Q.    Okay.  And then the right-hand side at the top

    22   it says what are some situations that raise concerns, do

    23   you see that?

    24        A.    Yes, I see that.

    25        Q.    Look at the sixth bullet point down which is

Case 12-338, Document 59-3, 07/23/2012, 671476, Page86 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 80

```
 1    the second from the last.

 2        A.   Uh-huh, yes, when an employee, okay.

 3        Q.   When an employee has a romantic relationship

 4    with a current or a potential supplier, contractor or

 5    customer or an employee of any such entity when the

 6    company employee has direct or indirect decision-making

 7    authority or influence with respect to the underlying

 8    business relationship.

 9        A.   Yeah, okay.  What was -- what's the point?

10        Q.   You had a -- the point is you knew that this

11    was against company policy; correct?

12        A.   No.

13        Q.   You didn't know that having a business --

14    having a personal relationship with a --

15        A.   When the company employee --

16        Q.   Excuse me, I'm not done.

17        A.   -- has direct or indirect decision-making

18    authority.

19        Q.   Sir, I'm not finished.  You need to let me

20    finish my question.

21        A.   Oh, I'm sorry.  I thought that you are reading

22    this paragraph.

23        Q.   I did.  Now I have a question.

24        A.   Okay.

25        Q.   Okay.  You understood as an employee of
```

Case 12-338, Document 59-3, 07/23/2012, 671476, Page87 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 81

1    Procter & Gamble that it was against company policy for

2    you to have a romantic relationship with an employee of a

3    contractor; correct?

4         A.   No.  It's when the company employee has direct

5    or indirect decision-making authority or influence with

6    respect to the underlying business relationship.

7         Q.   You had no such authority?

8         A.   No.  I don't have any authority.

9         Q.   You had no authority with respect to that

10   relationship?

11        A.   No.  No.  With respect to the business

12   relationship between Duracell and Practical, I'm not in a

13   position to offer any orders to that employee, I'm not in

14   the position to do any decision that may harm them or --

15   decision making, I'm talking about decision making here,

16   or put that company into better position with respect to

17   Duracell, and I have never done that.

18        Q.   Okay.

19        A.   So, yes, I agree there was a romantic -- not --

20   kind of emotional relationship, but not of this kind.  I

21   didn't use that relationship to advance Practical to a

22   better standing or worse standing.  Actually I was very

23   straightforward with Practical on audit on June 8th,

24   which might have strong consequences on what happened

25   that night and what happened after that.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page88 of 96

A-574

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 82

1       Q.   Okay.  Do you claim that you had no involvement

2    whatsoever in decisions that were made between Duracell

3    and Practical?

4       A.   Not in these kind of decisions, no.

5       Q.   What do you mean in these kind?

6       A.   Let me read.

7       Q.   I didn't ask you a question about the policy.

8    I asked you a question do you claim that you had no

9    involvement in any decision making with respect to the

10   relationship between Practical and Duracell.

11      A.   I can only voice my opinion.  I don't have

12   decision authority, yes, I don't have it.

13      Q.   I didn't say decision-making authority.  I

14   asked you whether or not you had any involvement in

15   decisions that impact the relationship between Practical

16   and Duracell?

17      A.   Yeah, I have it, but I didn't -- that never

18   affected those decisions.

19      Q.   I didn't say that.  But your quality auditing,

20   for example, could impact the relationship between

21   Practical and Duracell; correct?

22      A.   Yes, it could, but don't forget I'm not the

23   leading auditor, I'm there just in technical capacity, so

24   I'm there just to offer technical explanation of things.

25      Q.   Do you claim that Bel ever -- strike that.  Did

Case 12-338, Document 59-3, 07/23/2012, 671476, Page89 of 96

CICVARA v. PROCTER & GAMBLE                    December 21, 2010

Page 83

1    Bel ever tell you to stop massaging her feet or her back?

2        A.   She never told me to stop.  She did tell me

3    once don't do that anymore, and when she told me I didn't

4    do it anymore.  And actually, as I said, I was kind of

5    ashamed of myself for doing that anyway, so.

6        Q.   Do you claim that you only touched her back and

7    her feet?

8        A.   Yes.

9        Q.   How long --

10       A.   I also claim I never tried to kiss her.  Again

11   I'm stressing this because at one point I think she said

12   that I tried to kiss her all over her face.  Nothing

13   further from the truth and I can explain that why, if

14   you'll allow me.  It's not really something I'm proud of,

15   but I can explain.

