# 12-338-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

PREDRAG CICVARA,

*Plaintiff-Appellant,*

*v.*

PROCTOR & GAMBLE CO, DURACELL, LYNNE BURNETT,

*Defendants,*

*and*

GILLETTE CO, PROCTOR & GAMBLE CO., INC,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court
for the District of Connecticut (New Haven)*

## BRIEF FOR DEFENDANTS-APPELLEES

Richard B. Lapp
SEYFARTH SHAW LLP
*Attorneys for Defendants-Appellees*
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
312-460-5000

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, undersigned counsel of record for Defendants-Appellees The Gillette Co. ("Gillette") and The Procter & Gamble Co. ("P&G") (collectively, "the Company")[1] state as follows:

Non-governmental corporate entity Gillette is a wholly owned subsidiary of P&G, which is a publicly traded company and owns 10% or more of Gillette's stock.

Non-governmental corporate entity P&G does not have any parent corporation, nor does any publicly held corporation own 10% or more of its stock.

Non-governmental corporate entity Duracell no longer exists, having been merged into Gillette.

Dated this 24th day of August, 2012, at Chicago, Illinois

---

1.      Appellant incorrectly pleaded in the District Court that the named defendants in this case were "The Gillette Company and Procter & Gamble Company and Duracell."

Respectfully submitted,

SEYFARTH SHAW LLP

By: /s/ Richard B. Lapp

    Richard B. Lapp (rlapp@seyfarth.com)
    131 South Dearborn Street
    Suite 2400
    Chicago, Illinois  60603
    Phone:  (312) 460-5000
    Fax:    (312) 460-7000

*Attorneys for Defendants-Appellees Procter & Gamble Co. and The Gillette Co.*

# TABLE OF CONTENTS

PAGE

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUE.....................................................................3

STATEMENT OF THE CASE................................................................4

STATEMENT OF THE FACTS ..............................................................7

SUMMARY OF THE ARGUMENT ......................................................20

ARGUMENT ...................................................................................22

    I.    THE DISTRICT COURT'S DECISION GRANTING THE COMPANY SUMMARY JUDGMENT AND DENYING APPELLANT'S CROSS MOTION IS SUBJECT TO *DE NOVO* REVIEW. .........................................22

    II.   THE DISTRICT COURT CORRECTLY GRANTED THE COMPANY SUMMARY JUDGMENT BECAUSE THE COMPANY'S DECISION TO CANCEL APPELLANT'S STOCK OPTIONS WAS EMINENTLY REASONABLE.........................................................................23

    III.  APPELLANT'S UNDEVELOPED "ARGUMENT" THAT HE WAS WRONGLY DENIED SUMMARY JUDGMENT IS FRIVOLOUS. ...................32

    IV.  IN ANY EVENT, THIS COURT SHOULD DISMISS THE APPEAL FOR APPELLANT'S ABJECT FAILURE TO COMPLY WITH THE FEDERAL AND LOCAL RULES. ..........................................................34

CONCLUSION .................................................................................37

iii

# TABLE OF AUTHORITIES

**CASES**                                                                               **PAGE(S)**

*Bryant v. Food Lion, Inc.*,
    100 F. Supp. 2d 346 (D.S.C. 2000) ...................................................31

*Callon Petroleum Co. v. Nat. Indemnity Co.*,
    No. 11-241-cv, 2012 WL 2549500 (2d Cir. July 3, 2012) ................................33

*Cicvara v. Gillette Co. et al.*,
    No. 3:09-cv-02054-JCH (D. Conn.) .........................................................1, 4, 5

*Cicvara v. The Gillette Co. and Procter & Gamble Co. and Duracell*,
    Civil Action No. FBT-CV09-5028901-S (Conn. Super. Ct.)...............................4

*Ernst Haas Studio, Inc. v. Palm Press, Inc.*,
    164 F.3d 110 (2d Cir. 1999) .............................................................28

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101 (1989)......................................................................26

*Frank v. United States*,
    78 F.3d 815 (2d Cir. 1996), *vac'd on other grounds*,
    521 U.S. 1114 (1997).....................................................................33

*Fund for Animals v. Kempthorne*,
    538 F.3d 124 (2d Cir. 2008) .............................................................22

*Karby v. Std. Prods. Co.*,
    Civ. A. No. 3:90-2918-17, 1992 WL 333931 (D.S.C. June 22, 1992)...............31

*MacEwen Petroleum, Inc. v. Tarbell*,
    136 F.3d 263 (2d Cir. 1998) ..............................................................2

*McCarthy v. SEC*,
    406 F.3d 179 (2d Cir. 2005) .............................................................33

*Morley v. Ciba-Geigy Corp.*,
    66 F.3d 21 (2d Cir. 1995) ...............................................................34

*Mortimer Off Shore Servs. v. The F.R.G.*,
    615 F.3d 97 (2d Cir. 2010) ..............................................................24

*Noonan v. Staples, Inc.*,
    556 F.3d 20 (1st Cir. 2009)................................................................27

*Novella v. Westchester County*,
    661 F.3d 128 (2d Cir. 2011) ............................................................22

*O&G Indus., Inc. v. Nat'l R.R. Passenger Corp.*,
    537 F.3d 153 (2d Cir. 2008), *cert. denied*, 556 U.S. 1182 (2009) ....................22

*Oatway v. Am. Int'l Group, Inc.*,
    325 F.3d 184 (3d Cir. 2003) ............................................................25

*Perez v. Aetna Life Ins. Co.*,
    96 F.3d 813 (6th Cir. 1996) ........................................................26, 34

*Perez v. Aetna Lifs Ins. Co.*,
    106 F.3d 146 (6th Cir. 1997) ...........................................................27

*Sharkey v. Ultramar Energy Ltd.*,
    70 F.3d 226 (2d Cir. 1995) ............................................................25

*Sioson v. Knights of Columbus*,
    303 F.3d 458 (2d Cir. 2002) ...................................................28, 33, 36

*State ex rel. Merrill v. Greenbaum*,
    84 N.E.2d 253 (Ohio Ct. App. 1948)....................................................27

*Storey v. Cello Holdings, L.L.C.*,
    347 F.3d 370 (2d Cir. 2003) ...........................................................24

*Weir v. The Anaconda Co.*,
    773 F.2d 1073 (10th Cir. 1985) .......................................................27

*Welland v. Citigroup, Inc.*,
    No. 00 CV 0738(NRB), 2003 WL 22973574 (S.D.N.Y. Dec. 17, 2003),
    *aff'd*, 116 F. App'x 321 (2d Cir. 2004)................................................27

*Zickafoose v. UB Servs., Inc.*,
    23 F. Supp. 2d 652 (S.D. W. Va. 1998)...........................................31, 32

## FEDERAL STATUTES

28 U.S.C. § 1291 ...........................................................................1, 2

v

28 U.S.C. § 1332 .............................................................................1, 4

28 U.S.C. § 1441 .............................................................................1, 4

29 U.S.C. §§ 1001 *et seq.* ...................................................................8

**FEDERAL & LOCAL RULES**

2d Cir. R. 28.1 ...............................................................................21, 34

2d Cir. R. 28.1(a) ..........................................................................35, 36

2d Cir. R. 28.1(b) ..............................................................................4

Fed. R. App. P. 28 .............................................................................34

Fed. R. App. P. 28(a) .....................................................................21, 36

Fed. R. App. P. 28(a)(3) ......................................................................35

Fed. R. App. P. 28(a)(4) ......................................................................35

Fed. R. App. P. 28(a)(5) ......................................................................35

Fed. R. App. P. 28(a)(6) ......................................................................35

Fed. R. App. P. 28(a)(7) ......................................................................35

Fed. R. App. P. 28(a)(8) ......................................................................35

Fed. R. App. P. 28(a)(9)(A) ..................................................................35

Fed. R. App. P. 28(a)(9)(B) ..................................................................35

Fed. R. App. P. 28(b)(4) .......................................................................7

Fed. R. Civ. P. 28(a)-(b) .......................................................................1

Fed. R. Civ. P. 56(a) ..........................................................................22

**OTHER AUTHORITIES**

JAYNE E. ZANGLEIN & SUSAN J. STABILE, ERISA LITIGATION (3d ed. 2008) ..........25

# JURISDICTIONAL STATEMENT[2]

The District Court had subject matter jurisdiction over this civil case under 28 U.S.C. §§ 1332 & 1441.