16       Q.   Would you agree with me that it was poor

17   judgment as a manager at Procter & Gamble for you to

18   massage Bel's feet?

19       A.   I don't know what does it have to do anything

20   with management.  It's massaging the feet of a woman who

21   told me to come into her room.  When I came into her room

22   she went straight to the bed, she dimmed the light, not

23   me, she dimmed the lights, she put me in the position.  I

24   expected to go to the kitchen to sit down and eat the

25   dessert.  I actually brought the dessert with me.  What

Case 12-338, Document 59-3, 07/23/2012, 671476, Page90 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 84

1   she didn't say is that we actually ate the dessert at the

2   end of the encounter, we ate the dessert and we left

3   amicably.  I left her room.  It was nothing.  There was

4   no, you know, you harassed me, you did this to me.  It

5   was nothing.  We actually listened to music.  We ate

6   dessert and I left the room.

7          In the meantime her husband called her, she

8   talked to him 15 minutes in Chinese.  She called her

9   boss.  She gave him -- and that's when I thought that she

10  actually left the phone open and she recorded what was

11  going on in the room, because I was told that there is a

12  recording from her room on her boss' answering machine

13  when meeting with HR started on June 15th.  That was not

14  in the notes of meeting purposely.  That was the start of

15  opening sentence of Lynne Burnett was we have the

16  recording.

17      Q.   Okay.  You're going far beyond.  This has

18  nothing to do with my question.

19      A.   It's very important.

20      Q.   It might be important, okay, but I'm asking

21  specific questions, okay?

22      A.   Yeah, good.

23      Q.   Did you ever tell Bel Liu that you loved her?

24      A.   I don't recall that I told her in that sense.

25  I couldn't tell her I loved her.

A-577

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 85

1          Q.   Did you tell her you were falling in love with

2    her?

3          A.   I could have told her something like that, yes.

4          Q.   Well, what is it that you think you told her?

5          A.   I didn't tell her I'm falling in love with you,

6    no.  I told her that she -- I might have feelings for

7    her, yes.

8          Q.   Did you say anything else other than I might

9    have feelings for you?

10         A.   I never told her I love her.  I never told her

11   that because that wouldn't be true.  I don't love her.

12         Q.   What do you recall are the specific words that

13   you uttered to her, that I have feelings for you?

14         A.   If I told her anything, then I told her

15   something along those lines, yes.  I don't recall really

16   what I told her.  I can strongly say I never said I loved

17   her.  That would be too much.

18         Q.   But you did want to have sex with her, right?

19         A.   That I'm not really sure, the way you just said

20   it.  I didn't want to have sex with her.  I didn't come

21   to the room to have sex with her.

22         Q.   I didn't ask you --

23         A.   So, no.  I felt -- you know, I felt something

24   when I saw a woman opening the door and dressed like she

25   was I felt something, obviously there was a thought in my

Case 12-338, Document 59-3, 07/23/2012, 671476, Page92 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 86

1    mind, but I didn't come to that room to have sex, and I

2    would never, I would never have sex with a woman who said

3    no, never.  So I'm just not that person.

4         Q.   Okay.  When you saw her at the door did you

5    then want to have sex with her?

6         A.   No, at that point, no, I was very surprised

7    actually.

8         Q.   How about when you were rubbing her feet, did

9    you want to have sex with her?

10        A.   That is sensual, yes.  I didn't want to have

11   sex with her, but I thought about that, yes.  It wouldn't

12   be, you know.

13        Q.   How about when you were rubbing her back, did

14   the thoughts come to your mind to have sex with her?

15        A.   I don't -- I'm not sure.  For me it's much more

16   sensual to have feet than the back.  I'm not sure I was

17   thinking about that.  As I said I massage my wife and I'm

18   really sorry of what I did to my wife.  That would be the

19   extent of what I did to her.

20        Q.   Did you ever tell her that you had a feeling

21   that you would rape her?

22        A.   No.  That is very misinterpreted in that -- in

23   those notes.  I never said I would rape you.  I said when

24   you do that with your legs one could rape you.  That's

25   exactly what I said.

Case 12-338, Document 59-3, 07/23/2012, 671476, Page93 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 87

1      Q.    When you do what with your legs?

2      A.    What she did with her legs is she actually

3   uncovered herself and she spread her legs just enough so

4   that you can take a look and then she closed her legs and

5   she was laughing at me, and then I said when you do such

6   things one could rape you, and then we had academic

7   discussion about rape.  She probably expected me to act

8   upon that, and actually when she said what is rape, I

9   started to explain what is rape and I said rape is when

10  somebody is, you know, attempting to forcefully have sex

11  with you and blah, blah, blah.  That was the extent of

12  it.