Pursuant to 28 U.S.C. § 1291, the Court of Appeals has jurisdiction to review only those final decisions of the District Court that are noticed in Plaintiff-Appellant Predrag Cicvara's ("appellant") Notice Of Appeal, which was timely filed on January 19, 2012.[3] (A-834.)[4] Accordingly, this Court has jurisdiction to review the District Court's final judgment that it entered on November 29, 2011, and in which it (i) granted the Company's[5] Motion for Summary Judgment;

---

2. The Company submits this Jurisdictional Statement, as well as the following Statement of Issue, Statement of the Case, and Statement of the Standard of Review, because appellant failed to include them in his opening brief, notwithstanding his duty to do so. *See generally* Fed. R. Civ. P. 28(a)-(b). Appellant's repeated violations of the Federal and Local Rules that mandate the substance and form of his brief are noted throughout this brief and specifically addressed *infra*, Section.IV.

3. In his Notice Of Appeal, appellant states that he is challenging the District Court's final judgment, which he incorrectly states was entered on December 13, 2011. (A-834.) The District Court entered its final judgment on November 29, 2011, (A-833), and appellant successfully sought an extension of time to file his Notice Of Appeal by January 25, 2012, *see Cicvara v. Gillette Co.*, No. 3:09-cv-02054-JCH (D. Conn.), Dkt. ## 99 & 100. Accordingly, appellant's January 19, 2012 Notice Of Appeal was timely filed.

4. All citations to "(A-___)" reference the parties' Joint Appendix, which was filed with the Court on July 23, 2012. (Dkt. ## 57-59.) All citations to "(App. Br. at ___)" reference appellant's opening brief, which also was filed with the Court on July 23, 2012. (Dkt. # 55.)

5. At the time of the events underlying this case, Duracell was a wholly owned subsidiary of The Procter & Gamble Co. ("P&G"). Since these events,

1

(ii) denied appellant's Cross Motion for Summary Judgment; and (iii) entered judgment for the Company. (A-833.) This Court, though, does not have jurisdiction to hear any other issues that appellant may raise that were not the subject of the District Court's November 29, 2011 Order. *See* 28 U.S.C. § 1291; *see also MacEwen Petroleum, Inc. v. Tarbell*, 136 F.3d 263, 264 (2d Cir. 1998) ("A 'final' decision within the meaning of § 1291 is one that ends the litigation, leaving no issues unresolved between any of the parties and nothing for the court to do but execute the judgment.").

---

though, Duracell no longer exists as a separate corporate entity; it was merged entirely into The Gillette Co. ("Gillette"), which itself is a wholly owned subsidiary of P&G. Collectively, Duracell, Gillette, and P&G shall be referred to as the "Company."

## STATEMENT OF ISSUE

Did the District Court correctly conclude that the Company's decision to withhold Plaintiff-Appellant Predrag Cicvara's ("appellant") stock options was reasonable and not in breach of the Gillette Company 1971 Stock Option Plan (the "Plan") when:

(i) The Company terminated appellant's employment for cause after it had determined that he had invited himself to the hotel room of a female manager of one of Duracell's overseas suppliers; unexpectedly stripped to his underwear in her presence; sat next to her on the bed, uninvited, where she was laying ill; insisted on massaging her body despite her protests to stop; and then said that he "could rape" her;

(ii) Appellant's unwanted sexual advances toward, and explicit sexual threats against, the female manager expressly violated Company[6] policy, was imputed to the Company itself, and thereby threatened an already-strained business relationship with Duracell's supplier; and

(iii) The Plan's plain, unambiguous language cancels an employee's stock options if that employee is terminated for "gross misconduct which is materially and demonstrably injurious" to the Company?

---

6.    As explained *supra*, note 5, the "Company" refers collectively to Duracell, The Gillette Co., and The Procter & Gamble Co.

3

## STATEMENT OF THE CASE

On November 16, 2009, Plaintiff-Appellant Predrag Cicvara ("appellant") filed a Complaint in the Fairfield Judicial District of the State of Connecticut Superior Court, *Cicvara v. The Gillette Company and Procter & Gamble Company and Duracell*, Civil Action No. FBT-CV09-5028901-S (Conn. Super. Ct.), alleging, among other things, that the Company[7] breached the terms of the Gillette Company 1971 Stock Option Plan (the "Plan") when it prevented him from exercising stock options after it terminated his employment with Duracell for cause. (A-20 through A-22.)

On December 17, 2009, the Company removed the action to the U.S. District Court for the District of Connecticut pursuant to 28 U.S.C. §§ 1332 & 1441, on the grounds that (i) the parties are diverse in citizenship; and (ii) the amount in controversy exceeds $75,000. (A-14 through A-17.) Upon removal, the case was captioned *Cicvara v. Gillette Co. et al.*, No. 3:09-cv-02054-JCH (D. Conn.), and assigned to U.S. District Judge Janet C. Hall.[8] (A-1.)

---

7. As explained *supra*, note 5, the "Company" refers collectively to Duracell, The Gillette Co., and The Procter & Gamble Co.

8. Among the numerous deficiencies in appellant's brief noted throughout the Company's brief, appellant violated 2d Cir. R. 28.1(b) by failing to identify "the judge or agency official who rendered the decision appealed from and [to] cite the decision or supporting opinion."

Appellant filed his First Amended Complaint with the District Court on January 6, 2010.  (A-26 through A-33.)  The First Amended Complaint included eight claims against the Company, two of which pertained to appellant's original breach-of-contract claim concerning the Company's cancellation of his stock options.  (A-27 through A-29.)  The Company filed its Answer on January 22, 2010.  (A-37 through A-47.)

On April 15, 2011, the Company filed a Motion for Summary Judgment.  (A-145 through A-392.)  In response, appellant filed a Memorandum in Opposition to the Motion for Summary Judgment (A-727 through A-733) and a Cross Motion for Summary Judgment (A-734 through A-789).  In both documents, appellant abandoned the claims that were unrelated to his breach-of-contract claim, and argued only that the Company wrongly cancelled his stock options.  (A-727 through A-733, A-734 through A-789, A-820.)

By Order dated November 22, 2011, the District Court granted the Company's Motion for Summary Judgment and denied appellant's Cross Motion for Summary Judgment, concluding that the Company's decision to withhold appellant's stock options was not "arbitrary, capricious, or made in bad faith." *Cicvara v. Gillette Co et al.*, No. 3:09-cv-02054-JCH, slip op. at 8-12 (D. Conn. Nov. 22, 2011).  (A-827 through A-832.)  Subsequently, on November 29, 2011, the Court entered judgment in favor of the Company.  (A-833.)