13     Q.    What do you mean by --

14     A.    And I'm very sorry.

15     Q.    What do you mean by when you say she uncovered

16  herself?

17     A.    Oh, she was like -- you know, she was in -- how

18  you call that, whatever is on the bed, you know, she was

19  covered by that, and then she actually did this and she

20  showed her leg to me (indicating).

21     Q.    Do you claim that she was in the bed in

22  something other than this blouse and her shorts?

23     A.    No.  No.  She was in her blouse and her shorts,

24  but when she did that she was turning -- spreading her

25  legs and putting her legs like this (indicating).  I

Case 12-338, Document 59-3, 07/23/2012, 671476, Page94 of 96

CICVARA v. PROCTOR & GAMBLE                              December 21, 2010

Page 88

1    don't know why she did that.

2         Q.   But she had her shorts on?

3         A.   Yes, yes, she had her shorts on.

4         Q.   And you claim she spread her legs and then she

5    crossed her legs?

6         A.   Yes, and she did that repeatedly.

7         Q.   Why didn't you walk out?

8         A.   Well, you know, I ask myself that question

9    because there was something strange about all of the

10   situation I must say.  I didn't because it's just that, I

11   felt I would be with her, and I actually was invited to

12   the room, don't forget that.

13        Q.   I understand, but she didn't tie you down, did

14   she?

15        A.   No, she didn't.  I mean why would I leave the

16   room?  What did I do to leave the room?  I mean why would

17   I leave the room?

18        Q.   Were you uncomfortable when she spread her legs

19   and crossed them?

20        A.   I was feeling very strange, yes.

21        Q.   And you still didn't leave the room?

22        A.   No, I didn't.

23        Q.   Did you think that was poor judgment on your

24   part?

25        A.   Yes, it was.  I would agree it was poor

Case 12-338, Document 59-3, 07/23/2012, 671476, Page95 of 96

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 89

1   judgment on me, yes.

2                    MR. CERASIA:   I was told that we have to

3   go off because the tape is running out.

4                    THE VIDEOGRAPHER:   Off the record at

5   12:18 p.m.

6                    (Lunch Recess:   12:18 to 1:27 p.m.)

7                    THE VIDEOGRAPHER:   On the record at 1:27

8   p.m.

9   BY MR. CERASIA:

10       Q.   Mr. Cicvara, do you understand that you're

11  still under oath?

12       A.   Yes.

13       Q.   Okay.  Did you review any documents during the

14  break, the lunch break for the deposition?

15       A.   Documents per se I don't think so.  Talking

16  just about a few things.

17       Q.   Did you review any pieces of paper?

18       A.   No.

19       Q.   Okay.  When you say we were talking, meaning

20  with --

21       A.   The lawyer.

22       Q.   With your lawyer, okay.  By the way, do you

23  claim that Bel Liu ever touched you anywhere other than

24  on your thigh that one time in the car?

25       A.   I said she put her -- she put her head on my

Case 12-338, Document 59-3, 07/23/2012, 671476, Page96 of 96

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

```
                                                      Page 90
 1    shoulder numerous times.

 2        Q.    Right, but I'm talking about touching with her

 3    hand.

 4        A.    Oh, touching.  She did took me on the hand when

 5    we were in -- oh, boy, Singapore I think, yeah, in

 6    Singapore when we were going to visit the store where she

 7    bought certain T-shirts.

 8        Q.    And what did you claim she did?

 9        A.    Oh, she took my hand.  Actually she hold me on

10    the hand when we were walking down the street from hotel

11    to the store.

12        Q.    Did you ever tell her not to do that?

13        A.    No, I don't think I did tell her anything.

14        Q.    Did you ever touch or hold her hand at dinner?

15        A.    She did touch and hold my hand at dinner.  I

16    didn't.  She did touch and hold my hand when we were

17    walking out of the dinner in Indonesia.

18        Q.    How about in the dinner itself at the table?

19        A.    No, I don't recall that I did, no.

20        Q.    At any time that she touched your hand did you

21    ever tell her not to touch your hand?

22        A.    No.  No, I didn't.

23        Q.    How about when you claim she put her head on

24    your shoulder, did you ever tell her not to do that?

25        A.    No.
```