After moving for an extension of time to file his Notice Of Appeal, Appellant timely filed his Notice on January 19, 2012, declaring his intent to appeal "the final judgment entered in this action." (A-834.)

## STATEMENT OF THE FACTS[9]

**Introduction And Overview**.  In June 2009, Plaintiff-Appellant Predrag Cicvara ("appellant") entered the hotel room of Bel Liu — a female managing director at Practical Lighting Company ("Practical"), an Asia-based supplier of appellant's employer, Duracell[10] — and:  (i) inexplicably stripped to his underwear in her presence; (ii) sat next to her on her bed, uninvited, where she was lying ill; (iii) massaged her body despite her protests to stop; (iv) attempted to kiss her; and then (v) stated that he "could rape" her.  (A-183 through A-184; A-346; A-372.) Appellant left Ms. Liu's room only after she repeatedly demanded that he do so. (A-184; A-346; A-372; A-579 through A-580.)   In the days that followed, appellant sent to Ms. Liu a barrage of text messages and e-mails, in which he continued his unwanted sexual advances, apologized for his actions, and eventually promised to never again act like a "dirty old man" toward her.[11]  (A-184 through A-185; A-374 through A-381.)

---

9.    Because appellant's one-page "Factual Background" is woefully deficient in reciting the facts of this case, (App. Br. at 1-2), Gillette respectfully submits this Statement Of Facts in its stead, *see* Fed. R. App. P. 28(b)(4) (providing that an appellee may submit a statement of the facts if it "is dissatisfied with the appellant's statement").

10.    As explained *supra*, note 5, the "Company" refers collectively to Duracell, The Gillette Co., and The Procter & Gamble Co.

11.    Among appellant's many statements to Ms. Liu were: "Feel terrible that can't [sic] be with you and pamper you," (A-376); "Thx [sic] for the good time," (A-378); "Maybe the cultural differences that you so graceously [sic] tried

These facts are undisputed. (A-187 through A-188; A-339; A-387; A-578 through 580.) The undisputed record further shows that when the Company undertook an investigation as to whether appellant engaged in his misconduct, he freely admitted to members of the Company's Human Resources ("HR") Department what he had done. (A-187 through A-188; A-339; A-387.) In response, the Company terminated appellant's employment for cause on the grounds that his sordid behavior violated the Company's policy against harassment; its Purpose, Values, and Principles (the "PVPs"); and adversely affected the Company's already uneasy business relationship with Practical. (A-188 through A-189; A-339; A-387.) Consequently, appellant's stock options were cancelled automatically per the express terms of the Gillette Company 1971 Stock Option Plan (the "Plan"), a non-ERISA[12] profit sharing plan, which call for the immediate forfeiture of an employee's stock options if his employment is terminated for "gross misconduct which is materially and demonstrably injurious

---

to point to in one of our conversations did ironically played [sic] the part in what transpired lately," (A-374); "By being so polite and trying not to hurt my feelings you have unconsciously [sic] encouraged my (macho? possessive? animouse? [sic] stupid?) efforts to get more than you were ready to give," (A-374 through A-375); and, "I am trying to tell you that regardless of what your decision about us and our friendship will be, I still will have all these little precious pieces of happiness deeply carved in my memory and nothing will take these from me ever," (A-375).

12. The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.*

to the Company." (A-189 through A-192; A-311 through A-313; A-340 through A-341.)

Appellant sued, alleging that the Company breached the terms of the Plan when cancelling his stock options. (A-20 through A-25; A-26 through A-33.) The District Court (i) determined that the Company acted reasonably when concluding that appellant's tawdry actions constituted "gross misconduct which is materially and demonstrably injurious" to it *vis-à-vis* its business relationship with Practical; and (ii) concluded that, pursuant to the Plan, the Company lawfully withheld his stock options. (A-820 through A-833.) That same, uncontested record is now before this Court.

**Appellant's Position And Responsibilities At Duracell.** Before his employment with the Company was terminated, appellant held the position of Quality Assurance Manager with Duracell Lighting in Bethel, Connecticut. (A-180; A-503; A-506 through A-507.) He was responsible for, among other things, interacting with the Company's suppliers on all quality-related issues, including auditing suppliers' factories and ensuring that they met the Company's quality standards. (A-181; A-516.) Appellant's position required travel abroad and substantial interactions with the Company's suppliers; appellant acted as the Company's representative or, more colloquially, as its "face." (A-180 through A-181; A-526 through A-527.) In fact, appellant's job duties specifically required

9

him to "[p]rovide professional representation of Duracell/P&G per the P&G Worldwide Business Conduct Manual"; likewise, his duties were "vitally important in dealing with Contractors and Suppliers in that plans, decisions, and commitments could have significant impact from a financial and/or confidential perspective." (A-180; A-541 through A-544.)

**Duracell's Pre-Existing Tenuous Business Relationship With Practical.** Practical is a Hong Kong-based supplier of flashlights; it has three manufacturing facilities, which are located in Zhongshan, China; Bangkok, Thailand; and Medan, Indonesia. (A-181; A-510 through A-511.) One specific type of flashlight that Practical manufactured was a model known as "Daylite." (A-181; A-512 through A-513.) In 2008, the Company launched two models of the Daylite product: one powered by "AA" cell batteries, and another powered by "AAA" cell batteries. (A-181; A-512 through A-513.) However, the Company contracted not with Practical, but rather with one of Practical's competitors, to supply the two models. (A-181; A-512 through A-513.) The Company's business relationship with Practical consequently deteriorated, improving only after the Company agreed to contract with Practical to produce Daylite models using "C" and "D" cell Duracell batteries. (A-181; A-512 through A-513.)

**Appellant's Business Trip To Practical's Facilities And His Unwelcome Sexual Advances Toward The Company's Supplier.** In June 2009, appellant

10

traveled to Indonesia, Thailand, and China for a multi-day audit of Practical's manufacturing facilities. (A-182; A-389 through A-391.) The trip included overnight stays in Jakarta, Medan, Bangkok, and Guangzhou. (A-182; A-389 through A-391.) Appellant was accompanied on the trip and his tours of Practical's facilities by Ms. Liu, Yuen Yau, another managing director at Practical, and Andrew Yau, Practical's Chairman. (A-182 through A-183; A-545.)

Appellant made several unwanted sexual advances toward Ms. Liu during his business trip to Practical's facilities. Appellant's improper behavior began on June 5, while the group was in Indonesia. As Ms. Liu herself recounted to several of the Company's representatives, appellant unexpectedly asked Ms. Liu if he could see the view from her hotel room. (A-182; A-346.) Although Ms. Liu reported that she was not comfortable with the request, she acquiesced for fear of possibly offending a representative of a valuable customer of Practical. (A-182; A-346.) Immediately upon entering Ms. Liu's room, appellant forced himself on her, and began embracing her. (A-182; A-346.) Ms. Liu struggled free and informed appellant that she was not comfortable with him embracing her, that he should think about his family, that he was "a dirty old man," and then ordered him to leave. (A-182; A-346.) As revealed in the Company's subsequent investigation, after appellant left, Ms. Liu sent a text message to Austin Lin — an employee with the Company with whom she also had worked in the past — seeking his advice as

11

to how best to address the situation, given that the Company was Practical's customer.  (A-182 through A-183; A-337.)

On June 6, the group traveled to Singapore.  While there, appellant again forced himself on Ms. Liu in her hotel room, hugged her, and kissed her as well.  (A-345 through A-346.)  Even though Ms. Liu told appellant to stop, he stated that he wanted "to please" her; that he was attracted to her; and that he hoped that she would "be more than a friend."  (*Id.*)  Ms. Liu responded by telling appellant, "We are neither a couple [nor] lovers so please stop thinking about me."  (*Id.*)  She then ordered appellant to leave her room, again.  (*Id.*)

The group departed Singapore for Bangkok on June 8, and upon arriving, appellant, Ms. Liu, Mr. Yau, and Yuen Yau dined together.  (A-183; A-346.)  Shortly after dinner ended, Ms. Liu retired to her hotel room because she felt ill.  (A-183; A-346.)  Shortly thereafter, appellant sent to Ms. Liu a text message, asking if he could visit her hotel room to deliver a "special dessert."  (A-183; A-346; A-561; A-621.)  Ms. Liu replied, "No."  (A-183; A-346.)  But appellant pressed the issue, and Ms. Liu eventually relented, again out of concern that she may offend a representative of an important customer.  (A-183; A-346.)

When appellant arrived at Ms. Liu's hotel room, she immediately lay down on her bed, ill.  (A-183; A-346.)  Appellant then turned off the room's lights and sat down on the bed, next to her.  (A-346.)  Ms. Liu, who was sick and could not

move, asked appellant not to touch her, but appellant ignored her request. (*Id.*) Instead, he massaged Ms. Liu's body, kissed her eyes and chin, and attempted to kiss her lips. (A-183; A-346.) Appellant then told Ms. Liu, "I just want to touch you," stood up, stripped to his underwear, returned to the bed, and continued to massage her body. (A-346.) Even though Ms. Liu again asked appellant to stop, he did not; instead, he commented that he "could rape" her. (A-184; A-578 through A-579.)

Ms. Liu reported to the Company's investigators that she then "escaped" from the bed, told appellant to leave the room, and yelled at him that she "hated what he did." (A-346 through A-347.) Appellant, apparently undeterred, forced himself on Ms. Liu and tried to hold and kiss her more. (*Id.*) Ms. Liu "struggled" from appellant's arms and "ran" to a corner of her room where, she reported, appellant "chased" her. (A-347) Ms. Liu — again — ordered appellant to leave the room, which he then did, having been there for approximately one hour. (*Id.*)

The next day, appellant sent to Ms. Liu a text message stating, "Feel terrible that [I] can't be with you and pamper you." (A-184; A-376.) Almost immediately, Ms. Liu once again rebuffed appellant's sordid advances, responding, "I have to re-emphasize that we are not either couples or lovers." (A-184; A-377.)

Appellant ignored Ms. Liu's rejection, and continued to barrage her with text messages and e-mails. (A-184 through A-185; A-374 through A-375; A-378

13

through A-380.)  Appellant suddenly changed his tune, though, telling Ms. Liu that he was "in a shock and disgusted by [himself] and [his] poor judgment of things," and acknowledged that there was "no real excuse" for what he had done.  (A-184 through A-185; A-374 through A-375; A-380.)  Appellant even admitted that he had been a "[f]oolish dirty old man."  (A-185; A-375.)

**Ms. Liu Immediately Reports Appellant's Threat To The Company.**  On June 9, Ms. Liu again reached out to Mr. Lin at the Company to inform him about appellant's unwanted sexual advances and his "rape" comment from the previous night.  (A-185 through A-186.)  Mr. Lin, in turn, reported appellant's conduct to the Company's HR Manager, Dina Schmude, and encouraged Ms. Liu to speak with Practical's Chairman, Mr. Yau.  (A-186.)  Ms. Schmude next relayed Mr. Lin's report to Lynne Burnett, the Company's Global HR Director in Bethel.  (A-186.)

On June 11, Ms. Schmude and Senior HR Manager Peggy Wilczewski telephoned Ms. Liu in Hong Kong to investigate her report.  (A-186; A-349 through A-353; A-356 through A-359.)  Over the next 90 minutes, Ms. Liu provided Ms. Schmude and Ms. Wilczewski the details of appellant's conduct throughout the business trip and, in particular, his conduct and statements that he made in her hotel room on June 8.  (A-186; A-349 through A-353; A-356 through A-359.)  Ms. Liu also forwarded to Ms. Schmude and Ms. Wilczewski the e-mails

and text messages that appellant had sent to her. (A-186 through A-187; A-360 through A-369.)

**Practical Confronts The Company About Appellant's Threat.** While the Company's investigation of appellant's gross misconduct proceeded, Practical's Chairman, Mr. Yau, learned of appellant's actions, and sent an e-mail to the Company's Senior Purchasing Manager, informing him that appellant had made "inappropriate sexual advances" toward Ms. Liu. (A-187; A-294; A-339 through A-340.) Mr. Yau added that he was "very upset" by appellant's actions and that appellant was no longer welcome at Practical, and further demanded that the Company replace appellant with someone else for any future audits. (A-187; A-294; A-640 through A-641.) Mr. Yau's e-mail regarding appellant's conduct came at a time when the relationship between the Company and Practical remained strained. (A-187; A-330 through A-333.) In fact, a few days later Mr. Yau informed the Company's Associate Director for the Duracell Division that Practical was "very disappointed" with its business relationship with the Company. (A-187; A-330.)

**Appellant Admits His Misconduct To The Company.** On June 15, Ms. Burnett, Ms. Wilczewski, and Kevin Babis, appellant's manager, interviewed appellant in person regarding his alleged conduct. (A-187 through A-188; A-338; A-387; A-624 through A-625.) Appellant freely admitted to visiting Ms. Liu's

hotel room, touching her, and telling her, "When you do things like that (with your legs), one could rape you." (A-188; A-404; A-578 through A-579.) He tried to explain away his rape comment, however, stating: "Look, it was in a hotel and she was dressed in a way. I told her that I had a feeling I would rape her but never had that in my mind and I didn't thin[k] she'd think about it seriously." (A-188; A-339; *accord* A-578 through A-579.) Appellant continued to suggest that Ms. Liu's attire somehow provoked him, stating that she was "dressed in very short shorts." (A-188; A-339.) Appellant expressed no remorse for his actions; indeed, when Ms. Burnett asked him, "Do you realize you were a company representative and this is one of our suppliers?," he responded that he believed that he did nothing inappropriate at all. (A-188) And when asked at the end of the interview whether he had anything else to say, he stated only: "If I was thinking of things the way it turned out, I should have not been touching her that way." (*Id.*)

**The Company Terminates Appellant's Employment For Cause.** After considering Ms. Liu's accounts and appellant's admission of his actions, the Company terminated appellant's employment for having engaged in egregious misconduct that violated the Company's policy against harassment, as outlined in the Company's Worldwide Business Conduct Manual,[13] and the Company's

---

13. As relevant here, the Company's policy against harassment states that "[t]he Company's fundamental position is that all employees should treat their colleagues with respect." (A-235.) The policy continues: "Harassment may occur

16

PVPs.[14] (A-188 through A-189; A-339; A-387.) Importantly, the Company also determined that, by virtue of appellant's role as the Company's "face" abroad, his misconduct was ultimately imputed to the Company itself, thereby further harming the Company's business relationship with Practical. (A-188 through A-189; A-339; A-387.) Pursuant to the Plan's terms, appellant's stock options were cancelled automatically. (A-312 through A-313.) Specifically, Section 6(f) of the Plan defines "cause" as, among other things, actions that amount to "gross misconduct which is materially and demonstrably injurious to the Company":

> If an employee Participant is discharged for Cause, as hereinafter defined, *all his options shall immediately be cancelled effective as of the date of termination of his employment*. For the purposes of the Plan . . . a discharge for cause shall have occurred where a participant is terminated because of
>
> . . . .
>
> (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary.

---

in many forms, including . . . unwelcome sexual advances, . . . graphic or physical conduct that creates an intimidating, hostile, or offensive work environment." (*Id.*)

14. Among other things, the PVPs state: "We always try to do the right thing"; "We operate within the letter and spirit of the law"; "We uphold the values and principles of P&G in every action and decision"; "We respect our P&G colleagues, customers and consumers, and treat them as we want to be treated"; and "We develop close, mutually productive relationships with our customers and our suppliers." (A-278 through A-280.)

(A-190 (emphasis added); A-311 through A-313; A-340.)  After confirming the stock forfeiture was appropriate under the Plan, Ms. Wilczewski informed appellant by letter and telephone that his stock options had been forfeited automatically because his employment was terminated for cause, as Section 6(f) defined that term.  (A-190 through A-191; A-295 through A-296; A-340 through A-341.)

**The District Court Grants Summary Judgment In The Company's Favor.**  On November 11, 2011, the District Court granted the Company's Motion for Summary Judgment and denied appellant's Cross Motion for Summary Judgment, concluding that undisputed evidence established that the Company was contractually entitled under the Plan to withhold appellant's stock options.  (A-820 through A-832.)  The District Court found that "no rational juror" could conclude that the Company "lacked a reasonable good faith basis to determine" that appellant had engaged in gross misconduct that was materially and demonstrably injurious to it, given the substantial undisputed facts surrounding appellant's appalling misconduct:

> [Appellant] disputes none of the following:  [The Company] received information suggesting that he had made unwanted sexual advances toward Bel Liu, an employee of Practical, a [Company] supplier.  When contacted by Gillette representatives, Liu confirmed the allegations and provided copies of e[-]mails and text messages that corroborated her version of events.

18

Additionally, [appellant] does not dispute that [the Company's] relationship with Practical was already strained prior to this incident, or that, upon learning of the incident, Practical's Chairman informed [the Company] that [appellant] was no longer welcome at his company's facilities. Finally, while [appellant] challenges the accuracy of Wilczewski's notes from the meeting at which he was terminated, he does no[t] dispute that, at this meeting, he admitted that he went to Liu's hotel room, touched her, and said, "When you do such thing[s] with your legs, one could rape you."

(A-830 through A-831 (citations omitted).) Accordingly, the Court concluded that appellant could not show that the Company "breached a contractual duty when it terminated his stock options pursuant to Section 6(f)(B) of the [P]lan," granted the Company's Motion for Summary Judgment, and denied appellant's Cross Motion. (A-831.)

This appeal followed. (A-834.)

19

## SUMMARY OF THE ARGUMENT[15]

It is undisputed that appellant made repeated, unwanted sexual advances toward Ms. Liu; forced himself on Ms. Liu on more than one occasion; and went to her hotel room late at night, where he inexplicably stripped to his underwear, sat next to her on her bed where she lay ill, groped her body despite her protests to stop, attempted to kiss her against her will, and then commented that that he "could rape" her. (A-183; A-346; A-372.) Yet now, amazingly, appellant dismisses his conduct as nothing more than a mere "pass." (App. Br. at 1.) Appellant's challenge to the District Court's judgment is utterly without merit. The Court should affirm the judgment for three reasons.

*First*, under any standard it is clear that the Company reasonably determined that appellant had engaged in "gross misconduct which [was] materially and demonstrably injurious to the Company." Appellant's physical and verbal sexual pursuit of the managing director of a Company supplier unquestionably was "demonstrably injurious" to the Company. (A-187; A-294; A-330 through A-333; A-339 through A-340; A-640 through A-641.)

---

15.    The Company has done its best to decipher appellant's largely incomprehensible opening brief and believes that it has addressed all of the arguments that he has raised. However, to the extent that that the Court may identify additional arguments advanced by appellant that the Company has not addressed, the Company respectfully requests an opportunity to file a supplemental brief to address those arguments.

*Second*, appellant's argument that the District Court erroneously denied his Cross Motion for Summary Judgment is frivolous. In his brief, appellant advances no argument on the point at all. Instead, he merely incorporates by reference the arguments that he made in his Cross Motion — a tactic that this Court routinely rejects. Moreover, his claim that "uncontested and incontrovertible facts" supported his Cross Motion completely ignores the undisputed evidence that he engaged in "gross misconduct" that "materially and demonstrably" injured the Company.

*Finally*, putting aside that appellant's arguments are substantively meritless, his brief utterly fails to present them in the format required by Fed. R. App. P. 28(a) and 2d Cir. R. 28.1. Thus, in addition to all of the reasons why this Court should reject appellant's arguments on the merits, the Court would be well within its authority to dismiss this appeal for his complete inability to conform to the Federal and Local Rules.

## ARGUMENT

This Court should affirm the District Court's judgment. No matter what standard one employs to review the decision to cancel appellant's stock options, the result is the same: the District Court correctly determined on the undisputed record that no rational juror could find that the Company lacked a reasonable, good-faith basis to support its conclusion that appellant had engaged in gross misconduct that was materially and demonstrably injurious to its business relationship with Practical.

## I.   THE DISTRICT COURT'S DECISION GRANTING THE COMPANY SUMMARY JUDGMENT AND DENYING APPELLANT'S CROSS MOTION IS SUBJECT TO *DE NOVO* REVIEW.

This Courts reviews *de novo* a district court's ruling on cross motions for summary judgment, "'in each case construing the evidence in the light most favorable to the non-moving party.'" *Novella v. Westchester County*, 661 F.3d 128, 139 (2d Cir. 2011) (quoting *Fund for Animals v. Kempthorne*, 538 F.3d 124, 131 (2d Cir. 2008) (internal quotation marks omitted)). "'Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting *O&G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 159 (2d Cir. 2008), *cert. denied*, 556 U.S. 1182 (2009); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

## II. THE DISTRICT COURT CORRECTLY GRANTED THE COMPANY SUMMARY JUDGMENT BECAUSE THE COMPANY'S DECISION TO CANCEL APPELLANT'S STOCK OPTIONS WAS EMINENTLY REASONABLE.

In granting the Company's Motion for Summary Judgment, the District Court concluded that appellant could not show that the Company had "breached a contractual duty when it terminated his stock options pursuant to Section 6(f)(B) of the [P]lan." (A-831.) As the District Court explained, "no rational juror could find that [the Company] lacked a reasonable, good faith basis to determine, first, that [appellant] had engaged in gross misconduct, and, second, that this misconduct was materially and demonstrably injurious to [the Company]." (*Id.*)

The District Court was correct. Under Ohio law — under which the Plan must be construed — the Company's decision to terminate appellant's stock options may be overturned only if the decision was arbitrary, capricious, or made in bad faith.[16] Regardless of the standard employed, however, the outcome is no

---

[16]. Appellant abandons any challenge to the District Court's conclusion that the Company's decision to terminate his non-ERISA stock options is subject only to arbitrary-or-capricious review. As appellant puts it in his brief, the only issue on appeal "is relatively simple. Did the defendant follow its own rules in divesting [appellant] of his stock options?" (App. Br. at 1.) Appellant even *admits* that the District Court correctly applied an arbitrary-or-capricious review, and that the only issue here is whether the Company acted arbitrarily, capriciously, or in bad faith when terminating his stock options: "Regardless of whether de novo or deferential is the standard, clearly a decision contrary to the express language of

different. It is apparent that the Company acted with the utmost reasonableness when cancelling appellant's stock options because of his "gross misconduct" — specifically, continued, unwanted advances toward, and threats of rape against, Ms. Liu — and that his gross misconduct "materially and demonstrably" injured the Company's business relationship with Practical. The Company's decision would therefore withstand scrutiny under *any* standard of review.

The District Court correctly concluded that appellant could not show that the Company "breached a contractual duty when it terminated his stock options pursuant to Section 6(f)(B) of the [P]lan." (A-831.) Appellant disagrees, arguing that the Company failed to "follow its own rules in divesting [him] of his stock options."[17] (App. Br. at 1.) As best as can be discerned, appellant argues that

---

the plan is 'arbitrary and capricious' on its face." (*Id.* at 3.) Accordingly, this Court need not even address the issue. *See Mortimer Off Shore Servs. v. The F.R.G.*, 615 F.3d 97, 103 n.9 (2d Cir. 2010) (refusing to address argument as abandoned when it was not asserted on appeal); *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 380 n.6 (2d Cir. 2003) (holding party abandoned an argument by failing to raise it in its appellate brief).

17. Appellant appears to challenge the process by which his stock options were cancelled. (App. Br. at 3.) This argument is beside the point and misrepresents the terms of the Plan. The Plan unambiguously provides that once an employee is discharged for cause — as appellant was here — the employee's stock options "shall immediately be cancelled effective as of the date of termination of his employment." (A-312.) In other words, once an employee is terminated for cause, the Plan requires no subsequent determination. This fact alone renders irrelevant appellant's contention that "under Sharkley [sic] V. [sic] Ultramar Energy, when an unauthorized party makes a factually challenged determination the appeal is heard on a de novo basis." (App. Br at 3 (citation

(i) his conduct, though "inappropriate," did not rise to the level of "gross misconduct"; and (ii) the Company failed to show that his "inappropriate" conduct resulted in a requisite level of damage to the Company.[18]  (*Id.* at 3, 6, 8-9.) Appellant essentially wants this Court to step in and determine whether he engaged in gross misconduct when he, among other things, informed Ms. Liu that he "could rape" her.  Appellant's argument is entirely unsupported by the record and should be rejected out of hand.

The terms of the Plan are clear: "If an employee Participant is discharged for Cause . . . all his options shall immediately be cancelled effective as of the date of

omitted).)  Appellant, moreover, completely undermines the contention earlier in his brief by repeatedly admitting that the District Court correctly applied the arbitrary-or-capricious standard.  (App. Br. at 2-3.)  In any event, appellant's attempted reliance on *Sharkey* is misplaced.  *Sharkey* involved a claim that ERISA pension benefits were improperly withheld in that case; this Court explained that, under ERISA, when a party not authorized by the ERISA plan denies benefits, that decision is reviewed *de novo*.  70 F.3d 226, 229-30 (2d Cir. 1995) (citing cases). Stock option plans, such as the Plan here, are not governed by ERISA, however. (A-305 through A-322.)  *See Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 187, 189 (3d Cir. 2003) (stating that "most courts have uniformly held that an incentive stock option plan is not an ERISA plan," and holding that the stock option plan at issue was not governed by ERISA); JAYNE E. ZANGLEIN & SUSAN J. STABILE, ERISA LITIGATION 73 (3d ed. 2008) (discussing cases).  *Sharkey* thus has no bearing on the issues at hand.

18.    Appellant suggests that the Company bore the burden of establishing that his misconduct caused it "'substantial and demonstrable' damage."  (App. Br. at 3.)  Appellant, though, provides no support for this assertion.  In fact, appellant's assertion contradicts the express terms of Section 6(b) of the Plan, which states that an employee forfeits his or her stock options when his or her employment is terminated for "gross misconduct which is materially and demonstrably injurious to the Company."  (A-312 through A-313.)

termination of his employment."[19] (A-312.) The Plan continues that "a discharge for 'Cause' shall have occurred where a Participant is terminated because of: . . . the Participant's engaging in . . . gross misconduct which is material and demonstrably injurious to the Company."[20] (A-312 through A-313.) Federal and state courts nationwide, including Ohio state courts, agree that a company's interpretation of the terms of non-ERISA employee benefit plans — like the stock-option plan here[21] — must stand unless it was arbitrary, capricious, or made in bad

---

19. At page 6 of his brief, appellant asserts — without any support — that stock options are *not* cancelled upon termination of employment if the termination is for cause. As appellant puts it, "[t]his is clearly not the language" of Section 6(f). (App. Br. at 6.) Appellant misrepresents the record. Section 6(f) clearly states, "If an employee Participant is discharged for Cause . . . all his options shall immediately be cancelled effective as of the date of termination of his employment." (A-312.)

20. In the *one* instance that appellant cites to the record in his brief, he refers to the Declaration of Ms. Wilczewski to support his claim that he "was terminated pursuant to Section 6(f)A of the plan." (App. Br. at 7.) Appellant again misrepresents the record. Contrary to appellant's contentions, paragraph 17 of Ms. Wilczewski's Declaration states that she informed him that "he could not exercise his stock options because they had been forfeited by virtue of Section 6(f) of the Plan." (A-340 through A-341.) In fact, Ms. Wilczewski's Declaration does not mention Section 6(f)(A) at all. (A-336 through A-342.) Although Ms. Wilczewski briefly mentioned Section 6(f)(A) in passing in her letter to appellant explaining that he had forfeited his stock options, she mentioned the provision only when providing the entire definition of "discharge for Cause" under the Plan. (A-295.) Thus, appellant is wrong when stating that there is an "issue of fact" as to "whether [he] was terminated pursuant to 6(f)A or 6(f)B." (App. Br. at 7.)

21. At pages 2 and 3 of his brief, appellant cites to two cases that, according to him, "clearly set forth the standard of review of ERISA benefit plans": *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), and *Perez v. Aetna Life Insurance Co.*, 96 F.3d 813 (6th Cir. 1996). Appellant's insistence that

faith. *See State ex rel. Merrill v. Greenbaum*, 84 N.E.2d 253, 255 (Ohio Ct. App. 1948) (holding that public pension fund's decision to withhold benefits from retired employee may be overturned only if it is "capricious, arbitrary, or unreasonable"); *accord Noonan v. Staples, Inc.*, 556 F.3d 20, 33-34 (1st Cir. 2009) (holding that, under Massachusetts law, when employees are fired for cause, employers' denial of employees' stock options per terms of stock option plan must stand unless it was "arbitrary, capricious, or made in bad faith"); *Weir v. The Anaconda Co.*, 773 F.2d 1073, 1078 (10th Cir. 1985) (holding that, under Kansas law, plan "committee's decision [to terminate stock options] must be upheld if it was properly within the committee's discretion and not arbitrary, in bad faith, or fraudulent"); *Welland v. Citigroup, Inc.*, No. 00 CV 0738(NRB), 2003 WL 22973574, at *11-*12 (S.D.N.Y. Dec. 17, 2003), *aff'd*, 116 F. App'x 321, 322 (2d Cir. 2004) (summary order) (holding that, under New York state law, employers' decision to terminate employees' unvested stock options must stand unless it was "arbitrary and capricious.").

Appellant cannot show that the Company's decision to cancel his stock option was arbitrary, capricious, or made in bad faith. Appellant's reprehensible

the "standard of review of ERISA benefits plans" is relevant to this case is puzzling. As explained *supra*, note 17, the Plan is not governed by ERISA. Appellant's citations to *Firestone* and *Perez* accordingly are misplaced. And, in any event, *Perez* is no longer good law; the Sixth Circuit vacated its opinion and judgment in that case in *Perez v. Aetna Life Insurance Co.*, 106 F.3d 146, 146 (6th Cir. 1997).

actions easily constituted "gross misconduct," and that "gross misconduct" unquestionably "materially and demonstrably" harmed the Company's business relationship with Practical. But regardless of how stringently one reviews the forfeiture of appellant's stock options, an abundance of undisputed evidence shows that the Company acted reasonably.[22]

All parties agree that, on several occasions, appellant made unwelcome sexual advances toward Ms. Liu and forced himself on her against her will. (A-182 through A-183; A-345 through A-346.) Appellant did not just make a "pass," as he flippantly puts it in his brief. (App. Br. at 1.) Nor did he merely make a "sexual overture." (*Id.* at 8.) He did not leave Ms. Liu's room "without any incident." (*Id.* at 1.) And the entire, vulgar ordeal was not merely an "inappropriate" and "awkward event." (*Id.*) Appellant told Ms. Liu that he could "*rape her*" while, in his underwear in her room, he grabbed her body, despite her protests and as she lay unable to move from illness, and left her alone only after

---

22. Appellant devotes two pages of his brief apparently discussing general rules of contract construction. (App. Br. at 4-5.) However, appellant provides no authority for the basis of his many assertions, ironically explaining that to do so "would be an insult to the Court." (*Id.* at 4.) Nor does appellant explain how his discourse even applies to his challenge to the District Court's decision. (*Id.* at 4-5.) Appellant's argument, therefore, "is tantamount to an 'invitation [for this Court] to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant.'" *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) (per curiam) (quoting *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (per curiam)). This Court should disregard appellant's argument on this point in its entirety. *Id.*

she screamed at him.  (A-183; A-346; A-578 through A-579; A-621.)  Appellant's

behavior was so contemptible that it easily rose to the level of "gross misconduct."

The Company's investigation confirmed appellant's conduct.[23]  (A-186

through A-187.)  That investigation included interviewing Ms. Liu, reviewing the

tawdry e-mails and text messages that appellant sent to Ms. Liu, and interviewing

appellant himself.  (A-186 through A-187; A-349 through A-353; A-356 through

A-369.)  Indeed, during that investigation, appellant volunteered that he visited Ms.

Liu's hotel room, touched her, and told her, "When you do things like that (with

your legs), one could rape you."  (A-188; A-404; A-578 through A-579.)

As appellant himself admits, "Courts have quite routinely upheld sexual

harassment as grounds for termination," and that "[s]uch conduct clearly is

---

23.    Appellant contends that he was denied his stock options "with no
investigation concerning the requirement to allege demonstrable loss to [the
Company]," which, appellant insists, is required by the Plan.  (App. Br. at 4.)  But
the Plan does not require "gross misconduct" to result in "demonstrable loss";
rather, "gross misconduct" need only be "materially and demonstrably injurious to
the Company."  (A-313.)  This distinction is important because the Plan accounts
for injuries that are unquantifiable and yet nevertheless harm the Company — for
instance, injuries to the Company's business relationships and the Company's
reputation as a whole, as here when Practical was offended, demanded that
appellant be replaced, and stated that it was "very disappointed" with its business
relationship with the Company.  (A-187; A-330.)  Indeed, a substantial portion of
the record is composed of documents that detail the thorough investigation that the
Company undertook regarding appellant's gross misconduct and the material and
demonstrable harm that he caused *vis-à-vis* the Company's business relationship
with Practical and reputation as a company.  (*See, e.g.*, A-186 through A-187; A-
294; A-330 through A-333; A-349 through A-353; A-356 through A-369; A-404;
A-578 through A-579; A-640 through A-641.)

29

adequate basis for termination." (App. Br. at 8.) But appellant's behavior went far beyond "sexual harassment." His grievous behavior not only violated the Company's policy against harassment and PVPs, but also damaged the Company's business relationship with Practical — a fact that appellant ignores entirely in his brief. (A-187 through A-189; A-339; A-387.) Appellant engaged in his gross misconduct at a time when the relationship between the Company and Practical was strained. (A-187; A-330 through A-333; A-512 through A-513.) And once Practical's Chairman, Mr. Yau, learned of appellant's harassment of Ms. Liu, he sent an e-mail to the Company's Senior Purchasing Manager, stating that he was "very upset" by appellant's behavior, that appellant was no longer welcome at Practical, and that the Company should send another Quality Assurance Manager to perform future audits. (A-187; A-294; A-640 through A-641.) Mr. Yau even informed the Company's Associate Director for the Duracell Division that Practical was "very disappointed" with its business relationship with the Company. (A-187; A-330.) In other words, because appellant acted as the Company's "face" to Practical while auditing Practical's facilities, his sexual misconduct was imputed to the Company itself, and consequently harmed the Company's reputation as a business partner to Practical. These undisputed facts unquestionably show that appellant's gross misconduct was "materially and demonstrably injurious" to the Company.

Given these facts, the Company's decision that appellant engaged in "gross misconduct" that harmed the Company is amply supported. In an analogous context, federal courts have concluded that a management employee — such as appellant — engages in "gross misconduct" when he or she undertakes "'substantial deviation from the high standards and obligations of a managerial employee that would indicate that said employee cannot be entrusted with his management duties without danger to the employer.'" *Bryant v. Food Lion, Inc.*, 100 F. Supp. 2d 346, 376 (D.S.C. 2000) (quoting *Karby v. Std. Prods. Co.*, Civ. A. No. 3:90-2918-17, 1992 WL 333931, at *6 (D.S.C. June 22, 1992)) (denying COBRA coverage to employee who demonstrated "repeated insubordination" in "his position as assistant store manager" on the basis that employee's actions constituted "gross misconduct"). Appellant's deviation from his managerial duties — from his duties as the "face" of the Company — could not be any more stark in this case. Because of his unacceptable behavior, appellant could not be entrusted with his management duties without danger to the Company as his employer; indeed, appellant exposed the Company to legal risk, damaged its business relationship with Practical at a time where the relationship was tenuous at best, and further exposed the Company to reputational harm. *Cf. Zickafoose v. UB Servs., Inc.*, 23 F. Supp. 2d 652, 656-57 (S.D. W. Va. 1998) (denying COBRA coverage on "gross misconduct" grounds where manager's assault of female

employee "cast[] serious doubt upon the manager's capacity for responsible decision making"). On these incontrovertible facts, the Company's conclusion that appellant engaged in "gross misconduct" was more than reasonable. Appellant thus was correctly denied his stock options on the date that his employment was terminated, and his attempt to recoup those forfeited stock options fails.

## III.   APPELLANT'S UNDEVELOPED "ARGUMENT" THAT HE WAS WRONGLY DENIED SUMMARY JUDGMENT IS FRIVOLOUS.

Despite the abundance of undisputed evidence showing that the Company reasonably terminated appellant's stock options, appellant argues that the District Court erred in denying his Cross Motion for Summary Judgment. (App. Br. at 4.) However, appellant's "argument" is no argument at all. Rather, it merely is *one sentence* that states — without any support whatsoever — that "uncontested and incontrovertible facts" before the District Court supported his motion: "Cicvara, in his cross motion, has demonstrated that he was denied stock options, 'automatically' (a word used by Gillette) with no investigation concerning the requirement to allege demonstrable loss to Gillette."[24] (*Id.*) That is all.

Appellant's one-sentence challenge to the District Court's judgment is nothing more than a misplaced attempt to incorporate by reference the arguments

---

24.   As detailed *supra*, note 23, appellant misstates the Plan and misrepresents the record when asserting that the Company undertook "no investigation concerning the requirement to allege demonstrable loss to [the Company]." (App. Br. at 4.)

that he attempted to advance in his Cross Motion for Summary Judgment.[25]   On numerous occasions, this Court has denounced such tactics, explaining that "merely incorporating an argument made to the district court does not preserve a question for appellate review." *Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996), *vac'd on other grounds*, 521 U.S. 1114 (1997); *accord Callon Petroleum Co. v. Nat. Indemnity Co.*, No. 11-241-cv, 2012 WL 2549500, at *1 (2d Cir. July 3, 2012) ("If an argument is not made, we need not guess as to what that argument might have been."); *McCarthy v. SEC*, 406 F.3d 179, 186 (2d Cir. 2005) ("[A]rguments not raised in an appellant's opening brief . . . are not properly before an appellate court even when the same arguments were raised in the trial court.").   In fact, the Court has held repeatedly that it will not address any argument incorporated by reference.   *See Callon*, 2012 WL 2549500, at *1 (holding that, where appellant did "not even hint at why it believe[d] that the district court erred," the Court would "not consider, let along decide the merits of, [appellant's] claim"); *Sioson*, 303 F.3d at 460 ("Nor will we take the absence of an argument on appeal as an invitation to dig up and scrutinize anew the memorandum in opposition to summary judgment that Appellant submitted to the

---

25.    Indeed, the vast majority of appellant's opening brief is merely a verbatim reproduction of the summary judgment memorandum that he submitted to the District Court.  (*Compare* App. Br., *with* A-727 through A-733.)

court below."). The Court should likewise disregard appellant's one-sentence "argument" here.

Appellant's bald contention that his Cross Motion for Summary Judgment is "supported entirely with uncontested and incontrovertible facts" nevertheless fails. In fact, he ignores that "uncontested and incontrovertible facts" overwhelmingly support judgment for *the Company*. *See supra*, Section.II. Plaintiffs' contention that his Cross Motion for Summary Judgment is "supported entirely with uncontested and incontrovertible facts" — without more — has "no chance of success." *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995) (internal quotation marks omitted). Appellant's argument is frivolous, and this Court should reject it as such. *See id.*

## IV. In Any Event, This Court Should Dismiss The Appeal For Appellant's Abject Failure To Comply With The Federal And Local Rules.

In addition to the many reasons why this Court should affirm the judgment of the District Court, this Court should refuse to consider appellant's opening brief for his utter failure to ensure that it satisfies the requirements of both Fed. R. App. P. 28 and 2d Cir. R. 28.1. Among its numerous deficiencies, appellant's brief contradicts the vast majority of the requirements listed in Fed. R. App. P. 28(a) by:

- Providing an incomplete table of authorities that does not include all of the authorities cited in the brief, such as *Perez v. Aetna Life Insurance Co.*, 96 F.3d 813 (6th Cir. 1996), which appellant cites on page 3, and a publication

apparently titled "*Sexual Harassment*" authored by "Alden and Moore," which appellant cites on page 7.[26] *See* Fed. R. App. P. 28(a)(3).

- Failing to include any Jurisdictional Statement. *See* Fed. R. App. P. 28(a)(4).

- Failing to include any Statement of Issues presented for review. *See* Fed. R. App. P. 28(a)(5).

- Failing to include any Statement of the Case. *See* Fed. R. App. P. 28(a)(6).

- Failing to include any Statement of Facts that includes proper citations to the record. *See* Fed. R. App. P. 28(a)(7).

- Failing to include any Summary of his Argument. *See* Fed. R. App. P. 28(a)(8).

- Failing to present any Argument that contains (a) sufficient citations to the parts of the record upon which appellant relies, *see* Fed. R. App. P. 28(a)(9)(A); and (b) a concise statement of the applicable standard of review, *see* Fed. R. App. P. 28(a)(9)(B). In fact, throughout his entire brief, appellant attempts to cite to the record only once. (App. Br. at 7.) And as noted above, appellant *misrepresents* that portion of the record. *See supra*, note 20.

*See also supra*, note 2. The deficiencies in appellant's brief go much deeper than violations of the Federal Rules, however. Taken in its entirety, appellant's brief fails entirely in attempting to convey his position on appeal. Appellant has not even clearly framed for this Court the issue on appeal. *See* 2d Cir. R. 28.1(a) ("A

---

26.    Despite its best attempts, due to appellant's deficient citation to this purported publication the Company has been unable to locate and to review it.

brief must be concise, logically arranged with proper headings, and free of irrelevant matter."). Appellant, moreover, does not even attempt to advance an argument that the District Court incorrectly denied his Cross Motion for Summary Judgment beyond what he has already argued before the District Court. In short, appellant has completely flouted the Federal and Local Rules when submitting his opening brief. Thus, this Court would be well within its authority to disregard appellant's opening brief and dismiss this appeal, and should do so here. *See, e.g.*, 2d Cir. R. 28.1(a) ("The court may disregard a brief that does not comply with this rule."); *Sioson*, 303 F.3d at 459-60 (dismissing appeal "in a counseled case" for appellant's failure to comply with Fed. R. App. P. 28(a)).

## CONCLUSION

For each of the reasons advanced above, the Company respectfully requests that this Court **AFFIRM** the District Court's Judgment, granting the Company's Motion for Summary Judgment, and denying appellant's Cross Motion for Summary Judgment.

DATED:    Chicago, Illinois
               August 24, 2012

SEYFARTH SHAW LLP

By:   /s/ Richard B. Lapp

Richard B. Lapp (rlapp@seyfarth.com)
131 South Dearborn Street
Suite 2400
Chicago, Illinois  60603
Phone:  (312) 460-5000
Fax:      (312) 460-7000

*Attorneys for Defendants-Appellees Procter & Gamble Co. and The Gillette Co.*

37

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,635 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(f), and type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14-point, proportionally spaced typeface, specifically, Times New Roman.

DATED:  Chicago, Illinois
        August 24, 2012

                        SEYFARTH SHAW LLP

                        By:    /s/ Richard B. Lapp                        

                        Richard B. Lapp (rlapp@seyfarth.com)
                        131 South Dearborn Street
                        Suite 2400
                        Chicago, Illinois  60603
                        Phone:  (312) 460-5000
                        Fax:      (312) 460-7000

                        *Attorneys for Defendants-Appellees Procter &
                        Gamble Co. and The Gillette Co.*